## IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF COLUMBIA

EDHAM MAMET,

and

IBRAHIM MAMET, as Next Friend of EDHAM
MAMET,

               Petitioner/Plaintiff,

               v.

GEORGE W. BUSH, *et al.*,

               Respondents/Defendants.

Case No. 1:05-cv-01602-ESH

---

### PETITIONER'S MOTION FOR ORDER TO SHOW CAUSE AND FOR ENTRY OF PROTECTIVE ORDER

      Petitioner Edham Mamet (hereinafter "Petitioner"), acting on his own behalf and through

his Next Friend, Ibrahim Mamet, respectfully requests that the Court (A) issue an Order to Show

Cause why the writ of *habeas corpus* should not be granted, returnable by Respondents in three

days, and (B) enter three orders in this case originally entered in *In re Guantanamo Detainee*

*Cases*: the November 8, 2004 Amended Protective Order and Procedures for Counsel Access to

Detainees at the United States Naval Base in Guantanamo Bay, Cuba; the November 10, 2004

Order Addressing Designation Procedures for "Protected Information"; and the December 13,

2004 Order Supplementing and Amending Filing Procedures Contained in November 8, 2004

Amended Protective Order.

## BACKGROUND

Petitioner is a prisoner at the United States Naval Station at Guantánamo Bay, Cuba

("Guantánamo"), where, upon information and belief, he has been held by the United States for

more than three years. During this time, he has been held virtually *incommunicado* and without

access to counsel. On July 29, 2005, undersigned counsel filed a Petition for Writ of Habeas

Corpus ("Petition") on behalf of Petitioner pursuant to 28 U.S.C. §§ 2241 and 2242, charging

that Petitioner is being detained in violation of the Constitution, laws and treaties of the United

States, and international law.

Petitioner is believed to be Uighur ("WEE-ghur"), a Turkic Muslim minority group living

in western China that has been brutally oppressed by the communist Chinese government.

According to public reports, the United States is currently incarcerating approximately twenty-

two Uighurs at Guantánamo. *Devastating Blows, Religious Repression of Uighurs in Xinjiang*,

17 HUMAN RIGHTS WATCH 2, § II, at 22-23 (2005) (attached at Ex. 1). Many of these men—

according to press reports, fifteen or more—have been determined by the government not to be

"enemy combatants,"[1] or a threat to the security of the United States. *See* Robin Wright, *Chinese*

*Detainees Are Men Without a Country: 15 Muslims, Cleared of Terrorism Charges, Remain at*

*Guantanamo With Nowhere to Go*, WASH. POST, Aug. 24, 2005 ("In late 2003, the Pentagon

quietly decided that 15 Chinese Muslims detained at the military prison at Guantanamo Bay,

Cuba, could be released.") (hereinafter "Wright Article") (attached at Ex. 2); Interview with

Gordon England, Secretary of the Navy, in Washington, D.C., at 3 (Mar. 29, 2005) ("I think it

---

[1] The government defines an "enemy combatant" as "an individual who was part of or supporting the Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." Paul Wolfowitz, Deputy Secretary of Defense, Memorandum for the Secretary of the Navy, Order Establishing Combatant Status Review Tribunal (July 7, 2004) (hereinafter "Wolfowitz Order") (attached at Ex. 3).

has been reported we have Uighurs from China that we have not returned to China, even though, you know, some of those have been deemed, even before these hearings, to be non-enemy combatants because of concerns and issues about returning them to their country.") (hereinafter "England Interview") (attached at Ex. 4); Demetri Sevastopulo, *Cheney backs Guantanamo Bay jail amid growing unease*, FIN. TIMES, June 14, 2005 ("The US is holding about 550 detainees at Guantanamo, including about a dozen Uighur Chinese whom the US has determined are no longer 'enemy combatants.'") (attached at Ex. 5).

There is substantial reason to believe that Respondents have already determined—months and possibly even years ago—that Petitioner is not an "enemy combatant" and should be released. *See, e.g.*, Wright Article (stating that the government knew that the Uighurs were not enemy combatants as of late 2003); England Interview at 3 (acknowledging that several of the Uighur detainees had been deemed non enemy combatants "even before the [government] hearings"); Interview with Colin Powell, Secretary of State, in Washington, D.C., at 5 (Aug. 12, 2004) ("[T]he Uighurs are a difficult problem and we are trying to resolve all issues with respect to all detainees at Guantanamo. The Uighurs are not going back to China, but finding places for them is not a simple matter, but we are trying to find places for them. And we are trying to find places for them, and, of course, all candidate countries are being looked at.") (attached at Ex. 6); *U.S.: Don't Send Detainees Back to China*, HUMAN RIGHTS NEWS (Human Rights Watch, New York, N.Y.) Nov. 26, 2003 ("The United States apparently is considering sending the Uighurs to China because it believes they do not constitute a threat to the United States and presumably have committed no crimes.") (attached at Ex. 7). In light of this concern, Petitioner's counsel has questioned Respondents as to whether Petitioner has been determined not to be an "enemy combatant," or no longer a threat to the United States. *See* E-Mail from Jason S. Pinney to

Andrew Warden and Terry Henry (Sept. 7, 2005) (attached at Ex. 8).  To date, the government

has not responded to this request.

The government admits to imprisoning people at Guantánamo long after they have been

found by the government's own Combatant Status Review Tribunals ("CSRTs") not to be

"enemy combatants."[2]  Indeed, the government has admitted as much in open court in a *habeas*

case brought by two such men.  *See Qassim, et al. v. Bush, et al.* (Civ. No. 05-497 (JR))

(hereinafter "*Qassim*"), Resp'ts' Mem. in Opp'n to Pet'rs' Mot. to Vacate Stay Order and Issue

Writ Directing Immediate Release of Pet'rs at 1 ("It is correctly noted in Petitioners' motion that

[CSRTs] have recently determined that Petitioners are no longer classified as enemy

combatants.") (attached as Ex. 10).  Despite the fact that the petitioners in *Qassim* have been

judged to not be "enemy combatants," the government continues to hold them indefinitely

without any promise of timely release.  *See Qassim* Tr. of Aug. 25, 2005, Status Conference

before the Hon. James Robertson at 18 ("[O]ur position would be that we can continue to hold

them in Camp Iguana or something like it *as long as it takes.*") (emphasis added) (attached at Ex.

11).

Furthermore, in *Qassim*, the government knowingly failed to inform the Court or

petitioners' counsel that their clients had been cleared by the CSRTs despite repeated requests by

counsel as to their clients' status.  *See Qassim* Tr. of Aug. 1, 2005, Mot. Hearing before the Hon.

James Robertson at 3 (hereinafter "*Qassim* August 1, 2005 Tr.") (attached at Ex. 12); *Qassim*

Memo. in Support of Pet'rs' Emergency Mot. to Vacate Stay Order and Issue Writ Directing

---

[2]  Since July 2004, the government has conducted CSRT hearings to review the status of each person
incarcerated at Guantánamo.  *See generally* Wolfowitz Order; *see also* Gordan England, Secretary of the
Navy, Memorandum for Distribution for Implementation of Combatant Status Review Tribunal
Procedures for Enemy Combatants detained at Guantanamo Naval Base, Cuba (July 29, 2004) (attached
at Ex. 9).

Immediate Release of Pet'rs at 1-2 (hereinafter "*Qassim* Motion") & accompanying Decl. by Sabin Willett (attached as Ex. 13). Moreover, even after the *Qassim* petitioners' CSRT proceedings had been concluded, the government continued to intimate to this Court that the petitioners were "enemy combatants." *See Qassim* August 1, 2005 Tr. At 20; *Qassim* Motion at 3. In fact, petitioners' counsel in *Qassim* only learned that their clients had been cleared by the CSRTs while visiting them in Guantánamo. *See Qassim* Motion at 6. To date, the government still refuses to provide petitioner' counsel in *Qassim* with copies of their clients' CSRT reports.

The government's conduct in *Qassim* demonstrates why it is so critical to require the Respondents to show cause in the present case. As it did in *Qassim*, the government has refused to state whether it believes Petitioner Mamet is an enemy combatant or whether he has been cleared for release [Check]. Despite this refusal, the government continues to acknowledge that many, if not all, of the Uighurs held at Guantánamo have been cleared by the CSRTs months if not years ago. Absent an Order to Show Cause, the government could continue to detain the Petitioner indefinitely without disclosing to the Court or Petitioner's counsel, that it has itself determined that it has no lawful basis for doing so.

## DISCUSSION

### A. <u>Order to Show Cause</u>

Pursuant to 28 U.S.C. § 2243, a court "shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto." The writ or order to show cause "*shall be returned within three days* unless for good cause additional time, not exceeding twenty days, is allowed." 28 U.S.C. § 2243 (emphasis added).

The United States Supreme Court has affirmed that Petitioner is entitled to challenge his incarceration via an application for the Great Writ. *Rasul v. United States*, 124 S. Ct. 2686, 2699 (2004) (upholding the jurisdiction of federal courts "to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing"). Indeed, the *Rasul* Court could not have been plainer in its mandate that this Court address the merits of the Guantánamo detainee cases, and hold a hearing. The Court (1) observed that "Petitioners' allegations . . . unquestionably describe custody in violation of the Constitution or laws or treaties of the United States," *id.* at 2698 n.15, (2) held that 28 U.S.C. § 2241 confers on the district court jurisdiction to "hear Petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base," *id.*, (3) directed the government to "make [its] response to the merits of Petitioners' claims," *id.* at 2689, and (4) "remand[ed] for the district court to consider in the first instance the merits of the Petitioners' Claims." *Id.*

These words are plain. The government is to respond, and the district court is to hear the case. Thus, *Rasul* supports entry of an Order to Show Cause in this instance so that the District Court can finally begin to do what the Supreme Court instructed more than a year ago: direct the government to make a response and address the merits of the case.[3] There is no reason for further delay—certainly not when the government has a record of obfuscating the truth, and knowingly continuing to imprison men who have been exonerated by its own military tribunal. And while *habeas* claims should always receive "a swift, flexible, and summary determination,"

---

[3] At least nine judges have issued show-cause orders notwithstanding entry of a stay. *See, e.g., El-Mashad v. Bush*, 05-CV-0270 (JR) (Apr. 7, 2005) (dkt no. 29); *Abdullah v. Bush*, 05-CV-0023 (RWR) (Apr. 8, 2005) (dkt no. 24); *Ameziane v. Bush*, 05-CV-0833 (ESH) (Apr. 12, 2005) (dkt no. 12); *Al-Anazi v. Bush*, 05-CV-0345 (JDB) (Apr. 21, 2005) (dkt no. 21); *Al Joudi v. Bush*, 05-CV-0301 (GK) (Apr. 29, 2005) (dkt no. 26); *Al Mohammad v. Bush*, 05-CV-0247 (HHK) (Apr. 30, 2005) (dkt no. 18); *Battayav v. Bush*, 05-CV-0714 (RBW) (May 19, 2005) (dkt no. 12); *Al-Wazan v. Bush*, 05-CV-0329 (PLF) (June 14, 2005) (dkt no. 37); *Hatim v. Bush*, 05-CV-1429 (RMU) (Aug. 22, 2005) (dkt no. 16).

*Preiser v. Rodriguez*, 411 U.S. 475, 495 (1973), the facts of this case require an especially expeditious adjudication as there is a significant likelihood that Petitioner has been cleared by the government, and yet continues to be held *incommunicado* with no immediate prospect of release.

**B.  Amended Protective Order and Order Addressing Designation Procedures**

On November 8, 2004, in *In re Guantanamo Detainees Cases*, United States District Court Senior Judge Joyce Hens Green entered an Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba (hereinafter "Amended Protective Order") (attached at Ex. 14).  This protective order was designed to protect the legitimate security concerns of the government, and establish procedures that must be followed by all *habeas* counsel.  *See* Amended Protective Order at 1-2.  On November 10, 2004, Judge Green also entered an Order Addressing Designation Procedures for "Protected Information" (attached at Ex. 15), and on December 13, 2004, Judge Green issued an Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order (attached at Ex. 16).

The entry of these Orders in the present case will serve to protect the government's legitimate interest in protecting sensitive information from public dissemination, and also to ensure that the Petitioner's counsel has guidelines to follow in communicating with its clients. On information and belief, Judge Green's Orders have been entered in every longstanding Guantánamo *habeas* case pending in the United States District Court for the District of Columbia, and the parties agree that the Orders should be entered in this case.  *See* E-Mail from

Andrew Warden to Susan Baker Manning (Aug. 11, 2005) (attached at Ex. 17).[4]

## CONCLUSION

It's time to face the very real possibility that the United States Government has been knowingly imprisoning innocent men for years, and that they have actively concealed this information from this Court and the general public. Without factual returns or a hearing, no one will ever know. Accordingly, for the above-stated reasons and for any other reason that may become known to the Court, Petitioner respectfully requests that the Court direct the Writ or an Order to Show Cause be issued, returnable by Respondents in three (3) days, and that the Court enter Judge Green's Orders as agreed to by the parties.

---

[4] Petitioner reserves the right to seek appropriate relief from the Orders, including increased access to contact with counsel and family members, including his next friend and brother, in the event it is revealed that he is not an "enemy combatant" or not considered a threat to the security of the United States.

Dated:  September _14_, 2005

Of Counsel:

Barbara Olshansky
Deputy Director
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone:    (212) 614-6439

Sabin Willett
Neil G. McGaraghan
Jason S. Pinney
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726
Telephone:    (617) 951-8000
Facsimile:    (617) 951-8925

Susan Baker Manning
Hope M. Jarkowski
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC  20036-3406
Telephone:    (202) 778-6150
Facsimile:    (202) 778-6155

David A. Peters
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103
Telephone:    (860) 240-2700
Facsimile:    (860) 240-2800

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EDHAM MAMET,

and

IBRAHIM MAMET, as Next Friend of EDHAM
MAMET,

       Petitioner/Plaintiff,

       v.

GEORGE W. BUSH
    President of the United States
    The White House
    1600 Pennsylvania Avenue, N.W.
    Washington, D.C. 20500;

DONALD RUMSFELD
    Secretary, United States
    Department of Defense
    1000 Defense Pentagon
    Washington, D.C. 20301-1000;

ARMY BRIG. GEN. JAY HOOD
    Commander, Joint Task Force - GTMO
    JTF-GTMO
    APO AE 09360; and

ARMY COL. MIKE BUMGARNER
    Commander, Joint Detention
    Operations Group, JTF - GTMO
    JTF-GTMO
    APO AE 09360,

       Respondents/Defendants.

Case No. 1:05-cv-01602-ESH

**DECLARATION OF JASON STILES PINNEY RE PETITIONER'S MOTION FOR ORDER TO SHOW CAUSE AND FOR ENTRY OF PROTECTIVE ORDER**

I, Jason Stiles Pinney, declare as follows:

    1.    I am over 18 years of age. I have personal knowledge of the facts stated herein, except those stated on information and belief, and, if called upon, could and would testify competently to them. I make this declaration in support of Edham Mamet's (hereinafter

"Petitioner"), acting on his own behalf and through his Next Friend, Ibrahim Mamet, Motion for Order to Show Cause and for Entry of Protective Order. I am associated with Bingham McCutchen LLP, counsel for Petitioner.

2.      A true and correct copy of *Devastating Blows, Religious Repression of Uighurs in Xinjiang*, 17 HUMAN RIGHTS WATCH 2, § II (2005), (available at http://hrw.org/reports/2005/china0405/china0405text.pdf) is attached as Exhibit 1.

3.      A true and correct copy of an article by Robin Wright, *Chinese Detainees Are Men Without a Country: 15 Muslims, Cleared of Terrorism Charges, Remain at Guantánamo With Nowhere to Go*, WASH. POST, Aug. 24, 2005, is attached as Exhibit 2.

4.      A true and correct copy of Paul Wolfowitz's, Memorandum for the Secretary of the Navy, Order Establishing Combatant Status Review Tribunal dated July 7, 2004, is attached as Exhibit 3.

5.      A true and correct copy of a Department of Defense posting of an Interview with Gordon England, Secretary of the Navy, in Washington, D.C., dated March 29, 2005 (available at http://usinfo.state.gov/dhr/Archive/2005/Apr/01-23233.html), is attached as Exhibit 4.

6.      A true and correct copy of a June 14, 2005, *Financial Times USA* article by Demetri Sevastopulo entitled "*The Americas: Cheney Backs Guantánamo Prison Amid Growing Unease*" is attached as Exhibit 5.

7.      A true and correct copy of an interview dated August 12, 2004, from the U.S. Department of State entitled *Roundtable with Japanese Journalists* (with Secretary Colin L. Powell) (available at http://www.state.gov/secretary/former/powell/remarks/35204.htm) is attached as Exhibit 6.

8.      A true and correct copy of a November 26, 2003, *Human Rights Watch* article entitled "*U.S.: Don't Send Detainees Back to China*" (available at http://www.hrw.org/press/2003/11/us112603.htm), is attached as Exhibit 7.

9.      A true and correct copy of E-Mail correspondence dated September 7, 2005, from Jason S. Pinney to Andrew Warden and Terry Henry, is attached as Exhibit 8.

10.      A true and correct copy of Gordon England's Memorandum for Distribution for Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantánamo Naval Base, Cuba, dated July 29, 2004, is attached as Exhibit 9.

11.      A true and correct copy of Respondents' Memorandum in Opposition to Petitioners' Motion to Vacate Stay Order and Issue Writ Directing Immediate Release of Petitioners is attached as Exhibit 10.

12.      A true and correct copy of Tr. of Aug. 25, 2005, Status Conference before the Hon. James Robertson, is attached as Exhibit 11.

- 2 -

13.    A true and correct copy of the Transcript of the Motion Hearing Before the Honorable James Robertson United States District Judge, dated August 1, 2005, is attached as Exhibit 12.

14.    A true and correct copy of Memorandum in Support of Petitioners' Emergency Motion to Vacate Stay Order and Issue Writ Directing Immediate Release of Petitioners and accompanying Declaration by Sabin Willett is attached as Exhibit 13.

15.    A true and correct copy of the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba, is attached as Exhibit 14.

16.    A true and correct copy of Order Addressing Designation Procedures For "Protected Information" dated November 10, 2004, is attached as Exhibit 15.

17.    A true and correct copy of Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order dated December 13, 2004, is attached as Exhibit 16.

18.    A true and correct copy of E-Mail from Andrew Warden to Susan Baker Manning (Aug. 11, 2005), is attached as exhibit 17.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on September 14, 2005, in Boston, Massachusetts.

_____
Jason Stiles Pinney

# **EXHIBIT 1**

# Devastating Blows
## Religious Repression of Uighurs in Xinjiang

I. Summary ........................................................................................................... 1
   A note on methodology ................................................................................. 7

II. Background ..................................................................................................... 8
   The political identity of Xinjiang ................................................................. 9
   Uighur Islam ................................................................................................ 10
   A history of restiveness .............................................................................. 11
   The turning point—unrest in 1990, stricter controls from Beijing .............. 12
   Post 9/11: labeling Uighurs terrorists ....................................................... 14
   Literature becomes sabotage ...................................................................... 17
   The international response—acquiescence and quid pro quos ..................... 19

III. National Law and Policy on Religion .......................................................... 23

IV. A Repressive Framework: Regulation of Religion in Xinjiang ..................... 26
   Policies Hidden from the Public ................................................................. 28
   Regulation in 1994-2001: "Keeping a handle on" the imams and party cadres ........... 29
   The 2001 draft amendments to the 1994 Regulations: narrowing the scope of
   "normal" religious activities ...................................................................... 31
   A Manual for Urumqi Municipality Ethnic Religious Work ........................ 40

V. Implementation: Restrictions on Freedom of Religion in Practice ............... 45
   Registration of religious organizations: a no-win situation ........................ 46
   The "reeducation" of imams in 2001 and 2002 ......................................... 47
   Control and conformity: supervision of mosques in 2001 .......................... 52
   The persecution of clerics and the demolition of mosques ......................... 53
   A Case of "Extremism" .............................................................................. 55

VI. Controlling Religion in the Education System ............................................. 56
   Minors barred from "participating in religious activities" in Xinjiang........... 56
   Purging the schools of religion ................................................................... 58
   Enforcement through surveillance .............................................................. 61
   Special campaigns ...................................................................................... 62

VII. Anti-Crime Campaigns and Religious Repression ...................................... 63
   Unrelenting crackdowns ............................................................................ 64
   Sweeps by law enforcement agencies......................................................... 67

VIII. Religious "Offenders" in Detention ......................................................... 69

IX. Freedom of Religion and China's Responsibility under International Law .............. 73

X. Recommendations: ....................................................................................... 77
   To the government of the People's Republic of China: ............................... 77

*Weiwu'er* [维吾尔]. People's names also differ markedly, depending on whether the original name is in Uighur, in Chinese transliteration, or in the abbreviated form used in official documents. Thus, for example, the Uighur name *Abdulkerim* is transliterated in Chinese as *Abbudoukelimu* [阿布都克里木], but will appear as *Abudou* [阿布都] in official documents. Places have different names in Chinese than in indigenous languages. Thus the city of Yining [伊宁] is called Ghulja in Uighur, and Hetian [和田] is known as Khotan.

For the sake of uniform orthography and wider recognition, this report has adopted the official Chinese transliteration of place names in the Xinjiang Uighur Autonomous Region, which we refer to simply as "Xinjiang."

## II. Background

Located in the farthest northwest corner of China, Xinjiang was first formally incorporated into the Chinese empire in 1884. Bordered by eight central Asian countries, in many ways it remains a remote outpost of the People's Republic of China, lagging in many socio-economic indicators and sharing few cultural or historical ties with Beijing.

Xinjiang is the only Chinese province or "autonomous" region with a Muslim majority. Indeed, along with Tibet it is the only administrative region in China in which ethnic Chinese still constitute a minority.

The non-Chinese population of Xinjiang of approximately nine million is almost entirely Muslim. The overwhelming majority of this group, approximately eight million, are Uighurs.

Chinese domination of Xinjiang has never been fully accepted. This is particularly true among Uighurs. A major source of tension has been the large migration of ethnic Chinese to Xinjiang, which many non-Chinese believe has had disastrous effects on local culture, language, and traditions. Many non-Chinese say that as a result they fear being overrun culturally, economically, and politically by ethnic Chinese. Many assert that this is the aim of Chinese state policy.

To understand the way that China has attempted to equate independent Uighur culture and religion with separatism, and by extension with "terrorism," it is useful to

understand the history of the region. The following summary includes a study of China's efforts to economically integrate the area, the role of Islam in Uighur identity, and instances of violent resistance to Chinese rule and government crackdowns.

## The political identity of Xinjiang

The ancestors of the Uighur people were most likely nomadic tribes originating from Mongolia who settled in the oases of the Tarim basin (the southern half of Xinjiang) around the seventh century. They were gradually converted to Islam from the tenth to the seventeenth century. The region was formally annexed to the Manchu Qing Empire in 1759, but effective control was loose due to the numerous uprisings that regularly shook the region. From 1866 to 1876, Xinjiang was under the rule of the Kashgar-based warlord Yakub Beg, before being reconquered in 1877 by the Qing troops and integrated formally into the empire as their "New Dominion," *Xinjiang* [新疆], in 1884. The fall of the Qing Empire in 1911 opened an era of rule by competing local warlords.

In 1944, a Soviet-backed independent East Turkestan Republic (ETR) was set up in the three western districts of Yili, Tacheng, and Ashan, with Yining as the capital. In 1947, it joined in a formal government with the nationalist forces controlling the rest of Xinjiang.

As the outcome of the Chinese civil war turned to the advantage of the Chinese Communists, Stalin, who had little interest in supporting a Muslim nationalist regime in the backyard of his own Central Asian Soviet republics, pressed for negotiations between the East Turkestan Republic and the Chinese Communist Party for a peaceful takeover of Xinjiang. The plane carrying the East Turkestan representatives on their way to Beijing in August 1949 for the negotiations crashed, killing all the occupants in circumstances that have led to widespread suspicion. This removed the local nationalist leaders from the scene and made way for the incorporation of Xinjiang into the newly born People's Republic of China.

Beijing immediately started a policy of large-scale migration into the region, and the proportion of ethnic Chinese increased from 6 percent in 1949 to 41.5 percent by the time of Mao's death in 1976. The relative liberalization of the 1980s initiated by Deng Xiaoping's "Opening and Reform" allowed for greater autonomy for Xinjiang. This included respect for certain cultural and religious practices. Ancient mosques were restored and new ones built, cultural traditions that had gone underground resurfaced, and individual economic activities were tolerated again. The number of Chinese cadre and personnel stationed in Xinjiang began to decrease, and by the end of the 1980s, the

share of the Chinese population had dropped to 37.5 percent. In the 1990s, however, through a combination of economic and land ownership incentives, Beijing engineered a rapid acceleration of the ethnic Chinese influx to Xinjiang. About 1.2 million people settled in Xinjiang during the decade, pushing the proportion of the ethnic Chinese population to 40 percent of the total of some 18.5 million people at present.[4]

Ethnic Chinese migrants have tended to benefit from the economic development of Xinjiang to a far greater degree than Uighurs, a source of much tension. Profound socio-economic disparities between Uighurs and Chinese are reflected in the fact that the former have on average about ten years less life expectancy than the Chinese settlers in the region.[5]

## Uighur Islam

The Uighurs have long practiced a moderate, traditional form of Sunni Islam, strongly infused with the folklore and traditions of a rural, oasis-dwelling population. Today most Uighurs still live in rural communities, although large cities have emerged in the region. Their history as commercial and cultural brokers between the different people connected by the Silk Road (through which Buddhism was introduced to China from India two millennia ago) gave rise to a markedly tolerant and open version of Muslim faith and a rich intellectual tradition of literature, science, and music. Nineteenth-century travelers to Kashgar noted that women enjoyed many freedoms, such as the right to initiate divorce and run businesses on their own

Sufism, a deeply mystical tradition of Islam revolving around the cult of particular saints and transmitted from master to disciples, has also had a long historical presence in Xinjiang. In daily life, Islam represents a source of personal and social values, and provides a vocabulary for talking about aspirations and grievances. The *imam* is traditionally a mediator and a moderator of village life, and performs many social functions as well as religious ones.

---

[4] "Analysis of the characteristics of population migrations in the western regions during the 1990s," *Social Science Review*, vol. 19, no. 2, April 2004, pp. 14-15 [90 年代中后期西部地区千亿人口特征分析，科学纵横，2004 年 4 月（总第 19 卷第 2 期），14-15 页].The Chinese authorities have consistently refused to acknowledge publicly any influx of migrants from interior China into Xinjiang.

[5] The 1990 national census showed that the mortality of ethnic minorities in Xinjiang was 3.6 times higher than for the Han population. Life expectancy was 61.62, against 71.4 for the Han population and 70 for China overall ("The quality and labor situation of the population from Xinjiang ethnic minorities," *Journal of Xinjiang University*, September 1999, vol. 7, no. 3 [新疆少数民族人口的素质与就业，新疆大学学报，1999 年 9 月第 7 卷第 3 期]).

As the borders of Xinjiang became more porous in the 1980s, a number of young Uighurs went clandestinely to Pakistan to receive the religious education they could not obtain under China's policies. Upon their return, they enjoyed great prestige due to their ventures abroad and their knowledge of Koranic theology, far beyond that typical among local imams. Small-scale, localized underground religious organizations started to emerge. A long history of tension and opposition to Chinese domination already existed (see below). In this period it began to take on an Islamic color.

There is no evidence that Salafism, the radical Islamic ideology connected to many *jihadist* movements around the world, has taken root to any significant extent in Xinjiang. Proponents of rebellion against Chinese rule have used the vocabulary of Islam and religious grievances against Beijing to justify their actions. These are not, however, mainstream views.

Recent reports suggest that Hizb ut-Tahrir (Party of Liberation), a movement which advocates the establishment of a pan-Central Asian caliphate and whose headquarters is located in London, has recently made inroads in Southern Xinjiang, but it has so far never advocated violence. Hizb ut-Tahrir is the object of rigorous repression in Uzbekistan and other Central Asian countries. It remains illegal in China.

### A history of restiveness

There has long been strong Uighur objection to Chinese rule in Xinjiang. In the middle of the twentieth century, as noted above, the western part of the region enjoyed independence as the Soviet-aligned East Turkestan Republic and effective control by China was not achieved until shortly after the establishment of the communist state in 1949. As a result, memories of a distinct political and administrative identity are strong in certain areas and among certain sections of the community.

A pan-Turkic ideology inspired the brief life of the modern independent state and, today, the political views of various Uighur groups based in Central Asia or farther afield in Turkey, Germany, and even the United States, remain mainly of pan-Turkic inspiration. These organizations in most cases have secular and democratic aspirations. They come from conventional political traditions and have not supported the use of violence for their objectives, whether for the achievement of "real autonomy" or "independence" for the country they still call East Turkestan. In Xinjiang itself, no unified movement has surfaced. In fact, for reasons of language, geography, and religion (Xinjiang's different Muslim ethnic groups of Kazakhs, Mongols, Tajiks, Chinese-speaking Hui, and Uighurs have distinct places of worship—Hui Mosques, Uighur Mosques, etc.), this is complicated and unlikely. Even if the groups themselves had the

will to join forces, Chinese restrictions on freedom of assembly, the formation of independent organizations, and the publication or circulation of political and cultural materials would make it all but impossible for these groups to acquire a broad base of support or to take on any collective form. No opposition groups are allowed to exist in any public form.

However, a number of small opposition groups are known to exist secretly.[6] They tend to gravitate around two geographic poles: Yining and the Yili valley, in the western part of Xinjiang close to the border with Kazakhstan, and Kashgar and Hetian, in southern Xinjiang. The opposition groups that are present in the southern part of Xinjiang, notably in the Kashgar and Hetian areas, are thought to be more oriented towards the incorporation of religious ideals within their political programs. Some small groups have advocated the establishment of an Islamic state in Xinjiang and reject Chinese sovereignty.

The pro-independence groups in Xinjiang are overwhelmingly ethno-nationalist movements—that is, they are articulated along ethnic lines, not religious ones. This appears to be the case among both religious and secular groups.

### The turning point—unrest in 1990, stricter controls from Beijing

In 1990 a major, Islamic-inspired insurrection in Baren county, northwest of Kashgar, led China to launch a long-term strategy to assert tighter control over Uighur society. Until then, Xinjiang had remained a distant indigenous periphery. But for Beijing this challenge to the state was the turning point in its policies towards the Uighurs and Xinjiang.

China's reaction was linked to major changes in regional and world politics: the loss of control by Moscow of its eastern European satellites and the imminent collapse of the Soviet Union and emergence of the new central Asian republics. China feared that Uighur ethno-nationalist aspirations in Xinjiang could be stirred up by the example of—and possible support from—the newly independent central Asian people across its borders.

Beijing then launched an ambitious plan to accelerate the integration of Xinjiang with China by stepping up ethnic Chinese migration to Xinjiang. At the same time, it

---

[6] James Millward, *Violent Separatism in Xinjiang: A Critical Assessment (Policy Studies No. 6)*, (Washington DC: East-West Center Washington, 2004), [online] http://www.eastwestcenter.org/res-rp-publicationdetails.asp?pub_ID=1479.

committed major resources to economic growth in Xinjiang, chiefly through the exploitation of Xinjiang's natural resources, above all oil and gas. These policies coincided with impressive economic growth in China, which made it possible to commit the capital and labor to carry them out. This led to tremendous changes in Xinjiang, as new roads, industries, cities, and waves of new migration ensued. The political calculus in Beijing was straightforward: in the 1990s many Chinese policy makers took the view that economic development reduces local nationalism and aids national integration. The transfer of ethnic Chinese labor was and is still seen widely in Chinese policy making circles as aiding political integration and ultimately removing reasons for political unrest. These polices in fact may have exacerbated political tensions because of a predictable local reaction to mass migration and the fact that many of the economic gains were unevenly distributed and favored the Han segment of the population. Uighurs felt increasingly marginalized and left behind.

These tensions became evident in February 1997 when a number of residents of Yining, a town fifty kilometers from the Kazakh border, staged a demonstration to protest Chinese policies in Xinjiang, in particular, restrictions on religious and cultural activities, as well as the migration of Chinese settlers to the region. The protesters requested that the provisions of the legislative autonomy regulations that govern all ethnic minority regions in China be respected. These guarantee the right of minority nationality populations to set up "organs of self-government," as well as to retain some control over their local affairs and economic resources.[7]

The protest was peaceful. However, the security forces, composed of the Public Security Bureau and the People's Armed Police, brutally put down the protest and shot a number of unarmed demonstrators. Three days of rioting followed. This led to further harsh reactions by the authorities. Casualty figures for the Yining riots vary depending on the source, but a conservative estimate suggests that nine people died and hundreds were injured.

In subsequent weeks, the authorities responded with arrests of thousands of Uighurs. Suspected activists were rounded up and public sentencing rallies were held across the region. The government also instituted new, far-reaching policies focused on religion as a supposed source of opposition. Mosques and religious schools were closed down.

---

[7] Law of the People's Republic of China on Regional National Autonomy, 1984 [中华人民共和国民族区域自治]. The law was amended in 2001. See "National autonomy law revised to support Western Development policy," Tibetan Information Network, March 13, 2001.

A month later, in March 1997, separatists detonated bombs simultaneously on three public buses in the provincial capital of Urumqi, killing nine and seriously wounding sixty-eight. This is the only known occasion in recent decades when Uighur activists are known to have attacked civilians indiscriminately. Subsequently, attacks were also carried out on police stations, military installations, and individual political leaders.

Among the actions attributed to separatist forces include the August 1998 wounding of a prison official in Kashgar by a booby trap package placed on his doorstep. Also in August 1998 two prisons in Yining prefecture were attacked by an armed group. Nine prison guards were killed; eighty prisoners managed to escape. Eighteen prisoners allegedly managed to flee to Kazakhstan according to the Hong Kong daily newspaper *Ming Pao*.[8] Despite the indisputably violent character of these incidents, government claims that the 1990s witnessed an escalation of violence are not accepted by all independent observers. For instance, the historian and Xinjiang expert James Millward writes that:

> Although the relatively few large-scale incidents in the 1990s were better publicized than those of the 1980s, they were not necessarily bigger or more threatening to the state. There have been, moreover, few incidents of anti-state violence—none large-scale—since early 1998. And none of them since the 1997 Urumqi bus bombings, alleged to be the work of Uighur terrorists, have targeted civilians.[9]

### Post 9/11: labeling Uighurs terrorists

Although the Xinjiang authorities began to publicly acknowledge anti-state violence in Xinjiang in the mid-1990s, they generally suggested that it was carried out only by "a handful of separatists" and stressed that the region was stable and prosperous. In early September 2001, the Xinjiang authorities had stressed that "by no means is Xinjiang a place where violence and terrorist accidents take place very often," and that the situation there was "better than ever in history."[10]

However, immediately after the September 11 attacks on the United States, the authorities reversed their stance. For the first time they asserted that opposition in

---

[8] Human Rights Watch, "China: Human Rights Concerns in Xinjiang," *A Human Rights Watch Backgrounder*, October 2001, [online], http://www.hrw.org/backgrounder/asia/china-bck1017.htm.

[9] Millward, *Violent Separatism in Xinjiang*, p. 10.

[10] Bao Lisheng, "Chinese Officials Say Not Much Terrorism in Xinjiang," *Ta Kung Pao*, September 2, 2001 (in Chinese).

Xinjiang was connected to international terrorism. They also asserted that in some cases the movement had connections to Osama bin Laden himself. China claimed that "Osama bin Laden and the Taliban in Afghanistan had provided the 'Eastern Turkestan' terrorist organizations with equipment and financial resources and trained their personnel," and that one particular organization, the "Eastern Turkestan Islamic Movement" (ETIM) was a "major component of the terrorist network headed by Osama bin Laden."[11]

By October the Chinese Foreign Ministry spokesman declared that, as "a victim of international terrorism," China hoped that "efforts to fight against East Turkestan terrorist forces should become a part of the international efforts and should also win support and understanding."[12]

On November 12, 2001, China told the U.N. Security Council that anti-state Uighur groups had links with the Taliban in Afghanistan and claimed that they were supported from abroad by radical Islamist organizations. Siding with the U.S. in the new "global war against terrorism," the Chinese government initiated an active diplomatic and propaganda campaign against "East Turkestan terrorist forces." This label was henceforth to be applied indiscriminately to any Uighur suspected of separatist activities. There has been no sign of any attempt by the Chinese authorities to distinguish between peaceful political activists, peaceful separatists, and those advocating or using violence.

In its efforts to win support for its post-September 11 equation of Uighur separatism with international terrorism, China has released a number of documents describing in some detail the alleged activities of Uighur terrorists groups in China. The first of these was published by the Information Office of the PRC State Council in January 2002, under the title: "East Turkestan Terrorist Forces Cannot Get Away with Impunity."[13] It offers the most comprehensive account to date of anti-state violence in Xinjiang and provides a catalog of violent acts allegedly committed by separatist groups in Xinjiang over the past decade. The document asserts that "East Turkestan terrorist forces" had conducted "a campaign of bombing and assassinations" consisting of more than 200

---

[11] "Terrorist Activities Perpetrated by 'Eastern Turkestan' Organizations and Their Links with Osama bin Laden and the Taliban," November 21, 2001, posted on the official website of the Permanent Mission of the People's Republic of China to the United Nations, [online] http://www.china-un.org/eng/zt/fk/t28937.htm (retrieved October 5, 2003).

[12] "China Asks Help Against Muslims," Associated Press, October 11, 2001.

[13] "East Turkestan' Terrorist Forces Cannot Get Away with Impunity," January 21, 2002, issued by the State Council Information Office, [online] http://www.china-un.ch/eng/23949.html. [国务院新闻办，"东突"恐怖势力难脱罪责,"2002 年 1 月 21 日, http://news.sohu.com/74/76/news147717674.shtml].

incidents resulting in 162 deaths and 440 people injured over the preceding decade.[14] This was the first time the Chinese authorities provided detailed specifics about violence in Xinjiang. The document also asserted that Uighur organizations responsible for the violence had received training and funding from Pakistan and Afghanistan, including direct financing from Osama bin Laden himself.[15]

The document has a highly charged ideological tone and contains numerous inconsistencies. It also lacks any independent intelligence to support its conclusions.[16] In particular, the central claim that all instances of anti-state violence, and all "separatist groups," originated from a single "East Turkestan terrorist organization" runs counter to known intelligence about the situation in Xinjiang. Even more problematic are the inconsistencies in the account of specific acts of violence within the document itself.

Human Rights Watch has no way of corroborating or disproving the incidents alleged in the January 2002 report. But as James Millward has written in his monograph, *Violent Separatism in Xinjiang: A Critical Assessment*:

> [There] are problems in the document's treatment of events in the 1990s. While its preface claims that terrorist acts killed 162 (and injured 440) over the past decade, the document itself enumerates only 57 deaths. Most of these people died in small-scale incidents with only one or two victims. The selection criteria for including these incidents, as well as many that resulted in no deaths, while excluding acts that led to the remaining 105 deaths are unclear. But if we are safe in assuming that the document likely mentions all spectacular acts of separatist violence, including those involving high loss of life, then we are left to conclude that over a hundred deaths from "terrorism"—nearly two-thirds the claimed total—occurred in small-scale or even individual attacks. Though definitions of terrorism are notoriously arbitrary, it seems legitimate to question what makes the unlisted acts "terrorist" or "separatist" as opposed to simply criminal.[17]

---

[14] Ibid.

[15] Ibid.

[16] For a detailed analysis of the problems of the January 2002 State Council Information Center report, see James Millward, *Violent Separatism in Xinjiang*.

[17] Millward, *Violent Separatism in Xinjiang*, pp. 12-13.

In December 2003, the Chinese government released a second report designed to legitimize its policies in Xinjiang and to enlist the support of the international community. The document listing "East Turkestan terrorist groups and individuals" was issued by the Ministry of Public Security and gave the names of four "Eastern Turkestan" terrorist organizations and eleven individual members of these groups, and called for international support to stop their activities, including a request for Interpol to issue arrest warrants.[18] The document points to the presence of Chinese Uighurs in Pakistan and Afghanistan, including some among the Taliban forces. It suggests that all Uighur opposition to Chinese domination, including non-violent resistance, is connected to international radical-Islamic terrorism.

---

### *Literature becomes sabotage*

Chinese authorities have not produced extensive evidence of specific activities carried out by what it has termed "terrorist forces" in Xinjiang over the past few years. Instead, Chinese authorities now argue that "separatist thought" is the new approach followed by dissident organizations that previously used violent tactics. This argument allows the authorities to accuse a dissenting writer or a non-violent group advocating minority rights of terrorist intentions and crimes.

The alleged link between terrorist organizations and the ideological content of publications surfaced immediately after September 11:

"Xinjiang independence elements have changed their combat tactics since the September 11 incident," stated a high-ranking Xinjiang official. "They have focused on attacking China on the ideological front instead of using their former frequent practice of engaging in violent terrorist operations."[19]

The official charged that those using "literary means" and "arts and literature" to "distort historical facts" were the same people responsible for "violent terrorist operations" in the past. He accused them of "taking advantage of art and literature to tout the products of opposition to the people and to the masses and of advocating ethnic splittist thinking."

---

[18] "Combating terrorism, we have no choice," *People's Daily Online*, December 18, 2003. The identified "Eastern Turkestan" terrorist organizations were the Eastern Turkestan Islamic Movement (ETIM), the Eastern Turkestan Liberation Organization (ETLO), the World Uighur Youth Congress (WUYC), and the Eastern Turkestan Information Center (ETIC).

[19] China News Agency, March 13, 2002, FBIS, March 25, 2002. [CHI-2002-0313].

In February 2002, the Xinjiang Party Secretary instructed the local authorities to crack down on these "separatist techniques" and detailed the "forms of infiltration and sabotage carried out in the ideological sphere by ethnic separatist forces":[20]

1. using all sorts of news media to propagate separatist thought;

2. using periodicals, works of literature and art performances; presenting the subject in satires or allegories that give free reign to and disseminate dissatisfaction and propagate separatist thought;

3. illegally printing reactionary books and periodicals; distributing or posting reactionary leaflets, letters and posters; spreading rumors to confuse the people; instilling the public with separatist sentiment;

4. using audio and video recordings, such as audio tapes, CDs or VCDs, to incite religious fanaticism and promote "holy war";

5. forging alliances with outside separatist and enemy forces, making use of broadcasts, the Internet, and other means to intensify campaigns of reactionary propaganda and infiltration of ideas into public opinion;

6. using popular cultural activities to make the masses receptive to reactionary propaganda encouraging opposition."[21]

From the wording of the document, published in the Party's official newspaper, the *Xinjiang Daily*, it appears that Xinjiang authorities equate any expression of dissatisfaction (*buman qingxu* 不满情绪), even metaphorical or ironical, with separatist thought (*fenlie sixiang* 分裂思想). The term "spreading rumors" (*zaoyao* 造谣) used in the article is the same as that used in criminal law: "incitement to subvert the political power of the state and overthrow the socialist system by means of *spreading rumors*, slander or other means" (Article 105), an offense for which the punishment can be life imprisonment. The document asserts that the "expression of dissatisfaction" in works of art is a form of criminal activity and is liable to criminal punishment. Furthermore, the document uses the terms "sabotage" and "infiltration" to characterize such activities, thus reinforcing the idea that they are equivalent to violent action.

The fact that "popular cultural activities" (*minjian wenhua huodong* 民间文化活动) are denounced as forms of "separatist" activity appears to be aimed at deterring people from engaging in activities that promote their history, culture, or tradition. Ethnic minority individuals and Uighur organizations abroad had complained in the past about similar official attitudes toward legitimate cultural pursuits, but prior to this official pronouncement their allegations had only been supported by circumstantial evidence, not stated explicitly as high-level Party policy.[22]

Such comments indicate that the Chinese authorities are trying to erase the distinctions among cultural and minority rights activists, pro-independence activists, and those who use violence. This suggests an historical shift: while before September 11, 2001, not all minority rights or

---

[20] "For the first time Xinjiang reveals the six forms of sabotaging operations of the separatist forces in the ideological sphere," Xinjiang Information Network, February 1, 2002 ["新疆首次披露民族分裂势力在意识形态领域破坏活动的六种形式," 新疆新闻网, 2002-02-01].

[21] Ibid.

[22] "Separatist Artist under Watch," *South China Morning Post*, January 15, 2002.

cultural rights activists or those on the "ideological front" (which presumably covers all critics of CCP policy) were considered to be terrorists, after September 11 they are, or should be, assumed to be terrorists.

In effect, China is claiming that terrorists have now become secret peaceful activists, presumably waiting for the right moment to revert to their former methods. This is a very dangerous set of assumptions that can be acted upon by the Chinese or Xinjiang security services at any time to justify arrests, heavy sentences, and the death penalty.

The case of Tursunjan Emet, a Uighur poet from Urumqi, illustrates this point. On January 1, 2002, Emet recited a poem in Uighur at the end of a concert at the Xinjiang People's Hall in the capital Urumqi. The Party committee ruled that the poem had an "anti-government" message and labeled the case as an "ethnic separatist crime in the area of the ideological front."[23] The Chairman of the Xinjiang provincial government immediately called for an investigation, vowing to purge all who "openly advocate separatism using the name of art," and urged cadres to use "politics" as the only standard in judging artistic and literary work. Emet went into hiding immediately after the incident. He was then detained, probably in late January 2002.[24] Official Chinese sources have since denied that he was ever detained. Unofficial sources indicate that he was released, some weeks, or possibly months, later.[25]

In a similar case, on February 2, 2005, the Kashgar Intermediate Court sentenced Uighur author Nurmemet Yasin to ten years imprisonment for publishing a story allegedly "inciting separatism." In late 2004, Yasin published "The Blue Pigeon" in the *Kashgar Literature Journal*.[26] A month later, he was arrested in Bachu County. His story told of a blue pigeon that traveled far from home. When it returned, different colored pigeons captured him and locked him in a birdcage. Although the other pigeons fed him, the blue pigeon opted to commit suicide rather than remain imprisoned in his hometown.

In part because pro-independence Uighurs use a blue flag, Chinese authorities read the story as referring to Uighur resentment of the government's policies in Xinjiang. The court tried Yasin in closed hearings; RFA sources claimed he was denied access to a lawyer.

It is therefore now official policy that criticism or minority expression in art and literature can be deemed a disguised form of secessionism, its author a criminal or even "terrorist."

## *The international response—acquiescence and quid pro quos*

The new Chinese description of the nature and level of violence and separatism in Xinjiang led to a significant change in the international approach to Xinjiang. The U.S.

---

[23] Ibid; China News Agency, March 13, 2002, FBIS, March 25, 2002 [CHI-2002-0313].

[24] "Surge in Arrests and Prosecutions for Endangering State Security," *Newsletter of the Dui Hua Foundation*, Issue 11, Spring 2003.

[25] Amnesty International, "People's Republic of China: Uighurs fleeing persecution as China wages its 'war on terror'," July 7, 2004 [AI Index: ASA 17/021/2004].

[26] Radio Free Asia Uighur Service, February 8, 2005, [online] http://origin.rfaweb.org/yughur/xewerler/tepsili_xewer/2005/02/08/orkishi/, (retrieved February 10, 2005).

government, keen after September 11 to enlist Chinese support in its efforts against Islamist terrorism, agreed to a Chinese request that it co-sponsor the inclusion of a little-known Uighur organization, the East Turkestan Islamic Movement (ETIM), on the U.N.'s list of terrorist organizations purportedly linked to al-Qaeda and subject to the freezing of assets. Although American officials declared that they had "independent evidence" of such a connection, the State Department press release explaining this decision quoted verbatim a document issued by the Chinese government in 2002 that similarly outlawed ETIM. The U.S. statement even mistakenly attributed all the terrorist incidents described in that document solely to ETIM, a claim that even the Chinese authorities had not made.[27]

The "independent evidence" referred to by the State Department appears to have originated from the arrest a few weeks earlier in Kyrgyzstan of a group of Uighurs who were allegedly planning an attack on the U.S. embassy.[28] Kyrgyzstan deported to China two persons alleged to be ETIM members who had "plotted to attack the U.S. Embassy in Kyrgyzstan as well as other U.S. interests abroad."[29] In their rush to find corroborative evidence, U.S. officials seem never to have questioned the reports from Kyrgyz authorities, who have a record of trumping up terrorism charges against Uighurs. U.S. officials have privately indicated unease at the decision to list ETIM. In December 2003 the U.S. declined to support China's request to list another Uighur organization, the East Turkestan Liberation Organization.[30]

The U.S. has also publicly insisted that the ETIM listing and the international war on terror should not be used by China to justify internal repression against political opponents or minorities. President Bush stressed in October 2001 in Shanghai that, "The war on terrorism must never be an excuse to persecute minorities."[31] U.S. Ambassador Clark Randt similarly stated in January 2002 that "Being a valuable member of the coalition does not mean that China… can use terrorism as an excuse to persecute its ethnic minorities."[32] However, the U.S. has not withdrawn or formally qualified its

---

[27] See "Criminalizing Ethnicity: Political Repression in Xinjiang," *China Rights Forum*, no. 1, 2004.

[28] "U.S. has Evidence ETIM Plans Attack," *People's Daily Online*, August 30, 2002.

[29] U.S. Department of State, *Patterns of Global Terrorism 2002*, [online] http://www.state.gov/s/ct/rls/pgtrpt/.

[30] "China seeks co-op worldwide to fight 'East Turkestan' terrorists," Xinhua News Service, December 15, 2003.

[31] "U.S., China Stand Against Terrorism: Remarks by President Bush and President Jiang Zemin," press conference at the Western Suburb Guest House in Shanghai, People's Republic of China), [online] http://www.whitehouse.gov/news/releases/2001/10/20011019-4.html.

[32] "United States-China Relations in the Wake of 9-11," speech by Ambassador Clark T. Randt, Jr., United States Ambassador to China, The Asia Society, Hong Kong, January 21, 2002, [online] http://www.asiasociety.org/speeches/randt2.html.

condemnation of the ETIM from the U.N. list. In the process, it has handed China a major propaganda victory against its political opponents in Xinjiang.

China has also been very active in enrolling the support of its Central Asian neighbors in the crackdown against Uighur ethno-nationalist aspirations. It is the driving force behind the Shanghai Cooperation Organization (SCO), a regional security body composed of China, Russia, Kazakhstan, Kyrgyzstan, Tajikistan, and Uzbekistan set up in 1996 (Uzbekistan joined in 2001). The SCO was established in part to address Chinese concerns about a number of small Uighur political and opposition movements that, in the first years of independence for the former Soviet republics, set up organizations in the region, giving Uighur exiles a much closer base for their operations than the previous generation of activists, who had been based in Turkey and, later, Germany. Under pressure from Beijing, since 1996 these Central Asian countries have effectively silenced independent Uighur organizations on their soil and on several occasions have repatriated refugees in response to requests by China. Some of those repatriated refugees were executed upon their return.[33]

Since the co-option by China and other states of the notion of the "war against terror," international co-operation has been leveraged in the Central Asian region by means of mutual agreement about those regarded by these states as political opponents. These cases have not always involved activists involved in the use of violence. In October 2004, China and Russia made a joint call for international efforts to help in their respective fights against opponents, with the Russians seeking help against Chechen rebels and the Chinese seeking help against Uighur separatists. The statement referred to "terrorists" and "separatists" in Chechnya and Xinjiang, whom it said "are part of international terrorism" and "should be the targets of the international fight against terrorism."[34] The wording of the Chinese part of the statement referred both to terrorism and separatism, but implied that they were interchangeable:

> China understands and firmly supports all measures taken by Russia to
> resume the constitutional order of the Republic of Chechnya and to
> fight against terrorism. Russia firmly supports all measures taken by

---

[33] Amnesty International, "People's Republic of China: Uighurs fleeing persecution as China wages its 'war on terror,'" July 7, 2004 [AI Index: ASA 17/021/2004].

[34] "Leaders unite in terrorism stand," *South China Morning Post*, October 15, 200; Ministry of Foreign Affairs of the PRC: "China and Russia Issue a Joint Statement, Declaring the Trend of the Boundary Line between the Two Countries Has Been Completely Determined," October 14, 2004 (available on the website of the ministry at www.fmprc.gov.cn).

China to fight against the terrorist and separatist forces in "East Turkestan" and to eliminate terrorist jeopardy.[35]

The Kazakh government acknowledged in November 2004 that it had extradited fourteen Uighurs to China and Kyrgyzstan since 1997.[36] Pakistan has boasted that it has eliminated Uighur "terrorists" in its northern areas.[37] Beijing has also pressured Pakistan and Nepal for the repatriation of refugees. In January 2002, Nepal forcibly repatriated three Uighurs who had been granted refugee status by the UNHCR and were awaiting relocation to a third country.[38] One of them, Shaheer Ali, was executed shortly thereafter after being convicted for separatism. He left a detailed account of torture inflicted on him in Chinese jails before his death.[39]

China has asked the United States to send to China the twenty-two or twenty-three Chinese Uighurs held at Guantanamo Bay in Cuba.[40] The detainees had allegedly been fighting alongside Taliban forces in Afghanistan at the time of the U.S. invasion, and were arrested by Pakistani authorities when fleeing into Pakistan when the U.S. offensive against the Taliban started. Despite the fact that the Pentagon ascertained that these prisoners had "no intelligence value," a Chinese mission was reportedly permitted to interrogate the prisoners at the Guantanamo detention facility.[41] Following reports in December 2003 that the U.S. was about to release some of the Uighurs without charge, and was considering handing them over to China,[42] Human Rights Watch and others raised concerns over Chinese authorities' track record of swiftly executing repatriated "separatists."[43] The first reports that the U.S. government had ruled out return to China

[35] Ministry of Foreign Affairs of the PRC: "China and Russia Issue a Joint Statement, Declaring the Trend of the Boundary Line between the Two Countries Has Been Completely Determined," October 14, 2004, [online] www.fmprc.gov.cn.

[36] "Kazakhstan Reveals Uighur Extraditions," Radio Free Europe/Radio Liberty, November 16, 2004.

[37] Human Rights Watch interview with senior Pakistani intelligence official, February 2004. To protect the confidentiality of sources, we have removed potentially identifying details from citations to interviews we conducted in Xinjiang and elsewhere, including the specific date and in some cases the location of the interview.

[38] Amnesty International, "Urgent Action Appeal: Fear of forcible return," April 22, 2002. [UA 119/02].

[39] "Executed Uighur refugee left torture testimony behind," Radio Free Asia, October 23, 2003. Shaheer Ali spoke to RFA's Uighur Service in May 2001, describing eight months of torture from April to December of 1994 in the Old Market Prison, in Guma (in Chinese, Pishan) county, in the Xinjiang Uighur Autonomous Region. In several Human Rights Watch interviews conducted by telephone from Nepal, Shirali described how he was beaten with shackles, shocked in an electric chair, repeatedly kicked unconscious, and then drenched in cold water to revive him for more torture.

[40] Demitri Sevastopuolo, "U.S. fails to find homes for Uighur detainees," Financial Times, October 28, 2004.

[41] "US fails to find homes for Uighur detainees," The Financial Times, October 28, 2004.

[42] "Eleven Turks at Guantanamo base," United Press International, February 6, 2004.

[43] "U.S.: Don't Send Detainees Back to China," Human Rights Watch, November 26, 2003, [online] http://www.hrw.org/press/2003/11/us112603.htm.

because of the risk that the Uighurs might be tortured or executed appeared in June 2004.[44] In August 2004, U.S. Secretary of State Colin Powell declared publicly that the U.S. would not return the Uighurs.[45] The Chinese embassy in Washington continues to press for their repatriation. It has declared that Beijing considers the Uighurs at Guantanamo to be "East Turkestan terrorists" who should be returned to China.[46]

While there are genuine security concerns in Xinjiang, they are manipulated by Chinese authorities for political and economic ends. When it is expedient, the authorities insist that only "an extremely small number of elements" are engaged in separatism and that the situation is "stable." In March 2005, the head of the Xinjiang government, Ismail Tiwaldi, confirmed that "there have been no terror attacks in Xinjiang in recent years," thus corroborating his statement of the previous year that "Xinjiang ha[d] not recorded a single violent incident, nor any assassination case [in 2004]," and that "there hadn't been even a small incident," throughout 2003.[47] When, however, the government desires international support for its crackdown on Uighur challenges to Chinese authority, including peaceful activities, it raises the specter of Islamic terrorism.

## III. National Law and Policy on Religion

*We will never allow the use of religion to oppose the Party's leadership and the socialist system or undermine the unification of the state and unity among various nationalities.*[48]

On its face, China's 1982 constitution guarantees freedom of religion. Article 36 states:

Citizens of the People's Republic of China enjoy freedom of religious belief. No state organ, public organization or individual may compel citizens to believe in, or not to believe in, any religion; nor may they discriminate against citizens who believe in, or do not believe in any religion.

---

[44] "China torture fears hamper jail releases," *The Financial Times*, June 22, 2004.

[45] "Powell Says Detained Uighurs Will not be Returned to China," Agence France-Presse, August 13, 2004].

[46] "US fails to find homes for Uighur detainees," *The Financial Times*, October 28, 2004.

[47] "Head of China's northwest Muslim Xinjiang region says area safe from terror attacks," Associated Press, March 13, 2005 ; "Xinjiang confident of reining in rebels," *South China Morning Post*, March 13, 2004.

[48] "Jiang Zemin, Zhu Rongji address National work conference," Xinhua, December 12, 2001, FBIS, December 19, 2001 [CHI-20011-1212].

# EXHIBIT 2

**washingtonpost.com**   Sign In | Register Now

PRINT EDITION | Subscribe to
The Washington Post

NEWS | OPINIONS | SPORTS | ARTS & LIVING | Discussions | Photos & Video | Entertainment Guide | **CLASSIFIEDS** | JOBS | CARS | REAL

SEARCH: ⦿ News ○ Web [_____] go   powered by YAHOO! SEARCH   Top 20 E-mailed Article

Advertisement

VONAGE IS SO EASY, YOUR INNER NERD
WILL HAVE TO FIND SOMETHING ELSE TO DO.

washingtonpost.com > Nation

Print This Article
E-Mail This Article

**MOST VIEWED ARTICLES**

Nation       On the Site

Updated 12:15 p.m. ET

- Fifth Day of Disaster Begins With Fire
- 'To Me, It Just Seems Like Black People Are Marked'
- For Those Remaining, 'This Is Total Chaos'
- A City of Despair and Lawlessness
- Displacement Of Historic Proportions

Advertisement

**Top News**
In Katrina's Wake: Latest news, photos, multimedia and maps

# Chinese Detainees Are Men Without a Country
## 15 Muslims, Cleared of Terrorism Charges, Remain at Guantanamo With Nowhere to Go

*By Robin Wright*
**Washington Post Staff Writer**
**Wednesday, August 24, 2005; Page A01**

In late 2003, the Pentagon quietly decided that 15 Chinese Muslims detained at the military prison in Guantanamo Bay, Cuba, could be released. Five were people who were in the wrong place at the wrong time, some of them picked up by Pakistani bounty hunters for U.S. payoffs. The other 10 were deemed low-risk detainees whose enemy was China's communist government -- not the United States, according to senior U.S. officials.

More than 20 months later, the 15 still languish at Guantanamo Bay, imprisoned and sometimes shackled, with most of their families unaware whether they are even alive.

They are men without a country. The Bush administration has chosen not to send them home for fear China will imprison, persecute or torture them, as the United States charges has happened to other members of China's Muslim minority. But the State Department has also been unable to find another country to take them in, according to U.S. officials and recently filed court documents.

Other detainees cleared of terrorism charges have also languished for years at

READER FORUMS

What Do You Think?

GUANTANAMO DETAINEES



**List of Detainees** View the largest list of names made public thus far which includes 370 men whose identities have appeared in media reports, on Arabic Web sites and in legal documents.

Detainees Listed by Name

Detainees Listed by Nationality

Pentagon Documents

Advertisement

Sav...
on ...
CLICK F...

FEATURED AD
- Sign up with
- College Tuiti...
- NASCAR Tick...
- Lawyers: Def...
- $160,000 Mor...
- For College C...
- Refinance a $...
- Free Report f...
  trends
- Enter the HP
- Cool gadgets

washingtonpost.com



John G. Roberts Jr.

**Who is he?**

**What does his nomination mean?**

**Complete Coverage.**

washingtonpost.com

---

**RSS NEWS FEEDS**

Top News
Nation
What is RSS? | All RSS Feeds

**E-MAIL NEWSLETTERS**

View a Sample and Sign Up
Today's Headlines &
Columnists
Daily Politics News &
Analysis
Federal Insider
Breaking News Alerts
Manage Your Newsletters

**TODAY IN SLATE**

**News & Politics**
The Katrina
Premium
Economically
speaking, Katrina



Guantanamo Bay, but all have been sent home or are in the process of being transferred. For the Chinese Uighurs (pronounced *WEE-gurs* ), there is no end in sight. About 20 countries -- including Sweden, Finland, Switzerland, Turkey and a Latin American country -- have turned down U.S. overtures to give them asylum, according to U.S. officials.

Conditions at Guantanamo

Guantanamo -- A Holding Terror

**WHO'S BLOGGING?**

Read what bloggers are saying about this article.

V????????r????uskoinen

BARISTA

COMBAT PHILOSOPHY

Full List of Blogs (13 links) »

POWERED BY
Technorati

The State Department says it is still working behind the scenes to find the Uighurs a home. A senior official called their situation "unfortunate."

This month, lawyers and human rights groups appealed to the United States to take in the stranded Uighurs. "It's not like these people were once considered to be a threat and now are not," said Tom Malinowski of Human Rights Watch. "These people need to be released, either in another country or the U.S. They're America's responsibility."

But the Bush administration has balked at allowing them to enter the United States, even under restricted supervision, or to appear in a court that is hearing two of the men's cases, according to U.S. officials and court documents.

In the meantime, the men are still treated as prisoners. Sabin P. Willett, a Boston lawyer who volunteered to take the cases of two Uighurs in March, finally met with them last month, after he and his team went through their own FBI clearances. One of the Uighurs was "chained to the floor" in a "box with no windows," Willett said in an Aug. 1 court hearing.

"You're not talking about your client?" asked Judge James Robertson of the U.S. District Court in Washington.

"I'm talking about my client," Willett said.

"He was chained to a floor?" Robertson asked again.

"He had a leg shackle that was chained to a bolt in the floor," Willett replied.

CONTINUED    1    2    Next >

Print This Article    E-Mail This Article    Permission to Republish

© 2005 The Washington Post Company

Advertising Links                                    What's this?

# **EXHIBIT 3**



**DEPUTY SECRETARY OF DEFENSE**
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

– 7 JUL 2004

## MEMORANDUM FOR THE SECRETARY OF THE NAVY

**SUBJECT:    Order Establishing Combatant Status Review Tribunal**

This Order applies only to foreign nationals held as enemy combatants in the control of the Department of Defense at the Guantanamo Bay Naval Base, Cuba ("detainees").

*a. Enemy Combatant.* For purposes of this Order, the term "enemy combatant" shall mean an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces. Each detainee subject to this Order has been determined to be an enemy combatant through multiple levels of review by officers of the Department of Defense.

*b. Notice.* Within ten days after the date of this Order, all detainees shall be notified of the opportunity to contest designation as an enemy combatant in the proceeding described herein, of the opportunity to consult with and be assisted by a personal representative as described in paragraph (c), and of the right to seek a writ of habeas corpus in the courts of the United States.

*c. Personal Representative.* Each detainee shall be assigned a military officer, with the appropriate security clearance, as a personal representative for the purpose of assisting the detainee in connection with the review process described herein. The personal representative shall be afforded the opportunity to review any reasonably available information in the possession of the Department of Defense that may be relevant to a determination of the detainee's designation as an enemy combatant, including any records, determinations, or reports generated in connection with earlier determinations or reviews, and to consult with the detainee concerning that designation and any challenge thereto. The personal representative may share any information with the detainee, except for classified information, and may participate in the Tribunal proceedings as provided in paragraph (g)(4).

*d. Tribunals.* Within 30 days after the detainee's personal representative has been afforded the opportunity to review the reasonably available information in the possession of the Department of Defense and had an opportunity to consult with the detainee, a Tribunal shall be convened to review the detainee's status as an enemy combatant.

*e. Composition of Tribunal.* A Tribunal shall be composed of three neutral commissioned officers of the U.S. Armed Forces, each of whom possesses the appropriate security clearance and none of whom was involved in the apprehension,



detention, interrogation, or previous determination of status of the detainee. One of the members shall be a judge advocate. The senior member (in the grade of 0-5 and above) shall serve as President of the Tribunal. Another non-voting officer, preferably a judge advocate, shall serve as the Recorder and shall not be a member of the Tribunal.

*f. Convening Authority.* The Convening Authority shall be designated by the Secretary of the Navy. The Convening Authority shall appoint each Tribunal and its members, and a personal representative for each detainee. The Secretary of the Navy, with the concurrence of the General Counsel of the Department of Defense, may issue instructions to implement this Order.

*g. Procedures.*

(1) The Recorder shall provide the detainee in advance of the proceedings with notice of the unclassified factual basis for the detainee's designation as an enemy combatant.

(2) Members of the Tribunal and the Recorder shall be sworn. The Recorder shall be sworn first by the President of the Tribunal. The Recorder will then administer an oath, to faithfully and impartially perform their duties, to all members of the Tribunal to include the President.

(3) The record in each case shall consist of all the documentary evidence presented to the Tribunal, the Recorder's summary of all witness testimony, a written report of the Tribunal's decision, and a recording of the proceedings (except proceedings involving deliberation and voting by the members), which shall be preserved.

(4) The detainee shall be allowed to attend all proceedings, except for proceedings involving deliberation and voting by the members or testimony and other matters that would compromise national security if held in the presence of the detainee. The detainee's personal representative shall be allowed to attend all proceedings, except for proceedings involving deliberation and voting by the members of the Tribunal.

(5) The detainee shall be provided with an interpreter, if necessary.

(6) The detainee shall be advised at the beginning of the hearing of the nature of the proceedings and of the procedures accorded him in connection with the hearing.

(7) The Tribunal, through its Recorder, shall have access to and consider any reasonably available information generated in connection with the initial determination to hold the detainee as an enemy combatant and in any subsequent reviews of that determination, as well as any reasonably available records, determinations, or reports generated in connection therewith.

(8) The detainee shall be allowed to call witnesses if reasonably available, and to question those witnesses called by the Tribunal. The Tribunal shall determine the

2

reasonable availability of witnesses. If such witnesses are from within the U.S. Armed Forces, they shall not be considered reasonably available if, as determined by their commanders, their presence at a hearing would affect combat or support operations. In the case of witnesses who are not reasonably available, written statements, preferably sworn, may be submitted and considered as evidence.

(9) The Tribunal is not bound by the rules of evidence such as would apply in a court of law. Instead, the Tribunal shall be free to consider any information it deems relevant and helpful to a resolution of the issue before it. At the discretion of the Tribunal, for example, it may consider hearsay evidence, taking into account the reliability of such evidence in the circumstances. The Tribunal does not have the authority to declassify or change the classification of any national security information it reviews.

(10) The detainee shall have a right to testify or otherwise address the Tribunal in oral or written form, and to introduce relevant documentary evidence.

(11) The detainee may not be compelled to testify before the Tribunal.

(12) Following the hearing of testimony and the review of documents and other evidence, the Tribunal shall determine in closed session by majority vote whether the detainee is properly detained as an enemy combatant. Preponderance of evidence shall be the standard used in reaching this determination, but there shall be a rebuttable presumption in favor of the Government's evidence.

(13) The President of the Tribunal shall, without regard to any other provision of this Order, have authority and the duty to ensure that all proceedings of or in relation to the Tribunal under this Order shall comply with Executive Order 12958 regarding national security information.

*h. The Record.* The Recorder shall, to the maximum extent practicable, prepare the record of the Tribunal within three working days of the announcement of the Tribunal's decision. The record shall include those items described in paragraph (g)(3) above. The record will then be forwarded to the Staff Judge Advocate for the Convening Authority, who shall review the record for legal sufficiency and make a recommendation to the Convening Authority. The Convening Authority shall review the Tribunal's decision and, in accordance with this Order and any implementing instructions issued by the Secretary of the Navy, may return the record to the Tribunal for further proceedings or approve the decision and take appropriate action.

*i. Non-Enemy Combatant Determination.* If the Tribunal determines that the detainee shall no longer be classified as an enemy combatant, the written report of its decision shall be forwarded directly to the Secretary of Defense or his designee. The Secretary or his designee shall so advise the Secretary of State, in order to permit the Secretary of State to coordinate the transfer of the detainee for release to the detainee's

country of citizenship or other disposition consistent with domestic and international obligations and the foreign policy of the United States.

*j.* This Order is intended solely to improve management within the Department of Defense concerning its detention of enemy combatants at Guantanamo Bay Naval Base, Cuba, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law, in equity, or otherwise by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

*k.* Nothing in this Order shall be construed to limit, impair, or otherwise affect the constitutional authority of the President as Commander in Chief or any authority granted by statute to the President or the Secretary of Defense.

This Order is effective immediately.

*Paul Wolfowitz*

4

# **EXHIBIT 4**

Case 1:05-cv-01602-UNA     Document 3     Filed 09/14/2005     Page 40 of 234

Aug. 17, 2005     War on Terror     Transformation     News Products     Press Resources     Images     Websites     Cont:

Updated: 29 Mar 20

**NEWS**

 Printer
Friendly
✉ Email A C

**U.S. Department of Defense**
Office of the Assistant Secretary of Defense (Public Affairs)

# News Transcript

On the Web:                                           Public contact:
http://www.defenselink.mil/transcripts/2005/tr20050329-2382.html http://www.dod.mil/faq/comment.html
Media contact: +1 (703) 697-5131                      or +1 (703) 428-0711

**DoD News**
   Advisories
   Contracts
   Live Briefing
   Photos
   Releases
   Slides
   Speeches
   Today in Dol
   Transcripts

**American Forc**
**News**
   Articles
   Television
   Special Repc

**DoD Search**

**About News**
**News Archive**
**News by E-ma**

**Other News**
**Sources**

---

**Presenter: Secretary of The Navy Gordon England**               **Tuesday, March 29, 2005 3:33 p.m. EST**

---

### Defense Department Special Briefing on Combatant Status Review Tribunals

SEC. ENGLAND:  Good afternoon.  I believe this is the ninth time we've gotten together.  And again, if we haven't all met, I'm Gordon England, the secretary of the Navy.  But as you know, in this capacity I'm Secretary Rumsfeld's designated civilian official for the Detainee Administrative Review Processes at Guantanamo.

I'm here today to talk to you about our Combatant Status Review Tribunals, what we call the CSRTs.  And again, to review, the CSRT is a one-time review to determine if a person, a detainee, is or is not an enemy combatant.

Now, today I'm not going to discuss our Administrative Review Boards, or our ARBs.  As you'll recall, the Administrative Review Boards meet -- it's an annual review of detainees.  So if you indeed are an enemy combatant, you remain at Guantanamo; annually we have a review of your status, and that review can result in either a release decision, transfer to the home country with conditions, or continue to detain at Guantanamo.

Now, there's a number of legal cases pending regarding the Administrative Review Board, and therefore, I'm not going to discuss specifics at this day because -- today because I can't discuss those specifics with all the legal issues going on.  I can, however, report that we have now conducted more than 60 of our Administrative Review Boards, and those cases are now starting to come to my desk for a decision.

Again, for the CSRT, the decision is made by the tribunal of military officers, while the Administrative Review Board's recommendations come to me for final decision.

Also, regarding the ARBs, you previously received copies of these administrative review detailed procedures so you have that; you know how they operate.  And also, the unclassified portions of those hearings are now open to the media.  And I know that some of your organizations have already been sitting in and observing those hearings.  Again, the ARBs are annual, so we will complete an ARB for every enemy combatant detained at Guantanamo, and we'll complete those by the end of this year.

Okay, now let me address the topic today that I think you're most interested in, which are the CSRTs.  I am pleased to report that we have completed a major milestone.  The Combatant Status Review Tribunals for all of the DOD detainees at Guantanamo are completed.

Now, you'll recall in our last discussion I mentioned that our last hearing was in January.  And last week, Rear Admiral McGarrah signed-off on his final review of the last package.

Now, before I provide you the final CSRT statistics, let me reflect on what's been accomplished and what this means during this past year.

First, the basis of detaining captured enemy combatants is not to punish but, rather, to prevent them from continuing to fight against the United States and its coalition partners in the ongoing global war on terrorism.  Detention of captured enemy combatants is both allowed and accepted under international law of armed conflict.

Second, the Combatant Status Review Tribunals have provided a venue for detainees to personally challenge their status as enemy combatants.  As you will recall, in last June's Supreme Court decision in "Hamdi," Justice O'Connor explicitly suggested that a process based on existing military regulations -- and she specifically cited Army regulation 190-8 -- might be sufficient to meet due process standards. You'll also perhaps know that that Army regulation is what the U.S. uses to implement Article 5 of the Geneva Convention that deals with prisoners of war.

So our CSRT process incorporates that guidance from Article 5, Army regulation 190-8 and, as I mentioned in the past, it adds features for further benefit of the detainee. For example, a personal representative is made available to each detainee to assist in preparing his case before the CSRT.

Third, we have notified all enemy combatants of the opportunity to challenge their detention in federal district court. During this process, several detainees have completed documents for submission directly to the federal court here in Washington, D.C.

Lastly, our national security interests would be harmed if classified information about terrorist organizations and activities were released, so in many cases much of the information about a detainee is classified. In fairness to the detainee, we have the intelligence community clear unclassified summaries of this information about each detainee, which is then shared with each detainee as the unclassified basis for his detention.

Now to the numbers; the summary, the results of all this work for the past 10 or so months.

We have completed a total of 558 of the Combatant Status Review Tribunals, CSRTs. The last hearing was held on January 22nd.

Now you recall that once the hearing is completed, the record of the tribunal is compiled and forwarded to the convening authority, Admiral McGarrah, for sufficient review and for final action. Of the 558 CSRT hearings conducted, the enemy combatant status of 520 detainees was confirmed. The tribunals also concluded that 38 detainees were found to no longer meet the criteria to be designated as enemy combatants. So 520 enemy combatants, 38 non-enemy- combatants.

The Department of State has been notified of all of these determinations, and State is coordinating the return of the 38 non- enemy-combatants to their home countries. As of today, five of those 38 persons have returned to their home countries, and the Department of State is working to coordinate the return of the remaining 33 as expeditiously as possible.

As you know, we do not discuss individual cases, but I can share with you some of the common features of those cases to give you a sense of their complexity. Each case is different, and each case is unique. Even for the detainees who have been determined by our CSRTs to be no longer to be designated as enemy combatants, the files on those detainees often contain information that suggests that they could be classified as enemy combatants. There is often conflicting information that has to be sorted through very carefully by the CSRT members.

It should be emphasized that a CSRT determination that a detainee no longer meets the criteria for classification as an enemy combatant does not necessarily mean that the prior classification as EC was wrong.

For example, information obtained subsequent to the detainee's original capture can shed light not only on the circumstances of capture but also the detainee's activities before capture.

For the last 10 months, we have focused on being open, fair and rigorous. Our responsibility is to protect the United States and our allies from terrorist threats while providing an administrative process for detainees to contest their status. This is very important work. It is important that we do it right and that we balance the risk.

I'm happy to take your questions about the CSRTs. As I said at the beginning, I will not be addressing the ARB process today, but hopefully I will be able to get back with you in the near future, depending on the legal situation of those cases, and report the specifics to you.

Q    Mr. Secretary?

SEC. ENGLAND:  Bob?

Q    Bob Burns from AP.  In the written procedures that laid out the way these review boards were to be conducted, it said that regarding the government evidence that's presented during the procedure, that the evidence is to be considered, quote, "genuine and accurate," unquote.  Is that the same as saying that these are facts presented about these individuals?

SEC. ENGLAND:  Well, they're the facts as certainly as we know them, as people report them, as they're compiled.  So -- I mean, it's as factual as we know it's factual.  I mean, people report.  There's data to support it.  So again, it's like facts presented, I think, in the legal context to a jury, same type of data that would be presented.  So I would say yes.

Q    Does it include hearsay information?

SEC. ENGLAND:  Pardon?

Q    Does it include hearsay information?

SEC. ENGLAND:  I would say it includes information that we consider reliable, and the board looks at the

totality of the information. So we look at the preponderance of the evidence, and if there isn't a preponderant amount of evidence to support the conclusion that a person is an enemy combatant, then we would conclude they're not an enemy combatant. And that's why there's 38 that are not enemy combatants -- designated as such.

Q    Okay.

Q    How do you reconcile that description of the process with what we now know about the Murat Kurnaz case, where there was one unsupported memo from some unspecified military officer that said this guy may be associated with someone who's a suicide bomber, but SOUTHCOM's intelligence and Germany's intelligence both said they had no evidence of it at all, and yet he was designated an enemy combatant by this process?

SEC. ENGLAND:  I read the article.  The article is partially correct, but the article does -- the reporter did not have access to all the information.  All the information has not been declassified and, in fact, a lot of the information that was inadvertently
declassified, all of it wasn't.  So again, the tribunal bases their decision on the preponderance of the evidence, classified, unclassified, from all sources, and they make the very best decision they can.

Keep in mind, I mean, this is a tribunal.  We have three military officers sworn to do the very best job they can for the United States of America.  So you look at this data.  I mean, my analogy is, the same way a judge or a jury looks at data.  They make the best evaluation based on the data that they have available.  And they make those decisions.  I mean, just like in a legal sense, just like sometimes judges are overruled or juries are overruled, I mean, the systems aren't perfect.  These are human beings looking at data, but they are as right as we can make them based on the data.  And we have very, very high quality people that do this.

So, it is fair, it's equitable.  And as I said before, we actually bend over to the benefit of the detainee -- I think we go as far as we possibly can for the detainee to provide any data they also wish to provide.  So it's as fair and balanced as we can possibly make it.

Q    Does Judge Green have access to all that data, at least they offered a conclusion, right?

SEC. ENGLAND:  I don't know if Judge Green had access to all the data or not.  I mean, that's a question you have to ask the Department of Justice.  But I know that the data that was reported in the Washington Post was not all the data that was available to the tribunal.

Q    Secretary Rumsfeld said today that he made a recommendation for a nominee for a deputy secretary of defense.  Would you be that recommendation?

SEC. ENGLAND:  Look, that's up to the secretary to whoever he -- you have to ask the secretary who he decides to nominate.  I'm not the person -- I'm not -- I don't -- I don't get --

Q    I'm assuming if he recommended you, you'd know about it. Are you the -- his recommended choice?

SEC. ENGLAND:  I don't -- I don't get to make those recommendations, and that's a Secretary Rumsfeld question.

Q    Well, have you been interviewed for the job?

SEC. ENGLAND:  But I -- but I'd be pleased to serve if I was nominated.

Q    Have you been interviewed for the job, sir?  (Light laughter.)

SEC. ENGLAND:  I have discussed the job with Secretary Rumsfeld, yes.

Q    Mr. Secretary, can you tell us is there a temporary restraining order still in place preventing the military from transferring any detainees outside of Guantanamo, and does that only affect the 38 non-enemy combatants?

SEC. ENGLAND:  Well, I know that -- I'm not sure there's a restraining order, but, of course, I think it has been reported we have Uighurs from China that we have not returned to China, even though, you know, some of those have been deemed, even before these hearings, to be non-enemy combatants because of concerns and issues about returning them to their country.  And I understand the State Department has been working with other countries to see if we can have them go to another country, and my understanding is that's still -- they're still in Guantanamo, so that issue is unresolved.  So I – at a minimum I know the Uighurs are there and have not been returned to China.

Q    Mr. Secretary, could you give --

SEC. ENGLAND:  William?

Q    I understand that you're not going to give the identities of the 38, but could you give a breakdown of the

nationalities for those 38? And also, are you saying, are you saying -- you're not conceding that any mistakes were made anywhere in the process on any of the 38?

SEC. ENGLAND: Well, let me tell you what we do. I mean, again, you have to understand the process. We take all the data available, every bit of the data we can. We allow the detainee to also provide any data they wish to provide, any statements they want to make. They can provide data from the home country. We provide an opportunity for them to do that. And we examine all the data. And on the preponderance of all the data, we make the very best decision we can make. Is it perfect in every case?

I mean, again, take our legal system. I mean, there's a -- at the end of the day there is a judgment. In this case, we have three people. Think of it like an appeals, when you go up to an appeals court there's three judges so that you get a better balance than one. So we have three members of the tribunal, and they make the very best decision they can based on the data available.

Is the system perfect? It's human beings, so obviously it's not perfect, but it is as perfect as we can make the system and as fair as we can make the system for the detainee while protecting America. Keep in mind we do have an obligation to protect America from terrorists. So we make this as fair as we can, but we look at the totality of the data. So I mean, that's the question, is this as fair and as right as you can make it. In my judgment, we're doing that. And we've opened this. I mean, people can sit in for the unclassified, obviously not for the classified, portion. So we've made it open, transparent and available, and I believe we're doing this the very best way we can.

Q    How about the nationality breakdown?

SEC. ENGLAND: I don't have the nationality breakdown. I'll get back with you on that subject. We'll see if we can make it available. I don't know if we -- if we have it, I'll have to see if we can --

Q    Well, you would know what countries you're trying to send them back to, right?

SEC. ENGLAND: Yes.

Q    Okay.

SEC. ENGLAND: That's what I say. So let us get back to you on that question.

Q    Sir?

Q    Sir, just on the 558 now, is that all the people at Guantanamo?

SEC. ENGLAND: Yes.

Q    So they're all essentially -- everyone was there up till arriving at what point has been --

SEC. ENGLAND: On the island today we have about 540 people, because obviously, some have left since we started this process last spring. So we have about 540 there, and there are still people waiting to leave.

Q    And now if someone arrives tomorrow, such as me, let's say -- no, that might not be a good example, because they probably wouldn't delay my hearing, but how long would it take for someone -- do you have to wait a year or six -- now that everyone's been completed, how --

SEC. ENGLAND: Well, everyone's been completed, so all enemy combatants have been through the process. That process is completed. If new people are coming to Guantanamo, we'd have a hearing just as quickly as we could get all the data available and have a fair hearing.

Q    And that would depend on data collection, essentially.

SEC. ENGLAND: Data collection, making sure we had the right interpreters,  interviewing, providing rights to the prisoner, et cetera, et cetera.

Q    Okay.

SEC. ENGLAND: Ann (sp)?

Q    When they get released, are they free, or are they released to the government for further prosecution or whatever?

SEC. ENGLAND: No, they're free. I mean, they're released. They're free.  We just move them to a different area on Guantanamo. Arrangements are made to send them home.

Q    Do they get any special privileges once they have been designated not an enemy combatant?  Better quarters or better food?

SEC. ENGLAND: It's a better environment, I believe, it is a different area than they've been in, while waiting to be transferred. And we do that as quickly as we can. State has to do it. They have to make arrangements, transportation. So there's some finite time involved to do all that.

Q    And how much time have they been there? A month? Weeks?

SEC ENGLAND: Different times. I think some maybe have been there as much as two months. You know, again, it's up to State along with the country. Sometimes it's just difficult to arrange transportation. But we try to move them out as quickly as we can. The delay is not necessarily on us, it's really on the country they're being returned to.

Yes, ma'am?

Q    Mr. Secretary, when you look at the 38 cases that we're talking about, are there any commonalities, any tipping point that brought these cases about in the detainees' favor?

SEC. ENGLAND: I would say what I'll call thin files. That is, the files may say that they were in al Qaeda training camp, they may say they trained with al Qaeda, but the files are thin and not enough data that you would classify them as an enemy combatant. So I would say thin data files. Typically the tribunals look for supporting data, verification of the data. So I would say there is commonality in that regard. I'm not sure there was other commonality, because every single case is different.

Yes, sir?

Q    Has the process of holding ghost detainees under CIA control ended there? When you said 140 (sic), you said that was all the people there.

SEC. ENGLAND: Pardon me; 540.

Q    Five forty. Yes, sorry. There had been a number of reports that there were others that were not included in the previous numbers we've been given.

SEC. ENGLAND As far as I know, that's all the people in Guantanamo. I mean, I have no other data. As far as I know, that's the total number, and we've been consistently reporting these numbers.

Q    And can you tell us anything about any changes that are under consideration in the Military Commission system?

SEC. ENGLAND: No, I don't. Military Commissions are outside my purview, so I can't help you.

Q    Given what you were saying earlier about how at the end of the day these are three human beings that do the best they can, there's nothing that's perfect when human beings are involved; what is the U.S. government's justification for not offering compensation to the 38 individuals, at least, who were evidently there because of
prior imperfections by human beings, number one?

And number two, do we now -- is it your belief, then, that we have done everything -- the government has done everything it needs to do to comply with the Supreme Court decision in Hamdi?

SEC. ENGLAND: We have an administrative process. The Supreme Court -- first of all, there's still a legal parallel process that's taking place, and this is an administrative process. Justice O'Connor, the last time the Supreme Court, I believe in July or so of last year, said that one of the remedies she felt was to have a process like Army Regulation 190-8. So we have implemented that for all of the detainees. And as I said before, we've actually gone beyond that. So we'll have to see what happens in the court system. But from our point of view, we are doing what we believe the Supreme Court expects us to do in terms of having these tribunals.

Q    And what about compensation?

SEC. ENGLAND: Not my decision on compensation. But again, decisions made based on not only data that was available at the time, but subsequent data; so indeed, there can be -- there could have been easily a determination at that time that they were enemy combatants. Later data or data, or the tribunal itself, you know, could have determined otherwise. But I'm not the person for determination of compensation.

STAFF: That's it.

Q    Thank you.

SEC. ENGLAND: Okay, good. Thanks, everybody.

(C) COPYRIGHT 2005, FEDERAL NEWS SERVICE, INC., 1000 VERMONT AVE. NW; 5TH FLOOR;

WASHINGTON, © 2005, U.S.A. ALL RIGHTS RESERVED. ANY REPRODUCTION, REDISTRIBUTION OR RETRANSMISSION IS EXPRESSLY PROHIBITED.  UNAUTHORIZED REPRODUCTION, REDISTRIBUTION OR RETRANSMISSION CONSTITUTES A MISAPPROPRIATION UNDER APPLICABLE UNFAIR COMPETITION LAW, AND FEDERAL NEWS SERVICE, INC. RESERVES THE RIGHT TO PURSUE ALL REMEDIES AVAILABLE TO IT IN RESPECT TO SUCH MISAPPROPRIATION. FEDERAL NEWS SERVICE, INC. IS A PRIVATE FIRM AND IS NOT AFFILIATED WITH THE FEDERAL GOVERNMENT.  NO COPYRIGHT IS CLAIMED AS TO ANY PART OF THE ORIGINAL WORK PREPARED BY A UNITED STATES GOVERNMENT OFFICER OR EMPLOYEE AS PART OF THAT PERSON'S OFFICIAL DUTIES.  FOR INFORMATION ON SUBSCRIBING TO FNS, PLEASE CALL JACK GRAEME AT 202-347-1400.

Printer-friendly Version                    Email A Copy

# **EXHIBIT 5**

6/14/05 Fin. Times USA 6
2005 WLNR 9376166

Financial Times USA
Copyright 2005 Financial Times Ltd.

June 14, 2005

Section: THE AMERICAS

THE AMERICAS: Cheney backs Guantanamo prison amid growing unease

By DEMETRI SEVASTOPULO

WASHINGTON Vice-President Dick Cheney yesterday defended the US detention facility at Guantanamo Bay amid mounting criticism from Democrats, and some Republicans, that the prison is damaging the US reputation overseas and encouraging anti-US recruits.

Mr Cheney denied allegations that prisoners at Guantanamo were being treated inhumanely, and called the prison an "essential part" of the US strategy to win the "war on terror".

"The track record there is on the whole pretty good," Mr Cheney said. "I think these people have been treated far better than they could be expected to have been treated by virtually any other government on the face of the earth."

President George W. Bush last week sparked speculation about the future of Guantanamo when he said the US was "exploring all alternatives" for its detainees. Republican senators Mel Martinez and Chuck Hagel recently joined a growing chorus of Democrats who argue that the prison is damaging the US image abroad.

Patrick Leahy, a senior Democratic senator, yesterday called the prison a "national disgrace" that had become "the primary recruiting tool of our enemies".

Last month, the White House lambasted Newsweek for a story, since retracted, that said the Pentagon had concluded that a US guard flushed a Koran down a lavatory at Guantanamo. The Pentagon investigation concluded there was no credible evidence to support the allegation. But it did find that US guards deliberately mishandled the holy book on three occasions.

Mr Cheney yesterday said the prison was necessary to detain "enemy combatants" to prevent them from returning to the battlefield. The US is holding about 550 detainees at Guantanamo, including about a dozen Uighur Chinese whom the US has determined are no longer "enemy combatants".

The US does not want to repatriate the Uighurs - ethnic Muslims from China's Xinjiang province - out of fear that they could be tortured in China. But the Bush administration is having trouble persuading other countries to take the Uighurs.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT 6**



# U.S. DEPARTMENT *of* STATE

## Roundtable with Japanese Journalists

**Secretary Colin L. Powell**
Washington, DC
August 12, 2004

(3:30 p.m. EDT)

**SECRETARY POWELL:** Well, it's a great pleasure to see you all. And in the interest of time, I will just make myself available to your questions, in whatever order you would like to ask them, if you have worked that out.

**QUESTION:** (Inaudible.)

(Laughter.)



**QUESTION:** Thank you very much. My question is on North Korea. Libya voluntarily give up-- decided to give up its WMD program. But it took nine months to relinquish it and an additional several month, several month to actually dismantle the program, and the North Koreans have not even acknowledged (inaudible). Do you think it's possible to (inaudible) North Korea (inaudible) one year from now?

**SECRETARY POWELL:** I don't know. I am Secretary of State, but not a fortune teller. (Laughter.) I would like to see the issue resolved within a year. I just don't know if it will be possible. I do know, though, that we have made progress over the last year and a half by getting all of the parties in the six-party talks to acknowledge that the mutual goal is the denuclearization of the Korean Peninsula, even North Koreans agree to that.

What we are discussing now is how to go about it in a way that serves the interest of each member in the six-party talks. The North Koreans want to feel safe, and that they will not be attacked or invaded by the United States. And we have said that repeatedly. We have no desire or intention to attack or invade North Korea. We have no hostile intention toward North Korea.

The President has said many times that he is concerned about the North Korean people and he would like to see if it is not possible for the international community to help them, not to invade them, but to help them. But it has to begin with North Korea removing this danger to the region, this danger of nuclear weapons. And I think the six-party talks have shown some progress.

These things take time, necessarily. As you noted, it took a long time with Libya, but Libya came to a very sound conclusion. Libya said, "What are we getting for this? We spent a lot of money on chemical and nuclear programs. And does anybody like us any better? Are we getting investment? The rest of the world is globalizing. The rest of the world is going into the internet age, and we sit here with our health care system deteriorating, with all kinds of other things that are not favorable to us, so maybe we should get rid of this." And that's what they chose to do.

We have described this example to the North Koreans. The North Koreans always respond saying, "We're not Libya." Well, we know you're not Libya, but you should make the same kind of assessment. And if you have a program that is not serving a particular purpose, then maybe it's time to think about how we could more rapidly get rid of that program and deal with that program.

But the North Koreans want to be safe. They want to believe that if they didn't have this program, that the United States would not invade them. We're not going to invade them with this program or without this program. It's not our intention or the purpose we serve. South Korea wants to be safe. Japan wants to be safe from the

threat of nuclear weapons in the region, and both China and Russia realize that this is destabilizing to have this kind of program in the region.

So we all have a mutual goal, denuclearization of the Peninsula, and everybody is looking at their own individual needs in order to move forward. How long it will take, I don't know. The agreed framework in 1994, didn't happen all of a sudden, it took time. It took a lot of time and a lot of interlocutors, and a lot of meeting -- meetings before the agreed framework was arrived at, and it was a flawed agreement.

And so, we want a good agreement. And we want an agreement that serves the needs and the purposes of all of the parties, and the President is looking for and hoping for a political and diplomatic solution.

QUESTION: I understand the U.S., the United States, has supported Japan's membership in the UN Security Council as a permanent member. In the case, what is your view about the Article 9 of the Japanese constitution says that there are obstacles that, you know, (inaudible) that Japan's participation when it comes to (inaudible).

SECRETARY POWELL: Well, as you know, Secretary General Annan has a group studying the United Nations now, a group of very distinguished individuals, Mr. Brent Scowcroft is the American who is on this group, and I hope that they will come up with ideas that would allow all of us to examine the right composition for the Security Council. Is this current form, the right form, or should it be expanded? Should it have different tiers of membership within the Security Council? But we certainly have been supportive of Japan's interest in becoming a member of this major body within the general -- within the United Nations, the Security Council.

Article 9, of course, is something that the Japanese people feel very, very strongly about, and it really comes out of the World War II experience. And it is something that I think was encouraged by the Americans at that time. And so, we understand the importance of Article 9 to the Japanese people and why it's in your constitution. But at the same time, if Japan is going to play a full role on the world stage and become a full active participating member of the Security Council and have the kinds of obligations that it would pick up as a member of the Security Council, then Article 9 would have to be examined in that light.

But whether or not Article 9 should be modified or changed is absolutely, entirely up to the Japanese people to decide because it is in your constitution, and the United States would never presume to offer an opinion. The only opinion that counts in this regard is the opinion of the Japanese people, as they express their collective will, as to whether they wish their constitution changed or not.

Our security obligations with Japan are well known because it's documented in our mutual defense agreements.

QUESTION: Mr. Secretary, last month, in Jakarta, ASEAN Plus 3 discussed establishing so-called East Asia community. What is your view on that? I mean, I understand that your last -- I mean, the former administration, the former Bush Administration --

SECRETARY POWELL: Former Bush Administration?

QUESTION: Former Bush Administration, proposed the idea of establishing a so-called East Asia economic focus.

 SECRETARY POWELL: Mm-hmm. We believe that the various Asian bodies, whether it's the Asian Regional Forum or ASEAN, or if you talk about economic issues, APEC gives everybody an opportunity to express views and find programs of mutual benefit that they can use to go forward into this 21st century globalizing world.

The United States understands that there may be some reasons that people have for going into other kinds of formats, such as ASEAN Plus 3. We just hope that as our friends in Asia look at these alternatives or these other formations, they're free to participate in their sovereign countries. We would hope they would only do so if it did not, in any way, damage the relationship that the United States has bilaterally with our friends in the region and that we have within the ASEAN Regional Forum framework.

And that's why I go to Jakarta every -- or to the ASEAN meeting every year and I sing. (Laughter.) But it's an important -- it's an important body because it brings all of us together in the United States. It is the major large Asian forum that the United States plays a part in, and it is becoming more than just an economic discussion in

our ARF meetings, it is also now dealing with security and terrorism, which affects economics.

So, we are not yet persuaded of the need for these other arrangements, but sovereign nations are free to choose what they do, but don't choose it in a way that undercuts the very, very fine and strong relations that we have, that the United States has with each and every one of our friends in Asia.

QUESTION: Mr. Secretary, back to North Korea. Is the Nunn-Lugar program something that can be applied to North --

SECRETARY POWELL: The what?

QUESTION: Nunn-Lugar. Can that be applied to North Korea? If North Korea decides to dismantle its program, would you give them money and expertise to jointly sort of dismantle, the way we did that in the Soviet Union?

SECRETARY POWELL: I don't know whether it would be under the Nunn-Lugar framework, but certainly if North Korea moves in this direction we understand that outside resources would be needed to help North Korea. I think the IAEA would have a role to play and all of the other parties to the six-party talks would have a role to play.

QUESTION: In money and expertise? Would the U.S. give them --

SECRETARY POWELL: Yeah, mm-hmm. You know, under the Agreed Framework we had experts who were monitoring things in North Korea, as was the IAEA, but I think just as we did with Libya in helping to remove the burden that it had of these programs, we would certainly help North Korea.

QUESTION: Also on North Korea --

SECRETARY POWELL: I think it's important for me to say, though, it has to be done in the context of something that is totally irreversible and it has to be done in the context of the entire program, all aspects of the program, and there has to be an acknowledgement of not only the previous programs of plutonium but the enriched uranium programs as well.

So, in that context, and that's the six-party context, certainly the United States would be willing to assist with the cost of removal, destruction and total elimination of the programs.

QUESTION: Also HEU program? So if North Korea continued to deny its HEU program at the next round of six-party talk, are you going to shift your forecast to the nonproliferation regime, such as PSI? I am wondering at what point would the U.S. decide to take this issue to the UN Security Council?

SECRETARY POWELL: No, no decisions have been made. We are far from that kind of action at this point. There are other aspects to North Korean behavior that we don't like: selling of weapons, selling of knowledge of weapons, counterfeiting of money; there are drug trade issues that we have with North Korea. So there are many other aspects to their policies that we are disapproving of.

But with respect to the enriched uranium program, we believe that the evidence is solid that they have done work in this program on this kind of technology and we don't see how we could get a complete solution to the nuclear question without getting questions answered with respect to the enriched uranium program. When we confronted them with the information that we had that they had such a program, they were distressed but then they acknowledged it. They said so. We do, yes. And they have acknowledged it subsequently and they have also denied it subsequently. So sometimes they say they have it and sometimes they say they don't have it. Sometimes they say, well, that was just a tactic we used in negotiations and sometimes they say it was not a tactic, we do have it.

And so it's difficult to read them. Since it is difficult to read them, I think we have to insist that all parts of their program, plutonium and enriched uranium, have to be part of any agreement. When the Agreed Framework was entered into, it was clearly for the purpose of denuclearizing the peninsula, but everybody thought it was only a plutonium denuclearization at Yongbyon and we discovered in the last several years that they had been working on enriched uranium. And so we can't go down that road again. We cannot be put in a position -- the world cannot be put in a position -- of knowing of an enriched uranium program and not having it as part of the denuclearization process.

**QUESTION:** Mr. Secretary, also thank you so much for (inaudible) appreciate it. I want to follow up my colleague's question about the North Korea. In last round of six-party talks in Beijing you made a initial and a complete proposal.

**SECRETARY POWELL:** Mm-hmm.

**QUESTION:** If they made a commitment of dismantlement of the whole nuclear weapons programs, they can get some benefit and (inaudible) participate the HEU (inaudible) supply and (inaudible) but United States is not willing to do that and the North Korea now (inaudible) the United States to do some action, action for action. Do you have any, you know, flexibility to show some kind of symbolic gestures to North Korea to move the process forward just like a, such a teeny, small dollar value contribution or transportation or (inaudible)? Otherwise, and also, HEU issue – it's – United States proposal it's a total commitment of the old nuclear weapons. So commitment not including HEU, it's a nonstarter for United States?

**SECRETARY POWELL:** How can we have a total commitment if it doesn't include the enriched uranium part of the program? Now, with respect to North Korean desires, what we have said is that we want to help North Korea but we are not prepared to start putting real benefits on the table in response to a promise to do something. We have seen this kind of tactic with the North Korean negotiators in the past. Now, some of our colleagues in the six-party talks are willing to put forward fuel and maybe other help to the North Koreans. Some of our party – our colleagues are putting forward food now. We have made a contribution through.

But we believe we need to see some progress. We need to see some things actually happen that shows absolute seriousness on their part before we would be willing to contribute support or resources to North Korea.

This should not be something that is holding up progress. Since other members of the six-party talks have said they would put something up front to assist North Korea with its fuel and energy needs, that should be enough. The United States has said up front as we start down this road we will provide assurances with respect to our lack of a hostile intent and our assertion and statement that we have no plans to invade or attack, and this will all be part of an agreement that we will enter into over time.

But the burden, frankly, in my judgment, is on North Korea to make a move, not constantly for people to come back to the United States and say, well, you made a good move at the last six-party talks, you showed a great deal of flexibility, you put down a clear statement of what you need, all of your other colleagues in the six-party talks thought that this was a significant move on the part of the United States, but the North Koreans are not happy so please make another move. No, this is not the way to negotiate with them. We showed flexibility. All five of the six members -- and you know which ones I mean -- showed flexibility and it really now is up to the North Koreans to take back that proposal, which they did, to Pyongyang, to study it carefully, to analyze it -- that's what I expect them to do -- and then to come back the next working group session or the next plenary session and respond to the proposal and we will be prepared to respond to the proposals that they put down.

So the six-party talks are serving the intended purpose of bringing all of the countries in the neighborhood, plus the United States, together. We have made some progress. All six nations are committed to denuclearization of the peninsula. All six nations know that the North Koreans require assistance. All six nations are agreed in principle that some sort of security document will be appropriate at the right time. So we have made progress, but these things take time.

**QUESTION:** Mr. Secretary, thank you very much. My question is regarding (inaudible) Major Jenkins. This issue is a difficult issue. First of all, at the same time there are separate idea in Japan how to resolve this issue. I am wondering, I know that United States position has not changed, especially DOD attitude still very strong. How are you going to deal with this issue? Do you have any good idea to make everybody happy or are you considering (inaudible) still considering to put him to jail still?

**SECRETARY POWELL:** He is a deserter from the United States Armed Forces and that's a fact. It's a fact that we can't change. And it's not the DOD position; it's the position of the United States Government. And he came out of North Korea and then went and spent some time in a third country, and then when his health situation was analyzed and it was made clear that he needed more sophisticated healthcare in Japan and he was moved to Japan, that also put him with his wife and children in a better setting; the United States made clear that we still viewed him as a deserter and that will not change, but he is a man who is now in need of medical care.

And so Japan knows that we have not renounced our desire to have him return to be dealt with in our military justice system, but for now his health is the important thing. And we are working with the Japanese Government and Mr. Jenkins is in touch with various people as to how he might deal with this matter in a legal

sense. But we cannot set aside the fact that he is a deserter. We cannot set aside the fact that because he is a deserter we need to resolve this case at some point in the future. Right now, he is under medical care and that comes first. We are not pressing our case.

**QUESTION:** Two quick questions. What would the fate of the Uighur detainees at Guantanamo Bay be? Are they going to be given asylum here? We understand they're not going to be sent back to China. Are they going to be relocated to a third country?

And very quickly, democracy in Burma has not progressed an inch. There is no evidence that the U.S. sanctions on Burma have, in any way, in any significant way, affected the military junta. The national convention was held without the NLD participation. What more can the U.S. and the international community do?

**SECRETARY POWELL:** On the first problem, the Uighurs are a difficult problem and we are trying to resolve all issues with respect to all detainees at Guantanamo. The Uighurs are not going back to China, but finding places for them is not a simple matter, but we are trying to find places for them. And we are trying to find places for them, and, of course, all candidate countries are being looked at.

With respect to -- I'm sorry --

**QUESTION:** Burma.

**SECRETARY POWELL:** Burma. I'm disappointed that the Government of Burma has not moved in a positive direction with respect to democracy, with respect to letting Aung San Suu Kyi participate in her party, participate in the life, political life of Burma. I think Burma is missing a golden opportunity.

The United States has, perhaps, been the most outspoken country in the world on this subject, and we have not only been outspoken, but we have used what we can with our sanctions policy to express our displeasure to the Burmese Government. I do it at every one of my Asia meetings, I do it every year at the ASEAN Regional Forum, and rather than saying, "What more can the United States do?", what more can the rest of the international community do, because not all members of the international community have spoken out as clearly on this issue and have taken the actions they might take to put pressure on the regime.

And so we will continue to put pressure on the regime. We will not have a satisfactory relationship with Burma until this matter is resolved. And it is not enough to say, "Well, we have a roadmap to democracy," if it is not a real roadmap and if it doesn't allow pluralistic activities within the political system.

And as long as Aung San Suu Kyi is denied the opportunity to participate in the political life of Burma, and her party is so denied, then we will continue to speak out strongly and find out if there are any other levers one can apply against the regime.

**QUESTION:** So --

**QUESTION:** On Iran.

**QUESTION:** Yes.

**QUESTION:** So do you want Japan to withdraw? I mean, (inaudible), including Japan, to withdraw its business from Iran, because Iran has a dangerous nuclear missile programs?

**SECRETARY POWELL:** We would hope that as Japan examines its relationship with Iran, it would take into account, in any business transaction or any proposals that come along, the fact that Iran is not behaving in a responsible manner. The IAEA has found serious deficiencies in their program. The European Foreign Ministers 3, the three foreign ministers, entered into agreements with Iran, which Iran is not complying with. And it seems clear to us that Iran is trying to develop a nuclear weapon, and it is essentially saying to the international community, "No matter what you think, we're going to go ahead and build centrifuges and preserve the option of going further." I would hope that the Japanese Government and Japanese businesses would take this into account as they make judgments as to whether this is the place that one should be making investments in or doing this kind of energy business with.

Okay. Last one.

**QUESTION:** Mr. Secretary, is it true that the recent visit (inaudible) that U.S. Government ask the Japanese Government, (inaudible), to call off the agreement regarding the government Azadegan oil field. And (inaudible) recommended the Japanese Government to invest in a (inaudible)? Is this true?

**SECRETARY POWELL:** I don't – I don't think all of that is true, no. (Laughter.) Thank you very much.

(Laughter.)

The Japanese Government knows our view and I think I'll leave it there. Thank you.

**QUESTION:** Thank you, Secretary, again. Thank you so much.

Released on August 13, 2004

# **EXHIBIT 7**

HUMAN RIGHTS WATCH

hrw.org   *DEFENDING HUMAN RIGHTS WORLDWIDE*

HUMAN RIGHTS NEWS

PORTUGUÊS  FRANÇAIS  РУССКИЙ  DEUTSCH
ESPAÑOL  中文  العربية  OTHER

**Home**
**News Releases**
**About HRW**
**Get Involved**
**Publications**
**Info by Country**
Africa
Americas
Asia
Europe/Central Asia
Middle East/N. Africa
United States

**Global Issues**
Arms
Children's Rights
Economic, Social &
Cultural Rights
HIV/AIDS
International Justice
LGBT Rights
Prisons
Refugees
Torture and Abuse
United Nations
Women's Rights
More...

**Campaigns**
**Film Festival**
**Photo Galleries**
**Audio / Video**
**Site Map**
**Contact Us**
**RSS**



U.S. Foreign Policy & Human Rights

FREE

Join the HRW Mailing List

## U.S.: Don't Send Detainees Back to China

(New York, November 26, 2003) The United States should abandon reported plans to send Uighur detainees currently held at Guantánamo Bay to China, where they are likely to face mistreatment and possibly torture, Human Rights Watch said today.

> **"The United States should not even contemplate returning Uighurs to China. Any assurances from China that it will not mistreat returnees would not be worth the paper they are written on. It would be virtually impossible for the U.S. to prevent mistreatment of these detainees once they fall into China's abysmal prison system."**
>
> **Brad Adams**
> **Executive Director of Human Rights Watch's Asia Division**

More than a dozen ethnic Uighur separatists were apprehended in Afghanistan and transferred to the U.S. military detention facility at Guantánamo Bay in Cuba. They were reportedly training in Afghanistan with Uighur groups seeking independence or greater autonomy from China for the northwestern province of Xinjiang.

China has a long and well-documented history of repression of the Uighurs, a Muslim, Turkic-speaking community. The government has systematically tortured and otherwise mistreated suspected separatists. The death penalty has been used against those found guilty of separatist activities after trials that do not meet international fair trial standards. Annual U.S. State Department human rights reports have consistently and strongly criticized China for the mistreatment of ethnic Uighurs. Reflecting these concerns, the United States has urged China to allow the United Nations Special Rapporteur on Torture to visit China and have access to its prisons and other places of detention.

"The United States should not even contemplate returning ethnic Uighurs to China," said Brad Adams, executive director of Human Rights Watch's Asia division. "Any assurances from China that it will not mistreat returnees would not be worth the paper they are written on. It would be impossible for the United States to prevent mistreatment of these detainees once they fall into China's abysmal prison system."

While insisting that the United States should not return Uighurs to China, Human Rights Watch reiterated its longstanding objection to the practice of detaining individuals indefinitely without charges at Guantánamo in violation of international human rights law and international humanitarian law. Persons for whom there is no legal basis to detain must be released to countries where they will not face torture or mistreatment.

The problems of rendition of suspects to countries that routinely practice torture was highlighted by the case of Maher Arar, a Syrian-born Canadian citizen, who was transferred by the United States to Syria after being detained in New York. On November 4, Arar publicly asserted that while held in Syrian prisons for ten months he was repeatedly tortured by being whipped with a thick electric cable and threatened with electric shocks. The United States claimed that it had received assurances from Syria that Arar would not be mistreated.

Case 1:05-cv-01602-UNA     Document 3     Filed 09/14/2005     Page 57 of 234

"As with Arar and Syria, it is a fallacy to believe that a state that systematically practices torture will magically transform itself simply because it has offered diplomatic assurances," said Adams. "It would be extremely reckless to accept written assurances from China in these cases. If these men are returned and anything happens to them, it will be the responsibility of the United States."

Expelling, returning or extraditing a person to a country where there are substantial grounds for believing that he or she would be subjected to torture is a violation of the Convention against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, a treaty that the United States ratified in 1994.

The Bush Administration has acknowledged this obligation, and asserts it does not render suspects if it believes it is likely that they will be tortured. On June 25, the U.S. Defense Department General Counsel, William Haynes, wrote to U.S. Senator Patrick Leahy: "Should an individual be transferred to another country to be held on behalf of the United States, or should we otherwise deem it appropriate, United States policy is to obtain specific assurances from the receiving country that it will not torture the individual being transferred to that country. We can assure you that the United States would take steps to investigate credible allegations of torture and take appropriate action if there were reason to believe that those assurances were not being honored."

The United States apparently is considering sending the Uighurs to China because it believes they do not constitute a threat to the United States and presumably have committed no crimes. Yet it is reportedly insisting that those released be investigated and imprisoned upon repatriation.

"The United States operates a system in Guantánamo in which detainees are held without charges and without access to lawyers or family members," said Adams. "It now proposes to compound this travesty of justice by sending these men to a country in which the presumption of innocence is routinely turned on its head."

Human Rights Watch urged the Bush Administration to institute a moratorium on the rendition of persons to countries that routinely use torture until it has undertaken a broader review of the U.S. practice with regard to renditions. The review must examine the nature of the assurances the United States receives from countries prior to transfer, the steps it takes to ensure persons are not abused after rendition, and the actual fate of those who have been turned over to countries known to practice torture. Before it lifts the moratorium, the United States must also ensure that its own practices are consistent with U.S. and international law, and that procedures are in place to protect transferred detainees from being subjected to torture or other cruel, inhuman or degrading treatment.

The potential return of Uighurs to China is particularly worrisome given the longstanding, highly emotional situation in Xinjiang. Armed Uighur groups have bombed and attacked Chinese government and military targets. Human Rights Watch has condemned separatist violence, as well as the systematic repression by China against Uighurs and Muslims in Xinjiang. China has opportunistically used the international "war on terror" to conflate armed separatists with those advocating peaceful efforts to obtain independence or greater autonomy.



Contribute to Human Rights Watch

Home | About Us | News Releases | Publications | Info by Country | Global Issues | Campaigns | What You Can Do | Community | Bookstore | Film Festival | Search | Site Map | Contact Us | Press Contacts | Privacy Policy

© Copyright 2004, Human Rights Watch   350 Fifth Avenue, 34th Floor   New York, NY 10118-3299   USA

**EXHIBIT 8**

**Harding, Paula B.**

| | |
|---|---|
| **From:** | Pinney, Jason S. |
| **Sent:** | Wednesday, September 07, 2005 2:49 PM |
| **To:** | Andrew. Warden@usdoj. gov (E-mail); 'terry.henry@usdoj.gov' |
| **Cc:** | Willett, P. Sabin; Manning, Susan Baker |
| **Subject:** | Mamet v. Bush: Case No. 1:05cv01602 (ESH) |

Dear Terry and Andrew,

As you know, we have filed a *habeas corpus* petition on behalf of Edham Mamet.  Can you please advise as to the following questions?

1.  Does the Government understand Mr. Mamet to be Uighur?
2.  Has the Government made a determination that Mr. Mamet is not an enemy combatant, or otherwise does not represent a security threat to the United States?
3.  Has the Government any plan or expectation as to Mr. Mamet's release?

Regards.

Jason S. Pinney
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
tel:  617.951.8684
fax:  617.428.6491
www.bingham.com

*The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above.  Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient.  If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal.  Thank you.*

*You should recognize that responses provided by means of this email are akin to ordinary telephone or face-to-face conversations and do not reflect the level of factual or legal inquiry or analysis which would be applied in the case of a formal legal opinion.  A formal opinion could reach a different result.  We would, of course, be happy to prepare such a definitive statement or formal opinion if you would like us to.*



Pinney, Jason
S..vcf

**EXHIBIT 9**



**THE SECRETARY OF THE NAVY**
WASHINGTON, D.C. 20350-1000

**29 July 2004**

MEMORANDUM FOR DISTRIBUTION

Subj:   Implementation of Combatant Status Review Tribunal
        Procedures for Enemy Combatants detained at Guantanamo
        Bay Naval Base, Cuba

Ref:    (a) Deputy Secretary of Defense Order of July 7, 2004
        (b) Convening Authority Appointment Letter of
            July 9, 2004

Encl:   (1) Combatant Status Review Tribunal Process
        (2) Recorder Qualifications, Roles and Responsibilities
        (3) Personal Representative Qualifications, Roles and
            Responsibilities
        (4) Combatant Status Review Tribunal Notice to Detainees
        (5) Sample Detainee Election Form
        (6) Sample Nomination Questionnaire
        (7) Sample Appointment Letter for Combatant Status Review
            Tribunal Panel
        (8) Combatant Status Review Tribunal Hearing Guide
        (9) Combatant Status Review Tribunal Decision Report
            Cover Sheet

1.  Introduction

    By reference (a), the Secretary of Defense has established a
Combatant Status Review Tribunal (CSRT) process to determine, in
a fact-based proceeding, whether the individuals detained by the
Department of Defense at the U.S. Naval Base Guantanamo Bay,
Cuba, are properly classified as enemy combatants and to permit
each detainee the opportunity to contest such designation.   The
Secretary of the Navy has been appointed to operate and oversee
this process.

    The Combatant Status Review Tribunal process provides a
detainee:  the assistance of a Personal Representative; an
interpreter if necessary; an opportunity to review unclassified
information relating to the basis for his detention; the
opportunity to appear personally to present reasonably available
information relevant to why he should not be classified as an
enemy combatant; the opportunity to question witnesses
testifying at the Tribunal; and, to the extent they are

Subj:   Implementation of Combatant Status Review Tribunal
        Procedures for Enemy Combatants detained at Guantanamo
        Bay Naval Base, Cuba

reasonably available, the opportunity to call witnesses on his
behalf.

## 2.  Authority

    The Combatant Status Review Tribunal process was established
by Deputy Secretary of Defense Order dated July 7, 2004
(reference (a)), which designated the undersigned to operate and
oversee the Combatant Status Review Tribunal process.  The
Tribunals will be governed by the provisions of reference (a)
and this implementing directive, which sets out procedures for
Tribunals and establishes the position of Director, Combatant
Status Review Tribunals.  Reference (b) designates the Director,
CSRT, as the convening authority for the Tribunal process.

## 3.  Implementing Process

    The Combatant Status Review Tribunal Process is set forth in
enclosure (1).  Enclosures (2) and (3) set forth detailed
descriptions of the roles and responsibilities of the Recorder
and Personal Representative respectively.  Enclosure (4) is a
Notice to detainees regarding the CSRT process.  Enclosure (5)
is a Sample Detainee Election Form.  Enclosure (6) is a Sample
Nominee Questionnaire for approval of Tribunal members,
Recorders, and Personal Representatives.  Enclosure (7) is an
Appointment Letter that will be signed by the Director of CSRT
as the convening authority.  Enclosure (8) is a CSRT Hearing
Guide. Tribunal decisions will be reported to the convening
authority by means of enclosure (9).  This implementing
directive is subject to revision at any time.

CC:
Secretary of State
Secretary of Defense
Attorney General
Secretary of Homeland Security
Director, Central Intelligence Agency
Assistant to the President for National Security Affairs
Counsel to the President

2

Deputy Secretary of Defense
Secretary of the Army
Secretary of the Navy
Secretary of the Air Force
Chairman of the Joint Chiefs of Staff
Director, Federal Bureau of Investigation
Director of Defense Agencies
Director, DOD Office of Detainee Affairs

## Combatant Status Review Tribunal Process

### A. Organization

Combatant Status Review Tribunals (CSRT) will be administered by the Director, Combatant Status Review Tribunals. The Director will staff and structure the Tribunal organization to facilitate its operation. The CSRT staff will schedule Tribunal proceedings, provide for interpreter services, provide legal advice to the Director and to Tribunal panels, provide clerical assistance and other administrative support, ensure information security, and coordinate with other agencies as appropriate.

### B. Purpose and Function

This process will provide a non-adversarial proceeding to determine whether each detainee in the control of the Department of Defense at the Guantanamo Bay Naval Base, Cuba, meets the criteria to be designated as an enemy combatant, defined in reference (a) as follows:

> An "enemy combatant" for purposes of this order shall mean an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

Each detainee whose status will be reviewed by a Tribunal has previously been determined, since capture, to be an enemy combatant through multiple levels of review by military officers and officials of the Department of Defense.

The Director, CSRT, shall convene Tribunals pursuant to this implementing directive to conduct such proceedings as necessary to make a written assessment as to each detainee's status as an enemy combatant. Each Tribunal shall determine whether the preponderance of the evidence supports the conclusion that each detainee meets the criteria to be designated as an enemy combatant.

Adoption of the procedures outlined in this directive is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

### C. Combatant Status Review Tribunal Structure

(1) Each Tribunal shall be composed of a panel of three neutral commissioned officers of the U.S. Armed Forces convened to make determinations of enemy combatant status pursuant to this implementing directive. Each of the officers shall possess the appropriate security clearance and none of the officers appointed shall have been involved in the apprehension, detention, interrogation, or previous determination of status of the detainees other than the CSRT process. The senior member of each Tribunal shall be an officer serving in the grade of O-6 and shall be its President. The other members of the Tribunal shall be officers in the grade of O-4 and above. One of

**Enclosure (1)**

the officers appointed to the Tribunal shall be a judge advocate. All Tribunal members have an equal vote as to a detainee's enemy combatant status.

(2) **Recorder.** Each Tribunal shall have a commissioned officer serving in the grade of O-3 or above, preferably a judge advocate, appointed by the Director, CSRT, to obtain and present all relevant evidence to the Tribunal and to cause a record to be made of the proceedings. The Recorder shall have an appropriate security clearance and shall have no vote. The Recorder shall not have been involved in the apprehension, detention, interrogation, or previous determination of status of the detainees other than the CSRT process. The role and responsibilities of the Recorder are set forth in enclosure (2).

(3) **Personal Representative.** Each Tribunal shall have a commissioned officer appointed by the Director, CSRT, to assist the detainee in reviewing all relevant unclassified information, in preparing and presenting information, and in questioning witnesses at the CSRT. The Personal Representative shall be an officer in the grade of O-4 or above, shall have the appropriate security clearance, shall not be a judge advocate, and shall have no vote. The Personal Representative shall not have been involved in the apprehension, detention, interrogation, or previous determination of status of the detainees other than the CSRT process. The role and responsibilities of the Personal Representative are set forth in enclosure (3).

(4) **Legal Advisor.** The Director, CSRT, shall appoint a judge advocate officer as the Legal Advisor to the Tribunal process. The Legal Advisor shall be available in person, telephonically, or by other means, to each Tribunal as an advisor on legal, evidentiary, procedural or other matters. In addition, the Legal Advisor shall be responsible for reviewing each Tribunal decision for legal sufficiency. The Legal Advisor shall have an appropriate security clearance and shall have no vote. The Legal Advisor shall also not have been involved in the apprehension, detention, interrogation, or previous determination of status of the detainees other than the CSRT process.

(5) **Interpreter.** If needed, each Tribunal will have an interpreter appointed by the President of the Tribunal who shall be competent in English and a language understood by the detainee. The interpreter shall have no vote and will have an appropriate security clearance.

**D. Handling of Classified Material**

(1) All parties shall have due regard for classified information and safeguard it in accordance with all applicable instructions and regulations. The Tribunal, Recorder and Personal Representative shall coordinate with an Information Security Officer in the handling and safeguarding of classified material before, during and after the Tribunal proceeding.

(2) The Director, CSRT, and the Tribunal President have the authority and duty to ensure that all proceedings of, or in relation to, a Tribunal under this Order shall comply with Executive Order 12958 regarding national security information in all respects. Classified information may be used in the CSRT process with the concurrence of the

2

**Enclosure (1)**

originating agency. Classified information for which the originating agency declines to authorize for use in the CSRT process is not reasonably available. For any information not reasonably available, a substitute or certification will be requested from the originating agency as cited in paragraph E (3)(a) below.

(3)   The Director, CSRT, the CSRT staff, and the participants in the CSRT process do not have the authority to declassify or change the classification of any classified information.

## E. Combatant Status Review Tribunal Authority

The Tribunal is authorized to:

(1)   Determine the mental and physical capacity of the detainee to participate in the hearing. This determination is intended to be the perception of a layperson, not a medical or mental health professional. The Tribunal may direct a medical or mental health evaluation of a detainee, if deemed appropriate. If a detainee is deemed physically or mentally unable to participate in the CSRT process, that detainee's case will be held as a Tribunal in which the detainee elected not to participate. The Tribunal President shall ensure that the circumstances of the detainee's absence are noted in the record.

(2)   Order U.S. military witnesses to appear and to request the appearance of civilian witnesses if, in the judgment of the Tribunal President those witnesses are reasonably available as defined in paragraph G (9) of this enclosure.

(3)   Request the production of such reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant, including information generated in connection with the initial determination to hold the detainee as an enemy combatant and in any subsequent reviews of that determination, as well as any records, determinations, or reports generated in connection with such proceedings (cumulatively called hereinafter the "Government Information").

(a) For any relevant information not provided in response to a Tribunal's request, the agency holding the information shall provide either an acceptable substitute for the information requested or a certification to the Tribunal that none of the withheld information would support a determination that the detainee is not an enemy combatant. Acceptable substitutes may include an unclassified or, if not possible, a lesser classified, summary of the information; or a statement as to the relevant facts the information would tend to prove.

(4)   Require each witness (other than the detainee) to testify under oath. The detainee has the option of testifying under oath or unsworn. Forms of the oath for Muslim and non-Muslim witnesses are in the Tribunal Hearing Guide (enclosure (8)). The Tribunal Recorder will administer the oath.

3

**Enclosure (1)**

**F.    The Detainee's Participation in the CSRT Process**

(1)    The detainee may elect to participate in a Combatant Status Review Tribunal or may waive participation in the process. Such waiver shall be submitted to the Tribunal in writing by the detainee's Personal Representative and must be made after the Personal Representative has explained the Tribunal process and the opportunity of the detainee to contest this enemy combatant status. The waiver can be either an affirmative statement that the detainee declines to participate or can be inferred by the Personal Representative from the detainee's silence or actions when the Personal Representative explains the CSRT process to the detainee. The detainee's election shall be noted by the Personal Representative on enclosure (5).

(2)    If a detainee waives participation in the Tribunal process, the Tribunal shall still review the detainee's status without requiring the presence of the detainee.

(3)    A detainee who desires to participate in the Tribunal process shall be allowed to attend all Tribunal proceedings except for proceedings involving deliberation and voting by the members and testimony or other matters that would compromise national security if held in the presence of the detainee.

(4)    The detainee may not be compelled to testify or answer questions before the Tribunal other than to confirm his identity.

(5)    The detainee shall not be represented by legal counsel but will be aided by a Personal Representative who may, upon the detainee's election, assist the detainee at the Tribunal. He shall be provided with an interpreter during the Tribunal hearing if necessary.

(6)    The detainee may present evidence to the Tribunal, including the testimony of witnesses who are reasonably available and whose testimony is considered by the Tribunal to be relevant. Evidence on the detainee's behalf (other than his own testimony, if offered) may be presented in documentary form and through written statements, preferably sworn.

(7)    The detainee may present oral testimony to the Tribunal and may elect to do so under oath or affirmation or as unsworn testimony. If the detainee testifies, either under oath or unsworn, he may be questioned by the Recorder, Personal Representative, or Tribunal members, but may not be compelled to answer questions before the Tribunal.

(8)    The detainee's Personal Representative shall be afforded the opportunity to review the Government Information, and to consult with the detainee concerning his status as an enemy combatant and any challenge thereto. The Personal Representative may share the unclassified portion of the Government Information with the detainee.

(9)    The detainee shall be advised of the foregoing by his Personal Representative before the Tribunal is convened, and by the Tribunal President at the beginning of the hearing.

**Enclosure (1)**

## G. Tribunal Procedures

(1) By July 17, 2004, the convening authority was required to notify each detainee of the opportunity to contest his status as an enemy combatant in the Combatant Status Review Tribunal process, the opportunity to consult with and be assisted by a Personal Representative, and of the jurisdiction of the courts of the United States to entertain a habeas corpus petition filed on the detainee's behalf. The English language version of this Notice to Detainees is at enclosure (4). All detainees were so notified July 12-14, 2004.

(2) An officer appointed as a Personal Representative will meet with the detainee and, through an interpreter if necessary, explain the nature of the CSRT process to the detainee, explain his opportunity to personally appear before the Tribunal and present evidence, and assist the detainee in collecting relevant and reasonably available information and in preparing for and presenting information to the CSRT.

(3) The Personal Representative will have the detainee make an election as to whether he wants to participate in the Tribunal process. Enclosure (5) is a Detainee Election Form. If the detainee elects not to participate, or by his silence or actions indicates that he does not want to participate, the Personal Representative will note this on the election form and this detainee will not be required to appear at his Tribunal hearing. The Director, CSRT, as convening authority, shall appoint a Tribunal as described in paragraph C (1) of this enclosure for all detainees after reviewing Nomination Questionnaires (enclosure (6)) and approving Tribunal panel members. Enclosure (7) is a sample Appointment Letter.

(4) The Director, CSRT, will schedule a Tribunal hearing for a detainee within 30 days after the detainee's Personal Representative has reviewed the Government Information, had an opportunity to consult with the detainee, and notified the detainee of his opportunity to contest his status, even if the detainee declines to participate as set forth above. The Personal Representative will submit a completed Detainee Election Form to the Director, CSRT, or his designee when the Personal Representative has completed the actions above. The 30-day period to schedule a Tribunal will commence upon receipt of this form.

(5) Once the Director, CSRT, has scheduled a Tribunal, the President of the assigned Tribunal panel may postpone the Tribunal for good cause shown to provide the detainee or his Personal Representative a reasonable time to acquire evidence deemed relevant and necessary to the Tribunal's decision, or to accommodate military exigencies as presented by the Recorder.

(6) All Tribunal sessions except those relating to deliberation or voting shall be recorded on audiotape. Tribunal sessions where classified information is discussed shall be recorded on separate and properly marked audiotapes.

5

**Enclosure (1)**

(7) **Admissibility of Evidence.** The Tribunal is not bound by the rules of evidence such as would apply in a court of law. Instead, the Tribunal shall be free to consider any information it deems relevant and helpful to a resolution of the issues before it. At the discretion of the Tribunal, for example, it may consider hearsay evidence, taking into account the reliability of such evidence in the circumstances.

(8) **Control of Case.** The President of the Tribunal is authorized to order the removal of any person from the hearing if that person is disruptive, uncooperative, or otherwise interferes with the Tribunal proceedings following a warning. In the case of the removal of the detainee from the Tribunal hearing, the detainee's Personal Representative shall continue in his role of assisting the detainee in the hearing.

(9) **Availability of Witnesses.** The President of the Tribunal is the decision authority on reasonable availability of witnesses.

    (a) If such witnesses are from within the U.S. Armed Forces, they shall not be considered reasonably available if, as determined by their commanders, their presence at a hearing would adversely affect combat or support operations.

    (b) If such witnesses are not from within the U.S. Armed Forces, they shall not be considered reasonably available if they decline properly made requests to appear at a hearing, if they cannot be contacted following reasonable efforts by the CSRT staff, or if security considerations preclude their presence at a hearing. Non-U.S. Government witnesses will appear before the Tribunal at their own expense. Payment of expenses for U.S. Government witnesses will be coordinated by the CSRT staff and the witness's organization.

    (c) For any witnesses who do not appear at the hearing, the President of the Tribunal may allow introduction of evidence by other means such as e-mail, fax copies, and telephonic or video-telephonic testimony. Since either video-telephonic or telephonic testimony is equivalent to in-person testimony, the witness shall be placed under oath and is subject to questioning by the Tribunal.

(10) **CSRT Determinations on Availability of Evidence.** If the detainee requests witnesses or evidence deemed not reasonably available, the President of the Tribunal shall document the basis for that decision; to include, for witnesses, efforts undertaken to procure the presence of the witness and alternatives considered or used in place of that witness's in-person testimony.

(11) **Burden of Proof.** Tribunals shall determine whether the preponderance of the evidence supports the conclusion that each detainee meets the criteria to be designated as an enemy combatant. There is a rebuttable presumption that the Government Evidence, as defined in paragraph H (4) herein, submitted by the Recorder to support a determination that the detainee is an enemy combatant, is genuine and accurate.

**Enclosure (1)**

(12) **Voting.** The decisions of the Tribunal shall be determined by a majority of the voting members of the Tribunal. A dissenting member shall prepare a brief summary of the basis for his/her opinion, which shall be attached to the record forwarded for legal review. Only the Tribunal members shall be present during deliberation and voting.

## H.  Conduct Of Hearing

A CSRT Hearing Guide is attached at enclosure (8) and provides guidance on the conduct of the Tribunal hearing. The Tribunal's hearing shall be substantially as follows:

(1)  The President shall call the Tribunal to order, and announce the order appointing the Tribunal (see enclosure (7)). The President shall also ensure that all participants are properly sworn to faithfully perform their duties.

(2)  The Recorder shall cause a record to be made of the time, date, and place of the hearing, and the identity and qualifications of all participants. All proceedings shall be recorded on audiotape except those portions relating to deliberations and voting. Tribunal sessions where classified information is discussed shall be recorded on separate and properly marked audiotapes.

(3)  The President shall advise the detainee of the purpose of the hearing, the detainee's opportunity to present evidence, and of the consequences of the Tribunal's decision. In cases requiring an interpreter, the President shall ensure the detainee understands these matters through the interpreter.

(4)  The Recorder shall present to the Tribunal such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant, including the circumstances of how the detainee was taken into the custody of U.S. or allied forces (the evidence so presented shall constitute the "Government Evidence"). In the event the Government Information contains evidence to suggest that the detainee should not be designated as an enemy combatant, the Recorder shall also separately provide such evidence to the Tribunal.

(5)  The Recorder shall present to the Tribunal an unclassified report summarizing the Government Evidence and any evidence to suggest that the detainee should not be designated as an enemy combatant. This report shall have been provided to the detainee's Personal Representative in advance of the Tribunal hearing.

(6)  The Recorder shall call the witnesses, if any. Witnesses shall be excluded from the hearing except while testifying. An oath or affirmation shall be administered to each witness by the Recorder. When deemed necessary or appropriate, the Tribunal members can call witnesses who are reasonably available to testify or request the production of reasonably available documentary or other evidence.

(7)  The detainee shall be permitted to present evidence and question any witnesses. The Personal Representative shall assist the detainee in obtaining unclassified documents and in arranging the presence of witnesses reasonably available and, if the detainee elects, the Personal Representative shall assist the detainee in the presentation of

7

**Enclosure (1)**

information to the Tribunal. The Personal Representative may, outside the presence of the detainee, present or comment upon classified information that bears upon the detainee's status if it would aid the Tribunal's deliberations.

(8) When deemed necessary and appropriate by any member of the Tribunal, the Tribunal may recess the Tribunal hearing to consult with the Legal Advisor as to any issues relating to evidence, procedure, or other matters. The President of the Tribunal shall summarize on the record the discussion with the Legal Advisor when the Tribunal reconvenes.

(9) The Tribunal shall deliberate in closed session with only voting members present. The Tribunal shall make its determination of status by a majority vote. The President shall direct a Tribunal member to document the Tribunal's decision on the Combatant Status Review Tribunal Decision Report cover sheet (enclosure (9)), which will serve as the basis for the Recorder's preparation of the Tribunal record. The unclassified reasons for the Tribunal's decision shall be noted on the Tribunal Decision Report cover sheet, and should include, as appropriate, the detainee's organizational membership or affiliation with a governmental, military, or terrorist organization (e.g., Taliban, al Qaida, etc.). A dissenting member shall prepare a brief summary of the basis for his/her opinion.

(10) Both documents shall be provided to the Recorder as soon as practicable after the Tribunal concludes.

I. Post-Hearing Procedures

(1) The Recorder shall prepare the record of the hearing and ensure that the audiotape is preserved and properly classified in conformance with security regulations.

(2) The detainee's Personal Representative shall be provided the opportunity to review the record prior to the Recorder forwarding it to the President of the Tribunal. The Personal Representative may submit, as appropriate, observations or information that he/she believes was presented to the Tribunal and is not included or accurately reflected on the record.

(3) The Recorder shall provide the completed record to the President of the Tribunal for signature and forwarding for legal review.

(4) In all cases the following items will be attached to the decision which, when complete and signed by the Tribunal President, shall constitute the record:

(a) A statement of the time and place of the hearing, persons present, and their qualifications;

(b) The Tribunal Decision Report cover sheet;

(c) The classified and unclassified reports detailing the findings of fact upon which the Tribunal decision was based;

8

**Enclosure (1)**

(d) Copies of all documentary evidence presented to the Tribunal and summaries of all witness testimony. If classified material is part of the evidence submitted or considered by the Tribunal, the report will be properly marked and handled in accordance with all applicable security regulations; and

(e) A dissenting member's summary report, if any.

(5) The President of the Tribunal shall forward the Tribunal's decision and all supporting documents as set forth above to the Director, CSRT, acting as Convening Authority, via the CSRT Legal Advisor, within three working days of the date of the Tribunal decision. If additional time is needed, the President of the Tribunal shall request an extension from the Director, CSRT.

(6) The Recorder shall ensure that all audiotapes of the Tribunal hearing are properly marked with identifying information and classification markings, and stored in accordance with all applicable security regulations. These tapes may be reviewed and transcribed as necessary for the legal sufficiency and Convening Authority reviews.

(7) The CSRT Legal Advisor shall conduct a legal sufficiency review of all cases. The Legal Advisor shall render an opinion on the legal sufficiency of the Tribunal proceedings and forward the record with a recommendation to the Director, CSRT. The legal review shall specifically address Tribunal decisions regarding reasonable availability of witnesses and other evidence.

(8) The Director, CSRT, shall review the Tribunal's decision and may approve the decision and take appropriate action, or return the record to the Tribunal for further proceedings. In cases where the Tribunal decision is approved and the case is considered final, the Director, CSRT, shall so advise the DoD Office of Detainee Affairs, the Secretary of State, and any other relevant U.S. Government agencies.

(9) If the Tribunal determines that the detainee shall no longer be classified as an enemy combatant, and the Director, CSRT, approves the Tribunal's decision, the Director, CSRT, shall forward the written report of the Tribunal's decision directly to the Secretary of the Navy. The Secretary of the Navy shall so advise the DoD Office of Detainee Affairs, the Secretary of State, and any other relevant U.S. Government agencies, in order to permit the Secretary of State to coordinate the transfer of the detainee with representatives of the detainee's country of nationality for release or other disposition consistent with applicable laws. In these cases the Director, CSRT, will ensure coordination with the Joint Staff with respect to detainee transportation issues.

(10) The detainee shall be notified of the Tribunal decision by the Director, CSRT. If the detainee has been determined to no longer be designated as an enemy combatant, he shall be notified of the Tribunal decision upon finalization of transportation arrangements or at such earlier time as deemed appropriate by the Commander, JTF-GTMO.

9

Enclosure (1)

# Recorder Qualifications, Roles and Responsibilities

**A. Qualifications of the Recorder**

    (1)    For each case, the Director, CSRT, shall select a commissioned officer in the grade of O-3 or higher, preferably a judge advocate, to serve as a Recorder.

    (2)    Recorders must have at least a TOP SECRET security clearance. The Director shall ensure that only properly cleared officers are assigned as Recorders.

**B. Roles of the Recorder**

    (1)    Subject to section C (1), below, the Recorder has a duty to present to the CSRT such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant, including the circumstances of how the detainee was taken into the custody of U.S. or allied forces (the "Government Evidence"). In the event the Government Information contains evidence to suggest that the detainee should not be designated as an enemy combatant, the Recorder shall also provide such evidence to the Tribunal.

    (2)    The Recorder shall have due regard for classified information and safeguard it in accordance with all applicable instructions and regulations. The Recorder shall coordinate with an Information Security Officer (ISO) in the handling and safeguarding of classified material before, during, and following the Tribunal process.

**C. Responsibilities of the Recorder**

    (1)    For each assigned detainee case under review, the Recorder shall obtain and examine the Government Information as defined in paragraph E (3) of enclosure (1).

    (2)    The Recorder shall draft a proposed unclassified summary of the relevant evidence derived from the Government Information.

    (3)    The Recorder shall ensure appropriate coordination with original classification authorities for any classified information presented that was used in the preparation of the proposed unclassified summary.

    (4)    The Recorder shall permit the assigned Personal Representative access to the Government Information and will provide the unclassified summary to the Personal Representative in advance of the Tribunal hearing.

    (5)    The Recorder shall ensure that coordination is maintained with Joint Task Force-Guantanamo Bay and the Criminal Investigative Task Force to deconflict any other ongoing activities and arrange for detainee movements and security.

    (6)    The Recorder shall present the Government Evidence orally or in documentary form to the Tribunal. The Recorder shall also answer questions, if any, asked by the Tribunal.

Enclosure (2)

(7) The Recorder shall administer an appropriate oath to the Tribunal members, the Personal Representative, the paralegal/reporter, the interpreter, and all witnesses (including the detainee if he elects to testify under oath).

(8) The Recorder shall prepare a Record of Proceedings, and, if applicable, a record of the dissenting member's report.  The Record of Proceedings should include:

(a) A statement of the time and place of the hearing, persons present, and their qualifications;

(b) The Tribunal Decision Report cover sheet;

(c) The classified and unclassified reports detailing the findings of fact upon which the Tribunal decision was based;

(d) Copies of all documentary evidence presented to the Tribunal and summaries of all witness testimony. If classified material is part of the evidence submitted or considered by the Tribunal, the report will be properly marked and handled in accordance with applicable security regulations; and

(e) A dissenting member's summary report, if any.

(9) The Recorder shall provide the detainee's Personal Representative the opportunity to review the record prior to the Recorder forwarding it to the President of the Tribunal. The Personal Representative may submit, as appropriate, observations or information that he/she believes was presented to the Tribunal and is not included or accurately reflected on the record.

(10) The Recorder shall submit the completed Record of Proceedings to the President of the Tribunal who shall sign and forward it to the Director, CSRT via the CSRT Legal Advisor. Once signed by the Tribunal President, the completed record is considered the official record of the Tribunal's decision.

(11) The Recorder shall ensure that all audiotapes of the Tribunal hearing are properly marked with identifying information and classification markings, and stored in accordance with applicable security regulations. These tapes are considered part of the case record and may be reviewed and transcribed as necessary for the legal sufficiency and convening authority reviews.

2

Enclosure (2)

## Personal Representative Qualifications, Roles and Responsibilities

### A. Qualifications of Personal Representative

(1) For each case, the Director, CSRT, shall select a commissioned officer serving in the grade of O-4 or higher to serve as a Personal Representative. The Personal Representative shall not be a judge advocate.

(2) Personal Representatives must have at least a TOP SECRET security clearance. The Director shall ensure that only properly cleared officers are assigned as Personal Representatives.

### B. Roles of the Personal Representative

(1) The detainees were notified of the Tribunal process per reference (a). When detailed to a detainee's case the Personal Representative shall further explain the nature of the CSRT process to the detainee, explain his opportunity to present evidence and assist the detainee in collecting relevant and reasonably available information and in preparing and presenting information to the Tribunal.

(2) The Personal Representative shall have due regard for classified information and safeguard it in accordance with all applicable instructions and regulations. The Personal Representative shall coordinate with an Information Security Officer (ISO) in the handling and safeguarding of classified material before, during, and after the Tribunal process.

### C. Responsibilities of the Personal Representative

(1) The Personal Representative is responsible for explaining the nature of the CSRT process to the detainee. Upon first contact with the detainee, the Personal Representative shall explain to the detainee that no confidential relationship exists or may be formed between the detainee and the Personal Representative. The Personal Representative shall explain the detainee's opportunity to make a personal appearance before the Tribunal. The Personal Representative shall request an interpreter, if needed, to aid the detainee in making such appearance and in preparing his presentation. The Personal Representative shall explain to the detainee that he may be subject to questioning by the Tribunal members, but he cannot be compelled to make any statement or answer any questions. Paragraph D, below, provides guidelines for the Personal Representative meeting with the enemy combatant prior to his appearance before the Tribunal.

(2) After the Personal Representative has reviewed the Government Information, had an opportunity to consult with the detainee, and notified the detainee of his opportunity to contest his status, even if the detainee declines to participate as set forth above, the Personal Representative shall complete a Detainee Election Form (enclosure (5)) and provide this form to the Director, CSRT.

**Enclosure (3)**

(3)    The Personal Representative shall review the Government Evidence that the Recorder plans to present to the CSRT and shall permit the Recorder to review documentary evidence that will be presented to the CSRT on the detainee's behalf.

(4)    Using the guidelines set forth in paragraph D, the Personal Representative shall meet with the detainee, using an interpreter if necessary, in advance of the CSRT. In no circumstance shall the Personal Representative disclose classified information to the detainee.

(5)    If the detainee elects to participate in the Tribunal process, the Personal Representative shall present information to the Tribunal if the detainee so requests. The Personal Representative may, outside the presence of the detainee, comment upon classified information submitted by the Recorder that bears upon the presentation made on the detainee's behalf, if it would aid the Tribunal's deliberations.

(6)    If the detainee elects not to participate in the Tribunal process, the Personal Representative shall assist the detainee by presenting information to the Tribunal in either open or closed sessions and may, in closed sessions, comment upon classified information submitted by the Recorder that bears upon the detainee's presentation, if it would aid the Tribunal's deliberations.

(7)    The Personal Representative shall answer questions, if any, asked by the Tribunal.

(8)    The Personal Representative shall be provided the opportunity to review the record prior to the Recorder forwarding it to the President of the Tribunal. The Personal Representative may submit, as appropriate, observations or information that he/she believes was presented to the Tribunal and is not included or accurately reflected on the record.

**D. Personal Representative Guidelines for Assisting the Enemy Combatant**

In discussing the CSRT process with the detainee and completing the Detainee Election Form, the Personal Representative shall use the guidelines provided below to assist the detainee in preparing for the CSRT:

You have already been advised that a Combatant Status Review Tribunal has been established by the United States government to review your classification as an enemy combatant.

A Tribunal of military officers shall review your case in "x" number of days [or other time frame as known], and I have been assigned to ensure you understand this process. The Tribunal shall review your case file, offer you an opportunity to speak on your own behalf if you desire, and ask questions. You also can choose not to appear at the Tribunal hearing. In that case I will be at the hearing and will assist you if you want me to do so.

You will be provided with an opportunity to review unclassified information that relates to your classification as an enemy combatant. I will be able to review additional information that is classified. I can discuss the unclassified information with you.

2

**Enclosure (3)**

You will be allowed to attend all Tribunal proceedings, except for proceedings involving deliberation and voting by the members, and testimony or other matters that would compromise U.S. national security if you attended. You will not be forced to attend, but if you choose not to attend, the Tribunal will be held in your absence and I will attend.

You will have the opportunity to question witnesses testifying at the Tribunal.

You will have the opportunity to present evidence to the Tribunal, including calling witnesses to testify on your behalf if those witnesses are reasonably available. If a witness is not considered by the Tribunal as reasonably available to testify in person, the Tribunal can consider evidence submitted by telephone, written statements, or other means rather than having a witness testify in person. I am available to assist you in gathering and presenting these materials, should you desire to do so. After the hearing, the Tribunal shall determine whether you should continue to be designated as an enemy combatant.

I am neither a lawyer nor your advocate, but have been given the responsibility of assisting your preparation for the hearing. None of the information you provide me shall be held in confidence and I may be obligated to divulge it at the hearing.
I am available to assist you in preparing an oral or written presentation to the Tribunal should you desire to do so. I am also available to speak for you at the hearing if you wish that kind of assistance.

**Do you understand the** process or have any questions about it?

**The Tribunal is examining** one issue: whether you are an enemy combatant against the United States or its coalition partners. Any information you can provide to the Tribunal relating to your activities prior to your capture is very important in answering this question. However, you may not be compelled to testify or answer questions at the Tribunal hearing.

Do you want to participate in the Tribunal process and appear before the Tribunal?

Do you wish to present information to the Tribunal or have me present information for you?

Is there anyone here in the camp or elsewhere who can testify on your behalf regarding your capture or status?

Do you want to have anyone else submit any information to the Tribunal regarding your status? [If so,] how do I contact them? If feasible and you can show the Tribunal how the information is relevant to your case, the Tribunal will endeavor to arrange for evidence to be provided by other means such as mail, e-mail, faxed copies, or telephonic or video-telephonic testimony.

Do you have any questions?

3

**Enclosure (3)**

## **Combatant Status Review Tribunal Notice to Detainees\***

You are being held as an enemy combatant by the United States Armed Forces. An enemy combatant is an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. The definition includes any person who has committed a belligerent act or has directly supported such hostilities.

The U.S. Government will give you an opportunity to contest your status as an enemy combatant. Your case will go before a Combatant Status Review Tribunal, composed of military officers. This is not a criminal trial and the Tribunal will not punish you, but will determine whether you are properly held. The Tribunal will provide you with the following process:

1. You will be assigned a military officer to assist you with the presentation of your case to the Tribunal. This officer will be known as your Personal Representative. Your Personal Representative will review information that may be relevant to a determination of your status. Your Personal Representative will be able to discuss that information with you, except for classified information.

2. Before the Tribunal proceeding, you will be given a written statement of the unclassified factual basis for your classification as an enemy combatant.

3. You will be allowed to attend all Tribunal proceedings, except for proceedings involving deliberation and voting by the members, and testimony or other matters that would compromise U.S. national security if you attended. You will not be forced to attend, but if you choose not to attend, the Tribunal will be held in your absence. Your Personal Representative will attend in either case.

4. You will be provided with an interpreter during the Tribunal hearing if necessary.

5. You will be able to present evidence to the Tribunal, including the testimony of witnesses. If those witnesses you propose are not reasonably available, their written testimony may be sought. You may also present written statements and other documents. You may testify before the Tribunal but will not be compelled to testify or answer questions.

As a matter separate from these Tribunals, United States courts have jurisdiction to consider petitions brought by enemy combatants held at this facility that challenge the legality of their detention. You will be notified in the near future what procedures are available should you seek to challenge your detention in U.S. courts. Whether or not you decide to do so, the Combatant Status Review Tribunal will still review your status as an enemy combatant.

If you have any questions about this notice, your Personal Representative will be able to answer them.

**[\*Text of Notice translated, and delivered to detainees 12-14 July 2004]**

**Enclosure (4)**

## Sample Detainee Election Form

Date/Time: _____

ISN#: _____

Personal Representative: _____
[Name/Rank]

Translator Required? _____        Language? _____

CSRT Procedures Read to Detainee or Written Copy Read by Detainee?_____
-------------------------------------------------------------------------------------------------

# Detainee Election:

☐ **Wants to Participate in Tribunal**

☐ **Wants Assistance of Personal Representative**

☐ **Affirmatively Declines to Participate in Tribunal**

☐ **Uncooperative or Unresponsive**

# Personal Representative Comments:

_____
_____
_____
_____
_____
_____

_____
Personal Representative

**Enclosure (5)**

## Sample Nomination Questionnaire



### Department of Defense
### Director, Combatant Status Review Tribunals

As a candidate to become a Combatant Status Review Tribunal member, Recorder, or Personal Representative, please complete the following questionnaire and provide it to the Director, Combatant Status Review Tribunal (CSRT). Because of the sensitive personal information requested, no copy will be retained on file outside of the CSRT.

1. Name (Last, First MI)_____  2. Rank/Grade_____

3. Date of Rank_____ 4. Service _____ 5. Active Duty Service Date _____

6. Desig/MOS _____   7. Date Current Tour Began: _____

8. Security Clearance Level _____ 9. Date of clearance: _____

10. Military Awards / Decorations:_____
_____

11. Current Duty Position_____ 12. Unit: _____

13. Date of Birth _____ 14. Gender _____ 15. Race or Ethnic Origin _____

16. Civilian Education. College/Vocational/Civilian Professional School: _____

17. Date graduated or dates attended (and number of years), school, location, degree/major:_____
_____
_____

18. Military Education. Dates attended, school/course title._____
_____

19. Duty Assignments. Last four assignments, units, and dates of assignments. _____
_____
_____

20. Have you had any relative or friend killed or wounded in Afghanistan or Iraq? _____ Explain.
_____
_____
_____

**Enclosure (6)**

21.  Have you had any close relative or friend killed, wounded, or impacted by the events of September 11, 2001? _____ Explain._____

_____

_____

_____

22.  Have you ever been in an assignment related to enemy prisoners of war or enemy combatants, to include the apprehension, detention, interrogation, or previous determination of status of a detainee at Guantanamo Bay? _____ Explain._____

_____

_____

_____

23.  Do you believe you may be disqualified to serve as a Tribunal member, Recorder, or Personal Representative for any reason?  Explain.    _____

_____

_____

_____

24.  Your name or image as well as information related to the enemy combatant may be released to the public in conjunction with the Combatant Status Review Tribunal process.  Could this potential public affairs release affect your ability to objectively serve in any capacity in the Tribunal process? Y/N_____Explain._____

_____

_____

_____

SIGNATURE OF OFFICER:_____DATE: _____


Approved_____ Disapproved_____    Director, CSRT


2

## Sample Appointment Letter for Combatant Status Review Tribunal Panel



### Department of Defense
#### Director, Combatant Status Review Tribunals

Ser

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL

Ref:  (a) Convening Authority Appointment Letter of 7 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by DCN XXX "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" is hereby convened.  It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

       **MEMBERS:**

       XXX, 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; President*

       YYY, 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; Member*

       ZZZ, 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; Member*


             J.M. MCGARRAH
             RADM, CEC, USNR


[* The Order should note which member is the Judge Advocate required to be on the Tribunal.]

Enclosure (7)

## Combatant Status Review Tribunal Hearing Guide

**RECORDER:**     All rise. (The Tribunal enters)

[In Tribunal sessions where the detainee has waived participation, the Tribunal can generally omit the *italicized* portions.]

**PRESIDENT:**     This hearing shall come to order.

**RECORDER:**     This Tribunal is being conducted at [Time/Date] on board Naval Base Guantanamo Bay, Cuba. The following personnel are present:

_____, President

_____, Member

_____, Member

_____, Personal Representative

_____, Interpreter,

_____, Reporter/Paralegal, and

_____, Recorder

[Rank/Name] is the Judge Advocate member of the Tribunal.

**PRESIDENT:**     The Recorder will be sworn. Do you, (name and rank of the Recorder) swear (or affirm) that you will faithfully perform the duties assigned in this Tribunal (so help you God)?

**RECORDER:**     I do.

**PRESIDENT:**     The reporter/paralegal will now be sworn.

**RECORDER:**     Do you (name and rank of reporter/paralegal) swear or affirm that you will faithfully discharge your duties as assigned in this tribunal?

**REPORTER/PARALEGAL:**   I do.

**PRESIDENT:**     *The interpreter will be sworn. [If needed for witness testimony when detainee not present]*

*RECORDER:*     *Do you swear (or affirm) that you will faithfully perform the duties of interpreter in the case now hearing (so help you God)?*

*INTERPRETER:*   *I do.*

**Enclosure (8)**

PRESIDENT:        *We will take a brief recess while the detainee is brought into the room.*

RECORDER:         *All Rise.*

[Tribunal members depart, followed by the Recorder, Personal Representative, Interpreter, and Court Reporter. The detainee is brought into the room. All participants except the Tribunal members return to the Tribunal room.]

RECORDER:         *All Rise. [The Tribunal members enter the room.]*

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        This hearing will come to order. You may be seated.

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        *(NAME OF DETAINEE)*, this Tribunal is convened by order of the Director, Combatant Status Review Tribunals under the provisions of his Order of XX July 2004. It will determine whether *you [or Name of Detainee]* meet the criteria to be designated as an enemy combatant against the United States or its allies or otherwise meet the criteria to be designated as an enemy combatant.

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        This Tribunal shall now be sworn. All rise.

INTERPRETER:      *(TRANSLATION OF ABOVE).*

[All persons in the room stand while Recorder administers the oath. Each voting member raises his or her right hand as the Recorder administers the following oath:]

RECORDER:         Do you swear (affirm) that you will faithfully perform your duties as a member of this Tribunal; that you will impartially examine and inquire into the matter now before you according to your conscience, and the laws and regulations provided; that you will make such findings of fact and conclusions as are supported by the evidence presented; that in determining those facts, you will use your professional knowledge, best judgment, and common sense; and that you will make such findings as are appropriate according to the best of your understanding of the rules, regulations, and laws governing this proceeding, and guided by your concept of justice (so help you God)?

MEMBERS OF TRIBUNAL:  I do.

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        The Recorder will now administer the oath to the Personal

2

**Enclosure (8)**

Representative.

INTERPRETER:         (TRANSLATION OF ABOVE).

[The Tribunal members lower their hands but remain standing while the following oath is administered to the Personal Representative:]

RECORDER:            Do you swear (or affirm) that you will faithfully perform the duties of Personal Representative in this Tribunal (so help you God)?

PERSONAL
REPRESENTATIVE:  I do.

INTERPRETER:         (TRANSLATION OF ABOVE).

PRESIDENT:           Please be seated. The Reporter, Recorder, and Interpreter have previously been sworn. This Tribunal hearing shall come to order.

[All personnel resume their seats.]

INTERPRETER:         (TRANSLATION OF ABOVE).

PRESIDENT:           (NAME OF DETAINEE), you are hereby advised that the following applies during this hearing:

INTERPRETER:         (TRANSLATION OF ABOVE).

PRESIDENT:           You may be present at all open sessions of the Tribunal.  However, if you become disorderly, you will be removed from the hearing, and the Tribunal will continue to hear evidence.

INTERPRETER:         (TRANSLATION OF ABOVE).

PRESIDENT:           You may not be compelled to testify at this Tribunal. However, you may testify if you wish to do so. Your testimony can be under oath or unsworn.

INTERPRETER:         (TRANSLATION OF ABOVE).

PRESIDENT:           You may have the assistance of a Personal Representative at the hearing. Your assigned Personal Representative is present.

INTERPRETER:         (TRANSLATION OF ABOVE).

PRESIDENT:           You may present evidence to this Tribunal, including the testimony of witnesses who are reasonably available. You may question witnesses testifying at the Tribunal.

3

Enclosure (8)

INTERPRETER:     *(TRANSLATION OF ABOVE).*
PRESIDENT:       *You may examine documents or statements offered into evidence other than classified information. However, certain documents may be partially masked for security reasons.*

INTERPRETER:     *(TRANSLATION OF ABOVE).*

PRESIDENT:       *Do you understand this process?*

INTERPRETER:     *(TRANSLATION OF ABOVE)*

PRESIDENT:       *Do you have any questions concerning the Tribunal process?*

INTERPRETER:     *(TRANSLATION OF ABOVE)*

[In Tribunal sessions where the detainee has waived participation substitute:

PRESIDENT:       [Rank/Name of Personal Representative] you have advised the Tribunal that [Name of Detainee] has elected to not participate in this Tribunal proceeding. Is that still the situation?

**PERSONAL**
**REPRESENTATIVE:** Yes/No. [Explain].

PRESIDENT:       Please provide the Tribunal with the Detainee Election Form marked as Exhibit D-a.]


[Presentation of Unclassified Information by Recorder and Detainee or his Personal Representative. Recorder evidence shall be marked in sequence R-1, R-2, etc. while evidence presented for the detainee shall be marked in sequence D-a, D-b, etc.]

[The Interpreter shall translate as necessary during this portion of the Tribunal.]

PRESIDENT:       Recorder, please provide the Tribunal with the unclassified evidence.

RECORDER:        I am handing the Tribunal what has previously been marked as Exhibit R-1, the unclassified summary of the evidence that relates to this detainee's status as an enemy combatant. A translated copy of this exhibit was provided to the Personal Representative in advance of this hearing for presentation to the detainee. In addition, I am handing to the Tribunal the following unclassified exhibits, marked as Exhibit R-2 through R-x. Copies of these Exhibits have previously been provided to the Personal Representative.

PRESIDENT:       Does the Recorder have any witnesses to present?

RECORDER:        Yes/no.

4

**Enclosure (8)**

If witnesses appear before the Tribunal, the Recorder shall administer an appropriate oath:

<u>Form of Oath for a Muslim</u>

Do you [Name], in the Name of Allah, the Most Compassionate, the Most Merciful, swear that
your testimony before this Tribunal will be the truth?

<u>Form of Oath or Affirmation for Others</u>

Do you (swear) (affirm) that the statements you are about to make shall
be the truth, the whole truth, and nothing but the truth (so help you
God)?

INTERPRETER:   (TRANSLATION AS NECESSARY)

[Witnesses may be questioned by the Tribunal members, the Recorder, the Personal
Representative, or the detainee.]

**RECORDER:**      **Mr./Madam President, I have no further unclassified information for the
Tribunal but request a closed Tribunal session at an appropriate time to
present classified information relevant to this detainee's status as an enemy
combatant.**

PRESIDENT:      *[Name of detainee]* (or Personal Representative), *do you* (or does the
detainee) want to present information to this Tribunal?

[If detainee not present, Personal Representative may present information to the Tribunal.]

*INTERPRETER:    (TRANSLATION OF ABOVE).*

*[If the detainee elects to make an oral statement:]*

*PRESIDENT:      [Name of detainee] would you like to make your statement under oath?*

*INTERPRETER:    (TRANSLATION OF ABOVE).*

*[After statement is completed:]*

*PRESIDENT:      [Name of detainee] does that conclude your statement?*

*INTERPRETER:    (TRANSLATION OF ABOVE).*

*PRESIDENT:      [Determines whether Tribunal members, Recorder, or Personal
Representative have any questions for detainee.]*

5

**Enclosure (8)**

PRESIDENT:        *[Name of detainee] do you have any other evidence to present to this Tribunal?*

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        All unclassified evidence having been provided to the Tribunal, this concludes this Tribunal session.

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        *(Name of detainee), you shall be notified of the Tribunal decision upon completion of the review of these proceedings by the convening authority in Washington, D.C.*

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        *If the Tribunal determines that you should not be classified as an enemy combatant, you will be released to your home country as soon as arrangements can be made.*

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        *If the Tribunal confirms your classification as an enemy combatant you shall be eligible for an Administrative Review Board hearing at a future date.*

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        *That Board will make an assessment of whether there is continued reason to believe that you pose a threat to the United States or its allies in the ongoing armed conflict against terrorist organizations such as al Qaida and its affiliates and supporters or whether there are other factors bearing upon the need for continued detention.*

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        *You will have the opportunity to be heard and to present information to the Administrative Review Board. You can present information from your family that might help you at the Board. You are encouraged to contact your family as soon as possible to begin to gather information that may help you.*

INTERPRETER:      *(TRANSLATION OF ABOVE).*

PRESIDENT:        *A military officer will be assigned at a later date to assist you in the Administrative Review Board process.*

INTERPRETER:      *(TRANSLATION OF ABOVE)*

PRESIDENT:        This Tribunal hearing is adjourned.

6

**Enclosure (8)**

RECORDER:     All Rise. [If moving into Tribunal session in which classified material will be discussed add:] This Tribunal is commencing a closed session. Will everyone but the Tribunal members, Personal Representative, and Reporter/Paralegal please leave the Tribunal room.

PRESIDENT:     [When Tribunal room is ready for closed session.] You may be seated. The Tribunal for [Name of detainee] is now reconvened without the detainee being present to prevent a potential compromise of national security due to the classified nature of the evidence to be considered. The Recorder will note the date and time of this session for the record.

[Closed Tribunal Session Commences, as necessary, with only properly cleared personnel present. Presentation of classified information by Recorder and, when appropriate, Personal Representative. Recorder evidence shall be marked in sequence R-1, R-2, etc. while evidence presented for the detainee shall be marked in sequence D-a, D-b, etc. All evidence will be properly marked with the security classification.]

PRESIDENT:     This Tribunal session is adjourned and the Tribunal is closed for deliberation and voting.

RECORDER: Notes time and date when Tribunal closed.

7

**Enclosure (8)**

# [CLASSIFICATION]
## Combatant Status Review Tribunal Decision Report Cover Sheet

[CLASSIFICATION]: UNCLASSIFIED Upon Removal of Enclosure(s) (2) [and (3)]


TRIBUNAL PANEL: _____

ISN #: _____                    DATE: _____

Ref:    (a) Convening Order of XX YYY 2004
        (b) CSRT Implementation Directive of XX July 2004
        (c) DEPSECDEF Memo of 7 July 2004


Encl:   (1) Unclassified Summary of Basis for Tribunal Decision (U)
        (2) Classified Summary of Basis for Tribunal Decision (U)
        (3) Copies of Documentary Evidence Presented (U)

This Tribunal was convened by references (a) and (b) to make a determination as to whether the detainee meets the criteria to be designated as an enemy combatant as defined in reference (c).

The Tribunal has determined that he (is) (is not) designated as an enemy combatant as defined in reference (c).

[If yes] In particular the Tribunal finds that this detainee is a member of, or affiliated with, _____ (al Qaida, Taliban, other), as more fully discussed below and in the enclosures.

 Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision, as summarized below. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosure (2).

_____
_____
_____
_____
_____
_____


                        _____
                        (Rank, Name) President



**Enclosure (9)**

**<u>EXHIBIT</u> <u>10</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ABU BAKKER QASSIM, et al.,<br><br>      Petitioners,<br><br>    v.<br><br>GEORGE W. BUSH, et al.,<br><br>      Respondents. | Civil Action No. 05-497 (JR) |

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO**
**PETITIONERS' MOTION TO VACATE STAY ORDER AND**
**ISSUE WRIT DIRECTING IMMEDIATE RELEASE OF PETITIONERS**

Respondents hereby oppose petitioners' motion to vacate the stay order, to issue a writ of habeas corpus, and to order the immediate release of petitioners. It is correctly noted in petitioners' motion that Combatant Status Review Tribunals ("CSRTs") have recently determined that petitioners are no longer classified as enemy combatants. Accordingly, respondents intend to release them as soon as possible and have been diligently undertaking efforts toward that end. As explained below, the only thing holding up petitioners' release is that respondents are trying to locate a suitable country for transfer to avoid a situation where petitioners would be returned to a country where it is more likely than not that they would be tortured.[1] During the interim period, petitioners are being held in the least restrictive conditions available, and it is simply not a workable alternative to commingle former detainees – even those determined to no longer be enemy combatants – in base housing for military personnel, civilian

---

[1] Petitioners themselves voiced concerns about this issue in an earlier motion, in response to which the Court issued an order that, among other things, <u>bars</u> their "release, repatriation, or rendition." Order dated Apr. 13, 2005 (dkt. no. 14). Of course, before any release could be effected, respondents would have to obtain relief from this aspect of the Court's April 13, 2005 order.

contractors, their dependents, and authorized visitors during the interim period pending their permanent departure from Guantanamo. Consequently, there is no basis for petitioners' request in this regard. Furthermore, rather than favoring vacating the present stay, the CSRTs' decisions that petitioners are no longer enemy combatants and the fact that, independent of this litigation, respondents already are pursuing a course that will result in their release once a suitable destination country can be arranged counsels maintaining the stay. Petitioners' motion, accordingly, should be denied.

## A.    The Court Should Not Vacate the Present Stay of Proceedings

On April 13, 2005, the Court granted respondents' motion to stay proceedings in this case pending the appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos. 05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-5064 et al. (D.C. Cir.).[2] Petitioners argue that the stay was improper because, they say, the issues that will be determined in the pending appeals in Khalid and Guantanamo Detainee Cases are "academic in this case," and "the factual and legal bases upon which the Court's stay order was founded are moot." Petrs' Mem. at 4.

However, petitioners' portrayal of the issues on appeal in Khalid and Guantanamo Detainee Cases is materially incomplete. Petitioners selectively highlight one issue before the Court of Appeals – whether the CSRTs comport with any constitutional due process requirements – but fail to mention the crucial threshold issue also presented: whether aliens

---

[2] On July 26, 2005, at the request of the detainees for expedited consideration, the D.C. Circuit moved up the date of oral argument and both cases are now scheduled to be argued on September 8, 2005.

2

outside the United States who have not voluntarily developed any substantial connection with this country have constitutional rights. See Khalid v. Bush, 355 F. Supp. 2d 311, 322-23 (D.D.C. 2005) (holding in the negative).[3] Petitioners cannot sidestep this fundamental issue; indeed, the principal case law they cite as a legal basis for the relief sought in this very motion is deeply imbued with the assumption that non-resident aliens enjoy constitutional rights. See Petrs' Mem. at 9-10 ("'[T]he public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process; [i]t is always in the public interest to prevent the violation of a party's constitutional rights.'") (quoting Abdah v. Bush, 2005 WL 711814, *6 (D.D.C. Mar. 29, 2005) (emphasis added)).[4] Petitioners provide no other putative legal basis for the relief they seek, and petitioners' ability to avail themselves of constitutional rights, therefore, appears key to their request for relief. Thus, far from being "academic in this case" as petitioners claim, the issues on appeal in Khalid and Guantanamo Detainee Cases touch the core of the instant motion.

---

[3] The CSRTs' determinations that these petitioners were no longer enemy combatants did not invest them with constitutional rights. The case law excluding constitutional rights for non-resident aliens does not hinge on whether or not they are enemy combatants. See, e.g., United States v. Verdugo-Urquidez, 494 U.S. 263 (1990) (involving civilian Mexican-citizen defendant in criminal case, not enemy combatant); Pauling v. McElroy, 278 F.2d 252, 254 n.3 (D.C. Cir. 1980) (suit to enjoin nuclear testing by civilian citizens of Canada, Britain, France, Germany, Japan, and other countries, not enemy combatants).

[4] Petitioners also rely on Zadvydas v. Davis, 533 U.S. 678 (2001). See Petrs' Mem. at 12 n.9. In Zadvydas, the Supreme Court interpreted an immigration statute not applicable here so as to avoid constitutional difficulty, and, in the course of doing so, reaffirmed the critical "distinction as to the availability of constitutional rights between an alien who has effected an entry into the United States and one who has never entered," stressing that "[i]t is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." 533 U.S. at 693, cited in Khalid, 355 F. Supp. 2d at 322.

Petitioners imply that it was somehow misleading or deceptive for the Government to move for a stay, including deferral of factual returns, in this case because the two petitioners herein were subsequently determined to no longer be enemy combatants.[5]  However, the stay is as justified, if not more so, in this case as in the others.  As the Court is likely aware, respondents filed essentially the same stay motion in dozens of Guantanamo detainee cases because the anticipated guidance from the Court of Appeals on the key issues is likely to affect dramatically how, if at all, these cases proceed with respect to the various issues and requests for relief involved in the cases, including, as discussed above, the very request for relief in the instant motion.  Any issue of whether a petitioner possesses substantive legal rights under the Constitution, treaties, or statutes regarding his detention would be the subject of and affected by resolution of the pending appeals and is thus properly the subject of a stay, and this is true regardless of whether an individual's detention is expected to continue or respondents have already determined to release him as soon as the necessary arrangements for an appropriate destination country can be made.

Indeed, the fact that these petitioners are already slated for release, independent of the outcome of this litigation, would constitute, if anything, an additional factor weighing in favor of a stay in this case.  In this case, what is typically the core issue in most habeas cases is not actually in dispute:  respondents agree it is appropriate to release petitioners and intend to release them as soon as possible.  The only thing holding up their release is the making of suitable

_____

[5] The CSRTs determined petitioners should no longer be classified as enemy combatants on March 26, 2005, after the stay motion had been briefed.  Up until that date, prior determinations by Department of Defense decisionmakers that petitioners were classified as enemy combatants remained in effect and operative.

4

arrangements for transferring them to a country where it is not more likely than not that they would be tortured, a matter in which the Government is acting in recognition of the very concerns petitioners themselves have expressed.[6] The pendency of appeals that are likely to determine the legal landscape going forward warrants a stay in any Guantanamo detainee habeas case; if there is any such case in which it would be appropriate to lift the stay and forge ahead with plenary proceedings, surely it is not one in which respondents are already substantially engaged in efforts to bring about petitioners' release.

Furthermore, the undertaking to locate and interact with an appropriate country to which petitioners may be released is a classic type of foreign policy matter committed exclusively to the Executive Branch. See, e.g., Schneider v. Kissinger, 412 F.3d 190, 195 (D.C. Cir. 2005) (noting that "the Supreme Court has described the President as possessing 'plenary and exclusive power' in the international arena and 'as the sole organ of the federal government in the field of international relations'" (quoting United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936))). The fact that sensitive diplomatic negotiations and arrangements that must be

---

[6] As noted in prior filings in this case, it is the policy of the United States not to transfer Guantanamo detainees to countries where it is more likely than not that they would be tortured, and the Government employs an elaborate process involving significant diplomatic efforts to carry out that policy. See generally Declaration of Pierre-Richard Prosper dated Mar. 8, 2005 ("Prosper Decl."), previously filed in connection with respondents' March 21, 2005 opposition to petitioners' motion for preliminary injunction (dkt. no. 7); Declaration of Matthew C. Waxman dated June 2, 2005, previously filed on July 11, 2005 (dkt. no. 22). United States policy in this regard is consistent with the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment as ratified by the United States Senate. See Resolution of Ratification, 136 Cong. Rec. S17486, S17492 (Oct. 27, 1990) ("The Senate's advice and consent is subject to the following understandings, which shall apply to the obligations of the United States under this Convention: . . . . That the United States understands the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.'").

undertaken by the Executive Branch are the lynchpin in ultimately effecting the petitioners'

release further counsels in favor of a stay and against present judicial intervention in this case.[7]

**B.      The Court Should Not Order "Immediate Release" of Petitioners
         or Changed Residential Conditions Pending Their Release**

Petitioners ask for an order directing an "immediate release."[8]  However, respondents are

already working diligently to effect petitioners' release as soon as possible.  The issue that must

be resolved in order for the release to take place – locating, consistent with petitioners' own

expressed concerns, a suitable country to which petitioners can be transferred where it is not

more likely than not that they would be tortured – is one that will exist and will have to be dealt

with whether or not the Court issues the requested order.

Petitioners' answer seems to be that, in the meantime, they wish to be implanted as

private residents alongside servicemembers, their dependents, and/or authorized visitors, in some

form of housing on the Guantanamo Bay Naval Base but outside the detention facility.  However,

---

[7]  While the Government's efforts to implement its policy and locate an appropriate
destination country are continuing and multifaceted, the specific details of those efforts are not
appropriate for disclosure outside appropriate governmental channels.  See Prosper Decl. ¶¶ 9-12
(submitted previously with respondents' memorandum in opposition to petitioners' motion for
preliminary injunction, filed Mar. 21, 2005 (dkt. no. 7)).

[8]  Petitioners appear to request that the Court order petitioners' release by issuing a writ of
habeas corpus.  However, as a technical matter, a writ of habeas corpus simply directs the
custodian to "make a return certifying the true cause of detention," after which the Court would
engage in a substantive review of whether the reasons underlying the detention are justified.  28
U.S.C. § 2243; Roman v. Ashcroft, 162 F. Supp. 2d 755, 759 (N.D. Ohio 2001) ("[T]he writ of
habeas corpus merely initiates the proceedings.  It is analogous in this respect to the writ of
certiorari, another prerogative writ still in use.  When the Supreme Court grants a writ of
certiorari, it is bringing the case before it for decision rather than deciding it on the merits.  The
same is true of habeas corpus.").  For the same reasons as the stay of proceedings should be
maintained, the Court should not at this time undertake plenary substantive review of reasons
underlying detention that the Government is actively working to terminate.

petitioners fail to cite any applicable legal authority for the Court to order such relief.[9]

Guantanamo Bay Naval Base is a closed-access military base dedicated to military functions that

require security and a controlled environment. See Declaration of Col. Michael I. Bumgarner ¶ 8

(submitted herewith). For instance, in order to travel to Guantanamo, U.S. citizen habeas

counsel must possess a security clearances as well as country and theater clearances. See

Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay,

Cuba, ¶ III.D.4, entered herein by dkt. no. 16, and reproduced at In re Guantanamo Detainee

Cases, 344 F. Supp. 2d 174, 186, 191 (D.D.C. 2004). Even then, counsel are required to be

escorted by military staff for movement on most areas of the Base. See, e.g., Willett Decl. ¶ 16.

Petitioners, even if no longer classified as enemy combatants, are foreign nationals who

have no prior voluntary connection with or allegiance to the United States and who were

previously held as enemy combatants. Thus, release in this context is not like, for example, the

release of a U.S. citizen detained domestically pursuant to the criminal justice system, which

generally consists of transporting the ex-convict outside the detention facility whereupon he is

free to rejoin local society. Rather, release generally involves repatriating the former detainee to

_____

[9] Petitioners cite Zadvydas v. Davis, 533 U.S. 678 (2001), and Clark v. Martinez, 125 S. Ct. 716 (2005), as precedents for the relief they seek. See Petrs' Mem. at 12 n.9. However, both of those cases dealt with a provision of the Immigration and Nationality Act that by its own terms has no application here. See 8 U.S.C. § 1231(a)(6) (applying to three categories of "alien[s] ordered removed" pursuant to a final order of removal under the pertinent immigration statutes). Moreover, petitioners' reliance on Zadvydas simply reaffirms the propriety of the stay pending the appeals that will address whether persons in petitioners' situation possess constitutional rights. See supra note 4. Further, the Court in Zadvydas made clear that its holding was not intended to speak to any "special circumstances" that might call for "heightened deference to the judgments of the political branches with respect to matters of national security." 533 U.S. at 696. The Military's management of the residential status of individuals formerly detained as enemy combatants during the transitional period pending their release constitutes such special circumstances, particularly when those individuals are located on a secure military base.

his home country or, in situations where repatriation would not be consistent with United States policy, transferring him to another appropriate country, which requires, among other things, diplomatic coordination with the foreign government and implementation of respondents' policies to guard against repatriation or transfer of detainees to countries where it is more likely than not that they would be tortured.

In the meantime, petitioners are housed in Camp 4, where detainees have a communal living arrangement consisting of 10-man bays in which they can move about freely with nearly all-day access to exercise yards and other recreational opportunities.  Bumgarner Declaration ¶¶ 4-7.  Camp 4 detainees can play soccer and volleyball and are provided games such as chess, checkers, and playing cards, as well as books through a librarian.  Bumgarner Declaration ¶ 4.  They are served meals family-style on picnic benches under an awning.  Bumgarner Declaration ¶ 5.  These detainees are also provided weekly movies and special food items.  Id.

Of course, we do not mean to imply that being temporarily confined at Camp 4 pending release is somehow tantamount to outright freedom.  However, no housing arrangement that could be granted to petitioners while they remain at Guantanamo, a secure U.S. military base, would entail outright freedom.  Despite what petitioner's counsel may have perceived during his visit, Guantanamo outside Camp Delta is not an open society but a military base that, for sound reasons and like any other military base, maintains a controlled environment.  Bumgarner Declaration ¶¶ 8-11.  Even assuming there was some available, suitable, and vacant space outside Camp Delta where petitioners could be housed, they would have to be confined within a perimeter and subject to appropriate monitoring.  Bumgarner Declaration ¶ 8.  As noted above, even habeas counsel are subject to restrictions and are required to be escorted by military

8

personnel when traveling in most areas of the base.

Unlike visiting habeas counsel, petitioners – notwithstanding that they have been determined by CSRTs to no longer be enemy combatants – are not U.S. citizens and presumably have no allegiance or loyalty to the United States. A determination that a detainee is no longer an enemy combatant simply reflects that he is deemed not to be "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States of its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."[10] It does not necessarily imply a finding that an individual is benign in all respects. See Bumgarner Declaration ¶¶ 10-11. Moreover, the determination with which the CSRTs were tasked is not an exact science.[11] The circumstances in which wartime detainees were apprehended can be ambiguous, and prior Department of Defense decisionmakers had found that these petitioners were enemy combatants. The Department of Defense has learned that some former Guantanamo

_____

[10] See Order Establishing Combatant Status Review Tribunal (July 7, 2004), available at <<http://www.defenselink.mil/news/Jul2004/d20040707review.pdf>>.

[11] Petitioners, in emphasizing that the CSRTs "exonerated" them and found them "blameless," misperceive the function of the CSRT and the import of its findings. See Petrs' Mem. at 1, 6 (citing Herrera v. Collins, 506 U.S. 390 (1993), for the proposition that "[t]he central purpose of any system of criminal justice is to convict the guilty and free the innocent" (emphasis petitioners')). To the contrary, the purpose of detention of enemy combatants "is to prevent captured individuals from returning to the field of battle and taking up arms once again," and "[c]aptivity in war is neither revenge nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war." Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2640 (2004) (plurality opinion) (internal quotation marks omitted). The CSRT is a fact-based proceeding to determine whether a detainee is properly classified as an enemy combatant – nothing more, nothing less. It is not a criminal justice oriented process and does not "exonerate" a detainee, provide a character reference, or serve as a guarantee that a detainee could be appropriately and safely assimilated into American society on a military base.

detainees who were released upon judgments that they no longer presented a threat have

reemerged in combat and terrorism activities following their release.  While such experience

does not undermine the finality of the specific CSRT results in this case, it does counsel against

resettling former detainees in the middle of a military base in unrestricted circumstances where

the security of military functions and/or safety of base personnel could be compromised.  The

chain of command at Guantanamo has decided in its military judgment that such a precipitous

move could jeopardize the good order, safety, and security of the base, and that judgment should

not be subject to second-guessing at petitioners' behest.

***

For the foregoing reasons, respondents respectfully request that petitioners' motion be

denied.

Dated: July 29, 2005                         Respectfully submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             KENNETH L. WAINSTEIN
                                             United States Attorney

                                             DOUGLAS N. LETTER
                                             Terrorism Litigation Counsel

10

    _/s/ Robert J. Katerberg_____
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
EDWARD H. WHITE
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel: (202) 616-8298
Fax: (202) 616-8460

Attorneys for Respondents

11

# **EXHIBIT 11**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et          :        Civil Action No. 05-497
al.,                           :
          Plaintiffs,          :        August 25, 2005
v.                             :
GEORGE BUSH, et al.,           :
          Defendants           :        2:00 p.m.
. . . . . . . . . . . . . :        . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiffs:        P. SABIN WILLETT, ESQUIRE
                           BINGHAM McCUTCHEN, LLP
                           150 Federal Street
                           Boston, Massachusetts  02110-1726
                           (617) 951-8684

                           SUSAN BAKER MANNING, ESQUIRE
                           BINGHAM McCUTCHEN, LLP
                           1120 20th Street, NW
                           Suite 800
                           Washington, D.C.  20036-3406
                           (202) 778-6172
                           BARBARA J. OLSHANSKY, ESQUIRE
                           CENTER FOR CONSTITUTIONAL RIGHTS
                           666 Broadway
                           New York, New York  10012
                           (212) 614-6439
For the Defendants:        TERRY M. HENRY, ESQUIRE
                           U.S. DEPARTMENT OF JUSTICE
                           CIVIL DIVISION
                           20 Massachusetts Avenue, NW
                           Room 7144
                           Washington, D.C.  20530
                           (202)514-4107
Court Reporter:            REBECCA KING, RPR, CRR
                           Official Court Reporter
                           Room 4802-B, U.S. Courthouse
                           Washington, D.C. 20001
                           (202) 898-9398
Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 2

```
 1                        P R O C E E D I N G S

 2            COURTROOM DEPUTY:  Civil action number 05-CV-497,

 3    Abu Bakker Qassim, et al. versus George W. Bush, et al.

 4    P. Willett and Susan Baker Manning for the plaintiff; Terry

 5    Marcus Henry for the defendant.

 6            THE COURT:  Counsel, I set this hearing by an order

 7    that I issued last week, perhaps somewhat hopefully, thinking

 8    that between then and now the parties might have an opportunity

 9    to talk with each other and perhaps work out what I have called

10    a just and honorable solution to the problem before us.

11            And I don't have any particular agenda for this

12    hearing, except I do have a number of questions.  But I think we

13    should begin, perhaps, simply by asking -- well, the petitioner

14    can go first.  Tell me if you will, sir, what changes, if any,

15    have occurred since you were last here on August 1st, and what

16    the present situation is with your clients, as you understand

17    it.

18            MR. WILLETT:  Good afternoon, Your Honor.  Sabin

19    Willett of Bingham McCutchen for the petitioners.  With me is

20    Susan Baker Manning and the Center For Constitutional Rights.

21            Mr. Henry and I did have a chance to speak after your

22    order.  We were not able to narrow our differences.  What has

23    happened with respect to my clients is that on the 19th of

24    August, Ms. Manning and I were able to communicate by telephone

25    with them.  Also on that day, my client Adel Abdul Hakim spoke
```

1     by telephone with his sister.  It was a little bit awkward to

2     organize that; his sister had to travel to Stockholm to the

3     U.S. Embassy and speak on a secure phone.  But my grandmother

4     always said, if you don't like someone's coat, you should

5     compliment her hat, so we do compliment the Government's hat for

6     arranging that telephone call.

7              It is my understanding that our clients are in a place

8     called Camp Iguana.  It's still a prison; there are, as I

9     understand it, somewhat better conditions than the prison they

10    used to be in.

11             The other development I would say, Your Honor, is one

12    that I have not learned myself, I have been reading about it in

13    the press.  And that is, it now appears from the public

14    statements both that Ambassador Prosper made on the radio this

15    morning and that were reported by the Washington Post yesterday,

16    that the Government has been involved in this effort for

17    two years, that they have struck out with two-dozen countries,

18    and that this thing isn't going anywhere any time soon.

19             And I don't know if now is the time to argue, or you

20    have other questions, but I did want to at some point today

21    return to what we now see is the only legitimate solution to

22    this problem.

23             THE COURT:  You have met with your clients once.  Is

24    that correct --

25             MR. WILLETT:  That's correct, Your Honor.

Abu Bakker Qassim, et al. vs.                    CV 05-497                         August 25, 2005
George W. Bush, et al.

Page 4

1          THE COURT:  -- or on one series of occasions?

2          MR. WILLETT:  We have a meeting scheduled for Monday as

3     well this week in Cuba.  But we met them only once before now.

4          THE COURT:  And you're going to Cuba again?

5          MR. WILLETT:  Sunday, yes.

6          THE COURT:  What are the logistics of you going to

7     Guantanamo Bay?

8          MR. WILLETT:  You fly to Ft. Lauderdale and you there

9     present a theatre clearance to a little airline called

10    Aero Sunshine, the sort of airplane where they ask you what you

11    weigh and then they say, you sit in this seat and you sit in

12    that seat.  And then you fly three hours to Gitmo.

13          You are billeted at the combined bachelor's quarters,

14    which costs $12 a night and is worth every penny, and then in

15    the morning they take you across on a ferry to the windward

16    side, where you're met by a Navy chief petty officer, who

17    escorts you to the prison.

18          You meet your client at what they call Camp Echo at the

19    prison for certain hours of the day where this is permitted, and

20    then you're escorted back to the ferry at the end of the day.

21          THE COURT:  Do you have any information about the

22    conditions under which you'll be able to meet your clients this

23    time at Camp Iguana?

24          MR. WILLETT:  I don't, Your Honor.  I don't know that I

25    would be able to meet them at Camp Iguana, though I would like

United States District Court                202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                          Official Court Reporter

Page 5

1   to.  I think the Government's practice is to bring all habeas

2   counsel to Camp Echo and meet them in the conditions that I

3   described last time we were together.  Meeting them at Camp

4   Iguana would be helpful because we would get a sense of what

5   their current situation is like, but to be candid, Mr. Henry and

6   I haven't spoken about whether I would be permitted to do that.

7        THE COURT:  You say that you and Mr. Henry have met but

8   have not been able to narrow the differences between you.  Is

9   that right?

10       MR. WILLETT:  We spoke, Your Honor.  We did not meet.

11  But it is correct that I think it's safe to say, we did not

12  narrow the differences.

13       THE COURT:  All right.  Thank you.  Thank you, sir.

14  Maybe I should hear from Government counsel.

15       MR. HENRY:  Thank you, Your Honor.  Terry Henry with

16  the Department of Justice.  I'm here for the respondents.

17       Your Honor, just to clarify, petitioner's counsel and

18  myself did speak once on Monday about Your Honor's order, and

19  counsel had some questions.  I don't think the discussion was

20  any kind of negotiation over things.  So just to make it clear

21  for the record what's going on here.

22       But there have been a number of developments since we

23  submitted the last declaration of General Hood in this matter on

24  August 8th, along with our supplemental brief, and I'm happy to

25  report to the Court on what those developments are.

Abu Bakker Qassim, et al. vs.             CV 05-497                 August 25, 2005
George W. Bush, et al.

Page 6

1        THE COURT:  I would be happy to hear them.

2        MR. HENRY:  As counsel indicated, on Friday the 19th

3  there was a telephone conference between counsel and both

4  petitioners in this case.  They were able to use the translator

5  that they had mentioned to the Court at the last hearing, who

6  does not have a security clearance, but as indicated in General

7  Hood's declaration, DOD is okay with that translator being used

8  subject to appropriate security conditions.  And that happened.

9        There was also --

10       THE COURT:  Just let me stop you with that.  That was a

11  telephone call, a telephone conference between counsel with

12  their clients and their interpreter?

13       MR. HENRY:  That's correct.

14       THE COURT:  Was it a monitored call?

15       MR. HENRY:  It was monitored by a member of the

16  privilege team, which under the protective order regime in this

17  case is a DOD person that's basically responsible for reviewing

18  materials that counsel learns from detainees that counsel wants

19  to use in an unclassified context for classification purposes.

20       The protective order operates on the assumption that

21  information learned from the detainee is either classified or

22  subject to protection; then, when counsel want to use that

23  information in an unclassified context, filing or go to the

24  press or whatever, they run it through the privilege team who

25  does a classification review on it.  And that privilege team is

Page 7

```
 1    segregated from the litigation other than their involvement in

 2    the...

 3            THE COURT:  Mr. Henry, help me understand this

 4    classification business.  These petitioners have been designated

 5    as no longer enemy combatants.  Right?

 6            MR. HENRY:  That's correct.

 7            THE COURT:  What do they know, could they say that

 8    would be classified?

 9            MR. HENRY:  Well, as General Hood pointed out in his

10    declaration, there are two main areas of information that is of

11    concern.  And the first deals with security measures at the camp

12    itself.  That may be classified or it may just be information

13    that would be deemed protected under the protective order, which

14    is entitled to being treated like under seal and that kind of

15    thing, as opposed to being classified.

16            THE COURT:  But if they have that kind of information,

17    how can they ever be let out?

18            MR. HENRY:  Well, Your Honor, the purpose of the

19    classification review is to review the information and just see.

20    I mean, Gitmo is aware of the situation if people are let out

21    and if there needs to be any change to the way things are done,

22    things like that, but while folks are there in the camp, there

23    is the concern about sharing, you know, concurrent information,

24    if you will, about that.

25            So that information is just reviewed by a privilege
```

Page 8

```
 1   team member, it's either classified or not, and then things go

 2   forward.

 3          The other class of information that's involved is

 4   information about the status of other detainees.  And again,

 5   it's just, you know, a precaution with respect to information

 6   they would be sharing while they continue to be detained there.

 7          This regime has been in place for almost a year now.

 8   It works, with complaints by petitioner's counsel as well as

 9   complaints on the other end, but it has worked well for the past

10   your or so.  I might add, the monitoring by the privilege team

11   member was with the agreement of counsel.

12          The other thing that happened on this past Friday was,

13   as petitioner's counsel mentioned, the call between one of the

14   petitioners and the sister, his sister that was identified at

15   the last hearing.  And just to make one correction to what

16   Mr. Willett said, it was not over a secure phone, it was over an

17   unsecured line, just a normal telephone call to the embassy

18   there in Sweden.  The embassy was involved just to make sure

19   that the person receiving the call on the other end was actually

20   the person that was identified as the petitioner's sister.  So

21   that call went on for an hour and a half or so.

22          The other major area of development deals with the

23   living arrangements that the petitioners are in in Camp Iguana.

24   As noted in General Hood's declaration, there had been plans in

25   the works for a number of weeks to renovate Camp Iguana for
```

Abu Bakker Qassim, et al. vs.                   CV 05-497                        August 25, 2005
George W. Bush, et al.

1    folks NLEC's like petitioner, where they could stay pending

2    their relocation or whatever.

3            As indicated in General Hood's declaration, that

4    renovation was accomplished and the petitioners were moved there

5    the week of August 15th.  The camp is made up of several

6    buildings; there is a sleeping quarters building that's air

7    conditioned and they have individual beds.  All the living

8    quarters there at Camp Iguana are air conditioned, there's a

9    recreation building where there are sofas, television, video

10   games, other recreational materials, ping-pong tables, table

11   soccer, that kind of thing.

12           There's a kitchen building, where, although the

13   petitioners are provided three meals a day that are prepared in

14   Halal fashion, they do have a kitchen-type affair, a building

15   that has a microwave, refrigerator, coffee pot, stove, utensils,

16   and they get tea, coffee, fresh fruit, ice cream, things like

17   that, snack items.

18           There is a bathhouse that has separate shower stalls,

19   separate toilet stalls similar to the type of building that's

20   used for troops in some of the more permanent camps in the

21   Middle East.  There's an outside recreation yard with picnic

22   tables and that sort of thing, a soccer goal, that kind of

23   stuff.

24           The petitioners have 24-hour access to all of these

25   materials -- or all of these facilities, and this is in addition

United States District Court                   202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                            Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CV 05-497                          August 25, 2005
George W. Bush, et al.

Page 10

```
 1     to the medical care and access to Qur'ans and prayer books and

 2     things like that that all the other detainees have.

 3              THE COURT:  There's no lockdown in any part of this

 4     facility, this Camp Iguana?

 5              MR. HENRY:  They are free to roam that facility.

 6              THE COURT:  24/7?

 7              MR. HENRY:  24/7, yes, Your Honor.

 8              THE COURT:  But there's a gate around it?

 9              MR. HENRY:  There is a fence.

10              THE COURT:  A fence around it?

11              MR. HENRY:  Yes, Your Honor, there is.

12              THE COURT:  How many people are there?

13              MR. HENRY:  Currently there are about 10 NLEC's total,

14     and all of the NLEC's, all the Uighur NLECs are there.  I think

15     we had mentioned before that -- in General Hood's declaration

16     that there were a couple of NLEC's that were in another camp due

17     to disciplinary infractions.  I think two of those were Uighurs,

18     and those two Uighur folks have been moved to Camp Iguana.

19              I believe that there is one or two other nationality

20     NLEC's that are in a disciplinary confinement situation, and one

21     that is in another area due to medical needs.  You know, he's

22     not there for disciplinary reasons.

23              THE COURT:  There are 10 Uighur NLEC's, or 10 NLEC's

24     all total?

25              MR. HENRY:  All total.
```

United States District Court                     202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                     Official Court Reporter

Abu Bakker Qassim, et al. vs.    CV 05-497      August 25, 2005
George W. Bush, et al.

Page 11

1   THE COURT:  Of whom how many are Uighurs, are you able

2 to tell?

3   MR. HENRY:  I'm not able to say on the public record,

4 but it's just a handful.

5   THE COURT:  And when counsel come down to Gitmo next

6 week to meet with these people, will they be able to meet with

7 them in a free and open manner at Camp Iguana, or are they going

8 to have to be taken back over to Camp Echo and be shackled to

9 the floor again?

10   MR. HENRY:  All of the meetings at Camp Echo; as a

11 matter of practice, there are safety considerations that we've

12 talked about before.  The shackling is one leg to a bolt in the

13 floor, standard operating procedure, the purpose of which is to

14 prevent any sort of incident where someone could, you know, hurt

15 someone else.  Which attempts like that are not unheard of.

16 It's difficult for DOD to have basically a nonuniform policy in

17 this regard with respect to specific individuals, that kind of

18 thing.  They have, like I said, a standard operating procedure

19 there.

20   But all of the counsel meetings are there in Camp Echo.

21 There would be concerns about having some kind of meeting

22 arrangement in Camp Iguana; number one because there's not

23 facilities for it there, and number two, there's the aspect of

24 subjecting other NLEC's over there in Camp Iguana to inspection,

25 if you will, by outsiders.

Page 12

```
 1          There is one change, though, with respect to the
 2   meetings at Echo, and that's that counsel would be able to use
 3   the translator that doesn't have a security clearance.
 4          THE COURT:  That does not have a security clearance?
 5          MR. HENRY:  That's right.
 6          THE COURT:  They can bring their interpreter down with
 7   them?
 8          MR. HENRY:  Yes.  And I understand that's their
 9   intention.
10          THE COURT:  Well, you anticipated my next question.
11   What about mail?  What about mail facilities?
12          MR. HENRY:  Mail facilities?
13          THE COURT:  Can they receive mail and send mail?
14          MR. HENRY:  Absolutely.  In fact, we have addressed
15   this in the context of other motions that have been filed in
16   other cases.  The mail operation at Gitmo is quite extensive.
17   It involves thousands of pieces of mail a month, and the mail
18   is -- you know, they can send mail, they can receive mail,
19   they're given postcards and stationery on which to write stuff
20   and mail letters that's processed through the security apparatus
21   there at Gitmo, and it is forwarded on.  And the same happens in
22   reverse for incoming mail from family members or whoever.
23          And then, of course, there's the attorney-client mail,
24   which is a different operation that does not go through the
25   security monitoring apparatus, and pursuant to the regime that
```

Page 13

```
 1   was worked out in the protective order.  So that mail remains

 2   privileged.

 3           THE COURT:  Are these petitioners literate in their own

 4   language, or do you know?

 5           MR. HENRY:  I believe they are, Your Honor.  But I

 6   don't know for sure.

 7           MR. WILLETT:  They are.

 8           THE COURT:  And again, is every telephone call as

 9   complicated as the call from this one petitioner to his sister?

10   Do they have to arrange something?

11           MR. HENRY:  The family call -- the calls with family

12   members is actually a very rare occurrence.  It had been done,

13   my understanding is once before, with respect to a military

14   commissioned candidate.  So this is a relatively new practice

15   for Guantanamo.  There was this concern, especially since the

16   first time anybody on the Government side had heard about the

17   petitioner's sister -- and my understanding from the last

18   hearing was that the sister basically cold called Mr. Willett.

19   There was some concern just to make sure that the person on the

20   other end of the call was who, you know, they purported to be.

21           And for now, the easiest way to do that was to ask the

22   sister to go to the embassy, which I understand is about 45 or

23   so miles from where she currently lives.  She did that, the

24   embassy confirmed her identity and then accepted the call, gave

25   her the phone, let her talk.
```

Abu Bakker Qassim, et al. vs.                    CV 05-497                              August 25, 2005
George W. Bush, et al.

Page 14

```
 1          With respect to family members in other situations, if

 2    there would be some easier way to do it, it's hard to say right

 3    now, just because this is one of the very few calls that have

 4    actually happened.  As General Hood indicated, he was amenable

 5    to making a provision for family calls for NLEC's, so I'm sure

 6    going forward they'll get a process down.  But right now that's

 7    what we have.

 8          THE COURT:  But as I hear you state it, the calls would

 9    be, A, monitored, and B, these people, although officially

10    designated no longer enemy combatants, you're not willing to say

11    they're no longer under suspicion, so there still has to be some

12    double checking of who they're talking to?

13          MR. HENRY:  Well, there are a couple of issues in

14    there.  I mean, number one is the double checking who they're

15    talking to, that's for a number of reasons, including just to

16    avoid having some crackpot on the other end, if you will, who

17    happens to learn the name of a relative of one of the NLEC's.

18          THE COURT:  Whose problem is it if there's a crackpot

19    on the other end of the line?

20          MR. HENRY:  Well, Your Honor, having these phone calls

21    is a resource intensive operation at Guantanamo, and aside

22    from --

23          THE COURT:  Are you talking about money?

24          MR. HENRY:  Talking about resources as far as moving

25    the detainee to where a phone is and getting that all set up.
```

Abu Bakker Qassim, et al. vs.                     CV 05-497                              August 25, 2005
George W. Bush, et al.

Page 15

1          But also I think Guantanamo has an interest in not

2     subjecting a detainee to receiving prank phone calls, if you

3     will.  So there are interests involved there.

4          With respect to the monitoring, again, that's an item

5     that was worked out in the protective order regime and is

6     allowed, monitoring of family calls, and --

7          THE COURT:  But the protective order regime had to do

8     with detainees, enemy combatant detainees, didn't it?

9          MR. HENRY:  Your Honor, when we negotiated that

10    protective order, the Combatant Status Review Tribunal process

11    was ongoing.  So I think it's fair to say that, you know, we

12    didn't know the precise outcome of all of those, and the order

13    was negotiated just in a broad brush sense applicable to

14    everyone.

15         THE COURT:  Well, you urged me the last time I was

16    here -- you were here not to mess around with the protective

17    order that had been negotiated with such difficulty and at such

18    length and in so many cases, and I have foreborne, if that's the

19    right form of that verb, from doing so for 25 days.  But I think

20    one of the questions that's in my mind is whether that

21    protective order works for NLEC's.

22         So that's kind of on the table.  I mean, it's

23    unthinkable, I imagine, for the Government just to put a phone

24    booth in Camp Iguana.

25         MR. HENRY:  That's correct, Your Honor.  If I could

Page 16

1    make one suggestion --

2          THE COURT:  It's difficult for me to understand why

3    that's unthinkable, actually.

4          MR. HENRY:  Well, there could be any number of reasons,

5    including, again, just keeping an eye on who is being called;

6    you know, do we give the detainees international calling cards?

7    You know, there are logistical as well as other issues.

8          But if I could make one suggestion.  If the

9    petitioner's counsel has got problems with particular aspects of

10   the order, they can bring them up and we can talk about it, and

11   I can see if the client is willing to loosen things up.  I mean,

12   General --

13         THE COURT:  That's kind of what I was hoping might

14   happen before today.  But maybe it will happen after today.

15         MR. HENRY:  Well, Your Honor, the protective order is

16   very long, it's very complex.  There are a lot of provisions in

17   it, all of which were negotiated at length and was approved by

18   Judge Green.  So they deal with mail, they deal with phone

19   calls, they deal with all kinds of stuff.

20         So I think, you know, expecting a wholesale

21   renegotiation of that may not be practical.  It would very well

22   be very time-consuming.  I think probably the best way to

23   proceed would be to take things on a little more incremental

24   level, and if there are specific problems that exist, we'll try

25   to work it out.

Abu Bakker Qassim, et al. vs.
George W. Bush, et al.                          CV 05-497                          August 25, 2005

                                                                                    Page 17

1          THE COURT:  I will borrow from Mr. Willett's analogy

2   and say, I can't exactly compliment your coat, but I'm going to

3   take that "maybe we can loosen things up," quote, unquote, as a

4   nice compliment on your hat.

5          MR. HENRY:  Thank you, Your Honor.

6          THE COURT:  Now, I asked you in the order to be

7   prepared to make an in camera presentation of the details of

8   efforts to place these petitioners, and I don't know how you

9   propose to -- whether you have something for me in writing,

10  whether you want to adjourn literally for an in camera

11  proceeding, but I would like to hear what's going on.

12         Last time I said I wasn't sure I did want to know what

13  was going on, but I think I'm ready.

14         MR. HENRY:  Well, Your Honor, I'm prepared to brief the

15  Court orally, and at the level of detail that I've been

16  authorized to talk about, we can do this with cleared counsel in

17  chambers if you want to do it that way.

18         THE COURT:  Who's cleared?

19         MR. HENRY:  I believe Mr. Willett is.

20         MR. WILLETT:  And Ms. Manning, Your Honor.

21         THE COURT:  Then when we adjourn here we'll go to

22  chambers and do just that.  Thank you.

23         I would like to talk a little bit more about the big

24  picture.  It's been almost six months now since these men were

25  declared to be NLEC's.  Does the Government have a position on

Abu Bakker Qassim, et al. vs.                    CV 05-497                           August 25, 2005
George W. Bush, et al.

Page 18

1    the length of time that it would be reasonable to continue

2    holding them in this status if you still can't find any place

3    for them?

4         MR. HENRY:  Well, Your Honor, I believe our position is

5    that the condition -- the living arrangements as they currently

6    exist meet and exceed any kind of level that would be

7    appropriate as a matter of constitutional law or any kind of

8    situation like that, and that we would continue to hold them --

9         THE COURT:  You're not saying constitutional law.  You

10   don't think the Constitution applies down there, do you?

11        MR. HENRY:  That's correct.  But one issue with

12   addressing the living arrangements, if you will, is what kind of

13   standard are you going to apply.  And the only analogy of which

14   I'm aware -- and the Court's involvement in living arrangements

15   with respect to individuals detained in the course of a war has

16   not been done of which I am aware.  But the only area of

17   analogy, of course, would be the administration of prisons with

18   respect to other convicted folks or pretrial detainees.  So

19   that's what I'm referring to.

20        So I think our position would be that we can continue

21   to hold them in Camp Iguana or something like it as long as it

22   takes.

23        Now, having said that, the living conditions for the

24   NLEC's have evolved since the NLEC determinations were made.

25   They've evolved significantly.  I have no reason to believe they

United States District Court                  202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                            Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CV 05-497                                August 25, 2005
George W. Bush, et al.

Page 19

1    will not continue to do that.

2              And with respect to length of time and that sort of

3    thing, I can -- I would prefer to talk about that in camera.

4              THE COURT:  The Government's memorandum submitted after

5    the last hearing contained a number of rather nonspecific

6    concerns about what might happen if the petitioners were to set

7    foot in the United States.  And we don't have to rehearse all

8    those.  Your papers say what they say.  They betrayed in my

9    mind -- those of you in the audience who are not lawyers or

10   products of the American law schools don't take this phrase off

11   and put it in the newspapers, because it's a lawyer's phrase.

12   Imaginary horribles.

13             Has the Government refined its position on this -- on

14   whether there's any circumstances in which these people might be

15   even considered refugees admittable to the United States or

16   admittable on some sort of limited parole that would not commit

17   them to the United States?

18             MR. HENRY:  Well, Your Honor, I think our position was

19   set out in our brief, and I don't think it would be imaginary

20   that bringing them here would change their immigration status

21   significantly.  And I think that's still the case.

22             As far as further details on that and what may be the

23   Government's thinking, just like the courts, we try to wait for

24   specific situations before we commit anything publicly as to

25   what our position would be.

Abu Bakker Qassim, et al. vs.                  CV 05-497                        August 25, 2005
George W. Bush, et al.

Page 20

1          THE COURT:  I've noticed that.  I've noticed that.

2          All right.  Thank you, Mr. Henry.

3          Mr. Willett, your turn.  Do you have any comment or

4     questions about what we've just discussed here with Mr. Henry?

5          MR. WILLETT:  No, Your Honor.  What I do want to

6     address is interim release under the SARD case, and I don't know

7     whether it's better to do that after the chambers conference or

8     now.  Because what we're reading in the newspapers and what I

9     think you're going to hear in chambers is they're not going to

10    fix this internationally, not any time soon.  They've been at it

11    for two years, according to the Washington Post, according to

12    NPR.  I mean, they had Ambassador Prosper on the radio this

13    morning saying they've gone at 24 or 25 countries without

14    success.

15         Evidently some countries are intimidated by the heft of

16    China in the international marketplace; others may ask why a

17    particular administration with a go-it-alone philosophy about

18    foreign affairs now comes to them for help.  I'm not a diplomat.

19    I don't know.

20         But what I do know is, it's not working.  It's not

21    going to work next month, it's not going to work in six months,

22    it's particularly not going to work if we just fluff up the

23    pillows a little bit at Gitmo and leave them there, with no

24    particular pressure on the government to make something happen.

25         So whenever it's appropriate, I want to talk to you

United States District Court                202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                          Official Court Reporter

Page 21

1    about prophesy, because I would like to propose a different

2    prophesy than the one Your Honor suggested in your August 19th

3    order.  It looks like now is the time.

4              THE COURT:  I think now is the time.

5              MR. WILLETT:  Okay.  Let's go back to what nobody can

6    argue with, because the Supreme Court said it in Rassoul.  And

7    that's that you have jurisdiction in this case, which means that

8    you have jurisdiction of the case and the petitioners.  An act

9    of Congress says you can bring them to this courtroom.  No one

10   could question that, either.

11             We then move to the Court of Appeals for this circuit,

12   which has said that a habeas judge having jurisdiction of a case

13   has the power before the final determination of the writ to

14   order appropriate, in effect, parole, conditions of interim

15   release.  And at such a hearing you have to consider, is there a

16   danger to the community, does the petitioner represent a danger

17   to himself, is there a risk that he would flee, all of those

18   things that nobody better than the Federal District Court knows

19   how to do, because you do it all the time in slightly different

20   circumstances.  You have that power.  I don't think anyone can

21   argue with that power.  So we have to ask ourselves, would this

22   be the case that the Court of Appeals would determine to rip

23   from the jurisdiction of the federal trial court?

24             And here's why I suggested a different prophesy:  The

25   first is that there's actual a technical inaccuracy in your

Abu Bakker Qassim, et al. vs.                        CV 05-497                        August 25, 2005
George W. Bush, et al.

Page 22

```
 1    opinion.  The Court of Appeals did not stay Judge Hens Green's

 2    order, she stayed it herself.  As far as I know, they've never

 3    yet tipped their hand in a habeas case that didn't involve the

 4    process for a military tribunal.

 5              Why they wouldn't tip it has partly to do, of course,

 6    with the unarguable, unassailable propositions I just laid out

 7    for you in terms of your jurisdiction.  It has partly to do, I

 8    think, because they know their own supervisory court expressed

 9    in Hamdan, expressed in Rassoul, expressed in Zadvadus a real

10    horror of indefinite incarceration.  That was the thing to be

11    feared.  I think I just heard Mr. Henry say they're going to be

12    there as long as it takes.

13              THE COURT:  That's what I heard, too.

14              MR. WILLETT:  So is this the case, where people have

15    been determined not to be enemy combatants, where they would

16    leap in to take that jurisdiction from the trial court?

17              My prophesy -- I'm going to go with Justice

18    Frankfurter, Your Honor, who on several occasions referred to

19    the fairness, the common sense, and the courage of the District

20    Court in this country.  And I'm going to believe the Court of

21    Appeals, just like this Court, believes in the rule of law, and

22    relies, just as everyone else does, on the exercise of that

23    common sense, fairness, and courage.

24              So my prophesy is a little different.  And I hope it

25    doesn't go too far to say -- because we are talking about
```

Page 23

1    prophesy, and it's all about what's practical, not necessarily

2    what's legal or even appropriate.  But I guess it is a fact that

3    we're about to begin a big circus next week or the week after in

4    the United States Senate.  I don't doubt that the Hamdan

5    decision is going to be on the table during those confirmation

6    hearings, and the Court of Appeals may find itself under a

7    scrutiny from the media that it's not accustomed to.  In that

8    crucible, is it going to leap into this courtroom to take this

9    case away?

10            Suppose for a moment that my prophesy is wrong, and

11    suppose that the Government invites a radical degree of judicial

12    activism from the Court of Appeals.  I suppose it's probably

13    100 percent likelihood that they'll ask for a stay.

14            Well, if that happens, Your Honor, I'll just get on the

15    elevator and go to the fifth floor, and with the deepest

16    respect, I think if that happens, it becomes my problem.

17            Now, we've thought long and hard about fluffing up the

18    pillows as opposed to asking you for this relief.  The problem

19    is, if it was 30 days of fluffing up the pillows, we probably

20    wouldn't be asking for it.  We would stick at the base.  It's

21    not going to be 30 or 60 or 90.  It's going on two years.

22            So if there is an order for interim release from this

23    Court after you've had the hearing, let the Government explore

24    any concerns they have about risk to the community, after you've

25    settled a set of terms for appropriate conditional release,

Abu Bakker Qassim, et al. vs.                    CV 05-497                                   August 25, 2005
George W. Bush, et al.

Page 24

1    after Mr. Parhat Yassin (ph), who is in the courtroom today and

2    is a resident asylee Uighur escaped from China himself, and who

3    has called me up to offer his home as refuge for these people,

4    after you've heard the evidence, if you issue that kind of

5    order, the only thing I can tell you is that I'll be proud to

6    ride the elevator to any floor of this building and defend it.

7            THE COURT:  Well, it certainly has not escaped your

8    notice, nor Mr. Henry's, that the concern I had with issuing

9    this little memorandum the other day was the question of whether

10   something could be done in the interim that would make the lives

11   of these petitioners tolerable pending the reasonable amount of

12   time that it takes to get them placed.

13           If you're right that they're not going to be placed and

14   it's indefinite, well, that puts a different picture on it, and

15   maybe it won't matter so much if it takes a year for the Court

16   of Appeals to sort it out on appeal.  I don't think Mr. Henry is

17   going to even want to respond to what you've just said because

18   it's sort of hypothetical.  Am I right, Mr. Henry?

19           MR. HENRY:  That's correct, Your Honor.

20           THE COURT:  One more question, Mr. Willett.  Is there

21   any dispute about the conditions under which these people are

22   being held, or about the appropriateness or necessity of the

23   conditions under which they're now being held?

24           MR. WILLETT:  Oh, yes.  I mean, Your Honor, I don't

25   think they should be held behind any fence.  If you mean do we

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Page 25

```
 1   dispute the nature of the kitchen and so forth, I don't know the

 2   facts myself.  We didn't get in to them on the 19th.  So I don't

 3   have a basis today to dispute what Mr. Henry told you about the

 4   living conditions.

 5            THE COURT:  I'm just wondering what purpose might be

 6   served, if any, if the petitioners can't be brought here, if

 7   their bodies can't be brought here, if perhaps a magistrate

 8   judge of this court might go there.  And I'm wondering what

 9   purpose such a visit might have.

10            MR. WILLETT:  We welcome anyone going there, the Court,

11   the press, us, anybody.  We think that's a good thing.  What I

12   would suggest, though, is that the only remedy that's really

13   going to make sense is to open up the gate, and since they don't

14   want to do that on Gitmo, we're down to the District of

15   Columbia.  So we think ultimately they should be here and they

16   should not be in any kind of jail.

17            While we understand that since the ultimate resolution

18   is probably going to be, in effect, a deportation subject to

19   Your Honor 's being satisfied with the place they're being

20   deported to --

21            THE COURT:  You really think I'm going to have anything

22   to say about that?

23            MR. WILLETT:  Well, you will, actually, Your Honor, if

24   you retain jurisdiction of the case by not concluding the habeas

25   case.  That's why interim release seemed like the perfect fit
```

Page 26

1    here.  You still have the case, it's not a final order, you have

2    jurisdiction of it, and when Mr. Henry comes in and says we've

3    talked the Netherlands into it or talked Sweden into it or

4    whatever we can do, at that point they will be sent to that

5    country and the case will be dismissed as moot.

6          But the interim release has that nice feature of Your

7    Honor's retained jurisdiction, which I think addresses their

8    parade of horribles.

9          THE COURT:  Okay, Mr. Willett.  Thank you.  Well,

10   people sitting out in the courtroom may be wondering what has

11   happened.  I'm not sure much of anything has happened, but we've

12   had a conversation, we're now going to have a conversation in

13   camera.  That will be in chambers, it will be among the

14   government counsel and other cleared counsel.

15         Since I don't think we have a cleared court reporter,

16   it's going to be off the record.  Any problem with that,

17   counsel?

18         MR. WILLETT:  No, Your Honor.

19         MR. HENRY:  No, Your Honor.

20         THE COURT:  In that case we will adjourn this

21   proceeding and I will see counsel in chambers directly.  Thank

22   you.

23         (Proceedings adjourned at 2:55 p.m.)

24

25

Abu Bakker Qassim, et al. vs.                    CV 05-497                                    August 25, 2005
George W. Bush, et al.

Page 27

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, Rebecca King, certify that the foregoing is a

 4   correct transcript from the record of proceedings in the

 5   above-entitled matter.

 6

 7

 8

 9   _____          _____

10   SIGNATURE OF COURT REPORTER         DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                     Official Court Reporter

**EXHIBIT 12**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et            :        Civil Action No. 05-497
al.,                             :
            Plaintiffs,          :        August 1, 2005
v.                               :
GEORGE BUSH, et al.,             :
                                 :        4:00 p.m.
            Defendants           :
. . . . . . . . . . . . . . . :        . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiffs:         P. SABIN WILLETT, ESQUIRE
                            JASON S. PINNEY, ESQUIRE
                            BINGHAM McCUTCHEN, LLP
                            150 Federal Street
                            Boston, Massachusetts  02110-1726
                            (617) 951-8684
                            BARBARA J. OLSHANSKY, ESQUIRE
                            CENTER FOR CONSTITUTIONAL RIGHTS
                            666 Broadway
                            New York, New York  10012
                            (212) 614-6439
For the Defendants:         TERRY M. HENRY, ESQUIRE
                            ROBERT J. KATERBERG, ESQUIRE
                            JOSEPH HUNT, ESQUIRE
                            VINCENT GARVEY, ESQUIRE
                            U.S. DEPARTMENT OF JUSTICE
                            CIVIL DIVISION
                            20 Massachusetts Avenue, NW
                            Room 7144
                            Washington, D.C.  20530
                            (202)514-4107


Court Reporter:             REBECCA KING, RPR, CRR
                            Official Court Reporter
                            Room 4802-B, U.S. Courthouse
                            Washington, D.C. 20001
                            (202) 898-9398


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Page 2

```
1                    P R O C E E D I N G S

2            COURTROOM DEPUTY:  Civil action number 05-497, Abu

3    Bakker Qassim, et al., versus George Bush, et al.

4            Counsel, could you identify yourselves for the record.

5            MR. WILLETT:  Good Afternoon, Your Honor.  Sabin

6    Willett of Bingham McCutchen.  With me, Jason Pinney, my

7    colleague; Barbara Olshansky and Tina Foster from the Center For

8    Constitutional Rights, for the petitioners.

9            MR. HENRY:  Good afternoon, Your Honor.  Terry Henry

10   with the Department of Justice, and with me at counsel table is

11   Joseph Hunt, Vincent Garvey, and Mr. Robert Katerberg.

12           THE COURT:  Okay.  Well, there are a lot of people in

13   this courtroom, and I don't know the extent to which everybody

14   knows what the background of this matter is, but the proposition

15   of this case is quite simple.  The petitioners in this case have

16   petitioned for writs of habeas corpus.

17           I did with this case as I have done with all of the

18   Guantanamo cases that I have handled, which is quite a number.

19   I issued a stay order at the request of the government.  In the

20   stay order I said, however -- and I'm not quoting what I said,

21   but in general I said, I now have jurisdiction of this matter,

22   so the government can't do anything to these people without

23   advanced notice to opposing counsel and to me.

24           Both sides have appealed that order to the Court of

25   Appeals; the appeal has just recently perfected, I think.  And I
```

Abu Bakker Qassim, et al. vs.                    CA 05-497                          August 1, 2005
George Bush, et al.

Page 3

1    received, I think last week, a rather startling motion from the

2    petitioners to the effect that when their counsel finally had a

3    chance to go talk to them in July in Guantanamo, middle of July,

4    they found out that the petitioners have been found by the

5    Combatant Status Review Tribunal to be noncombatants.  And that

6    this happened sometime in -- I don't know, a long time ago, and

7    that nobody bothered to notify either petitioners' counsel or

8    me.

9           And not only that, but when petitioners' counsel asked

10   questions of the government, they were ignored and the questions

11   were not answered.

12          Now the petitioners have asked since these men have

13   been found not to be combatants, that they be released into the

14   non-prison side of the Guantanamo compound until or unless they

15   are relocated by the government.

16          The government resists that notion, and that's why

17   we're here, to have a hearing and find out what on earth is

18   going on here.

19          I will hear from the petitioners.

20          MR. WILLETT:  Thank you very much, Your Honor.  Again,

21   Sabin Willett for the petitioners.

22          I was about to start with a little excursus on the law,

23   because I think that the government in its brief filed Friday

24   has asked you the wrong question.  The question is not, what

25   justification have my clients for release, the question in a

Abu Bakker Qassim, et al. vs.                    CA 05-497                           August 1, 2005
George Bush, et al.

Page 4

1    habeas case is what justification does the executive proffer for

2    imprisonment.

3           And it has always been the case in the common law writ

4    of habeas, as well as the way it's drafted into the statute,

5    that the very first thing that must happen is that the

6    government must show cause.

7           Now, if they make a showing of cause, if they point to

8    an adjudication or a statute or something in law, then we have a

9    hearing.  But I will tell you candidly, we waited with some

10   anxiety for their brief, thinking there must be some other

11   cause, because the cause they've always asserted to you and the

12   other judges of this court is that they may rest upon Deputy

13   Secretary of the Defense memo that defines enemy combatants and

14   creates the CSRT.

15          Indeed, it appears from their brief, that remains their

16   only lawful justification.  They point to no other statute or no

17   other doctrine that we could determine.

18          So this is not a case that presents a question that's

19   now before the Court of Appeals as to whether it's indeed lawful

20   for a Deputy Secretary to declare a war that Congress never did,

21   or all of those other questions.  This question says what any

22   habeas case says at the outset to the respondent:  What is the

23   justification for imprisonment?  And there is, as I read their

24   brief, no answer to that.

25          Now, I might -- Your Honor has adverted to how we got

Abu Bakker Qassim, et al. vs.                    CA 05-497                           August 1, 2005
George Bush, et al.

Page 5

1    to where we are, and so I won't dwell on that.  It was of

2    concern to us as well.

3         But I would highlight one point for Your Honor.

4    According to the brief that they filed on the 26th -- excuse me,

5    that they filed Friday of last week, the CSRT proceedings were

6    completed on the 26th of March.

7         Now, three days later they filed in this court an

8    opposition to a motion that we have made, and the opposition

9    was, among other things, attempting to persuade you not to

10   require them to come up with returns on the CSRTs.

11        THE COURT:  Yes, that's right.

12        MR. WILLETT:  And in that paper, which was not a form

13   brief filed in 50 habeas cases, it was only filed in this case,

14   in that paper they said -- I want to get the quote right.  They

15   said, "A factual return for a petitioner in a Guantanamo

16   detainee case typically has consisted of the record of

17   proceedings that confirmed petitioner's status as an enemy

18   combatant."

19        Now, they knew that they weren't enemy combatants when

20   they wrote that.  They then wrote a full page about the burden

21   to the government of producing returns in redacted form and

22   carving out all of the classified information and so on.

23        Now, Your Honor, if I might direct your attention to

24   the Navy regulations on this, I have a copy that I can hand to

25   the clerk if that's of help.  To be clear about what this is,

United States District Court                      202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                       Official Court Reporter

Page 6

1    this is Navy Secretary England's 2004 set of regulations that

2    govern the conduct of CSRTs.

3           And if I can invite Your Honor to turn to the very last

4    page, this is the official one-page Combatant Status Review

5    Tribunal decision report cover sheet.  This is what the tribunal

6    president must sign when the hearing finishes, and you will see

7    that all it says is that the tribunal has determined that he,

8    meaning the detainee, is or is not designated as an enemy

9    combatant.  That's it.  They could have produced one page.

10          That same day that they filed that brief, I sent them

11   another e-mail saying, do you contend that these people are a

12   security threat to the U.S.?  And we specifically said, because

13   if you don't, maybe we can work together in some way to try to

14   talk about their release.  Which is an important point when they

15   start to talk about the interference they perceive we're now

16   bringing to them, now that it's August.

17          The other thing I would like to mention about the Navy

18   regulations is, first of all, they still haven't turned over the

19   CSRT.  I asked them again on Friday, twice.  You refer to it in

20   your brief; apparently it's a finding of noncombatant.  Can you

21   turn it over?  I was told that request was not appropriate.  So

22   I don't have it.

23          But I do have the regulations, and what the regulations

24   make clear is that what happened on March 26th was the last step

25   in a three-step process.  First the tribunal meets, it

Page 7

1    deliberates and it makes a determination.  These are all in the

2    regulations, Your Honor.

3            It then goes to the legal officer for a review.  When

4    he's done or she's done reviewing, it goes up to the director of

5    CSRT, which I believe to be Admiral Magera.

6            So what happened on the 26th was the last step.  They

7    must have known for a long time before that -- at least that the

8    tribunal had made a determination of noncombatant status.  How

9    long, we don't know.  They know, but they're not telling.

10           Now, the only thing I know is that one of my clients

11   recalled that his tribunal might have occurred in 2004.  He

12   wasn't sure.  Late 2004, early 2005.  So that's what we know

13   about how long non-enemy combatants have been imprisoned at

14   Guantanamo.

15           Now, the government wants to talk about what's

16   practical, and Colonel Baumgartner talks about basically how you

17   can't have these fellows walking around the base.  I think in a

18   habeas case, the question is simply whether Your Honor orders

19   they be released, but we're trying to be productive and talk

20   about the practical consequences of that.

21           One, but by no means the only one, is that they would

22   be accommodated in the civilian population at the base.  And

23   indeed, I think a hearing would show that in addition to

24   civilians working at McDonald's, you've got actual noncitizens

25   who are working at the base.  This is on information and belief,

Page 8

1     and we would need a hearing to know with certainty.  But I

2     believe that to be the case, Your Honor.

3           But if the colonel is unwilling to extend that courtesy

4     or he thinks it somehow compromises the mission, I mean, I can

5     tell Your Honor that the secure facility, the prison, is a long

6     way away from the McDonald's.  You drive down a road between two

7     arroyos, and nobody is getting near that place that doesn't

8     belong there.

9           But if it makes him uncomfortable, I will point out

10    that we learned over the weekend -- and I'll follow up with a

11    declaration on this, but there is a quasi precedent for what

12    we're asking for.  Apparently, sometime in the '90s, Haitian

13    refugees were interdicted on the high seas by the Coast Guard.

14    These people had committed no crime and they had violated no

15    immigration law of the United States.

16          They were brought to Guantanamo, and I am told --

17    again, this is information and belief.  I am told that they were

18    billeted in a Marine barracks, that they received mess

19    privileges, and they found some sort of work at a fast-food

20    restaurant while their asylum petitions to various countries

21    were pending.  Again, a hearing would determine whether this

22    information is correct, but I don't believe it accurate that

23    there has never been this kind of thing on the base before.

24          The second thing I would say, Your Honor, is that we

25    threw that out as an alternative to imprisonment, but I believe

Abu Bakker Qassim, et al. vs.                    CA 05-497                         August 1, 2005
George Bush, et al.

Page 9

1    there's another alternative, at least one, which is that as the

2    habeas judge in this case, it lies within your power to require

3    that they bring the person, I think it says the body of the

4    petitioner, to your courtroom.

5           Now, at a hearing where that occurred, you could

6    satisfy yourself as to whether you think there's any risk to the

7    community or to the petitioner or anyone through some kind of

8    release terms.

9           THE COURT:  Then when they're on American soil, they

10   can apply for asylum?

11          MR. WILLETT:  Evidently.  And I'm not in immigration

12   law, but evidently this is not actually that kind of dodge,

13   because if they are paroled here, they are not deemed to make an

14   entry.  At least that's my understanding.  The immigration

15   lawyers could clarify that.

16          And again, an asylum petitioner is purely discretionary

17   with the Attorney General.  There's no way to make it happen,

18   although many of the Uighur expatriate people you see in the

19   courtroom have indeed been granted asylum petitions.

20          The point is that they could be brought here, and while

21   the State Department process is ongoing, with which we do not

22   wish to interfere, they could be released under supervisory

23   conditions.  There is, again, a precedent -- not a precedent,

24   but there is an analogy for this in 8 U.S. Code dealing with

25   asylum and deportation cases.  Indeed, after someone has been

United States District Court                  202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                            Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CA 05-497                    August 1, 2005
George Bush, et al.

 1    deported, they can actually be released into the population

 2    under various conditions of supervision, depending on the

 3    circumstances of the case.

 4            So you could have a situation where these petitioners,

 5    who would be welcomed into the Uighur community that is here

 6    today, they could be required to report to the Marshal Service

 7    or whatever the appropriate conditions are, or indeed, Your

 8    Honor could determine that you're not comfortable at all after

 9    you conduct a hearing.  I'm not attempting to prejudge anything.

10    But there are solutions short of this continuing imprisonment.

11            Your Honor, I've been focused on the practical

12    dimension from the point of view of the government, but I think

13    it only fair to spend just a moment on the practical dimension

14    of continued imprisonment to my clients.  They're not soldiers,

15    they're not criminals, they're just Uighur people.  And I've

16    never heard of Uighurs either before this case, but come to find

17    out there might not be a more pro-U.S. Muslim group in the

18    world.  The Uighurs have traditionally suffered under religious

19    and political oppression at the hands of the communist Chinese,

20    and I can remember a time when that made a person someone we

21    liked in this country.

22            My two clients, Abu Bakker and Adel, fled from such

23    persecution originally to Kyrgyzstan, and were trying to make

24    their way to find work in Turkey when they found themselves in

25    the wrong place at the wrong time.  They are husbands, they are

United States District Court                202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                          Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CA 05-497                                   August 1, 2005
George Bush, et al.

1    fathers, they are sons.

2            Now, Colonel Baumgartner says it isn't a bad prison,

3    it's only medium security.  You can play ping-pong, you can eat

4    your meal family style, but not with your family.  And it's

5    true:  Compared to some of the other horrors that have happened

6    at Guantanamo and that we've heard about most recently from

7    Fort Meade and the Courts Martial going on down there last week,

8    Camp Four is pretty good, but it's still a prison.

9            Here's what I saw on July 14th:  A slight, gentle man

10   with a shy smile chained to the floor, a man sitting in a box

11   that had no windows.  As far as the guards were concerned, he

12   has no name.  They refer to him by his number.  When he wanted

13   to go to the bathroom, a guard had to come in and put on green

14   rubber gloves --

15           THE COURT:  You're not talking about your client?

16           MR. WILLETT:  I'm talking about my client.

17           THE COURT:  He was chained to a floor?

18           MR. WILLETT:  He had a leg shackle that was chained to

19   a bolt in the floor, Your Honor, in Camp Echo.  Both of my

20   clients.

21           I thought I knew something about what this imprisonment

22   meant, but I was wrong.  I really found out Friday of last week.

23   You see, there had been a newspaper article that had been

24   written about this story, and it had been picked up by the

25   Uighur Diaspora and made its way to Europe.

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Page 12

1           And late Thursday came an extraordinary telephone call,

2     and on Friday, through an interpreter, I spoke by telephone to

3     Kabsur Abdul Hakim, who is a refugee living in Sweden, and she

4     is Adel's sister.  And while Nury Turkel, the interpreter who

5     was in the room, and I listened to her weep, she told us that

6     she thought her brother was dead.

7           You see, she was right.  These people are dead to the

8     outside world.  They're dead to their children, they're dead to

9     their wives, even their names are a secret.  And but for the

10    fortuity that my clients happen to have outside lawyers, the

11    fact of their acquittal, or whatever you call this, that would

12    be a secret.

13          You can't send them a photograph or a box of cookies,

14    you can't visit them without a law degree and a U.S. passport.

15    They write us letters but they never come out.

16          Your Honor, I submit that in a habeas case, the delay,

17    the time lost, is the harm itself, and every single day this

18    continues is another small death.

19          THE COURT:  Before you sit down, let me ask you a

20    question that I didn't want to interrupt you with.  But are

21    there limits to my jurisdiction here, now that this matter is on

22    appeal?

23          MR. WILLETT:  I don't think so, Your Honor.  There's

24    two matters -- actually only one matter on appeal.  The

25    government took an appeal of your order with respect to what I

Abu Bakker Qassim, et al. vs.                       CA 05-497                         August 1, 2005
George Bush, et al.

1    might call rendition.  It might be that that is on appeal --

2    although I believe someone has made a motion to dismiss that

3    appeal, so I'm a little murky about that, at least in one of the

4    other habeas cases.

5           What we did was, we filed a mandamus petition seeking

6    to require that you hold a hearing.  That, as I understand the

7    jurisprudence, doesn't create an appeal unless the Court of

8    Appeals accepts it and notifies the government that they need to

9    respond, which they have not done.

10          In any event, it would become moot and we would

11   withdraw it upon any of the relief that we're asking for here.

12          THE COURT:  All right.  Let me hear from the

13   government.

14          Thank you, sir.

15          MR. HENRY:  Your Honor, may it please the Court, what

16   we're dealing with here ultimately is two requests:  One is

17   whether the stay should be lifted in this case; and the second

18   is whether the living conditions of the petitioners in the case

19   should somehow be altered.

20          Neither of those requests is appropriate, and we

21   believe petitioners' motion should be denied.

22          If I may, let me just deal with the legal issue first.

23   The petitioners have argued that there is no legal basis for the

24   current detention of the petitioners, and that that somehow

25   gives them and this Court the authority to deal with the issue

United States District Court                   202-898-9398                  Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CA 05-497                    August 1, 2005
George Bush, et al.

1    of the current living conditions of the petitioners.

2            Actually, Your Honor, the executive's authority to make

3    war includes the power to detain individuals as enemy combatants

4    or individuals suspected of being enemy combatants.  That legal

5    authority would necessarily include the authority to wind up

6    that detention in an orderly fashion, and that's exactly what

7    has gone on here.

8            As we indicated in the brief that we filed on Friday,

9    these folks have been determined to be no longer enemy

10   combatants, and I would point out that the determination of the

11   CSRT is that the petitioners are no longer enemy combatants.

12   Prior to that final determination, they were held under the

13   enemy combatant categorization.

14           During the time that they have -- since they have been

15   determined to no longer be enemy combatants, there has been a

16   diplomatic process under way to find a suitable country for

17   transfer of these individuals consistent with the United States

18   policy not to transfer people to countries where it's more

19   likely than not that they will be tortured.  That process is

20   ongoing, those efforts are diligent, multifaceted, and it's our

21   hope that soon there will be an option available for transfer of

22   these petitioners and they can ultimately be released.

23           But since we're dealing with a situation where you have

24   kind of an interim, a transitional detention situation, it's our

25   position that the petitioners shouldn't be permitted to

United States District Court                202-898-9398                Rebecca King, RPR, CRR
For the District of Columbia                                            Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CA 05-497                         August 1, 2005
George Bush, et al.

Page 15

1    interject themselves into that detention at this time, since the

2    detention is really just an extension of the detention, to

3    detain individuals generally as enemy combatants.

4            Now, I would point out as far as the legal basis of the

5    relief that the petitioners seek here, the only thing that they

6    claim is a Constitutional right to have the Court step in and

7    deal with their living conditions.  But the Constitutional right

8    of detainees at Gitmo vis-a-vis the government and its power to

9    detain individuals, that is a subject of the ongoing appeal in

10   the D.C. circuit, and that, we believe, points to the continued

11   propriety of the stay in this case.

12           The case is not moot; the finding that these

13   individuals are no longer enemy combatants did not moot the

14   case.  It's on the way to being moot pending the working out of

15   this diplomatic process, but it's not there yet.

16           And I would point out along these lines that in all the

17   Guantanamo Bay cases, we have moved for stays, we have opposed

18   having to conduct any kind of proceedings in the litigation

19   regarding the merits of these petitioners, other petitioners,

20   all the petitioners in the Guantanamo cases' detention.  And

21   we've also opposed having to produce any factual records with

22   respect to the detention.

23           Just as an aside, the petitioners' counselor complains

24   about us not responding to his requests for information --

25           THE COURT:  I don't think that was an aside.  What's

1    your response to that?

2          MR. HENRY:  Your Honor, basically we have 120 cases on

3    behalf of more than 230 detainees.  We receive requests for

4    informal discovery as to the status, all the kinds of aspects

5    with respect to petitioners, and we generally do not respond to

6    those simply because we're not in a position to do it,

7    especially when these cases should be stayed because the legal

8    issues involved are before the Court of Appeals.

9          And I should point out that in this case, given that

10   the detention is ongoing and that petitioners -- the only legal

11   authority they're citing for relief with respect to that

12   detention is a Constitutional right, and that very issue

13   continues to be before the Court of Appeals.

14         THE COURT:  Well, the Constitutional right, I suppose,

15   if you're talking about the writ of habeas corpus, which is

16   enshrined in the Constitution, yes.  But if the Supreme Court

17   has held that there is a right of habeas corpus for people at

18   Guantanamo, what can it mean?  Are you saying that you've got a

19   right to file a writ of habeas corpus, but that's all?  Nothing

20   can ever happen because of it?

21         MR. HENRY:  Well, Your Honor, essentially yes.  The

22   writ of habeas corpus brings the matter before the Court, but

23   the issue of whether --

24         THE COURT:  But the Court can't do anything about it?

25         MR. HENRY:  Well, the issue of whether they are

Abu Bakker Qassim, et al. vs.         CA 05-497         August 1, 2005
George Bush, et al.

Page 17

```
 1   substantive rights that a petitioner can assert against his
 2   detention, whether that be detention as an enemy combatant or as
 3   here, a detention on the tail end of an enemy combatant
 4   detention --
 5          THE COURT:  Well, turn it around and answer the
 6   question that petitioner put.  Because he's right.  What habeas
 7   corpus does is to bring the petitioner before the Court, or to
 8   require you to bring the petitioner before the Court, and
 9   explain by what right you're holding him.
10          Now, explain that.  Is it, as you said earlier, the
11   power to wind up in an orderly fashion?  Is that it?
12          MR. HENRY:  Yes, Your Honor.
13          THE COURT:  That's the right that you assert for
14   hanging on to these people?
15          MR. HENRY:  That is correct, Your Honor.  Once a
16   petitioner or a detainee generally is determined, you know, no
17   longer to be an enemy combatant, it's not a question of you just
18   open the gates of Guantanamo and let them walk out.
19          THE COURT:  Of course not.  You could let them swim, I
20   suppose, but that doesn't make any sense.
21          MR. HENRY:  Well, the executive's power with respect to
22   the detention of individuals, it necessarily includes the
23   authority to wind up that detention in an orderly process.
24          THE COURT:  You're making that argument as a matter of
25   your assertion of the logic of the situation.
```

Abu Bakker Qassim, et al. vs.                    CA 05-497                              August 1, 2005
George Bush, et al.

Page 18

```
 1              Do you have any case support for it except for your

 2     logic?

 3              MR. HENRY:  I do not have case support, but I do have

 4     historical precedent.  At the end of World War II, at the end of

 5     the Korean War, at the end of the Gulf War, there were

 6     significant numbers of individuals who could not be repatriated

 7     consistent with the laws of war due to concerns about the laws

 8     of repatriation.  That's essentially what we have here.

 9              That took time to wind up those issues.  In the case of

10     World War II, it was several years.  That's the kind of

11     situation we have here.  A determination has been made that

12     these folks are no longer enemy combatants and should be

13     transferred, released.  The problem is, as of yet there is not a

14     country that has agreed to accept them where there's not this

15     concern about torture or mistreatment.

16              So it's based on the necessary logic of the situation.

17     I don't think the executive could be in the business of making

18     war and detaining individuals if he did not have the concomitant

19     authority to wind up that detention in an orderly fashion.

20              And it's based on historical precedent because, in

21     these large conflicts in the past, there have been significant

22     numbers of individuals where there have been repatriation

23     concerns.  As you may know, Your Honor, the Geneva Convention

24     requires combatants, POWs, whatever, to be repatriated as soon

25     as possible after the end of hostilities, but there are other
```

Abu Bakker Qassim, et al. vs.                    CA 05-497                    August 1, 2005
George Bush, et al.

Page 19

1    concerns that enter into that.

2              THE COURT:  We all know that I've got no power under

3    the Geneva Convention.

4              MR. HENRY:  According to the D.C. circuit, the

5    Convention was not judicially enforceable.

6              But the issue here is not -- well, that issue is

7    repatriation.  Here the issue is repatriation of sorts, except

8    these folks are not going to be repatriated due to the concerns

9    about the treatment they would receive on that end.

10             And so the executive is in the process of undertaking

11   diligent efforts to try to locate an alternative third country

12   to which these folks can be sent.

13             THE COURT:  But you're not at liberty to explain that

14   to this courtroom, to opposing counsel, or even to me.  That's

15   your position?

16             MR. HENRY:  Your Honor, I'm not in a position to

17   explain it definitely to this courtroom or to opposing counsel.

18   With respect to some sort of ex parte in-camera discussion with

19   you, I'm more than happy to go back to the client and see if

20   that could be arranged.

21             THE COURT:  I'm not sure I want to hear that ex parte.

22             MR. HENRY:  Your Honor, as you understand, diplomatic

23   negotiations, especially on sensitive issue like this, are very

24   delicate, and a public disclosure of those could well adversely

25   affect that.

Abu Bakker Qassim, et al. vs.                    CA 05-497                    August 1, 2005
George Bush, et al.

1           THE COURT:  Yes, I can understand that.  And there is

2      certainly a practical conundrum that is posed by this situation

3      because of the -- because the petitioners are Uighurs, and we've

4      all read up enough on their status in China to know that that's

5      a serious problem.

6           I must say, though, that I would like to hear you

7      respond to why -- maybe I can understand that you blow off

8      e-mails and don't answer e-mails, but why did you not tell

9      petitioners' counsel what the situation was?  And why did you

10     file a piece of paper in this court three days after the CSRT

11     proceeding implying that they were combatants?

12          MR. HENRY:  Well, Your Honor, a couple of responses to

13     that.  First of all, as to the general matter, we have not been

14     providing notice of an intent to release individuals.  That

15     issue is on appeal to the D.C. circuit.  We've opposed numerous

16     motions seeking some sort of advance notice of release and that

17     sort of thing, and until we are ready to release someone, we

18     have not been giving advance notice.

19          We have also --

20          THE COURT:  Are you telling me that there are lots of

21     NLECs down there who nobody knows are NLECs?

22          MR. HENRY:  Your Honor, the numbers of NLECs have been

23     publicly released by DOD.  You know, as particular individuals

24     in situations where we've had to file factual returns or

25     whatever, obviously, we comply with that order and that is

Abu Bakker Qassim, et al. vs.                    CA 05-497                    August 1, 2005
George Bush, et al.

Page 21

1    provided to counsel.

2            In situations where factual returns have not been

3    required, and as we've argued in the stay motions we've filed in

4    all these cases, the petitioners have an opportunity to meet

5    with, correspond with counsel and all that sort of thing.

6            THE COURT:  I'll tell you one thing, Counsel.  You've

7    talked me early on into not requiring returns to be filed in the

8    cases.  But I'm going to go back to all of my habeas cases this

9    afternoon and change those orders.  Because if you're telling me

10   that it's only an order to file a return that will allow you to

11   tell opposing counsel that their clients are no longer enemy

12   combatants, that's a little hard for me to understand.

13           MR. HENRY:  But, Your Honor, until we're ready to

14   release someone, I mean, we continue to detain them.  The case

15   is not moot.  The grounds for the detention are, if not the

16   exact subject of, certainly will be affected by what's going on

17   in the Court of Appeals.

18           So the same grounds that animate the stay with respect

19   to proceedings apply across the cases.  And I would also point

20   out that as a practical matter, we have new cases filed

21   virtually every day.  How many of those that we know of right

22   off the bat involve NLECs?  I can't tell you.

23           THE COURT:  Oh, I think you've got a database.  How

24   many people are down there?

25           MR. HENRY:  A little over 500.  Your Honor, I'm telling

Abu Bakker Qassim, et al. vs.                    CA 05-497                    August 1, 2005
George Bush, et al.

Page 22

1    you as --

2              THE COURT:  It's easy, isn't it?  It's a spreadsheet.

3    It's a spreadsheet, isn't it?

4              MR. HENRY:  I don't know, Your Honor.  It involves our

5    inquiry to the client and that sort of thing.

6              But, you know, all I'm intending to point out is that

7    it is a logistical undertaking that is significant, and...

8              In any event, as I've pointed out, the same issues that

9    animate the stay apply across the board in all the cases until

10   we're at a point where we're ready to release someone.

11   Obviously, at that point, the case becomes moot and we notify

12   everyone appropriately, or we comply with whatever orders the

13   Courts may issue with respect to advance notice or, in your

14   case, coming to the Court for advanced permission.

15             THE COURT:  Go back to your repatriation cases after

16   World War II.  The people you're talking about that took a long

17   time to get repatriated were repatriated from where?  POW camps

18   in Michigan?

19             MR. HENRY:  They were POWs, I'm not sure of their exact

20   location.

21             THE COURT:  They were POWs.  They weren't people who

22   had been determined not to be enemy combatants.

23             MR. HENRY:  Well, a cessation of hostilities had

24   occurred, so they were no longer enemy combatants in that sense.

25   This was after the end of the war.

Page 23

```
 1           THE COURT:  And where were they kept?  Were they kept

 2    in prisons?

 3           MR. HENRY:  They were kept in prisons, I believe.  I

 4    don't know if any were here in the U.S.  I know some were in

 5    Europe.  They were kept in prisons, and -- until the issues were

 6    worked out.

 7           They involved citizens of other countries who had been

 8    fighting for the Germans, and they claimed our enlistment or our

 9    fighting for them had been compelled under various threats of

10    violence.  But they couldn't be sent back to their home country

11    because they would be shot as traitors, that sort of thing, and

12    it took several years to work that out.

13           Like I said, same kind of concerns at the end of the

14    Korean War, same kind of concerns at the end of the Gulf War for

15    significant numbers of individuals, and that's the same kind of

16    situation that we have here.

17           THE COURT:  What about counsel's example of the

18    Haitians?

19           MR. HENRY:  What he's referring to is the Migrant

20    Operations Center; it's a facility at Guantanamo.  It's not a

21    detention facility, but it's a facility where immigrants who are

22    interdicted on the high seas that claim a protected status -- in

23    other words, they can't be immediately repatriated because of

24    fears of torture or whatever.

25           And after an interview process they go through -- like
```

Page 24

1    I said, they go through multiple interviews, they go through a

2    background check, that sort of thing.  And if they can't be sent

3    back, they are temporarily housed at this Migrant Operations

4    Center pending finding a third country that will take them.

5        After there are various background checks and that kind

6    of thing that goes on, they are permitted to seek work at the

7    various retail establishments and that sort of thing at

8    Guantanamo.  But again, that's after they go through background

9    checks and that sort of thing.

10       THE COURT:  But they're placed in the center before the

11   background checks, aren't they?

12       MR. HENRY:  My understanding is, and my understanding

13   is not complete, but my understanding is that they are in the

14   center, but they can't leave the center.  They're under certain

15   sort of monitoring pending their --

16       THE COURT:  But they're not chained to floors, are

17   they?

18       MR. HENRY:  Well, Your Honor, what happens is, when

19   counsel meet with the detainees at Gitmo --

20       THE COURT:  There's a yes-or-no answer to that

21   question.  Are they chained to floors in the immigrant detention

22   center?

23       MR. HENRY:  The detainees are not chained to floors in

24   their normal detention center either, Your Honor.

25       THE COURT:  But in the immigrant center.  If lawyers go

Page 25

1    down to talk to people in that immigrant center, are they

2    chained to floor?

3            MR. HENRY:  It's my understanding that lawyers are not

4    permitted to go down to the Migrant Operations Center.

5            THE COURT:  So if lawyers show up, they have to chain

6    people to floors.  Is that the rule?

7            MR. HENRY:  I don't believe so, Your Honor.  I don't

8    know what the rule is.

9            Let me tell you what the rule is at Guantanamo with

10   respect to the detention operations, the enemy combatant-related

11   detention operations.  As we pointed out in our filing, and as

12   detailed in the declaration of the commander of the Guantanamo

13   joint task force detention operations, the detainees here are

14   housed in a communal living arrangement, 10-man bays, with other

15   NLECs.  They have all-day access to the exercise yard, they have

16   various recreation activities, that sort of thing.

17           When counsel come down to meet with any detainee

18   petitioner at Guantanamo, the detainee is moved to a special

19   camp called Camp Echo that has huts where a detainee has a cell

20   he's kept in, and there then there's a room where counsel and

21   the detainee can talk.

22           It's standard operating procedure that whenever the

23   detainee is in the presence of counsel, or, like, if there's an

24   interrogation -- if they're moved to an interrogation room or

25   whatever, if it's someone besides the detainee there, the

Abu Bakker Qassim, et al. vs.          CA 05-497          August 1, 2005
George Bush, et al.

Page 26

1    detainees are shackled and the chain is bolted to the floor.

2    And we've had situations where the detainee has basically -- not

3    these petitioners, but other petitioners have lunged at,

4    attempted to do violence to, the attorneys.

5         So the chaining to the floor is for everyone's

6    protection; it's a standard operating procedure.  They don't

7    make exceptions based on, well, I think this guy is okay.  I

8    mean, you can see the potential danger of that kind of

9    situation, given that they've got 500 people down there and

10   rotating guard staffs and that sort of thing.

11        So the chaining to the floor, while I certainly

12   understand is an unpleasant image, it happens with respect to

13   all counsel visits or visits from any individuals that are not

14   the detainees themselves.  And it's done for the safety of all

15   concerned.

16        But the detainees are not kept chained in their normal

17   detention facility; in fact, it's quite the opposite.  They're

18   allowed to freely move around the bay where they live with other

19   individuals.  They have all-day access to the exercise yard,

20   they eat their meals communally, they have recreation

21   activities.

22        THE COURT:  Let me ask you the same jurisdictional

23   question I put to petitioners' counsel.  Is there any

24   jurisdictional -- well, I know that you have jurisdictional

25   issues, but, I mean, based on -- is there any jurisdictional

1    limits on this proceeding based on what is currently on appeal

2    in this case?

3         MR. HENRY: Let me say, I don't think so.  But let me

4    just correct something that petitioners' counsel said.  They not

5    only filed a petition for mandamus, they filed a notice of

6    appeal with respect to Your Honor's --

7         THE COURT:  Cross-appeal.

8         MR. HENRY:  -- cross-appeal with respect to Your

9    Honor's stay motion.  But I don't think an appeal of a stay

10   affects the Court's jurisdiction to modify the stay or do

11   whatever in appropriate circumstances.  And the petitioners'

12   counsel is correct that as far as I know, the Court of Appeals

13   has not required any kind of response to the mandamus petition.

14        THE COURT:  Who operates this immigrant detention

15   center?  I suppose that's the State Department.

16        MR. HENRY:  The Department of Homeland Security.

17        THE COURT:  Oh, Homeland Security.

18        MR. HENRY:  And that is an issue with respect to

19   providing asylum or transfer to third countries, that sort of

20   thing, issues that are well beyond the issues that have been

21   vetted in these cases so far.

22        THE COURT:  Well, are -- those people in that

23   immigration detention center, the reason they've been

24   interdicted on the high seas so they don't touch foot on

25   American soil so they don't have the right to seek asylum.

Abu Bakker Qassim, et al. vs.                    CA 05-497                              August 1, 2005
George Bush, et al.

Page 28

```
 1     That's why they're not at Guantanamo.  Right?

 2          MR. HENRY:  I'm not sure I would characterize it that

 3     way, Your Honor.  They interdict people on the high seas in

 4     various circumstances, in a boat sinking, whatever.  I mean, the

 5     duty of the Coast Guard --

 6          THE COURT:  That's called a rescue.  Interdiction is a

 7     different concept entirely, isn't it?

 8          MR. HENRY:  They overlap, Your Honor, is my

 9     understanding.

10          THE COURT:  Well, I'm not through with this point.  I'm

11     trying to figure out why it wouldn't make sense or why it would

12     be unlawful for these people to be placed in a facility like

13     that instead of where they are.

14          MR. HENRY:  Well, Your Honor, if you take a look at the

15     commander's declaration, he's explained the reasons why the

16     petitioners are where they are.

17          Let me just say --

18          THE COURT:  I did take a look at it.  He spoke of his

19     concerns.  He said --

20          MR. HENRY:  Yes.

21          THE COURT:  -- because they might be unhappy with where

22     they were finally sent.

23          MR. HENRY:  That's one concern.  There have been issues

24     with respect to detainees unhappy with their country of ultimate

25     transfer who -- and there are concerns that they could take some
```

Page 29

1    action against themselves or others to try to avoid going there.

2    There's concerns along those lines.

3            There are concerns about -- you know, the fact that

4    someone has been determined to no longer be an enemy combatant

5    doesn't make them benign in all circumstances.  There are

6    concerns -- you know, you drop these folks into the general

7    population of Guantanamo, there are concerns about their own

8    safety with respect to potential threats from the outside.

9            In a situation --

10           THE COURT:  I thought that's what this whole background

11   investigation thing was for.

12           MR. HENRY:  Well, Your Honor, the background

13   investigation is for immigrants, it's not for folks who are

14   detained as enemy combatants or have been detained as enemy

15   combatants in --

16           THE COURT:  I'm sorry.  I thought you said it was for

17   people who had been interdicted and who were not going to be

18   permitted to be immigrants and were going to be sent somewhere

19   else.

20           MR. HENRY:  I'm sorry.  I used the word "immigrant," I

21   guess, incorrectly, Your Honor.  They have been interdicted but

22   they're not -- they weren't detained as enemy combatants.  So

23   you have a completely different situation.

24           THE COURT:  It sounds like that comment and a few

25   others you've made, like they might be harmful to others, they

Abu Bakker Qassim, et al. vs.                    CA 05-497                    August 1, 2005
George Bush, et al.

Page 30

1    might be harmful to themselves, they might be violent if they

2    didn't like where they were going, it sounds like the fact that

3    they have been detained as enemy combatants creates some sort of

4    presumption in your mind or in the government's mind about them.

5            MR. HENRY:  Your Honor, it's more a situation

6    concerning the finding that someone is no longer an enemy

7    combatant.  As explained in the Navy regulations, the order that

8    petitioners' counsel handed up, an enemy combatant is defined as

9    someone, and I'm paraphrasing, that's a member of or associated

10   with Al-Queda or the Taliban, and includes people who committed

11   belligerent acts against the United States and its coalition

12   partners.

13           If you've determined that a detainee is no longer that

14   kind of person, that's all the decision is.  It's not a decision

15   that they're wonderful people who should be integrated into any

16   available society as soon as possible.  So the commander at

17   Guantanamo has to make his decisions concerning the security of

18   the detainees and of the base, based on his experience and what

19   he knows.

20           And as explained in the declaration, you know, he's

21   made a determination based on the good order, safety, and

22   security of the base and the detainees.  And that's what's going

23   on here.

24           Again, this is part and parcel with enemy combatant

25   detention and winding this up in an orderly process.  I mean,

United States District Court                 202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                            Official Court Reporter

Page 31

1    the historical examples that I gave you, just because there were

2    repatriation concerns, my understanding is they didn't turn

3    these folks loose to run around until they found a country

4    suitable for them, and that's what's going on here.  The

5    petitioner is being detained in the least-restrictive conditions

6    available at the detention facility.

7            I might add, you know, if they were moved outside the

8    detention facility, I think all that would mean is a relocation

9    of the security force situation, because the commander would

10   still feel an obligation to monitor -- you know, to provide the

11   care and emergency and security services that they do at the

12   detention camp.  It would just mean that it's done somewhere

13   else on the base.

14           THE COURT:  Yeah.  The petitioners' notion that he

15   should be placed in the civilian and military side of the

16   detention facility to live with the Marines is a nonstarter as

17   far as I'm concerned.  I agree that that doesn't make sense.

18           But I haven't quite let loose of the immigrant facility

19   that you've been talking about, or some sort of other -- you

20   said early on, Counsel, you said that -- you used the word

21   "soon" to describe when you thought that this might be resolved.

22   Define "soon."

23           MR. HENRY:  I don't know when that is.  I apologize if

24   I misspoke.  I mean, I think I said "soon" in kind of the

25   hopeful sense of the word.  Like I said, the diplomatic efforts

1    are ongoing, multifaceted, and I think the government would like

2    nothing better than to find suitable countries of transfer for

3    these individuals, as well as other NLECs that have similar

4    concerns.

5            But I am not in a position, because I can't, not -- I

6    simply lack the knowledge to be able to give you any kind of

7    estimate as to when someone could be found.  And obviously, a

8    foreign country's decision to take these folks is up to that

9    country, and we can't really predict for sure what they're going

10   to do.

11           But I would say that these folks -- since they've been

12   determined to be NLECs, the diplomatic process is ongoing and

13   the government is trying its best to find a suitable country to

14   send these folks to.

15           THE COURT:  All right.  I'll hear from the petitioner

16   again by way of brief reply.

17           MR. WILLETT:  Thank you, Your Honor.

18           Let me start at the end.  We don't know what the State

19   Department is doing, but I can tell you, here are the facts that

20   are in the record:  One of my clients was told in Khandahar that

21   they already knew it was a mistake.  That's some time before

22   June of '02.

23           Then-Secretary of State Powell was quoted in press

24   accounts in August of '04 saying, yeah, we know about the

25   Uighurs.  It's a problem.  They're not going to be sent back to

Page 33

1    China.

2          We, on our side, have made efforts such as we can.

3    We've been on the phone to Sweden, we've been on the phone to

4    Turkey, we've been on the phone to the U.N. High Commissioner

5    for Refugees.  All I can tell the Court is we have yet to trip

6    over the State Department's trail.  When we call people, they

7    don't tell us, we can't talk to you, we're already talking to

8    other people.

9          So what they're doing, who knows?  All we can really

10    say is they kept it secret that they made this determination and

11    who knows whether they've done anything.

12          I do want to talk about -- Your Honor asked questions

13    of counsel about the legal basis of this wind-up concept, and I

14    agree that there is none.  There is a case we cited called

15    Zadvydas, which is a case about what happens when someone is

16    deported and no one will take them.  There, Justice Bryer held

17    for the Supreme Court that there's a rebut-able presumption that

18    six months is about as far as you can go detaining somebody,

19    even when there was a Congressional statute authorizing it.

20          And Zadvydas was a case involving convicted criminals.

21    The two people at issue there had been convicted of serious

22    crimes.  So I believe there is no lawful basis for what is

23    clearly indefinite imprisonment.

24          I would point out as well, that with respect to the

25    wind-up of World War II, what you had then was prisoners of war

Abu Bakker Qassim, et al. vs.                    CA 05-497                        August 1, 2005
George Bush, et al.

Page 34

1    held in a fully Hague Convention-compliant prisoner of war

2    facility.  So far as I know, at least so far as the record

3    shows, the case reports, no one was contesting his being held

4    there at the time, because the alternative, I suppose, was to be

5    sent back to some crater in Germany.

6           So there's no -- I don't think any legal rule comes out

7    of those situations that would deal with the situation where

8    someone who has been adjudged not to be a prisoner of war, even,

9    is held indefinitely.

10          I do apologize that I was mistaken.  We did

11   cross-appeal, and Mr. Henry is correct about that.  I agree,

12   though, I think we both agree there's no jurisdictional problem

13   here.

14          And I wanted to re-emphasize, we do not rest on some

15   Constitutional right.  We think we have them, but we don't need

16   to rest on them.  It's their burden to proffer a legal basis for

17   detention, which they haven't done.

18          All of the solutions are imperfect.  The Migrant

19   Operations Center may be better than some.  It's not perfect,

20   but I would ask the Court to consider the alternative of

21   bringing the body here.

22          And then last, if I could ask --

23          THE COURT:  Well, bringing the body here would entail

24   bringing the body here in chains, number one, locking him up in

25   some local facility which is probably not as pleasant as the

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Abu Bakker Qassim, et al. vs.                CA 05-497                        August 1, 2005
George Bush, et al.

1   facility in Guantanamo, and then what?  Then you would hope for

2   some parole to the community.

3              MR. WILLETT:  Yes, Your Honor.

4              THE COURT:  That's not even close to a foregone

5   conclusion.

6              MR. WILLETT:  I don't expect that it would be.  Your

7   Honor's decision might be that they had to be returned.  I don't

8   know what it would be.  But at least you would be able to assess

9   these sort of vaporous allegations that somebody might be

10  harmful to someone else.

11             THE COURT:  Well --

12             MR. WILLETT:  That is an option.  And I think it's

13  really the government's problem to come up with a solution.

14             THE COURT:  I didn't hear counsel say that there's an

15  individual determination being made that any of these

16  petitioners might be harmful.  I heard him say that it's sort of

17  a -- my word, not his, sort of a bureaucratic determination made

18  by a commander who is trying to keep the whole place under

19  order.  I mean, that's the excuse given for locking him up when

20  he was -- or for shackling him when he was brought to see you.

21             MR. WILLETT:  Yes, I understand, Your Honor.

22             THE COURT:  And at some level we can all understand

23  that, whichever side we're on.  He's got to -- I don't think the

24  commander of the base can be charged with making individual

25  harm/not harm decisions about people under his control.

United States District Court                 202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                           Official Court Reporter

Page 36

1            MR. WILLETT:  Well, I agree with Your Honor.  But I

2    don't also think that the commander of the base therefore gets a

3    lawful basis to imprison.  If it's not convenient for these

4    people to be at the base, and it may not be, they have to be

5    released somewhere else.  I mean, this is the Pottery Barn rule.

6    They broke it, they have to fix it.  And if they can't be

7    repatriated to China, and they can't, then maybe they have to

8    sit here while this problem gets solved.

9            Your Honor, I want to ask, if I can, for two things

10   more while you ponder what you're going to do.  The first is

11   that the protective order in this case forbids telephone contact

12   with detainees except in unusual circumstances.  I think this

13   qualifies.  We would like to have telephone contact with our

14   clients.  It's particularly important to help us try to develop

15   a repatriation solution, to identify Uighur communities abroad

16   where we might be able to make an asylum petition.  Sweden is an

17   example, but there might be others.

18           We would like for their families to be able to talk to

19   them by telephone.  That's my first request.

20           The second is that I can't tell you how difficult it is

21   to get to Guantanamo with a DOD-approved Uighur-speaking

22   translator.  Their rule is, you've got to be a U.S. citizen and

23   you've got to speak Uighur; and my rule is you can't have shown

24   up before for the interrogators because then they won't know if

25   I'm a lawyer or interrogator.  That subset gets you down to

Page 37

1    zero.

2              Now, I have in the room Mr. Nury Turkel, who is a

3    lawful alien resident in the Washington, D.C. area.  He is a

4    Uighur, he speaks Uighur.  He is a graduate of the American

5    University Law School.  I have been asking for months for the

6    government to approve Mr. Turkel as an interpreter so that we

7    could take him with us to Guantanamo, and there is no response.

8    It would be helpful if we could have Mr. Turkel on the telephone

9    with our clients, and as well if he could come with us to

10   Guantanamo.

11             THE COURT:  Is Mr. Turkel a member of any bar?

12             MR. WILLETT:  May I have just a minute, Your Honor?

13             Your Honor, his admission to the New York bar is

14   pending.

15             THE COURT:  He's passed the New York bar exam?

16             MR. WILLETT:  Yes, he has.

17             THE COURT:  Okay.  Mr. Henry, do you want to respond to

18   those two requests?

19             MR. HENRY:  Yes, Your Honor.  Thank you.

20             With respect to the interpreter situation, my

21   understanding is that petitioners' counsel submitted a security

22   clearance application with respect to him, and that that's under

23   consideration by -- you know, there's a background investigation

24   the FBI does, that sort of thing.

25             That's all being handled through the Court security

1    officers that are assigned to this case.  All counsel, all

2    interpreters that go down to Guantanamo have to possess a

3    security clearance, and the situation is his clearance hasn't

4    come through.  That typically has taken in the past anywhere

5    from six weeks to, you know, eight, ten weeks, things like that.

6         So I don't know the exact status of the security

7    clearance situation because that's not in our control.  It's

8    handled through the court security office.

9         With respect to telephone contact -- let me just add, I

10   assume that if the gentleman obtains his security clearance,

11   then, like many other translators for the other counsel in the

12   other cases have gotten their security clearance, they go down

13   and do their thing.

14        With respect to the issue of telephone situation, the

15   telephone contact, you know, Your Honor, we went through a

16   carefully crafted and very contentious process back last fall

17   coming up with this protective order that applies in all of

18   these Guantanamo cases so far.  These issues of telephone

19   contact and those kind of things were all presented to Judge

20   Green, and she signed off on this.  It has worked so far, you

21   know, not without some complaint from both sides, but it appears

22   to be working.

23        And if Your Honor starts making special exceptions for

24   telephone contact and that sort of thing, I think, since it's on

25   a slippery slope, we'll get all kinds of requests and motions

1    for exceptions based on individual circumstances of individual

2    detainees, and it will significantly undermine what has been a

3    very difficult process to manage these counsel visits and

4    counsel communications with clients in a fashion that, you know,

5    maintains the various equities of each side that's involved.

6              Thank you.

7              THE COURT:  If I study the briefs that you-all have

8    submitted very carefully, am I going to find all that you have

9    to tell me on the question of whether I have the power to order

10   the petitioners brought to the United States, where presumably

11   the clearance of an interpreter would not be required and the

12   telephone restrictions would not be imposed?

13             MR. WILLETT:  We can very quickly supplement the brief,

14   Your Honor.

15             MR. HENRY:  Your Honor, we, too, can submit a brief

16   addressing that issue.  I would point out that under the

17   statutory scheme, the way I understand it, the bringing the body

18   before the Court is in habeas practice a rare circumstance.

19   It's usually done to try to resolve factual issues having to do

20   with the -- typically the grounds, in most cases the criminal

21   trial situation.

22             THE COURT:  Clearly in modern habeas practice, it has

23   not been thought that bringing the body before me is -- although

24   that is -- you know, "You have the body, bring it to me" is the

25   first language -- the first words of the Latin phrase of the

Page 40

1    classical writ of habeas corpus.  But I agree with you that in

2    modern practice that has not been thought to be the function of

3    a writ of habeas corpus.

4            But I am -- just as the commander in Guantanamo has

5    expressed concern, I have concerns about two people who are not

6    any longer enemy combatants who can't talk to their family on

7    the telephone or even have an interpreter.  That's a problem,

8    Counsel.

9            MR. HENRY:  Well, Your Honor, the family communication

10   situation, again, was vetted before Judge Green.

11           THE COURT:  Who I don't think was thinking about NLECs,

12   was she?

13           MR. HENRY:  Your Honor, the order was developed I think

14   before that became an issue.

15           I would point out that, you know --

16           THE COURT:  Look, I don't want to -- I don't want to

17   argue that any further.  My question was, if I study the briefs

18   that have been filed before me, will I find everything you have

19   to tell me on that subject.  You both answered no.

20           MR. HENRY:  That's correct.

21           THE COURT:  So I'll see whatever you have to tell me

22   in, what, five days?

23           MR. WILLETT:  We'll get it before that.

24           THE COURT:  All right.  Anything further from either

25   side?

Abu Bakker Qassim, et al. vs.                    CA 05-497                          August 1, 2005
George Bush, et al.

Page 41

1          Thank you very much.

2          We're adjourned.

3          (Proceedings adjourned at 5:11 p.m.)

4

5

6              CERTIFICATE OF OFFICIAL COURT REPORTER

7

8          I, Rebecca King, certify that the foregoing is a

9    correct transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13

14   _____            _____

15   SIGNATURE OF COURT REPORTER                 DATE

16

17

18

19

20

21

22

23

24

25

United States District Court                202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                          Official Court Reporter

# EXHIBIT 13

PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

FILED WITH
COURT SECURITY OFFICER
DATE 7/21/05

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM and A'DEL ABDU
AL-HAKIM,

                        Petitioners/Plaintiffs,

              v.                                      Civil Action No. 05 cv 0497 (JR)

George W. Bush, *et al.*,

                        Respondents/Defendants.

---

## MEMORANDUM IN SUPPORT OF PETITIONERS' EMERGENCY MOTION TO VACATE STAY ORDER AND ISSUE WRIT DIRECTING IMMEDIATE RELEASE OF PETITIONERS

Petitioners Abu Bakker Qassim and Adel Abdu Al-Hakim submit this

memorandum of law in support of their Emergency Motion to Vacate Stay Order and

Immediately Issue Writ Directing Release of Petitioners. Relief is urgently needed because

the government continues to imprison Petitioners in a high-security jail despite having

concluded, months ago, that there is no lawful basis to hold them.

## I.    PROCEDURAL BACKGROUND

*The Habeas Corpus Petitions.* Counsel for Mr. Qassim and Mr. Al-Hakim filed a

Petition for Writs of Habeas Corpus on March 10, 2005.

*The Government's Refusal to Respond.* The government immediately moved to

stay this case, contending that a pending appeal in other *habeas* cases would resolve

common questions, and thus that judicial efficiency would be served by staying

proceedings here until resolution of that appeal. *See* Respondents' Motion to Stay

Proceedings Pending Related Appeals and for Continued Coordination (filed March 14,

2005) [Docket No. 2].[1] The government never responded to the Petition. It never

---

[1]    The government argued that the issues on appeal in *In re Guantanamo Detainee
Cases*, 355 F.Supp.2d 433 (D.D.C. 2005), *appeal docketed*, and *Khalid v. Bush*, 355 F.Supp.2d

1

disclosed any information regarding Petitioners, never produced records of its Combatant Status Review Tribunals ("CSRTs"), and never disclosed any allegation, charge, or basis on which Petitioners are (or ever were) held. On information and belief, the government knew, but withheld from this Court during the stay proceedings, that it had already determined (through the CSRT process) that the Petitioners are not so-called "enemy combatants." *See* Declaration of Sabin Willett ("Willett Decl.") (filed herewith) ¶¶ 11-12.

*The Government's Efforts to Conceal the Facts.* At the time the petition was filed, counsel was unable to meet or communicate with Petitioners. Press reports suggested that they might be among a group of uniquely-situated Guantanamo prisoners seized by mistake and not regarded to be enemy combatants even by the government. According to a March 16, 2005 press report, "The Pentagon determined last year that half of the two dozen Uighur Chinese captured in the war on terrorism have no intelligence value and should be released. The US has so far resisted Beijing's demands for repatriation out of concern that they may be tortured once back in China." "Uighurs face return from Guantanamo," *Financial Times* (March 16, 2005).[2] *See also infra* § IV.

Accordingly, in March, 2005, counsel twice asked the government whether it contended that the Petitioners were enemy combatants or in any way a threat to the security of the United States. *See* April 5, 2005 Declaration of Susan Baker Manning re Reply in Support of Motion for Rule 16 Conference and for Other Procedural Relief, Exs. G & H [Docket No. 12]. The government ignored these inquiries. *Id.* at ¶ 9.

Strategic silence has not, however, been the government's only tactic. The government has repeatedly implied that Petitioners had been deemed to be "enemy

---

311 (D.D.C. 2005), *appeal docketed*, would address the "core issues" in this case. Motion to Stay at 7. The D.C. Circuit recently scheduled oral argument in those cases for the fall of 2005. There is no need to wait for that decision, however, because the government's representation to this Court was misleading at best. The core issue here—that Petitioners already have been exonerated by the government—is not at issue in either appeal.

[2]    Previously submitted as Exhibit F to Second Declaration of Susan Baker Manning In Support of Application for Preliminary Injunction [Docket No. 6].

combatants," when in fact they had not. To take just one example, a March 29, 2005 filing, the government noted that "[a] factual record for a petitioner in a Guantanamo Bay detained case typically has consisted of the record of proceedings before the Combat Status Review Tribunal that *confirmed petitioner's status as an enemy combatant properly subject to detention.*" Respondents' Opposition to Request for Rule 16 Conference at 3 n.2 (emphasis added) [Docket No. 11]. That is highly misleading, given what the government apparently already knew—that CSRT had exonerated these men, not "confirmed" their status as enemy combatants.

Because the government refused to respond to the Petition, and successfully argued that it should not be required to provide a factual return, Petitioners' Counsel were unable to identify and point out the government's misleading statements to the Court. The usual delays attended efforts by counsel to meet with their clients. Counsel were first subject to an FBI background check, were not permitted to telephone the Petitioners, and were not permitted to travel to meet them until July 13, 2005 (Mr. Qassim) and July 14, 2005 (Mr. Al-Hakim). Willett Decl. ¶ 3. Only then did Counsel learn that the government had already resolved the critical factual issue—whether Petitioners are "enemy combatants"— in Petitioners' favor.

*The Stay and the Pending Legal Dispute.* The government's strategic silence has cost these Petitioners many months in prison. It strongly appears that the government knew that it had found these Petitioners not to be enemy combatants at the same time that it vigorously—and successfully—litigated in this Court to avoid disclosing that fact. The result was that the illegal imprisonment of the Petitioners has been prolonged for many months.

In May 2005, unaware that the Petitioners had been found not to be enemy combatants, this Court granted the government's motion for stay. The stay related to a legal dispute that is relevant only where the government alleges a prisoner is an "enemy combatant." As the Court well knows, many Guantanamo prisoners have contended that

3

the CSRT process was illegal and noncompliant with the Supreme Court's decision in *Rasul v. Bush*, 124 S. Ct. 2686 (2004). The government has repeatedly argued that the CSRT is the appropriate process for determining whether a prisoner is or is not an "enemy combatant." *See, e.g., In re Guantanamo Detainee Cases*, 355 F.Supp.2d 433, 467 (D.D.C. 2005), *appeal docketed*, ("[R]espondents contend in their motion to dismiss that were this Court to conclude that the detainees are entitled to due process under the Fifth Amendment, the CSRT proceedings would fully comply with all constitutional requirements."). In January, two courts of this district reached contradictory conclusions on the question, and the dispute became the subject of consolidated appeals (as well as, later, a mandamus petition filed by these Petitioners). *See In re Guantanamo Detainee Cases*, 355 F.Supp.2d 433 (D.D.C. 2005), *appeal docketed*; *Khalid v. Bush*, 355 F.Supp.2d 311 (D.D.C. 2005), *appeal docketed*. The consolidated appeals and mandamus petition are now pending in the Court of Appeals.

   All of those disputes are now revealed to be academic in this case, which now presents a circumstance counsel believe has never been addressed by any Court considering a Guantanamo *habeas* petition. Here, *the government itself, through its CSRT process has acknowledged that there is no lawful basis to imprison the Petitioners*. Accordingly, the factual and legal premises upon which the Court's stay order was founded are moot. The Petitioners, who have suffered more than three and one-half years of imprisonment, and who have been exonerated by the government of any wrongdoing, must immediately be released.

**II.    STATEMENT OF FACTS**

   1.    Mr. Qassim is 36 years old. He is a "Turkistani," and a native of "East Turkistan," the region of western China also known as Xinjiang Uighur Autonomous Region and ruled with an iron fist by Communist China. He is married and has three children, including a pair of twins. He has never seen the twins nor heard their voices. Willett Decl. ¶ 4.

4

2.    Mr. Al-Hakim is 31 years old. He is also a Turkistani, and native of the East Turkistan region. He is married and has three children. He has never met his third child. *Id.* ¶ 5.

3.    Qassim and Al-Hakim are Uighurs, Muslims whose homeland is under control of Communist China. The Uighurs have suffered widespread intimidation, oppression, and torture at the hands of Chinese authorities.[3] Both Qassim and Al-Hakim fled persecution in China to Kyrgyzstan, where they met. They traveled thence to Iran. Willett Decl. ¶ 6.

4.    The Petitioners were seized in Pakistan by Pakistani security forces in late 2001 or early 2002. In prison, Mr. Al-Hakim was advised that the Americans had paid a bounty of $5,000 apiece. Willett Decl. ¶ 7. *See also* "Guantanamo detainees say Arabs, Muslims sold for U.S. bounties," USA Today (May 31, 2005) (reporting that certain Guantanamo Bay detainees testified to CSRT that they had been sold to American forces for bounties ranging from $3,000 to $25,000).

5.    Neither Mr. Qassim nor Mr. Al-Hakim has ever harbored any animosity toward America, and remarkably, each professes to feel support for America, even after three and a half years of detention. Each, however, is deeply opposed to the Chinese government, and believes that he will be imprisoned or tortured if sent back to China. *Id.* ¶ 8.

6.    Indeed, while in custody at Guantanamo, each of the Petitioners was interrogated by Chinese representatives. During each of these sessions, Petitioners refused to speak, and were threatened. Willett Decl. ¶ 9.

7.    The Petitioners were delivered into U.S. custody by the Pakistanis in late 2001 or early 2002, and then held in Kandahar, Afghanistan for approximately six months.

---

[3]    *See infra* § IV. *See also* Petitioners' Reply in Support of Request for Rule 16 Conference and Other Procedural Relief at 1-4, and Exhibits B-F & I-M to the Declaration of Susan Baker Manning in support thereof [Docket 12].

The United States transferred Petitioners to Guantanamo Bay, Cuba in approximately June, 2002, and has imprisoned them there ever since. Willett Decl. ¶ 10.

8.    Sometime in late 2004 or early 2005, Messrs. Qassim and Al-Hakim each participated in a separate Combatant Status Review Tribunal. Willett Decl. ¶ 11

9.    Earlier this year, at least two months ago, each Petitioner received a written statement with the results of the CSRT. Each petitioner, using an Arabic word, described the conclusion as that he had been found, "innocent." Willett Decl. ¶ 12.

10.    Each Petitioner received a letter from undersigned counsel. Each petitioner responded by writing a letter advising counsel of the CSRT result. *Id.* ¶ 13

11.    Undersigned counsel never received any letter from either Petitioner, Willett Decl. ¶ 14, and did not learn of the CSRT results until July 13 and 14, 2005, when counsel first met the clients.

12.    On July 14, 2005, counsel spoke to a JAG officer at Guanatanamo Bay, who confirmed that each of the Petitioners had received a CSRT finding that he was "no longer an enemy combatant." Willett Decl. ¶ 15.

13.    There are substantial housing and work opportunities at Guantanamo Bay, Cuba outside the detention facilities and away from secure and other sensitive military facilities. Willett Decl. ¶ 14-18.

## III.    PETITIONERS SHOULD, AND MUST, BE RELEASED.

### A.    There Is No Legal Basis for Imprisoning Mr. Qassim or Mr. Al Hakim.

"The central purpose of any system of criminal justice is to convict the guilty *and free the innocent.*" *Herrera v. Collins*, 506 U.S. 390, 398 (1993) (emphasis added). Here, the government continues to imprison—apparently for reasons of its own convenience— men it has already found to be blameless. It has no authority to do so.

The government contends that it derives its authority to imprison "enemy combatants" at Guantanamo Bay, Cuba from the Authorization for Use of Military Force passed by Congress in the wake of the September 11 attacks. Pursuant to that joint

resolution, Congress authorized the President to use "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks [of September 11, 2001] . . . or harbored such organizations or persons." Authorization for Use of Military Force, Pub.L. 107-40, §§ 1-2, 115 Stat. 224. Acting pursuant to that authorization, the President sent U.S. Armed Forces into Afghanistan to wage a military campaign against al Qaeda and the Taliban regime that had supported it. In a November 13, 2001 executive order, the President also purported to authorize the Secretary of Defense to detain persons the executive has "reason to believe" are members of al Qaeda, terrorists, or those who "knowingly harbored" such individuals. As is well known, the Secretary of Defense detained hundreds of men at Guantanamo Bay, Cuba without charge or hearing as so-called "enemy combatants."

Over two and a half years later, and nine days after the Supreme Court issued its *Rasul* and *Hamdi* decisions, the executive branch issued regulations finally defining an "enemy combatant" and establishing the CSRT process.[4] It defined an "enemy combatant" as "an individual who was part of or supporting the Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." Order Establishing Combat Status Review Tribunal issued by Deputy Secretary of Defense Paul Wolfowitz (July 7, 2004) ("Wolfowitz Order") at ¶ *d*.[5] *See also Khalid v. Bush*, 355 F.Supp.2d 311 at n.2 (D.D.C. 2005) (Leon, J.) (noting that this definition "applies to foreign nationals held at Guantanamo"), *appeal docketed*.

Deputy Secretary Wolfowitz's order specifically provides: "Following the hearing

---

[4]     The Supreme Court noted in *Hamdi* that up to that time the government "ha[d] never provided any court with the full criteria it uses in classifying individuals" as "enemy combatants." *Hamdi v. Rusmsfeld*, 124 S. Ct. 2633, 2639 (2004).

[5]     Available at www.defenselink.mil/news/Jul2004/d20040707review.pdf.

of testimony and the review of documents and other evidence, the Tribunal shall determine in closed session by majority vote *whether the detainee is properly detained as an enemy combatant.*" Wolfowitz Order at ¶ g(12) (emphasis added). *See also* Memorandum issued by Secretary of the Navy Gordon England implementing CSRT procedures (July 29, 2005) at 1 (noting that the CSRT was established to determine whether detainees at Guantanamo "are properly classified as enemy combatants *and to permit each detainee to opportunity to contest such designation*") (emphasis added).[6]

Deputy Secretary Wolfowitz's order further provides:

> *Non-Enemy Combatant Determination.* If the Tribunal determines that the detainee shall no longer be classified as an enemy combatant, the written report of its decision shall be forwarded directly to the Secretary of Defense or his designee. The Secretary or his designee shall so advise the Secretary of State, in order to permit the Secretary of State to coordinate the transfer of the detainee for release to the detainee's country of citizenship or other disposition consistent with domestic and international obligations and the foreign policy of the United States."

Wolfowitz Order at ¶ *i*.

We have elsewhere asserted that the CSRT process is unlawful, but that question is now moot. If Congress and the President only authorized the detention of "enemy combatants," then even assuming for the sake of argument that the executive has extrajudicial power to define enemy combatants and adjudicate their status, it must follow that when the executive branch determines a person *not* to be an enemy combatant, no extrajudicial basis remains to justify imprisonment.[7]

It is undisputed that the CSRT has determined that Mr. Qassim and Mr. Al-Hakim

---

[6]     Available at www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

[7]     *Cf. Rasul*, 124 S. Ct. at 2698 n.15 ("Petitioners' allegations—that, although they have engaged neither in combat nor in acts of terrorism against the United States, they have been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing—unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.'"); *Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2648 (2004) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker.").

are not properly detained as "enemy combatants." Having contended that the tribunal process was adequate to determine whether a prisoner was or was not an "enemy combatant," the government can hardly ignore the result of its own process—particularly a process that it controlled minutely, even to the level of depriving the prisoner of counsel and an opportunity to confront the evidence against him.[8] As to the government, the CSRT's determination is final and binding. *See* Navy Sec. England Memo. at Enclosure 1 § I(8). Mr. Qassim and Mr. Al-Hakim must therefore be released.

### B.    Equitable Considerations and the Public Interest

These Petitioners have been in prison, without charge, for more than three and one half years. Apparently, there has never been a basis to hold them. When he was still in Kandahar, Mr. Al-Hakim was advised by an interrogator that the government knew that that his capture was a mistake. Willett Decl. ¶ 10. The CSRT has confirmed that there is no basis to detain Petitioners. *Id.* ¶¶ 12 & 15. Mr. Al-Hakim has a child he has never seen, and Mr. Qassim has two. *Id.* ¶¶ 4 & 5. Each has a wife who does not know where is his, or if he is alive. Each has family members to whom he has not spoken for years. The hardships of life at Guantanamo itself are too well known to require repetition.

"[T]he public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process; '[i]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Abdah v. Bush*, 2005 WL

---

[8]    The government has indicated in filings with this Court that—contrary to what it has actually done in this case—a prisoner who is exonerated by the CSRT will be released. *See, e.g.,* Respondents' Memorandum in Opposition to Petitioners' Motions for Temporary Restraining Orders and Preliminary Injunctions at 11 ("DoD has no interest in detaining enemy combatants longer than necessary."); *id.* at 12-13 ("The underlying purpose of detention of enemy combatants at Guantanamo is to remove them from the fight and negate the danger they would otherwise pose to the United States and its allies. . . . If the Executive determines, for whatever reason, that the Nation's security no longer require it to detain a particular individual, then the obvious and natural thing to do is to end the detention."); Declaration of Pierre-Richard Prosper (Exhibit C to Respondents' Memorandum in Opposition to Petitioners' Motions for Temporary Restraining Orders and Preliminary Injunctions) at ¶ 3 ("Detainees have been transferred for release when it is determined that they no longer meet the criteria of enemy combatants or no longer pose a continuing threat to the United States.").

711814 (D.D.C. 2005) (Kennedy, J., quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir.1994)). The public also has a strong interest in confidence that its public institutions reflect a rule of law, rather than the unchecked power of the executive. At some point the Courts simply must call a halt.

Petitioners' ongoing confinement appears to be a public-relations exercise designed to minimize embarrassment to the government by keeping the mistaken incarceration out of public view. Government embarrassment hardly justifies a man's imprisonment. If it was gulled by Pakistani bounty hunters, and then held these men in appalling conditions in Kandahar and Guantanamo Bay for three and one half years, then the government must shoulder responsibility for its mistakes.

**IV.    Practical Issues Related to Release, and the Government's Obligation Not to Return Petitioners to China Where They Will Likely be Tortured or Killed.**

Petitioners expect the government to contend that it has continued to imprison Petitioners because it has been unable to find a suitable country that will accept them. Petitioners are Uighurs, an oppressed ethnic and religious minority in western China. They cannot be returned to their home, because they would likely be imprisoned, tortured or killed by the Communist Chinese government. But being a refugee is not a crime justifying indefinite detention.

According to the State Department, in China during 2004 "[f]ormer detainees reported credibly that officials used electric shocks, prolonged periods of solitary confinement, incommunicado detention, beatings, shackles, and other forms of abuse. . . . Deaths in custody due to police use of torture to coerce confessions from criminal suspects continued to occur." U.S. Dep't Of State, Country Reports On Human Rights Practices – 2004 (China Report), § 1(c) (2005), available at www.state.gov/g/drl/rls/hrrpt/2004/41640.htm.

The State Department reports particularly harsh abuse of the ethnic Uighur Muslims:

> The Government used the international war on terror as a
> justification for cracking down harshly on suspected
> Uighur separatists expressing peaceful political dissent and
> on independent Muslim religious leaders. . . . Uighurs were
> executed and sentenced to long prison terms during the
> year on charges of separatism. . . . In October 2003,
> Uighur Shaheer Ali was executed after being convicted of
> terrorism. He had been repatriated forcibly from Nepal in
> 2002, where he had been interviewed by the UNHCR and
> granted refugee status.

*Id.* at Introduction and § 5, subsection on National/Racial/Ethnic Minorities. *See also* J.

Kurlantzik, "Unnecessary Evil: China's Muslims aren't terrorists. So why did the Bush

administration give Beijing the green light to oppress them?" *Washington Monthly* (Dec. 1,

2002) ("More than 3,000 Uighurs reportedly have been secretly jailed since 9/11, and many

have been executed for no given reason. Xinjiang province . . . remains the only place in

China where people are routinely put to death for purely political disagreement.").

The Chinese government has called on Washington to return Uighurs captured in

Afghanistan to China "to face charges of terrorism." Manning Decl., Ex. J [Docket 12].

Mr. Qassim and Mr. Al-Hakim have each been interrogated and specifically threatened by

Chinese officials while imprisoned at Guantanamo. Willet Decl. ¶ 9. There is every reason

to believe that to return them to China would be a death sentence.

Press reports indicate that the U.S. government has vacillated on whether it would

return the Uighurs in Guantanamo to China. On August 12, 2004, Secretary of State Colin

Powell said that the ethnic Uighurs at Guantanamo would not be returned to China. "The

Uighurs are a difficult problem," Powell said in a briefing, "and we are trying to resolve all

issues with respect to all detainees at Guantanamo. The Uighurs are not going back to

China." Manning Decl., Ex. L [Docket 12].

Recent press reports indicate, however, that the Government has been unsuccessful

in finding a third country willing to take the Uighurs from Guantanamo. *Id.*, Ex. E. Press

reports have quoted a "senior administration official" as indicating "[t]he US may have to

consider sending Muslim Chinese prisoners at Guantanamo Bay to China, following failed

11

efforts to persuade European countries to accept them as refugees." "Uighurs face return from Guantanamo," *Financial Times* (March 16, 2005).

The government's long confinement of the Petitioners at Guantanamo Bay may have so stigmatized them in the eyes of the world that it is difficult to find a home for them elsewhere, or the government may not regard Petitioners' plight as a priority, or both.

One thing is certain: just because there is not yet a country to which the Petitioners may be sent does not mean that the only option is to incarcerate them indefinitely in a maximum-security prison.[9] They are neither criminals, nor war criminals, nor "enemy combatants" (whatever the latter phrase means), nor illegal aliens. They were brought to Cuba by the United States government against their will. There is vastly more to the Guantanamo Bay Naval Station than a prison,[10] and even if Petitioners' stay at Guantanamo must be prolonged for some period of time, there is no reason to prolong their *imprisonment* there.

Having brought the Petitioners to Guantanamo Bay against their will, the United States can find a place to house them that is not a maximum security prison. Petitioners therefore request that the Court promptly convene a hearing to address practical considerations concerning the release of the Petitioners.

## V.     CONCLUSION

---

[9]     Although the executive branch's current detention without charge of hundreds of men by at Guantanamo is unprecedented—and, as we have contended elsewhere, wholly illegal—this case is not the first time the government has faced the quandary of what to do with individuals who cannot be sent back to their own country. The Supreme Court has ruled, in no uncertain terms, that it may not simply jail them indefinitely. "Based on our conclusion that indefinite detention of aliens [admitted to the United States and subsequently ordered removed] would raise serious constitutional concerns, we construe the statute [authorizing post-removal detention] to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review." *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001). *See also Clark v. Martinez*, 125 S. Ct. 716 (2005) (affirming *Zadvydas* and extending the rule against indefinite detention to aliens held by the government but not yet admitted to the United States).

[10]     Guantanamo Bay is a large station, many parts of which are of normal security. Many contractors and other civilians work and live there. Willet Decl. ¶¶ 16-18. Adequate food and housing are available today, for modest cost, on the Leeward Side, separated by a Navy ferry from the side of the bay where the secure facilities are located. *Id.*

Mr. Qassim and Mr. Al-Hakim have not committed any crime. Indeed, it is not clear that they were ever accused of wrongdoing—and in any case, the government has exonerated them. That same government should release them from prison at once.

Mr. Qassim and Mr. Al-Hakim therefore respectfully request that the Motion be allowed, that writs of habeas corpus issue, that the court issue and order prohibiting their transfer or rendition to any other country pending further hearing, and that the Court promptly hold a hearing to consider what other relief may be just and proper in these unique circumstances.

Dated: July 20, 2005

Respectfully Submitted,

Abu Bakker Qassim and A'del Abdu Al-Hakim,

By their attorneys,

Sabin Willett
Neil G. McGaraghan
Jason S. Pinney
Daniel Hunter Kiel
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110-1726
Telephone: (617) 951-8000
Facsimile: (617) 951-8925

Susan Baker Manning
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

Barbara Olshansky
Deputy Director
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6439

13

PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

For Privilege Team
Review

FILED WITH a
COURT SECURITY OFFICER
DATE 7 21 05

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM and A'DEL ABDUL
HAKIM,

                    Petitioners/Plaintiffs,

        v.

George W. Bush, *et al.*,

                    Respondents/Defendants.

Civil Action No. 05 cv 0497 (JR)

## DECLARATION OF SABIN WILLETT

Pursuant to 28 U.S.C. § 1746, Sabin Willett declares that the following is true and correct.

1.      I am counsel to Abu Bakker Qassim and Adel Abdul Hakim, the petitioners in these habeas corpus cases.

2.      Our firm filed the petition in March, 2005. At the time we had no access to the Petitioners. Since that time we have been seeking vigorously to communicate with them. We have written letters but received none from them.

3.      Our first meeting with our clients was delayed because by an FBI background check of me and my colleagues at Bingham McCutchen LLP, and then because the government advised that logistical problems prevented an earlier meeting. Accordingly, my colleague Susan Baker Manning, our translator Felice Bezri, and I first met Mr. Qassim on July 13, 2005, at Camp Echo, Guantanamo Bay, Cuba. We first met Mr. Hakim on July 14, 2005, at Camp Echo, Guantanamo Bay, Cuba.

4.      On July 13, 2004, Mr. Qassim advised us that he is 36 years old. He is a "Turkistani," a native of Ghulja, a city in what he refers to as "East Turkistan." This is a region of the world controlled by the Communist Chinese. Mr. Qassim is married and has three children, including a pair of twins. He has never seen the twins nor heard their

# UNCLASSIFIED

voices.

5.    On July 14, 2005, Mr. Hakim advised us that he is 31 years old.  He is also a Turkistani and native of East Turkistan.  He is married and has three children.  He has never seen nor spoken to his third child.

6.    Each of Messrs. Qassim and Hakim advised us that he is of the Uighur ethnic group and a Muslim, that his homeland is under control of Communist China, and that the Uighurs have suffered widespread intimidation, oppression, and torture at the hands of Chinese authorities.  Each advised that he fled persecution in China (or as each called it, Turkistan) to the capital city of Kyrgyzstan, where the two men met.  They traveled thence to Iran, seeking visas that would permit them to go to Turkey, where there is a Uighur community and possible work near Istanbul.

7.    Each of Messrs. Qassim and Hakim advised that he was seized in Pakistan in late 2001 or early 2002 by Pakistani security forces.  Mr. Hakim advised that while in prison in Pakistan, a guard told him that the Americans had offered $5,000 apiece for him and Mr. Qassim.

8.    Each of Mr. Qassim and Mr. Hakim advised us that he had no animosity toward America prior to his capture, and remarkably, has none today even after more than three and one half years of detention.  Each, however, is deeply opposed to the government of China, and believes that he will be imprisoned and tortured if he is returned to China.

9.    Each of Mr Qassim and Mr. Hakim advised us that at some point during the first year at Guantanamo Bay, he had been interrogated by Chinese representatives.  During each of these sessions, the Petitioners declined to speak to the Chinese.  The Chinese interrogators spoke angrily and made threats.  Mr. Hakim said that they told him he was lucky the Pakistanis had turned him over to the Americans, rather than them, as if he thought this [i.e., Guantanamo Bay] was a prison, just wait until we [i.e., the Chinese] get you.

UNCLASSIFIED

10.    Each of Mr. Qassim and Mr. Hakim advised us that he was delivered into American custody by the Pakistanis in late 2001 or early 2002, and then held in Kandahar for approximately six months. Mr. Hakim advised that an American interrogator said in Kandahar that the Americans knew that Mr. Hakim had been seized by mistake. Each of Mr. Qassim and Mr. Hakim advised us that in approximately June, 2002, he was transferred to Guantanamo Bay, where he has been imprisoned ever since.

11.    Each of Mr. Qassim and Mr. Hakim advised that he had participated in a separate Combatant Status Review Tribunal. Neither was sure of the date. Mr. Qassim believed it had happened earlier this year. Mr. Hakim advised that he thought it may have happened late last year or earlier this year.

12.    Each of Mr. Qassim and Mr. Hakim advised that, earlier this year, he received a written statement that he had been found to be "innocent" by the CSRT. Our clients speak limited Arabic, with difficulty, and this translation was through an Arabic interpreter, who advised that the men had used the Arabic word for "innocent." On information and belief, the statement was more likely to the effect that the Petitioner was not, or no longer deemed an "enemy combatant." I have not seen the document. Each advised us that he believed that he had received this document approximately two months ago.

13.    Each Petitioner later received a letter from my firm. Each petitioner said he wrote in response to this letter and advised my firm of his CSRT result.

14.    As of the date of our departure from our offices on July 12, 2005, our firm had never received any letter from either Petitioner. We did not learn of the CSRT results until July 13 and 14, 2005, when we first met the clients.

15.    On July 14, 2005, I spoke by telephone to Lieutenant Colonel Lowery, who had met us the previous day at Camp Echo and introduced himself as a JAG officer stationed at Guantanamo Bay. On July 14, Lt. Col. Lowery reached me by cell phone via the Chief Petty Officer assigned as our escort. I asked Lt. Col. Lowery whether my

UNCLASSIFIED

clients had received CSRT findings that they were not deemed enemy combatants. Lt. Col Lowery advised that he had to check. Shortly after that, he telephoned (again through the chief petty officer escorting us) and advised that this information was correct, each client had been determined by a CSRT "no longer to be an enemy combatant." Lt. Col. Lowery also advised that the "hitch" was that the Petitioners could not be sent back to China, and the government had not been able to find another country to take them.

16.    Based on my personal observations as a visitor there, the United States Naval Station at Guantanamo Bay is divided into the Leeward side, located on the west side of the south-facing bay, and the Windward side, located on the east side of the bay. Most of the facilities associated with the naval station, including the so-called "detainee facilities," appear to be located on the Windward side. In addition, there appear to be non-secure facilities such as schools, restaurants, the Navy Exchange, movie theatres, barracks, and other such facilities on the Windward side. Much of the Windward side, through which we were escorted by navy chief petty officers, resembles an ordinary American city. To a visitor it appears that many nonuniformed civilians are working there in ordinary, nonsensitive functions.

17.    The facilities visible to civilians on the Leeward side are of much smaller scope. These include the "Combined Bachelors' Quarters," a hotel where, among other things, habeas counsel are housed. The hotel rooms are rudimentary but well equipped with bathroom and shower facilities, kitchenettes, refrigerators, telephones and televisions. The charge to guests is $12 per day. Also located on the Windward side are a mess hall, where civilians may eat for modest charge, a small grocery, a beach, and the airport.

UNCLASSIFIED

18.    So far as I am aware, one cannot travel between the Leeward side and the Windward side except on ferries operated by the Navy.

19.    I have created this affidavit from memory in the Secure Facility in Crystal City, without the benefit of my notes, which I was not permitted to bring with me from Guantanamo Bay.

I declare this 16th day of July under penalty of perjury that the foregoing is true.

Sabin Willett

UNCLASSIFIED

5

PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM and A'DEL ABDU
AL-HAKIM,

          Petitioners/Plaintiffs,

    v.

George W. Bush, *et al.*,

          Respondents/Defendants.

Civil Action No. O5 cv 0497 (JR)

## [PROPOSED] ORDER GRANTING PETITIONERS' EMERGENCY MOTION
## TO VACATE STAY ORDER AND ISSUE WRIT
## DIRECTING IMMEDIATE RELEASE OF PETITIONERS

For good cause shown, the Court's April 13, 2005 order granting stay of

proceedings is hereby vacated. The Respondents are ordered to release Petitioners Qassim and

Al-Hakim from confinement at the Guantanamo Bay, Cuba detainment facilities.

Respondents are further ordered not to transfer or render Petitioners to the

custody or jurisdiction of any other country, pending further order of this Court. The Court

shall conduct a hearing on _____ to consider other and further appropriate

relief consistent with this order.

Dated: _____, 2005

                                      _____
                                      James Robertson
                                      United States District Judge

# **EXHIBIT 14**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ) | **Civil Action Nos.** |
| ) | **02-CV-0299 (CKK), 02-CV-0828 (CKK),** |
| ) | **02-CV-1130 (CKK), 04-CV-1135 (ESH),** |
| ) | **04-CV-1136 (JDB), 04-CV-1137 (RMC),** |
| *In re* **Guantanamo Detainee Cases** ) | **04-CV-1142 (RJL), 04-CV-1144 (RWR),** |
| ) | **04-CV-1164 (RBW), 04-CV-1166 (RJL),** |
| ) | **04-CV-1194 (HHK), 04-CV-1227 (RBW),** |
| ) | **04-CV-1254 (HHK), 04-CV-1519 (JR)** |
| ) | |

**AMENDED PROTECTIVE ORDER AND PROCEDURES FOR COUNSEL ACCESS
TO DETAINEES AT THE UNITED STATES NAVAL BASE
IN GUANTANAMO BAY, CUBA**

This matter comes before the Court upon Respondents' Motion for Protective Order to prevent the unauthorized disclosure or dissemination of classified national security information and other protected information that may be reviewed by, made available to, or are otherwise in the possession of, the petitioners and/or petitioners' counsel in these coordinated cases. Pursuant to the general supervisory authority of the Court, in order to protect the national security, and for good cause shown,

IT IS ORDERED:

1.    The Court finds that these cases involve classified national security information or documents, the storage, handling and control of which require special security precautions, and access to which requires a security clearance and a "need to know." These cases may also involve other protected information or documents, the storage, handling and control of which may require special precautions in order to protect the security of United States government personnel and facilities, and other significant government interests.

2.    The purpose of this Protective Order is to establish the procedures that must be followed by all petitioners' counsel, their respective petitioner(s), all other counsel involved in

these cases, translators for the parties, and all other individuals who receive access to classified national security information or documents, or other protected information or documents, in connection with these cases, including the privilege team as defined in Exhibit A.

      3.    The procedures set forth in this Protective Order will apply to all aspects of these cases, and may be modified by further order of the Court *sua sponte* or upon application by any party. The Court will retain continuing jurisdiction to enforce or modify the terms of this Order.

      4.    Nothing in this Order is intended to or does preclude the use of classified information by the government as otherwise authorized by law outside of these actions.

      5.    Petitioners' counsel shall be responsible for advising their employees, the petitioners, and others of the contents of this Protective Order, as appropriate or needed.

      6.    Petitioners' counsel are bound by the terms and conditions set forth in the "Revised Procedures For Counsel Access To Detainees At the U.S. Naval Base In Guantanamo Bay, Cuba," and the procedures for handling mail and documents brought into and out of counsel meetings, attached hereto as Exhibit A. This Protective Order specifically incorporates by reference all terms and conditions established in the procedures contained in Exhibit A to the extent they place limitations on petitioners' counsel in their access to and interaction with petitioners or handling of information. Any violation of the terms and conditions of those procedures will also be deemed a violation of this Protective Order. This paragraph does not apply with respect to provisions in the procedures contained in Exhibit A that are or have been overridden by the Court.

      7.    The privilege team shall not disclose to any person any information provided by counsel for a petitioner or by a petitioner, other than information provided in a filing with the Court, unless such information, if it were monitored information, could be disclosed under Section X of Exhibit A. Such disclosure shall be consistent with the provisions of Section X of Exhibit A.

<u>Definitions</u>

8.    As used herein, the words "documents" or "information" shall include, but are not limited to, all written or printed matter of any kind, formal or informal, including originals, conforming copies and non-conforming copies (whether different from the original by reason of notation made on such copies or otherwise), and further include, but are not limited to:

a.    papers, correspondence, memoranda, notes, letters, reports, summaries, photographs, maps, charts, graphs, interoffice and intra-office communications, notations of any sort concerning conversations, meetings, or other communications, bulletins, teletypes, telegrams, telefacsimiles, invoices, worksheets, and drafts, alterations, modifications, changes and amendments of any kind to the foregoing;

b.    graphic or oral records or representations of any kind, including, but not limited to, photographs, charts, graphs, microfiche, microfilm, videotapes, sound recordings of any kind, and motion pictures;

c.    electronic, mechanical or electric records of any kind, including, but not limited to, tapes, cassettes, disks, recordings, electronic mail, films, typewriter ribbons, word processing or other computer tapes or disks, and all manner of electronic data processing storage; and

d.    information acquired orally.

9.    The terms "classified national security information and/or documents," "classified information" and "classified documents" refer to:

a.    any classified document or information that has been classified by any Executive Branch agency in the interests of national security or pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE

3

COMPARTMENTED INFORMATION (SCI)," or any classified information contained in such document;

    b.  any document or information, regardless of its physical form or characteristics, now or formerly in the possession of a private party that has been derived from United States government information that was classified, regardless of whether such document or information has subsequently been classified by the government pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)";

    c.  verbal or non-documentary classified information known to the petitioner or petitioners' counsel; or

    d.  any document and information as to which the petitioner or petitioners' counsel have been notified orally or in writing that such documents or information contains classified information.

   10.  All classified documents, and information contained therein, shall remain classified unless the documents bear a clear indication that they have been declassified by the agency or department that is the original classification authority of the document or the information contained therein (hereinafter, the "original classification authority").

   11.  The terms "protected information and/or documents," "protected information" and "protected documents" refer to any document or information deemed by the Court, either upon application by counsel or *sua sponte*, as worthy of special treatment as if the document or information were classified, even if the document or information has not been formally deemed to be classified.

   12.  For purposes of this Protective Order, "petitioners' counsel" shall be defined to include an attorney who is employed or retained by or on behalf of a petitioner for purposes of

4

representing the petitioner in habeas corpus or other litigation in federal court in the United States, as well as co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation.

13.    "Access to classified information" or "access to protected information" shall mean having access to, reviewing, reading, learning, or otherwise coming to know in any manner any classified information or protected information.

14.    "Secure area" shall mean a physical facility accredited or approved for the storage, handling, and control of classified information.

15.    "Unauthorized disclosure of classified information" shall mean any knowing, willful or negligent action that could reasonably be expected to result in a communication or physical transfer of classified information to an unauthorized recipient.

<u>Designation of Court Security Officer</u>

16.    The Court designates Christine E. Gunning as Court Security Officer for these cases, and Joan B. Kendrall, Michael P. Macisso, James P. Londergan, Mary M. Cradlin, Daniel O. Hartenstine, John P. Molinard, Jennifer Campbell, and Barbara J. Russell as Alternate Court Security Officers, for the purpose of providing security arrangements necessary to protect from unauthorized disclosure of any classified documents or information, or protected documents or information, to be made available in connection with these cases.  Petitioners' counsel shall seek guidance from the Court Security Officer with regard to appropriate storage, handling, transmittal, and use of classified documents or information.

5

<u>Access to Classified Information and Documents</u>

17.    Without authorization from the government, no petitioner or petitioners' counsel shall have access to any classified information involved in these cases unless that person shall first have:

a.    made a written submission to the Court Security Officer precisely stating the reasons why counsel has a need to know the classified information requested; and

b.    received the necessary security clearance as determined by the Department of Justice Security Officer; and

c.    signed the Memorandum of Understanding ("MOU"), attached hereto as Exhibit B, agreeing to comply with the terms of this Protective Order.

The written submissions that are made by counsel to the Court Security Officer stating the reasons why counsel has a need to know the classified information requested shall be kept confidential by the Court Security Officer and shall not be disclosed to any other counsel or party to these cases unless the Court specifically orders such disclosure.

18.    Petitioners' counsel to be provided access to classified information shall execute the MOU appended to this Protective Order, and shall file executed originals with the Court and submit copies to the Court Security Officer and counsel for the government. The execution and submission of the MOU is a condition precedent for petitioners' counsel to have access to, or continued access to, classified information for the purposes of this proceeding.

19.    The substitution, departure, or removal of petitioners' counsel from these cases for any reason shall not release that person from the provisions of this Protective Order or the MOU executed in connection with this Order.

6

20.    The government shall arrange for one appropriately approved secure area for the use of petitioners' counsel.  The secure area shall contain a working area that will be supplied with secure office equipment reasonable and necessary to the preparation of the petitioners' case. Expenses for the secure area and its equipment shall be borne by the government.

21.    The Court Security Officer shall establish procedures to ensure that the secure area is accessible to the petitioners' counsel during normal business hours and at other times on reasonable request as approved by the Court Security Officer.  The Court Security Officer shall establish procedures to ensure that the secure area may be maintained and operated in the most efficient manner consistent with the protection of classified information.  The Court Security Officer or Court Security Officer designee may place reasonable and necessary restrictions on the schedule of use of the secure area in order to accommodate appropriate access to all petitioners' counsel in this and other proceedings.

22.    All classified information provided by the government to counsel for petitioners, and all classified information otherwise possessed or maintained by petitioners' counsel, shall be stored, maintained, and used only in the secure area.

23.    No documents containing classified information may be removed from the secure area unless authorized by the Court Security Officer or Court Security Officer designee supervising the area.

24.    Consistent with other provisions of this Protective Order, petitioners' counsel shall have access to the classified information made available to them in the secure area, and shall be allowed to take notes and prepare documents with respect to those materials.

25.    Petitioners' counsel shall not copy or reproduce any classified information in any form, except with the approval of the Court Security Officer or in accordance with the procedures established by the Court Security Officer for the operation of the secure area.

7

26.     All documents prepared by petitioners or petitioners' counsel that do or may contain classified information (including without limitation, notes taken or memoranda prepared by counsel and pleadings or other documents intended for filing with the Court) shall be transcribed, recorded, typed, duplicated, copied, or otherwise prepared only by persons who have received an appropriate approval for access to classified information. Such activities shall take place in the secure area on approved word processing equipment and in accordance with the procedures approved by the Court Security Officer. All such documents and any associated materials containing classified information (such as notes, memoranda, drafts, copies, typewriter ribbons, magnetic recordings, exhibits) shall be maintained in the secure area unless and until the Court Security Officer advises that those documents or associated materials are unclassified in their entirety. None of these materials shall be disclosed to counsel for the government unless authorized by the Court, by petitioners' counsel or as otherwise provided in this Protective Order.

27.     Petitioners' counsel shall discuss classified information only within the secure area or in another area authorized by the Court Security Officer, shall not discuss classified information over any standard commercial telephone instrument or office intercommunication system, and shall not transmit or discuss classified information in electronic mail communications of any kind.

28.     The Court Security Officer or Court Security Officer designee shall not reveal to any person the content of any conversations she or he may hear by or among petitioners' counsel, nor reveal the nature of documents being reviewed by them, or the work generated by them, except as necessary to report violations of this Protective Order to the Court or to carry out their duties pursuant to this Order. In addition, the presence of the Court Security Officer or Court Security Officer designee shall not operate as a waiver of, limit, or otherwise render inapplicable, the attorney-client privilege or work product protections.

8

29.    Petitioners' counsel shall not disclose the contents of any classified documents or information to any person, including counsel in related cases brought by Guantanamo Bay detainees in this or other courts, except those authorized pursuant to this Protective Order, the Court, and counsel for the government with the appropriate clearances and the need to know that information.  Except as otherwise specifically provided by Judge Colleen Kollar-Kotelly in her well-reasoned opinion addressing counsel access procedures regarding petitioners Mohammed Ahmed al Kandari, Fawzi Khalid Abdullah Fahad al Odah, and Khalid Abdullah Mishal al Mutairi in Al Odah v. United States, 02-CV-0828 (CKK), counsel for petitioners in these cases are presumed to have a "need to know" information both in their own cases and in related cases pending before this Court.  Therefore, and except as provided with respect to the three petitioners in Al Odah mentioned above, counsel for all petitioners in these cases who have satisfied all necessary prerequisites and follow all procedures set forth herein may share and discuss among themselves classified information to the extent necessary for the effective representation of their clients.  Counsel for respondents may challenge the "need to know" presumption on a case-by-case basis for good cause shown.

30.    Petitioners' counsel shall not disclose classified information not provided by petitioner-detainee to that petitioner-detainee.  Should petitioners' counsel desire to disclose classified information not provided by petitioner-detainee to that petitioner-detainee, petitioners' counsel will provide in writing to the privilege review team (See Exhibit A) a request for release clearly stating the classified information they seek to release.  The privilege review team will forward the petitioner counsel's request to the appropriate government agency authorized to declassify the classified information for a determination.  The privilege review team will inform petitioners' counsel of the determination once it is made.

9

31.     No petitioner or counsel for petitioner shall disclose or cause to be disclosed any information known or believed to be classified in connection with any hearing or proceeding in these cases except as otherwise provided herein.

32.     Except as otherwise stated in this paragraph and to ensure the security of the United States of America, at no time, including any period subsequent to the conclusion of the proceedings, shall petitioners' counsel make any public or private statements disclosing any classified information or documents accessed pursuant to this Protective Order, including the fact that any such information or documents are classified.  In the event that classified information enters the public domain, however, counsel is not precluded from making private or public statements about the information already in the public domain, but only to the extent that the information is in fact in the public domain.  Counsel may not make any public or private statements revealing personal knowledge from non-public sources regarding the classified or protected status of the information or disclosing that counsel had personal access to classified or protected information confirming, contradicting, or otherwise relating to the information already in the public domain.  In an abundance of caution and to help ensure clarity on this matter, the Court emphasizes that counsel shall not be the source of any classified or protected information entering the public domain.

As stated in more detail in paragraph 49 below, failure to comply with these rules may result in the revocation of counsel's security clearance as well as civil and/or criminal liability.

33.     The foregoing shall not prohibit petitioners' counsel from citing or repeating information in the public domain that petitioners' counsel does not know to be classified information or a classified document, or derived from classified information or a classified document.

34.     All documents containing classified information prepared, possessed or maintained by, or provided to, petitioners' counsel (except filings submitted to the Court and

served on counsel for the government), shall remain at all times in the control of the Court

Security Officer for the duration of these cases. Upon final resolution of these cases, including

all appeals, all such documents shall be destroyed by the Court Security Officer.

<u>Access to Protected Information and Documents</u>

35.    Without authorization from the government or the Court, protected information

shall not be disclosed or distributed to any person or entity other than the following:

a.    petitioners' counsel, provided such individuals have signed the

Acknowledgment, attached hereto as Exhibit C, attesting to the fact that they have read this

Protective Order and agree to be bound by its terms; and

b.    the Court and its support personnel.

36.    The execution of the Acknowledgment is a condition precedent for petitioners'

counsel to have access to, or continued access to, protected information for the purposes of this

proceeding. A copy of each executed Acknowledgment shall be kept by counsel making the

disclosure until thirty (30) days after the termination of this action, including appeals.

37.    The substitution, departure, or removal of petitioners' counsel from these cases

for any reason shall not release that person from the provisions of this Protective Order or the

Acknowledgment executed in connection with this Protective Order.

38.    Petitioners' counsel shall not disclose the contents of any protected documents or

information to any person, to include counsel in related cases brought by Guantanamo Bay

detainees in this or other courts, except those authorized pursuant to this Protective Order, the

Court, or counsel for the government. Except as otherwise specifically provided by Judge

Colleen Kollar-Kotelly with respect to counsel for petitioners Mohammed Ahmed al Kandari,

Fawzi Khalid Abdullah Fahad al Odah, and Khalid Abdullah Mishal al Mutairi in <u>Al Odah v.</u>

<u>United States</u>, 02-CV-0828 (CKK), counsel for petitioners in these coordinated cases may share

protected information with each other but only to the extent that counsel have appropriate

11

security clearances and that all other procedures set forth in this Protective Order are complied with. Petitioners' counsel shall maintain all protected information and documents received through this proceeding in a confidential manner.

39.    Petitioners' counsel shall not disclose protected information not provided by petitioner-detainee to that petitioner-detainee without prior concurrence of counsel for the government or express permission of the Court.

40.    No petitioner or counsel for petitioner shall disclose or cause to be disclosed any information known or believed to be protected in connection with any hearing or proceeding in these cases except as otherwise provided herein.

41.    At no time, including any period subsequent to the conclusion of the proceedings, will petitioners' counsel make any public or private statements disclosing any protected information or documents accessed pursuant to this Protective Order, including the fact that any such information or documents are protected.

42.    Protected information shall be used only for purposes directly related to these cases and not for any other litigation or proceeding, except by leave of the Court. Photocopies of documents containing such information shall be made only to the extent necessary to facilitate the permitted use hereunder.

43.    Nothing in this Protective Order shall prevent the government from using for any purpose protected information it provides a party. Nothing in this Protective Order shall entitle another party to protected information.

44.    Supplying protected information to another party does not waive privilege with respect to any person or use outside that permitted by this Protective Order.

45.    Within sixty (60) days of the resolution of these actions, and the termination of any appeals therefrom, all protected documents or information, and any copies thereof, shall be promptly destroyed, provided that the party to whom protected information is disclosed certifies

12

in writing that all designated documents and materials have been destroyed, and further provided that counsel for the government may retain one complete set of any such materials that were presented in any form to the Court. Any such retained materials shall be placed in an envelope or envelopes marked "Protected Information Subject to Protective Order." In any subsequent or collateral proceeding, a party may seek discovery of such materials from the government, without prejudice to the government's right to oppose such discovery or its ability to dispose of the materials pursuant to its general document retention policies.

Procedures for Filing Documents

46.    Until further order of this Court, any pleadings or other document filed by a petitioner shall be filed under seal with the Court through the Court Security Officer unless the petitioner has obtained from the Court Security Officer permission, specific to a particular, non-substantive pleading or document (e.g., motions for extensions of time, continuances, scheduling matters, etc.) not containing information that is or may be classified or protected, to file the pleading or document not under seal. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court. The Court Security Officer shall promptly examine the pleading or document and forward it to the appropriate agencies for their determination whether the pleading or document contains classified information. If it is determined that the pleading or document contains classified information, the Court Security Officer shall ensure that portion of the document, and only that portion, is marked with the appropriate classification marking and that the document remains under seal. If it is determined that the pleading or document contains protected information, the Court Security Officer shall ensure that portion of the document, and only that portion, remains under seal. Any document filed by petitioner that is determined not to contain classified information or protected information, and is not subject to any other restrictions on disclosure, shall immediately be unsealed by the Court Security Officer and placed in the public record. The Court Security

13

Officer shall immediately deliver under seal to the Court and counsel for the government any pleading or document to be filed by petitioners that contains classified information or protected information. The Court shall then direct the clerk to enter on the docket sheet the title of the pleading or document, the date it was filed, and the fact that it has been filed under seal with the Court Security Officer.

47.    Any pleading or other document filed by the government containing classified information shall be filed under seal with the Court through the Court Security Officer. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court. The Court Security Officer shall serve a copy of any classified pleadings by the government upon the Petitioner at the secure facility.

48.    Nothing herein shall require the government to disclose classified or protected information. Nor shall anything herein prohibit the government from submitting classified information or protected information to the Court *in camera* or *ex parte* in these proceedings, or entitle petitioners or petitioners' counsel access to such submissions or information. Except for good cause shown in the filing, the government shall provide counsel for the petitioner or petitioners with notice served on such counsel on the date of the filing.

<u>Penalties for Unauthorized Disclosure</u>

49.    Any unauthorized disclosure of classified information may constitute violations of United States criminal laws. In addition, any violation of the terms of this Protective Order shall be immediately brought to the attention of the Court and may result in a charge of contempt of Court and possible referral for criminal prosecution. <u>See</u> <u>e.g.</u>, Executive Order 12958, as amended. Any breach of this Protective Order may also result in the termination of access to classified information and protected information. Persons subject to this Protective Order are advised that direct or indirect unauthorized disclosure, retention, or negligent handling of classified documents or information could cause damage to the national security of the United

14

States or may be used to the advantage of an adversary of the United States or against the interests of the United States. Persons subject to this Protective Order are also advised that direct or indirect unauthorized disclosure, retention, or negligent handling of protected documents or information could risk the security of United States government personnel and facilities, and other significant government interests. This Protective Order is to ensure that those authorized to receive classified information and protected information will not divulge this information to anyone who is not authorized to receive it, without prior written authorization from the original classification authority and in conformity with this Protective Order.

50.     The termination of these proceedings shall not relieve any person or party provided classified information or protected information of his, her, or its obligations under this Protective Order.


IT IS SO ORDERED.

November 8, 2004                              _____/s/_____
                                                      JOYCE HENS GREEN
                                                      United States District Judge


15

Exhibit A

EXHIBIT A

**REVISED PROCEDURES FOR COUNSEL ACCESS TO DETAINEES
AT THE U.S. NAVAL BASE IN GUANTANAMO BAY, CUBA**

**I. Applicability**

  Except as otherwise stated herein or by other Order issued in the United States District Court for the District of Columbia, the following procedures shall govern counsel access to all detainees in the control of the Department of Defense ("DoD") at the U.S. Naval Base in Guantanamo Bay, Cuba ("GTMO") by counsel for purposes of litigating the cases in which this Order is issued.

  These procedures do not apply to counsel who are retained solely to assist in the defense of a detainee in a trial by military commission. Access by that counsel is covered by the Procedures for Monitoring Communications Between Detainees Subject to Trial by Military Commission and their Defense Counsel Pursuant to Military Commission Order No. 3.

**II. Definitions**

A. <u>Communications</u>: All forms of communication between counsel and a detainee, including oral, written, electronic, or by any other means.

B. <u>Counsel</u>: An attorney who is employed or retained by or on behalf of a detainee for purposes of representing the detainee in the United States District Court for the District of Columbia and who is admitted, either generally or pro hac vice, in this Court. Unless otherwise stated, "counsel" also includes co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation.

C. <u>Detainee</u>: An individual detained by DoD as an alleged enemy combatant at the U.S. Naval Base in Guantanamo Bay, Cuba.

D. <u>Privilege Team</u>: A team comprised of one or more DoD attorneys and one or more intelligence or law enforcement personnel who have not taken part in, and, in the future, will not take part in, any domestic or foreign court, military commission or combatant status tribunal proceedings involving the detainee. If required, the privilege team may include interpreters/translators, provided that such personnel meet these same criteria.

E. <u>Legal Mail</u>: Letters written between counsel and a detainee that are related to the counsel's representation of the detainee, as well as privileged documents and publicly-filed legal documents relating to that representation.

1

EXHIBIT A

## III. Requirements for Access to and Communication with Detainees

A. Security Clearance:

    1.    Counsel must hold a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).

    2.    Counsel who possess a valid security clearance shall provide, in writing, the date of their background investigation, the date such clearance was granted, the level of the clearance, and the agency who granted the clearance. Access will be granted only after DoD verification of the security clearance.

    3.    Counsel who does not currently possess a Secret clearance will be required to submit to an application for clearance to the Department of Justice, Litigation Security Division.

B. Acknowledgment of and Compliance with Access Procedures

    1.    Before being granted access to the detainee, counsel will receive a copy of these procedures. To have access to the detainee, counsel must agree to comply fully with these procedures and must sign an affirmation acknowledging his/her agreement to comply with them.

    2.    This affirmation will not be considered an acknowledgment by counsel that the procedures are legally permissible. Even if counsel elects to challenge these procedures, counsel may not knowingly disobey an obligation imposed by these procedures.

    3.    The DoD expects that counsel, counsel's staff, and anyone acting on the behalf of the attorney will fully abide by the requirements of this document. Counsel is required to provide the DoD with signed affirmations from interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation, upon utilization of those individuals by counsel in a manner that implicates these procedures.

    4.    Should counsel fail to comply with the procedures set forth in this document, access to or communication with the detainee will not be permitted.

C. Verification of Representation

    1.    Prior to being permitted access to the detainee, counsel must provide DoD with a *Notification of Representation*. This Notification must include the counsel's licensing information, business and email addresses and phone number, as well as

EXHIBIT A

the name of the detainee being represented by the counsel. Additionally, counsel shall provide evidence of his or her authority to represent the detainee.

2.      Counsel shall provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of a second visit with the detainee. The Court recognizes that counsel may not be in a position to present such evidence after the initial meeting with a detainee. Counsel for detainees and counsel for respondents shall cooperate to the fullest extent possible to reach a reasonable agreement on the number of counsel visits allowed. Should counsel for a detainee believe that the government is unreasonably limiting the number of visits with a detainee, counsel may petition the Court at the appropriate time for relief.

3.      If the counsel withdraws from representation of the detainee or if the representation is otherwise terminated, counsel is required to inform DoD immediately of that change in circumstances.

4.      Counsel must provide DoD with a signed representation stating that to the best of counsel's knowledge after reasonable inquiry, the source of funds to pay counsel any fees or reimbursement of expenses are not funded directly or indirectly by persons or entities the counsel believes are connected to terrorism or the product of terrorist activities, including "Specially Designated Global Terrorists," identified pursuant to Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) or Exec. Order No. 12,947, 60 Fed. Reg. 5079 (Jan. 23, 1995), and (b) counsel has complied with ABA Model Rule 1.8(f).

D.  Logistics of Counsel Visits

1.      Counsel shall submit to the Department of Justice (DoJ) any request to meet with a detainee. This request shall specify date(s) of availability for the meeting, the desired duration of the meeting and the language that will be utilized during the meeting with the detainee. Reasonable efforts will be made to accommodate the counsel's request regarding the scheduling of a meeting. Once the request has been approved, DoJ will contact counsel with the date and duration of the meeting.

2.      Legal visits shall take place in a room designated by JTF-Guantanamo. No more than two attorneys (or one attorney and one assistant) plus one interpreter/translator shall visit with a detainee at one time, unless approved in advance by the Commander, JTF-Guantanamo. Such approval shall not be unreasonably withheld.

3.      Due to the mission and location of the US Naval Base at Guantanamo Bay, Cuba, certain logistical details will need to be coordinated by counsel prior to arrival. This includes arrangements for travel and lodging. Specific information regarding these issues will be provided by DoJ.

3

EXHIBIT A

4.      In order to travel to GTMO, all counsel must have a country and theater clearance for that specific visit.  In order to begin processing country and theater clearances, counsel must have confirmed flight information for travel to GTMO and a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).  Country and theater clearances require twenty (20) days to process.  Accordingly, counsel shall provide DoD, through DoJ, with the required information no later than 20 days prior to the GTMO visit date, or as soon as a visit is scheduled.  Requests for visits made inside of 20 days will not normally be granted.

## IV. Procedures for Correspondence Between Counsel and Detainee

### A. Mail Sent by Counsel to Detainee ("Incoming Mail")

1.      Counsel shall send incoming legal mail for a detainee to the privilege team at the appropriate address provided by government counsel.  Each envelope or mailer shall be labeled with the name of the detainee and shall include a return address for counsel sending the materials.  The outside of the envelope or mailer for incoming legal mail shall be labeled clearly with the following annotation: "Attorney-Detainee Materials-For Mail Delivery to Detainee."

2.      Each page of legal mail shall be labeled "Attorney-Detainee Materials." No staples, paper clips or any non-paper items shall be included with the documents.

3.      Upon receiving legal mail from counsel for delivery to the detainee, the privilege team shall open the envelope or mailer to search the contents for prohibited physical contraband.  Within two (2) business days of receipt of legal mail, and assuming no physical contraband is present, the privilege team shall forward the mail to military personnel at GTMO in a sealed envelope marked "Legal Mail Approved by Privilege Team" and clearly indicating the identity of the detainee to which the legal mail is to be delivered.  The privilege team shall return to the sender any incoming mail that does not comply with the terms of paragraphs IV.A.1., 2.

4.      Within two (2) business days of receipt of legal mail from the privilege team, personnel at GTMO shall deliver the envelope or mailer marked by the privilege team as "Legal Mail Approved by the Privilege Team" to the detainee without opening the envelope or mailer.  If counsel desires confirmation that the documents were delivered to the detainee, counsel is responsible for providing a stamped, self-addressed envelope for that purpose.  The detainee shall be responsible for mailing any confirmation of delivery to counsel as outgoing legal mail.  This method shall be the sole and exclusive means by which confirmation of delivery is provided to counsel.

4

EXHIBIT A

5.  Written correspondence to a detainee not falling within the definition of legal mail shall be sent through the United States Postal Service to the appropriate address provided by government counsel. Non-legal mail includes, but is not limited to, letters from persons other than counsel, including family and friends of the detainee. These non-privileged communications will be reviewed by military personnel at GTMO under the standard operating procedures for detainee non-legal mail.

6.  Counsel is required to treat all information learned from a detainee, including any oral and written communications with a detainee, as classified information, unless and until the information is submitted to the privilege team and determined to be otherwise by the privilege team or by this Court or another court. Accordingly, if a counsel's correspondence contains any summary or recitation of or reference to a communication with a detainee that has not been previously determined to be unclassified, the correspondence shall be prepared, marked, transported and handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information and Security Supplement to DOD Regulation 5200.1R.

7.  Written and oral communications with a detainee, including all incoming legal mail, shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation.

B.  Mail Sent by Detainee to Counsel ("Outgoing Mail")

1.  Detainees will be provided with paper to prepare communications to counsel. In the presence of military personnel, the detainee will seal the written communication into an envelope and it will be annotated as "Attorney-Detainee Materials-For Mail Delivery To Counsel." Each envelope shall be labeled with the name of the detainee and the counsel. Envelopes annotated with the name of persons other the detainee's counsel (including family/friends or other attorneys) shall be processed according to the standard operating procedures for detainee non-legal mail.

2.  Military personnel will collect the outgoing legal mail within one (1) business day of being notified by the detainee that the communication is prepared for sealing and mailing.

3.  After the outgoing legal mail is collected from the detainee, the envelope will be sealed into a larger envelope by military personnel at Guantanamo which will be marked as "Attorney-Detainee Materials-For Mail Delivery To Counsel" and will

5

EXHIBIT A

be annotated with the name of the detainee and the counsel. The envelope will be sealed and mailed in the manner required for classified materials. Within two (2) business days of receipt from the detainee, the communication will be mailed to the appropriate address as provided by government counsel.

4.    Detainees also are permitted to send non-legal mail, including written communications to persons other than counsel, through the United States Postal Service. These communications shall be reviewed by military personnel at Guantanamo under the standard operating procedures for detainee non-legal mail.

5.    In the event any non-legal correspondence or messages from a detainee to individuals other than his counsel (including family/friends or other attorneys) are sent to counsel as, or included with, legal mail, counsel shall return the documents to military personnel at GTMO for processing according to the standard operating procedures for detainee non-legal mail.

## V. Materials Brought Into A Meeting With Detainee And Counsel

A.    Counsel shall bring only legal mail, writing utensils and paper into any meeting with a detainee unless counsel has received prior approval from the Commander, JTF-GTMO. The Commander shall not unreasonably withhold approval for counsel to bring into a meeting with a detainee letters, tapes, or other communications introducing counsel to the detainee, if the government has first reviewed the communication and determined that sharing the communication with the detainee would not threaten the security of the United States.

B.    Written and oral communications with a detainee, including all documents brought into a meeting with a detainee, shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation.

## VI. Materials Brought Out Of A Meeting With Detainee and Counsel

A.    Upon the completion of each meeting with a detainee or during any break in a meeting session, counsel will give the notes or documents used or produced during the meeting to a designated individual at Guantanamo. These materials will be sealed in the presence of counsel and will be handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

B.    Upon the completion of the counsel's visit to Guantanamo, the notes or documents used or produced during the visit shall be sealed in the presence of

EXHIBIT A

counsel and placed in an envelope labeled as "Attorney-Detainee Meeting Documents–For Delivery to Counsel." The envelope shall be sealed into a larger envelope by military personnel at Guantanamo which shall be marked as "Attorney-Detainee Meeting Documents-For Mail Delivery To Counsel" and shall be annotated with the name of the detainee and the counsel. The envelope shall be sealed and mailed in the manner required for classified materials. Within two (2) business days following the completion of the counsel's visit to Guantanamo, the package shall be mailed to the appropriate address provided by government counsel.

C.    Correspondence or messages from a detainee to individuals other than his counsel (including family/friends or other attorneys) shall not be handled through this process. If a detainee provides these communications to his counsel during a visit, counsel shall give those communications to military personnel at Guantanamo so they can be processed under the standard operating procedures for detainee non-legal mail.

## VII. Classification Determination of Detainee Communications

A.    Counsel may submit information learned from a detainee to the privilege team for a determination of its appropriate security classification. Counsel shall memorialize the information submitted for classification review into a written memorandum outlining as specifically as possible the information for which counsel requests a classification determination. All documents submitted for classification review shall be prepared, handled and treated in the manner required for classified materials, as provided by as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R. No information derived from these submissions shall be disclosed outside the privilege team pursuant to these procedures until after the privilege team has reviewed it for security and intelligence purposes. Absent express consent given by the Court, or except as otherwise provided in this document, the submissions shall not be disclosed to any person involved in the interrogation of a detainee, and no such individual may make any use of those communications whatsoever, nor shall the submissions be disclosed to any Government personnel involved in any domestic or foreign court, military commission or combatant status tribunal proceedings involving the detainee.

B.    Counsel shall send all materials submitted for classification review to the appropriate address to be provided by government counsel. The outside of the envelope or mailer shall be clearly labeled "Attorney-Detainee Meeting Documents-For Classification Review By Privilege Team." Each envelope or mailer shall be annotated with the name of the detainee and the counsel. Each page of the document submitted for classification review shall be marked "Attorney-Detainee Materials" and "Classified." The envelope or mailer will be sealed and mailed in the manner required for classified materials.

EXHIBIT A

C.      As soon as possible after conducting the classification review, the privilege team shall advise counsel of the classification levels of the information contained in the materials submitted for review. The privilege team shall forward its classification determination directly to counsel after a review and analysis period not to exceed, from the time of receipt by the privilege team:

1. Seven (7) business days for information that is written in the English language;

2. Fourteen (14) business days for any information that includes writing in any language other than English, to allow for translations by the privilege team;

3. Twenty (20) business days for any information where the privilege team has reason to believe that a code was used, to allow for further analysis.

D.      While conducting classification review, the privilege team shall promptly report any information that reasonably could be expected to result in immediate and substantial harm to the national security to the Commander, JTF-Guantanamo. In his discretion, the Commander, JTF-Guantanamo may disseminate the relevant portions of the information to law enforcement, military and intelligence officials as appropriate.

E.      If, at any time, the privilege team determines that information in the documents submitted for classification review relate to imminent acts of violence, the privilege team shall report the contents of those documents to Commander, JTF-Guantanamo. In his discretion, the Commander, JTF-Guantanamo may disseminate the relevant portions of the information to law enforcement, military and intelligence officials.

F.      The privilege team shall not disclose any information submitted by counsel for classification review outside the privilege team, except as provided by these procedures or as permitted by counsel submitting the information.

## VIII. Telephonic Access to Detainee

A.      Requests for telephonic access to the detainee by counsel or other persons will not normally be approved. Such requests may be considered on a case-by-case basis due to special circumstances and must be submitted to Commander, JTF-Guantanamo.

B.      Any telephonic access by counsel will be subject to appropriate security procedures, but shall not include contemporaneous monitoring or recording.

C.      Any telephonic access by persons other than counsel will be subject to appropriate security procedures, including contemporaneous monitoring and recording.

8

EXHIBIT A

**IX. Counsel's Handling And Dissemination Of Information From Detainee**

    A.    Subject to the terms of any applicable protective order, counsel may disseminate the unclassified contents of the detainee's communications for purposes reasonably related to their representation of that detainee.

    B.    Counsel is required to treat all information learned from a detainee, including any oral and written communications with a detainee, as classified information, unless and until the information is submitted to the privilege team and determined to be otherwise. All classified material must be handled, transported and stored in a secure manner, as provided by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

    C.    Counsel shall disclose to DoJ or Commander, JTF-Guantanamo any information learned from a detainee involving future events that threaten national security or involve imminent violence.

    D.    Counsel may not divulge classified information not learned from the detainee to the detainee. Counsel may not otherwise divulge classified information related to a detainee's case to anyone except those with the requisite security clearance and need to know using a secure means of communication. Counsel for detainees in the coordinated cases pending in the United States District Court for the District of Columbia are presumed to have a "need to know" information in related cases pending before this Court. Counsel for respondents in those cases may challenge this presumption on a case-by-case basis for good cause shown.

**X. JTF-Guantanamo Security Procedures**

    A.    Counsel and translators/interpreters shall comply with the following security procedures and force protection safeguards applicable to the US Naval Base in Guantanamo Bay, Cuba, JTF-Guantanamo and the personnel assigned to or visiting these locations, as well as any supplemental procedures implemented by JTF-Guantanamo personnel.

    B.    Contraband is not permitted in JTF-Guantanamo and all visitors are subject to search upon arrival and departure. Examples of contraband include, but are not limited to, weapons, chemicals, drugs, and materials that may be used in an escape attempt. Contraband also includes money, stamps, cigarettes, writing instruments, etc. No items of any kind may be provided to the detainee without the advance approval of the Commander, JTF-Guantanamo.

    C.    Photography or recording of any type is prohibited without the prior approval of the Commander, JTF-Guantanamo. No electronic communication devices are permitted. All recording devices, cameras, pagers, cellular phones, PDAs, laptops, portable electronic devices and related equipment are prohibited in or near JTF-Guantanamo. Should any of these devices be inadvertently taken into a

9

EXHIBIT A

prohibited area, the device must be surrendered to JTF-Guantanamo staff and purged of all information.

D.     Upon arrival at JTF-Guantanamo, security personnel will perform a contraband inspection of counsel and translators/interpreters using metal detectors as well as a physical inspection of counsel's bags and briefcases and, if determined necessary, a physical inspection of his/her person.

E.     Counsel shall not be permitted to interview or question members of the Joint Task Force about their duties or interactions with detainees without first obtaining permission from the Commander, Joint Task Force Guantanamo. Should permission be unreasonably denied, counsel may seek an Order from this Court granting permission for good cause shown.

F.     Counsel will meet with a detainee in conference facilities provided by GTMO. These facilities are subject to visual monitoring by closed circuit TV for safety and security reasons. (The only other method of visual observation available is for the door to remain open with military police sitting outside the door.). No oral communications between counsel and detainee will be heard.

G.     At the conclusion of a meeting with a detainee, counsel and translators/interpreters will again be inspected using a metal detector and, if deemed necessary, by physical inspection of their persons.

Exhibit B

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                          )
, et al.                  )
                          )
        Petitioners,      )
                          )
     v.                   ) Civil Action No.
                          )
GEORGE W. BUSH,           )
     President of the United )
     States, et al.,      )
                          )
        Respondents.      )
```

**MEMORANDUM OF UNDERSTANDING REGARDING ACCESS TO
CLASSIFIED NATIONAL SECURITY INFORMATION**

Having familiarized myself with the applicable statutes, regulations, and orders related to, but not limited to, unauthorized disclosure of classified information, espionage and related offenses; The Intelligence Identities Protection Act, 50 U.S.C. § 421; 18 U.S.C. § 641; 50 U.S.C. § 783; 28 C.F.R. § 17 et seq.; and Executive Order 12958; I understand that I may be the recipient of information and documents that belong to the United States and concern the present and future security of the United States, and that such documents and information together with the methods and sources of collecting it are classified by the United States government.  In consideration for the disclosure of classified information and documents:

(1)  I agree that I shall never divulge, publish, or reveal either by word, conduct or any other means, such classified

documents and information unless specifically authorized in writing to do so by an authorized representative of the United States government, or as expressly authorized by the Protective Order entered in the United States District Court for the District of Columbia in the case captioned _____ v. George W. Bush, No. _____.

(2)   I agree that this Memorandum of Understanding and any other non-disclosure agreement signed by me will remain forever binding on me.

(3) I have received, read, and understand the Protective Order entered by the United States District Court for the District of Columbia in the case captioned _____ v. George W. Bush, No. _____, and I agree to comply with the provisions thereof.


_____        _____
                                         Date


_____        _____
                                         Date


2

Exhibit C

EXHIBIT C

### ACKNOWLEDGMENT

The undersigned hereby acknowledges that he/she has read the Protective Order entered in the United States District Court for the District of Columbia in the case captioned _____ v. George W. Bush, No. _____, understands its terms, and agrees to be bound by each of those terms. Specifically, and without limitation, the undersigned agrees not to use or disclose any protected information or documents made available to him/her other than as provided by the Protective Order. The undersigned acknowledges that his/her duties under the Protective Order shall survive the termination of this case and are permanently binding, and that failure to comply with the terms of the Protective Order may result in the imposition of sanctions by the Court.


DATED: _____    BY: _____
                              (type or print name)


                         SIGNED: _____

# **EXHIBIT 15**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | **Civil Action Nos.** |
| ) | **02-CV-0299 (CKK), 02-CV-0828 (CKK),** |
| ) | **02-CV-1130 (CKK), 04-CV-1135 (ESH),** |
| ) | **04-CV-1136 (JDB), 04-CV-1137 (RMC),** |
| *In re* **Guantanamo Detainee Cases** ) | **04-CV-1142 (RJL), 04-CV-1144 (RWR),** |
| ) | **04-CV-1164 (RBW), 04-CV-1166 (RJL),** |
| ) | **04-CV-1194 (HHK), 04-CV-1227 (RBW),** |
| ) | **04-CV-1254 (HHK), 04-CV-1519 (JR)** |
| ) | |

## ORDER ADDRESSING DESIGNATION PROCEDURES
## FOR "PROTECTED INFORMATION"

On November 8, 2004, counsel for respondents in these coordinated cases filed a motion

requesting the Court to designate as "protected information" the unclassified information

contained in the respondents' factual returns to the petitions for writs of habeas corpus that is not

filed on the public record. Counsel for certain petitioners filed responses stating that they could

not take a position on the respondents' motion until they or a designated representative had an

opportunity to review the material that the respondents seek to have declared "protected."

In the interest of the efficient administration of these proceedings, it is hereby

ORDERED that should counsel for respondents in these consolidated cases wish to have

the Court deem any information "protected" pursuant to the Court's November 8, 2004 Amended

Protective Order and Procedures for Counsel Access to Detainees at the United States Naval

Base in Guantanamo Bay, Cuba, counsel for respondents shall disclose the information to

qualified counsel for petitioners and attempt to reach an agreement regarding the designation of

the information prior to filing a motion with the Court. "Qualified counsel" for petitioners

means those counsel who have satisfied the necessary prerequisites set forth in the Amended

Protective Order for the viewing of protected information.

It is FURTHER ORDERED that counsel for petitioners shall treat such disclosed information as "protected" unless and until the Court rules that the information should not be designated as "protected."

It is FURTHER ORDERED that counsel for petitioners shall make their best efforts to designate one attorney as a representative to review the information on their behalf and to negotiate with counsel for respondents prior to the filing of any motions to deem information "protected."

With respect to the November 8, 2004 Motion to Designate as "Protected Information" Unclassified Information in Factual Returns to Petitions for Writ of Habeas Corpus That is Not Filed on the Public Record, it is hereby

ORDERED that counsel for respondents shall deliver the information they seek to be deemed "protected" to the Court Security Officer at the designated secured facility on or before November 17, 2004.

It is FURTHER ORDERED that the Court Security Officer shall notify counsel for the petitioners of the location of the secured facility on or before November 12, 2004.

It is FURTHER ORDERED that petitioners' counsel shall review at the secured facility the information at issue and shall notify the Court of their position with respect to the designation of the information on or before November 19, 2004.

IT IS SO ORDERED.
November 10, 2004

_____/s/_____
JOYCE HENS GREEN
United States District Judge

2

# **EXHIBIT 16**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | **Civil Action Nos.** |
| ) | **02-CV-0299 (CKK), 02-CV-0828 (CKK),** |
| ) | **02-CV-1130 (CKK), 04-CV-1135 (ESH),** |
| ) | **04-CV-1136 (JDB), 04-CV-1137 (RMC),** |
| *In re* **Guantanamo Detainee Cases** ) | **04-CV-1144 (RWR), 04-CV-1164 (RBW),** |
| ) | **04-CV-1194 (HHK), 04-CV-1227 (RBW),** |
| ) | **04-CV-1254 (HHK), 04-CV-1897 (RMC)** |
| ) |  |
| ) |  |
| ) |  |
| ) |  |

## ORDER SUPPLEMENTING AND AMENDING FILING PROCEDURES
## CONTAINED IN NOVEMBER 8, 2004 AMENDED PROTECTIVE ORDER

In its November 8, 2004 Amended Protective Order, the Court set forth procedures for the filing of documents by counsel in these coordinated cases. Paragraph 46 governs the filing of documents by counsel for the petitioners and requires that all filings be first submitted under seal to the Court Security Officer ("CSO") to determine whether they contain classified or protected information. If the CSO, in consultation with the appropriate agency, concludes that a particular filing does not contain any classified or protected information, ¶ 46 requires the unsealing of the document by the CSO and the filing of the document in the public record. If the CSO, in consultation with the appropriate agency, concludes that a particular filing does contain classified or protected information, that information is to remain under seal and the unclassified and unprotected portions of the filing, if any, are to be placed in the public record. Paragraph 47 governs the filing of classified materials by counsel for the respondents and requires counsel to submit classified filings under seal to the Court through the CSO.

It has recently come to the Court's attention that some confusion and certain difficulties have arisen with respect to the filing of documents containing classified or protected information. Most of the difficulties have arisen as a result of the nature of the Court's CM/ECF electronic filing system. To clarify and, hopefully, to improve the filing system, it is hereby

ORDERED that the "Procedures For Filing Documents" contained on pages 13 through 14 of the November 8, 2004 Amended Protective Order are modified and supplemented as follows:

All documents filed by a petitioner shall be filed under seal with the Court through the Court Security Officer for determination by the appropriate agency as to whether the documents contain classified or protected information. At the time of making a submission to the CSO, the attorney shall file on the public record in the CM/ECF system a "Notice of Filing" notifying the Court that a submission has been made to the CSO and specifying in general terms the nature of the filing without disclosing any potentially classified or protected information. It is the Court's understanding that the CM/ECF system requires counsel to attach a document to any entry made by them on the system. Accordingly, the document to be attached to the Notice of Filing in the CM/ECF system shall be a one page submission repeating in general terms the nature of the filing without disclosing any potentially classified or protected information and disclosing the date and time the document was delivered to the CSO for her review.

In the event that the CSO informs counsel for a petitioner that a proposed filing does not contain any classified or protected information, counsel shall then promptly file the full submission in the CM/ECF system and counsel shall make specific reference to the earlier docket

2

entry notifying the Court that the document had been submitted to the CSO for review. The

docket entry description shall also state that the CSO has approved of the public filing of the

document. The underlying document filed in the CM/ECF system shall contain a notation in the

upper right hand corner of the first page stating "PREVIOUSLY FILED WITH CSO AND

CLEARED FOR PUBLIC FILING."

  In the event that the CSO informs counsel for a petitioner that a proposed filing does in

fact contain some or all classified or protected information, counsel shall then promptly file in

the CM/ECF system a version of the document suitable for public viewing. Unless an entire

document is deemed classified or protected, a "version of the document suitable for public

viewing" shall mean a document in which the portions of the document containing classified or

protected information are redacted. Such document shall contain a notification in the upper right

hand corner of the first page stating "REDACTED VERSION FOR PUBLIC FILING CLEARED

BY CSO." In the event an entire document is deemed classified or protected, a "version of the

document suitable for public viewing" shall mean a one page "half sheet" containing the caption

of the case, a version of the title of the document that does not disclose classified or protected

information, and a brief statement that the CSO has informed counsel that the entire document is

classified or protected. The docket entry description in the CM/ECF system for the document

suitable for public viewing shall make specific reference to the earlier docket entry notifying the

Court that the document had been submitted to the CSO for review.

  Any pleading or other document filed by counsel for the respondents containing classified

or protected information shall be filed under seal with the Court through the CSO. In addition,

counsel for respondents shall file in the CM/ECF system a version of the document suitable for

public viewing as that phrase is defined in the preceding paragraph.


IT IS SO ORDERED.

December 13, 2004                                    _____/s/_____
                                                    JOYCE HENS GREEN
                                                    United States District Judge

4

# **EXHIBIT 17**

**Harding, Paula B.**

**Subject:**                FW: Mamet v. Bush (Case No. 1:05cv01602 (RMU))


-----Original Message-----
From: Andrew.Warden@usdoj.gov [mailto:Andrew.Warden@usdoj.gov]
Sent: Thursday, August 11, 2005 4:39 PM
To: Manning, Susan Baker
Subject: RE: Mamet v. Bush (Case No. 1:05cv01602 (RMU))


Ms. Manning,

Respondents consent to entry of the three referenced below.

Thanks,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084


-----Original Message-----
From: susan.manning@bingham.com [mailto:susan.manning@bingham.com]
Sent: Thursday, August 11, 2005 3:51 PM
To: Henry, Terry (CIV); Warden, Andrew (CIV)
Subject: Mamet v. Bush (Case No. 1:05cv01602 (RMU))

Terry and Andrew --
I attach for your reference a courtesy copy of the Petition for Writ of Habeas Corpus
filed today on behalf of Edham Mamet, a Uighur prisoner at Guantanamo Bay Naval Station,
and his brother and next friend, Ibrahim Mamet.  We are in the process of serving
Respondents.  You should be aware that we believe Mr. Mamet's case involves common issues
of fact and grows out of the same event or transaction as Kiyemba v. Bush (1:05-cv-01509-
RMU), and we have notified the Court that they are related cases.
Please be advised that Mr. Mamet may also be known as Nejmadin Mohammed.  I am not
presently aware of his ISN.  I will forward evidence of our authority to represent Mr.
Mamet under separate cover.
I assume that the government has no objection to the entry in this matter of the November
8, 2004 Amended Protective Order, as well as the December 13, 2004 Order regarding filing
procedures and the November 10, 2004 Order addressing protected information designation
procedures.  I would appreciate confirmation.
regards,
Susan

Susan Baker Manning, Esq.
Bingham McCutchen LLP
1120 20th Street NW, Suite 800
Washington DC 20036
202.778.6172 (t)
202.778.6155 (f)
susan.manning@bingham.com


> >  <<Mamet Habeas Corpus Petition.pdf>>