## IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF COLUMBIA

EDHAM MAMET,

and

IBRAHIM MAMET, as Next Friend of EDHAM
MAMET,

        Petitioner/Plaintiff,

        v.

GEORGE W. BUSH, *et al.*,

        Respondents/Defendants.

Case No. 1:05-cv-01602-ESH

**APPLICATION FOR
PRELIMINARY INJUNCTION
AND MEMORANDUM IN
SUPPORT THEREOF**

**(Oral Argument Requested)**

### INTRODUCTION

Petitioner Edham Mamet (hereinafter "Petitioner") is a prisoner at the United States

Naval Station, Guantánamo Bay, Cuba ("Guantánamo"). Based on recent Government

announcements and press reports, Petitioner believes that he may be transferred to the custody of

a foreign government without a hearing and without proper consideration of the likelihood of

torture by the transferee government. Accordingly, pursuant to Fed. R. Civ. P. 65 and the All

Writs Act, 28 U.S.C. § 1651, Petitioner asks the Court to enter a Preliminary Injunction

preventing the Government from transferring him from Guantánamo to any other location absent

thirty-days advance written notice to Petitioner and his Counsel.

### BACKGROUND

**I.    Uighur Detainees at Guantánamo**

As detailed in the Petitioner's August 11, 2005, *habeas corpus* petition ("Petition") and

September 14, 2005, Motion for Order to Show Cause, Petitioners are believed to be ethnic

Uighurs ("WEE-ghurs") from the Xinjiang Uyghur Autonomous Region, a province of the

People's Republic of China (also referred to as "East Turkistan"). Uighurs are a Turkic Muslim

minority group that has been, and continues to be, brutally oppressed by the communist Chinese

government. *See* U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES –

2004 (Feb. 28, 2005) ("The [Chinese] Government used the international war on terror as a

pretext for cracking down harshly on suspected Uighur separatists expressing peaceful political

dissent.") (hereinafter "China Report") (attached at Ex. 1).

Strikingly, the Government has repeatedly acknowledged that many—*if not most*—of the

Uighurs imprisoned at Guantánamo have been exonerated by the Government in its Combatant

Status Review Tribunals ("CSRT") or otherwise. *See, e.g.*, Interview with Pierre-Richard

Prosper, United States Ambassador at Large for War Crimes, in Washington, D.C., at 1-2 (Aug.

25, 2005) (discussing efforts to release and resettle the Uighur population at Guantánamo)

(hereinafter "Prosper Interview") (attached at Ex. 2); Interview with Gordon England, Secretary

of the Navy, in Washington, D.C., at 3 (Mar. 29, 2005) ("I think it has been reported we have

Uighurs from China that we have not returned to China, even though, you know, some of those

have been deemed, even before these hearings, to be non-enemy combatants because of concerns

and issues about returning them to their country.") (attached to Pet'r's Mot. for Order to Show

Cause at Ex. 4 (Sept. 14, 2005)); Interview with Colin Powell, Secretary of State, in Washington,

D.C., at 5 (Aug. 12, 2004) ("[T]he Uighurs are a difficult problem and we are trying to resolve

all issues with respect to all detainees at Guantánamo. The Uighurs are not going back to China,

but finding places for them is not a simple matter, but we are trying to find places for them. And

we are trying to find places for them, and, of course, all candidate countries are being looked

at.") (attached to Pet'r's Mot. for Order to Show Cause at Ex. 6 (Sept. 14, 2005)); Interview with

Richard Boucher, Spokesman for the Department of State, in Washington, D.C., at 6-7 (May 13, 2004) (hereinafter "Boucher Interview") ("In the case of the Uighurs who are there, we have identified some who might be eligible for release. We are currently considering how that process can work. If it's decided that they can, obviously, the situations of individual, individuals need to be taken into account, including their wishes and their ability to go to different places.") (attached at Ex. 3).

Yet despite these acknowledgements, the Uighurs still languish in prison at Guantánamo. Meanwhile, the Government continues to assert its authority detain non enemy combatant Uighurs for "as long as it takes."   Tr. of Status Conference before the Hon. James Robertson at 18 (Aug. 25, 2005), *Qassim, et al., v. Bush, et al.*, Case No. 1:05-cv-00497-JR (attached at Ex. 4).

The Government blames the delay on difficulties encountered in locating a third country willing to admit the Uighurs. *See, e.g.*, Prosper Interview at 1 ("We've approached probably about 25 countries."); Josh White, *5 Chinese Detainees Given More Freedom at Guantánamo*, WASH. POST, Aug. 26, 2005 (attached at Ex. 5); Neil A. Lewis, *Guantánamo detainees pose dilemma: Eligible for release, the Muslim Uighurs could be in danger if returned to China*, N.Y. TIMES, Nov. 15, 2004 (attached at Ex. 6).  These purported difficulties counsel in favor of judicial circumspection to ensure that any Uighur detainees scheduled for release are transferred to a safe country that will not collapse under pressure from the Chinese government to repatriate them to China. *See* Boucher Interview at 6-7 (stating, in reference to the release of Uighurs, "[w]e have talked to the Chinese and other governments about this situation at this point, but I don't have anything definitive for you yet on the release or where they might go."); AMNESTY INT'L, PEOPLE'S REPUBLIC OF CHINA, UIGHURS FLEEING PERSECUTION AS CHINA WAGES ITS

"WAR ON TERROR" (2004) ("Amnesty International has received credible allegations that during this visit [to Guantanamo], which reportedly lasted between one and two weeks, Chinese officials took photographs of the Uighurs and interrogated them about their backgrounds.") (attached at Ex. 7).

## II.    Rendition and Transfer of Detainees to a Foreign Country

Petitioner has reason to fear that they he will be rendered or transferred to a country where he could be tortured, abused or detained indefinitely without any due process of law.  In another case involving Uighur detainees at Guantánamo, *Qassim v. Bush*, the Government has acknowledged that Guantánamo detainees may be transferred to the control of another government, including their country of citizenship, for continued detention and prosecution. *See* Decl. of Pierre-Richard Prosper at 2 (filed in *Qassim v. Bush*) (hereinafter, "Prosper Decl.") (acknowledging the Government practice of transferring detainees to foreign countries "either for release or for further detention, investigation, prosecution or control, as appropriate") (attached at Ex. 8).  Accordingly, there can be no doubt that the prospect of transfer to a hostile country absent due process is a real danger that the Petitioner faces.

This practice of moving detainees, known as "rendition" or "extraordinary rendition," is thought to be used to facilitate interrogation through torture.  Upon information and belief, detainees are believed to be "rendered" to countries where torture is routine.

American and international news organizations have documented the Government's use of this practice.  Citing CIA, FBI, and other Government sources, The Washington Post, The L.A. Times, and The New Yorker, amongst others, have reported that the Government has transferred detainees such as the Petitioners into the custody of foreign governments that engage in torture.  According to *The Washington Post*:

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries, including Egypt . . ., whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASH. POST, Mar. 11, 2002 (attached as Ex. 9).

These "renditions" are based on agreements between the United States and foreign governments "to have local security services hold certain terror suspects in their facilities for interrogation by CIA and foreign liaison officers." Dana Priest, *Long-Term Plan Sought for Terror Suspects*, WASH. POST, Jan. 2, 2005 (attached at Ex. 10); *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations*, WASH. POST, Dec. 26, 2002 (in cases involving "lower-level captives, the CIA hands them to foreign intelligence services—notably those of Jordan, Egypt and Morocco—with a list of questions the agency wants answered. These 'extraordinary renditions' are done without resort to legal process and usually involve countries with security services known for using brutal means.") (attached at Ex. 11).

Distressingly, the latest reports indicate that the Department of Defense is poised to *greatly accelerate the pace of renditions and transfers* of Guantánamo detainees to foreign countries. *See* Andrea Koppel & Elise Labott, *U.S. Officials: Gitmo Transfer talks Active*, CNN, Aug. 10, 2005 ("The United States and at least 10 other nations are involved in negotiations that could drop the detainee population at Guantánamo Bay by 80 percent—or approximately 410 people—within the coming months, State Department officials said.") (attached at Ex. 12); Josh White & Robin Wright, *Afghanistan Agrees to Accept Detainees: U.S. Negotiating Guantánamo Transfers*, WASH. POST, Aug. 5, 2005 ("The Bush administration is negotiating the transfer of

nearly 70 percent of the detainees at the U.S. detention facility in Guantánamo Bay, Cuba, to three countries as part of a plan.") (attached at Ex. 13); Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba*, N.Y. TIMES, Mar. 11, 2005 (hereinafter "Jehl Article") (attached at Ex. 14).

The government's decision to transfer detainees brings up the possibility of jurisdictional battles following transfer of Petitioner to a foreign country. The Government may try and argue that transfer, by itself, divests this Court of jurisdiction to grant Petitioner's requested relief. Regardless of the merits of such an argument, it's important to consider the practical harm to Petitioner that such a stance would cause.

Furthermore, any rendition of Petitioner to his homeland of China would be disastrous. According to the State Department, in China during 2004 "[f]ormer detainees reported credibly that officials used electric shocks, prolonged periods of solitary confinement, incommunicado detention, beatings, shackles, and other forms of abuse. . . . Deaths in custody due to police use of torture to coerce confessions from criminal suspects continued to occur." China Report § 1.c. The State Department reports particularly harsh abuse of the Uighurs of Eastern Turkistan:

> Uighurs were sentenced to long prison terms and sometimes executed during the year on charges of separatism. During the strike-hard campaign, which officially concluded in 2003, authorities stated they prosecuted more than 3,000 cases in Xinjiang and held mass sentencing rallies attended by more than 300,000 persons. By its own account, the Government broke up 22 groups engaged in what it claimed were separatist and terrorist activities and meted out 50 death sentences to those charged with separatist acts from January to August. In July, two Muslim Uighurs reportedly were executed after being convicted in Aksu City, Xinjiang, of illegally organizing the East Turkestan People's Party and using armed tactics to split the country. Approximately 15 others were convicted of separatism and sentenced to long prison terms in the same case. In October 2003, Uighur Shaheer Ali was executed after being convicted of terrorism. *He had been repatriated forcibly from Nepal in 2002, where he had been interviewed by the UNHCR and granted refugee status.*

*Id.* § 5 (emphasis added).  These reports emphasize the great potential for harm that Petitioner faces.

The Government's official policy on the rendition of detainees is "not to transfer a person to a country if it determines that it is *more likely than not* that the person will be tortured." Prosper Decl. at 2 (acknowledging the Secretary of Defenses responsibility for the "transfer of detainees from Guantánamo Bay to other governments either for release or for further detention, investigation, prosecution or control, as appropriate").  Ignoring the fact that our Government finds it permissible to unilaterally transfer people—including non-enemy combatants—who've been imprisoned for several years absent judicial process, and without the protections of international law, it's particularly troubling to consider that the Government is willing to transfer a detainee to a country where it perceives there to be a *49% chance that the detainee will be tortured.*  The danger of this policy further highlights the potential harm to Petitioner upon surreptitious transfer from Guantánamo, and the urgent need for the Court to enter a Preliminary Injunction against his removal absent proper notice.

To be sure, at the heart of the Petition is a request by Petitioner to be released from unlawful detention.  Depending on the circumstances, transfer to another country may be an acceptable resolution.  There is strong evidence, however, that "release" or transfer may simply be a change of warden from the Respondents to a foreign state where abuse is routine and due process is unavailable.  Under such circumstances, and in light of the Petitioner's isolation from counsel and the outside world, notice, a hearing, and an impartial fact finding are vital to ensure that any transfer from Guantánamo (i) safeguards the Court's jurisdiction, (ii) protects the Petitioner's right to meaningfully challenge his detention and (iii) will not subject Petitioner to torture or abuse.  Furthermore, the requested relief merely seeks to preserve the status quo.

Accordingly, Petitioner is entitled to a Preliminary Injunction preventing his transfer absent proper notice and a hearing.

## STATEMENT OF FACTS

Due to Government restrictions on communicating with detainees at Guantánamo, undersigned counsel has had no direct contact with Petitioner.  Accordingly, information concerning the background and status of Petitioner is limited.

Upon information and belief, Petitioner is a Uighur and a citizen of China who has been held at Guantánamo for more than three years.  Currently, it is believed that Petitioner is being held in Camp X-Ray.  Counsel is presently arranging a visit to Guantánamo to meet with Petitioner.

## ARGUMENT

### I.    Petitioner is Entitled to a Preliminary Injunction

Petitioner's request meets the most fundamental purpose of preliminary injunctive relief: "to preserve the status quo between the parties pending a final determination of the merits of the action."  13 MOORE'S FEDERAL PRACTICE § 65.20 (3d ed. 2004).  Moreover, each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) Petitioner will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioner is likely to succeed on the merits of his claims; and (4) there is a clear public interest in preventing the Government from rendering individuals to foreign countries for detention and torture.  *See Al-Fayed v. CIA*, 254 F.3d 300, 304 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Where the balance of hardships tips decidedly in favor of the moving party, it will "ordinarily be enough that the [Movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).

### A.   Petitioner is Likely to Succeed on the Merits of his Claims

Petitioner has properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004) ("We...hold that [28 U.S.C.] § 2241 confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantánamo Bay Naval Base."). Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996).

On information and belief, the Government has recently "determine[ed] to reduce the population at Guantánamo, in part by persuading other countries to bear some of the burden of detaining terrorism suspects." *See* Jehl Article. This decision appears to have been the direct result of recent "adverse court rulings" in the Guantánamo detainee cases. *See id.* Releasing Petitioner from Guantánamo, where his detention is subject to *habeas* review, to the custody of a foreign sovereign where it is not, may enable the Government to perpetuate its detention of Petitioner while doing an end-run around this Court's ability to grant effective relief.[1] Thus, the requested injunction is essential to protect the Court's jurisdiction. *See* 28 U.S.C. § 1651(a); *Vision Communications*, 74 F.3d at 291.

---

[1] The Court need not reach here the question of whether rendition would deprive it of jurisdiction. At a minimum, it would practically limit the Court's ability to fashion practical and effective relief.

Moreover, the underlying Petition raises weighty issues that already have been resolved largely in Petitioner's favor by Judge Green in *In re Guantánamo Detainee Cases. See generally* 355 F. Supp. 2d 443 (D.D.C. 2005). As Judge Collyer ruled in *Abdah v. Bush*, "the Petitioners . . . raise serious arguments that require more deliberative consideration concerning whether removing them from the Court's jurisdiction, while insisting on continued detention, is within the province of the executive." Memo. Op. (Mar. 12, 2005) (Civ. No. 04-1254) (hereinafter "Abdah Order") (attached at Ex. 15). Petitioner here asks no more than the opportunity for this Court's deliberative consideration of his claims, claims which raise issues so serious, substantial, and difficult as to warrant maintenance of the status quo. *See id.* at 6 (*citing Washington Metro. Area Transit Comm'n*, 559 F.2d at 844).

B.    The Balance of Harm Manifestly Favors Petitioner

Whether rendered to China, or somewhere else altogether, Petitioner stands to suffer immeasurable and irreparable harm. Transfer to another country, even if "only" for continued imprisonment, may effectively circumvent Petitioner's right to adjudicate the legality of his detention in this Court.

> While the Supreme Court has granted them a right of access to our court system, such a transfer would terminate that right, insofar as it sounds in habeas corpus, because the U.S. courts would no longer have control over their warden. . . . With or without the allegation of improper forms of interrogation in a foreign country, the Court concludes that a continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners.[2]

*Abdah* Order at 7-8.

---

[2] In *Abdah*, Judge Collyer suggested that transfer of petitioners back to their native Yemen for release would cause them no harm because it is the goal of their habeas petition. *Abdah* Order at 8. Here, by contrast, such a presumption is unwarranted as "release" to China may be the functional equivalent of continued detention and torture.

By contrast, Respondents, who, upon information and belief, have already held Petitioner for more than three years, are asked only to give thirty-days advance notice prior to transferring him from Guantánamo. This would merely facilitate judicial review (to the extent necessary). Such a requirement would have no impact "on the Government's efforts to arrange transfers of Guantánamo Bay detainees but would ensure that a judicial officer reviews the Petitioners' rights to prior notice and/or retention in this jurisdiction before the Government actually carries out any such transfer." *Id.* at 9-10.

C.    There is a Clear Public Interest in Preventing the United States from Rendering Petitioner to a Foreign Country for Detention and Torture

The final criterion does not warrant extensive discussion. Public policy favors requiring the Government to give adequate notice of any planned transfer of Petitioner away from Guantánamo and out of the Court's jurisdiction where there is a risk that Petitioner will be delivered into the hands of torturers. No matter how satisfied the executive branch may be that its actions are lawful, the public good requires that a federal litigant—one properly before the Court and represented by counsel—be provided with a meaningful opportunity to contest his transfer to places that may have a demonstrated record of torturing detainees. The notion that the public interest might favor permitting the Government make such a transfer without meaningful review is unthinkable. The Government has detained this individual for more than three years without trial, without counsel, and without charges. There can be no possible harm to national security, or any other legitimate interest, if the Respondents are merely required to give adequate notice of a planned transfer.

**CONCLUSION**

For the foregoing reasons, Petitioner asks that Respondents be required to give Petitioner and his counsel no less than thirty-days advance written notice of any proposed transfer of Petitioner away

from Guantánamo Bay Naval Station. Such notice shall include the proposed destination, and the

proposed date of transfer.

Dated: September 16, 2005

Of Counsel:

Barbara Olshansky
Deputy Director
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone:    (212) 614-6439

Sabin Willett
Neil G. McGaraghan
Jason S. Pinney
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110-1726
Telephone:    (617) 951-8000
Facsimile:    (617) 951-8925

Susan Baker Manning
Hope M. Jarkowski
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC 20036-3406
Telephone:    (202) 778-6150
Facsimile:    (202) 778-6155

David A. Peters
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103
Telephone:    (860) 240-2700
Facsimile:    (860) 240-2800

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EDHAM MAMET,

and

IBRAHIM MAMET, as Next Friend of EDHAM
MAMET,

        Petitioner/Plaintiff,

        v.

GEORGE W. BUSH, et al.,

        Respondents/Defendants.

Case No. 1:05-cv-01602-ESH

**DECLARATION OF JASON
STILES PINNEY RE
APPLICATION FOR
PRELIMINARY INJUNCTION
AND MEMORANDUM IN
SUPPORT THEREOF**

I, Jason Stiles Pinney, declare as follows:

1.    I am over 18 years of age. I have personal knowledge of the facts stated herein, except those stated on information and belief, and, if called upon, could and would testify competently to them. I make this declaration in support of Edham Mamet's (hereinafter "Petitioner"), Application for Preliminary Injunction and Memorandum in Support Thereof. I am associated with Bingham McCutchen LLP, counsel for Petitioner.

2.    A true and correct copy of U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES - 2004 (Feb. 28, 2005) is attached as Exhibit 1.

3.    A true and correct copy of an Interview with Pierre-Richard Prosper, United States Ambassador at Large for War Crimes, in Washington, D.C., (Aug. 25, 2005) is attached as Exhibit 2.

4.    A true and correct copy of an Interview with Richard Boucher, Spokesman for the Department of State, in Washington, D.C. (May 13, 2004) is attached as Exhibit 3.

5.    A true and correct copy of Tr. of Status Conference before the Hon. James Robertson at 18 (Aug. 25, 2005), *Qassim, et al., v. Bush, et al.,* Case 1:05-cv-00497, is attached as Exhibit 4.

6.      A true and correct copy of an article by Josh White, *5 Chinese Detainees Given More Freedom at Guantánamo*, WASH. POST (Aug. 26, 2005) is attached as Exhibit 5.

7.      A true and correct copy of an article by Neil A. Lewis, *Guantánamo detainees pose dilemma: Eligible for release, the Muslim Uighurs could be in danger if returned to China*, N.Y. TIMES (Nov. 15, 2004) is attached as Exhibit 6.

8.      A true and correct copy of AMNESTY INT'L, PEOPLE'S REPUBLIC OF CHINA, UIGHURS FLEEING PERSECUTION AS CHINA WAGES ITS "WAR ON TERROR" (2004) is attached as Exhibit 7.

9.      A true and correct copy of the Declaration of Pierre-Richard Prosper (filed in *Qassim v. Bush)* is attached as Exhibit 8.

10.     A true and correct copy of Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects,* WASH. POST (Mar. 11, 2002) is attached as Exhibit 9.

11.     A true and correct copy of an article by Dana Priest, *Long-Term Plan Sought for Terror Suspects,* WASH. POST (Jan. 2, 2005) is attached as Exhibit 10.

12.     A true and correct copy an article by Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* WASH. POST (Dec. 26, 2002) is attached as Exhibit 11.

13.     A true and correct copy of an article by Andrea Koppel & Elise Labott, *U.S. Officials: Gitmo Transfer talks Active,* CNN (Aug. 10, 2005) is attached as Exhibit 12.

14.     A true and correct copy of an article by Josh White & Robin Wright, *Afghanistan Agrees to Accept Detainees: U.S. Negotiating Guantánamo Transfers* WASH. POST (Aug. 5, 2005) is attached as Exhibit 13.

15.     A true and correct copy of an article by Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba* N.Y. TIMES (Mar. 11, 2005) is attached as Exhibit 14.

16.     A true and correct copy of a Memorandum Opinion in *Abdah, et al., v. Bush et al.*, (Mar. 12, 2005) (Civ. No. 04-1254) is attached as Exhibit 15.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed on September 16, 2005, in Boston, Massachusetts.

_____
                 Jason Stiles Pinney

LITDOCS/615405.1

# **EXHIBIT 1**

# U.S. DEPARTMENT *of* STATE

## China (includes Tibet, Hong Kong, and Macau)

Country Reports on Human Rights Practices - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

(The section for Tibet, the report for Hong Kong, and the report for Macau are appended below.)

The People's Republic of China (PRC) is an authoritarian state in which, as specified in its Constitution, the Chinese Communist Party (CCP or Party) is the paramount source of power. Party members hold almost all top government, police, and military positions. Ultimate authority rests with the 24-member political bureau (Politburo) of the CCP and its 9-member standing committee. Leaders made a top priority of maintaining stability and social order and were committed to perpetuating the rule of the CCP. Citizens lacked the freedom to express opposition to the Party-led political system and the right to change their national leaders or form of government. Socialism continued to provide the theoretical underpinning of national politics, but Marxist economic planning has given way to pragmatism, and economic decentralization has increased the authority of local officials. The Party's authority rested primarily on the Government's ability to maintain social stability; appeals to nationalism and patriotism; Party control of personnel, media, and the security apparatus; and continued improvement in the living standards of most of the country's 1.3 billion citizens. The Constitution provides for an independent judiciary; however, in practice, the Government and the CCP, at both the central and local levels, frequently interfered in the judicial process and directed verdicts in many cases.

The security apparatus is made up of the Ministries of State Security and Public Security, the People's Armed Police, the People's Liberation Army (PLA), and the state judicial, procuratorial, and penal systems. Civilian authorities generally maintained effective control of the security forces. Security policy and personnel were responsible for numerous human rights abuses.

The country's transition from a centrally planned economy toward a market based economy continued. Although state-owned industry remained dominant in key sectors, the Government has taken steps to restructure major state-owned enterprises (SOEs), privatized many small and medium SOEs, and allowed private entrepreneurs increasing scope for economic activity. Rising urban living standards; a burgeoning middle class; greater independence for entrepreneurs; the reform of the public sector, including government efforts to increase transparency and eliminate administrative hurdles; and expansion of the private sector, including foreign-invested enterprises, continued to increase workers' employment options and reduce state control over citizens' daily lives.

The country faced many economic challenges, including reform of SOEs and the banking system, growing unemployment and underemployment, an aging population, the need to construct an effective social safety net, and rapidly widening income gaps between coastal and interior regions and between urban and rural areas. In recent years, between 100 and 150 million persons voluntarily left rural areas to search for better jobs and living conditions in cities, where they were often denied access to government-provided economic and social benefits, including education and health care. The Government continued to relax controls over migration from rural to urban areas, and many cities took steps to expand the rights of migrants and their dependents to basic social services. In the industrial sector, continued downsizing of SOEs contributed to rising urban unemployment that was widely believed to be much higher than the officially estimated 4 percent, with many sources estimating the actual figure to be as high as 20 percent. The Government reported that urban per capita disposable income in 2003 was $1,028 and grew by 9 percent over the previous year, while rural per capita cash income was $317 and grew by 4 percent. Official estimates of the percentage of citizens living in absolute poverty showed little change from the previous year. The Government estimated that 30 million persons lived in poverty, and the World Bank estimated the number whose income does not exceed one dollar per day to be 100 to 150 million persons.

The Government's human rights record remained poor, and the Government continued to commit numerous and serious abuses. Citizens did not have the right to change their government, and many who openly expressed dissenting political views were harassed, detained, or imprisoned, particularly in a campaign late in the year against writers, religious activists, dissidents, and petitioners to the Central Government. Authorities were quick to suppress religious, political, and social groups that they perceived as threatening to government authority or national stability, especially before sensitive dates such as the 15th anniversary of the 1989 Tiananmen massacre and other significant political and religious occasions. However, the Constitution was amended to mention human rights for the first time.

Abuses included instances of extrajudicial killings; torture and mistreatment of prisoners, leading to numerous deaths in custody; coerced confessions; arbitrary arrest and detention; and incommunicado detention. The judiciary was not independent, and the lack of due process remained a serious problem. The lack of due process was particularly egregious in death penalty cases, and the accused was often denied a meaningful appeal. Executions often took place on the day of conviction or on the denial of an appeal. In Xinjiang, trials and executions of Uighurs charged with separatism continued. Government pressure continued to make it difficult for lawyers to represent criminal defendants. The authorities routinely violated legal protections in the cases of political dissidents and religious figures. They generally attached higher priority to suppressing political opposition and maintaining public order than to enforcing legal norms or protecting individual rights. According to 2003 government statistics, more than 250,000 persons were serving sentences in "reeducation-through-labor" camps and other forms of administrative detention not subject to judicial review. Other experts reported that more than 310,000 persons were serving sentences in these camps in 2003.

Throughout the year, the Government prosecuted individuals for subversion and leaking state secrets as a means to harass and intimidate, while others were detained for relaying facts about Chinese human rights issues to those outside the country. Among those detained or convicted on such charges were Christian activists Zhang Rongliang, Liu Fenggang, Xu Yonghai and Zhang Shengqi, and journalists Zhao Yan, Shi Tao, Li Changqin and members of the independent PEN Center's China branch. The Government detained individuals administratively to suppress dissent and intimidate others. In April and June, authorities detained many who planned 15th anniversary commemorations of the 1989 Tiananmen massacre, including activist Hu Jia and "Tiananmen Mothers" organization founders. Similarly, military officials detained Dr. Jiang Yanyong because he wrote to government leaders requesting an official reassessment of the 1989 Tiananmen massacre.

The number of individuals serving sentences for the now-repealed crime of counterrevolution was estimated at 500 to 600; many of these persons were imprisoned for the nonviolent expression of their political views. Nongovernmental organizations (NGOs) estimated that as many as 250 persons remained in prison for political activities connected to the 1989 Tiananmen demonstrations.

The authorities granted early release from prison to Tibetan nun Phuntsog Nyidrol in February and China Democracy Party (CDP) co-founder Wang Youcai in March. Counterrevolutionary prisoners Liu Jingsheng and Chen Gang were also released during the year, after their sentences were reduced. However, many political prisoners, including Internet activists Xu Wei, Yang Zili, and Huang Qi; Uighurs Rebiya Kadeer and Tohti Tunyaz; journalists Zhao Yan and Jiang Weiping; labor activists Yao Fuxin and Xiao Yunliang; civil activist Mao Hengfeng; Catholic Bishop Su Zhimin; Christian activists Zhang Rongliang, Zhang Yinan, Liu Fenggang, and Xu Yonghai; Tibetans Jigme Gyatso, Tenzin Deleg, and Gendun Choekyi Nyima; Inner Mongolian cultural activist Hada; CDP co-founder Qin Yongmin; and political dissident Yang Jianli remained imprisoned or under other forms of detention, some in undisclosed locations.

The Government used the international war on terror as a pretext for cracking down harshly on suspected Uighur separatists expressing peaceful political dissent and on independent Muslim religious leaders. The human rights situation in the Tibet Autonomous Region (TAR) and in some Tibetan regions outside the TAR also remained poor (see Tibet Addendum).

The Government maintained tight restrictions on freedom of speech and of the press, and a wave of detentions late in the year signaled a new campaign targeting prominent writers and political commentators. The Government regulated the establishment and management of publications, controlled broadcast and other electronic media, censored some foreign television broadcasts, and jammed some radio signals from abroad. During the year, publications were closed and otherwise disciplined for publishing material deemed objectionable by the Government, and journalists, authors, academics, Internet writers, and researchers were harassed, detained, and arrested by the authorities. Although the scope of permissible private speech has continued to expand in recent years, the Government continued and intensified efforts to monitor and control use of the Internet and other wireless technology, including cellular phones, pagers, and instant messaging devices. During the year, the Government blocked many websites, began monitoring text messages sent by mobile phones, and pressured Internet companies to censor objectionable content. NGOs reported that 43 journalists were imprisoned at year's end.

The Government severely restricted freedom of assembly and association and infringed on individuals' rights to privacy. The authorities harassed and abused many who raised public grievances, including petitioners to the Central Government. The Government outlawed public commemoration of the 1989 Tiananmen massacre. Thousands of individuals protesting forced evictions and workplace and health issues were detained during the year. Petitioner issues were increasingly considered suspect by the Government, and petitioner leader Ye Guozhu was arrested in August while seeking permission to hold a 10,000-person rally against forced eviction.

While the number of religious believers in the country continued to grow, the Government's record on respect for religious freedom remained poor, and repression of members of unregistered religious groups increased in some parts of the country. Members of unregistered Protestant and Catholic congregations, Muslim Uighurs, and Tibetan Buddhists, including those residing within the TAR (see Tibet Addendum) experienced ongoing and, in some cases, increased official interference, harassment, and repression. Government officials increased vigilance against "foreign infiltration under the guise of religion." The Government detained and prosecuted a number of underground religious figures in both the Protestant and Catholic Church. Among them, Protestants Liu Fenggang, Xu Yonghai, and Zhang Shengqi were sentenced for sending to overseas organizations information that the Government considered sensitive.

The extent of religious freedom varied significantly from place to place. The Government continued to enforce regulations requiring all places of religious activity to register with the Government. Many provincial authorities required groups seeking to register to come under the supervision of official, "patriotic" religious organizations. Religious worship in many officially registered churches, temples, and mosques occurred without interference, but unregistered churches in some areas were destroyed, religious services were broken up, and church leaders and adherents were harassed, detained, or beaten. At year's end, scores of religious adherents remained in prison because of their religious activities. No visible progress was made in normalizing relations between the official Patriotic Catholic Church and Papal authorities, although both the Government and the Vatican stated that they were ready to resume negotiations aimed at establishing diplomatic relations. The Government continued its crackdown against the Falun Gong spiritual movement, and tens of thousands of practitioners remained incarcerated in prisons, extrajudicial reeducation-through-labor camps, and psychiatric facilities. Several hundred Falun Gong adherents reportedly have died in detention due to torture, abuse, and neglect since the crackdown on Falun Gong began in 1999.

Freedom of movement continued to be restricted. However, the Government continued to relax its residence-based registration requirements. The Government denied the U.N. High Commissioner for Refugees (UNHCR) permission to operate along its border with North Korea and deported several thousand North Koreans, many of whom faced persecution and some of whom may have been executed upon their return, as provided in North Korean law. Abuse and detention of North Koreans in the country was also reported.

The Government did not permit independent domestic NGOs to monitor human rights conditions. However, in September, the U.N. Working Group on Arbitrary Detention visited Beijing, Sichuan, and the TAR and toured 10 detention facilities. Although the Government extended invitations to the U.N. Special Rapporteur for Torture and the U.N. Special Rapporteur for Religious Intolerance, those visits did not occur by year's end. The Government also extended an invitation to the leaders of the U.S. Commission on International Religious Freedom, but the visit did not occur due to restrictive conditions that the Government placed on the visit. In December, the Government postponed a planned seminar by the Organization for Economic Cooperation on Socially Responsible Investment, which resulted in the cancellation of a visit by the OECD's Trade Union Advisory Council to discuss labor issues.

Violence against women, including imposition of a coercive birth limitation policy that resulted in instances of forced abortion and forced sterilization, continued to be a problem, as did prostitution. Discrimination against women, persons with disabilities, and minorities persisted. Trafficking in persons continued to be a serious problem.

Labor demonstrations, particularly those protesting nonpayment of back wages, continued. Workplace safety remained a serious problem, particularly in the mining industry. The Government continued to deny internationally recognized worker rights, including freedom of association. Forced labor in prison facilities remained a serious problem.

Significant legal reforms continued during the year, including a Constitutional amendment specifically to include protection of citizens' human rights and legally obtained private property for the first time. In July, the Government enacted the Administrative Procedures Law, which prohibits government agencies from violating citizens' rights or seizing property without clear legal authority. A new infectious disease law was enacted prohibiting discrimination against people with HIV/AIDS and Hepatitis B, and employment discrimination against those with HIV/AIDS and Hepatitis B was outlawed. Treatment of some migrant workers was improved in many major cities through the passage of laws intended to guarantee migrant children access to public education and to protect migrant workers' rights to receive their salary on a regular basis. The Government enacted reforms related to interrogation of detainees, fighting corruption, procedures for requisitioning land, confiscation of personal property, extending social security, regulating religion, and providing legal aid. At year's end, it remained unclear how widely these reforms would be implemented and what effect they would have.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

During the year, politically motivated and other arbitrary and unlawful killings occurred. While no official statistics on deaths in custody were available, state-run media reported that 460 people were killed by law enforcement officials and over 100 seriously injured through abuse or dereliction of duty in 2003. In August, the Sichuan Provincial Procuratorate issued a report stating that, in the first half of the year, 118 individuals in Sichuan Province died and 10 were severely injured due to malfeasance by police and prison officials. In June, state-run media reported that in Guizhou Province police beat Jiang Zongxiu to death after she was detained administratively for distributing Bibles (see Section 2.c.). In April, Gu Xianggao died in police custody in Harbin, Heilongjiang Province. Public security officials offered compensation to his family in connection with his death. In these cases, officials denied that the deaths occurred because of police abuse, but others who viewed the bodies stated that beatings had occurred (see Sections 1.c. and 1.d.).

Several hundred Falun Gong adherents reportedly have died in detention due to torture, abuse, and neglect since the crackdown on Falun Gong began in 1999 (see Section 2.c). Some groups based abroad estimated that as many as 2,000 Falun Gong practitioners have died as a result of official persecution.

Trials involving capital offenses sometimes took place under circumstances involving severe lack of due process and with no meaningful appeal. Executions often took place on the day of conviction or appeal. For example, on international antidrug day, June 26, dozens of prisoners were executed, many within hours of their trial and conviction. In Xinjiang, executions of Uighurs accused by authorities of separatism, which some observers claimed were politically motivated, were reported (see Section 5). The Government regarded the number of death sentences it carried out as a state secret. However, in March, a National People's Congress deputy asserted that nearly 10,000 cases per year "result in immediate execution." The statement sparked calls for reform, including returning the power to issue death sentences from provincial courts to the Supreme People's Court (SPC) and eliminating the death penalty for economic and other nonviolent crimes. Nonetheless, media reports stated that approximately 10 percent of executions were for economic crimes, especially corruption. SPC and Ministry of Justice officials stated that the 10,000 executions per year figure is exaggerated. Amnesty International (AI) reported that China executed more persons than any other country. Some foreign academics estimated that as many as 10,000 to 20,000 persons are executed each year.

b. Disappearance

The Government used incommunicado detention. The law requires notification of family members within 24 hours of detention, but many individuals were held without notification for significantly longer periods, especially in sensitive political cases. Dr. Jiang Yanyong and his wife were detained on June 1 and held incommunicado for several weeks in connection with a letter he wrote to government leaders about the 1989 Tiananmen massacre (see Section 2.d.). New York Times researcher Zhao Yan also was held for several days in September before authorities notified his relatives and employer (see Section 2.a.).

By year's end, the Government had not provided a comprehensive, credible accounting of all those missing or detained in connection with the suppression of the 1989 Tiananmen demonstrations. Public calls for a reassessment of the 1989 Tiananmen massacre increased during the year, especially around the 15th anniversary of the crackdown.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Prison Law forbids prison guards from extorting confessions by torture, insulting prisoners' dignity, and beating or encouraging others to beat prisoners; however, police and other elements of the security apparatus employed torture and degrading treatment in dealing with some detainees and prisoners. While senior officials acknowledged that torture and coerced confessions were chronic problems, they did not take sufficient measures to end these practices. Former detainees reported credibly that officials used electric shocks, prolonged periods of solitary confinement, incommunicado detention, beatings, shackles, and other forms of abuse.

Since the crackdown on Falun Gong began in 1999, several hundred Falun Gong adherents reportedly died in custody due to torture, abuse, and neglect (see Section 2.c.). During the year, the Government arrested Falun Gong members and formally charged them with manufacturing claims that they were tortured.

During the year, police continued to use torture to coerce confessions from criminal suspects. A Supreme People's Procuratorate (SPP) investigation uncovered more than 4,000 cases of official abuse, including torture and extracting confessions through coercion, from 2001 to 2003. Lawyers and other observers continued to point to the December 2003 conviction and execution of crime syndicate figure Liu Yong on corruption charges as a prominent example of the Government ignoring evidence of torture in the interest of fighting crime. Liu was sentenced to death in 2002, but Beijing-based defense attorneys discovered evidence that a key witness' confession was coerced through torture. As a result, the Liaoning High Court overturned Liu's death sentence in August 2003. Yielding to public opposition to the ruling, the SPC reinstated the death penalty in December 2003, and Liu was executed the same day.

Mao Hengfeng, a Shanghai housing activist and organizer sentenced to reeducation through labor for staging "disorderly visits" to Government offices, reportedly suffered various forms of torture. She reportedly was held with drug addicts who were allowed to abuse her, was strapped to her bed for hours at time, was force-fed an unidentified medicine that turned her mouth black, and, on one occasion, had her limbs pulled in different directions for a period of 2 days.

The Government made some efforts to address the problem of torture during the year. Some provincial governments issued regulations stipulating that judges and police who used torture to extract confessions from suspects would face dismissal. In May, the SPP announced a 1-year campaign to punish officials who infringed on human rights, including officials who coerced confessions through torture or illegally detained or mistreated prisoners. In August, the Government issued new regulations governing the length and conditions of interrogation for pretrial detainees, including protections for pregnant women, juveniles, and the elderly. Police officers who tortured suspects faced dismissal and criminal prosecution in some cases. For example, in June two police officers in Bazhou, Hebei Province, were sentenced to life in prison and a suspended death sentence after torturing a suspect to death and hiding the body in 2001. In July, two Sichuan Province police officers were sentenced to 12 years and 1 year in prison, respectively, in another case in which a suspect died after being tortured.

During the year, there were reports of persons, including Falun Gong adherents, sentenced to psychiatric hospitals for expressing their political or religious beliefs (see Section 1.d.). Some reportedly were forced to undergo electric shock treatments.

Petitioners and other activists sentenced to administrative detention also reported being tortured. Such reports included being strapped to beds or other devices for days at a time, being beaten, being forcibly injected or fed medications, and being denied food and use of toilet facilities.

The Ministry of Justice administered more than 670 prisons with a population of over 1.5 million inmates, according to official statistics. In addition, 33 jails for juveniles housed over 19,000 juvenile offenders. The country also operated hundreds of administrative detention centers, which were run by security ministries and administered separately from the Ministry of Justice and the formal court system (see Section 2.d.)

Conditions in penal institutions for both political prisoners and common criminals generally were harsh and frequently degrading. Prisoners and detainees often were kept in overcrowded conditions with poor sanitation. Prison capacity became an increasing problem in some areas, including Guangdong Province. Food often was inadequate and of poor quality, and many detainees relied on supplemental food and medicines provided by relatives. Some prominent dissidents were not allowed to receive supplemental food and medicine from relatives. Political prisoners often were kept segregated from each other and placed with common criminals, who sometimes beat political prisoners at the instigation of guards. Xu Guang, a former CDP member released from prison in September, stated that he was beaten and placed in a metal cage for 2 months after he commemorated the anniversary of the 1989 Tiananmen massacre while in Qiaoci Prison in Hangzhou, Zhejiang Province. Newly arrived prisoners or those who refused to acknowledge committing crimes were particularly vulnerable to being beaten in prison. In January, political dissident He Depu was reportedly beaten by guards at Beijing No. 2 Prison and made deaf in one ear. Authorities acknowledged He's deafness, but asserted that he was already deaf when he entered prison, a claim denied by his family members. Prolonged use of electric shocks and use of a rack-like disciplinary bed were reported at Inner Mongolia's Chifeng Prison. Inner Mongolian cultural activist Hada was among those tortured, according to credible NGO reports. Chinese prison management relied on the labor of prisoners both as an element of punishment and to fund prison operations (see Section 6.c.).

Adequate, timely medical care for prisoners continued to be a serious problem, despite official assurances that prisoners have the right to prompt medical treatment if they become ill. In August, businessman Wu Daiyou died in a Chongqing prison. His family claimed he contracted tuberculosis in prison and died because authorities denied him needed medical treatment. Political prisoners continued to have difficulties obtaining medical treatment, despite repeated appeals on their behalf by their families and the international community. Foreign citizen Jude Shao suffered a serious heart ailment in a Shanghai prison that authorities were unable to treat. Foreign legal residents Yang Jianli and Wang Bingzhang suffered strokes in prison, but authorities rejected their requests for outside medical care. Others with health concerns included Uighur businesswoman Rebiya Kadeer; democracy activists Qin Yongmin, Hua Di, and He Depu; Internet writers Yang Zili and Luo Yongzhang; labor activists Xiao Yunliang, Yao Fuxin, Hu Shigen, and Zhang Shanguang; civil activist Mao Hengfeng; Inner Mongolian activist Hada; and religious prisoners Zhang Rongliang, Liu Fenggang, Xu Yonghai, Gong Shengliang, Chen Jingmao, and Bishop Su Zhimin. During the year, some political prisoners went on hunger strikes in prison to protest their treatment.

Special prisons to segregate HIV-positive prisoners and provide care to those with HIV/AIDS were established during the year, including facilities in Henan and Zhejiang Provinces. In July, supporters of a Shangqiu, Henan Province AIDS orphanage and school, which the Government claimed was operating illegally, were detained for contesting the closure of the institution. Wang Guofeng and Li Suzhi, who have HIV, claimed they received inadequate treatment while detained and that authorities refused to provide them with test results or allow them to travel to Beijing to see specialists after they were released on bail. The Government stated they were denied imported HIV medications because such medicines likely were smuggled into the country.

Acknowledging guilt was a precondition for receiving certain privileges, including the ability to purchase outside food, make telephone calls, and receive family visits. Prison officials often denied privileges to those, including political prisoners, who refused to acknowledge guilt or obey other prison rules. After CCP activist Wang Bingzhang told jailers he intended to stage a hunger strike, prison staff withheld prison visits, letters, telephone privileges, and other communication for 6 months as punishment. Foreign Falun Gong member Charles Lee staged a hunger strike to protest forced "reeducation" sessions he was given in prison. Some prominent political prisoners, however, received better than standard treatment.

Conditions in administrative detention facilities, such as reeducation-through-labor camps, were similar to those in prisons. Beating deaths occurred in administrative detention. The March 2003 death of university graduate Sun Zhigang in a custody-and-repatriation camp designed to hold illegal migrants focused public attention on abuses in the administrative detention system. Under the custody-and-repatriation system, police detained and forcibly repatriated to their home provinces migrants, petitioners, and political activists caught without an identification card, work permit, or temporary residence permit. Public outcry following Sun's death played an important role in the State Council's decision, in June 2003, to abolish the custody-and-repatriation system and convert custody-and-repatriation camps across the country into voluntary humanitarian aid shelters for the homeless. Initial reports indicated that most current residents of the camps are indeed there voluntarily. In June, a facility employee who urged inmates to beat Sun was sentenced to death. During the year, one inmate was given a suspended death sentence, and 17 others received prison sentences in connection with Sun's death.

Deaths in reeducation-through-labor camps led to calls to reform or abolish that system as well. Reform of the reeducation-through-labor law was placed on the legislative agenda of the National People's Congress (NPC), but no

concrete steps were taken to enact a new law during the year. Scholars publicly discussed reforms, including introducing judicial oversight of reeducation-through-labor sentences, allowing lawyers to participate in hearings prior to reeducation sentences, limiting the types of behavior punishable by reeducation, establishing alternatives to incarceration, and shortening the maximum term of reeducation.

Sexual and physical abuse and extortion were reported in some detention centers. Forced labor in prisons and reeducation-through-labor camps was also common.

The Government generally did not permit independent monitoring of prisons or reeducation-through-labor camps, and prisoners remained inaccessible to most international human rights organizations. However, the Government hosted a visit by the U.N. Working Group on Arbitrary Detention that included visits to 10 detention facilities in Beijing, Chengdu, and the TAR (see Section 1.d.). The Government also agreed to invite the U.N. Special Rapporteur for Torture, but the visit stalled, in part because of the Government's refusal to allow him to visit prisons without advance notice (see Section 4). By year's end, the Government had not announced any progress in talks with the International Committee of the Red Cross (ICRC) on an agreement for ICRC access to prisons, although there were several rounds of consultations between the ICRC and the Government about allowing the ICRC to open an office in Beijing. Monthly working level meetings intended to renew cooperation on the U.S.-China Prison Labor Memorandum of Understanding continued during the year, and visits were conducted in July, September, and December (see Section 6.c).

d. Arbitrary Arrest or Detention

Arbitrary arrest and detention remained serious problems. The law permits authorities, in some circumstances, to detain persons without arresting or charging them, and persons may be sentenced administratively to up to 3 years in reeducation through-labor camps and other administrative detention facilities without a trial. Because the Government tightly controlled information, it was impossible to determine the total number of persons subjected to new or continued arbitrary arrest or detention. According to 2003 official government statistics, more than 250,000 persons were in reeducation-through-labor camps. Other experts reported that more than 310,000 persons were serving sentences in these camps in 2003. According to published reports of the Supreme People's Procuratorate, the country's 340 reeducation-through-labor facilities had a total capacity of about 300,000 people. In addition, special administrative detention facilities existed for drug offenders and prostitutes. In 2002, these facilities held over 130,000 offenders, and the number reportedly has increased. An additional form of administrative detention for migrants and homeless persons, known as custody and repatriation, was abolished in 2003 and converted into a system of over 900 voluntary humanitarian aid shelters (see Section 1.c.). According to official statistics, those facilities had served more than 670,000 people from August 1, 2003 to November 30, 2004. The Government also confined some Falun Gong adherents, petitioners, labor activists, and others to psychiatric hospitals.

Approximately 500 to 600 individuals continued to serve sentences for the now-repealed crime of counterrevolution. Many of these persons were imprisoned for the nonviolent expression of their political views (see Section 1.e.).

The Ministry of Public Security (MPS) coordinates the country's law enforcement, which is administratively organized into local, county, provincial, and specialized police agencies. Recent efforts have been made to strengthen historically weak regulation and management of law enforcement agencies; however, judicial oversight is limited and checks and balances are absent. Corruption at the local level was widespread. Police officers reportedly coerced victims of crimes, took individuals into custody without due cause, arbitrarily collected fees from individuals charged with crimes, and mentally and physically abused victims and perpetrators. The SPP investigated approximately 1,980 police officials for dereliction of duty in the period from January to September. Among them was a Hunan Province police official who was sentenced to 6 months in prison for failing to investigate the abduction and rape of a 9-year-old girl. Public interest lawyers also sued police in a Hunan Province village for failing to investigate the murder of a young woman, allegedly committed by her police officer boyfriend. Through September, the SPP filed 938 corruption cases against 1,078 officials working in prisons, jails, and other detention facilities.

Extended, unlawful detention by security officials remained a serious problem. The SPP reported that from 1998 through 2002 there were 308,182 persons detained for periods longer than permitted by law. In 2003, the Government initiated a campaign to resolve cases of extended, unlawful detention. According to state media, 7,064 criminal suspects endured extended unlawful detention during the year (including some whose detention was prolonged from 2003). Courts reviewed and resolved 6,775 of those cases from January to October 2004, leaving only 289 cases unresolved, the Government stated. In March, the SPC and SPP reported to the National People's Congress that they had reviewed nearly 30,000 extended detention cases in 2003, including many that dated back several years, and resolved nearly all. In most cases, those detained unlawfully were formally charged or convicted, but a few, including Internet writer Liu Di, were released. Procuratorates in Hainan and Guizhou Provinces formally punished local police officers who unlawfully extended a suspect's term in custody.

According to the Criminal Procedure Law, police may unilaterally detain a person for up to 37 days before releasing him or formally placing him under arrest. After a suspect is arrested, the law allows police and prosecutors to detain him for up to 6 and one-half months before trial while a case is being further investigated. In practice, pretrial detention in some cases lasted for a year or longer. Dissident Yang Jianli was held without conviction for more than 2 years before his verdict and 5-year sentence on espionage and illegal entry charges was announced in May. Originally detained in April 2002, he was not tried until August 2003. The U.N. Working Group on Arbitrary Detention found that the country's pretrial detention of Yang Jianli violated the Universal Declaration on Human Rights and the International Covenant on

China (includes Tibet, Hong Kong, and Macau)                Page 7 of 63
Case 1:05-cv-01602-UNA     Document 7     Filed 09/20/2005     Page 22 of 214
Civil and Political Rights.

The law stipulates that authorities must notify a detainee's family or work unit of his detention within 24 hours. However, in practice, failure to provide timely notification remained a serious problem, particularly in sensitive political cases. Under a sweeping exception, officials are not required to provide notification if doing so would "hinder the investigation" of a case. In some cases, police treated those with no immediate family more severely. Police continued to hold individuals without granting access to family members or lawyers, and trials continued to be conducted in secret. Detained criminal suspects, defendants, their legal representatives, and close relatives were entitled to apply for bail, but, in practice, few suspects were released pending trial.

The Criminal Procedure Law does not address the reeducation-through-labor system, which allows non-judicial panels of police and local authorities, called Labor Reeducation Committees, to sentence persons to up to 3 years in prison-like facilities. The committees can also extend an inmate's sentence for an additional year. Defendants legally were entitled to challenge reeducation-through-labor sentences under the Administrative Litigation Law. They could appeal for a reduction in, or suspension of, their sentences; however, appeals rarely were successful. Many other persons were detained in similar forms of administrative detention, known as "custody and education" (for example, for prostitutes and their clients) and "custody and training" (for minors who committed crimes). A special form of reeducation center was used to detain Falun Gong practitioners who had completed terms in reeducation through labor, but whom authorities decided to detain further.

According to foreign researchers, the country had 20 "ankang" institutions (high-security psychiatric hospitals for the criminally insane) directly administered by the Ministry of Public Security. Some dissidents, persistent petitioners, and others were housed with mentally ill patients in these institutions. "Patients" in these hospitals were reportedly given medicine against their will and forcibly subjected to electric shock treatment. The regulations for committing a person into an ankang facility were not clear. Credible reports indicated that a number of political and trade union activists, "underground" religious believers, persons who repeatedly petitioned the Government, members of the banned China Democratic Party, and Falun Gong adherents were incarcerated in such facilities during the year. These included Wang Miaogen, Wang Chanhao, Pan Zhiming, and Li Da, who were reportedly held in an ankang facility run by the Shanghai Public Security Bureau. The Government negotiated with the World Psychiatric Association to resolve a motion pending in previous years that would have expelled the country from the organization for using psychiatric facilities to incarcerate political prisoners, but a planned WPA visit to the country did not take place.

Administrative detention was frequently used as a vehicle to intimidate political activists and prevent public demonstrations (see Section 2.b.). For example, authorities detained several persons in the period before the April "Qingming" memorial holiday as a means to prevent public commemoration of the 1989 Tiananmen massacre. Tiananmen Mothers organization co-founders Ding Zilin, Jiang Xianling, and Huang Jinping were detained at separate locations in late March. AIDS activist Hu Jia also was detained after he stated his intention to commemorate the anniversary on their behalf. All were retained eventually, but some were prevented from returning to Beijing until after the holiday was over. On June 1, military officials detained retired PLA doctor Jiang Yanyong, who in 2003 had helped focus international attention on the spread of Severe Acquired Respiratory Syndrome (SARS) in Beijing, because he wrote to government leaders requesting a reassessment of the 1989 Tiananmen crackdown. The 72-year-old Jiang and his wife, Hua Zhongwei, were interrogated in an undisclosed location. Hua was released on June 15. Jiang was released without charges on July 20, but he was forbidden to speak with journalists or foreigners, and he remained in a form of house arrest. Dr. Jiang also was pressured not to leave the country to accept an award (see Section 2.d.).

Arrests on charges of revealing state secrets, subversion, and common crimes were used during the year by authorities to suppress political dissent and social advocacy. Citizens were detained and prosecuted during the year under broad and ambiguous state secrets laws for, among other actions, disclosing information on criminal trials, meetings, and government activity. The number of persons executed each year has been deemed by the Government to be a state secret. Information could retroactively be classified a state secret by the Government. Dozens of citizens writing on the Internet or engaging in on-line chat about political topics were detained on state secrets and subversion charges during the year (see Section 2.a.). More than 100 intellectuals signed a petition urging the Government to revise the subversion law because its use in the prosecution of Internet writer Du Daobin contradicted the constitutional guarantee of free speech.

In September, the U.N. Working Group on Arbitrary Detention visited detention facilities in Beijing, Sichuan Province, and the TAR. Although satisfied with its access, the Working Group noted that all four recommendations from its 1997 visit to China still had not been implemented and continued to be serious problems. First, the law lacks a presumption of innocence until proven guilty. Second, it fails to define "endangering national security" so that overly broad prosecutions can and do occur. Third, the law includes no protection for those peacefully exercising rights protected by the Universal Declaration of Human Rights. Fourth, no "real judicial control" exists over the reeducation-through-labor system. The Working Group noted the Government's announced plan to adopt legislation that would address deficiencies in reeducation through labor and regulate the use of psychiatric institutions in administrative detention.

Police sometimes harassed and detained relatives of dissidents. Journalists also were detained or threatened during the year, often when their reporting met with the Government's or local authorities' disapproval (see Section 2.a.). For example, New York Times researcher Zhao Yan was detained in September shortly after the newspaper published an article correctly predicting the resignation of Jiang Zemin as chairman of the Central Military Commission. The newspaper denied that Zhao had any involvement with the story, and prosecutors did not disclose the basis for the

charges, citing state secrets laws (see Section 2.a.). In December, farmers' advocate and writer Li Boguang and three members of the independent PEN Center promoting writers' freedoms were among those detained in what appeared to be a campaign targeting writers (see Section 2.a.). Local authorities used the Government's campaign against cults to detain and arrest large numbers of religious practitioners and members of spiritual groups, including Christian leader Zhang Rongliang (see Section 2.c.).

The campaign that began in 1998 against the China Democracy Party (CDP), an opposition party, continued during the year. Dozens of CDP leaders, activists, and members have been arrested, detained, or confined as a result of this campaign. Since December 1998, over 40 core leaders of the CDP have been given severe punishments on subversion charges. Xu Wenli, Wang Youcai, and Qin Yongmin were sentenced in 1998 to prison terms of 13, 12, and 11 years, respectively. Xu Wenli and Wang Youcai were released on medical parole to the United States in December 2002 and March 2004, respectively. Qin remained in prison at year's end. During the year, Sang Jiancheng was sentenced to a 3-year prison term in connection with an open letter calling for political reform and a reappraisal of the official verdict on the 1989 Tiananmen massacre signed by 192 activists, including former CDP members, prior to the 16th Party Congress in November 2002. Internet writer Ouyang Yi, one of the signers of the open letter, was released after serving a 2-year prison sentence in December, but other signers of the letter remained jailed.

Since the Government banned the Falun Gong spiritual group in 1999, criminal proceedings involving accused Falun Gong activists were held almost entirely outside the formal court system. In December, a Beijing attorney sent an open letter to the National People's Congress highlighting issues of arbitrary detention and unlawful process in cases involving Falun Gong. The letter focused on the April detention and subsequent administrative sentencing of his client, Huang Wei of Shijiazhuang, Hebei Province, who was released in 2002 from a 3-year reeducation sentence for Falun Gong activities. On April 13, Huang was detained again, his home was searched, and a security official signed Huang's name on a confession, according to the open letter. Huang was sentenced on June 3 to three more years of reeducation in connection with Falun Gong. When Huang tried to sue the Government in protest, his attorney was denied permission to see his client. According to the letter, court and prison authorities told the attorney that only the "610 Office" of the Ministry of Justice could address Falun Gong matters. In the process, the letter described how judges explained how courts are under strict orders not to accept Falun Gong cases and that, in such cases, the courts do not follow normal pretrial procedures. The attorney's letter concluded that such treatment of accused Falun Gong adherents was unlawful.

The campaign against separatism in Xinjiang specifically targeted the "three evils" of extremism, splittism, and terrorism as the major threats to Xinjiang's social stability. Because authorities in Xinjiang regularly failed to distinguish carefully among those involved in peaceful activities in support of independence, "illegal" religious activities, and violent terrorism, it was often difficult to determine whether particular raids, detentions, arrests, or judicial punishments targeted those seeking to worship, those peacefully seeking political goals, or those engaged in violence (see Section 5).

e. Denial of Fair Public Trial

The Constitution states that the courts shall, in accordance with the law, exercise judicial power independently, without interference from administrative organs, social organizations, and individuals. However, in practice, the judiciary was not independent. It received policy guidance from both the Government and the Party, whose leaders used a variety of means to direct courts on verdicts and sentences, particularly in politically sensitive cases. At both the central and local levels, the Government frequently interfered in the judicial system and dictated court decisions. Trial judges decide individual cases under the direction of the trial committee in each court. In addition, the Communist Party's Law and Politics Committee, which includes representatives of the police, security, procuratorate, and courts, has authority to review and influence court operations at all levels of the judiciary; the Committee, in some cases, altered decisions. People's Congresses also had authority to alter court decisions, but this happened rarely. Corruption and conflicts of interest also affected judicial decision-making. Judges were appointed by the People's Congresses at the corresponding level of the judicial structure and received their court finances and salaries from those government bodies. This sometimes resulted in local authorities exerting undue influence over the judges they appointed and financed.

The Supreme People's Court (SPC) is the highest court, followed in descending order by the higher, intermediate, and basic people's courts. These courts handle criminal, civil, and administrative cases, including appeals of decisions by police and security officials to use reeducation through labor and other forms of administrative detention. There were special courts for handling military, maritime, and railway transport cases.

Corruption and inefficiency were serious problems in the judiciary as in other areas (see Section 3). Safeguards against corruption were vague and poorly enforced.

In recent years, the Government has taken steps to address systemic weaknesses in the judicial system and to make the system more transparent and accountable to public scrutiny. In 2003, the SPP prosecuted 9,720 officials involved in investigating, prosecuting, or adjudicating criminal cases. In its March report to the National People's Congress (NPC), the SPC reported that 794 judges were investigated for corruption in 2003, and 52 faced criminal prosecution. SPC regulations require all trials to be open to the public, with certain exceptions, such as cases involving state secrets, privacy, and minors. The legal exception for cases involving state secrets was used to keep politically sensitive proceedings closed to the public and even to family members in some cases. Under the regulations, "foreigners with valid identification" are to be allowed the same access to trials as citizens. As in past years, foreign diplomats and journalists sought permission to attend a number of trials only to have court officials reclassify them as "state secrets"

cases, thus closing them to the public. Some trials were broadcast, and court proceedings were a regular television feature. A few courts published their verdicts on the Internet.

Citizens continued to use the court system to seek legal redress against government malfeasance. According to official statistics, 110,199 administrative lawsuits were filed against the Government in 2002, slightly fewer than in the previous year. Administrative actions were affirmed 18 percent of the time, transferred 23 percent of the time, and dismissed or rejected 59 percent of the time, according to those 2002 statistics. Decisions of any kind in favor of dissidents remained rare.

Court officials continued efforts to enable the poor to afford litigation by exempting, reducing, or postponing court fees. During the year, new regulations went into effect requiring law firms and private attorneys to provide some legal aid. Criminal and administrative cases remained eligible for legal aid, although the vast majority of defendants still went to trial without a lawyer. During the year, courts waived over $128 million (RMB 1.057 billion) in litigation costs. Legal aid to migrant workers accounted for 137,656 cases; in most cases, migrant workers sued for unpaid wages. State media claimed that the number of attorneys in the country increased to 102,000, but the supply of legal aid attorneys remained inadequate to meet demand. For example, the number of registered legal aid attorneys in Guangdong Province dropped 25 percent in 2003, and no legal aid agency existed in 45 counties in Guangxi Province. Nonattorney legal advisors and government employees provided the only legal aid options in many areas.

During the year, the conviction rate in criminal cases remained over 95 percent. In 2003, 730,355 of the 747,096 persons (97.7 percent) whose criminal cases were resolved at trial were found guilty and received criminal punishment. Of this number 158,562 (21.2 percent) were sentenced to terms of imprisonment of 5 years or greater. In practice, criminal defendants often were not assigned an attorney until a case was brought to court. In many politically sensitive trials, which rarely lasted more than several hours, the courts handed down guilty verdicts immediately following proceedings. Defendants who refused to acknowledge guilt often received harsher sentences than those who confessed. There was an appeals process, but appeals rarely resulted in reversals.

Police and prosecutorial officials often ignored the due process provisions of the law and of the Constitution. The lack of due process was particularly egregious in death penalty cases. There were over 60 capital offenses, including nonviolent financial crimes such as counterfeiting currency, embezzlement, and corruption. Executions were often carried out on the date of conviction (see Section 1.a.). The SPC reported that, in 2003, it reviewed 300 serious criminal cases, including capital cases, and affirmed 182 of them. Tibetan Lobsang Dondrub was executed in January 2003 for his alleged connection to a series of bombings in 2002. His execution occurred despite government assurances that he would be afforded full due process and that the national-level Supreme People's Court would review his sentence (see Tibet Addendum). The Government regarded the number of death sentences it carried out as a state secret. Minors and pregnant women were expressly exempt from the death sentence, although AI reported that a few criminals who were under age 18 at the time they committed an offense were executed as a result of courts' failure properly to determine their age. On March 8, Gao Pan was allegedly executed for a murder committed in August 2001, when he was not yet 18 years old.

The Criminal Procedure Law falls short of international standards in many respects. For example, it has insufficient safeguards against the use of evidence gathered through illegal means, such as torture, and it does not prevent extended pre- and posttrial detention (see Sections 1.c. and 1.d.). Appeals processes failed to provide sufficient avenue for review, and there were inadequate remedies for violations of defendants' rights. Furthermore, under the law, there is no right to remain silent, no protection against double jeopardy, and no law governing the type of evidence that may be introduced. The mechanism that allows defendants to confront their accusers was inadequate; according to one expert, only 1 to 5 percent of trials involved witnesses. Accordingly, most criminal "trials" consisted of the procurator reading statements of witnesses whom neither the defendant nor his lawyer ever had an opportunity to question. Defense attorneys have no authority to compel witnesses to testify. Anecdotal evidence indicated that implementation of the Criminal Procedure Law remained uneven and far from complete, particularly in politically sensitive cases.

The Criminal Procedure Law gives most suspects the right to seek legal counsel shortly after their initial detention and interrogation; however, police often used loopholes in the law to circumvent defendants' right to seek counsel. Defendants in politically sensitive cases frequently found it difficult to find an attorney. In some sensitive cases, lawyers had no pretrial access to their clients, and defendants and lawyers were not allowed to speak during trials. Even in nonsensitive trials, criminal defense lawyers frequently had little access to their clients or to evidence to be presented during the trial. Defendants in only one of every seven criminal cases had legal representation, according to credible reports citing internal government statistics. Government-employed lawyers often were reluctant to represent defendants in politically sensitive cases. The percentage of lawyers in the criminal bar reportedly declined from 3 percent in 1997 to 1 percent in 2001.

Defense attorneys rarely entered not guilty pleas on behalf of their clients, choosing instead to argue only for mitigation of the sentence. In June, a Hubei Intermediate Court scheduled the trial of Internet dissident Du Daobin on less than a week's notice, in part to prevent Du's Beijing-based defense counsel from appearing in court and presenting a not guilty plea. The local attorney who defended Du declined to submit a not guilty plea, citing fear of pressure by local authorities.

Some lawyers who tried to defend their clients aggressively continued to face serious intimidation and abuse by police and prosecutors, and some were detained. According to Article 306 of the Criminal Law, defense attorneys could be

held responsible if their clients commit perjury, and prosecutors and judges in such cases have wide discretion in determining what constitutes perjury. In May, prominent Beijing defense attorney Zhang Jianzhong was released after serving a 2-year sentence under Article 306. Chinese legal scholars claimed he was singled out for being too effective at representing criminal defendants, and approximately 600 lawyers signed a petition demanding that Zhang be found not guilty. According to the All-China Lawyers Association, since 1997 more than 400 defense attorneys have been detained on similar charges, and such cases continued during the year.

During the year, Chinese and foreign lawyers, law professors, legal journals, and jurists held seminars and publicly debated systemic legal reform. Among the suggested reforms were the introduction of a more transparent system of discovery, the abolition of coerced confessions, abolition of all forms of administrative detention, a legal presumption of innocence, an independent judiciary, improved administrative laws, restriction on use of the death penalty, reform of the media's interaction with the court system, and adoption of a plea bargaining system.

Government officials continued to deny holding any political prisoners, asserting that authorities detained persons not for their political or religious views, but because they violated the law; however, the authorities continued to confine citizens for reasons related to politics and religion. Tens of thousands of political prisoners remained incarcerated, some in prisons and others in labor camps. The Government did not grant international humanitarian organizations access to political prisoners.

Western NGOs estimated that approximately 500 to 600 persons remained in prison for the repealed crime of "counterrevolution," and thousands of others were serving sentences under the State Security Law, which Chinese authorities stated covers crimes similar to counterrevolution. Persons detained for counterrevolutionary offenses included labor activist Hu Shigen; writer Chen Yanbin; Inner Mongolian activist Hada; and dissidents Yu Dongyue, Zhang Jingsheng, and Sun Xiongying. Foreign governments urged the Government to review the cases of those charged before 1997 with counterrevolution and to release those who had been jailed for nonviolent offenses under the old statute. During the year, the Government held expert-level discussions with foreign officials on conducting such a review, but no formal review was initiated. However, a number of "counterrevolutionary" prisoners were released during the year, some after receiving sentence reductions, including Liu Jingsheng in November and Chen Gang in April.

Amnesty International has identified more than 80 persons by name who remained imprisoned or on medical parole for their participation in the 1989 Tiananmen demonstrations; other NGOs estimated that as many as 250 persons remained in prison for political activities connected to the 1989 Tiananmen demonstrations.

The authorities granted early release from prison to Tibetan nun Phuntsog Nyidrol in February and CDP co-founder Wang Youcai in March. In March, Uighur businesswoman Rebiya Kadeer received a 1-year sentence reduction on her 8-year sentence for supplying state secrets to foreigners, but she was scheduled to remain in prison until August 2006. Many others, including Internet activists Xu Wei, Yang Zili, and Huang Qi; journalists Zhao Yan and Jiang Weiping; labor activists Yao Fuxin and Xiao Yunliang; Catholic Bishop Su Zhimin; Christian activists Zhang Rongliang, Zhang Yinan, Liu Fenggang, and Xu Yonghai; Tibetans Jigme Gyatso, Tenzin Deleg, and Gendun Choekyi Nyima; Uighur writer Tohti Tunyaz; CDP co-founder Qin Yongmin; and political dissident Yang Jianli remained imprisoned or under other forms of detention during the year. Political prisoners generally benefited from parole and sentence reduction at significantly lower rates than ordinary prisoners.

Criminal punishments could include "deprivation of political rights" for a fixed period after release from prison, during which the individual is denied the limited rights of free speech and association granted to other citizens. Former prisoners also sometimes found their status in society, ability to find employment, freedom to travel, and access to residence permits and social services severely restricted. Former political prisoners and their families frequently were subjected to police surveillance, telephone wiretaps, searches, and other forms of harassment, and some encountered difficulty in obtaining or keeping employment and housing.

Officials confirmed that executed prisoners were among the sources of organs for transplant. Transplant doctors stated publicly in September 2003 that "the main source [of organ donations] is voluntary donations from condemned prisoners," but serious questions remained concerning whether meaningful or voluntary consent from the prisoners or their relatives was obtained. There was no national law governing organ donations, but a draft law was under consideration during the year. A Ministry of Health directive explicitly states that buying and selling human organs and tissues is not allowed. In 2003, the first local law regulating organ donation was passed in Shenzhen, prohibiting the sale or trade of human organs. The impact of this law in practice remained unclear. As of year's end, there were no reports of other localities passing a similar law. There were no reliable statistics on how many organ transplants occurred using organs from executed prisoners.

f. Arbitrary Interference With Privacy, Family, Home, Correspondence

The Constitution states that the "freedom and privacy of correspondence of citizens are protected by law"; however, the authorities often did not respect the privacy of citizens in practice. Although the law requires warrants before law enforcement officials can search premises, this provision frequently was ignored; moreover, the Public Security Bureau and the Procuratorate could issue search warrants on their own authority. Cases of forced entry by police officers continued to be reported.

During the year, authorities monitored telephone conversations, facsimile transmissions, e-mail, text-messaging, and Internet communications. Authorities also opened and censored domestic and international mail. The security services routinely monitored and entered residences and offices to gain access to computers, telephones, and fax machines. All major hotels had a sizable internal security presence, and hotel guestrooms were sometimes bugged and searched for sensitive or proprietary materials.

Some dissidents were under heavy surveillance and routinely had their telephone calls monitored or telephone service disrupted. The authorities frequently warned some dissidents and activists not to meet with foreigners. During the year, police in Beijing ordered several dissidents not to meet with Western journalists or foreign diplomats, especially before sensitive anniversaries, at the time of important Government or Party meetings, and during the visits of high-level foreign officials. These events also sparked greater surveillance, short-term detention, and harassment of dissidents. The authorities also confiscated money sent from abroad that was intended to help dissidents and their families.

Security personnel monitored and harrassed relatives of prominent dissidents, particularly during sensitive periods. For example, security personnel followed the family members of political prisoners to meetings with Western reporters and diplomats. Dissidents and their family members routinely were warned not to speak with the foreign press. Police sometimes detained the relatives of dissidents.

Official poverty alleviation programs and major state projects have included forced relocation of persons to new residences. The Government estimated that at least 1.2 million persons have been relocated for the Three Gorges Dam project on the Yangtze River.

Forced relocation because of urban development continued and, in some locations, increased during the year. Protests, some of which included thousands of participants, over relocation terms or compensation were common, and some protest leaders were prosecuted during the year (see Sections 2.b. and 3). Some evictions in Beijing were linked to construction for the 2008 Olympics.

In urban areas, many persons historically depended on government-linked work units for housing, healthcare, and other aspects of ordinary life. With the increase in market activities and private business, these benefits have changed so that newer employees at some government-linked work units no longer enjoy all of these benefits. For example, most work units now provide housing subsidies to employees, instead of directly alloting housing. Similarly, the work unit and the neighborhood committee have become less important as means of social and political control. Government interference in daily personal and family life continued to decline for most citizens. For example, work unit permission is no longer required before obtaining a divorce.

Under the country's family planning law and policies, citizens in 6 of the country's 31 provinces still were required to apply for government permission before having a first child, and the Government continued to restrict the number of births. Penalties for out-of-plan births still included social compensation fees and other coercive measures.

The Population and Family Planning Law, the country's first formal law on the subject, entered into force in 2002. The National Population and Family Planning Commission (NPFPC) enforces the law and formulates and implements policies with assistance from the China Family Planning Association, which had 1 million branches nationwide. The law is intended to standardize the implementation of the Government's birth limitation policies; however, enforcement continued to vary from place to place. The law grants married couples the right to have one child and allows eligible couples to apply for permission to have a second child if they meet conditions stipulated in local and provincial regulations. Many provincial regulations require women to wait 4 years or more after their first birth before making such an application. According to the U.N. Population Fund (UNFPA), the spacing requirement was removed in 5 and relaxed in 10 of the 30 counties across 30 provinces participating in UNFPA's "Country Program V." The NPFPC reported that the spacing requirement was removed in the provincial regulations of Hainan, Jilin, and Shanghai, and UNFPA reported that the requirement was relaxed by 15 other provincial-level governments.

The law requires counties to use specific measures to limit the total number of births in each county. Both the Constitution and the family planning law further require couples to employ birth control measures. According to a September 2002 U.N. survey, the percentage of women who select their own birth control method grew from 53 percent in 1998 to 83 percent in UNFPA-assisted counties in 2000. The law requires couples who have an unapproved child to pay a "social compensation fee," which sometimes reached 10 times a person's annual income, and grants preferential treatment to couples who abide by the birth limits. Officials often strongly encouraged women with multiple children to undergo sterilization, such as tubal ligation, according to multiple reports. Although the law states that officials should not violate citizens' rights, neither those rights nor the penalties for violating them are defined. The law provides significant and detailed sanctions for officials who help persons evade the birth limitations.

The law delegates to the provinces the responsibility for drafting implementing regulations, including establishing a scale for assessment of social compensation fees. The National Population and Family Planning Law requires family planning officials to obtain court approval for taking "forcible" action, such as confiscation of property, against families that refuse to pay social compensation fees.

The one-child limit was more strictly applied in the cities, where only couples meeting certain conditions (e.g., both parents are only children) were permitted to have a second child. In most rural areas (including towns of under 200,000

persons), where approximately two-thirds of citizens lived, the policy was more relaxed, generally allowing couples to have a second child if the first was a girl or disabled. Local officials, caught between pressures from superiors to show declining birth rates, and from local citizens to allow them to have more than one child, frequently made false reports. Ethnic minorities, such as Muslim Uighurs and Tibetans, were subject to much less stringent population controls (see Tibet Addendum). In remote areas, limits often were not enforced, except on government employees and Party members.

The 2000 census enumerated the fertility rate at 1.3 births per woman, but later the Government adjusted the figure upward to 1.8 births per woman. According to the U.N., the fertility rate does not exceed 1.7. According to Chinese census authorities, the yearly growth rate of the population is 0.7 percent per year. Media reports indicated that some parts of the country had zero or even negative population growth, while the growth rate continued to increase elsewhere.

Authorities continued to reduce the use of targets and quotas. Authorities who still used the target and quota system required each eligible married couple to obtain government permission before the woman became pregnant. In some counties, only a limited number of such permits were made available each year, so couples who did not receive a permit were required to wait at least a year before obtaining permission. Counties that did not employ targets and quotas allowed married women to have a first child without prior permission. UNFPA research showed, and the NPFPC confirmed, that 25 of China's 31 provincial-level governments had done away with the requirement for birth permits before conceiving a first child, the principal mechanism for enforcing targets and quotas. Some targets remained, such as in Liaoning Province which continues to set provincial targets in its 5-year plan, despite having abolished birth permits four years ago and having eliminated target-setting at the city, county and township levels. UNFPA reports that only Fujian, Henan, Jiangxi, and Yunnan Provinces and the Xinjiang Uighur Autonomous Region still required birth permits.

The country's population control policy relied on education, propaganda, and economic incentives, as well as on more coercive measures such as the threat of job loss or demotion and social compensation fees. Psychological and economic pressure were very common; during unauthorized pregnancies, women sometimes were visited by birth planning workers who used threats, including that of social compensation fees, to pressure women to terminate their pregnancies. The fees were assessed at widely varying levels and were generally extremely high. According to provincial regulations, the fees ranged from one-half to 10 times the average worker's annual disposable income. Local officials have authority to adjust the fees downward and did so in many cases. Additional disciplinary measures against those who violated the child limit policy by having an unapproved child or helping another to do so included job loss or demotion, loss of promotion opportunity, expulsion from the Party (membership in which was an unofficial requirement for certain jobs), and other administrative punishments, including, in some cases, the destruction of property. In the cases of families that already had two children, one parent was often pressured to undergo sterilization, according to reliable reports. These penalties sometimes left women little practical choice but to undergo abortion or sterilization. Rewards for couples who adhered to birth limitation laws and policies included monthly stipends and preferential medical and educational benefits. During the year, the NPFPC began a number of programs to encourage smaller families. For example, new pension benefits were made available for those who adhered to birth limitation laws.

Seven provinces--Anhui, Hebei, Heilongjiang, Hubei, Hunan, Jilin, and Ningxia--require "termination of pregnancy" if the pregnancy violates provincial family planning regulations. An additional 10 provinces--Fujian, Guizhou, Guangdong, Gansu, Jiangxi, Qinghai, Sichuan Shanxi, Shannxi, and Yunnan--require unspecified "remedial measures" to deal with out-of-plan pregnancies. Article 33 of the 2002 law states that family planning bureaus will conduct pregnancy tests and follow-up on married women. Some provincial regulations provide for fines if women do not undergo periodic pregnancy tests. For example, in Hebei the range was $24 to $60 (RMB 200 to 500), and in Henan it was $6 to $60 (RMB 50 to 500).

At the same time, because of economic development and other factors, such as limited housing size, both parents working full-time, and high education expenses, couples in major urban centers often voluntarily limited their families to one child.

The Population and Family Planning Law delegates to the provinces the responsibility for implementing appropriate regulations to enforce the law. By year's end, all provincial-level governments except the TAR had amended their regulations to conform with the new law. Anhui Province, for example, passed a law permitting 13 categories of couples, including coal miners, some remarried divorcees, and some farm couples, to have a second child. The law does not require such amendments, however, unless existing regulations conflict with it. Existing regulations requiring sterilization in certain cases are not contradicted by the new law, which says simply that compliance with the birth limits should "mainly" be achieved through the use of contraception.

Central Government policy formally prohibits the use of physical coercion to compel persons to submit to abortion or sterilization. Because it is illegal, the use of physical coercion was difficult to document. A few cases were reported during the year. In June, officials in Jieshou City, Anhui Province, forced a woman to be sterilized, and state media reported that the woman was injured when she jumped out of a window in the operating room in an attempt to avoid the procedure. In the same city, another woman committed suicide when her relatives were detained in population schools, facilities designed to provide reeducation to those who violate family planning guidelines. The use of population schools as detention centers was condemned by Central Government officials. According to state-media reports, the local officials responsible for the detentions were fired or sanctioned administratively. In response, NPFPC officials ordered

an investigation, sent a letter to each province condemning the actions in Anhui Province, and called on all provincial-level family planning officials to focus on "implementing the rule of law." Earlier in the year, media reports noted that a drug offender in Gansu Province was forced to have an abortion before her trial on charges punishable by the death sentence.

Senior officials stated repeatedly that the Government "made it a principle to ban coercion at any level," and the NPFPC has issued circulars nationwide prohibiting birth planning officials from coercing women to undergo abortions or sterilization. However, the Government does not consider social compensation fees and other administrative punishments to be coercive. Under the State Compensation Law, citizens also may sue officials who exceed their authority in implementing birth planning policy, and, in a few instances, individuals have exercised this right. The NPFPC has set up a hotline for use by UNFPA project county residents to lodge complaints against local officials.

Corruption related to social compensation fees reportedly decreased after the 2002 passage of State Council Decree 357, which established that collected "social compensation fees" must be submitted directly to the National Treasury rather than retained by local birth planning authorities. NPFPC officials reported in 2002 that they responded to more than 10,000 complaints against local officials.

In order to delay childbearing, the Marriage Law sets the minimum marriage age for women at 20 years and for men at 22 years. It continued to be illegal in almost all provinces for a single woman to bear a child, and social compensation fees have been levied on unwed mothers. The Government stated that the practice of levying social compensation fees for "pre-marriage" births was abolished on an experimental basis in some counties during the year and was relaxed in cases where couples promptly registered their marriages. In 2002, Jilin Province passed a law making it legal, within the limits of the birth limitation law, for an unmarried woman who "intends to remain single for life" to have a child.

Laws and regulations forbid the termination of pregnancies based on the sex of the fetus, but because of the intersection of birth limitations with the traditional preference for male children, particularly in rural areas, many families used ultrasound technology to identify female fetuses and terminate these pregnancies (see Section 5). The use of ultrasound for this purpose is prohibited specifically by the Population Law and by the Maternal and Child Health Care Law, both of which mandate punishment of medical practitioners who violate the provision. According to the NPFPC, few doctors have been charged under these laws. The most recent official figures, from November 2000, put the overall male to female sex ratio at birth at 116.9 to 100 (as compared to the statistical norm of 106 to 100), and, in some parts of the country, the ratio was even more skewed. For second births, the national ratio was 151.9 to 100. Several localities experimented with new measures to address the sex ratio imbalance. These included restricting promotions for officials in extremely unbalanced areas of Shaanxi Province and limiting abortions after 14 weeks for pregnancies that were authorized by a birth or family planning permit in Guiyang. During the year, the NPFPC launched a "Care for the Girl Child" initiative in 11 pilot counties to raise awareness of the sex ratio imbalance and to improve protection of the rights of girls.

In 2003, a new Marriage Law abolished a requirement that couples have premarital examinations to determine if they were at risk for passing on debilitating genetic diseases. In addressing the risk of genetic disease, the Maternal and Child Health Care Law continued to recommend abortion or sterilization in some cases. In practice, however, most regions of the country still did not have the medical capacity to determine accurately the likelihood of passing on debilitating genetic diseases.

Lack of informed consent was a general problem in the practice of medicine throughout the country.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution states that freedom of speech and freedom of the press are fundamental rights to be enjoyed by all citizens; however, the Government tightly restricted these rights in practice. The Government interpreted the Party's "leading role," as mandated in the preamble to the Constitution, as circumscribing these rights. The Government continued to threaten, arrest, and imprison many individuals for exercising free speech. A wave of detentions late in the year appeared to signal a new campaign against writers. Internet essayists in particular were targeted. The Government strictly regulated the establishment and management of publications. The Government did not permit citizens to publish or broadcast criticisms of senior leaders or opinions that directly challenged Communist Party rule. The Party and Government continued to control print, broadcast, and electronic media tightly and used them to propagate Government views and Party ideology. All media employees were under explicit, public orders to follow CCP directives and "guide public opinion," as directed by political authorities. Formal and informal guidelines continued to require journalists to avoid coverage of many politically sensitive topics. These public orders, guidelines, and statutes greatly restricted the freedom of broadcast journalists and newspapers to report the news and led to a high degree of self-censorship. The Government continued an intense propaganda campaign against the Falun Gong.

Journalists who reported on topics that met with the Government's or local authorities' disapproval continued to suffer harassment, detention, and imprisonment. In January, the chief editor and six staff members of Guangdong Province's Southern Metropolitan Daily newspaper were detained for alleged economic crimes. Three of the editors were prosecuted in March on corruption charges that many observers viewed as retaliation for the newspaper's muckraking

coverage of stories such as the emergence of SARS in 2003, its brief recurrence in 2004, and the 2003 beating death of college graduate Sun Zhigang in a custody and repatriation camp (see Section 1.c). The news group's general manager Yu Huafeng was sentenced to 12 years imprisonment for embezzlement, and former editor Li Minying received an 11-year sentence for taking bribes. In June, their sentences were reduced on appeal to 8 and 6 years, respectively. Current editor-in-chief Cheng Yizhong was released in August after charges against him were dropped. In September, New York Times employee Zhao Yan was detained and later formally charged with leaking state secrets shortly after the newspaper published an article correctly predicting the resignation of Jiang Zemin as chairman of the Central Military Commission. The newspaper denied that Zhao had any involvement with the story, and prosecutors did not disclose the basis for the charges, citing state secrets laws. Zhao Yan had previously published several articles on rural protests for China Reform magazine. Another farmers' advocate who had also worked with Zhao Yan, Li Boguang, was detained December 14. In addition, Liaoning Province anti-corruption reporter Jiang Weiping remained jailed, as did Sichuan local official Li Zhi, who was convicted in 2003 of "subverting state power" after writing on the Internet to expose official corruption. The Committee to Protect Journalists again assessed China as "the world's leading jailer of journalists," with 43 journalists imprisoned at year's end.

A wave of detentions late in the year appeared to signal a new campaign targeting writers, political commentators, and academics. In November, Li Guozhu was detained for passing to foreign journalists information and photographs about ethnic violence in Henan Province (see Section 5). On November 24, Hunan Province journalist Shi Tao was detained under suspicion of leaking state secrets. On December 13, organizers of the independent PEN Center, which defends writers' freedoms, were detained and later released. Those detained included Yu Jie, Liu Xiaobo, and Zhang Zuhua. They had previously published articles in defense of Shi Tao and held an awards ceremony honoring the author of a banned book on the 1950s. Editor Wang Guangze of the 21st Century Business Herald was dismissed from his job, editor Chen Min of China Reform magazine was temporarily detained, and the New Weekly newspaper in Wuhan was ordered closed during this period. The week of December 6, People's Daily twice published editorials urging authorities to silence speech that provokes trouble and to provide greater control over the Internet.

In addition to criminal prosecution of writers, some government officials used civil lawsuits to block controversial writings. In August, the Fuyang Intermediate People's Court in Anhui Province heard a libel action against authors Chen Guidi and Wu Chuntao over their book "China Peasant Survey" (Nongmin Diaocha). The book, which was a best-seller until it was banned from further distribution in the spring, describes abuse and extortion of farmers by officials. One official named in the book, former Linquan County Communist Party secretary Zhang Xide, sued the authors and publishing house for libel. Scholars and attorneys stated that the lawsuit and high damages sought of approximately $25,000 (RMB 200,000) were intended to intimidate the publisher and inhibit criticism.

Newspapers could not report on corruption without government and party approval, and publishers published such material at their own risk. During the year, journalists and editors who exposed corruption scandals frequently faced problems with the authorities, and the Government continued to close publications and punish journalists for printing material deemed too sensitive. The State Press and Publication Administration ordered the influential bimonthly journal "Strategy and Management" closed indefinitely during the year, although the Government claimed that business reasons, not editorial ones, were behind the closure.

In August, authorities detained and deported two foreign individuals and two journalists for displaying a banner in Beijing reading "No Olympics for China until Tibet is Free."

Some citizens continued to speak out and publish on controversial topics, despite the Government's restrictions on freedom of speech and the press. For example, scholar Cao Siyuan, who convened a symposium on constitutionalism, freedom of speech, and direct elections in 2003 that attracted government attention, continued to publish but remained under surveillance by authorities. Huang Jingao, Party Secretary of Lianjiang County, Fujian Province, wrote an open letter critical of endemic corruption that was published on websites and in the People's Daily in August. Following the publication of the letter, he was sanctioned, and his duties were restricted by party officials in Fujian.

The scope of permissible private speech continued to expand. Controversial political topics could be discussed privately and in small groups without punishment, so long as the speaker did not publish controversial views or disseminate them to overseas audiences.

Censorship related to health issues continued. In early 2003, Government censorship of news concerning SARS was largely responsible for slowing the public health response to the disease. But after May 2003, when the Government publicly acknowledged the spread of the disease, the Government permitted greater reporting about SARS and other infectious diseases. As a result of lessons learned during the SARS epidemic, the Shanghai Municipal Government named its first public spokesperson. Nonetheless, in January, when Guangdong Province's Southern Metropolitan Daily newspaper reported on the reemergence of SARS cases, an editor and six journalists working for the newspaper were temporarily detained. Three of them later faced criminal corruption charges. Also, Dr. Jiang Yanyong, who exposed the spread of SARS in Beijing in April 2003, was detained for 45 days in June and July. Dr. Jiang's detention likely was a response to his open letter on the 1989 Tiananmen massacre (see Section 1.d.), rather than a direct reaction to his writings about SARS. Government restrictions on the press and the free flow of information also affected accurate reporting on HIV/AIDS. Those seeking to bring attention to the plight of AIDS orphans in Henan Province faced continued pressure to remain silent and were warned against speaking to journalists. However, in April, Vice Premier Wu Yi stated that the Government "would strictly investigate and affix responsibility" for those who hide, delay, or fail to report HIV/AIDS. In August, concerns were raised that the country failed to report outbreaks of avian influenza in

China (includes Tibet, Hong Kong, and Macau)
Page 15 of 63
Case 1:05-cv-01602-UNA    Document 7    Filed 09/20/2005    Page 30 of 214

poultry. Reporting on outbreaks of the disease in bird and animal populations was inconsistent, but there were no reports that media coverage of the outbreak was suppressed.

In 2003, the Government ended the practice of requiring government work units to subscribe to official newspapers, forcing many official newspapers to compete for readership or face insolvency. As a result, 677 newspapers were closed between September 2003 and March 2004. Journalists noted that the pressure to expand circulation sometimes conflicted with state control and censorship dictates because one way to expand readership was to provide accurate reporting about controversial topics.

There were a few privately owned print publications, but they were subject to pre- and post-publication censorship. There were no privately owned television or radio stations, and the Government had authority to approve all programming, although it occasionally did not preview all programs.

The publishing industry consists of three kinds of book businesses: Approximately 560 government-sanctioned publishing houses, smaller independent publishers that cooperated with official publishing houses to put out more daring publications, and an underground (illicit) press. Government-approved publishing houses were the only organizations legally permitted to print books. No newspaper, periodical, book, audio, video, or electronic publication may be printed or distributed without the printer and distributor being approved by the relevant provincial publishing authorities and the State Press and Publications Administration (PPA). The Communist Party exerted control over the publishing industry by preemptively classifying certain topics as off-limits; selectively rewarding with promotions and perks those publishers, editors, and writers who adhered to Party guidelines; and punishing those who did not adhere to Party guidelines with administrative sanctions and blacklisting. Some independent publishers took advantage of a loophole in the law to sign contracts with government publishing houses to publish politically sensitive works. These works generally were not subject to the same multi-layered review process as official publications of the publishing houses.

Underground printing houses have been targets of periodic campaigns to stop all illegal publications (including pornography and pirated computer software and audiovisual products). These campaigns sometimes had the effect of restricting the availability of politically sensitive books.

Many intellectuals and scholars, anticipating that books or papers on political topics would be deemed too sensitive to be published, exercised self-censorship. Overt intervention by the PPA, responsible for all printing and distribution in the country, and by the Party Central Propaganda Department, which provides editorial guidelines for all media, mostly occurred after publication. In areas such as economic policy or legal reform, there was far greater official tolerance for comment and debate. Criticism of Central Government authorities continued to remain largely off-limits.

Among books banned during the year were "China Peasant Survey," and "The Past Does Not Go Up In Smoke," a collection of essays dealing with the effect of political tumult in the 1950s and 1960s on the lives of prominent Chinese intellectuals. In January, authorities issued regulations restricting publication of books on constitutional reform to three official publishing houses. In 2002, the Department of Cultural Affairs in Urumqi, Xinjiang, ordered the destruction of thousands of books on Uighur history and culture. The books detailing and documenting Uighur history originally had been published with the approval of the authorities.

The authorities continued to jam, with varying degrees of success, Chinese-, Uighur-, and Tibetan-language broadcasts of the Voice of America (VOA), Radio Free Asia (RFA) and the British Broadcasting Corporation (BBC). English-language broadcasts on VOA generally were not jammed, unless they immediately followed Chinese-language broadcasts, in which case portions of the English-language broadcasts were sometimes jammed. Government jamming of RFA and BBC appeared to be more frequent and effective. Internet distribution of "streaming radio" news from these sources often was blocked. Despite jamming, in the absence of an independent press, overseas broadcasts such as VOA, BBC, RFA, and Radio France International had a large audience, including activists, ordinary citizens, and even government officials.

The Government prohibited some foreign and domestic films from appearing in the country. Television broadcasts of foreign programming, which were restricted largely to hotel and foreign residence compounds, also suffered from occasional censorship of topics including sensitive political issues. In southern China, where television programming from Hong Kong was available, "public service announcements" frequently interrupted news items critical of the Government.

The Government continued to encourage expanded use of the Internet; however, it also took steps to increase monitoring of the Internet and continued to place restrictions on the information available. Over 80 million persons regularly used the Internet, including those in urban and rural areas, according to surveys conducted during the year. In July, the Government began implementing new measures to monitor and filter text-messaging. The measures were designed to control for politically sensitive content and to stop the spread of pornography.

The country's Internet control system employed more than 30,000 persons and was allegedly the largest in the world. According to a 2002 Harvard University report, the Government blocked at least 19,000 sites during a 6-month period and may have blocked as many as 50,000. At times, the Government blocked the sites of some major foreign news organizations, health organizations, educational institutions, Taiwanese and Tibetan businesses and organizations,

religious and spiritual organizations, democracy activists, and sites discussing the 1989 Tiananmen massacre. The number of blocked sites appeared to increase around major political events and sensitive dates. The authorities reportedly began to employ more sophisticated technology enabling the selective blocking of specific content rather than entire websites in some cases. Such technology was also used to block e-mails containing sensitive content. The Government generally did not prosecute citizens who received dissident e mail publications, but forwarding such messages to others sometimes did result in detention. Internet usage reportedly was monitored at all terminals in public libraries.

The Ministry of Information Industry regulated access to the Internet while the Ministries of Public and State Security monitored its use. Regulations prohibit a broad range of activities that authorities have interpreted as subversive or as slanderous to the state, including the dissemination of any information that might harm unification of the country or endanger national security. Promoting "evil cults" was banned, as was providing information that "disturbs social order or undermines social stability." Internet service providers (ISPs) were instructed to use only domestic media news postings, record information useful for tracking users and their viewing habits, install software capable of copying e-mails, and immediately end transmission of so-called subversive material. Many ISPs practiced extensive self-censorship to avoid violating very broadly worded regulations. A study released in 2003 by Reporters Without Borders reported that only 30 percent of messages with "controversial content" were allowed onto Chinese "chatroom" websites. The remaining 70 percent of messages were filtered out by censors or removed by the site host.

Several individuals were jailed for their Internet publications during the year. On March 16, Shanghai resident Ma Yalian was sentenced to 18 months' reeducation through labor for posting articles on legal websites about her attempts to stop destruction of her home. Ma's web postings described police harassment of petitioners and suicide attempts outside government offices. In May, freelance journalist Liu Shui was sentenced to 2 years' administrative detention in Shenzhen in what NGOs claimed was retaliation for essays about reassessing the 1989 Tiananmen massacre and political reform that he wrote and posted on the Internet. Former Hubei Province civil servant Du Daobin was convicted of inciting subversion in June for his Internet writings about democracy. Du's prison sentence was suspended, but he appealed his conviction, arguing that his trial was unfair and that his writings did not incite subversion and were protected free speech (see Section 1.e.). In August, house Christians Liu Fenggang, Xu Yonghai, and Zhang Shengqi were convicted of disclosing state intelligence after using the Internet to send reports about the abuse of house Christians to overseas organizations. They were sentenced to 1 to 3 years in prison (see Section 2.c.). In September, Shenyang Internet writers Kong Youping and Ning Xianhua were sentenced, respectively, to 15 and 12 years in prison on charges of "subversion of state power" for posting articles and poems in support of the CDP. In November, Hunan Province journalist Shi Tao was detained, reportedly on state secrets charges. Shi had previously written for Contemporary Trade News and published an on-line article in April opposing the detention of Tiananmen Mothers' organization co-founder Ding Zilin. The NGO Reporters Without Borders called China "the biggest jail in the world for cyberdissidents." The Committee for the Protection of Journalists reported that the country had 43 journalists jailed at year's end.

In addition to imprisoning several persons during the year for disseminating information through the Internet, the Government detained several individuals for using the Internet to express support for other detained Internet activists. Liu Di was detained for a year after she expressed sympathy for Sichuan website manager Huang Qi and wrote pro-reform articles on-line. Huang ran a website that contained postings discussing the June 4, 1989 Tiananmen massacre until it was closed down, and he was detained on June 3, 2000. In November 2003, Liu Di was released after a court found that the evidence against her was insufficient; however, some persons detained for supporting her remained in custody at year's end. Among them, Kong Youping was sentenced to 15 years in prison in September for political writings, including many that expressed support for Liu Di.

The Government's "Public Pledge on Self Discipline for China's Internet Industry" continued during the year. More than 300 companies signed the pledge, including the popular Sina.com and Sohu.com, as well as foreign-based Yahoo!'s China division. Those who signed the pledge agreed not to spread information that "breaks laws or spreads superstition or obscenity." They also promised to refrain from "producing, posting, or disseminating pernicious information that may jeopardize state security and disrupt social stability." The China Internet Association adopted a "self-regulatory pledge" for search engine services during the year that was viewed by many as even stricter than the Government's self discipline pledge.

As of July, the China Internet Network Information Center said there were 87 million Internet users, 22 percent of whom access the web at Internet cafes. As of 2002, the country had more than 200,000 licensed Internet cafes, and a number of unlicensed ones as well. During the year, state media reported that several municipalities cracked down on illegal Internet cafes, including over 2,000 illegal cafes in Shenzhen. On April 27, the Ministry of Culture announced that, by the end of the year, all Internet cafes must install software that allows Government officials to monitor customers' web usage. Internet users at the cafes often are subject to surveillance. A May 24 China Newsweek article reported that at one popular Beijing Internet cafe with 320 computers, eight employees served as Internet monitors, while 10 other staff members walked around the room to check if customers were accessing "illegal" websites. Patrons caught entering such sites were given warnings. Most places sporadically enforced regulations requiring patrons to provide identification when using Internet cafes. In response to the health crisis caused by SARS, the authorities closed all the nation's Internet cafes in April 2003. Beijing cafes stayed closed until August 2003, while cafes in Shanghai and Sichuan reopened sooner.

In February, the Government announced that it would invest nearly $6 million (RMB 49.8 million) to create a new

system to control political publication on the Internet. Monitoring and censorship of Internet bulletin boards and chatrooms was especially strict at the time of sensitive anniversaries or key political meetings. For example, in September, a popular bulletin board at Beijing University was closed in the period before the Fourth Party Plenum meeting, and Internet censorship also increased before the March NPC session. In September, a local newspaper reported that authorities in Liaoning Province shut down an Internet website devoted to exposing official corruption, even though the website's administrator had obtained prior official approval.

In July, the Government began censoring text messages distributed by mobile telephone. According to state media, the campaign was designed to stop the spread of pornographic messages by phone, as well as to block circulation of illicit news and information. All text messaging service providers were required to install filtering equipment to monitor and delete messages deemed offensive by authorities. In the first week of the campaign's operation, the Government reportedly fined 10 companies and forced 20 others to close for failure to comply. As with print, broadcast, and Internet media, the Propaganda Department determined banned topics. In 2003, mobile phone users sent approximately 220 billion text messages, according to China Telecom.

The Government did not respect academic freedom and continued to impose ideological controls on political discourse at colleges, universities, and research institutes. Scholars and researchers reported varying degrees of control regarding issues they could examine and conclusions they could draw. For example, several professors were warned against calling for abolition of reeducation through labor. In March, Beijing University professor Jiao Guobiao published a criticism of Chinese censorship, listing his "14 Evils of the Central Propaganda Department." In August, his university threatened him with dismissal and indefinitely suspended him from teaching. Guangxi Normal University Professor Chen Qin reportedly suffered a stroke in July while being interrogated by security officials concerning his on-line essays criticizing political and social institutions. Scholar Xu Zerong remained in prison for "illegally providing state secrets" by sending sensitive reference materials on the Korean War to a contact in Hong Kong. Scholars studying religion reported that, during the year, the official Protestant church blocked some publications it found objectionable.

The Government continued to use political attitudes as criteria for selecting persons for the few government-sponsored study abroad programs, but did not impose such restrictions on privately sponsored students. More than 7,200 students studied abroad, a record according to the China Scholarship Council.

Researchers residing abroad also were subject to sanctions from the authorities when their work did not meet with official approval. In July, a Chinese-born overseas scholar was detained in Shanghai for 2 weeks and then forced to leave the country after being charged with disclosing state secrets in the course of his academic research on reform of the household registration system.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of peaceful assembly; however, the Government severely restricted this right in practice. The Constitution stipulates that such activities may not challenge "Party leadership" or infringe upon the "interests of the State." Protests against the political system or national leaders were prohibited. Authorities denied permits and quickly moved to suppress demonstrations involving expression of dissenting political views.

At times, police used excessive force against demonstrators. Demonstrations with political or social themes were often broken up quickly and violently. The vast majority of demonstrations during the year concerned economic and social issues such as land, housing, health, and welfare. Land disputes, industrial disputes, and anti-government protests were the three main causes of civil disturbances, according to a 2004 study of publicly reported protests. Citing government statistics, government-run Outlook magazine reported that over 58,000 "mass incidents" took place during 2003, more than 6 times the number reported 10 years earlier. Some of these demonstrations included thousands of participants. According to government statistics reported in Hong Kong, more than 2.3 million people took part in petitions, marches, and sit-ins in urban areas in 2003, while over 8 million participated in demonstrations in rural areas. Ministry of Public Security publications indicated that the number of demonstrations continued to grow and that protesters were becoming more organized.

Authorities detained potential protesters before the anniversary of the 1989 Tiananmen massacre and other sensitive events to head off public demonstrations (see Section 1.d.). In the period before the April "Qingming" holiday, which has often served as a time of public commemoration of the 1989 Tiananmen events, regulations were passed outlawing Tiananmen commemorative activities. In late March, "Tiananmen Mothers" organization co-founders Ding Zilin, Jiang Xianling, and Huang Jinping were confined in separate locations to prevent them from meeting with other victims' family members to commemorate the death of their relatives in the June 4, 1989 violence. In early April, when AIDS activist Hu Jia stated his intention to commemorate the anniversary in their absence, he was also detained. All were released but some were prevented from returning to Beijing until after the holiday was over. On June 1, retired PLA doctor Jiang Yanyong and his wife were also detained in the period before the anniversary of the 1989 Tiananmen massacre (see Section 2.d.). Western media reported that approximately 20 people were detained and taken away from Tiananmen Square on June 4 for attempting to commemorate the 1989 events.

Labor protests over restructuring of SOEs and resulting unemployment continued, and the number of such protests increased slightly over 2003, although they remained smaller in scale than the large labor protests which occurred in 2002. In February, a protest by some 2,000 workers seeking severance benefits from Hubei Province's bankrupt, state-

owned Tieshu textile factory was suppressed by force. Nine workers were detained, and four faced criminal charges. In July, 23 laid-off coal miners from Heilongjiang Province threated a mass suicide from the roof of a building near the Supreme People's Court when their petitions for compensation went unanswered. They were detained, and miners traveling to Beijing to support them were stopped by police. Protests by migrant laborers and construction workers, who demonstrated when employers withheld their salaries or underpaid them, continued. The Government passed legislation requiring that companies pay such workers and stepped up enforcement measures against some delinquent employers during the year (see Section 6.b.).

Protests, some of which included thousands of participants, concerning land, housing, and forced evictions were also widespread. The jailing of former Shanghai housing lawyer Zheng Enchong in October 2003, after his advocacy for hundreds of Shanghai residents displaced in a controversial urban redevelopment project, prompted demonstrations by his supporters in March. Similarly, Beijing and Tianjin-based housing petitioners and victims of forced eviction policies were detained in August and September to prevent them from holding a planned 10,000-person rally (see Section 3). On August 1, in Fujian Province's Wanli village, police officers beat hundreds of farmers who protested government land seizures.

The Government continued to wage a severe political, propaganda, and police campaign against the Falun Gong movement. The sustained government crackdown against the movement, which the Government banned in 1999, continued, and there were no reports of public protests during the year. In many cases, Falun Gong practitioners were subject to close scrutiny by local security personnel, and their personal mobility was tightly restricted, particularly at times when the Government believed public protests were likely.

Activist Li Dan was beaten and Pan Zhongfeng was detained in Shangqiu, Henan Province, during a July demonstration protesting closure of an AIDS orphanage and school.

The Constitution provides for freedom of association; however, the Government restricted this right in practice. Communist Party policy and government regulations require that all professional, social, and economic organizations officially register with, and be approved by, the Government. Ostensibly aimed at restricting secret societies and criminal gangs, these regulations also prevented the formation of truly autonomous political, human rights, religious, spiritual, environmental, social, labor, and youth organizations that might challenge government authority. Since 1999, all concerts, sports events, exercise classes, or other meetings of more than 200 persons require approval from Public Security authorities. In practice, much smaller gatherings ran the risk of being disrupted by authorities in some places.

No laws or regulations specifically govern the formation of political parties. But the China Democracy Party (CDP) remained banned, and the Government continued to surveil, detain, and imprison current and former CDP members (see Section 3).

According to government statistics on NGOs, at the end of 2003, there were approximately 142,000 social organizations, including 1,736 national-level and cross-provincial organizations, 21,030 provincial organizations, 48,731 local and county-level organizations registered with the Ministry of Civil Affairs, and others. NGOs were required to register with the Government. To register, an NGO must find a government agency willing to serve as the NGO's organizational sponsor, have a registered office, and hold a minimal amount of funds. Experts estimated that there were between one and two million unregistered NGOs. Although the registered organizations all came under some degree of government control, some were able to develop their own agendas. Some had support from foreign secular and religious NGOs. Some were able to undertake limited advocacy roles in such public interest areas as women's issues, the environment, health, and consumer rights. According to government guidelines, NGOs must not advocate non-party rule, damage national unity, or upset ethnic harmony. Groups that disobeyed guidelines and unregistered groups that continued to operate could face administrative punishment or criminal charges. In addition, there were 124,000 private, nonprofit corporations registered in 2003, an increase of 11.7 percent over 2002. Many of these groups functioned like NGOs, with 90,000 operating in the education and health fields, 9,037 in labor, 7,792 in civil society, 1,777 providing social services, and 728 in legal services. During the year, the Government passed a new law regulating charitable foundations and gave NGOs greater autonomy to establish the amount of their membership dues.

c. Freedom of Religion

The Constitution provides for freedom of religious belief and the freedom not to believe; however, the Government sought to restrict religious practice to government-sanctioned organizations and registered places of worship and to control the growth and scope of the activity of religious groups. There are five official religions: Buddhism, Taoism, Islam, Protestantism, and Catholicism. A government-affiliated association monitored and supervised the activities of each of the five faiths. Membership in religions grew rapidly. While the Government generally did not seek to suppress this growth outright, it tried to control and regulate religious groups to prevent the rise of sources of authority outside the control of the Government and the Party.

Overall, government respect for religious freedom remained poor, although the extent of religious freedom varied widely within the country. Freedom to participate in officially sanctioned religious activity increased in many areas of the country, but crackdowns against unregistered groups, including underground Protestant and Catholic groups, Muslim Uighurs, and Tibetan Buddhists (see Tibet Addendum) continued and worsened in some locations. The Government continued its repression of groups that it determined to be "cults" and of the Falun Gong spiritual movement in

particular.

All religious groups and spiritual movements were required to register with the State Administration for Religious Affairs (SARA, formerly known as the central Religious Affairs Bureau) or its provincial or local offices (still known as Religious Affairs Bureaus (RABs)). SARA and the RABs were responsible for monitoring and judging the legitimacy of religious activity. SARA and the Communist Party's United Front Work Department provided policy "guidance and supervision" over implementation of government regulations on religious activity.

In January, a national work conference on religion organized by SARA was held to "strengthen religious work." According to official media, the conference recommended that officials guard against Christian-influenced "cults" and avoid negative influences, including "foreign infiltration under cover of religion." Conference attendees also raised concern about circulation of foreign religious materials addressing the growth of Christianity in the country, including a documentary film entitled "The Cross" and a book entitled "Jesus in Beijing." Subsequently, many provinces convened their own local work conferences. In March, the 10th National Committee of the Chinese People's Political Consultative Conference (CPPCC) recommended revising the CPPCC Charter to permit the "freedom of religious belief." On November 30, the State Council issued new regulations governing religious affairs, shifting the national system of registration from one focused on religious sites to one focused on religious organizations and individuals. The new regulations made no reference to the five official religions.

A national campaign to require religious groups to register or to come under the supervision of official "patriotic" religious organizations continued during the year. Some groups registered voluntarily, some registered under pressure, some avoided officials in an attempt to avoid registration, and authorities refused to register others. Some unofficial groups reported that authorities refused them registration without explanation. The Government contended that these refusals were mainly the result of failure to meet requirements concerning facilities and meeting spaces. Many religious groups were reluctant to comply with the regulations out of principled opposition to state control of religion or due to fear of adverse consequences if they revealed, as required, the names and addresses of church leaders and members.

Local authorities' handling of unregistered religious groups, particularly Protestant "house churches," varied widely. In certain regions, Government supervision of religious activity was minimal, and registered and unregistered Protestant and Catholic churches existed openly side-by-side and were treated similarly by the authorities. In such areas, many congregants worshiped in both types of churches, and congregants in unregistered churches procured Bibles at official churches. In some parts of the country, unregistered house churches with hundreds of members met openly, with the full knowledge of local authorities, who characterized the meetings as informal gatherings to pray, sing, and study the Bible. In other areas, house church meetings of more than a handful of family members and friends were strictly proscribed. House churches often encountered difficulties when their membership grew, when they arranged for the regular use of facilities for the purpose of conducting religious activities, or when they forged links with other unregistered groups. As a result, urban house churches were generally limited to meetings of a few dozen members or less, while meetings of unregistered Protestants in small cities and rural areas could number in the hundreds.

Leaders of unauthorized groups were sometimes the targets of harassment, interrogation, detention, and physical abuse. Police closed scores of "underground" mosques, temples, seminaries, Catholic churches, and Protestant "house churches," including many with significant memberships, properties, financial resources, and networks. Authorities particularly targeted unofficial religious groups in locations where there were rapidly growing numbers of unregistered churches or in places of long-seated conflict between official and unofficial churches, such as with Catholics in Baoding, Hebei Province or with evangelical underground Protestant groups as in Henan Province and elsewhere.

The Government in many areas intensified pressure against Protestant house churches and their leaders during the year. In January, house Christian activists Qiao Chunling, Xu Yongling, and Zeng Guangbo reportedly were detained because of their alleged effort to communicate with foreigners about activities of house churches. House Christian activists in several regions were prevented from leaving their homes during the meeting of the National People's Congress in March. In June, the government-run Legal Daily newspaper reported that Jiang Zongxiu had died in police custody in Guizhou Province after being detained for distributing Bibles. Her body showed signs of physical abuse, and reliable reports indicated that she had been beaten in administrative detention. A Legal Daily editorial comment condemned local officials for mistreating Jiang. In April, more than 100 members of the Three Classes of Servants Church reportedly were detained in Heilongjiang Province, and most were later released. In June, dozens of leaders of the China Gospel Fellowship Protestant Church reportedly were detained in Wuhan, Hubei Province, but they were later released. In July, more than 100 house church leaders from Anhui Province were reportedly detained in Xinjiang while on a religious retreat. The same month, some 40 house church leaders were detained while attending a religious training seminar in Chengdu, Sichuan Province. In August, more than 100 house Christians were reportedly detained while on a religious retreat in Kaifeng, Henan Province. On August 6, Beijing-based Christian activist Liu Fenggang, Beijing homeless advocate Dr. Xu Yonghai, and Jilin Internet writer Zhang Shengqi were convicted and sentenced to 3, 2, and 1 years in prison, respectively, on charges of providing national intelligence overseas. The charges stemmed from an article Liu wrote and allegedly distributed to the foreign-based Chinese Christian magazine Christian Life Quarterly, which discussed persecution of other Chinese Christians and destruction of house churches. On September 11, Beijing-based pastor Cai Zhuohua was detained for his involvement in printing and distributing Christian literature. In December, underground church leader Zhang Rongliang was detained in Henan Province, and his whereabouts remained unknown at year's end. House church historian Zhang Yinan, who was detained in 2003, remained in a reeducation-through-labor camp in Pingdingshan County, Henan Province. Gouxing Philip Xu, however, reportedly was released from a reeducation-through-labor camp in June after being detained in 2002 in Shanghai.

A number of Catholic priests and lay leaders also were beaten or otherwise abused during the year, prompting Vatican officials formally to protest mistreatment. In Hebei Province, where approximately half of the country's Catholics reside, friction between unofficial Catholics and local authorities continued. Hebei authorities have forced many underground priests and believers to choose between joining the Patriotic Church (the officially sanctioned Catholic Church) or facing fines, job losses, periodic detentions, and, in some cases, the removal of their children from school. Some Catholics have been forced into hiding. In June, the Vatican formally protested the detention earlier in the year of three underground Catholic bishops from Hebei Province. Two were released shortly after their detention, although the whereabouts of 84-year-old Zhao Zhendong of Xuanhua City remained unclear at year's end. Underground Bishops Wei Jingyi of Heilongjiang Province and Jia Zhiguo of Hebei Province reportedly were detained for a few days before being released in March and April, respectively. Jia Zhiguo reportedly was again detained for several days in June, along with two other underground bishops. In August, eight underground clergy in Quyang County, Hebei Province, reportedly were detained while attending a religious retreat. At Christmas, a priest in Zhejiang Province, Wang Zhongfa, was reportedly detained, and religious services for both Catholics and Protestants were disrupted. There were conflicting reports about 76-year-old Shandong Province Bishop Gao Kexian, whom some sources claimed died in prison during the year. Reliable sources also reported that Bishop An Shuxin, Bishop Zhang Weizhu, Father Cui Xing, and Father Wang Quanjun remained detained in Hebei Province. There was no new information about underground Bishop Su Zhimin, who has been unaccounted for since his reported detention in 1997. Reports suggested that he had been held in a form of house arrest. The Government continued to deny taking coercive measures against him and stated he was traveling as a missionary.

During the year, local officials destroyed several unregistered places of worship around the country. In Zhejiang Province, there were continued reports that churches and shrines were closed or destroyed, although less often than in 2003. Zhejiang authorities often claimed that destroyed buildings were not zoned for religious activities, or were unsafe, or both. In February, a fire killed 39 worshippers and destroyed a makeshift temple in Zhejiang's Haining City. Visitors to Xinjiang Autonomous Region reported that mosques also have been destroyed, although some attributed the demolition as much to inter-religious conflict between Hui and Uighur Muslims as to government antagonism. In August, members of the Buddhist Foundation of America reported that a temple they had helped to restore in Tongliao, Inner Mongolia, was closed and the rededication ceremony cancelled by local officials. Spiritual leader Dechan Jeren (Yu Tianjian) was detained, and government authorities claimed he had misled followers about his status as a living Buddha.

The Government continued to restore or rebuild some churches, temples, mosques, and monasteries damaged or destroyed during the Cultural Revolution, and new facilities were constructed during the year. In March, the Government began construction of two new Protestant churches in Beijing, the first new churches to be constructed in the capital since 1949. Similarly, the site of the 135-year-old former Holy Trinity Cathedral in Shanghai was renovated at government expense and reopened as headquarters of the official Protestant China Christian Council and Three-Self Patriotic Movement. The number of restored and rebuilt temples, churches, and mosques remained inadequate to accommodate the increase in religious believers. The difficulty in registering new places of worship led to serious overcrowding in existing places of worship in some areas. Some observers cited the lack of adequate meeting space in registered churches to explain the rapid rise in attendance at house churches and "underground" churches.

The law does not prohibit religious believers from holding public office; however, party membership is required for almost all high-level positions in Government, state-owned businesses, and many official organizations. During the year, Communist Party officials again stated that party membership and religious belief were incompatible. The Routine Service Regulations of the People's Liberation Army state explicitly that service members "may not take part in religious or superstitious activities." Party and PLA personnel have been expelled for adhering to Falun Gong beliefs.

Despite official regulations encouraging officials to be atheists, in some localities as many as 25 percent of Party officials engaged in some kind of religious activity. Most of these officials practiced Buddhism or a folk religion. The National People's Congress (NPC) included several religious representatives. Two of the NPC Standing Committee's vice chairmen are Fu Tieshan, a bishop and vice-chairman of the Chinese Catholic Patriotic Association, and Pagbalha Geleg Namgyal, a Tibetan reincarnate lama. Religious groups also were represented in the Chinese People's Political Consultative Conference, an advisory forum for "multiparty" cooperation and consultation led by the CCP, and in local and provincial governments.

Official religious organizations administered local religious schools, seminaries, and institutes to train priests, ministers, imams, Islamic scholars, and Buddhist monks. Students who attended these institutes had to demonstrate "political reliability," and all graduates must pass an examination on their political as well as theological knowledge to qualify for the clergy. The Government permitted registered religions to train clergy and allowed limited numbers of Catholic and Protestant seminarians, Muslim clerics, and Buddhist clergy to go abroad for additional religious studies, but some religion students have had difficulty getting passports or obtaining approval to study abroad. In most cases, foreign organizations provided funding for such training programs.

Both official and unofficial Christian churches had problems training adequate numbers of clergy to meet the needs of their growing congregations. Because of restrictions and prohibitions on religion between 1955 and 1985, no priests or other clergy in official churches were ordained during that period. Thus, as senior clerics retire, there were relatively few experienced clerics to replace them. The Government stated that the official Catholic Church had trained more than 900 priests in the past decade.

Traditional folk religions such as Fujian Province's "Mazu cult" were still practiced in some locations. They were

tolerated to varying degrees, often seen as loose affiliates of Taoism or as ethnic minority cultural practices. However, at the same time, folk religions were labeled "feudal superstition" and sometimes were repressed because their resurgence was seen as a threat to Party control. In recent years, local authorities have destroyed thousands of shrines; however, there were no reports of widespread destruction during the year.

Buddhists made up the largest body of organized religious believers. The traditional practice of Buddhism continued to expand among citizens in many parts of the country. Tibetan Buddhists in some areas outside of the TAR had growing freedom to practice their faith. However, some government restrictions remained, particularly in cases in which the Government interpreted Buddhist belief as supporting separatism, such as in some Tibetan areas and parts of the Inner Mongolian Autonomous Region. Visits by emissaries of the Dalai Lama occurred in 2002, 2003, and September, 2004. Lodi Gyari, the Dalai Lama's Special Envoy, was a member of the September delegation (see Tibet Addendum).

Regulations restricting Muslims' religious activity, teaching, and places of worship continued to be implemented forcefully in Xinjiang. In some areas of Xinjiang where ethnic unrest has occurred, officials restricted the building of mosques and the training of clergy. Authorities reportedly continued to prohibit the teaching of Islam to children under the age of 18 in some areas where ethnic unrest has occurred, although children studied Arabic and the Koran without restriction in many other areas. For example, local officials have stated that persons younger than 18 are forbidden from entering mosques in Xinjiang, but this policy was enforced unevenly. Authorities also reserved the right to censor imams' sermons. In particular, imams were urged to emphasize the damage caused to Islam by terrorist acts in the name of the religion.

Fundamentalist Muslim leaders received particularly harsh treatment. In 2000, the authorities began conducting monthly political study sessions for religious personnel; the program reportedly continued during the year. In August, eight Uighur Muslims in Hotan District were reportedly charged with endangering state security, and scores were detained on charges of engaging in "illegal religious activities." Because of government control of information coming from Xinjiang, such reports were difficult to confirm.

There were numerous official media reports that the authorities confiscated illegal religious publications in Xinjiang. The Xinjiang People's Publication House was the only publisher allowed to print Muslim literature, and stores reported that those selling literature not included on Government lists of permitted items risked closure. In addition to the restrictions on practicing religion placed on party members and government officials throughout the country, teachers, professors, and university students in Xinjiang were not allowed to practice religion openly. Officials also reportedly restricted mosque building in some areas of Xinjiang, especially where unrest had occurred. However, in other areas, particularly in areas traditionally populated by the non-Central Asian Hui ethnic group, there was substantial religious building construction and renovation. Mosque destruction, which sometimes occurred in Xinjiang, occasionally resulted from intra-religious conflict.

The Government permitted Muslim citizens to make the Hajj to Mecca and in some cases subsidized the journey. A record number of nearly 10,000 Muslims made the Hajj during the year, nearly half of whom went with government-organized delegations. Other Muslims made the trip to Mecca via third countries. According to international Uighur groups, Uighur Muslims had greater difficulty getting permission to make the Hajj than other Muslim groups, such as Hui Muslims, and some Uighurs elected not to attempt to go for fear of repercussions.

The Government and the Holy See had not established diplomatic relations, and there was no Vatican representative on the Mainland. The Government stated that the role of the Pope in selecting bishops, the status of underground Catholic clerics, Vatican recognition of Taiwan, and the canonization of controversial Catholic missionaries on Chinese National Day in 2000 remained obstacles to improved relations. During the year, the Government stated that the political activities of Hong Kong Diocese Bishop Joseph Zen in the Hong Kong SAR had become a further obstacle to normalization of relations with the Vatican. Nonetheless, Bishop Zen paid a public visit to Shanghai in April.

The Government's refusal to allow the official Catholic Church to recognize the authority of the Papacy in many fundamental matters of faith and morals caused many Catholics to reject the official Catholic Church. Most bishops of the official Catholic Church were, in fact, recognized by the Vatican. However, friction between bishops who have been consecrated with Vatican approval and others consecrated without such approval continued, producing leadership conflicts. Foreign media reported that, at the consecration ceremony of some bishops during the year, both government and Vatican approval was stated publicly.

The increase in the number of Christians resulted in a corresponding increase in the demand for Bibles, which were available for purchase at most officially recognized churches and some bookstores. Although the country had only one government-approved publisher of Bibles and distribution had been a problem in the past, the shortage of Bibles in previous years appeared largely to have abated. Members of underground churches complained that the supply and distribution of Bibles in some places, particularly rural locations, was inadequate. Official churches said they discouraged the sale of Bibles outside the church to protect their copyright and financial interests, not to restrict distribution. They emphasized that versions of the Bible are available for less than $1 (RMB 8.3). Individuals could not order Bibles directly from publishing houses, making it difficult for some Christians to buy Bibles in volume. Customs officials continued to monitor for the "smuggling" of Bibles and other religious materials into the country, but there were no new cases of significant punishments for Bible importation. There were credible reports that the authorities sometimes confiscated Bibles and other religious material in raids on house churches.

Regulations enacted in 1994 and expanded in 2000 codified many existing rules involving religious practice by foreigners, including a ban on proselytizing. However, for the most part, the authorities allowed foreign nationals to preach to other foreigners, to bring in religious materials for personal use, and to preach to citizens at churches, mosques, and temples at the invitation of registered religious organizations. Religious worship by foreigners was permitted in unregistered facilities so long as citizens did not attend the services. In a number of major cities, regular worship services for foreigners were held, including Catholic, Protestant, Muslim, Jewish, and Church of Jesus Christ of Latter-Day Saints services. Foreigners were barred from conducting missionary activities, but some foreign religious groups were involved in education and providing social services.

Some foreign church organizations came under pressure to register with government authorities, and some foreign missionaries whose activities extended to citizens were expelled or asked to leave the country. The Government stated that those asked to leave had violated the law. In addition, the Government banned foreign-produced materials about Christianity in the country, including the documentary film "The Cross" and the book "Jesus in Beijing."

The authorities continued a general crackdown on groups considered to be "cults." Premier Wen Jiabao, in his address to the NPC in March, stressed that government agencies should strengthen their anti-cult work. These "cults" included not only Falun Gong and various traditional Chinese meditation and exercise groups (known collectively as "qigong" groups) but also religious groups that authorities accused of preaching beliefs outside the bounds of officially approved doctrine. Groups that the Government labeled cults included Eastern Lightning, the Servants of Three Classes, the Shouters, the South China Church, the Association of Disciples, the Full Scope Church, the Spirit Sect, the New Testament Church, the Way of the Goddess of Mercy, the Lord God Sect, the Established King Church, the Unification Church, and the Family of Love. Authorities accused some in these groups of lacking proper theological training, preaching the imminent coming of the Apocalypse or holy war, or exploiting the reemergence of religion for personal gain. The Eastern Lightning group was accused by the Government and some other unregistered Christian groups of involvement in violence.

Actions against such groups continued during the year. In April, over 100 members of the evangelical group the "Servants of Three Classes" were detained in Harbin, Heliongjiang Province. Most were released, but Gu Xianggao died in custody, allegedly as a result of beatings by police (see Section 1.c.). Police also continued their efforts to close down an underground evangelical group called the "Shouters," an offshoot of a pre-1949 indigenous Protestant group. In 2001, Gong Shengliang, founder of the South China Church, was sentenced to death on criminal charges including rape, arson, and assault. In 2002, an appeals court overturned his death sentence, and Gong was sentenced to life in prison. In the retrial, four women from his congregation claimed that, prior to the first trial, police had tortured them into signing statements accusing Gong of raping them. The four women, who were found not guilty of "cultist activity" in the retrial, were nonetheless immediately sent to reeducation-through-labor camps. In the retrial, the court also dropped all "evil cult" charges against the South China Church. During the year, elderly church member Chen Jingmao reportedly was abused in prison for attempting to convert inmates to Christianity.

The extent of public Falun Gong activity in the country continued to decline considerably, and practitioners based abroad reported that the Government's crackdown against the group continued. Since the Government banned the Falun Gong in 1999, the mere belief in the discipline (even without any public manifestation of its tenets) was sufficient grounds for practitioners to receive punishments ranging from loss of employment to imprisonment. Although the vast majority of the tens of thousands of practitioners detained since 1999 have been released, many were detained again after release (see Section 1.e.), and thousands reportedly remained in reeducation-through-labor camps. Those identified by the Government as "core leaders" have been singled out for particularly harsh treatment. More than a dozen Falun Gong members have been sentenced to prison for the crime of "endangering state security," but the great majority of Falun Gong members convicted by the courts since 1999 have been sentenced to prison for "organizing or using a sect to undermine the implementation of the law," a less serious offense. Most practitioners, however, were punished administratively. In addition to being sentenced to reeducation through labor, some Falun Gong members were sent to detention facilities specifically established to "rehabilitate" practitioners who refused to recant their belief voluntarily after release from reeducation-through-labor camps. In addition, hundreds of Falun Gong practitioners have been confined to mental hospitals (see Section 1.d.).

Police in the past often used excessive force when detaining peaceful Falun Gong protesters. During the year, allegations of abuse of Falun Gong practitioners by the police and other security personnel continued. According to the foreign-based Global Mission to Rescue Persecuted Falun Gong Practitioners, 1,047 Falun Gong practitioners, including children and the elderly, have died since 1997 as a result of official persecution (see Section 1.c.). Other groups based abroad estimated that as many as 2,000 practitioners have died in custody.

During the 2003 SARS epidemic, the Government launched new accusations that Falun Gong practitioners were disrupting SARS-prevention efforts. State-run media claimed that, beginning in April, Falun Gong followers "incited public panic" and otherwise "sabotaged" anti-SARS efforts in many provinces by preaching that belief in Falun Gong will prevent persons from contracting SARS. Authorities detained hundreds of Falun Gong adherents on such charges, including 69 in Jiangsu Province during May 2003 and 180 in Hebei Province during June 2003, according to state-run media. At year's end, their whereabouts remained unknown.

As recently as 2003, the Government continued its effort to round up practitioners not already in custody and sanctioned the use of high-pressure tactics and mandatory anti-Falun Gong study sessions to force practitioners to renounce Falun Gong. Even practitioners who had not protested or made other public demonstrations of belief reportedly were forced to

attend anti-Falun Gong classes or were sent directly to reeducation-through-labor camps, where in some cases, beatings and torture reportedly were used to force them to recant. These tactics reportedly resulted in large numbers of practitioners signing pledges to renounce the movement.

The Government taught atheism in schools. While the Government claimed that there were no national-level regulations barring children from receiving religious instruction, in some regions local authorities barred persons under 18 from attending services at mosques, temples, or churches.

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement within the Country, Foreign Travel, Emigration and Repatriation

Although the Government maintained restrictions on the freedom to change one's workplace or residence, the national household registration and identification card system continued to erode, and the ability of most citizens to move within the country to work and live continued to expand. However, the Government retained the ability to restrict freedom of movement through other mechanisms. Authorities heightened restrictions periodically during the year, particularly before politically sensitive anniversaries and to forestall demonstrations.

The Government's "hukou" system of national household registration underwent further liberalization during the year, as the country responded to economic demands for a more mobile labor force. Nonetheless, many persons could not officially change their residence or workplace within the country. Government and work unit permission were often required before moving from city to city. It was particularly difficult for peasants from rural areas to obtain household registration in some economically more developed urban areas. There remained a "floating population" of between 100 and 150 million economic migrants who lacked official residence status in cities. Without official residence status, it was difficult or impossible to gain full access to social services, including education. Further, migrant workers were generally limited to types of work considered least desirable by local residents, and they had little recourse when subject to abuse by employers and officials. In some major cities, access to education for children of migrant workers continued to improve during the year, and some cities began to offer migrants some other social services free of charge. Many cities and provinces continued experiments aimed at abolishing the distinction between urban and rural residents in household registration documents, including Guangdong, Jiangsu, Shandong, Anhui, Hebei, Hubei, and Sichuan Provinces. However, other localities, including Zhengzhou in Henan Province, re-established registration requirements during the year to halt the drain on public resources that had resulted from an influx of migrants. In June 2003, the administrative detention system of custody and repatriation applied to migrants was abolished and replaced by a network of aid shelters offering services to migrants, but it remained unclear at year's end how these reforms would be implemented (see Section 1.d.).

Prior to sensitive anniversaries, authorities in urban areas rounded up and detained some "undesirables," including the homeless, the unemployed, migrant workers, those without proper residence or work permits, petty criminals, prostitutes, and the mentally ill or disabled. Dissidents reported that the authorities restricted their freedom of movement during politically sensitive periods and visits by foreign dignitaries, including on some occasions removing suspected dissidents from Beijing.

Under the "staying at prison employment" system applicable to recidivists incarcerated in reeducation-through-labor camps, authorities have denied certain persons permission to return to their homes after serving their sentences. Some released or paroled prisoners returned home but were not permitted freedom of movement. Former senior leaders Zhao Ziyang and Bao Tong remained under house arrest in Beijing for their role in the 1989 Tiananmen protests, and security around them routinely was tightened during sensitive periods.

The Government permitted legal emigration and foreign travel for most citizens. Passports were increasingly easy to obtain in most places, although those whom the Government deemed to be threats, including religious leaders, political dissidents, and some ethnic minority members continued to have difficulty obtaining passports (see Tibet Addendum). According to media reports, more than 2.6 million mainland tourists have traveled to Hong Kong since the Government relaxed restrictions on such travel.

There were reports that some academics faced travel restrictions around the year's sensitive anniversaries, particularly the June 4 anniversary of the 1989 Tiananmen Square massacre, and there were instances in which the authorities refused to issue passports or visas on apparent political grounds. Members of underground churches sometimes were refused passports and other necessary travel documents. Some Falun Gong members also had difficulty in obtaining passports. On June 1, Dr. Jiang Yanyong and his wife were detained while en route to pick up a visa to travel abroad to visit their daughter. They were held for 7 and 2 weeks, respectively, because he wrote to government leaders requesting an official reassessment of the Tiananmen massacre. He was released in July, but remained in a form of house arrest. Dr. Jiang also was pressured not to accept the Ramon Magsaysay Award for Public Service and was not permitted to travel to a September awards ceremony in the Philippines.

Similarly, visas to enter the country were sometimes denied for political reasons. For example, some foreign academics who had been critical of the country continued to be denied visas. Some others who intended to discuss human rights or rule of law issues also were denied visas. For foreigners whose business did not raise political sensitivities, the Government introduced a long-term residence permit during the year.

The law neither provides for a citizen's right to repatriate nor otherwise addresses exile. The Government continued to refuse reentry to numerous citizens whom it considered to be dissidents, Falun Gong activists, or troublemakers. Although some dissidents living abroad have been allowed to return, dissidents released on medical parole and allowed to leave the country often were effectively exiled. Activists resident abroad have sometimes been imprisoned upon their return to the country.

The Government's refusal to permit some former reeducation-through-labor camp inmates to return to their homes constituted a form of internal exile.

Although a signatory of the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol, the country has no laws or regulations that authorize the authorities to grant refugee status. The Government largely cooperated with the UNHCR when dealing with the resettlement of ethnic Han Chinese or ethnic minorities from Vietnam and Laos resident in the country. During the year, the Government and UNHCR continued ongoing discussions concerning the granting of citizenship to these residents. Since the late 1980s, the Government has adopted a de facto policy of tolerance toward the small number of persons, fewer than 100 annually, from other nations who registered with the Beijing office of the UNHCR as asylum seekers. The Government permitted these persons to remain in the country while the UNHCR made determinations as to their status and, if the UNHCR determined that they were bona fide refugees, while they awaited resettlement in third countries. However, the Government continued to deny the UNHCR permission to operate along its northeastern border with North Korea, arguing that North Koreans who crossed the border were illegal economic migrants, not refugees.

During the year, several thousand North Koreans were reportedly detained and forcibly returned to North Korea, where many faced persecution and some of whom may have been executed upon their return, as provided in North Korean law. Several hundred North Koreans were permitted to travel to Seoul after they had entered diplomatic compounds or international schools in China, and approximately 1,900 arrived in South Korea via third countries such as Mongolia, Vietnam, Thailand, and Cambodia, most after transiting through China. There were numerous credible reports of harassment and detention of North Koreans in the country. The Government also arrested and detained foreign journalists, missionaries and activists, as well as some Chinese citizens, for providing food, shelter, transportation, and other assistance to North Koreans. According to NGOs, the Government reportedly allowed North Korean security forces to enter China to forcibly repatriate North Korean citizens during the year.

While UNHCR reported that more than 2,000 Tibetans each year continued to cross into Nepal, the Government continued to try to prevent many Tibetans from leaving (see Tibet Addendum).

In October 2003, the Government executed Uighur Shaheer Ali after he and another Uighur were forcibly returned to China in 2002 from Nepal, where they had been granted refugee status by UNHCR (see Section 5).

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

Citizens lack the right to change their government peacefully and cannot freely choose or change the laws and officials that govern them. While recent reforms allow citizens to elect members of village committees, which are not considered to be government bodies, and representatives to local people's congresses, the Communist Party continued to control appointments to positions of political power.

According to the Constitution, the National People's Congress (NPC) is the highest organ of state power. Formally, it elects the President and Vice President, selects the Premier and Vice Premiers, and elects the Chairman of the State Central Military Commission. In practice, the NPC Standing Committee oversees these elections and determines the agenda and procedure for the NPC under the direct authority of the CCP's Politburo Standing Committee. The NPC does not have the power to set policy or remove Government or Party leaders.

Under the 1987 Organic Law of Village Committees and its 1998 amendments, all of the country's approximately 1 million villages were expected to hold competitive, direct elections for subgovernmental village committees. Beginning in 1987, rural citizens voted directly for their local village committees, which were not considered government bodies. Most provinces already have held four or five rounds of village committee elections, according to the Ministry of Civil Affairs. Foreign observers who have monitored local village committee elections judged the elections they observed, on the whole, to have been fair. However, the Government estimated that one-third of all elections had serious procedural flaws. Corruption and interference by township level and Party officials continued to be a problem in some cases.

The 1979 Election Law governs elections of legislative bodies at all levels. Under this law, citizens have the opportunity to vote for local people's congress representatives at the county level and below, although in most cases the nomination of candidates in those elections was strictly controlled. People's congress delegates above the county level are selected by legislators at the level below. For example, provincial-level people's congresses select delegates to the NPC. Beginning in late 2002, a practice began of naming local Communist Party secretaries to concurrently serve as the head of the local people's congress. This move dramatically strengthened Party control over these legislatures.

Although the Party controls appointments of officials to government and Party positions at all levels, some township, county, and provincial elections featured experiments with increased competition, including self-nomination of

candidates, campaign speeches by candidates, public vetting of nominees, and a two-tiered indirect election system. In October, the Election Law was amended to permit preliminary elections to establish the list of candidates for direct elections in certain, limited situations.

The CCP retained a monopoly on political power and forbade the creation of new political parties. The Government continued efforts to suppress the China Democracy Party (CDP), an opposition party that had attracted hundreds of members nationwide within a few months of its founding in 1998. Public security forces had previously arrested nearly all of the CDP's leaders: Xu Wenli, Wang Youcai, and Qin Yongmin were sentenced in 1998 to prison terms of 13, 12, and 11 years, respectively. Xu Wenli and Wang Youcai were released on medical parole in the United States in December 2002 and March 2004, respectively, but Qin remained in prison. At the time of the 16th Party Congress in 2002, authorities targeted many remaining activists for signing an open letter calling for political reform and a reappraisal of the official verdict on the 1989 Tiananmen massacre (see Section 1.d.). More than 40 current or former CDP members remained imprisoned or held in reeducation-through-labor camps during the year, including Zhao Changqing, Sang Jiancheng, He Depu, Yao Zhenxiang, Han Lifa, Dai Xuezhong, and Jiang Lijun. In December, Zhejiang and Jiangsu Province activists were interrogated and a few, including Yang Tianshui and Wang Rongqing, were detained after they publicly proposed that the NPC draft a political party law.

Freedom of information regulations were enacted in many locations during the year, aimed at improving the public's communication with and supervision over local government initiatives. In Wuhan, freedom of information regulations were used in August to force a state-owned enterprise (SOE) to provide a laid-off worker with information about SOE restructuring. In July, a lawsuit was filed in Shanghai to force a local land office to comply with a citizen's request for information. The Government experimented with other forms of public oversight of government, including telephone hotlines and complaint centers, administrative hearings, increased opportunity for citizen observation of government proceedings, and other forms of citizen input in the local legislative process, such as hearings to discuss draft legislation. For example, citizen feedback was an important factor in selecting the site for a new airport in Hubei Province. Most major cities have introduced at least one of these mechanisms for citizens to provide input and feedback on government performance. The experiments have been generally well-received by the public.

Corruption remained an endemic problem. According to the Auditor General, embezzlement and misuse of public funds affected 75 percent of commissions and ministries under the State Council and accounted for approximately $170 million (RMB 1.4 billion) missing from the Central Government's 2003 budget. Transparency International continued to rank China among the worst countries in the world for bribery. Economists estimated that the cost of corruption may exceed 14 percent of gross domestic product.

The courts and Party agencies took disciplinary action against some public and Party officials during the year. According to the Supreme People's Procuratorate (SPP), prosecutors at all levels in 2003 investigated 39,562 cases of abuse of official power involving 43,490 individuals. They prosecuted 22,761 cases involving 26,124 individuals. From January to November, prosecutors investigated 42,258 officials, up one percent from 2003. During the 5-year period ending in 2002, 83,308 public officials were convicted for graft or bribery, a 65 percent increase over the previous 5-year period, according to the Supreme People's Court (SPC). In April 2003, the Minister of Supervision reported that 860,000 corruption cases were filed against Party members from 1997 to 2002, resulting in more than 137,000 expulsions and disciplinary action in more than 98 percent of cases. The Party's Central Discipline and Inspection Commission (CDIC) reported that 174,580 officials at various levels were disciplined for breaking laws and Party discipline in the period from December 2003 to November 2004. Of those, 8,691 lost Party membership and were prosecuted, according to state media reports. In some cases, the CDIC reportedly acted as a substitute for sanctions by the courts and other legal agencies.

During the year, citizens seeking to petition the Central Government for redress of grievances faced harassment, detention, and incarceration. Tens of thousands of citizens sought to redress grievances through petitions to the Central Government. Among them, Mao Hengfeng, a Shanghai housing activist and organizer, was sentenced in April to 18 months in a reeducation-through-labor facility for staging "disorderly visits" to government offices in support of her petition efforts. In August, two women were sentenced to 3 years reeducation after they and four others climbed atop a building near the central Zhongnanhai compound and threatened to commit suicide to protest the Government's neglect of their petitions. In August, Beijing-based petitioner leader Ye Guozhu was arrested for planning to hold a rally to protest forced evictions. He was tried in November, but the outcome of the trial was not available by year's end.

During the year, Central Government officials stated that provincial cadres would be evaluated, in part, on the number of petitions to Beijing coming from their provinces. This initiative aimed to improve accountability by provincial officials and to encourage them to resolve those complaints deemed legitimate. While a few cases were favorably resolved, most petitions languished. In some cases, provincial officials of "Letters and Visits" offices and local police pursued petitioners to Beijing and forcibly returned them to their home provinces. Such detentions often went unrecorded. In November 2003 and March 2004, Jiang Meili, the wife of imprisoned Shanghai housing attorney Zheng Enchong, was pursued to Beijing, abducted, and forced back to Shanghai by local "Letters and Visits" officials. She was seeking legal opinions from Beijing scholars and attorneys to support her husband's appeal of a 2003 conviction for "disclosing state secrets" in Shanghai housing disputes. In Hebei Province's Tangshan County, over 11,000 people signed a petition protesting corruption over land distribution and demanding recall of the local party secretary. When petition leader Zhang Youren carried the petition to Beijing in March, he was detained and forced back to Tangshan, where he was released. In July, Zhang was detained again. In the period before a key Party meeting in September, authorities rounded up thousands of the approximately 50,000 homeless petitioners living in temporary shanties known as Beijing's

"petitioners village." Many were forcibly returned to their home provinces. In December, Liaoning Province resident Qu Huiqian was detained at the State Council complaints office in Beijing while petitioning for her father's right to free housing as a retired military official. According to published reports, she was beaten unconscious by local officials from Liaoning Province and left in a ditch in Beijing. Hundreds of petitioners were also reportedly detained in sports stadiums or forced back to their home provinces at the time of the March NPC session. Some were reportedly sent to psychiatric facilities.

The Government placed no special restrictions on the participation of women or minority groups in the political process. However, women still held few positions of significant influence at the highest rungs of the Party or government structure. There was one woman on the 24-member Politburo; she concurrently held the only ministerial post (out of 28) occupied by a woman. There was also one woman among the five State Councilors. The head of a key Communist Party organization, the United Front Work Department, was a woman. In the country's 28 ministries, only 14 women served at the level of vice minister or higher. Women freely exercised their right to vote in village committee elections, but only a small fraction of elected members were women. As of the end of 2003, there were 12.3 million female Party members, making up over 18 percent of the 66.4 million members of the Communist Party. Women constituted 20.2 percent of the NPC and 13.2 percent of the NPC Standing Committee. The 16th Party Congress in 2002 elected 27 women to serve as members or alternates on the 198 person Central Committee, a slight increase over the total of the previous committee.

Minorities constituted 14 percent of the NPC, although they made up approximately 9 percent of the population. All of the country's 55 officially recognized minority groups were represented in the NPC membership. The 16th Party Congress elected 35 members of ethnic minorities to serve as members or alternates on the Central Committee and one ministerial-level post was held by an ethnic minority. However, minorities held few senior Party or government positions of significant influence.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The Government did not permit independent domestic NGOs to monitor openly or to comment on human rights conditions. It was difficult to establish an NGO, and the Government tended to be suspicious of independent organizations; most existing NGOs were quasi-governmental in nature and were closely controlled by government agencies (see Section 2.b.). However, an informal network of dissidents in cities around the country has become a credible source of information about government actions taken against activists. The information was disseminated outside of the country through organizations such as the Hong Kong-based Information Center for Human Rights and Democratic Movement in China and the New York-based Human Rights in China.

The press regularly printed articles about officials who exceeded their authority and infringed on citizens' rights. However, the Government remained reluctant to accept criticism of its human rights record by other nations or international organizations and criticized reports by international human rights monitoring groups, claiming that such reports were inaccurate and interfered with the country's internal affairs. Individuals were charged with and often convicted of "disclosing state secrets" during the year after passing information to human rights NGOs based abroad (see Sections 1.c. and 2.a.). The Government maintained that there were legitimate, differing approaches to human rights based on each country's particular history, culture, social situation, and level of economic development. The Government established the China Society for Human Rights, a "nongovernmental" organization whose mandate was not to monitor human rights conditions, but to defend the Government's views and human rights record.

The Government had active human rights dialogues with Australia, Canada, Germany, Hungary, Japan, Mexico, Norway, Switzerland, the United Kingdom, and the European Union. In March, the Government announced that it was suspending its human rights dialogue with the United States in reaction to the U.S. decision to table a resolution critical of the country's human rights record at the U.N. Commission on Human Rights 2004 session. The U.S. did not agree to schedule a new round of dialogue with China because of the lack of sufficient concrete results from the last round, held in December 2002. The Government also terminated some legal reform cooperation with the United States and U.S.-supported organizations.

The Government continued its unofficial dialogue on human rights and prisoner issues with a San Francisco-based human rights group. Visits by the group's exective director, including a prison visit, occurred during the year.

In September, members of the U.N. Working Group on Arbitrary Detention visited Beijing, Sichuan Province, and the TAR (see Section 1.d.). The Government agreed to invite the U.N. Special Rapporteur on Torture and the U.N. Special Rapporteur on Religious Intolerance, but those visits did not take place by year's end. The Government also extended an invitation to the leaders of the U.S. Commission on International Religious Freedom, but the visit did not occur due to restrictive conditions that the Government placed on the visit.

Section 5 Discrimination, Societal Abuse, and Trafficking in Persons

There were laws designed to protect women, children, persons with disabilities, and minorities. However, in practice, some societal discrimination based on ethnicity, gender, and disability persisted.

Case 1:05-cv-01602-UNA     Document 7     Filed 09/20/2005     Page 42 of 214

Violence against women was a significant problem. There was no national law criminalizing domestic violence, but Articles 43 and 45 of the Marriage Law provide for mediation and administrative penalties in cases of domestic violence. Over 30 provinces, cities, or local jurisdictions have passed legislation specifically to address domestic violence. According to a survey by the All-China Women's Federation, 16 percent of women had been beaten by their husbands. In 2002, women's federations at all levels received 36,600 complaints about family violence, up nearly 40 percent over the previous year, while the number of letters received complaining of family violence was nearly 30,000, up nearly 30 percent. Two-thirds of children were victims of family violence during their lives, according to the China Society for Human Rights. Actual figures were believed to be higher because spousal abuse still went largely unreported. According to experts, domestic abuse was more common in rural areas than in urban centers. In response to increased awareness of the problem of domestic violence, there were a growing number of shelters for victims. Rape is illegal, and some persons convicted of rape were executed. The law does not expressly recognize or exclude spousal rape.

The Central Government prohibits the use of physical coercion to compel persons to submit to abortion or sterilization. However, intense pressure to meet birth limitation targets set by government regulations (see Section 1.f.) has resulted in instances of local birth planning officials reportedly using physical coercion to meet government goals. In addition, women faced a disproportionate burden due to the government's enforcement of its birth limitation laws and practices, which require the use of birth control methods (particularly IUDs and female sterilization, which according to government statistics accounted for over 80 percent of birth control methods employed) and the abortion of certain pregnancies.

According to expert estimates, there were 1.7 to 5 million commercial sex workers in the country. The increased commercialization of sex and related trafficking in women trapped thousands of women in a cycle of crime and exploitation and left them vulnerable to disease and abuse. According to the official Xinhua News Agency, one in five massage parlors in the country was involved in prostitution, with the percentage higher in cities. A 2004 Guangdong Province survey found that 74.2 percent of massage parlor workers were involved in prostitution. Unsafe working conditions were rampant among the saunas, massage parlors, clubs, and hostess bars that have sprung up in large cities. Research indicated that up to 80 percent of prostitutes in some areas had hepatitis. In light of this and, in particular, of the growing threat of AIDS among sex workers, the U.N. Convention on the Elimination of Discrimination Against Women Committee in 1998 recommended that due attention be paid to health services for female prostitutes.

Although the Central Government and various provincial and local governments have attempted to crack down on the sex trade, there have been numerous credible reports in the media of complicity in prostitution by local officials. Actions to crack down on this lucrative business, which involved organized crime groups and businesspersons as well as the police and the military, had limited results. In August, an investigation of prostitution at entertainment facilities in Guangdong Province led to the permanent closure of 15 percent and temporary closure of another 40 percent of the facilities investigated, according to state-run media. There have been instances in which persons involved in organizing and procuring prostitutes have been prosecuted.

No statute outlaws sexual harassment in the workplace, and the law does not specifically define sexual harassment. In 2003, Beijing courts accepted and issued judgments in their first sexual harassment cases. There was no reliable data about the extent of sexual harassment, and the law did not specifically define sexual harassment. Experts suggested that many victims of sexual harassment did not report it out of fear of losing their jobs, but awareness was growing. State media reported that a television series on sexual harassment aired on many channels.

The Government has made gender equality a policy objective since 1949. The Constitution states that "women enjoy equal rights with men in all spheres of life." The Law on the Protection of Women's Rights and Interests provides for equality in ownership of property, inheritance rights, and access to education. Policies that once allotted work unit housing only to the husband in a couple have become gender-neutral, and an April Supreme Court interpretation emphasized that housing rights are shared equally, even in cases of divorce. Nonetheless, many activists and observers increasingly were concerned that the progress that has been made by women over the past 50 years was being eroded. They asserted that the Government appeared to have made the pursuit of gender equality a secondary priority as it focused on economic reform and political stability.

The Law on the Protection of Women's Rights and Interests was designed to assist in curbing gender-based discrimination. However, women continued to report that discrimination, sexual harassment, unfair dismissal, demotion, and wage discrepancies were significant problems. Efforts have been made by social organizations as well as by the Government to educate women about their legal rights, and there was anecdotal evidence that women increasingly were using laws to protect their rights.

Women's networks, involving lawyers, activists, and the press, were active in Beijing, Shanghai, and other cities, highlighting problems and calling for solutions to gender-based discrimination.

Nevertheless, women frequently encountered serious obstacles to the enforcement of laws. According to legal experts, it was very hard to litigate a sex discrimination suit because the vague legal definition made it difficult to quantify damages. As a result, very few cases were brought to court. Some observers also noted that the agencies tasked with protecting women's rights tended to focus on maternity-related benefits and wrongful termination during maternity leave rather than on sex discrimination, violence against women, and sexual harassment.

The All China Women's Federation reported that 47 percent of laid-off workers were women, a percentage significantly higher than their representation in the labor force. Many employers preferred to hire men to avoid the expense of maternity leave and childcare, and some even lowered the effective retirement age for female workers to 40 years of age (the official retirement age for men was 60 years and for women 55 years). Lower retirement ages also had the effect of reducing pensions, which generally were based on years worked. Some employers required that women be below the age of 30 to qualify for certain jobs.

The law provides for equal pay for equal work. However, a 1999 Government survey found that urban women were paid only 70.1 percent of what men received for the same work, while women in rural areas received only 59.6 percent of male peasants' incomes. Average incomes of female executives and senior professionals were only 57.9 percent and 68.3 percent of their male colleagues' salaries. Women have borne the brunt of the economic reform of state owned enterprises. Most women employed in industry worked in lower skilled and lower paid jobs and in sectors, such as textiles, which were particularly vulnerable to restructuring and layoffs. Women accounted for 60 percent of those below the poverty line in the country.

UNESCO reported during the year that less than 2 percent of women between the ages of 15-24 were illiterate, adding that 15 percent of women 15 years and older were illiterate. The female illiteracy rate was double that for men. Official government statistics claimed that the illiteracy rate among women ages 15-40 was 4.2 percent.

A high female suicide rate continued to be a serious problem. Many observers believed that violence against women and girls, discrimination in education and employment, the traditional preference for male children, the country's birth limitation policies, and other societal factors contributed to the especially high female suicide rate.

While the gap in the education levels of men and women was narrowing, men continued to constitute a disproportionate number of the relatively small percentage of the population that received a university-level education. According to figures released by the All-China Women's Federation, in 2002 women made up 44.0 percent of university students and 46.7 percent of all high school students. However, women with advanced degrees reported an increase in discrimination in the hiring process as the job distribution system opened up and became more competitive and market driven. According to Government statistics, 98.5 percent of girls nationwide were enrolled in elementary school, but it was widely believed that the proportion of girls attending school in rural and minority areas was far smaller than in cities.

Children

The Constitution prohibits maltreatment of children and provides for compulsory education. The country has outlawed child labor and trafficking in children, but serious problems in those areas persisted.

The Constitution provides for 9 years of compulsory education for children, but in economically disadvantaged rural areas, many children did not attend school for the required period and some never attend. Public schools were not allowed to charge tuition, but after the Central Government largely stopped subsidizing primary education in the early 1990s, many public schools began to charge mandatory fees to meet revenue shortfalls. Such fees made it difficult for poorer families to send their children to school or to send them on a regular basis. Some charitable schools have opened in recent years in rural areas, but not enough to meet demand. Children of migrant workers in urban areas also often had difficulty attending school. For these families, excessive school fees were a significant problem. The Government campaign for universal primary school enrollment by 2000 (which was not met) helped to increase enrollment in some areas. It also reportedly led some school officials to inflate the number of children actually enrolled.

In 2003, the U.N. Special Rapporteur on the Right to Education visited the country. Following the visit, the Special Rapporteur reported that the Government failed to provide education to many children of migrant workers and prohibited children from receiving religious education. The Special Rapporteur expressed serious concern about the recent privatization of the costs of public education, reporting that the Government compels parents to pay nearly half the costs of public education, making education inaccessible to many children. The Special Rapporteur also recommended the immediate prohibition of the practice of children performing manual labor at their schools to raise funds.

An extensive health care delivery system has led to improved child health and a continued decline in infant mortality rates. According to the 2000 Census, the infant mortality rate was 28.4 per 1,000. According to UNICEF statistics, the mortality rate for children under 5 years of age was 37 per 1,000 live births. The Law on the Protection of Juveniles forbids infanticide; however, there was evidence that the practice continued. According to the National Population and Family Planning Commission, only a handful of doctors have been charged with infanticide under this law. The law prohibits discrimination against disabled minors and codifies a variety of judicial protections for juvenile offenders. The physical abuse of children can be grounds for criminal prosecution.

Despite government efforts to prevent kidnapping and the buying and selling of children, these problems persisted in some rural areas, and children also were trafficked for labor purposes (see Section 5, Trafficking).

In 2004, Guangzhou and Chengdu cities established the country's first specialized juvenile courts designed to protect minors' rights and interests. Authorities arrested 69,780 juveniles in 2003 and approximately 19,000 juveniles were incarcerated in formal prisons. Abolition of the system of custody and repatriation in 2003 (see Section 1.c.) reduced the

number of children detained administratively. Nonetheless, more than 150,000 homeless "street children" lived in cities, according to state-run media. Many did not live with their parents and survived by begging. Juveniles were required by law to be held separately from adults except when facilities were insufficient. In practice, children sometimes were detained without their parents, held with adults, and required to work (see Sections 1.d. and 6.c.).

In 2003, 3-year-old Li Siyi starved to death at home in Chengdu, Sichuan Province, after police detained her mother for stealing two bottles of shampoo and reportedly ignored the mother's pleas to check on the girl. On August 19, two police officers were convicted of dereliction of duty in the case and sentenced to 2 and 3 years in prison.

Female infanticide, sex-selective abortions, and the abandonment and neglect of baby girls remained problems due to the traditional preference for sons and the birth limitation policy (see Section 1.f.). Many families, particularly in rural areas, used ultrasound to identify female fetuses and terminate pregnancies. An official study in Hainan Province found that 68 percent of abortions were of female fetuses. In a 2002 survey, 35 percent of women in one rural township admitting to having an abortion because of preference for a male child. Official figures from November 2000 put the overall male-female sex ratio at birth at 116.9 to 100 (as compared to the statistical norm of 106 to 100). For second births, the ratio was 151.9 to 100. Female babies also suffered from a higher mortality rate than male babies, contrary to the worldwide trend. State media reported that infant mortality rates in rural areas were 27 percent higher for girls than boys. Neglect of baby girls was one factor in their lower survival rate. One study found the differential mortality rates were highest in areas where women had a lower social status and economic and medical conditions were poor.

The Law on the Protection of Juveniles forbids the mistreatment or abandonment of children. According to the latest available figures, compiled in 1994, the number of children abandoned annually was approximately 1.7 million, and the number may have grown over the subsequent decade despite the fact that, under the law, child abandonment is punishable by a fine and a 5-year prison term. The vast majority of children in orphanages were female, although some were males who were either disabled or in poor health. Medical professionals frequently advised parents of children with disabilities to put the children into orphanages.

The Government denied that children in orphanages were mistreated or refused medical care but acknowledged that the system often was unable to provide adequately for some children, particularly those with serious medical problems. A 1997 revision of the adoption law made it easier for couples to adopt. However, adopted children were counted under the birth limitation regulations in most locations. As a result, couples who adopted abandoned baby girls, for example, were sometimes barred from having additional children.

Trafficking in Persons

The law prohibits trafficking in women and children; however, trafficking in persons and the abduction of women for trafficking remained serious problems. The country was both a source and destination country for trafficking in persons. Most trafficking was internal for the purpose of providing lower middle income farmers with brides or sons. Some cases involved trafficking of women and girls into forced prostitution in urban areas, and some reports suggested that certain victims, particularly children, were sold into forced labor.

Internal trafficking was a significant problem. The Ministry of Public Security estimated that at least 9,000 women and 1,000 children were kidnapped and sold illegally each year.

Some experts suggested that the demand for abducted women was fueled by the shortage of marriageable brides, particularly in rural areas. The serious imbalance in the male-female sex ratio at birth, the tendency for many village women to leave rural areas to seek employment, and the cost of traditional betrothal gifts all made purchasing a bride attractive to some poor rural families. Some families recruited brides from economically less advanced areas. Others sought help from criminal gangs, which either kidnapped women and girls or tricked them by promising them jobs and an easier way of life and then transporting them far from their home areas for delivery to buyers. Once in their new "family," these women were "married" and raped. Some accepted their fate and joined the new community; others struggled and were punished.

There were reports that women and girls from Burma, Laos, North Korea, Vietnam, and Russia were trafficked into the country either to work in the sex trade or to be forced to marry Chinese men. Past reports noted that trafficking of North Korean women and girls into the country to work in the sex industry was reportedly widespread in the northeastern part of the country, but reliable sources suggested that the practice has decreased. According to press reports, North Korean brides were sold for approximately $38 to $150 (RMB 315 to RMB 1,245). Women reportedly also were trafficked from Vietnam into the country for the purpose of forced marriage.

Citizens were trafficked from the country for sexual exploitation and indentured servitude in domestic service, sweatshops, restaurants, and other services. There were reports that citizens were trafficked to Australia, Belgium, Burma, Canada, Hungary, Italy, Japan (illegal immigrants held in debt bondage), Malaysia, the Netherlands (for the purpose of sexual exploitation), Singapore, Sri Lanka (for sexual exploitation), Taiwan, the United Kingdom (for sexual exploitation), and the United States.

At times, trafficked persons became entangled with alien smuggling rings, which often had ties to organized crime and

were international in scope. Persons trafficked by alien smugglers paid high prices for their passage to other countries, where they hoped that their economic prospects would improve. There were credible reports that some promised to pay from $30,000 to $50,000 (RMB 248,000 to 415,000) each for their passage. Upon arrival, many reportedly were forced to repay the traffickers for the smuggling charges by working in specified jobs for a set period of time. They often also were forced to pay charges for living expenses out of their meager earnings. The conditions under which these trafficked persons had to live and work were generally poor, and they were often required to work long hours. The smuggling rings that trafficked them often restricted their movements and confiscated their often fraudulent travel documents. Victims of trafficking faced threats of being turned in to the authorities as illegal immigrants and threats of retaliation against their families at home if they protested the situation in which they found themselves. Persons who were trafficked from the country and then repatriated sometimes faced fines for illegal immigration upon their return; after a second repatriation, such persons could be sentenced to reeducation through labor. Alien smugglers were fined $6,000 (RMB 49,600), and most were sentenced to up to 3 years in prison; some have been sentenced to death.

Kidnapping and the buying and selling of children continued to occur, particularly in poorer rural areas. There were no reliable estimates of the number of children trafficked. Domestically, most trafficked children were sold to couples unable to have children; in particular, boys were trafficked to couples unable to have a son. During the year, media reported arrests in the case of 76 baby boys sold in Hohhot, Inner Mongolia, and a case of 200 children, mostly boys, who were kidnapped in Kunming, Yunnan Province. However, baby girls also were trafficked. During the year, 52 people were convicted in a March 2003 case in which 28 girls were found packed in suitcases on a bus from Yulin, Guangxi Province. The babies were purchased in Yulin for $24 (RMB 200) to be resold for $240 to $360 (RMB 1992 to RMB 2988) to families in Anhui and Henan Provinces to work or serve as child brides. The oldest was 5 months of age; one baby died en route. Two leaders of the ring were sentenced to death. Children were also trafficked for labor purposes. Children trafficked to work usually were sent from poorer interior areas to relatively more prosperous areas; traffickers reportedly often enticed parents to relinquish their children with promises of large remittances that their children would be able to send to them.

The purchase of women was not criminalized until 1991, with the enactment of the NPC Standing Committee's "Decision Relating to the Severe Punishment of Criminal Elements Who Abduct and Kidnap Women and Children." This decision made abduction and sale separate offenses.

Arrests of traffickers have decreased from the peak in 2000, when a nationwide crackdown was initiated. That year, more than 19,000 persons were arrested and more than 11,000 were sentenced to punishments, including, in a few cases, the death penalty. In May, two men were sentenced to death in Yunnan Province after being convicted of trafficking 22 women to Guangdong Province and forcing them into prostitution. According to official media reports, from 2001 to 2003, police freed more than 42,000 kidnapped women and children. More than 22,000 suspects were arrested, and police solved 20,360 cases involving kidnapped women and children. Official statistics indicate that during the year authorities registered 3,343 cases involving trafficking of women and children (a 76.2 percent increase from 2002); uncovered 2,966 new cases of trafficking (an 87.1 percent increase from 2002); and rescued a total of 8,949 trafficked women and children (an 18.7 percent decrease from 2002). During the year, 5,043 suspects were arrested, and 3,144 were referred for prosecution. In Guangdong Province alone, 68 prosecutions were undertaken against traffickers from 2002 to June 2004 and officials rescued more than 100 children.

Despite government efforts to eliminate trafficking in women and children, the problem persisted. Demand far outstripped the available supply, making trafficking a profitable enterprise for those willing to risk arrest and prosecution. The Government also continued to struggle with the pervasive problem of official corruption (see Section 3). There were reports of complicity of local officials in the related problem of alien smuggling, as well as reports of the complicity of local officials in prostitution, which sometimes involved trafficked women. Hong Kong-based media reported in November that a Guangdong police official was arrested after allegedly providing thousands of visas to prostitutes traveling to Hong Kong and Macao, some of whom had reportedly never been to the place of visa issuance. In some cases, village leaders sought to prevent police from rescuing women who had been sold as brides to villagers.

Agencies involved in combating trafficking included the MPS, the SPC, the SPP, the Ministry of Civil Affairs, the Central Office in Charge of Comprehensive Management of Public Order, and the Legislative Office of the State Council. It was Central Government policy to provide funds to provincial and local police to house victims and return them to their homes. Government-funded women's federation offices provided counseling on legal rights, including the options for legal action against traffickers, to some victims. The All-China Women's Federation assisted Chinese victims in obtaining medical and psychological treatment.

Persons With Disabilities

The law protects the rights of persons with disabilities; however, the reality for persons with disabilities lagged far behind legal dictates, and many did not receive or have access to special assistance or to programs designed to assist them. According to the official press, all local governments have drafted specific measures to implement the law.

As attention began to focus on the Special Olympics and Paralympics to be held in the country in 2007-08, the press increasingly publicized the plight of persons with disabilities and the Government's efforts to assist them. State media reported that the Government increased its planned 2004 spending on infrastructure improvements for persons with disabilities to approximately $15.75 million, up from $12.5 million in 2003. The Government, at times in conjunction with NGOs such as the Lions Club International or the Special Olympics, sponsored a wide range of preventive and

Case 1:05-cv-01602-UNA     Document 7     Filed 09/20/2005     Page 46 of 214

rehabilitative programs. For example, several thousand blind persons have been trained in therapeutic massage. The goal of many of these programs was to allow persons with disabilities to be integrated into society. However, misdiagnosis, inadequate medical care, pariah status, and abandonment remained common problems.

According to reports, doctors frequently persuaded parents of children with disabilities to place their children in large government-run institutions, often far from the parents, and in which care was often seriously inadequate. Those parents who chose to keep children with disabilities at home generally faced difficulty in getting adequate medical care, day care, and education for their children. Government statistics showed that almost one quarter of the approximately 60 million persons with disabilities lived in extreme poverty. Unemployment among adults with disabilities remained a serious problem. The Government's official strategy was to integrate persons with disabilities into the mainstream work force, but efforts to do so were limited and confronted a cultural legacy of discrimination and neglect. Standards adopted for making roads and buildings accessible to persons with disabilities were subject to the Law on the Handicapped, which calls for their "gradual" implementation; compliance with the law was lax. Students with disabilities were discriminated against in access to education. The Higher Education Law permits universities legally to exclude candidates for higher education who have disabilities.

The Maternal and Child Health Care Law forbids the marriage of persons with certain specified contagious diseases or certain acute mental illnesses such as schizophrenia. If doctors find that a couple is at risk of transmitting disabling congenital defects to their children, the couple may marry only if they agree to use birth control or undergo sterilization. The Population and Family Planning Law requires local governments to employ such practices to raise the percentage of healthy births.

National/Racial/Ethnic Minorities

According to the 2000 census, the total population of the country's 55 officially recognized ethnic minorities was 106.4 million, or 8.4 percent of the total population. In addition to these 55 ethnic minorities and the dominant Han ethnic group, some citizens identified themselves as members of unrecognized ethnic minorities. Most minority groups resided in the areas they traditionally have inhabited. The Government's avowed policy on minorities calls for preferential treatment in marriage regulations, birth planning, university admission, and employment. Programs have been established to provide low interest loans, subsidies, and special development funds for minority areas. Nonetheless, in practice, minorities faced discrimination by the majority Han culture. Most of the minorities in border regions were less educated than the national average, and job discrimination in favor of Han migrants remained a serious problem. Racial discrimination was the source of deep resentment by minorities in some areas, such as Xinjiang, Inner Mongolia, and Tibetan areas. For example, ethnic Uighurs in Xinjiang did not have equal access to newly created construction jobs associated with development projects; Han workers were brought in from Sichuan and elsewhere to work, particularly on technical projects such as oil and gas pipelines. The Government did not openly recognize racism against minorities or tension among different ethnic groups as problems.

Government development policies have long been in place to improve minority living standards. However, while overall standards of living for those in minority areas have improved as a result of these policies, real incomes in minority areas, particularly for minorities, remained well below those in other parts of the country. The majority Han Chinese have benefited disproportionately from government programs and economic growth, even in minority areas. Many development programs have disrupted traditional living patterns of minority groups, and have included, in some cases, the forced evacuation of persons (see Section 2.d.).

Since 1949, government policy has resulted in a significant migration of Han Chinese to Xinjiang. According to a Government White Paper released in 2003, approximately 8.25 million of Xinjiang's 19.25 million official residents were Han Chinese, up from 300,000 in 1949. Approximately 8 million Xinjiang residents were Uighurs. Signficant numbers of Kazakhs, Hui, Tajiks, and other minorities also lived in Xinjiang. Official statistics underestimated the Han population of Xinjiang because the Government did not count as part of the official population the thousands of Han who were long-term "temporary workers." The migration of ethnic Han into Xinjiang in recent decades has caused the Han-Uighur ratio in the capital of Urumqi to shift from 20:80 to 80:20 and was a source of Uighur resentment. According to the 2000 census, non-Tibetan residents of the TAR comprised 6 percent of the population, but that figure did not include a large number of long-term Han residents. Their presence caused resentment among some Tibetans (see Tibet Addendum).

In many areas with a significant population of minorities, there were two-track school systems that used either standard Chinese or the local minority language. Students could choose to attend schools in either system. However, graduates of minority language schools typically needed 1 year or more of intensive Chinese before they could handle course work at a Chinese language university. Despite the Government's efforts to provide schooling in minority languages, the dominant position of standard Chinese in government, commerce, and academia put graduates of minority schools who lacked standard Chinese proficiency at a disadvantage. The vast majority of Uighur children in Xinjiang attended Uighur-language schools and generally received an hour's Chinese language instruction per day. During the year, the government allocated an additional US$9 million (RMB 74.25 million) to promote Chinese-language instruction in Xinjiang.

The CCP has an avowed policy of boosting minority representation in the Government and the CCP, and minorities constituted 14 percent of the NPC, which was higher than their percentage in the population. A 1999 government white paper reported that there were 2.7 million minority officials in the Government. The 2003 Government White Paper

states that there are 348,000 minority cadres in Xinjiang, accounting for 51.8 percent of all Party members in the autonomous region. Many members of minorities occupied local leadership positions, but few held positions of influence in the local Party apparatus or at the national level. For example, 63 percent of Xinjiang's deputies to the NPC were ethnic minorities. However, in most areas, ethnic minorities were shut out of positions of real political and economic power, which fed their resentment of Han officials holding the most powerful Party positions in minority autonomous regions.

Tensions between ethnic Han citizens and Uighurs in Xinjiang continued, and the authorities continued to restrict political, civil, and religious freedoms (see Section 2.c.) in the region. A campaign that began in 1997 to stress unity and to condemn "splittism" and religious extremism showed no signs of abating. During the year, authorities continued to prohibit activities they deemed separatist in nature, announced tightened security measures, and mounted campaigns to crack down on opposition.

The campaign against separatism in Xinjiang specifically targeted the "three evils" of extremism, splittism, and terrorism as the major threats to Xinjiang's social stability. Because the Government authorities in Xinjiang regularly grouped together those involved in "ethnic separatism, illegal religious activities, and violent terrorism," it was often unclear whether particular raids, detentions, or judicial punishments targeted those peacefully seeking to express their political or religious views or those engaged in violence. Many observers raised concerns that the Government's war on terror was being used as a pretext for cracking down harshly on Uighurs expressing peaceful political dissent and on independent Muslim religious leaders. In December 2003, the Government published an "East Turkestan Terrorist List," which labelled organizations such as the World Uighur Youth Congress and the East Turkestan Information Center as terrorist entities. These groups openly advocated East Turkestan independence, but with the exception of one group, the East Turkestan Islamic Movement (ETIM), there was no available evidence that they advocated violence to achieve this goal. The U.N. has designated ETIM a terrorist organization.

Uighurs were sentenced to long prison terms and sometimes executed during the year on charges of separatism. During the strike-hard campaign, which officially concluded in 2003, authorities stated they prosecuted more than 3,000 cases in Xinjiang and held mass sentencing rallies attended by more than 300,000 persons. By its own account, the Government broke up 22 groups engaged in what it claimed were separatist and terrorist activities and meted out 50 death sentences to those charged with separatist acts from January to August. In July, two Muslim Uighurs reportedly were executed after being convicted in Aksu City, Xinjiang, of illegally organizing the East Turkestan People's Party and using armed tactics to split the country. Approximately 15 others were convicted of separatism and sentenced to long prison terms in the same case. In October 2003, Uighur Shaheer Ali was executed after being convicted of terrorism. He had been repatriated forcibly from Nepal in 2002, where he had been interviewed by the UNHCR and granted refugee status.

For many Uighurs, the ongoing imprisonment of Uighur businesswoman Rebiya Kadeer symbolized the Government's mistreatment of Uighurs. In 2000, a Xinjiang court sentenced Kadeer, a former member of the provincial-level Chinese People's Political Consultative Conference, to 8 years in prison on charges of "passing state intelligence" to foreigners; according to an official press report, the intelligence she was accused of passing included newspaper articles and a list of names of persons whose cases had been handled by the courts. Kadeer, her son, and her secretary were arrested in 1999 while on their way to meet a visiting foreign delegation. Kadeer reportedly suffered various health problems in prison. Some foreign observers believed Kadeer was singled out for her activism on behalf of Uighurs and for her husband's involvement with Uighur causes and Radio Free Asia. In March, Kadeer received a 1-year sentence reduction for good behavior. The Government claimed she had recognized that she was a victim of "splittism" and remained "on the side of the Party and the people." She was due for release in August 2006. On October 18, Uighur Dilkex Tilivaldi was detained after meeting a foreign journalist, and his whereabouts continued to be unknown.

Other Uighurs whose work emphasized pride in cultural identity have also been harassed and detained by the Government. Writer and translator Abdulghani Memetemin was convicted in June 2003 on charges of sending state secrets abroad and sentenced to 9 years in prison for translating news articles into Chinese from the Uighur language and forwarding official speeches to the East Turkestan Information Center. In late 2001, the U.N. Working Group on Arbitary Detention ruled that Uighur scholar and researcher of Xinjiang's ethnic minorities Tohti Tunyaz had been arbitrarily detained. He was sentenced in 1999 to an 11-year prison term for "inciting separatism" and "illegally acquiring state secrets" and remained in prison at year's end.

Possession of publications or audiovisual materials discussing independence or other sensitive subjects was not permitted, and, according to reports, possession of such materials resulted in lengthy prison sentences.

Officials in the region claimed that the campaign against separatism was necessary to maintain public order. In March, Xinjiang's chairman Ismail Tiliwaldi said the campaign had improved security, noting in published reports that, since the start of 2003, there were no explosions or assassinations in the region and no tourists were killed in Xinjiang.

Han control of the region's political and economic institutions also contributed to heightened tension. Although government policies brought tangible economic improvements to Xinjiang, Han residents have received a disproportionate share of the benefits. The majority of Uighurs were poor farmers, and 25 percent were illiterate. Regulations require Uighurs to use Mandarin Chinese characters for their names on identification documents.

In July, Guizhou University Law School dean Yuan Hongbing and former colleague Zhao Jing applied for asylum during a business trip to Australia. Yuan, an ethnic Mongolian who had been arrested in 1994 for dissident writings and political organizing, stated that he had decided to remain in Australia in order to publish his writings on the situation of ethnic Mongolians and Tibetans. Inner Mongolian cultural activist Hada also continued to serve a 15-year sentence during the year.

In October, violence erupted near Zhongmou Township in Henan Province after an ethnic Hui taxi driver struck and killed a 6-year-old Han girl. Ethnic recriminations followed involving Han and Hui from several villages. In the end, dozens from both ethnic groups were killed or wounded. The Government closed Zhongmou to outsiders for several weeks and imposed a ban on domestic and foreign news reporting about the incident. Farmers' rights advocate Li Guozhu was detained in November after visiting the area, interviewing locals about the violence, and allegedly relaying his findings to foreign journalists.

Other Societal Abuses and Discrimination

No laws criminalize private homosexual activity between consenting adults. The 1997 criminal code abolished the crime of "hooliganism," which had previously been used to prosecute gay men and lesbians. In 2001, medical authorities removed homosexuality from the national diagnostic handbook of psychiatric disorders. In May, prohibitions on homosexuality were dropped from regulations governing the behavior of individuals serving sentences. In July, the country's delegation to the 15th annual AIDS Conference in Bangkok, Thailand, included representatives of an NGO advocating gay rights. Gay men and lesbians stated that official tolerance has improved in recent years. However, societal discrimination and strong pressure to conform to family expectations deter most individuals from publicly discussing their sexual orientation.

During the year, the Government officially outlawed discrimination against persons with HIV/AIDS and Hepatitis B under a new Contagious Disease Law and adopted regulations forbidding employment discrimination against persons with HIV/AIDS and Hepatitis B. However, discrimination against persons with HIV/AIDS remained widespread in many areas. Hospitals and physicians often refused to treat HIV-positive patients.

In February, the Government created the State Council AIDS office, putting policy formation regarding the AIDS issue at the highest Government level. The Government also introduced the China CARES Program, the goal of which was to provide care and treatment to 60,000 poor, rural people with HIV/AIDS. The program began in 51 pilot counties in April and added an additional 76 counties in June. The day before World AIDS Day, President Hu Jintao publicly shook hands with an AIDS patient and spoke about the need for the country to address the disease candidly without stigma. Regulations were also revised to permit, for the first time, those with HIV/AIDS and Hepatitis B to work as civil servants.

Information about the number of HIV/AIDS cases in the country remained difficult to gather and assess. Officials acknowledged that over 1 million citizens were infected with HIV, although the Government had not updated its official estimate of 840,000 persons infected.

Activist Li Dan was beaten and Pan Zhongfeng detained in Shangqiu, Henan Province, during a July demonstration protesting closure of an AIDS orphanage and school. Henan Province activists Wang Guofeng and Li Suzhi claimed they received inadequate treatment while detained and that authorities refused to provide them with test results or allow them to travel to Beijing to see specialists after they were released on bail (see Section 1.c.).

Section 6 Worker Rights

a. The Right of Association

The Constitution provides for freedom of association. However, in practice, workers were not free to organize or join unions of their own choosing. The All-China Federation of Trade Unions (ACFTU), which was controlled by the Communist Party and headed by a high-level Party official, was the sole legal workers' organization. The Trade Union Law gives the ACFTU control over the establishment and operation of all subsidiary union organizations and activities throughout the country, including enterprise-level unions. The Trade Union Law also allows workers to decide whether to join official unions in their enterprises. There were no reports of repercussions for the small percentage of workers in the state-owned sector that had not joined. Independent unions are illegal.

Although the ACFTU and its constituent unions had a monopoly on trade union activity, their influence over the workplace diminished with the economic reforms of recent years. ACFTU unions were relatively powerless to protect the tens of millions of members who have lost their jobs or had their wages or benefits delayed or cut in the massive restructuring of state-owned enterprises (SOEs), although, at the national level, the ACFTU may provide policy input on these issues. The unions have also provided some benefits and reemployment assistance to affected workers. The ACFTU had difficulty organizing in the country's rapidly growing private and foreign-invested sectors, where union membership during the year was estimated to be less than 20 percent. With declines in the state-owned sector and organizational weakness outside the state sector, the ACFTU's membership declined from nearly 100 percent of the urban workforce during the height of the planned economy to approximately 50 percent in recent years. The ACFTU reported a membership of 130 million at the end of 2003, out of an estimated 256 million urban workers.

The existence of an enormous rural labor force, some 490 million out of a total labor force of approximately 750 million, also complicated the organization and protection of workers. Farmers did not have a union or any other similar organization. Of some 130 million rural residents working in township and village enterprises, only a very small percentage were represented by unions. A "floating" migrant labor force of over 100 to 150 million persons has proven especially difficult to organize and protect, although state-run media reported that the ACFTU had stepped up a campaign to bring migrant workers into the union and that community unions for migrants had been established in a number of cities. Some migrants gravitated to temporary or seasonal low-wage work in urban areas where their household was not registered under the country's "hukou" system (see Section 2.d.). Many migrants, including substantial numbers of young women, were attracted to the growing private sector where unions were few and where their desire to earn more than they could in rural areas made them easy to exploit.

The ACFTU has shown some interest in adapting its organization to the needs of labor in a market economy. Local ACFTU federations have allowed a few limited experiments in more open union elections and decision-making. These included freely electing, by secret ballot, the leadership of ACFTU affiliated unions at several foreign-owned factories in Guangdong and Fujian Provinces in 2002 and 2003, although no new elections were reported during the year. At the national level, the ACFTU has had input into shaping the country's system of labor laws and regulations. In particular, the ACFTU actively pushed amendments to the Trade Union Law, passed in 2001, that give greater protection to union organizing efforts and legitimize labor union activity in the private sector, including foreign-invested enterprises, and will now allow migrant workers to become union members. In September, the ACFTU revised its Constitution to provide that the union's basic responsibility is to safeguard workers' legitimate rights and interests. Despite the ACFTU's stated goals to organize these new groups of workers, there had been very limited gains as of year's end.

During the year, the Government took specific actions against illegal union activity, including the detention and arrest of labor activists. In April, Chen Kehai and Zhao Yong, workers from the Tieshu Textile Factory in Suizhou, Hubei Province, were tried under summary proceedings and convicted on charges of disturbing public order for their involvement with a labor protest at the factory. A third worker, Zhu Guo, reportedly was tried and convicted on charges of assembling a crowd to disturb social order. Four other Tieshu workers were sentenced to reeducation through labor (see Section 2.b.).

Other labor activists, detained in previous years, were reportedly still in detention at year's end. In May 2003, Yao Fuxin and Xiao Yunliang, leaders of a large labor protest in Liaoyang City, Liaoning Province, who were detained in March 2002, were sentenced to 7 and 4 years in prison for subversion, based largely on allegations that they had made contact with the CDP in 1998, several years before the workers protests. Many observers believed that the sentences were largely in retaliation for their role in the labor protests and in exposing official corruption. Prison authorities continued to deny the two activists' applications for medical parole. Other labor activists reportedly still in detention included Hu Mingjun, Wang Sen, Wang Miaogen, Zhang Shanguang, Li Wangyang, Li Jiaqing, Miao Jinhong, Ni Xiafei, Li Keyou, Liao Shihua, Yue Tianxiang, Guo Xinmin, He Zhaohui, Peng Shi, Wang Guoqi, and labor lawyer Xu Jian.

The country was a member of the International Labor Organization (ILO) and had ratified core ILO conventions prohibiting child labor, the worst forms of child labor, and discrimination in remuneration between male and female workers. At year's end, the Government had not ratified other core conventions regarding the right of association, the right to collective bargaining, and the prohibition against compulsory labor.

In March 2003, the International Confederation of Free Trade Unions (ICFTU) amended an existing complaint to the ILO, adding allegations of freedom of association violations in the handling of the Tieshu Textile Factory matter. At year's end, the Government had not replied to the ILO's communications with respect to this matter.

The ACFTU had active ties with foreign trade union organizations and had a cooperative relationship with the ILO's China office. In 2002, the ACFTU gained a deputy workers' member seat on the ILO's Governing Body, a seat it lost in 1990 during the crackdown following the Tiananmen Square massacre. The ICFTU has publicly condemned the country for its denial of the right of free association, in particular for arresting labor activists. Pursuant to a 2001 Memorandum of Understanding with the ILO, the Ministry of Labor and Social Security (MOLSS) held the China Employment Forum in April. MOLSS also hosted the annual meeting of the International Social Security Association (ISSA) in September. On December 3, the Development Research Center of the State Council announced that a seminar on Socially Responsible Investment was postponed and visas for some participants rescinded. As a result, a long-planned visit by the OECD's Trade Union Advisory Council did not take place. The ACFTU also cooperated with the U.N. Development Program on a program to develop market-based approaches to help laid-off workers start their own businesses. Part of the program was designed to assist unions to adapt to a new labor relations model.

b. The Right to Organize and Bargain Collectively

The Labor Law permits collective bargaining for workers in all types of enterprises; however, in practice, genuine collective bargaining still did not occur. Under the law, collective contracts are to be developed through collaboration between the labor union (or worker representatives in the absence of a union) and management, and should specify such matters as working conditions, wage scales, and hours of work. The law also permits workers and employers in all types of enterprises to sign individual contracts, which are to be drawn up in accordance with the collective contract. The Ministry of Labor and Social Security in January promulgated new regulations, which took effect in May, governing collective contracts.

The country's shift toward a market economy and changing labor management relations created pressures for collective bargaining that would include more genuine negotiations and take workers' interests into greater account. The Trade Union Law specifically addresses unions' responsibility to bargain collectively on behalf of workers' interests. However, given the non-democratic, Party-dominated nature of the country's unions, collective bargaining fell far short of international standards. Workers had no means to formally approve or reject the outcome of collective contract negotiations and, without the right to strike, only a limited capacity to influence the negotiation process.

In the private sector, where official unions were few and alternative union organizations were unavailable, workers faced substantial obstacles to bargaining collectively with management. Workplace-based worker committees, serve as the vehicle for worker input into state-owned enterprise policies. These weakened during the year, and where they existed, the committees were often little more than rubber stamps for deals predetermined by enterprise management, the union, and the CCP representative.

The Trade Union Law provides specific legal remedies against anti-union discrimination and specifies that union representatives may not be transferred or terminated by enterprise management during their term of office. These provisions were aimed primarily at the private sector, where resistance to unions was common. The degree to which these provisions were enforced was unknown. Anti-union activity was virtually unknown in the state-owned sector.

Neither the Constitution nor the Labor Law provides for the right to strike. The Trade Union Law acknowledges that strikes may occur, in which case the union is to reflect the views and demands of workers in seeking a resolution of the strike. Some observers interpreted this provision to offer at least a theoretical legal basis for the right to strike. However, the Government continued to treat worker protests as illegal demonstrations, indicating that there was still no officially accepted right to strike. In addition, no other types of planned worker action were allowed.

During the year, the profound economic and social changes affecting workers continued to produce labor-related disputes and worker actions (see Section 2.b.). Most worker protests involved actual and feared job losses, wage or benefit arrears, allegations of owner/management corruption, or worker dissatisfaction with new contracts offered in enterprise restructuring. The Government took swift action to halt protests. Police detained protest leaders and dispersed demonstrations. In some cases, management, often at the direction of the Government, subsequently offered payments that met at least a portion of protesters' demands. The most noteworthy recent labor protests involved thousands of organized workers and sympathizers demonstrating in Liaoyang, Liaoning Province, in 2002. The workers protested alleged corruption in the closure of a major local SOE, the loss of jobs, and wage and benefit irregularities. Two protest leaders, Yao Fuxin and Xiao Yunliang, were convicted on subversion charges and sentenced in May 2003 (see Section 6.a.). After the protests, the former manager of the SOE was convicted of smuggling. The local Government fired Liaoyang's police chief and demoted a top Party official in the city. During the year, worker protests also occurred at private companies. In March and April, significant strikes occurred at factories of Stella International in Dongguan, Guangdong Province. A series of incidents of unrest, including strikes, ended in the detention of over 75 workers on charges of destruction of property, including three workers under age 18. Ten workers were convicted of destruction of property in the incidents but were released on December 31 as a result of court action that either suspended their sentences or lifted criminal sanctions.

The Labor Law provides for mediation, arbitration, and court resolution of labor disputes. Under these procedures, cases are to be dealt with first in the workplace, through a mediation committee, then, if unresolved, through a local arbitration committee under government sponsorship. If no solution is reached at this level, the dispute may be submitted to the courts. According to the Ministry of Labor and Social Security, 134,700 disputes involving 477,000 workers were submitted to arbitration during the first half of the year. The Ministry's yearly statistical report stated that 226,391 disputes involving 800,000 workers were handled during the year, increases of approximately 22.8 percent and 31.7 percent, respectively, over the previous year. The vast majority of cases, 223,503 (98 percent) were resolved. Of these, 67,765 cases (30 percent) were resolved by mediation, 95,774 (43 percent) were resolved by arbitration and 59,954 (27 percent) were resolved by other means. In 2002, 10,823 (4.7 percent) of total cases were collective labor disputes.

Observers differed over the effectiveness of these dispute resolution procedures. Workers reportedly had little trust in the fairness of workplace mediation. They viewed unions, which played a major mediation role, as inclined to favor management. Workers favored arbitration over workplace mediation, although they often looked with suspicion on the local government role in the process. There appeared to be increasing recognition, including among government officials, that some aspects of the dispute resolution system needed revision.

Laws governing working conditions in Special Economic Zones (SEZs) were not significantly different from those in effect in the rest of the country. Lax enforcement of these laws by provincial and local officials was a serious problem in the SEZs, as in other parts of the country. Wages in the SEZs and in the southeastern part of the country generally were higher for some categories of workers. Officials acknowledged that some investors in the SEZs were able to negotiate "sweetheart" deals with local partners that bypassed labor regulations requiring the provision of benefits and overtime compensation. Some foreign businesses in the SEZs had ACFTU-affiliated unions, and management reported positive relations with union representatives, in part because the ACFTU discouraged strikes and work stoppages.

c. Prohibition on Forced or Compulsory Labor

Case 1:05-cv-01602-UNA    Document 7    Filed 09/20/2005    Page 51 of 214

The law prohibits forced and compulsory labor, and the Government denied that forced or compulsory labor was a problem; however, forced labor was a serious problem in penal institutions. Citizens were consigned without judicial process to penal labor institutions (see Section 1.c.) that, by law and policy, utilized labor as a means of reform and reeducation. Reeducation-through-labor detainees and prisoners and pretrial detainees in the regular prison system were required to work, often with little or no remuneration. Diplomatic observers generally were unable to gain access to reform institutions to evaluate allegations about the treatment of prisoners. In some cases, prisoners worked in facilities directly connected with penal institutions; in other cases, they were contracted to nonprison enterprises. Facilities and their management profited from inmate labor.

In 1992, the U.S. and Chinese Governments signed a memorandum of understanding (MOU), followed by an implementing statement of cooperation (SOC) in 1994. These agreements expressed the intention of the governments to cooperate to ensure that prison-made products were not exported to the United States. Chinese cooperation under the MOU and SOC improved during the year. Regular monthly working-level meetings were held from December 2003 through the end of the year. Visits to three prison-related facilities were conducted in February, July and December, and the cases related to these facilities were closed. At year's end, the backlog of cases remained substantial. The Government continued to explicitly exclude from the agreements reform- and reeducation through labor institutions.

The Government prohibits forced and bonded labor by children, but some child trafficking victims were reportedly sold into forced labor (see Section 5).

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the employment of children under the age of 16, but the Government had not adopted a comprehensive policy to combat child labor. The Labor Law specifies administrative review, fines, and revocation of business licenses of those businesses that illegally hire minors. The law also stipulates that parents or guardians should provide for children's subsistence. Workers between the ages of 16 and 18 were referred to as "juvenile workers" and were prohibited from engaging in certain forms of physical work, including labor in mines.

The Government continued to maintain that the country did not have a widespread child labor problem and that the majority of children who worked did so at the behest of their families, particularly in impoverished rural areas, to supplement family income. Child workers in rural areas appeared to work primarily in township and village enterprises and in agriculture. In urban areas, they often worked as menial and street laborers. State-run media reported on children working at a Tianjin knitting mill and, in 2003, on children working at a handicrafts company in Fuzhou, in factories in Shanghai and Guangzhou, and in a hotel in Anhui Province. Some students worked in light industrial production within or for their schools. Some observers believed that coalmines, which often operated far from urban centers and out of the purview of law enforcement officials, also occasionally employed children. The existence of a large adult migrant labor force, often willing to work long hours for low wages, reduced the attractiveness of child labor for employers. State-run media reported on province-wide investigations into child labor by provincial labor and social security bureaus and on investigations done at the request of reporters.

e. Acceptable Conditions of Work

The Labor Law provides for broad legal protections for workers on such matters as working hours, wages, and safety and health. The Trade Union Law invests unions with the authority to protect workers against violations of their legal rights or contractually agreed conditions of work. The Law on the Prevention and Treatment of Occupational Diseases and the Production Safety Law identify responsibilities for work-related illness and accidents and provide for specific penalties for violation of the law. In November, the Government promulgated regulations on labor inspections, which expand the powers of government inspectors and increase penalties against employers for failure to pay the minimum wage, for being in arrears on wages, and for unreasonably withholding wages. However, there remained a substantial gap between the law's formal provisions for work conditions and the actual situation in the workplace.

There was no national minimum wage. The Labor Law allows local governments to set their own minimum wage according to standards promulgated by the Ministry of Labor and Social Security. In January, the Ministry promulgated a new regulation on minimum wages. The regulation, which took effect in March, sets out the formula by which localities set the minimum wage; expands the range of employers required to observe the minimum wage to include individually-owned enterprises with fewer than eight employees, public institutions, and social organizations; and provides for an hourly minimum wage for part-time workers. The regulation states that the departments of labor and social security at or above the county level are responsible for enforcement of the law. The regulation also provides that where the ACFTU finds an employer in violation of the regulation, it shall have the power to demand that the department of labor and social security deal with the case; at year's end, it was unclear whether the union had exercised this right. Widespread official corruption and efforts by local officials to attract and keep taxpaying, job-producing enterprises that might otherwise locate elsewhere undercut enforcement of the minimum wage provisions. Wage arrearages to employees of state-owned and private enterprises were common. During the year, the Government pledged to clear up wage arrearages in the construction industry within 3 years. State-run media reported that by year's end, 98.4 percent of the $4 billion (RMB 33.2 billion) owed to migrant workers for work on construction projects had been repaid.

The Labor Law mandates a 40-hour standard workweek, excluding overtime, and a 24-hour weekly rest period. It also prohibits overtime work in excess of 3 hours per day or 36 hours per month and mandates a required percentage of

Case 1:05-cv-01602-UNA    Document 7    Filed 09/20/2005    Page 52 of 214

additional pay for overtime work. However, these standards were regularly violated, particularly in the private sector. They were particularly ignored in enterprises that could rely on a vast supply of low-skilled migrant labor. In many industries, such as textile and garment manufacturing, compulsory overtime reportedly was common, often without overtime pay. Some areas of the country in which wages and working conditions reportedly were substandard, including parts of Guangdong Province, experienced shortages of workers during the year. During the year, auditors found that some factories routinely falsified overtime and payroll records. There also were reports of workers being prevented from leaving factory compounds without permission.

Occupational health and safety concerns remained serious. The poor enforcement of occupational health and safety laws and regulations continued to put workers' lives at risk. The State Administration for Work Safety (SAWS), which was administratively joined with the State Administration for Coal Mine Safety Supervision (SACMSS), was responsible for providing a nationwide framework for work safety. With enactment of the Work Safety Act in 2002, the Government gave SAWS/SACMSS a specific, detailed legal framework for its responsibilities. SAWS/SACMSS staffed nearly 70 field offices throughout the country. In January, SAWS promulgated regulations requiring companies in the mining, construction, dangerous chemicals, fireworks, and explosives industries to obtain work safety licenses as a prerequisite to doing business. SAWS also promulgated regulations governing work safety in the construction and electrical industries. In 2003, SAWS was given responsibility for workplace health supervision and inspection. The Ministry of Health was responsible for prevention and treatment of occupational illness. Some provincial and local governments have followed the national pattern of establishing separate work safety agencies. However, enforcement of national health and safety standards, which was the responsibility of governments below the national level, remained very weak.

Workplace health and safety did not improve significantly during the year, and there continued to be a high rate of industrial accidents. According to official statistics, from January to November, there were 13,268 work-related accidents, resulting in 14,595 deaths, compared with 15,597 workplace accidents, resulting in 17,315 deaths, for all of 2003. Coalmines were by far the most deadly workplaces. From January to November, 3,413 mine accidents occurred, killing 5,286 persons, a decrease of 253 accidents (6.9 percent) and 451 deaths (7.9 percent) from the previous year. SAWS claimed that the rate of 3 deaths per million tons of coal mined was the lowest in the country's history. Coalmine accidents comprised approximately 27 percent of all non-traffic, non-fire-related workplace accidents but accounted for approximately 40 percent of corresponding workplace deaths. Industrial accidents involving chemical leaks also caused numerous deaths and injuries. Enterprise owners and managers sometimes failed to report accidents and health problems. Local officials also often underreported such incidents. As a result, the actual number of workplace deaths and casualties was likely far higher.

The high rate of coal mining accidents highlighted serious enforcement problems in that sector. An October gas explosion in a Henan mine reportedly killed 147 miners. In November, 166 miners were killed in a single accident at a state-owned mine in Shaanxi Province, sparking reportedly violent protests by relatives of miners.

In recent years, the Government has closed tens of thousands of small coalmines, many of them illegal operations. Despite these efforts, many mines reopened illegally soon after closing. Observers attributed the enforcement problem in the coalmining sector primarily to corruption, a need to sustain employment in poor areas where many of the most dangerous mines were located, and the paucity and poor training of inspectors.

Government officials and media have stressed the need to control workplace accidents. In June, Vice Premier Huang Ju called for adopting effective preventive measures to stem industrial accidents. In April, following the blowout of a natural gas well, which killed 243 and injured more than 4,000 persons, a State Council Executive Committee Meeting chaired by Premier Wen Jiabao accepted the resignation of the general manager of the China National Petroleum Corporation (CNPC). The deputy manager of the CNPC subsidiary, an engineer, drilling team head, drilling technician, and two workers were prosecuted and received prison sentences for their role in the accident.

Fewer than half of rural enterprises met national dust and poison standards. Many factories that used harmful products, such as asbestos, not only failed to protect their workers against the ill effects of such products, but also failed to inform them about the hazards.

Almost 46 million workers participated in the country's work-injury insurance system at the end of 2003, an increase of 1.69 million over the previous year. In recent years, small but growing numbers of workers also began to use lawsuits to pursue work injury and illness claims against employers.

The Work Safety Law provides that employees have the right, after spotting an emergency situation that threatens their personal safety, to evacuate the workplace. Employers are forbidden to cancel the labor contracts, or reduce the wages or benefits, of any employee who takes such action. There was little information about how this law was applied in practice.

# TIBET

The United States recognizes the Tibet Autonomous Region (TAR) and Tibetan autonomous prefectures and counties in other provinces to be a part of the People's Republic of China. The Department of State follows these designations in its reporting. The preservation and development of Tibet's unique religious, cultural, and linguistic heritage and the protection of its people's fundamental human rights continue to be of concern.

Respect for Integrity of the Person

The Government's human rights record in Tibetan areas of China remained poor. However, in positive developments, the Government permitted a third visit to the country by the Dalai Lama's representatives and released some political prisoners, including Tibetan Buddhist nun Phuntsog Nyidrol. The Government controlled information about all Tibetan areas, and in addition, strictly controlled access to the TAR, making it difficult to determine accurately the scope of human rights abuses. Authorities continued to commit serious human rights abuses, including extra-judicial killing, torture, arbitrary arrest, detention without public trial, and lengthy detention of Tibetans for peacefully expressing their political or religious views. The overall level of repression of religious freedom in the TAR remained high. Conditions generally were less restrictive in Tibetan areas outside of the TAR, although there were some exceptions. Individuals accused of political activism faced ongoing harassment during the year. There were reports of imprisonment and abuse of some nuns and monks accused of political activism. Security was intensified during sensitive anniversaries and festival days in some areas, and activities viewed as vehicles for political dissent, including celebration of some religious festivals, were suppressed. There were reports of small-scale political protests in a number of Tibetan areas.

The lack of independent access to prisoners and prisons made it difficult to ascertain the number of Tibetan political prisoners or to assess the extent and severity of abuses. The Tibet Information Network (TIN) estimated that approximately 145 Tibetans were imprisoned on political grounds, approximately two-thirds of whom were monks or nuns. Approximately 60 political prisoners remained in TAR Prison in Lhasa, most serving sentences on the charge of "counterrevolution," which was dropped from the Criminal Law in 1997. Chinese authorities have stated that acts previously prosecuted as counterrevolutionary crimes continue to be considered crimes under China's anti-subversion laws. TIN's analysis indicated that the majority of Tibetan political prisoners were incarcerated in Lhasa and western Sichuan Province. The overall number of political prisoners in Tibetan areas dropped slightly compared to 2003, according to this analysis, but rose in Tibetan autonomous areas of Sichuan Province in connection with several high-profile cases.

In October, Radio Free Asia (RFA) reported that police in Qinghai's Golog Prefecture shot and killed Tibetan Buddhist religious leader Shetsul after he and other monks demanded that the police pay for medical treatment for injuries suffered while in custody.

In January, RFA reported that authorities in Sichuan's Tawu County, Kardze Prefecture, had arrested students Nyima Dorjee and Lobsang Dorjee for putting up pro-independence posters on local government buildings.

On February 12, Choeden Rinzen, a young monk at Lhasa's Ganden Monastery, reportedly was arrested for possession of a picture of the Dalai Lama and a Tibetan national flag.

In April, RFA reported that authorities in Qinghai's Tsolho Prefecture had arrested Tibetan singer Namkha, as well as composer and Tibetan Buddhist monk Bakocha, for their music's implicit political content. Authorities reportedly confiscated CDs of Namkha and Bakocha's music. Authorities released both individuals in early May.

In May, Chinese state media reported that authorities jailed a Tibetan named Penpa after he admitted to causing a May 20 explosion near a television tower near Lhasa.

In September, RFA reported that authorities in Sichuan's Kardze Prefecture sentenced Tibetan Buddhist monks Chogri and Topden and layman Lobsang Tsering to 3-year jail terms for putting up pro-independence posters. The three were reportedly among a group of 60 individuals detained on July 27 at a reception ceremony at Chogri Monastery in Draggo County, Kardze. Witnesses claimed that police beat some of those detained. It was believed that the other 57 individuals initially detained had been released by year's end.

Also in September, authorities in the TAR's Nagchu Prefecture reportedly arrested Tibetans Dejor, Tsering Dawa, and Datsok after a clash with Chinese workers over a mining project. They reportedly also arrested Tibetans Nyima Tenzen and Sonam Nyidup, who protested the detention by shouting pro-independence slogans in a bar.

On February 24, authorities released Tibetan Buddhist nun Phuntsog Nyidrol from Lhasa's TAR Prison (also known as Drapchi Prison) approximately 1 year before her sentence was due to expire. She had received a 9-year sentence for taking part in a peaceful demonstration in support of the Dalai Lama in 1989. Authorities extended her sentence to 17 years after she and other nuns recorded songs about their devotion to Tibet and the Dalai Lama in 1993 but reduced that sentence by 1 year in 2001 According to Human Rights Watch, following her release, the Chinese government imposed restrictions on Phuntsog Nyidrol's movement and association.

On April 18, authorities reportedly released Tibetan Buddhist monk Ngawang Oezer from TAR Prison upon completion of his 15-year sentence for participating in pro-independence activities at Drepung Monastery.

In August, observers confirmed the release of Kunchok Choephel Labrang and Jigme Jamtruk, two monks from Labrang Tashikyil Monastery, Gansu Province. Authorities reportedly arrested the monks in April 2003 for possessing booklets containing speeches of the Dalai Lama.

Case 1:05-cv-01602-UNA      Document 7      Filed 09/20/2005      Page 54 of 214

In October, authorities released Geshe Sonam Phuntsog, a religious leader from Darge Monastery in Kardze County, Kardze Prefecture, Sichuan Province. Authorities arrested Sonam Phuntsog in 1999 and sentenced him to a 5-year term for "inciting splittism," traveling to India to visit the Dalai Lama, and holding long-life prayer ceremonies for the Dalai Lama.

During the year, authorities did not respond to international calls for an inquiry into the case of Nyima Dragpa. A monk from Nyatso Monastery in Sichuan's Kardze Prefecture, Nyima Dragpa died in custody in October 2003, allegedly from injuries sustained during severe beatings.

On January 15, Yeshe Gyatso, a former member of the Chinese People's Consultative Conference, died at his home in Lhasa at the age of 71. TAR authorities had arrested Yeshi Gyatso in June 2003 on charges of splittism and sentenced him to 6 years' imprisonment but released him in November 2003 in ill health.

Prominent religious leader Tenzin Deleg Rinpoche, arrested in April 2002 for his alleged connection to a series of bombings, remained imprisoned under a death sentence with a 2-year reprieve, although officials indicated to international observers in December that his suspended death sentence would likely be commuted to life in prison in accordance with Chinese law and practice. Tenzin Deleg's former associate, Lobsang Dondrub, was executed on January 26, 2003, for his part in the alleged bombings. Lobsang Dondrub's execution occurred despite Chinese Government assurances that both individuals would be afforded full due process, and that the national-level Supreme People's Court would review their sentences.

Many other political prisoners also remained in prison or detention at year's end, including former Tibet University student Lobsang Tenzin, arrested in 1988 in connection with the death of a policeman during riots in Lhasa and currently surviving an 18-year sentence in the TAR's Pome Prison; Tibetan Buddhist monk Jigme Gyatso, arrested in 1996 for founding a Tibetan youth organization and serving a 15-year sentence in Lhasa's TAR Prison; farmers Sonam Dorje and Lhundrub Dorje, arrested in 1992 for unfurling a Tibetan flag and shouting pro-independence slogans, respectively serving 15- and 13-year sentences at TAR Prison; and monks Kalsang Dondrub and Ngawang Dondrub, sentenced in 2003 on charges of "endangering state security" for nonviolent political activities. Chadrel Rinpoche, released in 2002 after 6 years and 6 months in prison for leaking information about the selection of the Panchen Lama, was reportedly still under house arrest near Lhasa. Requests to meet with him by foreign government officials continued to be denied.

As in the rest of China, the security apparatus employed torture and degrading treatment in dealing with some detainees and prisoners. Detainees released in 2003 reported credibly that officials used electric shocks, prolonged periods of solitary confinement, incommunicado detention beatings, and other forms of abuse. Tibetans repatriated to China from Nepal in May 2003 reportedly suffered torture, including electric shocks, exposure to cold, and severe beatings, and were forced to perform heavy physical labor. Their family members also were pressured for bribes to secure their release. Prisoners were subjected routinely to "political investigation" sessions and were punished if deemed to be insufficiently loyal to the State.

Legal safeguards for Tibetans detained or imprisoned were the same as those in the rest of China and were inadequate in both design and implementation. Most judges had little or no legal training. Authorities worked to address this problem through increased legal education opportunities. According to an official of the TAR Higher People's Court, all seven cities and prefectures had established legal assistance centers, and 1,248 residents had received assistance by the end of 2003. However, some persons accused of political and other crimes did not have legal representation. Moreover, their trials were cursory and were closed if issues of state security were involved. Under the law, maximum prison sentences for crimes such as "endangering state security" and "splitting the country" were 15 years for each count, not to exceed 20 years in total. Such cases mainly concerned actions perceived to be in support of Tibetan independence, and activities did not have to be violent to be illegal or to draw a heavy sentence.

An unknown number of Tibetans were serving sentences in "reeducation-through-labor" camps and other forms of administrative detention not subject to judicial review. Conditions in administrative detention facilities, such as reeducation-through-labor camps, were similar to those in prisons. In July, state media reported that authorities had established a new reeducation-through-labor camp in the TAR's western Ngari Prefecture. The 40,000 square-foot camp reportedly could accommodate 200 inmates.

Prisoners in Tibetan areas were generally subject to the same conditions regarding forced labor as those in other areas of China. Forced labor was used in some prisons, detention centers, reeducation-through-labor facilities, and at work sites where prisoners were used as workers. The law states that prisoners may be required to work up to 12 hours per day, with 1 rest day every 2 weeks, but these regulations often were not enforced.

Family planning policies permitted Tibetans and members of other minority groups to have more children than Han Chinese. Urban Tibetans, including Communist Party members, were generally permitted to have two children. Rural Tibetans were encouraged, but not required, to limit births to three children. These regulations were not strictly enforced.

The Office of the U.N. High Commissioner for Refugees (UNHCR) reported that 2,427 Tibetan new arrivals approached UNHCR in Nepal during the year, of whom 2,338 were found to be "of concern" and of whom 2,318 were provided with

basic assistance; the remaining 89 Tibetan new arrivals departed for India without being registered or processed by UNHCR. In August, a TAR tourism official stated that approximately 400 TAR residents had traveled abroad in the first 8 months of the year, an increase over a total of 300 in 2003. Many Tibetans, particularly those from rural areas, continued to report difficulties obtaining passports. The application process was not transparent, and residents of different Tiebtan areas reported obstacles ranging from bureaucratic inefficiency and corruption to denials based on the applicant's political activities or beliefs. Police in China have stated that passport regulations permit them to deny passports to those whose travel will "harm the national security and national interests.

Due in part to such difficulties and in part to the difficulty many Chinese citizens of Tibetan ethnicity encountered in obtaining entry visas for India, it was difficult for Tibetans to travel to India for religious and other purposes. The Government placed restrictions on the movement of Tibetans during sensitive anniversaries and events and increased controls over border areas at these times. Nevertheless, thousands of Tibetans from China, including monks and nuns, visited India via third countries and returned to China after temporary stays. In February, RFA reported that the majority of Tibetans who transited Nepal to India were young Tibetans, whose ages ranged from 6 to 30, and that the main reason they migrated was the lack of Tibetan-language educational facilities and opportunities for religious education.

There were reports of arbitrary detention of persons, particularly monks, returning to China from Nepal. Detentions generally lasted for several months, although in most cases no formal charges were brought. In January, and again in September, there were reports that the Nepali government cooperated with Chinese authorities to repatriate Tibetans who crossed the border. NGOs reported that some individuals were detained and mistreated upon their return to China. For example, the Tibetan Centre for Human Rights and Democracy stated that when monks Gedun Tsundue and Jamphel Gyatso crossed back into China in February after studying in India, they were detained for 4 months and fined $545 (RMB 4,500) each. In July, RFA reported that Tibetan Buddhist monks Tenzen Samten and Thubten Samdup remained in detention at Shigatse's Nyari Prison 5 months after being arrested while attempting to cross the border from Nepal into China. According to RFA, the two monks were arrested with two other individuals, Sherab and Nawang Namgyal, in February.

The Government also regulated foreign travel to the TAR. In accordance with a 1989 regulation, foreign visitors (excluding individuals from Hong Kong, Macau, and Taiwan) were required to obtain an official confirmation letter issued by the Chinese Government before entering the TAR. Most tourists obtained such letters by booking tours through officially registered travel agencies. In July, state media announced that foreign tourists would enjoy "unrestricted access to all 70 counties of the TAR." However, TAR authorities were unable to confirm the change, and travelers reported that many restrictions remained in place. Official visits to the TAR were supervised closely and afforded delegation members very few opportunities to meet local persons not previously approved by the authorities. Foreigners could travel freely in most Tibetan areas outside the TAR. In March, authorities lifted restrictions on foreign travel to the last four closed counties in Sichuan's Ngaba Prefecture.

Freedom of Religion

Overall, the level of repression in Tibetan areas remained high and the Government's record of respect for religious freedom remained poor during the year. The Constitution of the People's Republic of China provides for freedom of religious belief, and the Government's May White Paper on "Regional Ethnic Autonomy in Tibet" stated, "Tibetans fully enjoy the freedom of religious belief." However, the Government maintained tight controls on religious practices and places of worship in Tibetan areas. Although the authorities permitted many traditional practices and public manifestations of belief, they promptly and forcibly suppressed activities they viewed as vehicles for political dissent or advocacy of Tibetan independence, such as religious activities venerating the Dalai Lama (which the Chinese government described as "splittist").

The atmosphere for religious freedom varied from region to region. Conditions were generally more relaxed in Tibetan autonomous areas outside the TAR, with the exception of parts of Sichuan's Kardze Tibetan Autonomous Prefecture. Most abbots and monks in Tibetan areas outside the TAR reported that they had greater freedom to worship, to conduct religious training, and to manage the affairs of their monasteries than their coreligionists in the TAR; however, restrictions remained. The Associated Press reported that, in November, Communist officials met with Buddhist leaders in Qinghai Province and warned that the Buddhist leaders would be punished if they failed to win greater support for Beijing's policies toward the exiled Dalai Lama and greater acceptance among their followers for Gyaltsen Norbu, the boy picked by the PRC as the reincarnation of the Panchen Lama, the second most prominent figure in Tibetan Buddhism.

Most Tibetans practiced Tibetan Buddhism and, to a lesser extent, the traditional Tibetan Bon religion. This held true for many Tibetan government officials and Communist Party members. Bon includes beliefs and ceremonies that practitioners believe predate the arrival of Buddhism in Tibet in the 7th century. Approximately 615 Tibetan Buddhist religious figures held positions in local people's congresses and committees of the Chinese People's Political Consultative Conference in the TAR. However, the Government continued to insist that Communist Party members and senior employees adhere to the Party's code of atheism, and routine political training for cadres continued to promote atheism. Government officials confirmed that some Religious Affairs Bureau (RAB) officers were members of the Communist Party and that religious belief is incompatible with Party membership. However, some lower level RAB officials practiced Buddhism.

Security was intensified during the Dalai Lama's birthday, sensitive anniversaries, and festival days in the TAR and in

some other Tibetan areas as well. In June, observers reported that students and faculty at Tibet University were restrained from participating in religious devotions connected to the Sagadawa festival. The prohibition on celebrating the Dalai Lama's birthday on July 6 continued. In August, some Lhasa residents privately expressed unhappiness with city authorities' plans to fix the date of the Drepung Shodon festival, which traditionally varied according to the Tibetan lunar calendar, on August 18th in order to promote tourism. However, residents were reportedly permitted to carry out observances on the traditional date a week later.

On May 23, the Government issued a White Paper on "Regional Ethnic Autonomy in Tibet," in which it urged the Dalai Lama to drop his "bid for Tibetan independence" and stated "the possibility of instituting another social system does not exist." In September, the Government extended invitations to emissaries of the Dalai Lama to visit Tibetan and other areas of China. The delegation visited Guangdong, Beijing, and Tibetan areas of western Sichuan Province. This marked the third visit of emissaries of the Dalai Lama to China in as many years. In September 2002, Lodi Gyari, the Dalai Lama's Special Envoy, and Kelsang Gyaltsen, the Dalai Lama's Envoy, traveled to Beijing, Lhasa, and other cities and met with a number of government officials. These were the first formal contacts between the Dalai Lama's representatives and the Government since 1993. They made a second trip to China in June 2003 to meet with Chinese officials and visited Shanghai, Beijing, and Tibetan areas in Yunnan Province. Additionally, Gyalo Thondup, the Dalai Lama's elder brother, visited in July 2002, making his first trip to the TAR since leaving in 1959 and subsequently has made additional private visits to China. The Government asserted that the door to dialogue and negotiation were open, provided that the Dalai Lama public affirmed that Tibet and Taiwan were inseparable parts of China.

Government officials maintained that possessing or displaying pictures of the Dalai Lama was not illegal. Authorities, however, appeared to view possession of such photos as evidence of separatist sentiment when detaining individuals on political charges. Pictures of the Dalai Lama were not openly displayed in major monasteries and could not be purchased openly in the TAR. In August, TAR Deputy Chairman Wu Jilie told visiting western journalists that not displaying the Dalai Lama's photo was the voluntary choice of most TAR residents. During the year, diplomatic and other observers saw pictures of a number of religious figures, including the Dalai Lama, displayed more widely in Tibetan areas outside the TAR. The Government also continued to ban pictures of Gendun Choekyi Nyima, the boy recognized by the Dalai Lama as the Panchen Lama. Photos of the "official" Panchen Lama, Gyaltsen Norbu, were not publicly displayed in most places, most likely because most Tibetans refuse to recognize him as the Panchen Lama. In February, RFA reported that authorities had warned Tibetans in two counties of Sichuan's Kardze Prefecture that they would lose their land if they did not surrender pictures of the Dalai Lama. There were no reports that this warning was enforced. However, in Sichuan's Karzde Tibetan Autonomous Prefecture and Litang, authorities reportedly conducted house to house searches in 2003 and confiscated private displays of the Dalai Lama's photo.

The Government's May White Paper stated that the TAR had over 46,000 Tibetan Buddhist monks and nuns and more than 1,700 venues for Tibetan Buddhist activities. Officials have cited almost identical figures since 1996, although the numbers of monks and nuns dropped at many sites as a result of the "patriotic education" campaign and the expulsion from monasteries and nunneries of many monks and nuns who refused to denounce the Dalai Lama or who were found to be "politically unqualified." These numbers represented only the TAR, where the number of monks and nuns was very strictly controlled; approximately 60,000 Tibetan Buddhist monks and nuns lived in Tibetan areas outside the TAR, according to informed estimates.

Government officials closely associated Buddhist monasteries with pro-independence activism in Tibetan areas of China. Spiritual leaders encountered difficulty re-establishing historical monasteries due to lack of funds, general limitations on monastic education, and denials of government permission to build and operate religious institutions, which officials in some areas contended were a drain on local resources and a conduit for political infiltration by the Tibetan exile community. The Government stated that there were no limits on the number of monks in major monasteries, and that each monastery's Democratic Management Committee (DMC) decided independently how many monks the monastery could support. Many of these committees, however, were government-controlled, and, in practice, the Government imposed strict limits on the number of monks in major monasteries, particularly in the TAR. The Government had the right to disapprove any individual's application to take up religious orders; however, the Government did not necessarily exercise this right in practice during the year. Authorities curtailed the traditional practice of sending young boys to monasteries for religious training by means of regulations that forbade monasteries from accepting individuals under the age of 18. Nevertheless, some monasteries continued to admit younger boys, often delaying their formal registration until the age of 18.

The Government continued to oversee the daily operations of major monasteries. The Government, which did not contribute to the monasteries' operating funds, retained management control of monasteries through the DMCs and local religious affairs bureaus. Regulations restricted leadership of many DMCs to "patriotic and devoted" monks and nuns and specified that the Government must approve all members of the committees. At some monasteries, government officials also sat on the committees.

The quality and availability of high-level religious teachers in the TAR and other Tibetan areas remained inadequate; many teachers were in exile, older teachers were not being replaced, and those remaining in Tibetan areas outside the TAR had difficulty securing permission to teach in the TAR. In recent years, DMCs at several large monasteries began to use funds generated by the sales of entrance tickets or donated by pilgrims for purposes other than the support of monks engaged in full-time religious study. As a result, some "scholar monks" who had formerly been fully supported had to engage in income-generating activities. Some experts were concerned that, as a result, fewer monks will be qualified to serve as teachers in the future. While local government officials' attempts to attract tourists to religious sites

provided some monasteries with extra income, they also deflected time and energy from religious instruction. There were reports of disagreements between monastic leaders and government officials over visitors, vehicle traffic, and culturally inappropriate construction near monastic sites. However, in July, authorities permitted resumption of the Geshe Lharampa examinations, the highest religious examination in the Gelug sect of Tibetan Buddhism, at Lhasa's Jokhang Temple for the first time in 16 years.

Government officials have stated that the "patriotic education" campaign, which began in 1996 and often consisted of intensive, weeks-long sessions conducted by outside work teams, ended in 2000. However, officials stated openly that monks and nuns continued to undergo political education, likewise known as "patriotic education," on a regular basis, generally less than four times a year, but occasionally more frequently, at their religious sites. Some religious leaders also held local political positions. Since primary responsibility for conducting political education shifted from government officials to monastery leaders, the form, content, and frequency of training at each monastery appeared to vary widely. However, conducting such training remained a requirement and had become a routine part of monastic management.

In January, Khenpo Jigme Phuntsog, the charismatic founder of the Serthar Tibetan Buddhist Institute (also known as Larung Gar) in Sichuan Province's Kardze Prefecture, died while receiving medical treatment in the provincial capital Chengdu. Founded in 1980, the Institute grew to house 10,000 monks and nuns before authorities moved to destroy structures and expel students from the site in 2001, ultimately reducing the population to approximately 4,000. After a year's absence officially attributed to medical treatment, Khenpo Jigme Phuntsog returned to the Institute in 2002. As recently as May 2003, conflicts over attempts to rebuild some structures resulted in arrests and the enforced closure of the Institute to outsiders. After the abbot's death, Sichuan authorities forbade the province's Buddhist monks from attending his funeral; nonetheless, eyewitnesses reported that tens of thousands of Tibetan and Han monks defied the order to pay their respects.

The Karmapa Lama, leader of Tibetan Buddhism's Karma Kagyu sect and one of the most influential religious figures in Tibetan Buddhism, remained in exile following his 1999 flight to India. The Karmapa Lama stated that he fled because of the Government's controls on his movements and its refusal either to allow him to go to India to be trained by his spiritual mentors or to allow his teachers to come to him. Visitors to Tsurphu Monastery, the seat of the Karmapa Lama, noted that the population of monks remained small and the atmosphere remained subdued.

The Government routinely asserted control over the process of finding and educating reincarnate lamas. The Panchen Lama is Tibetan Buddhism's second most prominent figure, after the Dalai Lama. The Government continued to insist that Gyaltsen Norbu, the boy it selected in 1995, is the Panchen Lama's 11th reincarnation. The Government continued to refuse to allow access to Gendun Choekyi Nyima, the boy recognized by the Dalai Lama in 1995 as the 11th Panchen Lama (when he was 6 years old), and his whereabouts were unknown. Government officials have claimed that the boy is under government supervision, at an undisclosed location, for his own protection and attends classes as a "normal schoolboy." All requests from the international community for access to the boy to confirm his well-being have been refused. While the overwhelming majority of Tibetan Buddhists recognized the boy identified by the Dalai Lama as the Panchen Lama, Tibetan monks claimed that they were forced to sign statements pledging allegiance to the boy the Government selected. The Communist Party also urged its members to support the "official" Panchen Lama. Gyaltsen Norbu made his third highly orchestrated visit to Tibetan areas in summer 2004, and his public appearances were marked by a heavy security presence.

Similarly, the child the Government approved as the seventh reincarnation of Reting Rinpoche was not accepted by many of the monks at Reting Monastery in 2000 because the Dalai Lama did not recognize his selection. The Pawo Rinpoche, who was recognized by the Karmapa Lama in 1994, lived under strict government supervision at Nenang Monastery. In 2001, NGOs reported that he was denied access to his religious tutors and required to attend a regular Chinese school.

In July, Tibetan and Chinese intellectuals succeeded in their petition drive to prevent Han Chinese sportsman Zhang Jian from swimming across Lake Namtso in the TAR, which many Tibetan Buddhists hold sacred.

In its May White Paper, the Government claimed that since 1949 it had contributed approximately $36 million (RMB 300 million) to renovate and open over 1,400 monasteries and to repair cultural relics, many of which were destroyed before and during the Cultural Revolution. In the same document, the Government claimed to have allocated an additional $40 million (RMB 330 million) since 2001 for the second phase of the renovation of the Potala Palace, as well as the renovation of the Norbulingka Palace (another former residence of the Dalai Lama in Lhasa) and Sakya Monastery, the seat of the Sakya sect of Tibetan Buddhism in rural southern TAR. Despite these and other efforts, many monasteries destroyed during the Cultural Revolution were never rebuilt or repaired, and others remained only partially repaired. Government funding of restoration efforts ostensibly supported the practice of religion, but also promoted the development of tourism in Tibetan areas. Most recent restoration efforts were funded privately, although a few religious sites also received government support for reconstruction projects during the year.

Economic Development and Protection of Cultural Heritage

The TAR is one of China's poorest regions, and Tibetans are one of the poorest groups; malnutrition among Tibetan children continued to be widespread in many areas of the TAR. The Central Government and other provinces of China heavily subsidized the TAR economy, which, according to official government statistics, grew by an average annual rate

of more than 10 percent for the last decade. Over 90 percent of the TAR's budget came from outside sources, and residents of the TAR benefited from a wide variety of favorable economic and tax policies. Tibetan autonomous areas outside the TAR benefited to varying degrees from similar favorable policies. Government development policies helped raise the living standards of most Tibetans, particularly by providing better transportation and communications facilities. However, Han Chinese benefited disproportionately from the Government's development policies in Tibetan areas.

In June, state media reported that Tibetans and other minority ethnic groups made up 78 percent of all government employees in the TAR. However, Han Chinese continued to hold key positions, including Party Secretary of the TAR. A similar situation continued to pertain to areas outside the TAR.

Some Tibetans reported that they experienced discrimination in employment for some urban occupations and claimed Han were hired preferentially for many jobs and received greater pay for the same work. This situation was partially attributed to Han contractors' practice of hiring through connections in their home cities. In recent years, some Tibetans reported that it was more difficult for Tibetans than Han to get permits and loans to open businesses. The widespread use of the Chinese language in urban areas and many businesses limited employment opportunities for Tibetans who did not speak Chinese.

Fundamental worker rights recognized by the International Labor Organization, including the right to organize and the right to bargain collectively, which were broadly denied in the rest of China, were also denied in Tibetan areas.

According to China's 2000 census, the population of Tibetans in the TAR was 2,427,168. The population of Tibetans in autonomous prefectures and counties outside the TAR was 2,927,372. Tibetans made up 94 percent of the population of the TAR. Government-sponsored development and the prospect of new economic opportunities attracted migrant workers from China's large transient population to the region, resulting in a net increase in the non-Tibetan share of the population (chiefly China's Muslim Hui minority and Han Chinese) from approximately 4 percent in 1990 to 6 percent in 2000. However, census figures did not include a large number of long-term Han Chinese residents, such as cadres, skilled workers, unskilled laborers, military and paramilitary troops, and their dependents. In Tibetan areas outside the TAR, Tibetans increased their majority share as natural population growth outpaced net migration by non-Tibetans. Migrants to the TAR were overwhelmingly concentrated in cities and towns, while Tibetans continued to make up nearly 98 percent of the population in rural areas. One official estimate put the number of Han Chinese residents in Lhasa at 100,000 out of a total population of 409,520, while many observers estimated that more than half of Lhasa's population was Han Chinese. Small businesses run by Han Chinese and Hui migrants--mostly restaurants and retail shops--predominated in cities throughout the Tibetan areas.

The Dalai Lama, Tibetan experts, and other observers expressed concern that development projects and other Central Government projects initiated in 1994 and reemphasized and expanded at the "Fourth Tibet Work Conference" in 2001, including the Qinghai-Tibet railroad, would continue to promote a considerable influx of Han Chinese, Hui, and other ethnic groups into the TAR. They feared that the TAR's traditional culture and Tibetan demographic dominance would be overwhelmed by such migration

Rapid economic growth, the expanding tourism industry and the introduction of more modern cultural influences also have disrupted traditional living patterns and customs and threatened traditional Tibetan culture. In Lhasa, the Chinese cultural presence was obvious and widespread. Residents lacked the right to play a role in protecting their cultural heritage.

In February, an audiotape smuggled out of China, purportedly made by Tibetan workers, alleged that Chinese authorities were mishandling the renovation of the Potala Palace in Lhasa by making culturally inappropriate architectural decisions. In September, Lhasa Deputy Mayor Ou Guoxiang announced a project to give Lhasa a more traditional "Tibetan look" by renovating buildings along the main streets of the building. Ou stated that the project had been conceived in response to concerns about Lhasa's urban development plans raised during the June-July 2003 UNESCO World Heritage Committee meeting.

Both Tibetan and Chinese are official languages in the TAR, and both languages were used on public and commercial signs. However, the Chinese language was spoken widely, and Chinese was used for most commercial and official communications. The dominant position of the Chinese language in government, commerce, and academia left many young Tibetans seeking to get ahead with little choice but to use Chinese rather than Tibetan.

Official government media reports in 2003 stated that 92 percent of eligible students in the TAR attended primary school and 61 percent attended middle school and that 80 percent of the counties in the TAR had instituted 6-year compulsory education and 17 percent had 9-year compulsory education. However, in practice, many pupils in rural and nomadic areas received only 1 to 3 years of schooling. Official statistics put the illiteracy rate for young and middle-aged TAR residents at 37 percent, but some observers believed it to be much higher in some areas.

The Government has established a comprehensive national Tibetan-language curriculum, and many elementary schools in Tibetan areas used Tibetan as the primary language of instruction. However, Tibetan students were also required to study Chinese language, Chinese was generally used to teach certain subjects, such as arithmetic, and Han Chinese students in Tibetan areas generally had the option to attend exclusively Chinese-medium schools. In middle and high schools--even some officially designated as "Tibetan" schools--teachers often used Tibetan only to teach

Case 1:05-cv-01602-UNA    Document 7    Filed 09/20/2005    Page 59 of 214

classes in Tibetan language, literature, and culture and taught many classes in Chinese. As a practical matter, proficiency in Chinese was essential to receive a higher education. China's most prestigious universities provided instruction only in Chinese, while the lower-ranked universities established to serve ethnic minorities allowed study of only some subjects in Tibetan. In general, opportunities to study at Tibetan-medium schools were greater in the TAR, while opportunities to study at privately funded Tibetan-language schools and to receive a traditional Tibetan-language religious education were greater in Tibetan areas outside the TAR.

Authorities in Tibetan areas required professors and students at institutions of higher education to attend political education sessions and limited course studies and materials in an effort to prevent separatist political and religious activities on campus. The Government controlled curricula, texts, and other course materials.

There were no formal restrictions on women's participation in the political system, and women held many lower-level government positions. However, as in the rest of China, women were underrepresented at the provincial and prefectural levels of government.

Prostitution was a growing problem in Tibetan areas, as it was elsewhere in the country. Hundreds of brothels operated semi-openly in Lhasa. Up to 10,000 commercial sex workers may have been employed in Lhasa alone. Some of the prostitution occurred at sites owned by the Party, the Government, and the military. Most prostitutes in the TAR were Han Chinese women, mainly from Sichuan. However, some Tibetans, mainly young girls from rural or nomadic areas, also worked as prostitutes. The incidence of HIV/AIDS among prostitutes in Tibetan areas was unknown, but lack of knowledge about HIV transmission and economic pressures on prostitutes to engage in unprotected sex made an increase in the rate of HIV infection likely.

The TAR Tourism Bureau continued its policy of refusing to hire Tibetan tour guides educated in India or Nepal. Government officials have stated that all tour guides working in the TAR were required to seek employment with the Tourism Bureau and to pass a licensing exam on tourism and political ideology. The Government's stated intent was to ensure that all tour guides provide visitors with the Government's position opposing Tibetan independence and the activities of the Dalai Lama. The Tourist Bureau's monopoly did not extend to Tibetan areas outside the TAR, and some tour guides educated abroad reportedly moved to those areas to seek employment.

The Tibetan-language services of Voice of America and RFA, as well as of the Oslo-based Voice of Tibet, suffered from the same jamming of their frequencies by Chinese authorities as their Chinese-language services. However, Tibetans were able to listen to the broadcasts at least some of the time. Unlike in 2003, there were no reports during the year that Tibetans were subject to intimidation and fines for listening to foreign-language broadcasts.

In February, the Tibet Information Network reported that TAR authorities had banned Tibetan author Oser's book, "Notes on Tibet," for its politically "sensitive" content.

In March, RFA reported that authorities had instituted political education activities at Lhasa-based TV-3 for airing a program that showed the Tibetan national flag. The station director reportedly was demoted.

Although the Government made efforts in recent years to restore some of the physical structures and other aspects of Tibetan Buddhism and Tibetan culture damaged or destroyed during the Cultural Revolution, repressive social and political controls continued to limit the fundamental freedoms of Tibetans and risked undermining Tibet's unique cultural, religious, and linguistic heritage.

## HONG KONG

Hong Kong is a Special Administrative Region (SAR) of the People's Republic of China (PRC). The 1984 Sino-British Joint Declaration on the Question of Hong Kong, and the Basic Law, the SAR's constitution approved by the PRC in 1990, specify that Hong Kong will enjoy a high degree of autonomy except in matters of defense and foreign affairs. This autonomy under the "one country, two systems" formula in effect since 1997 has been tested severely this year. The Basic Law provides for the protection of fundamental rights and calls for progress toward universal suffrage and further democratization after a 10-year period, starting with Hong Kong's July 1, 1997, reversion to Chinese sovereignty. The Chief Executive is chosen by a selection committee composed of 800 directly elected, indirectly elected, or appointed individuals. The Chief Executive appoints and supervises a cabinet of principal officers. The Basic Law significantly circumscribes the power of the legislature, the Legislative Council (Legco). In September 12 elections, voters directly elected 30 members of the Legco from geographic constituencies and indirectly elected 30 from functional or occupational constituencies. Despite isolated allegations of voter intimidation prior to the election and some irregularities on election day, the voting was considered free and fair. Majorities are required in both the geographic and the functional constituencies to pass legislation introduced by individual legislators. Members may not initiate legislation involving public expenditure, political structure, government operations, or government policy. The judiciary is independent, and the Basic Law vests Hong Kong's highest court with the power of final adjudication. Under the Basic Law, however, the Standing Committee of the PRC's National People's Congress (NPC) has the power of final interpretation of the Basic Law.

An effective police force under the firm control of civilian authorities maintained public order. The Independent Police

Complaints Council, made up of public members appointed by the Chief Executive, monitored and reviewed the work of an office that investigated public complaints against the police. The 4,000 Chinese troops sent to Hong Kong in 1997 to replace the British military garrison have maintained a low profile and have not performed or interfered in police functions.

Hong Kong's free market economy is an international trade, shipping, and finance center as well as a principal platform for trade and investment with the PRC. The economy grew 7.5 percent during the year, with no inflation. Per capita gross domestic product was approximately $23,000. The population was approximately 6.8 million.

The Government generally respected the human rights of residents, and the law and judiciary provided effective means of dealing with individual instances of abuse. In April, the Standing Committee of the NPC ruled out universal suffrage in the next elections for Chief Executive in 2007 and Legco in 2008. This was an initiative of the central authorities that cut short local debate and raised questions about the PRC's willingness to permit Hong Kong to operate with a high degree of autonomy. Human rights problems included: Limitations on residents' ability to change their government and limitations on the power of the legislature to affect government policies; allegations of intimidation of journalists and other media figures; violence and discrimination against women; discrimination against ethnic minorities; restrictions on workers' rights to organize and bargain collectively; and trafficking in persons for the purposes of forced labor and prostitution.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no reports of arbitrary or unlawful deprivations of life committed by the Government or its agents.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law forbids torture and other abuse by the police. There were allegations of assault by police officers during the year. Disciplinary action can range from warnings to dismissal. Criminal proceedings may be undertaken independently of the disciplinary process. The Complaints Against Police Office (CAPO) investigates allegations of excessive use of force and the Independent Police Complaints Council (IPCC), a body composed of public members appointed by the Chief Executive, monitors and reviews their work.

During the first half of the year, CAPO received 218 allegations of assault by police officers against persons in custody and 130 allegations of assault against persons not in custody, out of a total of 21,562 arrests. Of the 218 allegations of assault by police officers against persons in custody, 107 case investigations were completed and endorsed by the IPCC, and none were substantiated: 79 were withdrawn, 22 were deemed "not pursuable," 4 were judged to be false, 1 was judged "no fault," and 1 was judged "unsubstantiated." The remaining 111 cases were pending as of June 30. Of the 130 allegations of assault against persons not in custody, 62 case investigations were completed and endorsed by the IPCC, and none were substantiated: 45 were withdrawn, 13 were deemed "not pursuable," 1 was judged to be false, and 3 were judged "unsubstantiated." The remaining 68 cases were pending as of June 30. In response to concerns about the police being responsible for investigating their own misconduct, the Government drafted a bill to provide a statutory basis for the IPCC, which would allow it to set up its own secretariat, receive funding to hire its own permanent staff, and initiate investigations.

Prison conditions generally met international standards. Men and women were housed separately, juveniles were housed separately from adults, and pretrial detainees were held separately from convicted prisoners. For the first 6 months of the year, the average occupancy rate for Hong Kong's 24 prisons was 114 percent. Overcrowding was most serious in maximum security prisons, which operated at an average occupancy rate of 136 percent. The Government continued to address the problem of prison overcrowding by remodeling existing buildings to provide space for additional prisoners and redistributing the prison population. In addition, the Immigration Department expected its new Detention Center in Tuen Mun, due to be completed in 2005, to hold 400 additional people and eliminate the need to put immigration offenders in prison or other correctional facilities.

The Government permitted prison visits by human rights observers. Local justices of the peace regularly inspected prisons, and, as a standard procedure, these visits were unannounced.

d. Arbitrary Arrest, Detention, or Exile

Common law, legal precedent, and the Basic Law provide substantial and effective legal protection against arbitrary

arrest or detention, and the Government generally observed these provisions in practice. Suspects must be charged within 48 hours or released. During the year, the average length of pre conviction incarceration did not exceed 48 days.

The police force is led by a uniformed Police Commissioner who reports to the Secretary for Security--a member of the Chief Executive's Cabinet. The force had 28,695 officers and was divided into 5 departments with both headquarters and regional formations. Corruption was not a significant problem within the force. Police officers are subject to disciplinary review by CAPO and IPCC in cases of alleged misconduct (see Section 1.c.).

e. Denial of Fair Public Trial

The Basic Law provides for an independent judiciary, and the Government generally respected this provision in practice. The judiciary, underpinned by the Basic Law's provision that Hong Kong's common law tradition be maintained, generally provided citizens with a fair and efficient judicial process. Under the Basic Law, the courts may interpret those provisions of the Basic Law that address matters within the limits of the SAR's high degree of autonomy. The courts also interpret provisions of the Basic Law that touch on PRC central government responsibilities or on the relationship between the central authorities and the SAR, but before making final judgments on these matters, which are unappealable, the courts must seek an interpretation of the relevant provisions from the Standing Committee of the NPC. The Basic Law requires the courts to follow the Standing Committee's interpretation of Basic Law provisions. Judgments previously rendered are not affected. The NPC's mechanism for interpretation is its Committee for the Basic Law, composed of six mainland and six Hong Kong members. The Chief Executive, the President of the Legislative Council, and the Chief Justice nominate the Hong Kong members. Human rights and lawyers' organizations have expressed concern that this process, which circumvents the Court of Final Appeal's power of final adjudication, could be used to limit the independence of the judiciary or could degrade the courts' authority. In the controversial 1999 "right of abode" case (concerning the right of certain persons to reside in Hong Kong), the Government, after losing the case in the Court of Final Appeals, sought a reinterpretation of relevant Basic Law provisions from the NPC. There have been no such appeals of court decisions to the NPC since 1999.

The Court of Final Appeal is the SAR's supreme judicial body. An independent commission nominates judges. The Chief Executive is required to appoint those nominated, subject to endorsement by the legislature. Nomination procedures ensure that commission members nominated by the private bar have a virtual veto on the nominations. The Basic Law provides that, with the exception of the Chief Justice and the Chief Judge of the High Court, who are prohibited from residing outside of Hong Kong, foreigners may serve on the courts. In 2004, approximately 23 percent of judges and judicial officers were expatriates. Judges have security of tenure until retirement age (either 60 or 65, depending on the date of appointment).

Under the Court of Final Appeal is the High Court, composed of the Court of Appeal and the Court of First Instance. Lower judicial bodies include the District Court, which has limited jurisdiction in civil and criminal matters; the magistrates' courts, which exercise jurisdiction over a wide range of criminal offenses; the Coroner's Court; the Juvenile Court; the Lands Tribunal; the Labor Tribunal; the Small Claims Tribunal; and the Obscene Articles Tribunal.

The law provides for the right to a fair public trial, and an independent judiciary generally enforced this right in practice. Trials are by jury except at the magistrate court level. The judiciary provides citizens with a fair and efficient judicial process.

Under prosecution rules, there is a presumption of guilt in official corruption cases. Under the Prevention of Bribery Ordinance, a current or former government official who maintains a standard of living above that commensurate with his official income or controls monies or property disproportionate to his official income is, unless he can satisfactorily explain the discrepancy, guilty of an offense. The courts have upheld this practice.

According to the Basic Law, English may be used as an official language by the executive, legislative, and judicial branches. For historical reasons and because of the courts' reliance on common law precedents, almost all civil cases and most criminal cases were heard in English. In recent years, the Government has developed a bilingual legal system. It has increased the number of officers in the Legal Aid Department proficient in spoken Cantonese and written Chinese and extended the use of bilingual prosecution documents and indictments. All laws are bilingual, with the English and Chinese texts being equally authentic. All courts and tribunals may operate in either Cantonese or English. Judges, witnesses, the parties themselves, and legal representatives each may decide which language to use at any point in the proceedings.

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits arbitrary interference with privacy, family, home, and correspondence, and the Government generally respected these prohibitions in practice. Interception of communications is conducted under the Telecommunications Ordinance and the Post Office Ordinance. Wiretaps require authorization from the Chief Executive for interception operations, but a court issued warrant is not required. The Government did not reveal the number of wiretaps and mail interceptions the Chief Executive authorized.

The Office of the Privacy Commissioner for Personal Data (PCO), established under the Personal Data (Privacy) Ordinance (PDPO), works to prevent the misuse, disclosure, or matching of personal data without the consent of the subject individual or the commissioner. Some Government departments are exempted to combat social welfare abuse and tax evasion. Violations of the PDPO can be either criminal or civil offenses. Between June 2003 and June 2004, the PCO investigated 1,109 complaints of suspected breaches of the ordinance, completing action on 1,047. The PCO found violations of the PDPO in 26 of these cases, with none resulting in prosecution. The PCO found insufficient evidence to prosecute in 243 of the cases, while the remaining cases were resolved, rejected, or withdrawn after preliminary inquiries.

The PDPO is not applicable to PRC government organs in Hong Kong. At year's end, the Government was still considering whether it should be made applicable to PRC bodies. Under certain exemptions for purposes related to safeguarding the security, defense, or international relations of Hong Kong, and for the prevention, detection, or prosecution of a crime, Hong Kong authorities may be allowed to transfer personal data to a PRC body.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press, and the Government generally respected these rights in practice. During the year, allegations of intimidation by pro-Beijing groups and individuals prior to the September elections raised questions about these rights. Most Hong Kong media outlets are owned by businesses with interests on the mainland, making them vulnerable to self-censorship.

In February and March, the PRC media and local pro-PRC newspapers ran a series of articles defining patriotism in Hong Kong. The debate started with an article in the PRC-owned China Daily citing former Chinese leader Deng Xiaoping's statement that "only patriots should govern Hong Kong" and relating this criterion to the political debate over universal suffrage in Hong Kong. The PRC media later published guidelines for patriotic actions, and a local pro-PRC paper printed the names of those in Hong Kong perceived to be "unpatriotic." In the midst of the debate, Jiang Zemin, former president and then Chairman of the Chinese Central Military Commission accused Hong Kong's independent Apple Daily newspaper and two radio hosts of being "hostile forces," according to the local East Week magazine.

In May, two popular radio talk show hosts known for their antigovernment and anti-PRC rhetoric abruptly left their shows due to alleged intimidation. The two asserted that a man claiming to represent senior Beijing officials asked them to stop broadcasting until after the September election. Police questioned the man but made no arrest. A third talk show host received a phone call from a retired mid-level PRC official, which he perceived as a threat to his family. Subsequently, the PRC caller stated publicly that he had no intention of threatening the talk show host. In September, one of the talk show hosts was elected to the Legco, and, in October, another became host of a local television show. At year's end, the government investigations into these allegations continued.

In July, the Independent Commission Against Corruption (ICAC) raided seven newspapers with a warrant to seize documents related to a corruption case. ICAC staff also searched the homes of some journalists. The raided newspapers included pro-PRC, independent, and pro-democracy newspapers. In August, the Court of First Instance ruled ICAC's search warrant was "wrong in fact and in law." On October 11, the Court of Appeal dismissed ICAC's appeal on technical grounds but said that ICAC had acted lawfully. The Hong Kong Journalists' Association, Hong Kong Federation of Journalists, News Executives' Association, and the Newspaper Society all issued statements condemning the raids as violating freedom of the press. The acting head of ICAC said the agency respects the freedom of the press, but that it had to strike a balance between press freedom and the administration of justice.

The Telecommunications Ordinance gives the Government wide ranging powers to ban messages when it "considers that the public interest so requires." In practice, the Government has never invoked this law.

The Basic Law's Article 23 requires the Government to enact legislation prohibiting treason, secession, sedition, subversion against the Central People's Government, theft of state secrets, and links with foreign political organizations that are harmful to national security. In 2003, proposed legislation met with active and widespread public opposition. The Government withdrew the bill and stated publicly that it had no plans to reintroduce the legislation.

Individuals criticized the Government publicly and privately without reprisal, and many persons spoke freely to the media and used the media to voice their views. Political debate was vigorous. Varying viewpoints, including stories and opinions critical of the SAR and PRC Governments and statements by leading Chinese dissidents and pro-independence Taiwan activists, were carried by the mass media, in public forums, and by political groups.

During the year, newspapers published a wide variety of opinions, including some sharply critical of the NPC's decision ruling out universal suffrage in 2007 and 2008. Newspapers also carried opinions on sensitive topics such as Taiwan, Tibet, PRC leadership dynamics, Communist Party corruption, and human rights. There were 16 daily newspapers, all privately owned in name although 4 were supported financially--and guided editorially--by the PRC (Wen Wei Po, Ta Kung Pao, the Hong Kong Commercial Daily, and the China Daily). The non-PRC-owned newspapers, hundreds of periodicals, four commercial television stations (broadcast and cable), and two commercial radio stations operated

# **EXHIBIT 2**

# National Public Radio

National Public Radio
Morning Edition

August 25, 2005

Analysis: Chinese detainees at Guantanamo get hearing

Edition: 11:00 AM-12:00 Noon

Article Text:

STEVE INSKEEP, host:

A federal judge will hear arguments today concerning the fate of two men being held at the US military detention center at Guantanamo Bay, Cuba. The men are Uighurs. That's a minority Muslim group in northwestern China. They've been held at the remote military base for more than three years, even though the administration has determined that the men are no longer a risk to the United States. To find out why, we've called on NPR national security correspondent Jackie Northam.

JACKIE NORTHAM reporting:

Very little is known about the two Chinese Muslim men who are at the core of today's federal court hearing, but their situation has exposed the deep flaw in the Bush administration's policy on holding suspected terrorists at Guantanamo Bay. What is known is that Abu Bakker Qassim and Adel Abdu al-Hakim grew up in China. The Pentagon says the two received weapons training by the Taliban in Afghanistan. Both! men were captured and sent to Guantanamo in June of 2002.

More than a year ago, the Pentagon determined that the two Uighurs are not enemy combatants and so by rights should be allowed to leave Guantanamo. But Pierre-Richard Prosper, the US ambassador at large for war crimes, says the two men face persecution and perhaps torture if they're sent home to China.

Ambassador PIERRE-RICHARD PROSPER (US Ambassador At Large For War Crimes): When we made a decision that we wanted to release these Uighurs, we also decided that we were not prepared to send them back to China. So as a result, we had to find a third country for resettlement.

NORTHAM: Prosper says the US government has been actively trying to find a country that will take Qassim and Hakim, as well as more than a dozen other Uighurs being held at Guantanamo, with no luck.

Amb. PROSPER: We've approached probably about 25 countries.

NORTHAM: And...

Amb. PROSPER: Well, different degrees of response. Some is, you know, the flat-out no, some, you know, lukewarm, and others we continue to go back and forth with.

NORTHAM: Alex Biscaro is spokesman for the Swiss Embassy in Washington, DC. He says the US approached his government informally to see if it would be interested in taking the Uighurs.

Mr. ALEX BISCARO (Spokesman, Swiss Embassy): The question was whether there is a possibility to get them into Switzerland and with a status of refugees. And that was the main hurdle we have, was what kind of status can be given to them because, actually, technically or legally speaking, it's difficult to put them into a refugee status. So we have severe legal hurdles, so that we had to decline.

NORTHAM: Some countries have looked to the United Nations' High Commissioner for Refugees, or UNHCR, to determine refugee status before they agreed to resettle anyone. Jennifer Pagonis, a spokesman for the UNHCR in Geneva, says her organization needs more details about the Uighurs before it makes that determination.

Ms. JENNIFER PAGONIS (Spokesman, UNHCR): We don't have any information. We don't know who these people are, what their stories are, what were the circumstances surrounding their arrests. So, you know, if we don't have any of this information, we can't really know whether they're of concern to us or not.

NORTHAM: Pagonis says the UNHCR would need to talk to each of the Uighurs before making that determination, but the UNHCR has not been invited to Guantanamo to talk to the Uighurs and it won't be invited until it can give the administration a sense of whether or not it can help sort out the problem, says the State Department's Prosper.

Amb. PROSPER: In other words, there's no sense in having them go to Guantanamo if they know right now that they will not be able to, A, classify them as refugees, and then, B, help us with the resettlement process.

NORTHAM: But lawyers for the Uighurs say it's wrong for their clients to have to sit in prison while the administration tries to find them somewhere to live. US military officials say the men will be moved into a newly refurbished minimum security prison at Guantanamo and they'll have access to DVDs, communal dinners and more time for recreation. Sabin Willett, defense lawyer for Qassim and Hakim, argues that his clients should either be allowed to live on the civilian side of the Guantanamo Base or, Willett says, that the judge hearing the case should bring the two men to the United States and grant them some kind of parole.

Mr. SABIN WILLETT (Lawyer for Qassim and Hakim): That is, release them to the care and custody of some of the ex-pat Uighurs who are resident in the area and subject to, you know, reporting conditions or something like that until the State Department ultimately works out a country for them to go to.

NORTHAM: But Brad Berenson, a Washington lawyer who was involved in formulating the administration's legal strategy regarding detainees, says that the Uighurs cannot be allowed to resettle in the US. Mr. BRAD BERENSON (Washington Lawyer): What if our determination that they no longer present a danger to us is incorrect? I think it would be very, very hard for the president or the secretary of Defense or the secretary of State to justify to the American public releasing someone into our population, on our soil, if it later turns out they really were hostile to us and are, in fact, armed jihadists.

NORTHAM: That's the same argument that several governments made when asked why they turned down overtures by Washington to resettle the Uighurs held at Guantanamo.

Jackie Northam, NPR News, Washington.

INSKEEP: This is NPR News.

Copyright ©2005 National Public Radio®. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to National Public Radio. This transcript may not be reproduced in whole or in part without prior written permission. For further information, please contact NPR's Permissions Coordinator at (202) 513-2030.
Record Number: 200508251104

# **EXHIBIT 3**

INTERNATIONAL INFORMATION PROGRAMS
# USINFO.STATE.GOV

SEARCH enter keyword

Advanced Search/Arc

Topics    >> Regions    Resource Tools    Products    Español | Français | Pусскуú | عـربي | 中文 | فارسى

## Middle East and North Africa

**You Are In:** USINFO > Regions > Middle East and North Africa > A Vision for the Future

## State Department Noon Briefing, May 13

**Bolton/Libya ending military trade with WMD states, Libya, Red Cross/Guantanamo Report, China, Kuwait, Department/Nicholas Berg, Iraq, India/Pakistan, European Union, North Korea, Venezuela, human rights, Jordan, Israel/Palestinians, Syria**

State Department Spokesman Richard Boucher briefed the press May 13 at the noon briefing. Also participating, John Bolton, under secretary of state for arms control and international security affairs.

Following is the transcript of the State Department briefing:

U.S. Department of State
Daily Press Briefing Index
Thursday, May 13, 2004
12:15 p.m. EDT

BRIEFER: Richard Boucher, Spokesman

ANNOUNCEMENT
-- Under Secretary Bolton's Announcement on Libya Ending Military Trade with States of Serious Weapons of Mass Destruction Proliferation Concern

LIBYA
-- Ending Military Trade with Syria, Iran, and North Korea
-- Diplomatic Relations between the United States and Libya
-- Need to Eliminate Aspects of Chemical Weapons Programs

MISCELLANEOUS
-- Red Cross Guantanamo Report

CHINA
-- Negotiations on Status of Uighur Detainees at Guanatanamo

KUWAIT
-- Talks with Kuwaiti Officials on Kuwaiti Detainees at Guantanamo

CONSULAR
-- State Department's Contacts with Nicholas Berg and his Family
-- Detention of Mr. Berg/Assisting American Citizens to Leave Iraq

IRAQ
-- UN Security Council Discussions on UN Resolution on Iraq

-- Discussions with Group of Eight Ministers Tomorrow
-- Transfer of Sovereignty/Role of Ambassador Brahimi
-- Security Arrangements for Iraq

INDIA/PAKISTAN
-- India's Parliamentary Elections/Resignation of Prime Minister
Vajpayee
-- Dialogue between India and Pakistan/ Peace Process
-- Religious Freedom in India and Pakistan

EUROPEAN UNION
-- Expanding Visa Waiver Program/Status of Belgium

NORTH KOREA
-- Working Group Meeting in Beijing
-- Discussion of North Korea at Group of Eight Meeting

VENEZUELA
-- Military-to-Military Relations between United States and Venezuela
-- Eviction of U.S. Military Mission from Base at Fuerte Tiuna

HUMAN RIGHTS
-- Upcoming Human Rights Report

JORDAN
-- Secretary Powell's Meetings in Jordan

ISRAEL/PALESTINIANS
-- Incursions in Gaza

SYRIA
-- Relations between the United States and Syria


U.S. DEPARTMENT OF STATE
DAILY PRESS BRIEFING

THURSDAY, MAY 13, 2004
(ON THE RECORD UNLESS OTHERWISE NOTED)

12:15 p.m. EDT

MR. BOUCHER: Good afternoon, ladies and gentlemen. I have a brief
announcement, and that is that Under Secretary John Bolton is here
with me to make a brief announcement.

UNDER SECRETARY BOLTON: Thank you, Richard. I have a very brief
prepared statement on the subject of Libya, and then I'd be happy to
address a couple questions on it.

Today, the Libyan Government issued the following statement. I am
now quoting from the Libyan statement:

"As part of its efforts to strengthen peace and stability in the world, in
the context of which Libya announced in December 2003 that it

renounced programs, materials and equipment which might lead to the production of internationally banned weapons or delivery systems, as classified by the MTCR, Libya wishes to announce officially the application of this decision to its military dealings with other states.

"Libya will not deal in any military goods or services with states which Libya considers to be of serious weapons of mass destruction proliferation concern." Close quote on the Libyan statement.

Libya has also indicated that it will shortly announce its pledge to renounce trade in missiles and missile-related equipment and technology with countries that are not members of the missile technology control regime.

The United States welcomes this statement and regards it as an important step forward and an indicator of Libya's seriousness in abandoning weapons of mass destruction proliferation and rejoining the international community. We are particularly pleased that Libya has now committed to ending all military trade with states of serious weapons of mass destruction proliferation concern.

That's the end of the prepared statement. I'd be happy to answer a couple of questions.

QUESTION: Do your lists -- does your list and theirs match up? And who are these states --

UNDER SECRETARY BOLTON: Yeah.

QUESTION: -- as you understand Libya to mean?

UNDER SECRETARY BOLTON: Yes, we have discussed this question expressly with the Libyans and do have an understanding of what it covers. And that's why this is a particularly important announcement because the Government of Libya has assured the United States and the United Kingdom that its renunciation of all military trade with states of serious WMD proliferation concern includes North Korea, Syria and Iran.

We welcome Libya's announcement that it has decided to give up military trade with North Korea, Syria and Iran. All three of those countries are indeed states are very great proliferation concern, especially North Korea, which uses its exports of military technology to finance other dangerous activities. Libya's renunciation of military relationships with such proliferators is an important step forward.

Teri.

QUESTION: How much business do you believe Libya was doing with these three countries? How big a provider was it, or an importer, either way?

UNDER SECRETARY BOLTON: Well, North Korea had been the provider of Libya's Scud Missile arsenal, which included five Scud C's, which have been removed from Libya pursuant to the Libyan December

declaration, and several hundred Scud B's, a lower range ballistic missile which Libya has agreed to, as part of its general commitment not to have missiles that go beyond the MTCR parameters, 500 kilograms, over 300 kilometers, to bring those missiles within those constraints or to eliminate them.

QUESTION: Is that the --

QUESTION: Yeah, I was just wondering what -- why you're making this announcement on behalf of the Libyans?

UNDER SECRETARY BOLTON: I didn't make the announcement on behalf of the Libyans. I quoted the Libyan announcement and responded to it.

QUESTION: Which was, what, transmitted to your people in Tripoli?

UNDER SECRETARY BOLTON: It was made in Tripoli earlier this morning.

QUESTION: Publicly?

UNDER SECRETARY BOLTON: Publicly.

QUESTION: By?

UNDER SECRETARY BOLTON: The Libyan Government.

QUESTION: Yeah, yeah. But in what way? Was it communicated directly to you guys?

UNDER SECRETARY BOLTON: As you say, I don't speak for the Libyan Government. I don't have this transmitted --

QUESTION: No, I'm just --

UNDER SECRETARY BOLTON: My understanding is it was announced publicly.

Yes, sir.

QUESTION: But this came -- but this statement that you got here came from your interests -- whatever, your liaison office that you -- that you have in Tripoli?

UNDER SECRETARY BOLTON: You know, where did the electrons come from? I don't know.

Yes, sir.

QUESTION: Mr. Bolton, Libya -- Pakistan was the source for the Libya and the relations in the technology and missile and nuclear and all. Do you think that Libya will continue to deal with Pakistan?

UNDER SECRETARY BOLTON: The question of Libya's dealings with the other countries that I've indicated is that we have discussed with the Libyans the three countries that I've named. The announcement they will make on missiles will restrict it further to MTCR member countries.

And that's what we have to say about it.

Yes, sir.

QUESTION: Is the Libyan decision preceding now an imminent restoration of diplomatic relations between the United States and Libya?

UNDER SECRETARY BOLTON: Well, the course ahead has been determined by prior negotiations. I'm limiting my comments today to the subject of this further elaboration of the Libyan commitment to foreswear weapons of mass destruction.

Yes, sir.

QUESTION: Can you give us an update on exactly where the Libyans are now in terms of having given up existing WMD programs? Do they have anything left? If so, what?

UNDER SECRETARY BOLTON: Yeah. There are still some aspects of the chemical weapons program that need to be eliminated. Obviously, the agent itself is a highly dangerous substance and has to be eliminated under conditions of appropriate health and safety regard, and we're still working on that. The issue of the Scud B's remains, although the -- and the question of what we call phase three, or the longer term implementation issues. But we're working ahead on that. We're satisfied with the progress we've made. This announcement today is a further step in that direction.

QUESTION: What's the chemical agent that you alluded to there?

UNDER SECRETARY BOLTON: Various kinds of chemical weapons agents.

Yes, sir.

QUESTION: Right here?

UNDER SECRETARY BOLTON: Second row.

QUESTION: Okay.

UNDER SECRETARY BOLTON: Second row.

QUESTION: Oh, Nicholas.

QUESTION: Can you tell us, John, how much of that was actually negotiated in detail with the United States or Britain, or how much is -- is it simply an unilateral decision, good gesture, or what?

UNDER SECRETARY BOLTON: We discussed this with the Libyans. That's

why we have an understanding on what countries are covered. And this was something that's a further indication of the nature of the relations and the cooperative aspect of the work that they've been doing to eliminate their weapons of mass destruction.

Yeah.

QUESTION: How much business do you think that this will choke off from Syria, Iran and North Korea? I mean, were these -- was Libya a major purchaser?

UNDER SECRETARY BOLTON: Well, I think, particularly, with respect to North Korea, the sales of the Scud B's and the Scud C's over a period of time was a pretty substantial money earner for the North Koreans. And, as we know, North Korea has been the world's greatest proliferators of ballistic missile technology. They have used the hard currency earnings from that proliferation to finance their nuclear weapons program.

So this is a symbol by Libya of a decision not to have any further purchases from North Korea of any military goods or services, particularly on the missile front. It is consistent with what we have urged other states in the region to cut off their purchaser relationships with North Korea, as part of our overall effort to squeeze North Korean WMD sales to reduce the amount of money they have for their nuclear weapons program.

QUESTION: John, can I follow up? But in terms of -- so, in terms of the effect, are you hoping this will have more of a symbolic effect with other countries of the region? Or do you think that this will significantly curtail North Korea's -- or any of these other states proliferation programs?

UNDER SECRETARY BOLTON: I think that the -- it has an immediate impact by definition because Libya will not engage in any purchases. And I think as an example, a continuing example of Libya's openness and transparency in giving up weapons of mass destruction, we hope this will be a productive example for others in the region and around the world.

Yes, ma'am.

QUESTION: Can I just ask --

QUESTION: (Inaudible.)

QUESTION: Can I just ask the practical effect with Iran and Syria? Were there continuing, or were there military sales?

UNDER SECRETARY BOLTON: Well, not to get into the specifics, the point is, Iran and Syria are very serious proliferant states, states we consider, in the case of Iran, of sufficient concern. We've been trying for some time to get the matter referred to the UN Security Council.

So when a state like Libya, which was pursuing weapons of mass destruction and advance delivery systems, not only gives up the pursuit

of those assets, but says it's not going to have military dealings with other states that are pursuing weapons of mass destruction. I think that's a very important step forward.

And, I guess, Richard, did you want --

MR. BOUCHER: Last one, on this side.

QUESTION: Will this, the renunciation, sir, will it automatically translate into delisting Libya from the State Sponsors of Terror?

UNDER SECRETARY BOLTON: No, that's really a very separate question.

QUESTION: How will that come up? How will that be --

UNDER SECRETARY BOLTON: That's being handled in a separate track. I'm just addressing the WMD issues.

QUESTION: Thank you.

UNDER SECRETARY BOLTON: Okay. Thank you very much.

MR. BOUCHER: Thank you very much on that topic. Thank you, Under Secretary Bolton, in particular, for coming down to do that.

The wires kind of asked for a five-minute break. So that was about two minutes ago. So if we can, we'll have three minutes of quiet, and then we'll go on to the other things. Okay?

(Break.)

MR. BOUCHER: Okay, just to close off that discussion, there's one hanging question here: How did we know the Libyans had done this? We got -- we were informed by our people on the ground in Libya within the last hour or so that the Libyans had, indeed, made the announcement. I don't know for you exactly how they made the announcement or what arrangements you have to pick up announcements, but our people on the ground said the Libyans had, indeed, made the statement that we quoted.

Now, with that, I am glad to take your questions on other topics.

Tammy.

QUESTION: Can I ask you about -- there's apparently a new Red Cross report on Guantanamo that a senior Pentagon official traveling with Rumsfeld is quoted as saying was delivered to the State Department this week. Do you have any knowledge of this report, any -- can you characterize it at all? Have there been any meetings with ICRC officials about it?

MR. BOUCHER: On the subject of Guantanamo, we, obviously, have had regular meetings with the ICRC about it. They have met with military authorities. They have met with people at the Pentagon. Mr. Kellenberger, during his visits to Washington, has talked about

Guantanamo with the Pentagon, the NSC and us as well.

They do have a new report on Guantanamo. I think I've seen them confirm that they have presented one to us. As usual practice, I'm not in a position to go into any details on it, but they relay some of the concerns they have and some of the issues that they wanted to raise and discuss with us. And, indeed, we will certainly discuss those with them, and I'm sure the appropriate command authorities will discuss them as well.

QUESTION: Did it go first to Guantanamo, as the usual practices, or --

MR. BOUCHER: I don't quite know yet exactly. I know we have a copy, but whether we got the first one or not, I don't know for sure. But, certainly, it's available now inside the U.S. Government and we'll make sure that other responsible agencies have it and that those that are in a position to take the recommendations and decide what to do, that they are able to consider everything carefully and do what they can.

QUESTION: But now released at -- when did you get it?

MR. BOUCHER: Last couple days. I don't know exactly when.

Yeah, okay. Teri.

QUESTION: Change of subject?

QUESTION: Can I ask on Guantanamo?

QUESTION: Sure.

MR. BOUCHER: Sure.

QUESTION: There was a report this morning that the United States and China are negotiating over the status of a number of Uighur detainees at Guantanamo. I was wondering if you could say anything. Is this process underway?

MR. BOUCHER: As you know, we have a process underway of looking at people who are detained in Guantanamo, looking to identify those who may no longer be a significant threat or may not be wanted on criminal charges, and, indeed, reviewing those cases regularly now to ascertain which individuals might be eligible for release or transfer to other governments.

In the case of the Uighurs who are there, we have identified some who might be eligible for release. We are currently considering how that process can work. If it's decided that they can, obviously, the situations of individual, individuals need to be taken into account, including their wishes and their ability to go to different places.

We have talked to the Chinese and other governments about this situation at this point, but I don't have anything definitive for you yet on the release or where they might go.

QUESTION: In other words, they might not go back to China?

MR. BOUCHER: We've been in touch with China and other governments about it. They won't necessarily -- well, everything has to be taken into account in the individual cases.

QUESTION: Can I follow up on that?

QUESTION: You've talked to China and other governments about the Uighurs?

MR. BOUCHER: About the Uighurs, yeah.

QUESTION: On the general issue of Guantanamo, the Secretary -- and what you were just saying -- the Secretary has said publicly that he's been trying to work with the U.S. Government in terms of identifying these people, getting them, you know, either transported or released to other governments.

Is this moving -- is the pace fast enough, to his liking?

MR. BOUCHER: The -- I think we all wanted to make sure, the Secretary wanted to make sure, and all, really, the principals who have met and worked this out wanted to make sure there's a process of review, there was a process of release and transfer. Indeed, we've managed to do that in many cases already. I think the number is 146, if I'm correct. It may be higher. I forgot to check. But the number of people who have been released from Guantanamo, it's a continuing process.

We have discussions going on with a number of governments right now, and there is a continuing process of identifying prisoners who may be, as I said, no longer a threat, if they were released or that could be transferred, subject to further monitoring by other governments. So that's an ongoing process. Obviously, we want it to be as comprehensive and thorough as possible, but I think that's what all the agencies are working together on.

QUESTION: Picking you up on your last remark, could it be that some of these people were never a threat, and they were detained while you checked suspicions and allegations, and they were, obviously, not only have gotten over being threatening but were never threatened?

MR. BOUCHER: I don't want to make broad observations like that. Each of these cases is different. There are, you know -- there have been many people in custody already released. The number of people that, one way or the other, were found on the battlefield are in a difficult situation; there were dangerous situations for us in Afghanistan.

It was very, very large, thousands and thousands of those people have been released, some of them in detention. The ones at Guantanamo are the ones where there was the highest degree of suspicion about what they might have been up to. But whether every individual case, in the end, checked out or not, leave for the people who are operating the facility to answer, if they can.

Yeah. Okay. Sir.

QUESTION: Have you had any talks with Kuwaiti officials on the Kuwaiti detainees at Guantanamo, like this week, or tomorrow, or upcoming?

MR. BOUCHER: I don't know of any particular discussions with the Kuwaiti officials. I'd have to check and see. We are in touch with a number of governments. I just don't know if we've -- where we stand on Kuwait.

Yeah. Teri.

QUESTION: Same subject.

MR. BOUCHER: Yeah.

QUESTION: Could you go over whatever timeline you have with the State Department's contacts with Nicholas Berg while he was in Iraq?

MR. BOUCHER: Let me say, once again, we extend our deepest sympathies and condolences to Mr. Berg's family, and we condemn, in the strongest terms, this despicable act of murder and terrorism. Mr. Berg's remains have been returned to the United States, arrived this morning.

Our consular officers have been in touch with his family and spoke to them. I think it was on May 10th, when the remains that had been found earlier were identified as being Mr. Berg's body. We had contact with Mr. Berg in Baghdad with our U.S. consular officer who is out there. He had registered with a U.S. consular officer. He was in Iraq privately, not attached to any military operation or contractor.

We last spoke to him in Iraq on April 10th, 2004. At that time, our consular officer extended an offer to assist him in departing Iraq by plane to Jordan. He told us that he had planned to travel overland to Kuwait, and apparently had made arrangements to do that. We heard from his family a few days later and talked to his family about this when they talked to us on April 13th. Since then, since he went missing, then we were in regular touch with his family.

QUESTION: So he went -- April 10th was the last time you talked to him; April 13th was when you consider him missing, first, finally knew?

MR. BOUCHER: When his family -- I think his family contacted us and said we -- they hadn't heard from him --

QUESTION: Why was --

MR. BOUCHER: -- and what did we know?

QUESTION: Was the State Department encouraging him to get out when they -- is that why you offered to help him get to Jordan, you were encouraging him to leave?

MR. BOUCHER: I don't know if we were encouraging him, as much as

that he was planning on leaving; but, certainly, we were trying to facilitate his departure which -- at that time.

QUESTION: When he was detained by the Iraqis, was there any -- I don't know if consular rules are in order yet. But do you have to be notified and get consular visits with him? Is that in effect yet in Iraq?

MR. BOUCHER: I don't think it necessarily legally applies in this case. I don't think it's a Geneva Convention situation, in this matter.

QUESTION: Why wouldn't it apply? If he was in prison there, wouldn't you -- there is not rule that you need to be notified?

MR. BOUCHER: It has to do with status of governments in diplomatic representation. I don't think it comes up in quite the same manner as it does in other situations. Certainly, the detention was known to U.S. authorities. The FBI visited him up there.

QUESTION: And the consular official never did, that wasn't even considered?

MR. BOUCHER: I don't know at what point our consular officers learned that he had been in detention. But as far as consular notification is required to tell the U.S. Government when a foreign government arrests American nationals. In this case, U.S. authorities knew he had been detained, and indeed visited him, the FBI did.

QUESTION: What is the response to the family saying that the government, the U.S. Government didn't do enough?

MR. BOUCHER: I really am not -- don't think I'm in a position to speak on behalf of all agencies. But I'd say that we tried to help Mr. Berg when he came to us.

QUESTION: Richard, without the consular, Geneva Conventions, or anything like that, did the State Department know that this man was being detained? Because if you said that he had registered with the U.S. Consulate, wouldn't the State Department be able to clear some of the circumstances up while he was in detention?

MR. BOUCHER: I think I said three minutes ago, I don't know at what point we learned he was in detention. Sorry.

QUESTION: Did American officials, which was the next point --

MR. BOUCHER: Excuse me?

QUESTION: -- at any point -- well, I'll explain. There is an account out by people who knew him and who have said they thought he was singled out because he carried an Israeli stamp in his passport. Passports don't carry Israeli stamps, do they?

MR. BOUCHER: I don't know what the Israeli practice is on entry; that many countries stamp your passport when you go in. Certainly, we would have seen his passport when he registered. But, frankly, in

Case 1:05-cv-01602-UNA    Document 7    Filed 09/20/2005    Page 79 of 214

normal registration process, we don't look through somebody's passport to find out where they've been. We look at the front page to find out who they are, make sure they're Americans and register them.

Sir.

QUESTION: This is -- I guess kind of goes to the whole issue of jurisdiction and custody. But if the gentleman was in Iraqi police custody, as the government -- as the U.S. has said, but the U.S. is the governing power of Iraq right now and the U.S. was interrogating him and the U.S. deemed that there was enough information that he wasn't a threat and thought that he could be released, then how does that make it that he was in Iraqi custody?

MR. BOUCHER: As I said yesterday, those questions, I think, need to be answered by the people involved in the coalition and the FBI who were out in Baghdad. So I really am not in a position to answer all those questions from here.

QUESTION: On a general issue, can you check and see what the procedure is for American citizens that are in Iraq right now that might be picked up and what the rules are for them and --

MR. BOUCHER: I think, again, that's a question of rules and authorities in Iraq by the people in Iraq, and you can have your people ask the question there.

Okay, Charlie.

QUESTION: Can I follow up on that?

MR. BOUCHER: Yeah.

QUESTION: Even though you didn't provide an answer to understand, but my question is slightly different. On the offer to Mr. Berg of help, if you don't know maybe you could find out, has that offer been extended to others in Iraq in the -- you know, since there's been a consular officer there, since the CPA has been stood up? Is this something that happens on a regular basis or an irregular basis?

MR. BOUCHER: Just based on my understanding of consular officers and what they're doing there, what they're doing elsewhere, sure. Anytime somebody comes to us and said, you know, I'm looking for a way to leave, we try to help them out. And I assume that was the circumstance in this case.

QUESTION: Well --

QUESTION: I'm not worried about this case. I'm just asking generally. Is Mr. Berg one of a dozen, 50, 100, or one of two or three.

MR. BOUCHER: I don't know how many people the consular officers have seen, but if somebody comes to our consular officer and says, you know, I want to leave, I don't know how to make the arrangements, we'll help them to the extent we can.

QUESTION: Did you go over this already? Did he approach the consular officer to try and leave, or was he approached by them? Was that already answered?

MR. BOUCHER: As I said, my understanding is that we extended an offer to assist him in departing Iraq by plane to Jordan. I don't know specifically if he came and said help me out or how --

QUESTION: Well, it would appear he did not.

MR. BOUCHER: -- how it arose in the conversation --

QUESTION: Is it standard practice to go to people and tell them, "Hey, we can get you out of the country"?

MR. BOUCHER: Why do you say it appears that he did not?

QUESTION: Because he stayed.

MR. BOUCHER: This was April 10th, as I said ten minutes ago. This was April 10th. That was right around the time he disappeared.

QUESTION: I mean, there's three days between there and when he did disappear, right?

MR. BOUCHER: Yeah, right around the time he disappeared.

QUESTION: I think you may have handled this, but please explain to us how do private American citizens that are not working for a major corporation or something go to Iraq, whatever reason, business or pleasure or curiosity or whatever? What is the procedure? Do they go, they get a visa? What is the -- how is it done?

MR. BOUCHER: I don't know.

QUESTION: You can get a visa from somewhere?

MR. BOUCHER: First of all, you can ask an Iraqi embassy. They have representation overseas now. You can call the office here. I'm sure they'll be able to tell you what they issue for travel to Iraq.

Second of all, as far as how you make arrangements to get a truck or a bus or a plane or whatever to get into Iraq, I'm afraid I'm not a travel agent. I don't know.

QUESTION: Regarding the CPA, didn't they establish some sort of a protocol on how you go about this?

MR. BOUCHER: Again, if you want to know what the CPA might do with travelers to Iraq, you can ask the CPA. I'm sorry, I'm just not -- I'm standing here 10,000 miles away in Washington. I'm not able to answer questions about how to travel around Iraq.

QUESTION: Well, on --

QUESTION: Can I follow up on a different issue?

MR. BOUCHER: Yeah.

QUESTION: The murderers of Daniel Pearl were caught through some sort of, you know, a tool on the internet and so on. Is there something that is similar that is going on now, because it could be traced, you know, who these people are?

MR. BOUCHER: I don't know how the investigation is proceeding, but there is an --

QUESTION: Because they must have used some sort of a website, you know, probably registered with an American company or something.

MR. BOUCHER: I appreciate that. I am sure the investigators are using every possible means to track these people down, and we will continue to do so until they are caught and punished.

QUESTION: There are some news reports suggesting that, in fact, he was murdered before and then he was decapitated on the video. Are you aware of these news reports and why he was wearing this orange U.S. prison suit?

MR. BOUCHER: I don't know.

QUESTION: You don't know any details?

MR. BOUCHER: I'm not in a position to know. I'm sorry. We're just -- again, we're not involved in the events on the ground. The investigation may be trying to ascertain exactly the circumstances, but I'm not in a position to share any details anyway, even if we had them.

QUESTION: Could I shift slightly to -- still Iraq but --

QUESTION: Well, can we stay -- I just have one more. On the -- I know you say that the people on the ground are dealing with this, but you do have U.S. consular officers on the ground. So what is the job of the U.S. consular officer there and what is the coordination with the CPA?

MR. BOUCHER: The consular officer there works closely with the CPA and works -- is there to take care of American citizens, to provide American citizen services to people who are there, whether they are contractors or military people or anybody else who loses their passport, wants to get a message home, mom hasn't heard from them for days, wants us to pass a message saying please call home, or people who are in more difficult circumstances who might be looking for a way to leave or otherwise fall into trouble in Iraq. We're there to help out Americans who are in Iraq of all kinds.

QUESTION: Is there anything new to report on progress toward a resolution or resolutions for pre-transition -- or even post-transition, for that matter?

MR. BOUCHER: I think the simple answer is that the discussions

continue, that we have had a series of discussions at the United
Nations. I think there have been two so-called "informal/informal"
meetings, including one yesterday. We've had --

QUESTION: Informal/informal meetings?

MR. BOUCHER: Yeah, that's what they call them up in New York.

QUESTION: Is that like a non-TCOG TCOG?

MR. BOUCHER: Yeah, something like that, only less formal than that.
Anyway, just when a group of people from the UN Security Council get
together and kind of talk in general terms about something without it
being a formal meeting or a statement of positions, they're just trying
to figure something out, they call it an informal/informal.

So that's what they did yesterday again, discussing what the elements
might be of a UN resolution on Iraq. As you -- as I have reported to
previously, the Secretary has had a number of discussions about this in
his bilateral meetings over the last couple weeks and he looks forward
to discussions tomorrow with the Group of Eight foreign ministers and
then discussions over the weekend with some of our Arab friends and
partners who he'll be meeting.

The consultations that are going on in Iraq by Mr. Brahimi regarding the
formation of an interim government will also be important to consider
as we look at drafting a new UN resolution. So that's -- we're going to
have to gage our progress on how fast we move in relation to how fast
that process moves. We don't want to get ahead of that process of
forming the interim government in Iraq; on the other hand, we are
having these discussions so that we have an understanding about what
we can do to support that process, to endorse the process, to deal with
some of the issues that arise in giving the interim government authority
to, for example, control the Development Fund for Iraq and other
details of things that have been previously handled in UN resolutions.

QUESTION: And just -- I'm not looking for a percentage or anything like
that here, but for tomorrow in the G-8 meeting, considering that so
many -- half, right? -- are on the Security Council --

MR. BOUCHER: Yeah, and two others who, as we know, have troops in
Iraq. So there are many directly concerned.

QUESTION: Right. So can you kind of compare -- I mean, is this going
to be the major or a major topic of conversation, or is it going to be --
in terms of that region, or will it be more the Greater Middle East
Initiative?

MR. BOUCHER: The principal focus of this meeting of Group of Eight
ministers is to talk about the Group of Eight summit that will come up
in Sea Island. So they're going to deal --

QUESTION: Not the Greater Middle East Initiative?

MR. BOUCHER: They're going to deal most directly with all the issues

that will come up at Sea Island. That goes beyond the Middle East. But in terms of the Middle East, I'm sure there will be significant discussion of what's called the Greater Middle East Initiative, how we support reform process underway in the Arab world. There will be probably considerable discussion of the Middle East peace process and how that's proceeding and what all of us can do to support that.

So this was -- this discussion of a UN resolution, I'd say, is an opportunity because half the G-8 are Security Council members and others are directly interested, so it's another topic being taken up with this group in a separate -- almost a separate meeting, and then get down to the plenaries and the business of the G-8. But the principal focus of the discussions tomorrow will be G-8 business.

QUESTION: Wait, wait. There's a separate meeting just on --

MR. BOUCHER: There will be a meeting on this and then a meeting on G-8 topics too. Same people.

QUESTION: Sorry. Meeting on Iraq resolution or meeting on all three: Greater Middle East, Middle East peace process and Iraq resolution?

MR. BOUCHER: There are a series of meetings during the day, including discussions over lunch, so they have parsed out the agenda. There will be a separate discussion of Iraq resolution and Iraq issues and then there will be getting down to specific business of the G-8.

QUESTION: Could I ask you if the U.S. is coming into any difficulties with France and Russia on a proposed UN resolution --

MR. BOUCHER: As you all know, there is countries that have a lot of different views about how we go forward on Iraq and what we can do in the UN resolution. We ourselves have opened up those discussions. We, the United States, and other members of the Council, have said we want to hear all the views. We want to hear the views of council members. We want to hear the views of coalition partners. We want to hear the views of people in the region.

And the Secretary himself has been consulting very widely and will continue to do so to get all the various ideas together about how we could proceed with this resolution to support the work that the UN is doing in Iraq, to support the Iraqi interim government and the overall transition process underway there.

So we're hearing ideas from the Russians, from the French, from many nations. Some of these nations have started to talk in public about some of the things that they have thrown out on the table. We ourselves, I think, have put forward a list of half of dozen things that we would expect to do in the resolution. So we'll gather all of this together in the drafting process, and I'm sure work in the usual fashion at the United Nations to come up with a resolution that everybody thinks is the appropriate one.

I would say, and this is based on our discussions with other ministers, that there is considerable convergence on the elements of a resolution, considerable understanding of what a resolution needs to do, and then

we're sort of in the stage now of talking about a whole variety of details that need to be included as well.

QUESTION: Is there convergence on the principle that Iraqis should take full control of their government?

MR. BOUCHER: There is definitely convergence on the principle that the transfer of sovereignty needs to occur, that Iraqis need to be in charge of their country and running their country with this interim government and that we all support the process that Ambassador Brahimi has underway in Iraq, as well as the preparations that the UN is making to support elections down the road.

Nicholas.

QUESTION: Richard, Secretary Rumsfeld said today in Iraq that he thought a resolution, or resolutions, will help one, two, up to three handful of countries to join the United States in Iraq. Do you share his optimism? And, if so, well, what are the reasons you have to have that optimism? MR. BOUCHER: One, two or three handfuls?

QUESTION: He said one or two, and then, actually, the second time, he said up to three handfuls of countries, yes.

MR. BOUCHER: I think we have made clear that we do think there are countries who would be interested in participating in Iraq with a sovereign Iraqi government and a new UN resolution. I don't think we've -- I've seen a count over here, at this point, of how many might be willing to do that.

But over our discussions with many governments, over the course of months, really, about participation in Iraq, we know that there are many governments that said maybe when there is a UN resolution and an Iraqi government, we'll think about it more, or again, and we are in contact with other governments to see who might be interested at this stage. But I don't think I have any new count for you.

QUESTION: He also seemed to indicate in a sentence he began, but didn't finish, that if there is a second resolution, it might deal with the continuing presence of the multinational force. Is that something that you see --

MR. BOUCHER: I'm not usually in the habit of finishing Secretary Rumsfeld's sentences.

QUESTION: I know. Right.

MR. BOUCHER: But that is one of the elements we've already identified previously as being something that we would expect the resolution to deal with, the continuation and status of the multinational force.

QUESTION: He said it in the context of that part would -- may have to be in a separate resolution, not in the main one.

MR. BOUCHER: As I said, these elements are being discussed. I don't

have drafts or specific decisions on paragraphs or what goes in where.

Okay.

QUESTION: Can we go to the elections in India, please?

QUESTION: Yes, please.

QUESTION: Can I get one more --

QUESTION: Can I ask one more on Iraq, please?

MR. BOUCHER: Two more on Iraq. Okay.

QUESTION: Some on the Iraq Governing Council are saying Brahimi's role is advisory, they don't really have to accept what he recommends. Would you care to respond to that notion?

MR. BOUCHER: I think we have all in the international community and, indeed, throughout Iraqi society, said that we appreciate the work that Ambassador Brahimi is doing. He's leading a consultative process of Iraqis. He's consulting very widely in Iraqi society, hearing a lot of different views from different people in Iraqi society.

The overall process in Iraq is governed by the Transitional Law that the Governing Council passed, and will be further supplemented by the annex to that law and other things the Governing Council will do. So their role in the current situation is quite clear that they have certain authority as well as coalition authority to make these things happen. We have all welcomed the role that Ambassador Brahimi has played and we look for the results of his consultations.

QUESTION: India, please?

QUESTION: There is a new poll in The Washington Post that says 80 percent of Iraqis are against the CPA and American forces there and they're mistrustful of the transitional government. Do you think that this will complicate your effort to transfer the government to Iraqis by June 30th, possibly the anti-American sentiment?

MR. BOUCHER: I think -- I don't think one should go by one answer to one -- one report of one answer of one question of polls. I think there have been extensive polling done in Iraq that describe Iraqi attitudes. Certainly, Iraqis want their sovereignty back, they want to run their own country, they want to run their own government.

But they also, generally, from the data that I've seen, want us to stay there to make sure they can do that successfully and securely. That's the process that is, indeed, underway. That's the process that I think most Iraqis support. That is the process that has received widespread support in Ambassador Brahimi's consultations is for Iraqi to be able to stand up and take charge of their country and take charge of their government. That's what we want, that's what the UN wants, and that's what Iraqis want.

QUESTION: (Inaudible) come closer to June 30th (inaudible).

MR. BOUCHER: Yeah, but what does it say, in essence? It says that they want to run their own country. Well, that's what we want, too. We're all moving in that direction.

QUESTION: Richard, the most popular Prime Minister of India was ousted by the voters yesterday and he resigned today, and the Congress Party's opposition leader, Sonia Gandhi, may be the next Prime Minister in the next few hours. So you think any policy will change with the United States and also as far as the peace process with Pakistan is concerned?

MR. BOUCHER: I am not able to predict Indian policy. I will you, for the United States part, that we congratulate the Congress Party on their success in the election. As in any well established democracy, Prime Minister Vajpayee and his cabinet have accepted the decision of the electorate. Once again, we are shown how strong and how deep are the roots of Indian democracy in this matter.

We have a very strong bilateral relationship with India and we look forward to working with the new government when it's formed.

QUESTION: The Pakistan Government said it hoped that the incoming government would proceed with what they call a peace process. Is that a sentiment the U.S. shares?

MR. BOUCHER: We --

QUESTION: Because the outgoing government was making overtures to Pakistan.

MR. BOUCHER: Yeah, we have -- first of all, we have always supported a resolution of differences between India and Pakistan through dialogue. We have made, as you know, extensive efforts to try to assist them in the lowering of tension. We think that does reflect the desire of people in both countries for peace, so we will continue to assist that process and encourage that process.

I would note that during the Secretary's visits to India, I think every time he has met with Mrs. Gandhi and members of the Congress Party leadership, and he has frequently discussed this process going on with Pakistan with them and made clear how much we encourage it and support it.

QUESTION: Richard, one follow-up. Was U.S. expecting in any way defeat for Vajpayee because it's so close relations with -- between Vajpayee and this Administration? Also, at the same time, the U.S. has been dealing with the Congress Party for the last almost 45 to 50 years. You think this will make any difference now after the (inaudible)?

MR. BOUCHER: I think I answered that question first off. We've had excellent relations with India and we look forward to continuing those relations.

QUESTION: And U.S. is ready to welcome Prime Minister Sonia Gandhi if she --

MR. BOUCHER: When they have a government, we look forward to working with that government. It's just not quite time to say that yet.

Okay, sir.

QUESTION: I want to change the subject, if I could. Yesterday, in meetings with Deputy Secretary Armitage, these two officials from the EU asked for the United States to expand the Visa Waiver Program to include all EU members. I presume that means that they want Greece, which wasn't in the program before but was in the EU before May 1st, as well as nine out of the ten because Slovenia, one of the new ones, is already in the Visa Waiver Program, that they want all of those countries, citizens of those countries, to be able to come in the U.S. without visas.

What was the response, and how likely is that to -- how likely is that?

MR. BOUCHER: The United States will look at these countries on a country-by-country basis, but they -- really, participation in the Visa Waiver Program is a matter of statute, it's a matter of law. The criteria for a company to be nominated for Visa Waiver Program participation are that the country have a nonimmigrant visa applicant refusal rate of less than 3 percent, a machine-readable passport program in place, that they demonstrate adequate safeguards against fraudulent use of passports, and be sufficiently stable to ensure that conditions which could affect the program-qualifying criteria are not likely to change in the future.

Once nominated, the country must demonstrate that it has effective border controls in place for all territory under its control and that the country's law enforcement must demonstrate significant cooperation with U.S. counterparts, as well as international entities such as Interpol.

So those are the criteria that are applied that must be applied by law and that would be applied to any EU members. We are certainly willing to look at this in terms of any given government, but actually qualifying for the program requires meeting those statutory requirements.

QUESTION: Well, in fact, isn't -- aren't you more likely, at least at the moment, to drop at least one EU country from the Visa Waiver Program, Belgium, which is kind of on a double secret probation?

MR. BOUCHER: I'm not going to make any prediction. We, as you know, regularly review countries that are in the Visa Waiver Program to ensure that all the criteria are continuing to be met. And we have had discussions with the Belgian Government, along with other governments about that, but I wouldn't make any prediction on that, at this moment.

QUESTION: Can you just make -- is it not correct that Belgium has been warned that it may be dropped --

MR. BOUCHER: I'll check on what I can say about the exact status from Belgium. We've had discussions about the criteria, and making sure that all the various safeguards are in place, and if we're satisfied they will continue.

QUESTION: Are you under the impression right now that any -- either Greece or any of the nine of the 10 newcomers that are not in the program now, if any of them come close to meeting these criteria?

MR. BOUCHER: I don't think we --

QUESTION: Or has it never been --

MR. BOUCHER: We don't necessarily publish refusal rates on governments, but we always do look at the countries that are coming close or are becoming eligible. So I'm sure we'll be willing to look at it for countries that may be coming close on that. But, at this point, it's a country-by-country determination. And, as I said, we're happy to look at it for countries that join the -- are joining the EU, but they're going to have to meet the requirements if we are able to accept them under the law.

Teri.

QUESTION: Change the subject. Could you update us on the North Korea talks and let us know if, in fact, there was a one-on-one North Korea-U.S. meeting?

MR. BOUCHER: No separate meetings. They had a plenary session yesterday. They've had continued working groups talks today. Each party has presented its views on how to resolve the problem presented by North Korea's pursuit of nuclear weapons, and they are scheduled to meet again tomorrow.

QUESTION: Any progress, or everybody just made statements?

MR. BOUCHER: I don't think I would report anything particular on progress, or lack thereof, at this stage in the talks. So I'd let the working group continue their work, and we'll see where we get to and report at the end.

QUESTION: (Inaudible) includes no sort of brief encounters together sitting in the room while --

MR. BOUCHER: There are no additional meetings, meeting. It was all at six.

QUESTION: Can I change subject? Venezuela has -- provincial government has apparently asked the United States military missions to leave liaison offices that it has at various military bases around that country, and apparently this was conveyed on Friday by the Venezuelan Defense Minister. Have you protested against this? And have the people actually left? Are they going to come back? Or are they going to end up at the U.S. Embassy? And how do you regard it?

MR. BOUCHER: The United States has had longstanding cooperation with the -- longstanding military-to-military relations with the Government of Venezuela. And that has included having liaison personnel at various -- I think, four different Venezuelan military installations including the headquarters, but is being discussed here, Fuerte Tiuna.

We did receive notification from the Venezuelans last Friday that they would like us not to maintain offices at that installation, or those, I guess, all Venezuelan military bases, by May 30th. I think we find the notice disappointing. We felt that the military-to-military relations between the United States and Venezuela have been important to both of us, over a long period of time.

We have been -- worked cooperatively with the Venezuelans on military matters. We supplied equipment and continued to supply spare parts to the Venezuelans. So I think we're disappointed that they made this decision, but it is their decision to make. It's their property, their bases, their offices. And so we do think the overall goal of maintaining liaison with the Venezuelan Government. Venezuelan military remains important to us.

So I think our intention, at this point, is to put those people into our embassy and have them work out of there.

QUESTION: Does the Venezuelan military have any similar liaison officers at U.S. military facilities? And do you plan to ask them to vacate?

MR. BOUCHER: I, frankly, don't know if they have people or offices at CENTCOM, for example. I just don't know.

QUESTION: Do you know if they have any -- and you probably don't know this. But if you -- you know --

MR. BOUCHER: I'm sorry. SOUTHCOM, for example.

QUESTION: Yeah. Do you have any other -- do you have any plans to sort of -- retaliate is maybe not the right word, but take reciprocal measures because of this?

MR. BOUCHER: I think it's important to remember that, first of all, the relationships are important to us. And, second of all, we do recognize this is a decision that the Venezuelans can make about who they offer office space to at their headquarters. So we may be disappointed in the decision, but we intend to try to continue the work from our embassies.

QUESTION: So the spare parts will continue whether -- that has been (inaudible)?

MR. BOUCHER: I don't know if there is anything in particular pending at this point, or whether it might be more difficult to do at a slight distance. But, in principle, we'll try to maintain liaison-type relationships that we have had.

QUESTION: Change of subject. Richard, yesterday, the Commission on International Religious Freedom came out with a report and they have recommended India and Pakistan, both, to be countries of concern, if Secretary is likely to enforce the assumption that they have recommended to the Secretary?

MR. BOUCHER: I'm not going to speculate, at this point, on what we might come out with in the -- in the designations that we do every year. The committee is separate, and they make a variety of recommendations to us.

QUESTION: How do the State Department or Secretary feel about religious freedoms in India and Pakistan?

MR. BOUCHER: I don't have anything new to say today. We'll say what's new at the appropriate time.

QUESTION: Richard, do you know when the --

MR. BOUCHER: I don't remember exactly, frankly. It takes a while.

Yeah.

QUESTION: Do you know when the Human Rights Report, the Report on Human Rights --

MR. BOUCHER: I think we'll do it early next week. We'll get a notice out as soon as we're ready.

QUESTION: (Inaudible) more on G-8 meeting?

MR. BOUCHER: Yeah.

QUESTION: Japan wants to include the abduction issue and a chairman's statement to be issued after the meeting, will North Korean issues come up tomorrow?

MR. BOUCHER: I would expect, since many of these governments are concerned about North Korea, that we will discuss North Korea. The Secretary will have a separate meeting with Foreign Minister Kawaguchi tomorrow morning. So that's a chance for the two of us, who are most directly concerned with North Korea, to talk about it as well.

So I'm sure there will be discussion tomorrow of North Korea, including our concern that we share with the Japanese about the abductee issue. But, as far as predicting what we'll say at the end of the discussions, let's wait until the discussions are held.

Yeah.

QUESTION: Speaking of the Secretary's meetings, do you have anything more on who he is going to be seeing in Jordan? And can you confirm from this end what the Palestinians are saying, that he will meet with Abu Alaa on Saturday or tomorrow?

MR. BOUCHER: I'm not sure all the arrangements are made yet for meetings with the Palestinians. So I don't think at this point I can confirm any specific meetings.

QUESTION: Any? Not -- forget about the Palestinian. Anyone else?

MR. BOUCHER: He will have other meetings with other people, but I don't think I can confirm any specific meetings at this point.

Yeah.

QUESTION: You don't even want to go out on a limb and say that he's going to see King Abdullah?

MR. BOUCHER: I'm sure he will see King Abdullah. But under what circumstances, I don't know yet.

QUESTION: Well, we know that Abu Alaa is on his way to Amman. But my question to you: Why is the letter not being made available, the President's letter to Abu Alaa, to the Palestinian Prime Minister? Do you have any information on the letter?

MR. BOUCHER: I don't have anything -- information on that letter that the President said he was going to send. It would be up to the White House to discuss it. If you want to ask over there, I'm sure they can talk to you about it.

QUESTION: One more?

MR. BOUCHER: One more. Actually, we've got two more.

QUESTION: Under Secretary Grossman, on the Hill, today, this morning, said that if the new Iraqi government, whatever its shape, asks the U.S. military to leave, the military, U.S. military would leave. Is that the U.S. Government's position? Or do you not believe that you have authority in existing UN resolutions to stay longer?

MR. BOUCHER: I'd have to look back at the exact question. I think the authorities, the sovereignty of the Iraqi government, is clear. And that would be the logical answer and I'm sure Ambassador Grossman spoke for the United States Government on the point. Whether he was asked about it at the interim stage or the further post-election stage, I don't know. Didn't see the question myself.

But, in any case, I think it's not an issue that we expect to arise. Both we and the Iraqis that we're talking to, that others are talking to, expect that we will be able to work out security arrangements for Iraq that involve the continuation of the multinational force, the taking of increasing security responsibilities by the Iraqis and eventually the departure of the multinational force when the Iraqis are able to assume those full responsibilities.

We recognize on our part as well as the Iraqi part that it's necessary to have arrangements, to have appropriate military arrangements with the interim government and with the elected government, and we're very

Case 1:05-cv-01602-UNA    Document 7    Filed 09/20/2005    Page 92 of 214

confident that that will be worked out.

We do have one more. Nadia.

QUESTION: I just wanted to ask you if you've been in contact with the Israelis regarding the purpose of the incursions in Gaza and the high death of 30 Palestinians and 11 Israelis, and Arafat calling for the international communities to condemn that attack.

MR. BOUCHER: I don't know what contacts we've had with the Israelis. I'm sure our Embassy is in touch with them and the Consul General's Office is in touch with the Palestinian side as well. We, obviously, are following the situation out there, have been very concerned about some of the violence, some of the deaths that have occurred, specifically the attacks on the IDF and the whole question of remains --

QUESTION: (Inaudible.)

MR. BOUCHER: Excuse me. Over the last two days, we've talked about that. We are always concerned when this kind of violence occurs, always concerned about the deaths of Palestinians as well. So it's been a flare-up of violence and our people out there are following it closely.

We've got one more?

QUESTION: Yes, please. President Bashar Assad of Syria, he, after commenting on the Syria Accountability Act, he said he doesn't see the relations between the United States and Syria as at a deadlock and he welcomed the continuation of the dialogue between the two countries. That took place after the strong criticism yesterday from Amr Moussa of the Arab League and the Gulf states, you know, for the act.

Do you see -- do you agree with the assessment of President Assad's, you know, kind of optimistic, you know, futuristic look?

MR. BOUCHER: I think I'd stand by what we have said over the last few days, that we're certainly willing to continue our dialogue with the Syrian Government about these issues. But more important than that, we need to see action by the Syrian Government that accepts the need to change its relationships with terrorists, to change its behavior with regard to Iraq and the various other things that we have raised.

QUESTION: Thank you.

(The briefing was concluded at 1:25 p.m.)

Created: 13 May 2004 Updated: 14 May 2004

Page Tools: 📄 Printer friendly version    ✉ E-mail this article

🔼 BACK TO TOP

USINFO delivers information about current U.S. foreign policy and about American life and culture. This site is produced and maintained by the U.S. Department of State's Bureau of International Information Programs. Links to other internet sites should not be construed as an endorsement of the views contained therein.

Case 1:05-cv-01602-UNA     Document 7     Filed 09/20/2005     Page 93 of 214

**<u>EXHIBIT 4</u>**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et          :      Civil Action No. 05-497
al.,                           :
          Plaintiffs,          :      August 25, 2005
v.                             :
GEORGE BUSH, et al.,           :
          Defendants           :      2:00 p.m.
. . . . . . . . . . . . . :      . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiffs:      P. SABIN WILLETT, ESQUIRE
                         BINGHAM McCUTCHEN, LLP
                         150 Federal Street
                         Boston, Massachusetts  02110-1726
                         (617) 951-8684

                         SUSAN BAKER MANNING, ESQUIRE
                         BINGHAM McCUTCHEN, LLP
                         1120 20th Street, NW
                         Suite 800
                         Washington, D.C.  20036-3406
                         (202) 778-6172
                         BARBARA J. OLSHANSKY, ESQUIRE
                         CENTER FOR CONSTITUTIONAL RIGHTS
                         666 Broadway
                         New York, New York  10012
                         (212) 614-6439
For the Defendants:      TERRY M. HENRY, ESQUIRE
                         U.S. DEPARTMENT OF JUSTICE
                         CIVIL DIVISION
                         20 Massachusetts Avenue, NW
                         Room 7144
                         Washington, D.C.  20530
                         (202)514-4107
Court Reporter:          REBECCA KING, RPR, CRR
                         Official Court Reporter
                         Room 4802-B, U.S. Courthouse
                         Washington, D.C. 20001
                         (202) 898-9398

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1                P R O C E E D I N G S

2              COURTROOM DEPUTY:  Civil action number 05-CV-497,

3      Abu Bakker Qassim, et al. versus George W. Bush, et al.

4      P. Willett and Susan Baker Manning for the plaintiff; Terry

5      Marcus Henry for the defendant.

6              THE COURT:  Counsel, I set this hearing by an order

7      that I issued last week, perhaps somewhat hopefully, thinking

8      that between then and now the parties might have an opportunity

9      to talk with each other and perhaps work out what I have called

10     a just and honorable solution to the problem before us.

11              And I don't have any particular agenda for this

12     hearing, except I do have a number of questions.  But I think we

13     should begin, perhaps, simply by asking -- well, the petitioner

14     can go first.  Tell me if you will, sir, what changes, if any,

15     have occurred since you were last here on August 1st, and what

16     the present situation is with your clients, as you understand

17     it.

18              MR. WILLETT:  Good afternoon, Your Honor.  Sabin

19     Willett of Bingham McCutchen for the petitioners.  With me is

20     Susan Baker Manning and the Center For Constitutional Rights.

21              Mr. Henry and I did have a chance to speak after your

22     order.  We were not able to narrow our differences.  What has

23     happened with respect to my clients is that on the 19th of

24     August, Ms. Manning and I were able to communicate by telephone

25     with them.  Also on that day, my client Adel Abdul Hakim spoke

Abu Bakker Qassim, et al. vs.                    CV 05-497                              August 25, 2005
George W. Bush, et al.

1    by telephone with his sister.  It was a little bit awkward to

2    organize that; his sister had to travel to Stockholm to the

3    U.S. Embassy and speak on a secure phone.  But my grandmother

4    always said, if you don't like someone's coat, you should

5    compliment her hat, so we do compliment the Government's hat for

6    arranging that telephone call.

7            It is my understanding that our clients are in a place

8    called Camp Iguana.  It's still a prison; there are, as I

9    understand it, somewhat better conditions than the prison they

10   used to be in.

11           The other development I would say, Your Honor, is one

12   that I have not learned myself, I have been reading about it in

13   the press.  And that is, it now appears from the public

14   statements both that Ambassador Prosper made on the radio this

15   morning and that were reported by the Washington Post yesterday,

16   that the Government has been involved in this effort for

17   two years, that they have struck out with two-dozen countries,

18   and that this thing isn't going anywhere any time soon.

19           And I don't know if now is the time to argue, or you

20   have other questions, but I did want to at some point today

21   return to what we now see is the only legitimate solution to

22   this problem.

23           THE COURT:  You have met with your clients once.   Is

24   that correct --

25           MR. WILLETT:  That's correct, Your Honor.

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 4

1           THE COURT:  -- or on one series of occasions?

2           MR. WILLETT:  We have a meeting scheduled for Monday as

3    well this week in Cuba.  But we met them only once before now.

4           THE COURT:  And you're going to Cuba again?

5           MR. WILLETT:  Sunday, yes.

6           THE COURT:  What are the logistics of you going to

7    Guantanamo Bay?

8           MR. WILLETT:  You fly to Ft. Lauderdale and you there

9    present a theatre clearance to a little airline called

10   Aero Sunshine, the sort of airplane where they ask you what you

11   weigh and then they say, you sit in this seat and you sit in

12   that seat.  And then you fly three hours to Gitmo.

13          You are billeted at the combined bachelor's quarters,

14   which costs $12 a night and is worth every penny, and then in

15   the morning they take you across on a ferry to the windward

16   side, where you're met by a Navy chief petty officer, who

17   escorts you to the prison.

18          You meet your client at what they call Camp Echo at the

19   prison for certain hours of the day where this is permitted, and

20   then you're escorted back to the ferry at the end of the day.

21          THE COURT:  Do you have any information about the

22   conditions under which you'll be able to meet your clients this

23   time at Camp Iguana?

24          MR. WILLETT:  I don't, Your Honor.  I don't know that I

25   would be able to meet them at Camp Iguana, though I would like

United States District Court                  202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                            Official Court Reporter

Abu Bakker Qassim, et al. vs.                       CV 05-497                       August 25, 2005
George W. Bush, et al.

Page 5

```
 1    to.  I think the Government's practice is to bring all habeas

 2    counsel to Camp Echo and meet them in the conditions that I

 3    described last time we were together.  Meeting them at Camp

 4    Iguana would be helpful because we would get a sense of what

 5    their current situation is like, but to be candid, Mr. Henry and

 6    I haven't spoken about whether I would be permitted to do that.

 7            THE COURT:  You say that you and Mr. Henry have met but

 8    have not been able to narrow the differences between you.  Is

 9    that right?

10            MR. WILLETT:  We spoke, Your Honor.  We did not meet.

11    But it is correct that I think it's safe to say, we did not

12    narrow the differences.

13            THE COURT:  All right.  Thank you.  Thank you, sir.

14    Maybe I should hear from Government counsel.

15            MR. HENRY:  Thank you, Your Honor.  Terry Henry with

16    the Department of Justice.  I'm here for the respondents.

17            Your Honor, just to clarify, petitioner's counsel and

18    myself did speak once on Monday about Your Honor's order, and

19    counsel had some questions.  I don't think the discussion was

20    any kind of negotiation over things.  So just to make it clear

21    for the record what's going on here.

22            But there have been a number of developments since we

23    submitted the last declaration of General Hood in this matter on

24    August 8th, along with our supplemental brief, and I'm happy to

25    report to the Court on what those developments are.
```

Abu Bakker Qassim, et al. vs.                    CV 05-497                        August 25, 2005
George W. Bush, et al.

                                                                                    Page 6

1              THE COURT:  I would be happy to hear them.

2              MR. HENRY:  As counsel indicated, on Friday the 19th

3       there was a telephone conference between counsel and both

4       petitioners in this case.  They were able to use the translator

5       that they had mentioned to the Court at the last hearing, who

6       does not have a security clearance, but as indicated in General

7       Hood's declaration, DOD is okay with that translator being used

8       subject to appropriate security conditions.  And that happened.

9              There was also --

10             THE COURT:  Just let me stop you with that.  That was a

11      telephone call, a telephone conference between counsel with

12      their clients and their interpreter?

13             MR. HENRY:  That's correct.

14             THE COURT:  Was it a monitored call?

15             MR. HENRY:  It was monitored by a member of the

16      privilege team, which under the protective order regime in this

17      case is a DOD person that's basically responsible for reviewing

18      materials that counsel learns from detainees that counsel wants

19      to use in an unclassified context for classification purposes.

20             The protective order operates on the assumption that

21      information learned from the detainee is either classified or

22      subject to protection; then, when counsel want to use that

23      information in an unclassified context, filing or go to the

24      press or whatever, they run it through the privilege team who

25      does a classification review on it.  And that privilege team is

Page 7

1    segregated from the litigation other than their involvement in

2    the...

3              THE COURT:  Mr. Henry, help me understand this

4    classification business.  These petitioners have been designated

5    as no longer enemy combatants.  Right?

6              MR. HENRY:  That's correct.

7              THE COURT:  What do they know, could they say that

8    would be classified?

9              MR. HENRY:  Well, as General Hood pointed out in his

10   declaration, there are two main areas of information that is of

11   concern.  And the first deals with security measures at the camp

12   itself.  That may be classified or it may just be information

13   that would be deemed protected under the protective order, which

14   is entitled to being treated like under seal and that kind of

15   thing, as opposed to being classified.

16             THE COURT:  But if they have that kind of information,

17   how can they ever be let out?

18             MR. HENRY:  Well, Your Honor, the purpose of the

19   classification review is to review the information and just see.

20   I mean, Gitmo is aware of the situation if people are let out

21   and if there needs to be any change to the way things are done,

22   things like that, but while folks are there in the camp, there

23   is the concern about sharing, you know, concurrent information,

24   if you will, about that.

25             So that information is just reviewed by a privilege

Abu Bakker Qassim, et al. vs.                    CV 05-497                              August 25, 2005
George W. Bush, et al.

Page 8

1    team member, it's either classified or not, and then things go

2    forward.

3            The other class of information that's involved is

4    information about the status of other detainees.  And again,

5    it's just, you know, a precaution with respect to information

6    they would be sharing while they continue to be detained there.

7            This regime has been in place for almost a year now.

8    It works, with complaints by petitioner's counsel as well as

9    complaints on the other end, but it has worked well for the past

10   your or so.  I might add, the monitoring by the privilege team

11   member was with the agreement of counsel.

12           The other thing that happened on this past Friday was,

13   as petitioner's counsel mentioned, the call between one of the

14   petitioners and the sister, his sister that was identified at

15   the last hearing.  And just to make one correction to what

16   Mr. Willett said, it was not over a secure phone, it was over an

17   unsecured line, just a normal telephone call to the embassy

18   there in Sweden.  The embassy was involved just to make sure

19   that the person receiving the call on the other end was actually

20   the person that was identified as the petitioner's sister.  So

21   that call went on for an hour and a half or so.

22           The other major area of development deals with the

23   living arrangements that the petitioners are in in Camp Iguana.

24   As noted in General Hood's declaration, there had been plans in

25   the works for a number of weeks to renovate Camp Iguana for

Abu Bakker Qassim, et al. vs.                CV 05-497                        August 25, 2005
George W. Bush, et al.

Page 9

1   folks NLEC's like petitioner, where they could stay pending

2   their relocation or whatever.

3           As indicated in General Hood's declaration, that

4   renovation was accomplished and the petitioners were moved there

5   the week of August 15th.  The camp is made up of several

6   buildings; there is a sleeping quarters building that's air

7   conditioned and they have individual beds.  All the living

8   quarters there at Camp Iguana are air conditioned, there's a

9   recreation building where there are sofas, television, video

10  games, other recreational materials, ping-pong tables, table

11  soccer, that kind of thing.

12          There's a kitchen building, where, although the

13  petitioners are provided three meals a day that are prepared in

14  Halal fashion, they do have a kitchen-type affair, a building

15  that has a microwave, refrigerator, coffee pot, stove, utensils,

16  and they get tea, coffee, fresh fruit, ice cream, things like

17  that, snack items.

18          There is a bathhouse that has separate shower stalls,

19  separate toilet stalls similar to the type of building that's

20  used for troops in some of the more permanent camps in the

21  Middle East.  There's an outside recreation yard with picnic

22  tables and that sort of thing, a soccer goal, that kind of

23  stuff.

24          The petitioners have 24-hour access to all of these

25  materials -- or all of these facilities, and this is in addition

Page 10

```
 1    to the medical care and access to Qur'ans and prayer books and
 2    things like that that all the other detainees have.
 3            THE COURT:  There's no lockdown in any part of this
 4    facility, this Camp Iguana?
 5            MR. HENRY:  They are free to roam that facility.
 6            THE COURT:  24/7?
 7            MR. HENRY:  24/7, yes, Your Honor.
 8            THE COURT:  But there's a gate around it?
 9            MR. HENRY:  There is a fence.
10            THE COURT:  A fence around it?
11            MR. HENRY:  Yes, Your Honor, there is.
12            THE COURT:  How many people are there?
13            MR. HENRY:  Currently there are about 10 NLEC's total,
14    and all of the NLEC's, all the Uighur NLECs are there.  I think
15    we had mentioned before that -- in General Hood's declaration
16    that there were a couple of NLEC's that were in another camp due
17    to disciplinary infractions.  I think two of those were Uighurs,
18    and those two Uighur folks have been moved to Camp Iguana.
19            I believe that there is one or two other nationality
20    NLEC's that are in a disciplinary confinement situation, and one
21    that is in another area due to medical needs.  You know, he's
22    not there for disciplinary reasons.
23            THE COURT:  There are 10 Uighur NLEC's, or 10 NLEC's
24    all total?
25            MR. HENRY:  All total.
```

Page 11

1              THE COURT:  Of whom how many are Uighurs, are you able

2    to tell?

3              MR. HENRY:  I'm not able to say on the public record,

4    but it's just a handful.

5              THE COURT:  And when counsel come down to Gitmo next

6    week to meet with these people, will they be able to meet with

7    them in a free and open manner at Camp Iguana, or are they going

8    to have to be taken back over to Camp Echo and be shackled to

9    the floor again?

10             MR. HENRY:  All of the meetings at Camp Echo; as a

11   matter of practice, there are safety considerations that we've

12   talked about before.  The shackling is one leg to a bolt in the

13   floor, standard operating procedure, the purpose of which is to

14   prevent any sort of incident where someone could, you know, hurt

15   someone else.  Which attempts like that are not unheard of.

16   It's difficult for DOD to have basically a nonuniform policy in

17   this regard with respect to specific individuals, that kind of

18   thing.  They have, like I said, a standard operating procedure

19   there.

20             But all of the counsel meetings are there in Camp Echo.

21   There would be concerns about having some kind of meeting

22   arrangement in Camp Iguana; number one because there's not

23   facilities for it there, and number two, there's the aspect of

24   subjecting other NLEC's over there in Camp Iguana to inspection,

25   if you will, by outsiders.

Abu Bakker Qassim, et al. vs.                    CV 05-497                         August 25, 2005
George W. Bush, et al.

Page 12

1           There is one change, though, with respect to the

2      meetings at Echo, and that's that counsel would be able to use

3      the translator that doesn't have a security clearance.

4           THE COURT:  That does not have a security clearance?

5           MR. HENRY:  That's right.

6           THE COURT:  They can bring their interpreter down with

7      them?

8           MR. HENRY:  Yes.  And I understand that's their

9      intention.

10          THE COURT:  Well, you anticipated my next question.

11     What about mail?  What about mail facilities?

12          MR. HENRY:  Mail facilities?

13          THE COURT:  Can they receive mail and send mail?

14          MR. HENRY:  Absolutely.  In fact, we have addressed

15     this in the context of other motions that have been filed in

16     other cases.  The mail operation at Gitmo is quite extensive.

17     It involves thousands of pieces of mail a month, and the mail

18     is -- you know, they can send mail, they can receive mail,

19     they're given postcards and stationery on which to write stuff

20     and mail letters that's processed through the security apparatus

21     there at Gitmo, and it is forwarded on.  And the same happens in

22     reverse for incoming mail from family members or whoever.

23          And then, of course, there's the attorney-client mail,

24     which is a different operation that does not go through the

25     security monitoring apparatus, and pursuant to the regime that

Abu Bakker Qassim, et al. vs.                    CV 05-497                              August 25, 2005
George W. Bush, et al.

Page 13

1    was worked out in the protective order.  So that mail remains

2    privileged.

3            THE COURT:  Are these petitioners literate in their own

4    language, or do you know?

5            MR. HENRY:  I believe they are, Your Honor.  But I

6    don't know for sure.

7            MR. WILLETT:  They are.

8            THE COURT:  And again, is every telephone call as

9    complicated as the call from this one petitioner to his sister?

10   Do they have to arrange something?

11           MR. HENRY:  The family call -- the calls with family

12   members is actually a very rare occurrence.  It had been done,

13   my understanding is once before, with respect to a military

14   commissioned candidate.  So this is a relatively new practice

15   for Guantanamo.  There was this concern, especially since the

16   first time anybody on the Government side had heard about the

17   petitioner's sister -- and my understanding from the last

18   hearing was that the sister basically cold called Mr. Willett.

19   There was some concern just to make sure that the person on the

20   other end of the call was who, you know, they purported to be.

21           And for now, the easiest way to do that was to ask the

22   sister to go to the embassy, which I understand is about 45 or

23   so miles from where she currently lives.  She did that, the

24   embassy confirmed her identity and then accepted the call, gave

25   her the phone, let her talk.

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 14

1              With respect to family members in other situations, if

2     there would be some easier way to do it, it's hard to say right

3     now, just because this is one of the very few calls that have

4     actually happened.  As General Hood indicated, he was amenable

5     to making a provision for family calls for NLEC's, so I'm sure

6     going forward they'll get a process down.  But right now that's

7     what we have.

8              THE COURT:  But as I hear you state it, the calls would

9     be, A, monitored, and B, these people, although officially

10    designated no longer enemy combatants, you're not willing to say

11    they're no longer under suspicion, so there still has to be some

12    double checking of who they're talking to?

13             MR. HENRY:  Well, there are a couple of issues in

14    there.  I mean, number one is the double checking who they're

15    talking to, that's for a number of reasons, including just to

16    avoid having some crackpot on the other end, if you will, who

17    happens to learn the name of a relative of one of the NLEC's.

18             THE COURT:  Whose problem is it if there's a crackpot

19    on the other end of the line?

20             MR. HENRY:  Well, Your Honor, having these phone calls

21    is a resource intensive operation at Guantanamo, and aside

22    from --

23             THE COURT:  Are you talking about money?

24             MR. HENRY:  Talking about resources as far as moving

25    the detainee to where a phone is and getting that all set up.

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Page 15

```
 1           But also I think Guantanamo has an interest in not

 2   subjecting a detainee to receiving prank phone calls, if you

 3   will.  So there are interests involved there.

 4           With respect to the monitoring, again, that's an item

 5   that was worked out in the protective order regime and is

 6   allowed, monitoring of family calls, and --

 7           THE COURT:  But the protective order regime had to do

 8   with detainees, enemy combatant detainees, didn't it?

 9           MR. HENRY:  Your Honor, when we negotiated that

10   protective order, the Combatant Status Review Tribunal process

11   was ongoing.  So I think it's fair to say that, you know, we

12   didn't know the precise outcome of all of those, and the order

13   was negotiated just in a broad brush sense applicable to

14   everyone.

15           THE COURT:  Well, you urged me the last time I was

16   here -- you were here not to mess around with the protective

17   order that had been negotiated with such difficulty and at such

18   length and in so many cases, and I have foreborne, if that's the

19   right form of that verb, from doing so for 25 days.  But I think

20   one of the questions that's in my mind is whether that

21   protective order works for NLEC's.

22           So that's kind of on the table.  I mean, it's

23   unthinkable, I imagine, for the Government just to put a phone

24   booth in Camp Iguana.

25           MR. HENRY:  That's correct, Your Honor.  If I could
```

Page 16

1　make one suggestion --

2　　　　　THE COURT:  It's difficult for me to understand why

3　that's unthinkable, actually.

4　　　　　MR. HENRY:  Well, there could be any number of reasons,

5　including, again, just keeping an eye on who is being called;

6　you know, do we give the detainees international calling cards?

7　You know, there are logistical as well as other issues.

8　　　　　But if I could make one suggestion.  If the

9　petitioner's counsel has got problems with particular aspects of

10　the order, they can bring them up and we can talk about it, and

11　I can see if the client is willing to loosen things up.  I mean,

12　General --

13　　　　　THE COURT:  That's kind of what I was hoping might

14　happen before today.  But maybe it will happen after today.

15　　　　　MR. HENRY:  Well, Your Honor, the protective order is

16　very long, it's very complex.  There are a lot of provisions in

17　it, all of which were negotiated at length and was approved by

18　Judge Green.  So they deal with mail, they deal with phone

19　calls, they deal with all kinds of stuff.

20　　　　　So I think, you know, expecting a wholesale

21　renegotiation of that may not be practical.  It would very well

22　be very time-consuming.  I think probably the best way to

23　proceed would be to take things on a little more incremental

24　level, and if there are specific problems that exist, we'll try

25　to work it out.

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 17

 1          THE COURT:  I will borrow from Mr. Willett's analogy

 2     and say, I can't exactly compliment your coat, but I'm going to

 3     take that "maybe we can loosen things up," quote, unquote, as a

 4     nice compliment on your hat.

 5          MR. HENRY:  Thank you, Your Honor.

 6          THE COURT:  Now, I asked you in the order to be

 7     prepared to make an in camera presentation of the details of

 8     efforts to place these petitioners, and I don't know how you

 9     propose to -- whether you have something for me in writing,

10     whether you want to adjourn literally for an in camera

11     proceeding, but I would like to hear what's going on.

12          Last time I said I wasn't sure I did want to know what

13     was going on, but I think I'm ready.

14          MR. HENRY:  Well, Your Honor, I'm prepared to brief the

15     Court orally, and at the level of detail that I've been

16     authorized to talk about, we can do this with cleared counsel in

17     chambers if you want to do it that way.

18          THE COURT:  Who's cleared?

19          MR. HENRY:  I believe Mr. Willett is.

20          MR. WILLETT:  And Ms. Manning, Your Honor.

21          THE COURT:  Then when we adjourn here we'll go to

22     chambers and do just that.  Thank you.

23          I would like to talk a little bit more about the big

24     picture.  It's been almost six months now since these men were

25     declared to be NLEC's.  Does the Government have a position on

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Abu Bakker Qassim, et al. vs.                 CV 05-497                      August 25, 2005
George W. Bush, et al.

 1   the length of time that it would be reasonable to continue

 2   holding them in this status if you still can't find any place

 3   for them?

 4          MR. HENRY:  Well, Your Honor, I believe our position is

 5   that the condition -- the living arrangements as they currently

 6   exist meet and exceed any kind of level that would be

 7   appropriate as a matter of constitutional law or any kind of

 8   situation like that, and that we would continue to hold them --

 9          THE COURT:  You're not saying constitutional law.  You

10   don't think the Constitution applies down there, do you?

11          MR. HENRY:  That's correct.  But one issue with

12   addressing the living arrangements, if you will, is what kind of

13   standard are you going to apply.  And the only analogy of which

14   I'm aware -- and the Court's involvement in living arrangements

15   with respect to individuals detained in the course of a war has

16   not been done of which I am aware.  But the only area of

17   analogy, of course, would be the administration of prisons with

18   respect to other convicted folks or pretrial detainees.  So

19   that's what I'm referring to.

20          So I think our position would be that we can continue

21   to hold them in Camp Iguana or something like it as long as it

22   takes.

23          Now, having said that, the living conditions for the

24   NLEC's have evolved since the NLEC determinations were made.

25   They've evolved significantly.  I have no reason to believe they

United States District Court                  202-898-9398           Rebecca King, RPR, CRR
For the District of Columbia                                         Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 19

1   will not continue to do that.

2         And with respect to length of time and that sort of

3   thing, I can -- I would prefer to talk about that in camera.

4         THE COURT:  The Government's memorandum submitted after

5   the last hearing contained a number of rather nonspecific

6   concerns about what might happen if the petitioners were to set

7   foot in the United States.  And we don't have to rehearse all

8   those.  Your papers say what they say.  They betrayed in my

9   mind -- those of you in the audience who are not lawyers or

10  products of the American law schools don't take this phrase off

11  and put it in the newspapers, because it's a lawyer's phrase.

12  Imaginary horribles.

13        Has the Government refined its position on this -- on

14  whether there's any circumstances in which these people might be

15  even considered refugees admittable to the United States or

16  admittable on some sort of limited parole that would not commit

17  them to the United States?

18        MR. HENRY:  Well, Your Honor, I think our position was

19  set out in our brief, and I don't think it would be imaginary

20  that bringing them here would change their immigration status

21  significantly.  And I think that's still the case.

22        As far as further details on that and what may be the

23  Government's thinking, just like the courts, we try to wait for

24  specific situations before we commit anything publicly as to

25  what our position would be.

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 20

```
 1              THE COURT:  I've noticed that.  I've noticed that.

 2              All right.  Thank you, Mr. Henry.

 3              Mr. Willett, your turn.  Do you have any comment or

 4     questions about what we've just discussed here with Mr. Henry?

 5              MR. WILLETT:  No, Your Honor.  What I do want to

 6     address is interim release under the SARD case, and I don't know

 7     whether it's better to do that after the chambers conference or

 8     now.  Because what we're reading in the newspapers and what I

 9     think you're going to hear in chambers is they're not going to

10     fix this internationally, not any time soon.  They've been at it

11     for two years, according to the Washington Post, according to

12     NPR.  I mean, they had Ambassador Prosper on the radio this

13     morning saying they've gone at 24 or 25 countries without

14     success.

15              Evidently some countries are intimidated by the heft of

16     China in the international marketplace; others may ask why a

17     particular administration with a go-it-alone philosophy about

18     foreign affairs now comes to them for help.  I'm not a diplomat.

19     I don't know.

20              But what I do know is, it's not working.  It's not

21     going to work next month, it's not going to work in six months,

22     it's particularly not going to work if we just fluff up the

23     pillows a little bit at Gitmo and leave them there, with no

24     particular pressure on the government to make something happen.

25              So whenever it's appropriate, I want to talk to you
```

Page 21

1    about prophesy, because I would like to propose a different

2    prophesy than the one Your Honor suggested in your August 19th

3    order.  It looks like now is the time.

4         THE COURT:  I think now is the time.

5         MR. WILLETT:  Okay.  Let's go back to what nobody can

6    argue with, because the Supreme Court said it in Rassoul.  And

7    that's that you have jurisdiction in this case, which means that

8    you have jurisdiction of the case and the petitioners.  An act

9    of Congress says you can bring them to this courtroom.  No one

10   could question that, either.

11        We then move to the Court of Appeals for this circuit,

12   which has said that a habeas judge having jurisdiction of a case

13   has the power before the final determination of the writ to

14   order appropriate, in effect, parole, conditions of interim

15   release.  And at such a hearing you have to consider, is there a

16   danger to the community, does the petitioner represent a danger

17   to himself, is there a risk that he would flee, all of those

18   things that nobody better than the Federal District Court knows

19   how to do, because you do it all the time in slightly different

20   circumstances.  You have that power.  I don't think anyone can

21   argue with that power.  So we have to ask ourselves, would this

22   be the case that the Court of Appeals would determine to rip

23   from the jurisdiction of the federal trial court?

24        And here's why I suggested a different prophesy:  The

25   first is that there's actual a technical inaccuracy in your

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 22

1    opinion.  The Court of Appeals did not stay Judge Hens Green's

2    order, she stayed it herself.  As far as I know, they've never

3    yet tipped their hand in a habeas case that didn't involve the

4    process for a military tribunal.

5             Why they wouldn't tip it has partly to do, of course,

6    with the unarguable, unassailable propositions I just laid out

7    for you in terms of your jurisdiction.  It has partly to do, I

8    think, because they know their own supervisory court expressed

9    in Hamdan, expressed in Rassoul, expressed in Zadvadus a real

10   horror of indefinite incarceration.  That was the thing to be

11   feared.  I think I just heard Mr. Henry say they're going to be

12   there as long as it takes.

13             THE COURT:  That's what I heard, too.

14             MR. WILLETT:  So is this the case, where people have

15   been determined not to be enemy combatants, where they would

16   leap in to take that jurisdiction from the trial court?

17             My prophesy -- I'm going to go with Justice

18   Frankfurter, Your Honor, who on several occasions referred to

19   the fairness, the common sense, and the courage of the District

20   Court in this country.  And I'm going to believe the Court of

21   Appeals, just like this Court, believes in the rule of law, and

22   relies, just as everyone else does, on the exercise of that

23   common sense, fairness, and courage.

24             So my prophesy is a little different.  And I hope it

25   doesn't go too far to say -- because we are talking about

Page 23

1    prophesy, and it's all about what's practical, not necessarily

2    what's legal or even appropriate.  But I guess it is a fact that

3    we're about to begin a big circus next week or the week after in

4    the United States Senate.  I don't doubt that the Hamdan

5    decision is going to be on the table during those confirmation

6    hearings, and the Court of Appeals may find itself under a

7    scrutiny from the media that it's not accustomed to.  In that

8    crucible, is it going to leap into this courtroom to take this

9    case away?

10          Suppose for a moment that my prophesy is wrong, and

11   suppose that the Government invites a radical degree of judicial

12   activism from the Court of Appeals.  I suppose it's probably

13   100 percent likelihood that they'll ask for a stay.

14          Well, if that happens, Your Honor, I'll just get on the

15   elevator and go to the fifth floor, and with the deepest

16   respect, I think if that happens, it becomes my problem.

17          Now, we've thought long and hard about fluffing up the

18   pillows as opposed to asking you for this relief.  The problem

19   is, if it was 30 days of fluffing up the pillows, we probably

20   wouldn't be asking for it.  We would stick at the base.  It's

21   not going to be 30 or 60 or 90.  It's going on two years.

22          So if there is an order for interim release from this

23   Court after you've had the hearing, let the Government explore

24   any concerns they have about risk to the community, after you've

25   settled a set of terms for appropriate conditional release,

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 24

1    after Mr. Parhat Yassin (ph), who is in the courtroom today and

2    is a resident asylee Uighur escaped from China himself, and who

3    has called me up to offer his home as refuge for these people,

4    after you've heard the evidence, if you issue that kind of

5    order, the only thing I can tell you is that I'll be proud to

6    ride the elevator to any floor of this building and defend it.

7            THE COURT:  Well, it certainly has not escaped your

8    notice, nor Mr. Henry's, that the concern I had with issuing

9    this little memorandum the other day was the question of whether

10   something could be done in the interim that would make the lives

11   of these petitioners tolerable pending the reasonable amount of

12   time that it takes to get them placed.

13           If you're right that they're not going to be placed and

14   it's indefinite, well, that puts a different picture on it, and

15   maybe it won't matter so much if it takes a year for the Court

16   of Appeals to sort it out on appeal.  I don't think Mr. Henry is

17   going to even want to respond to what you've just said because

18   it's sort of hypothetical.  Am I right, Mr. Henry?

19           MR. HENRY:  That's correct, Your Honor.

20           THE COURT:  One more question, Mr. Willett.  Is there

21   any dispute about the conditions under which these people are

22   being held, or about the appropriateness or necessity of the

23   conditions under which they're now being held?

24           MR. WILLETT:  Oh, yes.  I mean, Your Honor, I don't

25   think they should be held behind any fence.  If you mean do we

United States District Court                  202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                            Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CV 05-497                          August 25, 2005
George W. Bush, et al.

Page 25

1    dispute the nature of the kitchen and so forth, I don't know the

2    facts myself.  We didn't get in to them on the 19th.  So I don't

3    have a basis today to dispute what Mr. Henry told you about the

4    living conditions.

5         THE COURT:  I'm just wondering what purpose might be

6    served, if any, if the petitioners can't be brought here, if

7    their bodies can't be brought here, if perhaps a magistrate

8    judge of this court might go there.  And I'm wondering what

9    purpose such a visit might have.

10        MR. WILLETT:  We welcome anyone going there, the Court,

11   the press, us, anybody.  We think that's a good thing.  What I

12   would suggest, though, is that the only remedy that's really

13   going to make sense is to open up the gate, and since they don't

14   want to do that on Gitmo, we're down to the District of

15   Columbia.  So we think ultimately they should be here and they

16   should not be in any kind of jail.

17        While we understand that since the ultimate resolution

18   is probably going to be, in effect, a deportation subject to

19   Your Honor 's being satisfied with the place they're being

20   deported to --

21        THE COURT:  You really think I'm going to have anything

22   to say about that?

23        MR. WILLETT:  Well, you will, actually, Your Honor, if

24   you retain jurisdiction of the case by not concluding the habeas

25   case.  That's why interim release seemed like the perfect fit

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 26

1    here.  You still have the case, it's not a final order, you have

2    jurisdiction of it, and when Mr. Henry comes in and says we've

3    talked the Netherlands into it or talked Sweden into it or

4    whatever we can do, at that point they will be sent to that

5    country and the case will be dismissed as moot.

6            But the interim release has that nice feature of Your

7    Honor's retained jurisdiction, which I think addresses their

8    parade of horribles.

9            THE COURT:  Okay, Mr. Willett.  Thank you.  Well,

10   people sitting out in the courtroom may be wondering what has

11   happened.  I'm not sure much of anything has happened, but we've

12   had a conversation, we're now going to have a conversation in

13   camera.  That will be in chambers, it will be among the

14   government counsel and other cleared counsel.

15           Since I don't think we have a cleared court reporter,

16   it's going to be off the record.  Any problem with that,

17   counsel?

18           MR. WILLETT:  No, Your Honor.

19           MR. HENRY:  No, Your Honor.

20           THE COURT:  In that case we will adjourn this

21   proceeding and I will see counsel in chambers directly.  Thank

22   you.

23           (Proceedings adjourned at 2:55 p.m.)

24

25

United States District Court              202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                        Official Court Reporter

Page 27

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Rebecca King, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     _____            _____

10    SIGNATURE OF COURT REPORTER                  DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT 5**

2 of 546 DOCUMENTS

Copyright 2005 The Washington Post
The Washington Post

**August 26, 2005 Friday**
Final Edition

**SECTION:** A Section; A22

**LENGTH:** 527 words

**HEADLINE:** 5 Chinese **Detainees** Given More Freedom at Guantanamo

**BYLINE: Josh White,** Washington Post Staff Writer

**BODY:**

Officials at the U.S. detention facility at Guantanamo Bay, Cuba, have moved five ethnic Uighurs into a less restrictive area of the prison while the United States tries to find a way to free the Chinese separatists in a third country.

The Uighurs are part of a group of 15 who have been held at Guantanamo Bay for three years but have been found to pose no threat to the United States or its allies. Last week they were transferred from cells to an area known as Camp Iguana, where they have use of an entertainment room, a kitchen and an outdoor recreational area, U.S. lawyers told a federal court judge at a hearing yesterday.

But they are still surrounded by a fence, have minimal contact with the outside world and are uncertain when their legal limbo will end.

Although five have been found not to be enemy combatants and all 15 have been cleared for release from Guantanamo Bay, the United States has found no country to accept the Uighurs (pronounced wee-gurs), Muslims who are seeking their own homeland on territory that is now part of northwestern China. The United States will not return them to China for fear that the government would persecute or torture them. The Uighurs have fought the Chinese government and are accused of terrorist attacks there.

U.S. authorities have asked nearly two dozen nations to provide refuge for the Uighurs without success, in part because other nations do not want to anger the Chinese. In the meantime, the U.S. government and lawyers for two of the Uighurs are trying to work out ways to grant the **detainees** greater freedom at Guantanamo Bay.

U.S. District Judge James Robertson said yesterday that he would like more time to consider the issue. He seemed pleased that the Uighurs, as well as about five other unidentified **detainees,** had been moved to better living quarters while they await their release.

Lawyers for the two Uighurs — Abu Bakker Qassim and Adel Abdu Hakim — who also represent seven other members of the group, argued yesterday that the U.S. government should allow the Uighurs to come to the United States as political asylum-seekers and grant them a loosely defined "parole" status. Two Washington area Uighurs have volunteered to house the men, said Omar Kanat of Vienna, vice president of the Uyghur American Association.

Sabin P. Willett argued in U.S. District Court in Washington yesterday that the Uighurs could be trapped in Guantanamo Bay indefinitely. Willett said the move to better quarters in the military prison amounted to "fluffing the pillows" instead of granting the men their freedom.

"I don't think they should be held behind any fence," Willett said.

Terry Henry, a Justice Department lawyer, said that one of the Uighur **detainees** was able to speak to his sister in Sweden on Friday for 90 minutes. Only one other **detainee** at Guantanamo Bay has been allowed to use the telephone. But Henry said the Uighurs should be held until arrangements can be made for them, and that they should not be released to the United States, even under parole status.

  

The Washington Post August 26, 2005 Friday

"We can continue to hold them in Camp Iguana, or something like it, for as long as it takes," Henry said.

**LOAD-DATE:** August 26, 2005





# **EXHIBIT 6**

Case 1:05-cv-01602-UNA   Document 7   Filed 09/20/2005   Page 126 of 214



Uyghur American Association forum > Uyghur American Association
Guantanamo detainees pose dilemma

User Name [User Name] ☑ Reme

Password [        ]

| Register | FAQ | Members List | Calendar | Today's Posts | Sear |

 Post Reply

Thread Tools ▽   Search this Thread ▽   Rate Thread ▽   Display

15-11-04, 06:40

**uyghur Advice**
Guest

**Guantanamo detainees pose dilemma**

Guantanamo detainees pose dilemma

Eligible for release, the Muslim Uighurs could be in danger if returned to China.

By Neil A. Lewis

New York Times News Service

GUANTANAMO BAY, Cuba - One of the most vexing and peculiar problems that the imprisonment of
suspected of being terrorists at Guantanamo has caused for the Bush administration has been what
with ethnic Uighur detainees.

Guantanamo has 22 Uighur (pronounced WEE-ger) detainees, most captured in Afghanistan. They tr
there from their homeland in the Xinjiang region of China, where the mostly Muslim Uighurs have for
low-level insurgency against Beijing's rule for years.

U.S. military officials have concluded that at least half of the Uighurs here are eligible for release, bu
prisoners have said they do not want to be returned to China, because they fear they will be torture
killed as terrorists.

That has sent U.S. officials scrambling to find a third country willing to accept the Uighurs. So far, se
European countries, including Norway and Switzerland, have declined. Newspapers in other Europea
countries have reported that their governments have refused as well.

Beijing has asserted that the Uighurs are terrorists and that the United States should return them to
to demonstrate its commitment to fighting terrorism around the world.

A spokesman for China's Foreign Ministry warned this month that relations between Washington and
could be harmed if the United States sent any Uighurs to a third country.

One of the Uighurs held at Guantanamo went before a special tribunal recently to argue that he was unlawful enemy combatant and should not have been arrested in Afghanistan and kept in the detent camp here.

The man, a 33-year-old with an artificial left leg, told the military panel that he was not an enemy of United States and that he hoped America would one day help the Uighur independence movement.

After taking an oath before Allah that he would tell the truth, the man said, "It's true that I went to Afghanistan," explaining that he did so to find a place for his family to live free from Chinese oppress

He disputed a statement that he had told an interrogator that he had been a member of the East Tur Islamic Movement, which was defined by the government as an extremist Muslim group in China.

"We fought against the Chinese government for years," he said. "That does not mean we are al-Qaed said he had sought military training and the proper use of a gun to fight the Chinese in the future.

At various times, he said that there was no proof he had been involved with al-Qaeda. "Do you have proof that I am with al-Qaeda? Any real proof?"

When he was told that there was evidence of his association but that it was classified and he could n it, he said, "I can't bring any evidence against the classified information I cannot see."





« Previous Thread | Next Thread »

| Posting Rules |  |
|---|---|

You **may** post new threads
You **may** post replies
You **may not** post attachments
You **may not** edit your posts
_____
vB code is **On**
Smilies are **On**
[IMG] code is **On**
HTML code is **On**

**Forum Jump**
Uyghur American Associati

All times are GMT -4. The time now is 11:32.

RSS feed - XML feed - Contact Us - UAA Forum -

Powered by: vBulletin Version 3.0.7
Copyright ©2000 - 2005, Jelsoft Enterprises Ltd.

**<u>EXHIBIT 7</u>**

# TABLE OF CONTENTS

Introduction ............................................................................................................. 1

Overview of the human rights situation in the XUAR .................................................. 2

    Uighur prisoners of conscience .......................................................... 6

    Estimates of arrests and sentences since March 2002 .......................................... 9

    Combating "terrorism": China's propaganda war intensifies ............................ 10

    Official definitions of "terrorism" ....................................................... 14

The plight of Uighurs abroad ..................................................................... 17

    International legal standards on the principle of *non-refoulement* ...................... 17

    The fate of Uighur activists forcibly returned to China ...................................... 19

    Exporting repression: harassment of Uighur returnees, exiles or their families . 34

Conclusion and Recommendations ............................................................. 38

    To the Chinese authorities ..................................................................... 38

    To other governments ..................................................................... 39

# People's Republic of China
## Uighurs fleeing persecution as China wages its "war on terror"

*"We need to take the initiative and go on the offensive, crack down on gangs as soon as they surface and strike the first blow. We must absolutely not permit the three vicious forces to build organizations, have ringleaders, control weapons and develop an atmosphere. We need to destroy them one by one as we discover them and absolutely not allow them to build up momentum"*, Zhang Xiuming, deputy secretary of the XUAR committee of the Chinese Communist Party (CCP), 17 January 2004.[1]

*"In Xinjiang, not one incident of explosion or assassination took place in the last few years....Last year Xinjiang's public security situation was very good..."* Ismael Tiliwaldi, Chair of the XUAR government, 12 April 2004.[2]

## Introduction

The following document examines recent developments in the continuing political crackdown in the Xinjiang Uighur Autonomous Region (XUAR) of the People's Republic of China and the plight of members of China's mainly Muslim Uighur community fleeing human rights violations in the region.[3] Amnesty International has published a number of reports on its concerns in the region since the 1990s, including two major reports in April 1999 and March 2002.[4] Repression has continued in the region over the last two years, in the context of an ongoing political and security crackdown against the so-called "three evils" of "separatists, terrorists and religious extremists", as China continues to use "anti-terrorism" as a pretext to suppress all forms of political or religious dissent in the region.

The Chinese authorities continue to deny representatives of international human rights organizations, including Amnesty International, access to China to conduct primary research. Much of the information contained in this report was obtained through sources outside China, including research conducted by Amnesty International in Turkey, Kazakstan and Kyrgyzstan in October 2003. These countries have sizeable Uighur populations, some of whom have arrived there recently from China. In several cases,

---

[1] "China's Xinjiang chief urges intensified crackdown on 'three forces'", *Zhongguo Xinwen She*, 17 January 2004.
[2] "Governor says China's Xinjiang has seen no terrorist attacks for years," *Xinhua*, 12 April 2004.
[3] This region is known to Uighur nationalists as "East Turkestan" or less commonly, "Uyghurstan".
[4] See Amnesty International, *People's Republic of China: Gross Violations of Human Rights in the Xinjiang Uighur Autonomous Region*, April 1999 (ASA 17/19/99) and *People's Republic of China: China's anti-terrorism legislation and repression in the Xinjiang Uighur Autonomous Region*, March 2002 (ASA 17/10/2002).

respondents asked that their names and other identifying details be withheld as they feared for their own safety or the safety of relatives living in the XUAR.

Anyone in the XUAR found passing information to the outside world about human rights abuses is at risk of arbitrary detention, torture and other serious human rights violations. High levels of repression have severely curtailed the flow of information from the region on human rights violations over recent years.

One example is the general lack of publicly available information about death sentences and executions in the region over the last two years. Amnesty International has documented reports of such cases on a yearly basis for the whole of China, including the XUAR. Until 2002, sentences and executions were regularly being reported in the media in the XUAR - the only place in China where people were sentenced to death for political crimes.[5] Now, however, death sentences and executions are only rarely being reported in the official media in the region, apparently because the authorities have become more sensitive to concerns raised by the international community over such cases.

The first section of this report gives an overview of the human rights situation in the XUAR, including recent developments in China's official propaganda campaign against "terrorism". The second section describes the plight of Uighurs in other countries, including those who apply for asylum. According to Amnesty International's research, several disturbing trends have emerged or intensified over recent months, including harassment by the Chinese authorities of relatives of Uighurs who flee abroad; increasing attempts by the Chinese authorities to curtail the political and human rights activities of Uighur activists in other countries; and growing fears among many Uighurs abroad, including asylum seekers and refugees, of being forcibly returned to China.

## Overview of the human rights situation in the XUAR

Amnesty International has been reporting on human rights violations against members of the ethnic Uighur community in the XUAR for many years. Repression of alleged "separatists" and "religious extremists" has continued since the early 1990s following the mass protests and violent riots of April 1990 in Baren township.[6] They intensified following further demonstrations and disturbances in various cities including Gulja, Khotan and Aksu in the mid-1990s and the initiation of a "strike hard" campaign against

---

[5] The execution of a Tibetan, Lobsang Dhondup, in Sichuan province in January 2003 for "causing explosions" and related offences after an unfair trial extended the scope of the death penalty for political offences outside the XUAR. See Amnesty International, *People's Republic of China: Executed "according to law"? The death penalty in China,* 17 March 2004 (ASA 17/003/2004).

[6] See Amnesty International (ASA 17/19/99) op cit. and *People's Republic of China: Secret Violence: Human rights violations in Xinjiang,* 1992 (ASA 17/050/1992).

crime throughout China in 1996 which made "separatists" in the XUAR a key target (as well as in Tibet and Inner Mongolia). Reports of serious human rights violations, including arbitrary detentions, unfair trials, torture and executions, increased once again following the brutal suppression of an initially peaceful demonstration by Uighurs in the city of Gulja (Yining) in February 1997, which resulted in several days of serious unrest in the city.[7] More recently, "separatists, terrorists and religious extremists" have once again been made a key target of a renewed national "strike hard" campaign against crime which was initiated in April 2001 and which has never formally been brought to a close.

The Chinese government's use of the term "separatism" refers to a broad range of activities, many of which amount to no more than peaceful opposition or dissent, or the peaceful exercise of the right to freedom of religion. Over the last three years, tens of thousands of people are reported to have been detained for investigation in the region and hundreds, possibly thousands, have been charged or sentenced under the Criminal Law; many Uighurs are believed to have been sentenced to death and executed for alleged "separatist" or "terrorist" offences, although the exact number is impossible to determine.[8]

At the same time, the government has increased restrictions on the religious rights of the Muslim population in the region, banning some religious practices during the holy month of Ramadan, closing many mosques and independent religious schools, increasing official controls over the Islamic clergy, and detaining or arresting religious leaders deemed to be "unpatriotic" or "subversive". Regional authorities have also launched political campaigns to "clean up" cultural and media circles and some government departments in Xinjiang to rid them of "undesirable elements."[9]

Human rights violations perpetrated in the XUAR are based on restrictions which apply nationwide. For example, repression of any acts which are deemed to "incite separatism" or "splittism", including acts of free expression and other non-violent activities, is underpinned by Article 103 of the Chinese Criminal Law (which may equally be applied to Tibetan or Inner Mongolian activists as to Uighur nationalists).[10] Similarly,

---

[7] See below for further information.
[8] For further information about Amnesty International's concerns about the application of the death penalty in China, see ASA 17/003/2004, op. cit.
[9] See Amnesty International, ASA 17/10/2002, op cit.
[10] Article 103: *Whoever organizes, plots, or acts to split the country or undermine national unification, the ringleader, or the one whose crime is grave, is to be sentenced to life imprisonment or not less than ten years of fixed-term imprisonment; other active participants are to be sentenced to not less than three but not more than ten years of fixed term imprisonment; and other participants are to be sentenced to not more than three years of fixed term imprisonment, criminal detention, control, or deprivation of political rights.*

religious practice is curtailed in China as a matter of national policy and any act of religious observance or worship outside formal, official channels may be subject to sanction, in violation of international human rights standards. The severity of restrictions imposed on any specific religion or belief system varies according to official policy, such as whether or not a particular group is the target of a political campaign. In the case of Muslims in the XUAR, religious repression has intensified during the official campaign against so-called "religious extremists," launched in recent years, with the result that controls imposed on Uighur Islam have become much harsher than on Islam among other peoples in China.[11]

Several additional factors have combined to lend a degree of severity to human rights violations in the XUAR over recent years and increased the level of discontent among the Uighur population in the region. The failure of the authorities to address grievances held by many Uighurs about serious and widespread violations of their economic, social and cultural rights remains a source of tension in the region.[12] Unemployment remains high among Uighurs and the continued influx of Han Chinese workers into the region has reportedly squeezed Uighurs further out of the labour market. The vast majority of Uighurs are farmers; they are not proficient in Chinese and have limited educational and employment opportunities. Yet, in recent years, reports indicate that Uighur families have increasingly been forced from their land by Han Chinese property developers without adequate consultation or compensation.[13] Restrictions on cultural rights have also been tightened in recent years, including the reported banning and burning of tens of thousands of Uighur books[14] and the imposition of an official

---

*Whoever instigates to split the country and undermine national unification is to be sentenced to not more than five years of fixed term imprisonment, criminal detention, control, or deprivation of political rights; ringleaders or those whose crimes are grave are to be sentenced to not less than five years of fixed term imprisonment.*

[11] See *The Xinjiang Problem* by Graham E Fuller and S.Frederick Starr, Central Asia-Caucasus Institute, John Hopkins University, December 2003, p.19.

[12] See Amnesty International, ASA 17/19/99, op cit.

[13] In a recent incident, at least 16 people were reportedly detained by the police in Yili prefecture for protesting at what they said was an unfair relocation package due to the construction of a reservoir and water power station project. See: "Police in Xinjiang detain protesters", *RFA*, 14 June 2004.

[14] For example, eyewitnesses apparently reported that in June 2002 books collected from No.1 Secondary School in Kashgar City were piled up and burned. For further information, see "*Uyghur language and culture under threat in Xinjiang*" by Dr Michael Dillon, 14 August 2002, Central Asia-Caucasus Analyst. Books which have been banned or burnt reportedly include books on Uighur history and culture, such as *A Brief History of the Huns and Ancient Literature* and *Ancient Uighur craftsmanship*. For further information, see *Criminalizing Ethnicity: Political Repression in Xinjiang* by Nicolas Becquelin in Human Rights in China, China Rights Forum, No.1, 2004 , p.45.

policy banning Uighur as a language of instruction for most courses at Xinjiang University from September 2002.[15]

The authorities have also justified religious repression in the XUAR in terms of combating "fundamentalist" or "extremist Islamic" activities.[16] Xinjiang analysts have noted that the vast majority of Uighurs practice moderate forms of Sufi or Sunni Islam, unconnected with more radical, so-called "wahabbist" Islamic movements. Nevertheless, the spread of such beliefs in the region has reportedly increased since the 1990s with growing connections between some Uighurs and fundamentalist Islamist movements, particularly in Central Asia, Pakistan and Afghanistan.[17] The extent of religious repression, however, goes far beyond the need to combat violent activities. Amnesty International has documented numerous cases of Uighurs being detained in the XUAR in connection with their peaceful religious practices, in violation of international standards on freedom of belief and religion.[18]

Amnesty International is concerned that the high levels of repression in the XUAR are narrowing the space for any independent expression of Uighur ethnic, cultural or religious identity. Such expression, particularly when it takes the form of peaceful criticism, dissent or dissatisfaction, is often deemed by the authorities to constitute "separatist", "terrorist" or "illegal religious" activities, leading to arbitrary detention, torture and other serious human rights violations. Amnesty International continues to urge the Chinese authorities to make a clear distinction between violent acts and peaceful expression of dissent, or social, cultural or religious identity.

---

[15] See "Xinjiang University to teach major subjects in Chinese", *Xinhua,* 7 June 2002. Fears about growing restrictions on the use of Uighur as a language of instruction were heightened further in March 2004 when it was reported that fifty ethnic minority schools in the XUAR would be merged with ethnic Chinese schools over the next five years and that teaching should be conducted in Chinese as much as possible. See "China imposes Chinese language on Uyghur schools", *RFA,* 16 March 2004.
[16] See *Dislocating China: Muslims, Minorities and Other Subaltern Subjects,* by Dru C. Gladney, Hurst & Co. London, 2004, pp.252-253
[17] See: *The Uyghurs in Xinjiang: the malaise grows* by Rémi Castets, China Perspectives No.49, Sept-Oct 2003.
[18] See, for example, Amnesty International, ASA 17/18/99, pp.10-11 and ASA 17/010/2002, pp.13-16, op. cit. Professor Dru C Gladney, a specialist on Xinjiang and Muslims in China, has also noted that the government has consistently rounded up any Uighur suspected of being "too" religious, especially those identified as Sufis or Wahabbis, see *China's Minorities: the case of Xinjiang and the Uyghur people,* paper submitted to the UN Sub-commission on Promotion and Protection of Minority Rights, Working Group on Minorities, Ninth Session, 12-16 May 2003, UN Doc. E/CN.4/Sub.2/AC.5/2003/WP.16.

## Uighur prisoners of conscience

The continued detention of prisoners of conscience in the XUAR is evidence that China's policies of repression in the region stretch far beyond concerns with combating acts of violence or "terrorism". Given official restrictions on access and information, the total number of those detained solely for engaging in peaceful acts of freedom of expression, association or other rights in the region is impossible to determine. Many of those falling within this category are believed to be held without charge or trial in "re-education through labour" camps or other places of detention. However, the two individuals, whose cases are described below, received long prison sentences and continue to be imprisoned, despite repeated calls for their release from other governments, human rights mechanisms of the United Nations, and non-governmental organizations, including Amnesty International.

**Rebiya Kadeer**, aged 57 and a mother of eleven was sentenced in a secret trial in March 2000 to eight years' imprisonment by the Urumqi Intermediate People's Court on charges of "providing secret information to foreigners" under Article 111 of the Chinese criminal law.[19] During the trial neither Rebiya Kadeer nor her lawyer were allowed to speak in her defence. The verdict of her trial describes the "secret information" as copies of the publicly available newspapers, *Kashgar Daily*, *Xinjiang Legal News*, *Yili Daily* and *Yili Evening News,* that she sent to her husband – a former political prisoner from the XUAR who has lived in the USA since 1996. Her appeal was rejected in November 2000, and the verdict was confirmed.

Rebiya Kadeer had travelled to the USA together with her husband in 1996, but she later returned to the XUAR. In 1997, the Chinese authorities placed her under surveillance and confiscated her passport. According to Wang Lequan, the secretary of the regional Communist Party Committee, this was reportedly because "her husband was engaged in subverting the government and separatist activities outside the country".[20] This appeared to refer to his activities as a broadcaster with the radio stations, *Voice of America (VOA)* and *Radio Free Asia (RFA)*.

Rebiya Kadeer was detained in August 1999 on her way to meet a member of a United States Congressional Research delegation which was visiting China at the time. She was accused of having in her possession a list of ten people "suspected of having a

---

[19] Article 111: *Whoever steals, secretly gathers, purchases, or illegally provides state secrets or intelligence for an organization, institution, or personnel outside the country is to be sentenced from not less than five years to not more than 10 years of fixed-term imprisonment; when circumstances are particularly serious, he is to be sentenced to not less than 10 years of fixed-term imprisonment, or life sentence, and when circumstances are relatively minor, he is to be sentenced to not more than five years of fixed-term imprisonment, criminal detention, control, or deprivation of political rights.*
[20] See "*A Door to the North*" by Ivo Dokoupilu, available on Transitions Online website at: http://www.tol.cz/jul99/specr10992.html, (retrieved on 24 November 1999).

connection with national separatist activists." Her family was not allowed to visit her for the first 15 months of her detention, and since then family visits have been restricted and closely monitored by the prison officials. On some occasions family visits have been cancelled, often at short notice. She is currently being held at Urumqi Women's Prison and reportedly suffers from chronic gastritis and occasional high blood pressure. She is on daily medication.

At the time of Rebiya Kadeer's detention in August 1999, her son Ablikim Abdurehim and her secretary Kahriman Abdukirim were also detained and sentenced without charge or trial to two and three years' "re-education through labour" terms respectively. Both were reportedly ill-treated in detention. In December 2002, four of Rebiya Kadeer's children living in the XUAR were briefly detained, apparently to prevent them from meeting with a senior US official visiting the region.

Rebiya Kadeer's sentence was reduced by one year in March 2004, reportedly because she had "recognised her mistakes and was resolved to stand on the side of the Party and people".[21] She is now due for release on 12 August 2006. According to reports, the Chinese authorities may consider further sentence reductions if Rebiya Kadeer continues to demonstrate "genuine repentance and willingness to reform."[22]

Rebiya Kadeer was once celebrated as a model Uighur businesswoman, and in 1995 her success won her a place in China's official delegation to the United Nations Fourth World Conference on Women in Beijing. In 1997 she was involved in creating the "Thousand Mothers Movement" – a forum promoting the rights of ethnic minority women, and creating employment opportunities for them. The forum was launched in Rebiya Kadeer's department store in Urumqi, and at a second meeting of the "Thousand Mothers Movement", she spoke about the power of women and her desire to help Uighur mothers, many of whom wished to work to help sustain their families, but had no opportunity to do so. Rebiya Kadeer had also been an official member of the Chinese People's Political Consultative Conference (CPPCC), a broad-based official body which includes representatives of the Chinese Communist Party, other official political parties, mass organizations and other key figures. In 1998, however, she was banned from re-election to the CPPCC, ostensibly because she had "failed" to condemn her husband's "separatist" activities in the USA.

Amnesty International welcomes the recent reduction in her prison sentence, but remains deeply concerned at Rebiya Kadeer's continued imprisonment in violation of her fundamental human rights to freedom of expression and association. The organization

---

[21] "China reduces sentenced of jailed Muslim businesswoman", *Associated Press (AP)*, 4 March 2004.
[22] See comment by John Kamm of the San-Francisco-based *Duihua (Dialogue) Foundation* in "Rare sentence reduction for leading Uighur activist in China", *Agence France Presse (AFP)*, 3 March 2004.

considers her to be a prisoner of conscience and reiterates its calls for her immediate and unconditional release.

**Tohti Tunyaz**, an ethnic Uighur historian aged 44, has now served six years of his 11-year sentence on charges of "illegally acquiring state secrets" and "inciting separatism" under Articles 111 and 103 of the Criminal Law. He is being held in the XUAR No.3 Prison in Urumqi.

Before his arrest in China on 11 February 1998, Tohti Tunyaz was a postgraduate student at the University of Tokyo in Japan. He was specializing in China's policy towards ethnic minorities, and had travelled home to the XUAR to collect material for his thesis on the region's history before the establishment of the People's Republic of China in 1949, in particular the period of the East Turkestan Republic between 1944-49. He was arrested during this visit and convicted in March 1999 by the Urumqi Intermediate People's Court. His sentence was later confirmed on appeal. He is due for release in February 2009.

The charge of "illegally acquiring state secrets" referred to a list of 50-year-old documents Tohti Tunyaz obtained with the help of an official librarian in the XUAR. During his trial, the charge of "inciting separatism" was linked with a book entitled "The Inside Story of the Silk Road" that the Chinese authorities claimed Tohti Tunyaz had published in Japan. However, according to his professor, he had not published such a book, or any book that "incites separatism".

Tohti Tunyaz writes under the pen-name Tohti Muzart, which refers to a river in Baicheng County in Aksu Prefecture of the XUAR, where he was raised. In 2002 PEN American Center honoured Tohti Tunyaz with the PEN/Barbara Goldsmith Freedom to Write Award. His family lives in Japan.

In May 2001, the United Nations Working Group on Arbitrary Detention (WGAD) adopted an opinion on Tohti Tunyaz's case which stated that the deprivation of liberty of Tohti Tunyaz was arbitrary and contravened several of the articles of the Universal Declaration of Human Rights, including rights to freedom of thought, opinion and expression. The WGAD also emphasized that:

"Mr Tohti Tunyaz cannot be sentenced merely for writing a research paper, which, even if it were published, lay within his right to exercise the freedoms of thought, expression and opinion which are enjoyed by everyone and which can by no

means be regarded as reprehensible if exercised through peaceful means, as they were in this case."[23]

To date, the Chinese authorities have failed to comply with WGAD's ruling to "remedy the situation" and Tohti Tunyaz remains in prison. Amnesty International considers him to be a prisoner of conscience and continues to call for his immediate and unconditional release.

## Estimates of arrests and sentences since March 2002

The Chinese authorities continue to withhold publication of detailed statistics about the detention and imprisonment of individuals across the country. China also continues to prevent access for international human rights organizations to conduct independent research on such issues.

In addition, growing levels of repression in the context of China's political crackdown in the XUAR have heightened the risks faced by those who attempt to publicise such information unofficially, including by passing information about arrests and sentences to individuals and organizations in other countries. The imprisonment of Rebiya Kadeer, detailed above, has sent a message to other Uighur activists that even passing local newspaper reports to the outside world may be considered a criminal offence. A combination of all of these factors make it impossible to make an accurate assessment of the number of those arrested and detained for political reasons in the XUAR.

At the annual session of the 10th National People's Congress in Beijing in March 2003, Han Zhubin, China's then procurator-general, publicised statistics which revealed that in the five years between 1998-2002, procuratorates nationwide approved the arrest of 3,402 individuals and prosecuted 3,550 people on charges of "endangering state security".[24] This high figure seems to indicate an intensive effort by the Chinese authorities to crack down on any behaviour deemed to pose a threat to "state security" or the "socialist system", which would include purported acts of "terrorism" or "separatism". While these are national figures, it is likely that a significant number are cases of Uighurs detained and sentenced in the XUAR for "inciting separatism".

---

[23] United Nations Working Group on Arbitrary Detention, "Opinion No. 7/2001 (People's Republic of China): Communication addressed to the Government on 26 April 2000, concerning Tohti Tunyaz", United Nations Economic and Social Council, Document No. E/CN.4/2002/77/Add.1, 11 December 2001.
[24] *Xinhua*, 11 March 2003. See also *Dialogue,* Spring 2003/Issue 11 by the *Duihua Foundation* for an analysis of these statistics at www.duihua.org)

In March 2002, Amnesty International estimated that thousands of people had been detained in the XUAR during the six months following September 2001, with at least scores charged or sentenced under the Criminal Law – most of them Uighurs.[25] Given the intensification in the official crackdown on the "three evil forces" of "separatism, terrorism and religious extremism" in the region, it is likely that the numbers have increased significantly since then.

In September 2003, exile Uighur sources reported that tens of thousands of people had been detained as alleged "separatists" or "terrorists" since March 2002 in the context of security operations in various cities in the XUAR aimed at confiscating or burning Uighur books and other media believed to promote independence.[26] They also estimated that from April to August 2002, 5,000 people were detained in Kashgar alone during a security operation aimed at unofficial Islamic activities. Around 150 of these people were reportedly executed.[27] Amnesty International has been unable to verify these figures.

On 24 September 2003, the Chinese authorities publicly announced a renewed security crackdown in the region, which was due to last for 100 days from 1 October 2003 (National Day) to Chinese New Year in late January 2004. Amnesty International is concerned that this is likely to have led to a significant increase in the number of Uighurs detained and/or sentenced for alleged "separatist" or "terrorist" offences.

## Combating "terrorism": China's propaganda war intensifies

Following the attacks in the USA on 11 September 2001, the Chinese authorities have actively sought to justify their crackdown in the XUAR as part of the international "war on terror" in an attempt to garner international support for their actions. Since then, the Chinese authorities have widely publicised the occurrence of a number of explosions and other violent activities attributed to armed Uighur nationalist groups during the 1980s and 1990s and used this as a pretext to justify the government's crackdown in the region in terms of "counter-terrorism".

Over the last three years, Uighur nationalists who would formerly have been branded as "separatists" have increasingly been labelled "terrorists". At the end of December 2001, China amended the provisions of its Criminal Law with the stated purpose of making more explicit the measures it already contained to punish "terrorist" crimes. In March 2002, Amnesty International published a report analysing these

---

[25] See Amnesty International, ASA 17/010/2003, op cit.
[26] See *East Turkistan: Genocide, prison, torture and linguacide in the name of 'Anti-Terrorism'*, ETIC Report 2003, available at www.uygur.org/enorg/h_rights/report_2003.html.
[27] See *Dong Tuerqisidan Renquan Wenti [East Turkestan Human Rights Problems], March 2002 – August 2003*, ETIC, available (in Chinese) at http://www.uygur.org/china/et/2004/0213.htm.

amendments and expressing concern that the new provisions enlarge the scope for application of the death penalty in China and could be used to further suppress freedom of expression and association.[28]

The crackdown on "separatists, terrorists and religious extremists" has continued over the last three years, even though there have been no official reports of attacks by "terrorist" groups. According to a Chinese government report published on 21 January 2002, which listed "terrorist" incidents in the region over the past ten years, the most recent explosion allegedly carried out by a "terrorist" group took place in April 1998 in Yecheng and the only other recent incident of violence imputed to "terrorists" since 1999 was the murder of one court official in Kashgar prefecture in February 2001.[29]

The absence of such incidents since then has recently been confirmed by local officials. On 12 April 2004, the Chair of the XUAR regional government, Ismael Tiliwaldi stated in a press conference that "not one incident of explosion or assassination took place in the last few years".[30] He added that "terrorists" had "incurred public wrath like a rat running across the streets."[31] In an apparent attempt to promote the economic potential of the region, he claimed that the public security situation in the region was "very good" and that "300,000 foreign tourists and more than ten million domestic tourists tour Xinjiang each year". "Not one of the 500 foreigners permanently residing in Xinjiang runs into trouble."

Nevertheless, in December 2002, China again highlighted the alleged threat posed by "East Turkestan terrorist forces" in a White Paper on National Defense, published by the State Council, which included a long section identifying "terrorism" as a key security issue. The paper reiterated that "China, too, is a victim of terrorism," and that "the 'East Turkistan terrorist forces' are a serious threat to the security of the lives and property of the people of all China's ethnic groups, as well as to the country's social stability."[32]

---

[28] See Amnesty International, ASA 17/10/2002, op cit.

[29] See "*East Turkestan terrorist forces cannot get away with impunity*", issued by the Information Office of China's State Council and published in the official People's Daily newspaper on 21 January 2002. This document asserted that "East Turkistan terrorist forces" had conducted "a campaign of bombing and assassinations" consisting of more than 200 incidents resulting in 162 deaths and 440 people injured.

[30] "Governor says China's Xinjiang has seen no terrorist attacks for years", *Xinhua,* 12 April 2004.

[31] The analogy of "rats running across the street" is commonly used to describe targets of political crackdowns in China, including recently, the Falun Gong spiritual movement, see Amnesty International, *People's Republic of China: Continuing abuses under a new leadership – summary of human rights concerns,* October 2003 (ASA 17/035/2003), pp.13-14

[32] *China's National Defense in 2002,* issued on 9 December 2002 by the State Council Information Office, available at http://www.china.org.cn/english/2002/Dec/50743.htm. Nicolas Becquelin has pointed out that in contrast, China's previous White Paper on defense, published in 2000, made only four scattered and general references to "terrorism". See China Rights Forum, Issue 1, 2004, op cit.

In apparent response to international criticism about its policies in the XUAR, in May 2003, China's State Council released a new White Paper entitled *The History and Development of Xinjiang,* which asserted that the rights of ethnic minorities in the region were fully protected, including freedom of religious belief.[33] The paper also stated that "[a]fter the September 11 incident, the voices calling for an international anti-terrorist struggle and cooperation have become louder and louder. In order to get out of their predicament, the 'East Turkestan' forces once again have raised the banner of 'human rights,' 'freedom of religion' and 'interests of ethnic minorities,' and fabricated claims that 'the Chinese government is using every opportunity to oppress ethnic minorities,' to mislead the public and deceive world opinion in order to escape blows dealt by the international struggle against terrorism." However, the paper failed to acknowledge or address concerns raised repeatedly by international human rights NGOs, United Nations experts and others about serious and widespread human rights violations against the Uighur community in the region over many years.

On 15 December 2003, the Chinese Ministry of Public Security issued a list of "East Turkestan terrorists" and "terrorist organizations" abroad.[34] This named four organizations: the East Turkestan Liberation Organization (ETLO), the East Turkestan Islamic Movement (ETIM), the World Uyghur Youth Congress (WUYC) and the East Turkestan Information Centre (ETIC) and eleven individual members of these groups: Hasan Mahsum, Muhanmetemin Hazret, Dolkun Isa, Abdujelil Karakash, Abdukadir Yapuquan, Abdumijit Muhammatkelim, Abdula Kariaji, Ablimit Tursun, Huadaberdi Hasherbik, Yasin Muhammat and Atahan Abuduhani. At the time of publication, the Chinese authorities called on other states to take international action by tracking these people down and handing them over to China.

Commentaries also appeared in the official Chinese press detailing "terrorist" incidents allegedly carried out by the individuals listed. In keeping with previous patterns, this information was uncorroborated and no credible evidence was provided to substantiate these claims. Indeed, much of the "evidence" appeared to have been obtained from other individuals under interrogation. In view of the ongoing and widespread use of torture and ill-treatment by police in China, particularly to extract "confessions" from detained suspects, Amnesty International believes any "evidence" obtained in this way must be treated with deep suspicion.[35]

---

[33] Available at http://www.china.org.cn/e-white/20030526/4.htm.
[34] "Combating terrorism, we have no choice," *People's Daily,* 16 December 2003, available online at: http://english1.peopledaily.com.cn/200312/18/eng20031218_130652.shtml
[35] For further information about the extent and nature of torture in China, see Amnesty International, *People's Republic of China: Torture – a growing scourge in China – time for action,* February 2001, ASA 17/004/2001.

Two of the organizations, WUYC and ETIC, headed by Dolkun Isa and Abdujelil Karakash respectively, are legally constituted non-governmental organizations based in Germany which publicise reports of human rights abuses against Uighurs in China and advocate self-determination or independence for the region.[36] They have stated on numerous occasions that they are opposed to the use of violence.[37] Following the publication of the list, a spokesman for the German Ministry of the Interior reportedly stated that he was aware of the WUYC, but did not classify them as "extremist" and that he did not know anything about ETIC.[38] Amnesty International is concerned that China's inclusion of these groups in its list is an attempt to curb their peaceful political and human rights monitoring activities, and to conflate peaceful political activism with violent acts of "terrorism".

The listing of ETIM and ETLO was in keeping with previous allegations made by China against these groups. Both were highlighted in China's official report on "East Turkestan terrorists" of January 2002 and China's allegations against ETIM were bolstered in August 2002 when the US, closely followed by the UN[39], formally classified ETIM as a "terrorist organization" after repeated lobbying from China. The grounds that formed the basis for this decision, aside from China's previous allegations, remain unclear.

A report produced by the US Congressional Research Service (CRS) in December 2001 had documented a number of armed groups allegedly operating in the region, but had failed to mention ETIM.[40] Its list of armed groups included: the United Revolutionary Front of Eastern Turkestan, the Organization for the Liberation of Uighurstan, the Wolves of Lop Nor, the Xinjiang Liberation Organization, the Uighur Liberation Organization, the Home of East Turkestan Youth and the Free Turkestan Movement. China's official statement on "East Turkestan terrorists" published in January 2002 listed several groups allegedly responsible for violence, including ETIM, ETLO, the Islamic Reformist Party 'Shock Brigade', the East Turkestan Islamic Party, the East Turkestan Opposition Party, the East Turkestan Islamic Party of Allah, the Uyghur Liberation Organization, the Islamic Holy Warriors and the East Turkestan International Committee.

---

[36] WUYC has since merged with another Uighur political group, the East Turkestan National Congress (ETNC) to form the World Uyghur Congress (WUC).
[37] Xinjiang analysts have also noted that the vast majority of the East Turkestan independence and information organizations disclaim violence. For a list of such groups, see *"Cyber-separatism: virtual voices in the Uyghur opposition"* in Gladney, 2004 op. cit.
[38] "China publishes Xinjiang 'terrorists' list", *Jane's Intelligence Review*, 3 March 2004.
[39] More specifically, the United Nations Security Council Sanctions Committee on al-Qaeda and the Taliban.
[40] *China's Relations with Central Asian States and Problems with Terrorism*, CRS Report for Congress, 17 December 2001.

Academics have noted the general lack of information available on any of the groups listed above and it remains unclear on what basis the US agreed to specifically single out ETIM as a "terrorist organization".[41] Since then, the US has refused to meet Chinese demands to formally add ETLO to its list. In a rare interview, conducted by *Radio Free Asia* on 24 January 2003, the secretive leader of this organization, Mehmet Emin Hazret reportedly stated: "[o]ur principle goal is to achieve independence for East Turkestan by peaceful means. But to show our enemies and friends our determination on the East Turkestan issue, we view a military wing as inevitable."[42] He reportedly denied allegations that ETLO had previously been involved in attacks and rejected links between his group and ETIM, which, he claimed, he had never heard of until it was listed in China's official report of January 2002.[43]

## Official definitions of "terrorism"

In January 2003, a young poet was reportedly arrested after he recited a verse during a performance at a Kashgar concert hall.[44] A local Chinese Communist Party official reportedly clarified that his poem "attacked government policy regarding ethnic minorities" and that "he wanted to destroy the unity between Uighur and Han". He reportedly added that "we regard this as **terrorism in the spiritual form,** but we want to educate not punish him."[45] No further details about the poet or his fate have become available. Amnesty International is concerned that the vague term "spiritual terrorism" – not concretely prescribed, let alone defined, in China's criminal law - appears to have been used in this case as a pretext for arrest.[46]

Amnesty International has previously raised concerns about China's recent interpretation of the demonstration and ensuing unrest in Gulja in February 1997 as an act

---

[41] Gladney notes that an Internet search for many of these organizations and their backgrounds reveals little, if any, information. See: *China's Minorities: the case of Xinjiang and the Uyghur people,* paper submitted to the UN Sub-commission on Promotion and Protection of Minority Rights, Working Group on Minorities, Ninth Session, 12-16 May 2003, UN Doc. E/CN.4/Sub.2/AC.5/2003/WP.16.

[42] "Separatist leader vows to target Chinese government", *RFA,* 29 Jan 2003.

[43] Ibid.

[44] See "Pressure to conform in West China", *Christian Science Monitor,* 29 September 2003.

[45] Ibid. Emphasis added. "Education" could represent a wide range of sanctions ranging from enforced political study classes to "Re-education through Labour", an administrative punishment imposed by the police without charge or trial, for up to three years.

[46] Amnesty International documented a similar case of the arrest of a poet, Tursunjan Amat, following his recital of a verse in Urumqi in January 2002. (See ASA 17/10/2002, op cit, p.17). Official Chinese sources have since denied that he was ever detained. Unofficial sources indicate that he was released, some weeks, or possibly months, later. See also the case of Uighur poet, Ahmadjan Osman, below.

of "terrorism" instigated by ETIM[47], otherwise cited as the East Turkestan Islamic Party of Allah (ETIPA).[48] Independent eyewitness reports received by Amnesty International indicate that the incident was a demonstration by local people calling for equal rights for Uighurs which degenerated into violence and rioting after the security forces used excessive force in an attempt to forcibly disperse the protestors. According to some eyewitness accounts, several members of the security forces opened fire on the demonstrators leading to an unknown number of deaths and injuries. Hundreds of detained demonstrators were reportedly hosed down with icy water in the cold February weather, resulting in frostbite and, in some cases, amputations of fingers, hands or feet. In the following days, thousands of residents were detained when soldiers and riot police carried out systematic searches through the streets, arresting and beating people, including children, in the process. Thousands of people were detained, many of them were tortured and at least two people died in custody, apparently as a result of torture or ill-treatment.[49]

Official moves to link the Gulja protests with "terrorists" were reinforced most recently during the trial of Shaheer Ali, a Uighur nationalist from Khotan in the XUAR, who was convicted and executed as a "terrorist" and alleged leader of ETIPA in March 2003 after being forcibly returned from Nepal the previous year. (This case is described in more detail below.)

In February 2003, Amnesty International wrote to the chair of the XUAR regional government, Ismael Tiliwaldi, asking for details about those believed to remain in prison in connection with the Gulja incident, calling for an independent inquiry into allegations of human rights violations that took place at that time, and requesting further information to substantiate official claims of ETIM/ETIPA's involvement.[50] To date, Amnesty International has received no response to this letter.

Like several other provisions in the Chinese Criminal Law, "terrorism" and related offences remain vaguely defined giving the authorities wide leeway to interpret such crimes in a broad manner.[51] This is of particular concern given the 2001 amendments to the Criminal Law, detailed above, which increase penalties for so-called "terrorist" offences, including in some cases the application of the death penalty, a

---

[47] In their report, "East Turkestan terrorist forces cannot get away with impunity" of 22 January 2002 (op. cit), the Chinese authorities described this incident as a 'serious riot during which the terrorists shouted slogans calling for the establishment of an Islamic Kingdom'.
[48] During a press conference on 12 September 2002, Kong Quan, a spokesperson from the Chinese Ministry of Foreign Affairs stated that ETIM had other names such as the 'East Turkestan Islamic Party of Allah' or the 'East Turkestan Islamic Party' (*Xinhua*, 12 Sept 2002).
[49] For further information see Amnesty International (ASA 17/18/99) op cit.
[50] For further information, see Amnesty International: *People's Republic of China: No justice for the victims of the 1997 crackdown in Gulja (Yining)*, 4 February 2003 (ASA 17/011/2003).
[51] See Amnesty International, ASA 17/10/2002, op. cit.

punishment which Amnesty International opposes under all circumstances as a violation of the right to life.

There is no internationally accepted legal definition of the terms "terrorism" or "terrorist"[52] and recent attempts by Chinese officials to define such terms at the national level are unconvincing. During the news conference, in which he introduced the list of alleged "terrorists" in December 2003, Zhao Yongchen, deputy director of the counter-terrorism department of the Ministry of Public Security gave the following criteria for 'defining' terrorist organizations:

- An organization or organizations that engage in terrorist activities endangering national security or social stability, and harm life and property through violence and terror (regardless of whether it is based in or outside of China);
- Possessing established organizational leadership and division of labour or systems for division of labour.

And in addition to the above two criteria:

- Currently or previously involved in the organization, planning, instigation, conduct or implementation of terrorist activities;
- Funding and supporting terrorist activities;
- Establishing bases for terrorist activities or organizing, recruiting and training terrorists;
- Collaborating with international terrorist organizations by receiving funding or training from these organizations or engaging in terrorist activities with them.

He went on to define "terrorists" as:

- Those who have established links with terrorist organizations and who engage in terrorist activities which harm state security or the lives and property of people (whether they are Chinese or foreign citizens).

And in addition to this, they must:

- organise, lead or belong to a terrorist organization;
- organise, plan, instigate, propagate or incite the implementation of terrorist activities;

---

[52] For further information, see Amnesty International, *Rights at risk: Amnesty International's concerns regarding security legislation and law enforcement measures*, January 2002 (ACT 30/001/2002).

- fund and support terrorist organizations and terrorists to assist them in the conduct of terrorist activities;
- receive funding or training from the above-mentioned terrorist organizations or other international terrorist organizations to engage in terrorist activities.[53]

While this is a relatively detailed list of categories, it provides no concrete definition of the terms "terror", "terrorism" or "terrorist", potentially giving the authorities a free hand to interpret such crimes in a sweeping rather than a narrow sense.

Amnesty International recognizes the duty of states under international human rights law to protect their populations from violent criminal acts. However, such measures should be implemented within a framework of protection for all human rights. The presence in any community of some violent groups or individuals must not be used to as a pretext to curtail the fundamental human rights of the community as a whole. Indeed, experience across the world shows that such policies are likely to lead to further violence, as those who wish to express their grievances peacefully find that all channels for such expression are closed.

# The plight of Uighurs abroad

## International legal standards on the principle of *non-refoulement*

*No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment [...].* Article 7, International Covenant on Civil and Political Rights (ICCPR), 1966

*No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.* Article 3, Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1984 (hereafter, Convention against Torture)

*No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.* Article 33, Convention Relating to the Status of Refugees, 1951 (hereafter, Refugee Convention).

---

[53] *"Zhongguo rending kongbu zuzhi he kongbu fenzi de juti biaozhun"* ("China sets concrete criteria for terrorist organizations and terrorists"), *Xinhua*, 15 December 2003, available at http://news.xinhuanet.com/legal/2003-12/15/content_1232510.htm.

The international legal principle of *non-refoulement* bars all states from returning individuals to a country where their lives or liberty are at risk or where they are likely to face torture. This is a binding principle of customary international law which is also laid out in international treaties such as the Refugee Convention and the Convention against Torture. The right not to be subjected to *refoulement* has been elaborated further by UN human rights bodies, including the Committee against Torture (CAT) and the Human Rights Committee (HRC), which monitor States' compliance with the Convention against Torture and the ICCPR respectively.

The CAT has reiterated the absolute nature of the protection afforded by Article 3 of the Convention against Torture and has taken the view that "Article 3 applies irrespective of whether the individual concerned has committed crimes and the seriousness of those crimes"[54] and that "the nature of the activities in which the person engaged is not a relevant consideration in the taking of a decision in accordance with Article 3 of this Convention"[55] In addition, the HRC has noted that "[s]tates parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement".[56]

Statements made by the UN Special Rapporteur on torture (SRT) have added weight to the decisions taken by the CAT and HRC. In particular in his report in 2002, the SRT reiterated the link between the non-derogable nature of the prohibition of torture and the principle of non-refoulement when he stated:

> "[i]t is submitted that the principle contained in the Human Rights Committee's statement and the above provision of the Convention against Torture represents an inherent part of the overall fundamental obligation to avoid contributing in any way to a violation of the prohibition of torture and other cruel, inhuman or degrading treatment or punishment. It must be emphasized that the protection offered by the principle of non-refoulement is of an imperative nature. In this regard, the Special Rapporteur notes the findings of the Committee against Torture to the effect that "the nature of the activities in which the person engaged is not a relevant consideration in the taking of a decision in accordance with article 3 of the Convention" and that article 3 applies "irrespective of whether the

---

[54] *M.B.B. v Sweden, Communication Number 104(1998), CAT/C/22/D/104/1998.*

[55] See for example *Seid Morten Aemei v Switzerland, Communication Number 34 (1995), CAT/C/18/D/34/1995.*

[56] Human Rights Committee, General Comment 20, Article 7, Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI\GEN\1\Rev.1 at 30 (1994), available at: http://www1.umn.edu/humanrts/gencomm/hrcom20.htm.

individual concerned has committed crimes and the seriousness of those crimes".[57]

## The fate of Uighur activists forcibly returned to China

Over recent years, Amnesty International has monitored growing numbers of forced returns of Uighur asylum seekers and refugees to China from several neighbouring countries, including Nepal, Pakistan, Kazakstan and Kyrgyzstan. Several Uighurs accused of committing criminal offences have also been forcibly returned, either clandestinely or under the terms of extradition agreements between China and other countries.

Such cases appear to have increased with the intensification of China's crackdown in the XUAR following the attacks in the USA of 11 September 2001, and in some cases there is evidence that the Chinese authorities have instigated or taken part in such returns. The fate of Uighurs returned to China is often difficult to establish due to tight restrictions on information, including the threat of reprisals against family members who pass such information abroad. However, in some recent cases, returnees are reported to have been subjected to serious human rights violations, including torture, unfair trial and even execution.

Amnesty International opposes the return of anyone to a country where they might face torture, execution or other serious human rights violations. The following are examples of countries where Uighurs are at particular risk of forcible return or where Uighurs are known to have been been forcibly returned to China over recent years, particularly since the events of 11 September 2001.

### Nepal

*Nepal has been party to the ICCPR and the Convention against Torture since 1991, but has not ratified the Refugee Convention. The Office of the United Nations High Commissioner for Refugees (UNHCR) plays a key role in assessing asylum seeker applications in Nepal, including Uighur cases.*

---

[57] *Civil and Political Rights including the questions of torture and detention, report of the newly appointed Special Rapporteur on torture, Mr Theo van Boven*, Commission on Human Rights 58th Session, 26 February 2002, UN Doc. E/CN.4/2002/137 at paragraph 14. At the UN Commission on Human Rights this year, a reference was made for the first time in the Torture Resolution (2004/41) to the principle of non-refoulement. This resolution was adopted by consensus, reiterating that the principle of *non-refoulement* in respect of torture and cruel, inhuman or degrading treatment or punishment is part of customary international law.

*China's relations with Nepal have long been complicated by the presence of over 20,000 exile Tibetans in Nepal, many of whom have campaigned for religious freedom and independence for Tibet. During an official visit to China in July 2002, King Gyanendra of Nepal reportedly promised that his country would seek greater cooperation from China on the issue of Tibet and that he would not allow people inside Nepal to "agitate against China".[58] In return, former Chinese President Jiang Zemin reportedly offered "moral support" for the Nepalese authorities' struggle with "Maoist rebels" in Nepal.[59] Until recently, few Uighurs are known to have fled to Nepal from China. However, since 2000, at least 16 Uighurs are reported to have arrived in Nepal to seek asylum. Several cases of refoulement which have emerged over the last two years have shown that the country is not a safe country of asylum for Uighur exiles.*

In one recent case, a Uighur activist, **Shaheer Ali** (also known as Shir Ali, Xieraili, Wujimaimaiti Abasi or Ghojamamat Abbas) was executed after being forcibly returned from Nepal to China. He had been recognised as a refugee by UNHCR in Nepal and was awaiting resettlement at the time of his detention and subsequent forcible return (*refoulement*).

Shaheer Ali was a young Uighur nationalist from the city of Khotan (Hetian) in the south of the XUAR. According to his testimony, which he requested be withheld until he was "in a safe place", he had been imprisoned and tortured in China in 1994 in connection with his political activities. He fled to Nepal via Tibet in November 2000 and applied for recognition as a refugee with UNHCR. He was recognised as a refugee in May 2001. In spite of this, he was detained by the Nepalese immigration authorities in December 2001 and held in Hanuman Dhoka district police office in Kathmandu for several weeks.

He is believed to have been taken away from the police office by a group of Nepalese police and officials from the Chinese embassy in Nepal on or around 10 January 2002 and forcibly returned to China shortly thereafter. One, possibly two, other Uighur detainees were taken away at the same time. One of them, **Abdu Allah Sattar** (also known as Abdullah Sattar), had been detained at the same time as Shaheer Ali and is also presumed to have been forcibly returned to China. Amnesty International has received no further information on his current whereabouts. The identity of the third possible returnee remains unclear.

Amnesty International received no further information on the fate of Shaheer Ali until October 2003, when it was reported in the official Chinese media that he had been executed. The exact date of Shaheer Ali's execution is unclear, but he was reportedly

---

[58] *Kathmandu Post*, 12 July 2002.
[59] Ibid.

sentenced to death in March 2003 after being convicted of various offences including "separatism", "organizing and leading a terrorist organization" and "illegal manufacture, trading and possession of weapons and explosives". His sentence was confirmed on appeal by the Xinjiang High People's Court.

According to a report on the official Chinese website www.tianshan.net on 21 October 2003, the court accused Shaheer Ali of leading a number of "terrorist" organizations, including the East Turkestan Islamic Party of Allah (ETIPA).[60] The court claimed that he had instructed members of the group to carry out various bombings, assassinations and other activities. It also stated that he conspired and engaged in "large-scale incitement and propaganda to split the country" which culminated in the Gulja (Yining) incident of 5 February 1997, which was described as an incident of "beating, smashing and looting".[61]

Shaheer Ali was tried in secret and it is not known what evidence was presented in court to substantiate the accusations against him. According to interviews that Shaheer Ali gave to *Radio Free Asia* while he was in Nepal and which were made public after his death, he claimed to belong to a group called the East Turkestan Islamic Reform Party which he described as a 'non-militant' organization.[62] He also described eight months of torture while imprisoned in Guma (Pishan) county, XUAR, in 1994, including being beaten with shackles, shocked in an electric chair and having metal nails pushed under his toenails, in an attempt to make him confess to various offences.

The execution of Shaheer Ali led to renewed concern about the fate of Abdu Allah Sattar (mentioned above) and another Uighur, **Kheyum Whashim Ali** (also known as Washim Ali), who was forcibly returned from Nepal in mid-2002. Kheyum Whashim Ali was recognised as a refugee by UNHCR in Nepal in October 2001, but was arrested and detained by the Nepalese immigration authorities soon afterwards. He was transferred to Hanuman Dhoka district police office on 1 May 2002 apparently for "investigation", although the charges against him were unclear. He was reportedly taken to the office of the Chief District Officer in Kathmandu on 23 May 2003 before being taken away again to an unknown location. According to one eyewitness, Kheyum Whashim Ali was in tears as he was being taken away.

It is not known exactly when Kheyum Whashim Ali was forcibly returned to China, but in February 2003, Amnesty International received reports that he was detained in Michuan prison, around 40km outside Urumqi, the regional capital. Later reports from

---

[60] As noted below, the Chinese authorities reportedly consider ETIPA to be another name for ETIM.
[61] Article available in Chinese on official *Xinjiang Xinwenwang* website at http://www.xjnews.com.cn/news/2003-10-21/20031021111742.htm.
[62] "Executed Uyghur refugee left torture testimony behind", *RFA,* 23 October 2003.

unofficial sources indicated that he was being held in isolation in a single cell; his face was swollen and he lacked mobility in his legs, allegedly as a result of torture or ill-treatment. Unconfirmed reports suggest that he has been charged with "subversion, separatism, involvement with an illegal organization and collecting money to buy weapons". To date, it remains unclear whether Kheyum Whashim Ali has been tried and sentenced. Amnesty International is seriously concerned for his safety.

Amnesty International considers that the obligation not to return an individual to a country where they face torture or other serious human rights violations should be fulfilled by the receiving country, in this case, Nepal. Nepal is not party to the Refugee Convention, but is nevertheless still bound by the principle of *non-refoulement* which is a fundamental principle of customary international law. China is a party to the 1951 Refugee Convention and the apparent involvement of Chinese officials in these cases in the receiving country raises serious questions over China's commitment to uphold international law. One of the fundamental principles of international refugee protection is that the granting of asylum is a peaceful and humanitarian act and that, as such, it cannot be regarded as unfriendly by any other state.[63] China risks undermining this important principle and the whole international framework of refugee protection through actions that put undue pressure on states hosting Chinese asylum-seekers and refugees, asylum-seekers themselves and other Chinese nationals in exile.[64]

Concerns about China's involvement are heightened by another well-publicised incident in Nepal last year, involving the *refoulement* of 18 Tibetans, including three women and eight children, in a joint operation carried out by officials from Nepal and China.[65] Eyewitnesses described the Tibetans as being carried crying and screaming into a vehicle believed to be owned by the Chinese embassy before being driven in the direction of the border by Chinese and Nepalese officials. The operation was carried out on 31 May 2003 in the face of widespread international concern expressed by UNHCR, governments and NGOs. The 18 were detained upon arrival in Tibet. Some of those who were later

---

[63] See, for example, the Declaration on Territorial Asylum, adopted by General Assembly resolution 2312 (XXII) of 14 December 1967.
[64] China's failure to uphold its international obligations under the Refugee Convention, to which it is a party, is illustrated more directly by its treatment of North Korean asylum seekers and refugees who cross the border into northern China from North Korea. China has officially classified such people as "economic migrants", denying them access to refugee determination procedures, including through UNHCR, despite evidence that many have genuine claims to asylum. Meanwhile, China has forcibly returned hundreds of North Koreans to an uncertain fate in North Korea, possibly including torture and execution, in violation of its obligations under the Refugee Convention. For further information, see Amnesty International, *Democratic People's Republic of Korea: Starved of Rights: Human Rights and the Food Crisis in the Democratic People's Republic of Korea*, January 2004 (ASA 24/003/2004), pp.29-33.
[65] See Amnesty International, *Nepal: forcible return of Tibetans to China unacceptable*, 2 June 2003 (ASA 31/021/2003).

released described being subjected to torture and ill-treatment in detention, including being kicked, beaten, prodded with electroshock batons, having sewing needles inserted under their fingernails, being forced to stand naked for long periods of time and being subjected to humiliating comments about their religious beliefs. Most were released a few months later, but at least one of them, believed to be the guide for the group, known as Tashi, was reportedly transferred to a prison in the Tibet capital, Lhasa. His current legal status and condition remain unclear, but he is believed to have received particularly harsh treatment because of his role as the guide.[66]

## Pakistan

*Pakistan is not party to the ICCPR, Convention against Torture or the Refugee Convention. It is nevertheless still bound by the principle of non-refoulement, which is a fundamental norm of customary international law. UNHCR plays an essential role in conducting refugee status determination in Pakistan, including on Uighur cases.*

*There are close trading links between the XUAR and Pakistan via the Karakorum highway and Pakistan has also reportedly been the source of numerous Islamic materials that have been smuggled into the XUAR in recent years.[67] Thousands of Uighurs are reported to have travelled backwards and forwards to Pakistan for business and religious purposes, particularly to study in Pakistan's madrassas. In addition, several camps used to train "terrorists" have reportedly been located in Pakistan, and some reports suggest that Uighurs have been among those trained in such camps.[68] China has also claimed that around 600 Uighurs escaped from Afghanistan to northern Pakistan in the context of the conflict in Afghanistan in 2001, but Amnesty International has been unable to verify this claim.*

*Following the 11 September 2001 attacks in the USA, China and Pakistan have sought to strengthen their cooperation in combating acts of "terrorism". In December 2003, it was reported that Pakistani troops had killed Hasan Mahsum, the leader of the East Turkestan Islamic Movement (ETIM), in the South Waziristan region of Pakistan on 2 October 2003. It is unclear why this announcement was delayed, but the information was publicised just a few days after China published its official list of Uighur "terrorists" and "terrorist organizations" based abroad, which was headed by Hasan Mahsum's name (see below).*

---

[66] For a detailed description of this incident see "Dangerous Crossings: Conditions impacting the flight of Tibetan refugees", *International Campaign for Tibet (ICT)*, June 2004. See also "Tibetan refugee describes torture, extortion in Chinese jail", *RFA*, 24 December 2003; "Seven of 18 Tibetans repatriated from Nepal still imprisoned", *World Tibet Network News, ICT*, 23 December 2003; and *Tibet Press Watch, ICT* January/February 2004.
[67] See Dillon, 2004, op cit, p.138.
[68] See Congressional Research Service Report, 17 December 2001, op. cit.

24    *Uighurs fleeing persecution as China wages its "war on terror"*

*In March 2003, the two countries agreed to enter into an extradition treaty to facilitate the exchange of prisoners. The treaty was formally signed during a visit to Beijing by Pakistani President Pervez Musharraf in November 2003. According to the official Chinese media, President Musharraf stated during the visit that "his country will never allow anybody, including the terrorist force of 'East Turkestan', to use the territory of Pakistan to carry out any form of anti-China activities".[69] In January 2004, it was further reported that China had forwarded a list of Chinese "terrorists and outfits linked to al-Qaeda" to Pakistan, asking the authorities to initiate action against these groups.[70] Amnesty International has not seen a copy of this list, but is concerned that it may contain individuals who have engaged in peaceful political activism or independent religious practices, as well as those who may be involved in violent activities. In May 2004, a XUAR public security official, Ma Mingyue, was quoted in the Pakistani press as saying that some "terrorists" and ETIM members from Xinjiang were hiding in the Pakistani cities of Lahore and Rawalpindi.[71]*

At least seven Uighurs are known to have been forcibly sent back to China from Pakistan since the beginning of 2002, some of whom had been recognised as refugees by UNHCR and were awaiting resettlement in other countries. The cases detailed below are those which Amnesty International has been able to document. However, it is feared that other Uighurs may also have been secretly returned from Pakistan in violation of their fundamental human rights and in violation of Pakistani domestic law on extradition.[72]

In May 2002, it was announced by Chinese officials at a news conference in Urumqi, that **Ismail Kadir** (or Ilham Kadir), alleged to be the "third highest leader" of ETIM, had been returned to China in March 2002 following his arrest in Pakistan earlier the same month.[73] Official reports suggested that he had been captured by Pakistani authorities in Kashmir. Overseas Uighur activists, however, claim that he was arrested in the city of Rawalpindi, northern Pakistan, home to a sizeable community of exile Uighurs.[74] They have also disputed official allegations that he was an ETIM member. Since his forcible return to China, no further information has become available about Ismail Kadir's place of detention or legal status. Given his alleged background, Amnesty

---

[69] "China, Pakistan Highlight Cooperation in Beijing", *Xinhua*, 4 November 2003.
[70] See: "Now China hands over list of terrorists to Pakistan", *Press Trust of India*, Islamabad, 17 January 2004, and "China corners Pak on terror", *Times of India*, 17 January 2004.
[71] ANI, 29 May 2004, Islamabad.
[72] For further information on transfers of foreign nationals from Pakistan in the context of the "war on terror", see Amnesty International: *Pakistan: Transfers to US custody without human rights guarantees*, June 2002 (ASA 33/011/2002).
[73] "China says terror suspect handed over by Pakistan", *AP*, 27 May 2002.
[74] See: http://www.uyghuramerican.org/statements/letter-to-colin.html

International fears that he may have been subjected to torture, and possibly sentenced to death and executed, as is often the case with such prisoners.

On 2 February 2002, two Uighurs, **Ismayil Abdusemed Haji** (also known as Ilham), and **Abdulhakim** were arrested in Rawalpindi, and unconfirmed reports suggest that they were handed over to China immediately without any legal process.[75] Some reports indicate that Chinese officials in plain clothes accompanied Pakistani police at the time of their arrest. It is possible that Ismayil Abdusemed Haji may be a pseudonym for Ismael Kadir, mentioned above. Amnesty International has received no further information about the fate of the two men.

**Elham Tohtam, Ablitip Abdul Kadir** and **Enver Tohti** (or **Enver Dawut**) all went missing in Rawalpindi, northern Pakistan on or around 22 April 2002. All had reportedly applied to UNHCR for asylum and were awaiting the results of their applications. Elham Tohtam was picked up by the police at around 6.30am and, according to eye-witnesses, blind-folded and led away to an unknown destination. Elham Tohtam is originally from Gulja city in the XUAR and was detained and tortured there in 1996 and 1999 for his suspected political activities. In April 1999, fearing further persecution, he fled first to Kyrgyzstan, then Kazakstan. In November 2000 he went to Pakistan where he lived with his wife and four children in Rawalpindi. He had approached UNHCR in Islamabad and the Australian government for emergency visas to Australia, where he has family members. Both Ablitip Abdul Kadir and Enver Tohti are also from Gulja. Ablitip Abdul Kadir lived together with his wife and three of his children in Pakistan. Unofficial sources suggest that the three were detained upon their return to China, although the charges against them and other details about their imprisonment remain unknown.

Three other Uighurs from Gulja are reported to have been arrested in Rawalpindi at around the same time. Their names are **Golamjan Yasin, Tilivaldi** and **Ablikim Turahun**. One Uighur from Kazakstan, identified as **Ezizhan**, and one Kyrgyz from Gulja, identified as **Zayir** (or Zaher), are also reported to have been arrested. Their fate remains unknown.

More recently, on 16 July 2003, two Uighurs, **Abdulwahab Tohti** and **Muhammed Tohti Metrozi** went missing in Rawalpindi. Both were reportedly engaged in pro-independence activities in the XUAR before fleeing to Pakistan. Muhammed Tohti Metrozi had become a student leader in Pakistan and had already been recognised as a refugee by UNHCR in Pakistan. He was awaiting resettlement to Sweden.

They both "disappeared" after Muhammed Tohti Metrozi received a telephone call from an official who reportedly worked for the Pakistani Intelligence Bureau asking

---

[75] See Amnesty International, ASA 33/014/2002, op cit.

them to come for a meeting. They went to meet the official and unconfirmed reports suggest that the two were transferred to China around three days later. As of August 2003, they were reported to be detained in Urumqi.

Amnesty International recently received information from an unofficial source that Muhammed Tohti Metrozi was tried on or around 10 April 2004 in Urumqi. The accusations against him reportedly related to sheltering Uighur activists who fled from China to Pakistan, belonging to a "separatist" group and applying to UNHCR for asylum. Muhammed Tohti Metrozi reportedly rejected these accusations, but the outcome of the trial, his health condition, and his exact place of detention remain unknown. No further information is available about the fate of Abdulwahab Tohti.

Fears of the safety of those returned are heightened by an earlier case in Pakistan when, in 1997, a group of around 14 Uighur religious students were arrested in Gilgit close to the Chinese border and handed over to the Chinese authorities without any legal process. They were reportedly summarily executed on the Chinese side soon after being driven across the border.

## Central Asia: Kazakstan and Kyrgyzstan

*The ICCPR has been ratified by Kyrgyzstan, and signed, but not ratified, by Kazakstan. Both states are parties to the Convention against Torture and the Refugee Convention. However, Kazakstan does not allow Uighurs access to the national asylum procedure, reportedly due to the delicate relationships between these countries and China. In Kyrgyzstan, Uighur asylum seekers can theoretically apply to a national procedure for protection, but do not do so, apparently for fear that the Kyrgyz authorities will pass this information on to the Chinese authorities. UNHCR therefore plays the key role in assessing refugee protection claims in these countries.*

*Their shared border with China and their large native Uighur populations make Kazakstan and Kyrgyzstan the most common first countries of 'refuge' for Uighurs fleeing the XUAR. Yet, they are possibly the most unsafe countries of asylum for Uighurs. In the context of its policies in the XUAR, China has made great efforts to ensure that its Central Asian neighbours cooperate in returning Uighurs who are suspected of being "separatists, terrorists or religious extremists". This relationship has been strengthened in recent years under the auspices of the Shanghai Cooperation Organization (SCO) which groups China, Russia, Kazakstan, Kyrgyzstan, Uzbekistan and Tajikistan. The Secretariat of the SCO was formally established in Beijing in January 2004 and a regional "anti-terror" centre was officially opened in Tashkent, Uzbekistan, in June 2004. Largely spearheaded by China, the organization has been described as a "major force"*

*in combating "terrorism" by Chinese officials[76] and one of its key aims appears to be to quell the activities of Uighur nationalists in both the XUAR and Central Asia. China also has extradition agreements with both Kazakstan and Kyrgyzstan.[77]*

*According to the official Chinese media, during a visit to the XUAR in May 2004, President Nazarbayev of Kazakstan said that 'Kazakstan will always adhere to the one-China policy and is willing to strengthen cooperation with China in the combat against terrorism, separatism and extremism for regional peace and stability'.[78] This, and other statements made by SCO members, suggest that China's neighbours appear to have adopted the China's concept of "separatism", which encompasses peaceful opposition activities, and are ready to cooperate with China to crack down on such activities. Amnesty International is concerned that such cooperation appears to be aimed at ensuring the forcible return of Uighurs to China, notwithstanding the high risks they face of serious human rights violations, including torture, arbitrary detention and even execution.*

Both Kazakstan and Kyrygzstan are home to large Uighur communities, comprising Uighur nationals of these countries as well as those who have arrived from the XUAR more recently.[79] Local Uighur activists in both countries have expressed alarm at a recent series of media reports which purport to denigrate Uighurs as a whole, including by describing Uighurs generally as "separatists" or "terrorists". Activists in the region have suggested that such articles may be instigated by local "pro-China forces" and the Chinese security forces.[80]

Uighur asylum seekers in both Kazakstan and Kyrgyzstan face an ever-present risk of being detained by the police as "illegal immigrants", which puts them in greater danger of being forcibly returned to China. One Uighur asylum seeker, who wished to remain anonymous, reported that the police had said "you are a separatist, you are a terrorist" when they arrested him recently in the Kyrgyz capital, Bishkek. When he presented an official document stating that he was a person of concern to UNHCR, they

---

[76] "Official says Shanghai group 'major force' in combating terrorism", *Xinhua*, 15 January 2004.
[77] China and Kazakstan signed an extradition treaty in July 1996 (see "Brief Introduction to Relations between China and Kazakstan", *Xinhuanet*, 21 May 2003*); Extradition treaty ratification documents were formally exchanged between Kygyzstan and China in March 2004 (see "Kyrgyzstan, China endorse extradition accord", *Kabar news agency*, 29 March 2004)
[78] "Kazakh president holds talks with Xinjiang party leader during China visit", *Xinhua*, 19 May 2004.
[79] There are officially reported to be around 250,000 Uighurs in Kazakstan and 50,000 in Kyrgyzstan, but the real figures may be much higher.
[80] See, for example, "Newspaper slur angers Uighurs", *Institute for War and Peace Reporting (IWPR)*, 25 January 2004.

reportedly replied: "this is like toilet paper – it won't help you." He was taken to a detention centre but released later the same day following intervention by UNHCR.

Local NGOs working with Uighur asylum seekers in Kazakstan and Kyrgyzstan have also reported growing numbers of cases where Uighurs in these countries have "disappeared" and are presumed to have been forcibly returned to China. Unconfirmed reports suggest that Uighurs attempting to cross the border from China are regularly sent back into China by border guards on the Kazak/Kyrgyz side of the border unless they are able to demonstrate that they are travelling for legitimate trading or other purposes. It is extremely difficult for local NGOs to obtain detailed information about such cases.

Some NGOs in Kazakstan and Kyrgyzstan who assist Uighurs from China have reportedly been subjected to threats, intimidation and harassment, often from unknown or unidentified sources, apparently aimed at preventing them from conducting their advocacy activities. NGOs assisting Uighurs in Kazakstan have reported increased levels of surveillance and monitoring of Uighurs by border guards on the Chinese side of the border, checking to see whether people were carrying sensitive information, including information about alleged human rights violations, such as details about political prisoners and prisons. One activist told Amnesty International that he used to have several contacts in the XUAR who used to regularly pass on information on human rights violations, but this network has now disappeared. He assumes that his informants have either been arrested or are in hiding.

Another Uighur said that on a recent trip home to the XUAR via the Kazak border, he was surprised to discover that guards on the Chinese side of the border, who used to be Chinese nationals of Kazak and Uighur ethnicity, are now all Han Chinese. He reported that he was treated in a discriminatory manner by the guards, a conflict which was exacerbated by communication difficulties – he could not speak Chinese and they could not speak Uighur or Russian. He was eventually allowed to pass through the border on payment of a small fee.

Local NGOs in the region who assist Uighurs from China estimated that Kazakstan may have returned around 20 Uighurs, and Kyrgyzstan around 50 Uighurs in recent years, but the exact number is impossible to determine. On 23 May 2002, two Uighurs, **Memet Sadik (or Mamet Sadyk)** and **Memet Yasin (or Mamet Yasyn)** were reportedly handed over to China by the Kyrgyz authorities on suspicion of being "international Islamic terrorists".[81] According to a spokesman from the US embassy in Beijing, they were suspected of being ETIM members who were planning "terrorist attacks" in Kyrgyzstan, including an attack on the US embassy in the Kyrgyz capital,

---

[81] See *East Turkestan: Genocide, prison, torture and linguacide in the name of "Anti-terrorism"*, ETIC report 2003, 5 Sept 2003, p.13, quoting Kyrgyz news agency.

Bishkek.[82] Kazak Commercial Television later reported that they had been arrested in a "joint operation by Chinese, US and Kyrgyz special services", adding that "a detailed chart of localities and explosives had been seized from them."[83] The report concluded by stating that "the fact that both the terrorists are ethnic Uighurs provides grounds that they are linked to the East Turkestan Islamic Movement." The case was later cited by the US in part justification for its decision to formally list ETIM as a "terrorist organization" (see below). No further information is available about the current whereabouts or legal status of the two men. Amnesty International fears that they may be sentenced to death or may have already been executed.

On 31 March 2004, it was reported in the official Chinese media that two men, **Rahmutulla Islayil** and **Arken Yakuf**, both Uighurs from Urumqi, had been executed after being transferred to China from Kyrgyzstan in July 2002.[84] They were reportedly sentenced to death in January 2004 after being convicted of the murder of a Chinese diplomat and his chauffeur in the Kyrgyz capital, Bishkek, in June 2002. Shortly after their arrest in Bishkek, the Kyrgyz Interior Minister reportedly suggested that the crime was not political in nature, but was rather the accidental result of a struggle for power between criminal gangs.[85] However, at the time of their handover to China, it was announced that according to Kyrgyz Foreign Ministry data, the two were "active members" of the East Turkestan Liberation Organization (ETLO), a group that had previously been condemned by China as a "terrorist organization".[86]

Official Chinese sources indicate that they were "officially arrested" (i.e. charged) in China on 31 October 2002.[87] They were sentenced to death on 12 January 2004 by the Urumqi Intermediate People's Court.[88] Their appeal to the Xinjiang Regional High People's Court was rejected, and the court issued the execution order on 25 March 2004.[89] No further details have been made public about the nature of the evidence against them or the circumstances of their trial.

Several other Uighurs of Chinese nationality have been convicted and imprisoned in Kyrgyzstan for serious offences and may be at risk of extradition to China where they would be at high risk of torture and execution. **Bakhramjan Alimov** (or Berhamjan), **Askar Tohti** (or Askar Tokhti) and **Ali Mahsum** (or Ali Mansum) were sentenced in

---

[82] See "US Warns of Plot by Group in W. China", *Washington Post,* 29 August 2002.
[83] "Kyrgyz, US, Chinese special services allegedly detain two Uighur 'terrorists'" *Kazak Commercial TV,* 10 September 2002.
[84] "Murderers of Chinese envoy to Kyrgyzstan executed", *Xinhua,* 30 March 2004.
[85] *Kyrgyz public educational TV,* 4 July 2002.
[86] ITAR-TASS, *BBC Monitoring,* 9 August 2002.
[87] *Xinhua,* 30 March 2004, op cit.
[88] Ibid.
[89] Ibid.

March 2001 in connection with bomb explosions which killed four people in the city of Osh, Kyrgyzstan in 1998.[90] Bakhramjan Alimov and Askar Tohti were sentenced to death, but were not executed due to a moratorium on executions in Kyrgyzstan. Ali Mahsum received a 25-year prison term. Supporters of the men claimed that they had nothing to do with the bombings, but rather that they had been targeted and prosecuted because of their ethnic origin.

More recently, on 31 December 2002 in the Kyrgyz capital, Bishkek, three Uighurs, **Ablimit, Tohti Niyaz** and **Kayser Jalal** were reportedly sentenced to 16, 17 and 25 years in prison respectively for forming an "unlawful East Turkestan organization" and "illegal possession of weapons." Their lawyers reportedly claimed that they were convicted on the basis of fabricated evidence.[91] Amnesty International fears that the formal ratification of an extradition treaty between China and Kyrgyzstan in March 2004 increases the risk that they will be returned to China where they are likely to face torture and execution.

In April or May 2003, **Abdukakhar Idris**, a Uighur asylum seeker reportedly "disappeared" in Almaty, Kazakstan. He is believed to have been detained and forcibly returned to China. According to a copy of his testimony, obtained by a local NGO before he went missing, Abdukakhar Idris, aged 22, is a former tailor and bookkeeper from Kashgar in the southern part of the XUAR. He fled across the border in April 2001 after being detained for investigation for three months in connection with his funding of a sports club which the authorities suspected of being a front for Uighur oppositional activities. Abdukakhar Idris was detained in the Kazak border town of Panfilov on 19 April 2001 and reportedly sentenced to one year in prison by Panfilov District Court on 19 September 2001 for "illegally crossing the border". He was released early, on 7 March 2002, after which he approached UNHCR for asylum. He then lived in hiding in Almaty, until he went missing around one year later after reportedly being taken from his home by Kazak police. No further information is available about his current whereabouts, legal status or state of health.

In late 2001, two Uighurs, **Ahat Memet** (aged 21) and **Turgan Abbas** (aged 27), both Islamic students from Yerken county, Kashgar prefecture, went missing in Kazakstan and are believed to have been forcibly returned to China. They had fled from the XUAR in August 1999, after their release from Yerken detention centre, Kashgar prefecture, where they had reportedly been detained and interrogated for one month on suspicion of engaging in "illegal religious" and "separatist" activities. They were reportedly arrested on their arrival in Kazakstan and sentenced in April 2000 to eighteen

---

[90] They were sentenced together with two others of Turkish and Russian nationality: Ahmet Gyunan and Nazar Chotchayev who received death sentences in connection with the same case.
[91] See: *Brief Report on the situation with human rights of Uighurs in Kyrgyzstan*, ETIC, 16 Feb 2002.

months in prison for "illegally crossing the border". Following their release, they applied to UNHCR in Almaty for refugee status. Shortly afterwards, they moved to Charyn village, 250 km outside Almaty, after reportedly being harassed by the police. Unofficial sources report that they were taken away from their home in Charyn by uniformed officers, and that the two were being detained in Panfilov in December 2001. Since then, there was no further news of their fate until it emerged earlier this year that the two were reportedly imprisoned in the XUAR. There are no further details about their exact whereabouts, legal status or state of health.

Amnesty International's concerns for their safety are heightened by an earlier case of forcible return from Kazakstan in February 1999 which reportedly resulted in death sentences and possible execution. **Hemit Memet, Kasim Mapir (or Kasim Mahpir)** and **Ilyas Zordun**, three young Uighur asylum seekers, who had reportedly participated in the Gulja demonstration of 5 February 1997, were forcibly returned to China by the Kazak Ministry of National Security on 11 February 1999. They had been arrested as they tried to cross the border into Kazakstan. It was later reported that two brothers of Hemit Memet, **Saydakhmet Memet** and **Zulfikar (or Zulikar) Memet**, had also been arrested in the XUAR for "assisting terrorists". They were held in Yengi Hayat prison in Gulja city and Zulfikar Memet was reportedly tortured in detention, including by having his fingernails pulled out. He was reportedly executed in secret in June 2000. Saydakhmet Memet was sentenced to six years in prison.

The fate of Hemit Memet, Kasim Mapir and Ilyas Zordun remains unclear. Some reports suggest that Hemit Memet was sentenced to death in a secret trial in July 1999, and that all three men had been executed in August 1999. Subsequent reports indicated however, that they did not face trial until March 2001, when they were given suspended death sentences after being convicted of "splitting the country, illegal storage of firearms, and illegally crossing the border". Amnesty International also received unconfirmed reports that they had been tortured in detention in order to force them to confess, but further details of their treatment remain unclear.

## USA: Uighurs held in Guantánamo Bay

*The United States of America (USA) has been party to the ICCPR since 1992 and the Convention against Torture since 1994. As a party to the 1967 Protocol relating to the Status of Refugees since 1968, it is also bound to accord protection to refugees under international refugee law.[92]*

---

[92] This protocol was adopted to extend the scope of the provisions of the Refugee Convention to take account of 'new refugee situations' that had arisen since 1951.

*The USA is home to a community of approximately 1,000 Uighurs, some of whom lobby the US government on their human rights and political concerns. Many expressed dismay when in August 2002, the USA complied with repeated requests from China to place the East Turkestan Islamic Movement (ETIM) on its list of "terrorist organizations", fearing that this would lead to an escalation in human rights violations in the XUAR. This listing, which was endorsed by the United Nations on 11 September 2002, corroborated China's previous condemnation of the group. Amnesty International has been unable to obtain credible, independent information which corroborates allegations that ETIM has been responsible for acts of violence. However, the group is little known and is believed to be relatively small and unrepresentative of many within China's Uighur community who have advocated respect for fundamental rights and freedoms or tried to exercise these rights peacefully. Since this listing was confirmed, official rhetoric has intensified in the Chinese media against "separatists, terrorists and religious extremists" in the XUAR as China has sought to interpret this move by the USA and the UN as an endorsement of its crackdown against all forms of dissent in the region.*

*The Chinese authorities have made regular references to this decision in their official reporting on the subject of "East Turkestan terrorists", ostensibly to demonstrate that the US supports China on this issue. For example, following bomb attacks in Spain in March 2004, the chair of the XUAR regional government, Ismael Tiliwaldi, reportedly stated that China would never allow such attacks to happen in the XUAR. He attributed the apparent lull in 'separatist' activities in the region to economic development and the decision by the US to add ETIM to its list of "terrorist groups".[93] Other statements made by the US urging China not to use the "war on terror" as a pretext to crack down on peaceful political dissent in the XUAR have never been reported in the official Chinese media.*

Amnesty International remains concerned about the treatment and fate of around 22 Uighurs who have been detained for more than two years in US military custody in Camp Delta, Guantánamo Bay, without charge or trial or access to any court, to legal counsel or to relatives. They were transferred there in early 2002 after being captured in the context of the international armed conflict in Afghanistan. In late 2001, China had officially called on the US to transfer any Uighurs captured in Afghanistan to its custody, but the US had reportedly refused to hand them over due to "differing interpretations of what constitutes a terrorist."[94]

The total number of Uighurs detained in the context of the conflict in Afghanistan remain unclear. Wang Lequan, the CCP Secretary and leading Chinese official in the XUAR, has reportedly claimed that around 300 were captured by US forces, 20 were killed, 600 had escaped to northern Pakistan and around 110 had returned to China and

---

[93] "China will never allow Madrid-like bomb attacks in Xinjiang: official", *AFP*, 12 March 2003.
[94] See "Uighurs taken in Afghanistan must be returned to China", *Reuters*, 11 December 2001.

been captured.[95] Amnesty International is unable to verify these figures, but if they are accurate, large numbers of Uighurs allegedly captured by the US remain unaccounted for.

In December 2003, Amnesty International issued an urgent appeal in response to reports that the US authorities were secretly negotiating with China the terms for the repatriation of those held in Camp Delta.[96] The organization expressed fears that the Uighurs would be at high risk of torture and possible execution if they were forcibly returned to China or to any third country where they would be at risk of subsequent transfer to China. These fears were heightened in May 2004, when it was reported that the US was reviewing the Uighurs' status to determine whether they posed a 'continuing threat', in which case they might be returned to China if the Chinese authorities could provide "persuasive documentation" of their links to "terrorist organizations".[97]

According to an unnamed US official quoted in the *Far Eastern Economic Review* (FEER), such detainees would only be returned 'if Beijing provides assurances that they will be treated in ways consistent with U.S. obligations under United Nations and other international conventions.'[98] Amnesty International has documented several cases where China has apparently failed to live up to human rights guarantees made to other governments, including the US government, indicating that such assurances should not be trusted.[99]

The same official also stated that the US would likely seek resettlement of the Uighurs in third countries if the above conditions could not be satisfied.[100] On 22 June 2004, another senior US official, who asked not to be named, reportedly stated that the US had been unable to find a country willing to take the Uighurs, but that they could not be sent back to China.[101]

Amnesty International's fears for the safety of the Uighur detainees are heightened by treatment which was allegedly meted out to them during a visit by an official Chinese delegation to Guantánamo Bay in September 2002. Amnesty International has received credible allegations that during this visit, which reportedly

---

[95] "China says terror suspect handed over by Pakistan", *AP*, 27 May 2002. Estimates given for the number of Uighurs in Afghanistan vary from 300 to 3,000, but, as academics have noted, these are extremely difficult to verify. See, for example: *Xinjiang - China's Muslim Far Northwest*, by Michael Dillon, RoutledgeCurzon, 2004, p.157.
[96] See Amnesty International Urgent Action, AMR 51/147/2003, and related updates, AMR 51/029/2004, AMR 51/044/2004, AMR 51/090/2004.
[97] *FEER*, 20 May 2004.
[98] Ibid.
[99] See Amnesty International, AMR 51/147/2003, op cit.
[100] *FEER*, 20 May 2004, op cit.
[101] "China torture fears hamper jail releases", *Financial Times*, 22 June 2004.

lasted between one and two weeks, Chinese officials took photographs of the Uighurs and interrogated them about their backgrounds. It is alleged that during this time, the detainees were subjected to intimidation and threats, and to "stress and duress" techniques such as environmental manipulation, forced sitting for many hours, and sleep deprivation, some of which allegedly occurred on the instruction of the Chinese delegation.

Chinese officials have since dismissed these allegations as "groundless."[102] Asked about these allegations during a Pentagon briefing on 3 June 2004, General James T. Hill of the US military would only confirm that various government delegations "have come and they have talked to their detainees", but stated that "we don't talk about what countries come" to Guantánamo. He said that foreign government delegations talk to their nationals "following our rules and under our direct supervision". Government memoranda released by the US administration in June 2004 show that various interrogation techniques have been approved for use at Guantánamo which go beyond normal US army doctrine and violate the international legal prohibition on torture and cruel, inhuman or degrading treatment. Methods authorized by the US Secretary of Defense in December 2002, for example, included sensory deprivation, stress positions, hooding, up to 20-hour interrogations, removal of clothing, forced shaving, and use of dogs to inspire fear. Numerous former detainees have alleged that they were ill-treated in US custody in Guantánamo or Afghanistan.

## Exporting repression: harassment of Uighur returnees, exiles or their families

Amnesty International has long been aware of measures reportedly taken by the Chinese authorities in the XUAR to monitor and restrict contacts between local Uighur families and their relatives abroad. Exile Uighur activists have reported that their telephone calls with their families are monitored by the authorities, making it impossible to discuss issues deemed sensitive by the authorities for fear of reprisals against their relatives. Other measures include denial of passports or other travel documents to family members who remain in the XUAR, effectively preventing them from visiting or joining their relatives abroad unless they travel illegally.[103]

Recent reports suggest that levels of control and repression have been stepped up over the last two years, as the authorities have apparently targeted families in an attempt to force Uighur exiles to return or prevent them from engaging in political activities abroad. One exile Uighur activist who works as a journalist told Amnesty International

---

[102] "China dismisses Amnesty report of help in abusing Guantanamo prisoners", *AFP*, 27 May 2004.
[103] Article 322 of the Chinese Criminal Law makes "illegally crossing a national boundary" an offence punishable with up to one year in prison.

that during a telephone call with members of his family in the XUAR in October 2003, his relatives said that the Chinese authorities knew every detail about his life abroad, including his telephone number and home address. Officials from the Chinese department of state security had apparently visited the family home saying that the journalist's activities were "bad and dangerous". The authorities had also apparently threatened other members of the family that they would not be given passports if he continues with his activities abroad. Other more distant relatives had apparently shunned his family for fear of reprisals.

In February 2004, seven Uighur acrobats, including five men and two women, from the Xinjiang Acrobatic Delegation, made a decision to leave their troupe and apply for asylum during a visit to Canada. It was subsequently reported that members of their families in the XUAR had been subjected to threats and intimidation from the local authorities in an apparent attempt to make them change their mind.[104]

One of them, a contortionist named **Aygul Memet**, aged 28 and the mother of a young daughter, reportedly stated: "They [local officials] threatened my family that if I did not go back, they would not see me again because they would not allow them to leave the country or let me go back."[105] She also claimed that the authorities had threatened to confiscate her family's house if she did not return.[106] Another acrobat, **Gulnar Wayit**, said: "My family was very happy for me, but they told me to stop calling them or it would give them more troubles...."[107]

The acrobats have reportedly claimed asylum on numerous grounds, including that they were not allowed to visit mosques for prayers; they were forced to eat during fasting periods; and that they were forced to eat pork and drink alcohol. A juggler, **Dilshat Sirajidin** stated: "We performed for the government and they used us to create this image of ethnic unity. We didn't have a choice. We had no right to oppose."[108] In reaction to these reports, Wang Lequan, the secretary of the XUAR Communist Party, claimed that the seven had been "deceived by overseas Xinjiang separatists", and that most were being held in Canada "against their will".[109] He added that their families wanted them to come home and that they would be treated "leniently" if they returned.[110]

---

[104] See "We had no rights: Acrobats", *Toronto Star*, 4 February 2004.
[105] Ibid.
[106] "Muslim women forced to drink, dance with male Chinese officials", *RFA*, 23 February 2004.
[107] *Toronto Star*, 4 February 2004, op cit.
[108] "The Uyghur acrobats who did the flip on China", by Stephen Sullivan, *Media Monitors Network*, 8 February 2004, available at
http://usa.mediamonitors.net/headlines/the_uygur_acrobats_who_did_the_flip_on_china.
[109] "Uighur acrobats from China defect after performance in Canada," *AFP*, 8 February 2004.
[110] Ibid.

**Mahmut Akatal,** a Uighur trader living in Turkey, who received Turkish citizenship following his departure from China in 1989, told Amnesty International that his son was detained for one month in Xinhe county, Aksu prefecture, after Mahmut Akatal gave an interview to the US-based broadcasting station, *Radio Free Asia,* in May 2003 about his arbitrary detention in the XUAR following a visit home in 1997. The police reportedly interrogated his son about why his father had moved to Turkey. He was released one month later after his relatives paid a fine. The family now has to obtain permission from the police if they want to travel outside Xinhe.

According to his testimony, during his own visit home in 1997, Mahmut Akatal was held in police custody for a total of 13 months in Urumqi and Aksu, followed by a period of five months' detention with charge or trial in a "Re-education through Labour" camp in Aksu. He was detained in connection with taking part in a Uighur pro-independence rally in Istanbul, although he denied his involvement. During police interrogation, he claimed he was beaten, deprived of sleep and threatened with dogs. In Aksu "Re-education through Labour" Camp he was forced to do hard labour, despite medical problems. He said the camp contained around 500 prisoners. All were Uighur political prisoners, including some who had been detained for reading the Koran. Following his release, Mahmut Akatal sued the authorities for wrongful detention, and eventually won his case – a positive, but unusual, event in China. The local authorities however refused to comply with a court order to pay him compensation, and he is still trying to win this from Turkey.

Mahmut Akatal's detention in 1997 indicates that the arbitrary detention and harassment of suspected Uighur nationalists who return to China is not a new phenomonen. However, recent moves by the Chinese authorities suggest that such measures are increasingly being employed as a deliberate strategy to curtail the peaceful political activities of Uighur pro-independence supporters abroad.

More recently, another Uighur activist, **Ahmed Yasin**[111] who had lived in Turkey for seven years and had also received Turkish citizenship, was detained by the police for ten days during a visit home to the XUAR in mid-2002. Ahmed Yasin had been involved in peaceful political activities in Istanbul including participating in demonstrations outside the Chinese consulate there. He claimed he had since been in contact with six other Uighurs based in Turkey, who had had similar treatment when they returned to the XUAR, but that most of them were too scared to publicise their experiences.

According to his testimony, upon arrival in the XUAR, Ahmed Yasin, was detained for ten days in a hotel, in which ten plain-clothes police and intelligence officers occupied both rooms adjoining his room. He was interrogated by successive police

---

[111] Not his real name

officers during this period, who videotaped and audiotaped the whole process. To his surprise, the officers were able to provide detailed information about various aspects of his life in Istanbul, including his home address, telephone number and work address, which the officers said they had obtained from informants operating within the Uighur community in Istanbul. One of the officers reportedly said: "We know everything that is happening in Istanbul – it's like watching TV".

During his interrogation, Ahmed Yasin was forced to write down all the political organizations and activities that he had been involved with in Turkey and threatened with imprisonment if he refused to cooperate. Eventually on the tenth day of interrogation, he agreed to sign a statement saying that he would not get involved with any movement that would "destroy China's unity". The officials then put on their uniforms and stood next to him to take a photograph of him holding the statement. He was then released and allowed to visit his family before returning to Turkey. Ahmed Yasin has since avoided getting involved in any Uighur political activities in Turkey for fear of punishment when he visits China again.

Amnesty International has received numerous reports of the Chinese authorities urging other countries to prevent or cancel political events organized by diaspora Uighur groups.[112] China's efforts to put pressure on other countries in connection with its own nationals, have also been highlighted by the recent expulsion from Syria of a renowned Uighur poet, **Ahmadjan Osman**, aged 40, a Chinese national who had been living in Syria for the last 15 years and had married a Syrian woman. Syria's decision to deport Ahmadjan Osman in early January 2004 came less than a month after China published its blacklist of "terrorist" suspects living abroad. The poet's name was not among those listed, but Ahmadjan Osman claimed that the Chinese authorities had put pressure on Syria to expel him, fearing that his poetry may become a rallying point for Uighur nationalists abroad.[113] He also believed that his occasional reporting for the US-based radio station, *Radio Free Asia*, may have been a factor in his expulsion. Ahmadjan Osman applied for asylum after he arrived in Turkey from Syria and was recognised as a mandate refugee by UNHCR in March 2004.[114]

---

[112] For example, China reportedly took such a stance towards the East Turkestan United Congress, which took place in Munich, Germany in April 2004 and an annual meeting of the Uyghur American Association in Washington DC in May 2004. The German and US authorities, however, resisted pressure to cancel these events and most participants were reportedly granted visas to attend.
[113] "Uyghur poet expelled by Syria seeks refugee status", *RFA*, 11 Feb 2004.
[114] The deportation of Ahmadjan Osman occurred in the context of an ongoing pattern of repression by the Syrian authorities of Islamist activists both from within the country and abroad. Such activists have long been labelled as "terrorists" and risk systematic torture or ill-treatment. Since the events of 11 September 2001 and in the context of its "cooperation" in combating "terrorism" the Syrian government has extradited Islamist activists to other countries and has tortured or ill-treated Syrians sent back to the country, including by the USA.

# Conclusion and Recommendations

The ongoing crackdown on the so-called "three evil forces" of "separatists, terrorists and religious extremists" is continuing to result in serious and widespread human rights violations directed against the Uighur community in the XUAR. The human rights situation in the region has deteriorated further following the events of 11 September 2001 as China uses the international "war on terror" as a pretext to justify its policies of repression in the region.

As part of this crackdown, there is evidence that China has increased its pressure on other states to forcibly return Uighurs based abroad who are suspected of so-called "separatist" or "terrorist" offences. In some cases, the Chinese authorities appear to have been actively involved in effecting such returns. Some of those who have been forcibly returned, including those who have sought asylum or been recognised as refugees, have reportedly been subjected to serious human rights violations, including torture, unfair trial and execution. The fate of other returnees remains unknown, often as a result of tight surveillance and other restrictions imposed by the local authorities on those who may be in a position to disclose such information.

The Chinese authorities have also put pressure on other states to curtail the peaceful activities of diaspora Uighur groups and individuals which attempt to document human rights abuses, support independence for the region and/or lobby the international community about their concerns.

In view of the serious and widespread human rights abuses in the XUAR, Amnesty International makes the following recommendations to the Chinese authorities and the wider international community:

## To the Chinese authorities:

- put an end to the extensive violations of civil, political, economic, social and cultural rights which are resulting from the current political crackdown in the XUAR, including arbitrary detention and imprisonment, incommunicado detention, unfair trials, executions after summary trials, and sweeping restrictions on religious, cultural and social rights;

- release all those detained in the XUAR in violation of their fundamental human rights, including Rebiya Kadeer, Tohti Tunyaz and other prisoners of conscience;

- make a clear distinction between activities which involve the peaceful exercise of civil, political, economic, social and cultural rights and those that would be internationally recognized as criminal acts; ensure that the grounds for detaining people are strictly limited to those activities which are internationally recognised as criminal offences;

- ensure that the detention and treatment of people suspected of having committed violent or other criminal acts for political ends, as well as their prosecution and trial, conform to international human rights standards;

- take effective measures to address long-standing grievances within the Uighur community about serious and widespread violations of their economic, social, cultural, civil and political rights;

- stop putting pressure on other states to forcibly return asylum seekers and refugees in violation of these states' obligations under international refugee and human rights standards;

- stop putting pressure on other states to prevent Uighur diaspora organizations and individuals from engaging in peaceful and legitimate activities in line with their fundamental human rights.

## To other governments, in particular the USA, Nepal, Pakistan, Kazakstan, Kyrgyzstan and other South Asian and Central Asian countries:

- with due recognition to the granting of asylum as a peaceful and humanitarian act, ensure that Uighur asylum seekers are given access to independent refugee determination procedures, including through the auspices of UNHCR where appropriate;

- refrain from returning to China any Uighur asylum seekers pending the outcome of their refugee status applications, and refrain from returning any Uighur asylum seekers to other countries where they would be at risk of forcible return to China and/or other human rights violations;

- refrain from returning to China any national of the PRC who is alleged to be associated with independent Islamic movements or "separatist" opposition

activities in China, who may be at risk of torture, the death penalty or other serious human rights violations upon their return to China;

- ensure that no Uighur asylum seekers are detained as a matter of routine, or otherwise in contravention of international standards, pending the outcome of their refugee status applications;

- ensure that Uighurs who have been recognised as mandate refugees by UNHCR, who cannot find effective protection in a first country of asylum, are able to be resettled in third countries as swiftly as possible;

- express concern about the extensive human rights violations currently taking place in the XUAR with the Chinese government.

**EXHIBIT 8**

*Redacted Version*
*for Public Filing*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et al.,

      Petitioners,

v.

GEORGE W. BUSH, et al.,

      Respondents.

Case 1:05-cv-00497-JR    Document 27-3    Filed 08/08/2005    Page 1 of 6

Civil Action No. 05-497 (JR)

## DECLARATION OF PIERRE-RICHARD PROSPER IN SUPPORT OF
## RESPONDENTS' SUPPLEMENTAL MEMORANDUM PURSUANT
## TO THE COURT'S INVITATION AT THE AUGUST 1, 2005 HEARING
### (Redacted Version for Public Filing)

CONFIDENTIAL

## DECLARATION OF PIERRE-RICHARD PROSPER

I, Pierre-Richard Prosper, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. (U) I am the Ambassador-at-Large for War Crimes Issues and have supervised the operation of the Department of State Office of War Crimes Issues (S/WCI) since July 13, 2001. In that capacity I advise the Secretary of State directly and formulate U.S. policy toward serious violations of the law of armed conflict committed in areas of conflict throughout the world. As the President's envoy, I travel worldwide and engage foreign government leaders and international organizations to build bilateral and international support for U.S. policies related to armed conflicts and international humanitarian law. Since September 11, 2001, my office has played a key role in maintaining a diplomatic dialogue with foreign governments whose nationals have been captured in connection with the armed conflict with the Taliban and al Qaida and who are detained at the U.S. Naval Base at Guantanamo Bay, Cuba. The following statements provide a general overview of the Department of State role in carrying out United States policy with respect to the transfer to foreign governments of detainees held at Guantanamo Bay and the process that is followed to ensure that any treaty-based obligations and United States policies are properly implemented. They are not intended to be an exhaustive description of all of the steps that might be undertaken in any particular case. I make these statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

CONFIDENTIAL

Classified by
United States Department of State
S/WCI - Pierre-Richard Prosper
E.O. 12958, For Reasons 1.4 (b) and (d)

2

~~CONFIDENTIAL~~

2. (U) The United States has no interest in detaining enemy combatants longer than necessary. The paramount goal is to ensure, to the maximum extent reasonably possible that transferring a detainee out of U.S. government control prior to the cessation of hostilities will not increase the risk of further attacks on the United States or its allies. The Secretary of Defense, or his designee, is generally responsible for approving the transfer of detainees from Guantanamo Bay to other governments either for release or for further detention, investigation, prosecution or control, as appropriate. On an ongoing basis, the Department of Defense is constantly reviewing the continued detention of each individual held at Guantanamo Bay Naval Base, Cuba.

3. (U) The Department of Defense consults with appropriate United States Government agencies, including the Department of State, before determining whether to transfer particular individuals. Of particular concern to the Department of State in considering the transfer of a detainee to a foreign government, either for release or continued detention, investigation, and prosecution, is the question of whether that government will treat the detainee humanely, in a manner consistent with its international obligations, and will not persecute the individual on basis of his race, religion, nationality, membership in a social group, or political opinion. The Department is particularly mindful of the longstanding policy of the United States not to transfer a person to a country if it determines that it is more likely than not that the person will be tortured or, in appropriate cases, that the person has a well-founded fear of persecution and would not be disqualified from persecution protection on criminal- or security-related grounds. This policy is consistent with the Convention Against Torture and other Cruel, Inhuman, or

~~CONFIDENTIAL~~

3

~~CONFIDENTIAL~~

Degrading Treatment or Punishment ("Torture Convention") and the Convention Relating to the

Status of Refugees ("Refugee Convention"). The Department of State advises the Department of

Defense and relevant agencies on the likelihood of persecution or torture in a given country and

the adequacy and credibility of assurances obtained from a particular foreign government prior to

transfer.



~~CONFIDENTIAL~~

4

CONFIDENTIAL



Page 5 of 6

CONFIDENTIAL

5

~~CONFIDENTIAL~~



05    Page 6 of 6

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on **8** August 2005.

Pierre-Richard Prosper

~~CONFIDENTIAL~~

**<u>EXHIBIT 9</u>**

1 of 1 DOCUMENT

Copyright 2002 The Washington Post
The Washington Post

March 11, 2002 Monday
Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 2048 words

**HEADLINE:** U.S. Behind Secret Transfer of Terror Suspects

**BYLINE:** Rajiv Chandrasekaran and Peter Finn, Washington Post Foreign Service

**DATELINE:** JAKARTA, Indonesia March 10

**BODY:**

Arriving here from Pakistan in mid-November, Muhammad Saad Iqbal Madni told acquaintances that he had come to Indonesia to disburse an inheritance to his late father's second wife. But instead of writing a check and leaving, he settled into a small boarding house in a crowded, lower-middle-class neighborhood, where he visited the local mosque and spent hours on end watching television at a friend's house.

Stocky and bearded, Iqbal, 24, betrayed little about his life in Pakistan, except to hand out business cards identifying him as a Koran reader for an Islamic radio station. In early January, however, the CIA informed Indonesia's State Intelligence Agency that Iqbal had another occupation, according to Indonesian officials and foreign diplomats. Iqbal, they said, was an al Qaeda operative who had worked with Richard C. Reid, the Briton charged with trying to detonate explosives in his shoes on an American Airlines flight from Paris to Miami on Dec. 22.

The officials and diplomats said the CIA provided information about Iqbal's whereabouts and urged Indonesia to apprehend him. A few days later, the Egyptian government formally asked Indonesia to extradite Iqbal, who carried an Egyptian as well as a Pakistani passport, a senior Indonesian official said. The Egyptian request alleged Iqbal was wanted in connection with terrorism, he said. It did not specify the crime, he said, but Indonesian officials were told the charges were unrelated to the Reid case.

By Jan. 9, Iqbal was in the hands of Indonesian intelligence agents. Two days later--without a court hearing or a lawyer--he was hustled aboard an unmarked, U.S.-registered Gulfstream V jet parked at a military airport in Jakarta and flown to Egypt, the Indonesian officials said.

Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries, including Egypt and Jordan, whose intelligence services have close

 

The Washington Post March 11, 2002 Monday

ties to the CIA and where they can be subjected to interrogation tactics--
including torture and threats to families--that are illegal in the United
States, the sources said. In some cases, U.S. intelligence agents remain closely
involved in the interrogation, the sources said.

"After September 11, these sorts of movements have been occurring all the
time," a U.S. diplomat said. "It allows us to get information from terrorists in
a way we can't do on U.S. soil."

U.S. officials would not comment on evidence linking Iqbal to Reid, but
Western diplomats in Jakarta said Iqbal's name appeared on al Qaeda documents
discovered by U.S. intelligence agents in Afghanistan. Indonesian officials said
U.S. officials did not detail Iqbal's alleged involvement with terrorism other
than to say he was connected to Reid, and as a consequence, he was highly sought
by the U.S. government.

Iqbal remains in custody in Egypt, intelligence sources said. The sources
said he has been questioned by U.S. agents but there was no word on his legal
status, a situation that resembles that of other Islamic activists taken into
custody in cooperation with the CIA.

In October, for instance, a Yemeni microbiology student wanted in connection
with the bombing of the USS Cole was flown from Pakistan to Jordan on a U.S.-
registered Gulfstream jet after Pakistan's intelligence agency surrendered him
to U.S. authorities at the Karachi airport, Pakistani government sources said.
The hand-over of the shackled and blindfolded student, Jamil Qasim Saeed
Mohammed, who was alleged to be an al Qaeda operative, occurred in the middle of
the night at a remote corner of the airport without extradition or deportation
procedures, the sources said.

U.S. forces seized five Algerians and a Yemeni in Bosnia on Jan. 19 and flew
them to a detention camp at the U.S. naval base at Guantanamo Bay, Cuba, after
they were ordered released by the Bosnian Supreme Court for lack of evidence--
and despite an injunction from the Bosnian Human Rights Chamber that four of
them be allowed to remain in the country pending further proceedings. The Human
Rights Chamber, created under the U.S.-brokered Dayton peace accords that ended
the 1992-95 war, was designed to protect human rights and due process.

U.S. involvement in seizing terrorism suspects in third countries and
shipping them with few or no legal proceedings to the United States or other
countries--known as "rendition"--is not new. In recent years, U.S. agents,
working with Egyptian intelligence and local authorities in Africa, Central Asia
and the Balkans, have sent dozens of suspected Islamic extremists to Cairo or
taken them to the United States, according to U.S. officials, Egyptian lawyers
and human rights groups. U.S. authorities are urging Pakistan to take the same
step with the chief suspect in the kidnapping and killing of Wall Street Journal
reporter Daniel Pearl.

In 1998, U.S. agents spirited Talaat Fouad Qassem, 38, a reputed leader of
the Islamic Group, an Egyptian extremist organization, to Egypt after he was
picked up in Croatia while traveling to Bosnia from Denmark, where he had been
granted political asylum. Qassem was allegedly an associate of Ayman Zawahiri,
the number-two man in Osama bin Laden's al Qaeda network. Egyptian lawyers said
he was questioned aboard a U.S. ship off the Croatian coast before being taken

  

The Washington Post March 11, 2002 Monday

to Cairo, where a military tribunal had already sentenced him to death in absentia. Egyptian officials have refused to discuss his case.

U.S. intelligence officers are also believed to have participated in the 1998 seizure in Azerbaijan of three members of Egypt's other main underground group, Egyptian Islamic Jihad, according to testimony provided to their attorneys in Cairo.

Also in 1998, CIA officers working with Albanian police seized five members of Egyptian Islamic Jihad who were allegedly planning to bomb the U.S. Embassy in Tirana, Albania's capital.

After three days of interrogation, the five men were flown to Egypt aboard a plane that was chartered by the CIA; two were put to death. The five were among 13 suspects known to have been picked up in the Balkans with U.S. involvement and taken to Egypt for trial.

Between 1993 and 1999, terrorism suspects also were rendered to the United States from Nigeria, the Philippines, Kenya and South Africa in operations acknowledged by U.S. officials. Dozens of other covert renditions, often with Egyptian cooperation, were also conducted, U.S. officials said. The details of most of these operations, which often ignored local and international extradition laws, remain closely guarded.

Even when local intelligence agents are involved, diplomats said it is preferable to render a suspect secretly because it prevents lengthy court battles and minimizes publicity that could tip off the detainee's associates. Rendering suspects to a third country, particularly Muslim nations such as Egypt or Jordan, also helps to defuse domestic political concerns in predominantly Muslim nations such as Indonesia, the diplomats said.

Sending a suspect directly to the United States, the diplomats said, could prompt objections from government officials who fear that any publicity of such an action would lead to a backlash from fundamentalist Islamic groups.

In Iqbal's case, Indonesian government officials told local media that he had been sent to Egypt because of visa violations. A spokesman for the immigration department said Iqbal failed to identify a sponsor for his visit to Indonesia on his visa application form, which was submitted in Islamabad, Pakistan.

A senior Indonesian government official said disclosing the U.S. role would have exposed President Megawati Sukarnoputri to criticism from Muslim-oriented political parties in her governing coalition. "We can't be seen to be cooperating too closely with the United States," the official said.

The official said an extradition request from Egypt and the discovery of Iqbal's visa infraction provided political cover to comply with the CIA's request. "This was a U.S. deal all along," the senior official said. "Egypt just provided the formalities."

Indonesian officials believe Iqbal, who arrived in Jakarta on Nov. 17, came to the vast Southeast Asian archipelago not to plan an attack but to seek refuge as the Taliban neared collapse and al Qaeda leaders sought to flee Afghanistan.

  

The Washington Post March 11, 2002 Monday

Western officials said they do not have a full picture of what Iqbal was doing in Indonesia and they cannot rule out the possibility that he was engaged in terrorist activities here.

Iqbal had lived in Jakarta as a teenager while his father, who also was an expert Koran reader, taught at the Arab Language Institute. Shortly after Iqbal arrived in November, he returned to his old neighborhood, a district in east Jakarta with narrow, winding streets and open sewers. There he met up with one of his father's former students, Mohammed Rizard, who helped him get a room at a nearby boarding house.

Rizard, a printer, said Iqbal often would spend afternoons at his house, watching television and singing Indian karaoke tunes. Although Iqbal said he came to Indonesia to distribute an inheritance to his father's second wife, he appeared to be in no hurry to perform the task, Rizard said.

"He was taking it easy," Rizard said. "He was more interested in talking about girls and singing karaoke."

Just before his arrest, Iqbal visited Solo, a city in central Java, Indonesia's main island, saying he was going to see his stepmother. The city is regarded by Western and Asian intelligence officials as a base for Jemaah Islamiah, a militant Muslim group with bases in Indonesia, Singapore and Malaysia that is alleged to be affiliated with al Qaeda. The group is accused of plotting to blow up Western embassies and U.S. naval vessels in Singapore and of aiding two of the Sept. 11 hijackers during a trip they made to Malaysia in 2000.

Rizard said he never discussed politics with Iqbal or inquired about his life in Pakistan. "He never talked about jihad or America," Rizard said. Rizard also said he rifled through Iqbal's suitcase and "found nothing suspicious."

In December, Iqbal sent several letters to friends in Pakistan, Rizard said. Three replies arrived at Rizard's house, which Iqbal used as a return address, after he had been seized and sent to Egypt. Rizard gave the unopened letters to correspondents for The Washington Post and the Weekend Australian newspaper.

The handwritten letters, in the Urdu language, contain no incriminating details but do suggest that Iqbal's missives had expressed deep frustration and despair.

"Why have you lost all hope?" one of his friends, Hafiz Mohammad Riazuddin, wrote. "Please keep your head and spirits up."

"Surprisingly you have asked about the Taliban," Riazuddin continued. "How did you become interested in politics? Anyway, by the time you sent this letter, Taliban rule has ended in Afghanistan. U.S. and British troops have landed in Afghanistan. The U.S. has taken bases in Pakistan and Pakistan's nuclear program is in danger."

A lengthy letter from a woman who appears to be his girlfriend suggested Iqbal had left Pakistan suddenly and had not told those close to him where he was going. "It gives great pleasure to know that you are alive," she wrote.

  

Page 5

The Washington Post March 11, 2002 Monday

Another letter, from a man named Shahid, refers to plans to visit an "uncle in America" and talk to an "Uncle Babar" in Malaysia.

Despite criticism from some U.S. officials as well as from neighboring Singapore and Malaysia that Indonesia is not moving aggressively enough against suspected terrorists, particularly members of Jemaah Islamiah, officials here quickly point to Iqbal's rendition as proof they are cooperating, albeit quietly, in the global fight against terrorism.

"The CIA asked us to find this guy and hand him over," the senior Indonesian official said. "We did what they wanted."

Finn reported from Berlin. Correspondent Howard Schneider in Cairo, special correspondent Kamran Khan in Karachi, Pakistan, and staff writers Dan Eggen and Walter Pincus in Washington contributed to this report.

**LOAD-DATE:** March 11, 2002

  

# **EXHIBIT 10**

1 of 1 DOCUMENT

Copyright 2005 The Washington Post
The Washington Post

January 2, 2005 Sunday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1165 words

**HEADLINE:** Long-Term Plan Sought For Terror Suspects

**BYLINE:** Dana Priest, Washington Post Staff Writer

**BODY:**

   Administration officials are preparing long-range plans for indefinitely imprisoning suspected terrorists whom they do not want to set free or turn over to courts in the United States or other countries, according to intelligence, defense and diplomatic officials.

   The Pentagon and the CIA have asked the White House to decide on a more permanent approach for potentially lifetime detentions, including for hundreds of people now in military and CIA custody whom the government does not have enough evidence to charge in courts. The outcome of the review, which also involves the State Department, would also affect those expected to be captured in the course of future counterterrorism operations.

   "We've been operating in the moment because that's what has been required," said a senior administration official involved in the discussions, who said the current detention system has strained relations between the United States and other countries. "Now we can take a breath. We have the ability and need to look at long-term solutions."

   One proposal under review is the transfer of large numbers of Afghan, Saudi and Yemeni detainees from the military's Guantanamo Bay, Cuba, detention center into new U.S.-built prisons in their home countries. The prisons would be operated by those countries, but the State Department, where this idea originated, would ask them to abide by recognized human rights standards and would monitor compliance, the senior administration official said.

   As part of a solution, the Defense Department, which holds 500 prisoners at Guantanamo Bay, plans to ask Congress for $25 million to build a 200-bed prison to hold detainees who are unlikely to ever go through a military tribunal for lack of evidence, according to defense officials.

   The new prison, dubbed Camp 6, would allow inmates more comfort and freedom than they have now, and would be designed for prisoners the government believes have no more intelligence to share, the officials said. It would be modeled on a U.S. prison and would allow socializing among inmates.

   "Since global war on terror is a long-term effort, it makes sense for us to





be looking at solutions for long-term problems," said Bryan Whitman, a Pentagon spokesman. "This has been evolutionary, but we are at a point in time where we have to say, 'How do you deal with them in the long term?' "

The administration considers its toughest detention problem to involve the prisoners held by the CIA. The CIA has been scurrying since Sept. 11, 2001, to find secure locations abroad where it could detain and interrogate captives without risk of discovery, and without having to give them access to legal proceedings.

Little is known about the CIA's captives, the conditions under which they are kept--or the procedures used to decide how long they are held or when they may be freed. That has prompted criticism from human rights groups, and from some in Congress and the administration, who say the lack of scrutiny or oversight creates an unacceptable risk of abuse.

Rep. Jane Harman (D-Calif.), vice chairman of the House intelligence committee who has received classified briefings on the CIA's detainees and interrogation methods, said that given the long-term nature of the detention situation, "I think there should be a public debate about whether the entire system should be secret.

"The details about the system may need to remain secret," Harman said. At the least, she said, detainees should be registered so that their treatment can be tracked and monitored within the government. "This is complicated. We don't want to set up a bureaucracy that ends up making it impossible to protect sources and informants who operate within the groups we want to penetrate."

The CIA is believed to be holding fewer than three dozen al Qaeda leaders in prison. The agency holds most, if not all, of the top captured al Qaeda leaders, including Khalid Sheik Mohammed, Ramzi Binalshibh, Abu Zubaida and the lead Southeast Asia terrorist, Nurjaman Riduan Isamuddin, known as Hambali.

CIA detention facilities have been located on an off-limits corner of the Bagram air base in Afghanistan, on ships at sea and on Britain's Diego Garcia island in the Indian Ocean. The Washington Post reported  last month that the CIA has also maintained a  facility within the Pentagon's Guantanamo Bay complex, though it is unclear whether it is still in use.

In contrast to the CIA, the military produced and declassified hundreds of pages of documents about its detention and interrogation procedures after the Abu Ghraib prison scandal. And the military detainees are guaranteed access to the International Committee of the Red Cross and, as a result of a U.S. Supreme Court ruling, have the right to challenge their imprisonment in federal court.

But no public hearings in Congress have been held on CIA detention practices, and congressional officials say CIA briefings on the subject have been too superficial and were limited to the chairman and vice chairman of the House and Senate intelligence committees.

The CIA had floated a proposal to build an isolated prison with the intent of keeping it secret, one intelligence official said. That was dismissed immediately as impractical.

  

The Washington Post January 2, 2005 Sunday

One approach used by the CIA has been to transfer captives it picks up abroad to third countries willing to hold them indefinitely and without public proceedings. The transfers, called "renditions," depend on arrangements between the United States and other countries, such as Egypt, Jordan and Afghanistan, that agree to have local security services hold certain terror suspects in their facilities for interrogation by CIA and foreign liaison officers.

The practice has been criticized by civil liberties groups and others, who point out that some of the countries have human rights records that are criticized by the State Department in annual reports.

Renditions originated in the 1990s as a way of picking up criminals abroad, such as drug kingpins, and delivering them to courts in the United States or other countries. Since 2001, the practice has been used to make certain detainees do not go to court or go back on the streets, officials said.

"The whole idea has become a corruption of renditions," said one CIA officer who has been involved in the practice. "It's not rendering to justice, it's kidnapping."

But top intelligence officials and other experts, including former CIA director George J. Tenet in his testimony before Congress, say renditions are an effective method of disrupting terrorist cells and persuading detainees to reveal information.

"Renditions are the most effective way to hold people," said Rohan Gunaratna, author of "Inside al Qaeda: Global Network of Terror." "The threat of sending someone to one of these countries is very important. In Europe, the custodial interrogations have yielded almost nothing" because they do not use the threat of sending detainees  to a country where they are likely to be tortured.

**LOAD-DATE:** January 2, 2005





# **EXHIBIT 11**

2 of 3 DOCUMENTS

Copyright 2002 The Washington Post
The Washington Post

December 26, 2002 Thursday
Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 2838 words

**HEADLINE:** U.S. Decries **Abuse** but **Defends Interrogations**;
'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities

**BYLINE:** Dana Priest and Barton Gellman, Washington Post Staff Writers

**BODY:**

Deep inside the forbidden zone at the U.S.–occupied Bagram air base in Afghanistan, around the corner from the detention center and beyond the segregated clandestine military units, sits a cluster of metal shipping containers protected by a triple layer of concertina wire. The containers hold the most valuable prizes in the war on terrorism — captured al Qaeda operatives and Taliban commanders.

Those who refuse to cooperate inside this secret CIA interrogation center are sometimes kept standing or kneeling for hours, in black hoods or spray-painted goggles, according to intelligence specialists familiar with CIA interrogation methods. At times they are held in awkward, painful positions and deprived of sleep with a 24–hour bombardment of lights — subject to what are known as "stress and duress" techniques.

Those who cooperate are rewarded with creature comforts, interrogators whose methods include feigned friendship, respect, cultural sensitivity and, in some cases, money. Some who do not cooperate are turned over — "rendered," in official parlance — to foreign intelligence services whose practice of torture has been documented by the U.S. government and human rights organizations.

In the multifaceted global war on terrorism waged by the Bush administration, one of the most opaque — yet vital — fronts is the detention and interrogation of terrorism suspects. U.S. officials have said little publicly about the captives' names, numbers or whereabouts, and virtually nothing about interrogation methods. But interviews with several former intelligence officials and 10 current U.S. national security officials — including several people who witnessed the handling of prisoners — provide insight into how the U.S. government is prosecuting this part of the war.

The picture that emerges is of a brass-knuckled quest for information, often in concert with allies of dubious human rights reputation, in which the traditional lines between right and wrong, legal and inhumane, are evolving and blurred.

While the U.S. government publicly denounces the use of torture, each of the current national security officials interviewed for this article defended the use of violence against captives as just and necessary. They expressed confidence that the American public would back their view. The CIA, which has primary responsibility for interrogations, declined to comment.

"If you don't violate someone's human rights some of the time, you probably aren't doing your job," said one official who has supervised the capture and transfer of accused terrorists. "I don't think we want to be promoting a view of zero tolerance on this. That was the whole problem for a long time with the CIA.."

The off-limits patch of ground at Bagram is one of a number of secret detention centers overseas where U.S. due process does not apply, according to several U.S. and European national security officials, where the CIA undertakes or manages the interrogation of suspected terrorists. Another is Diego Garcia, a somewhat horseshoe-shaped island in the Indian Ocean that the United States leases from Britain.

  

U.S. officials oversee most of the interrogations, especially those of the most senior captives. In some cases, highly trained CIA officers question captives through interpreters. In others, the intelligence agency undertakes a "false flag" operation using fake decor and disguises meant to deceive a captive into thinking he is imprisoned in a country with a reputation for brutality, when, in reality, he is still in CIA hands. Sometimes, female officers conduct interrogations, a psychologically jarring experience for men reared in a conservative Muslim culture where women are never in control.

In other cases, usually involving lower-level captives, the CIA hands them to foreign intelligence services — notably those of Jordan, Egypt and Morocco — with a list of questions the agency wants answered. These "extraordinary renditions" are done without resort to legal process and usually involve countries with security services known for using brutal means.

According to U.S. officials, nearly 3,000 suspected al Qaeda members and their supporters have been detained worldwide since Sept. 11, 2001. About 625 are at the U.S. military's confinement facility at Guantanamo Bay, Cuba. Some officials estimated that fewer than 100 captives have been rendered to third countries. Thousands have been arrested and held with U.S. assistance in countries known for brutal treatment of prisoners, the officials said.

At a Sept. 26 joint hearing of the House and Senate intelligence committees, Cofer Black, then head of the CIA Counterterrorist Center, spoke cryptically about the agency's new forms of "operational flexibility" in dealing with suspected terrorists. "This is a very highly classified area, but I have to say that all you need to know: There was a before 9/11, and there was an after 9/11," Black said. "After 9/11 the gloves come off."

According to one official who has been directly involved in rendering captives into foreign hands, the understanding is, "We don't kick the [expletive] out of them. We send them to other countries so they can kick the [expletive] out of them." Some countries are known to use mind-altering drugs such as sodium pentathol, said other officials involved in the process.

Abu Zubaida, who is believed to be the most important al Qaeda member in detention, was shot in the groin during his apprehension in Pakistan in March. National security officials suggested that Zubaida's painkillers were used selectively in the beginning of his captivity. He is now said to be cooperating, and his information has led to the apprehension of other al Qaeda members.

U.S. National Security Council spokesman Sean McCormack declined to comment earlier this week on CIA or intelligence-related matters. But, he said: "The United States is treating enemy combatants in U.S. government control, wherever held, humanely and in a manner consistent with the principles of the Third Geneva Convention of 1949."

The convention outlined the standards for treatment of prisoners of war. Suspected terrorists in CIA hands have not been accorded POW status.

Other U.S. government officials, speaking on condition of anonymity, acknowledged that interrogators deprive some captives of sleep, a practice with ambiguous status in international law.

The U.N. High Commissioner for Human Rights, the authoritative interpreter of the international Convention Against Torture, has ruled that lengthy interrogation may incidentally and legitimately cost a prisoner sleep. But when employed for the purpose of breaking a prisoner's will, sleep deprivation "may in some cases constitute torture."

The State Department's annual human rights report routinely denounces sleep deprivation as an interrogation method. In its 2001 report on Turkey, Israel and Jordan, all U.S. allies, the department listed sleep deprivation among often-used alleged torture techniques.

U.S. officials who defend the renditions say the prisoners are sent to these third countries not because of their coercive questioning techniques, but because of their cultural affinity with the captives. Besides being illegal, they said, torture produces unreliable information from people who are desperate to stop the pain. They look to foreign allies more because their intelligence services can develop a culture of intimacy that Americans cannot. They may use interrogators who speak the captive's Arabic dialect and often use the prospects of shame and the reputation of the captive's family to goad the captive into talking.

In a speech on Dec. 11, CIA director George J. Tenet said that interrogations overseas have yielded significant returns recently. He calculated that worldwide efforts to capture or kill terrorists had eliminated about one-third of the al Qaeda leadership. "Almost half of our successes against senior al Qaeda members has come in recent months," he said.

  

# **EXHIBIT 12**

2 of 2 DOCUMENTS

Copyright 2005 Cable News Network
All Rights Reserved
CNN.com

August 9, 2005 Tuesday 5:00 PM EST

**SECTION:** U.S.

**LENGTH:** 503 words

**HEADLINE:** U.S. officials: Gitmo **transfer** talks active

**BYLINE:** From Andrea **Koppel** and Elise **Labott** CNN Washington Bureau

**DATELINE:** WASHINGTON

**BODY:**

The United States and at least 10 other nations are involved in negotiations that could drop the detainee population at Guantanamo Bay by 80 percent — or 410 people — within the coming months, State Department officials said.

Saudi Arabia and Yemen are among the countries in "various stages of discussion" with the Bush administration about the return of their citizens in the next two months, said the two U.S. officials who hold senior posts.

Last week the United States and Afghanistan announced an agreement on a similar **transfer.**

The United States has 510 detainees from 34 countries in custody at Guantanamo.

Citizens from Saudi Arabia, Afghanistan and Yemen account for the majority of those detainees with 129, 110 and 107 respectively, the two U.S. officials said.

Detainees whom the United States considers "really bad guys" will remain in Guantanamo, the officials said, but in coming months the facility population could drop to about 100.

The U.S. military began bringing detainees from Afghanistan to the facility in Cuba in early 2002. The detainees in custody are suspected terrorists.

The releases could begin as early as next month. CNN reviewed the agreement that countries must sign before the United States **transfers** detainees.

The terms include a commitment to:

treat detainees "humanely and in a manner consistent with applicable international obligations"

refrain from torture

allow the United States or a third party such as the International Committee of the Red Cross (ICRC) access to the detainees to "verify the assurances"

"investigate, detain and prosecute" the detainee to the fullest extent possible; and

provide the United States with "advance notice" and place the detainee on "watch lists" should a country decide to release a detainee.

"We're not changing how the detainees are classified," one senior U.S. official said. " We're changing where they're held."

The United States likely will not release all of a country's citizens at one time after reaching an agreement, one senior U.S. official said.

  

CNN.com August 9, 2005 Tuesday

This **transfers** would be more gradual, happening over months or years, the official said. That would allow the countries to avoid having to handle a crush of detainees all at once and provide the United States with the opportunity to ensure that the various governments abide by the terms of the agreement.

One particularly sticky situation in negotiations with an unnamed European country concerns the placement of more than a dozen Chinese Uigurs — Turkic people who live mainly in west China and Uzbekistan, the senior officials said. The United States is concerned the Uigurs might suffer abuse in China.

The officials said that after negative media reports about the Guantanamo facility and alleged desecrations of the Quran, citizens in Muslim countries "woke up" their governments to expediting the necessary preparations for their nationals' return.

During the last two, years the United States has released at least 80 people, including dozens of detainees to European countries.

**LOAD-DATE:** August 10, 2005




# **EXHIBIT 13**

**NewsRoom**

**Page    1**

| | | | |
|---|---|---|---|
| Citation | Search Result | Rank(R) 2 of 2 | Database |
| 8/5/05 WP-BUS (No Page) | | | WP-BUS |

8/5/05 Wash. Post (Bus. Sec.) (Pg. Unavail. Online)
2005 WLNR 12297832

Washington Post
Copyright 2005 The Washington Post

**August 5, 2005**

U.S. Negotiating Guantanamo Transfers

By Josh **White** and Robin **Wright**

WASHINGTON _ The Bush administration is negotiating the transfer of nearly 70 percent of the detainees at the U.S. detention facility in Guantanamo Bay, Cuba, to three countries as part of a plan, officials said, to share the burden of keeping suspected terrorists behind bars.

U.S. officials announced Thursday that they have reached an agreement with the government of Afghanistan to transfer most of its nationals to Kabul's ''exclusive'' control and custody. There are 110 Afghan detainees at Guantanamo and 350 more at the Bagram airfield near Kabul. Their transfers could begin in the next six months.

Pierre-Richard Prosper, ambassador at large for war crimes, who led a U.S. delegation to the Middle East this week, said similar agreements are being pursued with Saudi Arabia and Yemen, whose nationals make up a significant percentage of the Guantanamo population. Prosper held talks in Saudi Arabia on Sunday and Monday, but negotiations were cut off after the announcement of King Fahd's death.

The decision to move more than 20 percent of the detainees at Guantanamo to Afghanistan and to largely clear out the detention center at Bagram is part of a broader plan to significantly reduce the population of ''enemy combatants'' in U.S. custody. Senior U.S. officials said Thursday's agreement is the first major step toward whittling down the Guantanamo population to a core group of people the United States expects to hold indefinitely.

''This is not an effort to shut down Guantanamo. Rather, the arrangement we have reached with the government of Afghanistan is the latest step in what has long been our policy _ that we need to keep dangerous enemy combatants off the battlefield,'' Matthew Waxman, deputy assistant secretary of defense for detainee affairs, said shortly after leaving Kabul with Prosper. ''We, the U.S., don't want to be the world's jailer. We think a more prudent course is to shift that burden onto our coalition partners.''

The negotiations come amid intense international and domestic pressure on U.S. detention operations, with allegations of mistreatment and abuse as well as

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



8/5/05 WP-BUS (No Page)

concern that detainees have been held for years without being prosecuted for their alleged crimes. Legal problems have also plagued the prosecutorial process at Guantanamo, which has been blocked for months as detainees' attorneys present challenges in U.S. federal courts.

``The Guantanamo issue is clearly a liability for the Bush administration, and emptying it has become a priority,'' said John Sifton, a specialist on Afghanistan and detainee issues at Human Rights Watch, an international monitoring group. ``It's not a victory for human rights if a whole set of people deprived of their liberty are then moved to another place and continued to be deprived of their liberty unlawfully.''

The agreement with Afghanistan is the largest of its kind so far. Prosper said Thursday that the U.S. government is working to send 129 Saudis and 107 Yemenis from Guantanamo to the custody of their home countries. If the U.S. government is able to arrange the transfer of detainees who came from all three countries, the population at the U.S. facility will drop by 68 percent, from 510 to 164.

Because the United States could hold on to those detainees who are considered by officials to pose the greatest terrorist threat, the numbers could change slightly. Negotiations depend on the cooperation of the other nations.

``We're now engaging the countries with the largest populations, so we expect to see the largest potential movement from Guantanamo,'' Prosper said in an interview from Dubai. ``So if we can reach an understanding with these countries that will allow us to return them with the greatest assurances, then this will be the biggest movement yet out of Guantanamo.''

Prosper and Waxman said that before such transfers can occur, the detainees' home countries must commit to taking steps that will prevent enemy combatants from re-engaging in hostile activity, and commit to treating the detainees humanely.

A major obstacle to the transfer of detainees to Afghanistan is infrastructure. U.S. officials have agreed to help Afghanistan build an appropriate prison and to train its guards.

One possible interim solution under consideration is that Afghan detainees at Guantanamo could be transferred to Bagram until permanent facilities are built. Prosper said such facilities could allow a gradual transfer over the next six months.

The United States considers all the remaining detainees to be medium- or high-risk and therefore not eligible for release once handed over, as has happened with about 70 detainees released earlier to about a dozen countries.

Over the past year, U.S. military authorities have released several dozen Afghans that have been determined as not posing a threat. But President Hamid Karzai has repeatedly called on the United States to hand over all Afghan citizens. He raised the issue during a meeting with President Bush in May.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



8/5/05 WP-BUS (No Page)

``I don't expect it will be too long before the actual transfer of detainees will start. It should be a matter of months to build the facilities,'' said Karim Rahimi, a spokesman for Karzai.

Senior military officials and members of Congress have said in recent days that the goal is to reduce the population at Guantanamo to a point at which the detainees who are the highest security risks can be held at the modern prison buildings there, while the rest of the facility could be ``mothballed'' for possible future use. Guantanamo's Camp V and the future Camp VI are modeled after U.S. domestic prisons.

In a military fact sheet about ``the future'' of Guantanamo, developed in early July, defense officials indicated that the operational priority of the facility is to shift from intelligence gathering to long-term detention.

The document noted that ``the significant majority of detainees are no longer regularly interrogated'' and that officials expect the population to decrease.

``The way that we've looked at it is that in waging the war against al-Qaida and the Taliban, we will continue to capture enemy fighters and need to prevent them from returning to the battlefield,'' Waxman said. ``But it need not be the U.S. who detains them for the long term.''

 -0-<

Correspondent N.C. Aizenman in Kabul and researcher Julie Tate in

Washington contributed to this report.

             ---- INDEX REFERENCES ----

NEWS SUBJECT:  (International Terrorism (1IN37))

INDUSTRY:  (Construction (1CO11); Correctional Facilities (1CO72); Commercial Construction (1CO15); Defense Policy (1DE81); Aerospace & Defense (1AE96); Defense (1DE43))

REGION:  (Afghanistan (1AF45); Americas (1AM92); Saudi Arabia (1SA38); North America (1NO39); Asia (1AS61); Latin America (1LA15); Cuba (1CU43); Middle East (1MI23); USA (1US73); Arab States (1AR46); Caribbean (1CA06); Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (AFGHANISTAN; BAGRAM; CONGRESS; GUANTANAMO; LEGAL; TALIBAN; US NEGOTIATING GUANTANAMO)  (Bush; Correspondent N.C. Aizenman; Fahd; Hamid Karzai; John Sifton; Julie Tate; Karim Rahimi; Karzai; Matthew Waxman; Prosper; Qaida; Richard Prosper; Waxman)

Word Count: 1268
8/5/05 WP-BUS (No Page)

      (C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# **EXHIBIT 14**

The New York Times                    The New York Times

                                                              Page    1

Citation              Search Result         Rank(R) 6 of 11        Database
3/11/05 NYT A1                                                     NYT

3/11/05 N.Y. Times A1
2005 WLNR 3773506

                   New York Times (NY)
        Copyright (c) 2005 The New York Times. All rights reserved.

                         **March 11, 2005**

                         Section: A

THE REACH OF WAR: GUANTANAMO; PENTAGON SEEKS TO SHIFT INMATES FROM CUBA BASE

     DOUGLAS **JEHL**; Neil A. Lewis and Tim Golden contributed reporting for this
                               article.

Pentagon reportedly seeks help from State Department and other agencies to cut
detainee population at Guantanamo prison by more than half, in part by
transferring suspected terrorists to prisons in Saudi Arabia, Afghanistan and
Yemen; CIA, which has carried out such transfers, and State and Justice
Departments have resisted some previous handovers out of concern for US security
or potential mistreatment; Sec Donald Rumsfeld seeks support for plan, starting
with Afghanistan; some outright releases are also possible to cut detainee
population of about 540; Pentagon has also halted flow of new prisoners into
Guantanamo; most there no longer have intelligence value and are not
interrogated regularly; adverse court rulings and determination to get other
countries to share burden also cited; Rumsfeld photo; chart on transfers (M)

WASHINGTON, March 10 The Pentagon is seeking to enlist help from the State
Department and other agencies in a plan to cut by more than half the population
at its detention facility in Guantanamo Bay, Cuba, in part by transferring
hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and
Yemen, according to senior administration officials.

The transfers would be similar to the renditions, or transfers of captives to
other countries, carried out by the Central Intelligence Agency, but are subject
to stricter approval within the government, and face potential opposition from
the C.I.A. as well as the State and Justice Departments, the officials said.

Administration officials say those agencies have resisted some previous
handovers, out of concern that transferring the prisoners to foreign governments
could harm American security or subject the prisoners to mistreatment.

A Feb. 5 memorandum from Defense Secretary Donald H. Rumsfeld calls for broader
interagency support for the plan, starting with efforts to work out a
significant transfer of prisoners to Afghanistan, the officials said. The
proposal is part of a Pentagon effort to cut a Guantanamo population that stands
at about 540 detainees by releasing some outright and by transferring others for

         (C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westlaw                                                        Westlaw

3/11/05 NYT A1

continued detention elsewhere.

The proposal comes as the Bush administration reviews the future of the naval base at Guantanamo as a detention center, after court decisions and shifts in public opinion have raised legal and political questions about the use of the facility.

The White House first embraced using Guantanamo as a holding place for terrorism suspects taken in Afghanistan, in part because the base was seen as beyond the jurisdiction of United States law. But recent court rulings have held that prisoners there may challenge their detentions in federal court.

Indeed, the Pentagon has halted, for the last six months, the flow of new terrorism suspects into the prison, Defense Department officials said. In January, a senior American official said in an interview that most prisoners at Guantanamo no longer had any intelligence value and were not being regularly interrogated.

The proposed transfers would represent a major acceleration of Pentagon efforts that have transferred 65 prisoners from Guantanamo to foreign countries. The population at Guantanamo includes more than 100 prisoners each from Afghanistan, Saudi Arabia and Yemen, a senior administration official said, and the United States might need to provide money or other logistical support to make possible a large-scale transfer to any of those nations.

Defense Department officials said that the adverse court rulings had contributed to their determination to reduce the population at Guantanamo, in part by persuading other countries to bear some of the burden of detaining terrorism suspects.

Under the administration's approach, the State Department is responsible for negotiating agreements in which receiving countries agree "to detain, investigate, and/or prosecute" the prisoners and to treat them humanely.

"Our top choice would be to win the war on terrorism and declare an end to it and repatriate everybody," a senior Defense Department official said in an interview. "The next best solution would be to work with the home governments of the detainees in order to get them to take the necessary steps to mitigate the threat these individuals pose."

The official, who spoke on condition of anonymity, said that future transfers into Guantanamo remained a "possibility," but made clear that the court decisions and the burdens of detaining prisoners at the American facility had made it seem less attractive to administration policymakers than before.

"It's fair to say that the calculus now is different than it was before, because the legal landscape has changed and those are factors that might be considered," a senior Defense Department official said.

In addition to working to transfer prisoners to their home countries, either to face charges there or simply to be kept in detention, officials also hope to

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





3/11/05 NYT A1

shed dozens of prisoners whose cases are being studied by special review boards.

Those three-member military boards began working in earnest in January to determine which prisoners are no longer a threat, have no information of value and may be released outright.

At its peak, the population at Guantanamo exceeded 750 prisoners. But the last time prisoners were transferred there was on Sept. 22, 2004, when a group of 10 was transferred from Afghanistan. The United States has already dispatched 211 Guantanamo prisoners, releasing the majority of them. Sixty-five have been transferred to the custody of other counties, including 29 to Pakistan, 5 to Morocco, 7 to France, 7 to Russia, and 4 to Saudi Arabia.

The administration's policy of detaining suspected terrorists at Guantanamo has relied on declarations that the detainees are unlawful "enemy combatants," based on assertions that they did not serve in a conventional army, and thus did not qualify for the protections listed in the Geneva Conventions.

Administration lawyers argued successfully in lower federal courts that United States laws, including access to the courts, did not apply because Guantanamo is part of Cuba.

But last June, the Supreme Court ruled that United States law applied to Guantanamo and that prisoners there could challenge their detentions in federal courts.

In August, a federal district judge ruled that the Geneva Conventions apply to Guantanamo prisoners and that the special military commissions to try war crimes were unconstitutional. The government's appeal of that ruling is scheduled to be heard next month.

Even as it moves to reduce the population at Guantanamo, the Pentagon has asked Congress for another $41 million in supplemental financing for construction there, including $36 million for a new, more modern prison and $5 million for a new perimeter fence.

The purpose, Defense Department officials said, was to provide a secure, humane detention facility for a remnant of the current population who are expected to remain there for the foreseeable future.

As many as 200 of those now at Guantanamo will most likely remain there indefinitely, the officials said, on grounds that they are too dangerous to be turned over to other nations or would probably face mistreatment if returned to those nations.

Each of the roughly 540 prisoners at Guantanamo have gone before a three-member military board, to have their status as enemy combatants reviewed. A final review has been completed in 487 cases; of those, all but 22 were found to have been properly classified, a status leaving them subject to possible war crimes charges.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




3/11/05 NYT A1

Unlike the Pentagon, the C.I.A. was authorized by President Bush after the Sept. 11 attacks to transfer prisoners from one foreign country to another without case-by-case approval from other government departments. Former intelligence officials said that the C.I.A. has carried out 100 to 150 such transfers, known as renditions, since Sept. 11.

By contrast, the transfers carried out by the Pentagon are subject to strict rules requiring interagency approval. Officials said that the transfers do not constitute renditions under the Pentagon's definition, because the governments that accept the prisoners are not expected to carry out the will of the United States.

Indeed, officials have been concerned that transfer of some detainees could threaten American security because they might escape from foreign prisons or the foreign governments might free them.

The White House has said its policy prohibits the transfer of prisoners to other nations if it is likely they will be tortured, and administration officials said the interagency review is intended in part to enforce that standard. Transfers have been approved by the State Department to countries including Saudi Arabia and Pakistan, identified in the department's own human rights reports as nations where the use of torture in prisons is common.

Administration officials said that American diplomats in those countries were responsible for monitoring agreements to make sure prisoners were not mistreated. The senior Defense Department official said that the difficulty of "gaining effective and credible assurances" that prisoners would not be mistreated had been "a cause of some delay in releasing or transferring some detainees we have at Guantanamo."

It is possible that Guantanamo inmates could petition a federal court to stop a transfer to a country where they did not want to be sent. But there is little if any precedent to suggest how the courts would rule.

In November, a lawyer for Mamdouh Habib, a prisoner who claimed he had been tortured in Egypt before being transferred to Guantanamo, asked a federal district court to stop the Bush administration from returning him to Egypt. Before the court ruled, he was sent to Australia in January and freed.

Photo: Defense Secretary Donald H. Rumsfeld is said to have sought broader support from other governmental agencies for transfers of detainees. (Photo by Doug Mills/The New York Times)(pg. A10)

Chart: "Transferred From Guantnamo"
While roughly 540 detainees are still being held by the American military at Guantnamo Bay, Cuba, 211 detainees have left. Of those 211, 146 have been released, and 65 have been transferred to other countries for further detention or for prosecution.

Detainees transferred from Guantnamo to other countries

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



3/11/05 NYT A1

To Pakistan: 29
Britain: 9
France: 7
Russia: 7
Morocco:5
Saudi Arabia: 4
Australia, Kuwait, Spain and Sweden: 1 each

(Source by Department of Defense)(pg. A10)

March 15, 2005, Tuesday - A front-page article on Friday about the Pentagon's efforts to send prisoners to other countries from Guantanamo Bay, Cuba, referred incompletely to legal proceedings in a recent case involving Mamdouh Habib, who had asked the Federal District Court in Washington to prohibit the government from sending him to Egypt. In November, a judge denied Mr. Habib's request but gave him permission to renew it if the government ordered his transfer there, and required the government to give advance notice of any such transfer. Mr. Habib was later sent instead to Australia, where he was released.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36); Prisons (1PR87))

INDUSTRY:  (Commercial Construction (1CO15); Aerospace & Defense (1AE96); Defense (1DE43); Construction (1CO11); Correctional Facilities (1CO72); Security (1SE29); Defense Intelligence (1DE90); Defense Policy (1DE81))

REGION:  (North Africa (1NO44); Yemen (1YE36); Southern Asia (1SO52); Saudi Arabia (1SA38); North America (1NO39); Western Europe (1WE41); Latin America (1LA15); Cuba (1CU43); Europe (1EU83); Central Europe (1CE50); Africa (1AF90); Eastern Europe (1EA48); Russia (1RU33); Indian Subcontinent (1IN32); Pakistan (1PA05); Egypt (1EG34); Arab States (1AR46); Western Asia (1WE54); Afghanistan (1AF45); Americas (1AM92); Asia (1AS61); Mediterranean (1ME20); Middle East (1MI23); Australasia (1AU56); Morocco (1MO33); USA (1US73); Oceania (1OC40); Australia (1AU55); Switzerland (1SW77); France (1FR23); Caribbean (1CA06))

Language:  EN

OTHER INDEXING:  (Rumsfeld, Donald H (Sec); Jehl, Douglas)  (BUSH; CENTRAL INTELLIGENCE AGENCY; DEFENSE; DEFENSE DEPARTMENT; DEPARTMENT OF DEFENSE; FEDERAL DISTRICT COURT; HABIB; MAMDOUH HABIB; PENTAGON; PRESIDENT BUSH; RUMSFELD; SEEKS; STATE; STATE DEPARTMENT; SUPREME COURT; WHITE HOUSE)  (Afghanistan; Donald H. Rumsfeld; Doug Mills; Habib; Justice Departments; Sec Donald Rumsfeld; Sixty) (Prisoners of War; Guantanamo Bay Naval Base (Cuba); United States Armament and Defense; United States International Relations; Terrorism; Intelligence Services; Security and Warning Systems)  (Afghanistan; Yemen; Saudi Arabia; Afghanistan)

COMPANY TERMS: STATE DEPARTMENT; JUSTICE DEPARTMENT; CENTRAL INTELLIGENCE AGENCY

EDITION: Late Edition - Final

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





3/11/05 NYT A1

Word Count: 2047
3/11/05 NYT A1

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# **EXHIBIT 15**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MAHMOAD ABDAH, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 04-1254 (HHK) (RMC)** |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

Thirteen Yemeni nationals, designated as "enemy combatants" at the Guantanamo Bay Naval Base ("GTMO") in Cuba, petition for a temporary restraining order ("TRO") to prevent their removal from GTMO and rendition to the custody of another government. They argue that such removal and rendition could have the effect of denying them access to U.S. courts for review of their detainment status and also potentially expose them to interrogation techniques and treatment that would be contrary to the laws of the United States.

Prior to their application for a TRO, the Petitioners had sought a preliminary injunction that would require the Government to give Petitioners' counsel 30-days notice of any such transfer. That matter is set for hearing before Judge Henry Kennedy on March 24, 2005.[1] In the

---

[1] The petition for a TRO is before the undersigned as the emergency motions judge for the weekend. It was filed in a manner consistent with secret documents in these cases at approximately 10:30 p.m. on Friday evening, March 11, 2005. Because the motion was filed on a Friday night *ex parte*, and because some of the materials appended to the motion are classified "Secret," the Court has not had the benefit of an opposition to the petition for a TRO or even argument from Petitioners' counsel, there being no available court reporter with clearance. Its decision here is clearly limited by those circumstances. The Court concludes that it can enter this memorandum opinion and order because it bases its analysis largely on the Government's arguments and factual proffer before Judge Kennedy.

meantime, the *New York Times* ran a story on March 11, 2005, describing a proposal by the Pentagon and Secretary of Defense Donald Rumsfeld to transfer more than half of the GTMO detainees to prisons in Saudi Arabia, Afghanistan, and Yemen.[2]  Petitioners' counsel also learned from co-counsel at the Center for Constitutional Rights, "citing information from a person, who, for professional reasons, refuses to make her sources public – that the government intends to transfer many detainees very quickly."  Petitioners' *Ex Parte* Motion for Temporary Restraining Order to Prevent Respondents From Removing Petitioners From Guantanamo Until Petitioners' Motion for Preliminary Injunction Is Decided ("Pets.' Motion"), Declaration of Marc D. Falkoff ("Falkoff Decl.") ¶ 3. Petitioners seek an *ex parte* TRO "because they are apprehensive that a public filing will provoke respondents to initiate the exact dark-of-night transfers that petitioners seek to prevent."  Pets.' Motion at 2.

## BACKGROUND

The Petitioners' underlying case is one of many *habeas corpus* petitions filed in the District Court for the District of Columbia on behalf of GTMO detainees after the Supreme Court in *Rasul v. Bush* held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." 124 S. Ct. 2686, 2699 (2004).  The Government filed motions to dismiss or for judgment as a matter of law in opposition to many of these *habeas* petitions.  Judge Joyce Hens Green, who had been designated to decide common issues of law and fact in eleven of these cases,

---

[2] *See* Pets.' Motion, Exh. C (Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba, The New York Times* (March 11, 2003)).

granted the motion in part and denied it in part.[3] In a separate case, Judge Richard Leon granted the

motion in its entirety.[4] The cases before Judges Green and Leon have been fully briefed in the D.C.

Circuit Court of Appeals and are under submission.

Fearful that the Government would transfer the detainees to other countries to avoid

further adverse court rulings, the Petitioners have sought a preliminary injunction from Judge

Kennedy to require 30-days prior notice of any such transfer. The Government filed its opposition

to that petition on March 8, 2005 and described in detail the nature of its process for considering

transfer of GTMO detainees. While that process involves high-level contacts between the U.S.

Department of State and a foreign government, as well as consideration of a detainee's status by the

U.S. Department of Defense, it does not contemplate any coordination or notice to the courts, where

constitutional issues are being litigated, or notice to the detainees' counsel.

## LEGAL STANDARDS

A TRO may be granted "without written or oral notice to the adverse party or that

party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified

complaint that immediate and irreparable injury, loss, or damage will result to the applicant before

the adverse party or that party's attorney can be heard in opposition . . . ." FED. R. CIV. P. 65(b). The

purpose of a TRO is to preserve the status quo and prevent irreparable harm until a hearing can be

held. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974).

In considering a request for a TRO, the court must examine whether: "(1) there is a

---

[3] *In re Guantanamo Detainee Cases*, 2005 WL 195356 (D.D.C. Jan. 31, 2005), *appeal docketed*, No. 05-8003 (D.C. Cir. ___ ).

[4] *Khalid v. Bush*, 2005 WL 100924 (D.D.C. Jan. 19, 2005), *appeal docketed*, No. 05-5063 (D.C. Cir. ___ ).

-3-

substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360 (D.C. Cir. 1999). These factors interrelate on a sliding scale and must be balanced against each other. *Id.* at 361. A strong showing on one factor can outbalance a weaker showing on another.

Where the balance of hardships tips decidedly toward the movant, it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Id.* at 844.

## ANALYSIS

The analysis here needs to define the rights at issue. Petitioners have a pending motion for a preliminary injunction ("PI") to obtain prior notice before they may be transferred to a foreign country for continued detention and, perhaps, interrogation by techniques that may be contrary to the laws of this country. Their motion for a PI, in turn, is designed to protect the Petitioners' rights to have the lawfulness of their current detention at GTMO ruled on by the Court of Appeals.

-4-

As defined by the Supreme Court, "'the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest.'" *Rasul*, 124 S. Ct. at 2692 (quoting *INS v. St. Cyr*, 533 U.S. 289, 301 (2001)). "Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land." *Id.* (quoting *Shaughnessy v. United States ex. rel. Mezei*, 345 U.S. 206, 218-219 (1953) (Jackson, J., dissenting)). The "law of the land" is interpreted and applied in this country by its court systems.

Detainees at GTMO may be transferred to the control of another government, generally to their country of citizenship, for release. Respondents' Memorandum in Opposition to Petitioners' Motion for Order Requiring Advance Notice of Any Repatriations or Transfers From Guantanamo ("U.S. Opp.") at 3; Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman ("Waxman Decl.") ¶ 3; Declaration of Ambassador Pierre-Richard Prosper ("Prosper Decl.") ¶ 3. "The United States also transfers Guantanamo detainees, under appropriate conditions, to the control of other governments for investigation and possible prosecution and continued detention when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies." U.S. Opp. at 3; *see also* Pets.' Motion, Exh. F.

The Petitioners have adequately shown that they could face continued detention at the request of the United States, or as a condition of their release from GTMO set by the United States, in any country to which they might be transferred even if, after the transfer, that foreign nation assumed full responsibility and control over their terms of incarceration and the United States

-5-

fully relinquished such responsibility and control.

    A.    <u>Likelihood of Success on the Merits</u>

    *Habeas corpus* challenges the detention of the petitioner. The Government wants at least some of the GTMO detainees to remain in detention, even if transferred to the control of foreign nation. Once transferred, however, their *habeas* petitions would become moot because the courts in the United States would no longer have control over their warden.

    The Government argues to Judge Kennedy, in its opposition to the Petitioners' request for a preliminary injunction, that "[t]here is no legal basis for judicial intervention in the processes by which enemy combatant detainees are repatriated or transferred, and any such interference would illegitimately encroach on the foreign relations and national security prerogatives of the Executive Branch." U.S. Opp. at 1. Obviously, the Petitioners' request for 30-days advance notice of any transfer is not at issue here and will not be decided. For purposes of the TRO, however, the Court finds that it would not be necessary in any way to intrude into foreign relations or negotiations over repatriation or transfer. The Court need only assess whether removing the detainees from the jurisdiction of the Court – while insisting on their continued detention – is subject to a temporary injunction so that the legality of that detention *ab initio* can be determined and the trial judge can decide whether prior notice is appropriate. These issues are "'so serious, substantial, difficult and doubtful'" as to warrant maintaining the status quo "whether or not movant has shown a mathematical probability of success." *Washington Metro. Area Transit Comm'n*, 559 F.2d at 844 (citation omitted).

    There is no doubt that the district courts have jurisdiction over the Petitioners' *habeas corpus* petitions. *Rasul*, 124 S. Ct. at 2698. There is also no doubt that "the All Writs

Act, 28 U.S.C. § 1651(a), empowers a district court to issue injunctions to protect its

jurisdiction . . . ." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996). The

Government resists this conclusion by arguing that Judge Green stayed these cases "for all

purposes" and that there is no jurisdiction remaining in the district court. The Court disagrees.

The appeal from Judge Green's ruling is interlocutory; the rest of the case remains

with Judge Kennedy and with the undersigned as the emergency motions judge. Because Judge

Green's ruling was so fundamental to the very rights of these litigants in the federal courts – and

because Judge Leon's ruling disagreed – Judge Green ordered an administrative stay to save

time, money and judicial resources. Such a stay could not be read to also deprive the Petitioners

of their rights to seek emergency assistance when faced with continued detention at the request of

the United States but no venue in which to challenge its legality.

The Court expresses no opinion on the likelihood that Petitioners will succeed in

their request for a 30-day notice prior to any transfer to a foreign country. Instead, it rules that

the Petitioners have at least a fifty-fifty chance of prevailing on their constitutional claims before

the Court of Appeals and that they raise serious arguments that require more deliberative

consideration concerning whether removing them from the Court's jurisdiction, while insisting

on continued detention, is within the province of the executive.

B.    Irreparable Harm

Were the Petitioners to be transferred to the control of a foreign country, they

would effectively lose their rights to pursue their *habeas* claims in this country. The Court finds

that their injury would be continued detention outside the jurisdiction of U.S. courts – courts that

are actively reviewing the constitutionality of that very detention. While the Supreme Court has

granted them a right of access to our court system, such a transfer would terminate that right,

insofar as it sounds in *habeas corpus*, because U.S. courts would no longer have control over

their warden. Presumably, the Petitioners would suffer no harm if the Government were to

transfer them to Yemen for release; that is the goal of their *habeas* petitions. A transfer with

continued indeterminate detention with no right of review or further court access poses a very

different set of parameters. With or without the allegation of improper forms of interrogation in

a foreign country, the Court concludes that a continuation of their detention without redress to

assess its legality could constitute irreparable harm to the Petitioners.

　　　　Nonetheless, the Court pauses over whether the Petitioners have shown the

immediacy of potential harm that justifies a TRO before the Government or its attorney could be

heard. FED. R. CIV. P. 65(b) (TRO may be granted without notice only if "it clearly appears from

specific facts . . . that immediate and irreparable injury, loss, or damage will result to the

applicant before the adverse party or that party's attorney can be heard in opposition."). The only

evidence of immediacy here is third- or fourth-hand hearsay: co-counsel at the Center for

Constitutional Rights told Petitioners' counsel that s/he was informed by an unnamed person that

another unnamed source confided that the Government intends to transfer many detainees – who

may or may not include any of the instant Petitioners – "very quickly." The reliability of such

information cannot be ascertained. Yet the Government has already denied a request from

counsel for the Petitioners that it informally agree to give advance notice of any transfer and it

clearly regards such notice as an intrusion into the executive sphere of foreign relations.

Consequently, the Petitioners state that they filed *ex parte* to avoid precipitating any hasty action

by the Government to avoid addressing such transfers-and-continued-detention in a U.S. court.

-8-

What is evident from the record is that the Pentagon and the State Department are working together to arrange for some numbers of unspecified GTMO detainees to be transferred to foreign nations and detained for uncertain periods. The Government refuses to give any advance notice of such transfers. Approximately 200 detainees have already been transferred, sixty-five of whom were sent abroad on the condition that they continue to be detained. Prosper Decl. ¶ 2. "Of those 65 detainees who have been transferred to the control of host governments, 29 were transferred to Pakistan, 9 to the United Kingdom, 7 to Russia, 5 to Morocco, 6 to France, 4 to Saudi Arabia, 1 to Denmark, 1 to Spain, 1 to Sweden, 1 to Kuwait, and 1 to Australia." *Id.* That this process continues is acknowledged by the United States. "Among the assurances sought in every transfer case in which continued detention by the government concerned is foreseen is the assurance of humane treatment . . . ." *Id.* ¶ 6. Under these circumstances, the only way that anyone could know that a transfer is about to happen, *i.e.,* be "immediate," is if one is within the chain of command within the federal departments that consult on such matters or if there were information revealed *sotto voce* to a reporter. Based on the totality of the circumstances, the Court finds that the Petitioners face a risk of irreparable harm that is sufficiently immediate to warrant temporary relief.

C.    Injury to the Government

The Court can see no injury to the Government from granting a temporary injunction here. At most, this injunction will be alive for ten days unless both parties agree to its continuation or Judge Kennedy extends it another ten days. Nothing about this injunction will serve to prevent the Government's diplomatic and other efforts to arrange transfers of Guantanamo Bay detainees but it will ensure that a judicial officer reviews the Petitioners' rights

-9-

to prior notice and/or retention in this jurisdiction before the Government actually carries out any such transfer.

D.   Injury to the Public Interest

The Court can see no injury to the public interest from granting a temporary injunction here.

**CONCLUSION**

For the reasons stated, the *Ex Parte* Motion for a Temporary Restraining Order will be GRANTED.  The Temporary Restraining Order accompanies this memorandum opinion.


DATE:  March 12, 2005.                    /s/ _____
                                          ROSEMARY M. COLLYER
TIME: 3:40 p.m.                           United States District Judge

-10-