CLEARED WITH CSO FOR PUBLIC FILING

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY<br>DETAINEE LITIGATION | :  Misc. No. 08-442 (TFH)<br>:<br>:  Civil Action No. 05-1509 (RMU)<br>:  Civil Action No. 05-1602 (RMU)<br>:  Civil Action No. 05-1704 (RMU)<br>:  Civil Action No. 05-2386 (RMU) |

### STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65 and the All Writs Act, 28 U.S.C. § 1651, and pending final disposition of these *habeas corpus* petitions, Petitioners have moved for a temporary restraining order and a preliminary injunction restraining and enjoining Respondents from detaining Petitioners in Camp 5, Camp 6, or any condition of partial or total isolation, and further restraining and enjoining Respondents from detaining Petitioners in any but the least restrictive camp within JTF-GTMO..  As grounds for this relief, Petitioners state:

**I.      FACTS**

   **A.  Uighurs at Guantanamo**

Petitioners herein are six of 17 Uighur prisoners held at the United States Naval Station, Guantánamo Bay, Cuba ("Guantánamo"), where they have been incarcerated since May, 2002.[1] The Uighur ("WEE-ghur") prisoners are stateless refugees from the Xinjiang Uyghur Autonomous Region, a province of the People's Republic of China (also referred to as "East

---

[1] 22 Uighurs in all have been sent to Guantanamo. Five of the men – whose cases presented identical issues as do Petitioners' – were released to Albania in May, 2006. By Order of the Court dated July 9, 2008 (Hogan, J.) (coordinating judge) Petitioners' petitions for *habeas corpus* were consolidated with those of 11 other Uighur prisoners remaining in Guantanamo, and are pending resolution in this Court. The 11 other men are not petitioners in this action.

Turkistan"). Uighurs are a Turkic Muslim minority group that has been, and continues to be, brutally oppressed by the communist Chinese government.

The United States government has repeatedly and publicly acknowledged that the Uighurs imprisoned at Guantánamo are not the enemy, that they do not present a threat, and that they have been eligible for release for at least four years. *See*, *e.g.*, Interview with Colin Powell, Secretary of State, in Washington, D.C., at 5 (Aug. 12, 2004) ("[T]he Uighurs are a difficult problem and we are trying to resolve all issues with respect to all detainees at Guantánamo. The Uighurs are not going back to China, but finding places for them is not a simple matter, but we are trying to find places for them. And we are trying to find places for them, and, of course, all candidate countries are being looked at.").[2] Indeed, five Uighur prisoners – whose cases presented identical questions as the petitioners here – were declared non-enemy combatants and were released from Guantanamo to Albania in May, 2007.

Despite the government's actions and acknowledgements that they should be freed, Petitioners remain imprisoned at Guantánamo in conditions of unbearable near-isolation, and therefore have brought this motion for injunctive relief.[3]

Camp 6 is an imposing physical concrete structure. It has no windows, and is surrounded by multiple fences, razor wire, and checkpoints guarded by MPs. In Camp 6 Petitioners are completely isolated in small 6-foot-eight-inch by 12-foot cells. The cell walls, ceiling, and floor are solid metal. The air conditioning is run throughout the day to keep these cells uncomfortably

---

[2] *See also,* Tim Golden, For Guantánamo Review Boards, Limits Abound, N.Y. Times, Dec. 31, 2006, at A20 (quoting a national security official who worked on the Uighur cases, "[W]e were shocked that they even sent those guys before the C.S.R.T.s. They had already been identified for release.")

[3] On July 2, 2008, by agreement with the government following a similar motion for injunctive relief, counsel were notified that ten Uighur men were moved from the isolation of Camp 6 to the communal facility of Camp 4, where one Uighur man was already being held. The remaining six men – who languish in Camp 6 – are the petitioners in this action. Between 2003 and 2006, most of the Uighurs had been held in Camp 4, where they lived communally in a bunk house, ate communally at picnic tables, had 24-hour access to a small outside area (and thus to sunlight and fresh air), and most significantly, had 24-hour access to each other. *See* January 20, 2007 Declaration of Sabin Willett, *Parhat v. Gates*, No. 06-1397 (D.C. Cir. Jan. 22, 2007), ¶¶ 27-29, attached hereto as Exhibit 1.

cold. The metal floors and walls conduct what little heat Petitioners may emit, and are cold to the touch. See generally, Declaration of Sabin Willett dated January 20, 2007 ("Willett Decl.¶¶ 15-18, attached as Exhibit 1.

Each cell is barren, except for a bed, toilet, sink, and metal mirror. There is no natural light or air. Petitioner Mahmud has complained that he is painfully cold in his cell. Declaration of Elizabeth P. Gilson dated July 24, 2008 ("Gilson Decl.") ¶ 5, attached as Exhibit 2. There are no windows or openings in the walls, floor, or ceiling, except strips of glass approximately four inches wide by twenty four inches high. The glass gives a view only of the interior corridor where MPs are stationed, and of a clock. There is no window to the outside. Throughout the day and night the loud churning of the HVAC system and the banging of doors in the facility echo through metal corridors and cells. Willett Decl. ¶¶ 15-18.

Petitioners have extreme difficulty sleeping, and are often awakened (purposely) by the guards in the middle of the night. Prisoners are constantly watched by MPs, as they sleep, as they eat, and as they defecate. Petitioners have no television or radio, no access to magazines or newspapers, and no way to communicate with the outside world. They have no family visits. They are imprisoned alone, they eat alone, and they pray alone. They sometimes attempt to communicate basic messages with one another by crouching at the door and yelling through a small gap between the floor and the door. A cry can be heard in the halls at times, "Are you all right?" Generally there is silence. Willett Decl.¶ 17.

Petitioners have little room to move about in cells not much larger than a closet. They are permitted to spend part of their day in a "recreation" pen: a concrete box fifteen meters by four meters, and two stories high. This box is divided into cages, each three by four meters. Willett Decl. ¶ 22. Petitioners are permitted to spend up to four hours a day in these small cages, two

men to a cage. Participating in "recreation" involves standing within the caged area and sometimes kicking a soccer ball against the fence. *Id.*

There are no similar prisons in the United States. Camp 6 is generally modeled after a super maximum or "supermax" facility. The United States employs supermax prisons to isolate and punish its most violent and dangerous offenders. Altogether, supermax facilities hold around one percent of all prisoners. *See* Jeffery Klugar, *Are Prisons Driving Prisoners Mad?* Time, Jan. 26, 2007. It is widely reported that these prisons drive their prisoners insane. *Id.* (noting that the isolation in these prisons is a type of "touchless torture").[4] *See also, Locked Up Alone – Detention Conditions and Mental Health at Guantánamo*, Human Rights Watch, June 2008, at 20 ("HRW Report"), *available at* http://www.hrw.org/reports/2008/us0608/us0608web.pdf. As a result of these conditions, prisoners within Camp 6 are reportedly becoming psychotic. *See* Suleiman al-Khalidi, *Guantanamo Conditions Said Worse*, Reuters, Jan. 26, 2007. Their days are now filled with infinite tedium and loneliness. *See* Ben Fox, *Life Harsher in New Guantanamo Unit*, WASH. POST, Feb. 3, 2007. The Uighur prisoners within Camp VI are suffering similar consequences. Gilson Declaration, ¶ 6-7. Counsel has recently learned that two of the Uighurs in Camp 6 have attempted to commit suicide. Declaration of Seema Saifee dated July 28, 2008 ("Saifee Decl.") ¶ 8, attached as Exhibit 3; All have reported grave unhappiness. Petitioner Mahmud reports that he is plagued with voices that order him to cry out. Gilson Decl. ¶ 6. A number of Petitioners have attempted to starve themselves to death. Saifee Declaration ¶¶ 9 - 11.

---

[4] The supermax facilities also raise serious constitutional questions. Currently, at least seven states are facing charges that their supermax facilities are a form of cruel and unusual punishment.

### B.   *Parhat v. Gates*: military's "enemy combatant" determination is invalid.

Nearly seven years after Petitioners and the other Uighurs were brought to Guantánamo, and three years after they first filed their *habeas* petitions, an Article III court – finally – held a hearing on the question of whether the Government was properly detaining these men. All 17 Uighur prisoners at Guantánamo are being held on a theory that they *allegedly* were affiliated with a group (the "East Turkistan Islamic Movement" or "ETIM") that *allegedly* was associated with al Qaida or the Taliban and *allegedly* engaged in hostilities against the U.S. or its allies.[5]

The case, *Parhat v. Gates*, No. 06-139, 2008 WL 2576977 (D.C. Cir. June 20, 2008), was brought on behalf of one of the Uighur prisoners, Huzaifa Parhat.[6] After reviewing the matter under the provisions of the Detainee Treatment Act of 2005, the United States Court of Appeals for the District of Columbia held that the military's Combatant Status Review Tribunal ("CSRT") had invalidly declared that Parhat is an enemy combatant. *Id.* at *1. The court directed the government to release or to transfer Parhat, or expeditiously to hold a new CSRT consistent with the court's opinion. *Id.* at *3.[7]

---

[5] *See*, *e.g.*, FOIA CSRT 3102-09 (Abdul Nassar), *Id*. at 2469-85 (Petitioner Mahnut), *Id*. at 1614-22 (Thabid), *Id*. at 1920-35 (Abdul Razakah, ISN 219), *Id*. at 2844-55 (Abdul Ghappar, ISN 281), *Id*. at 1623-30 (Abdusabour, ISN 275), *Id*. at 2909-21 (Abdusemet, ISN 295), 3151-59 (Petitioner Memet, ISN 328), *Id*. at 1505-16 (Huzaifa Parhat, ISN 320), *Id*. at 1631-44 (Jalal Jalaldin ISN 285), *Id*. at 00161-77 (Sabir Osman, ISN 282). The FOIA CSRT documents were produced by the military under a Freedom of Information Act request filed by the Associated Press, *available at* http://www.dod.mil/pubs/foi/detainees/csrt/ARB_Transcript_Set_6_.pdf.

[6] Mr. Parhat is not a petitioner for purposes of this motion; he was moved from Camp 6 to Camp 4 on July 2, 2008. (See footnote 4, *supra*.)

[7] Noting the CSRT's conclusion that there was no source evidence that Parhat had ever joined ETIM, the Court declined to reach that question because of fundamental flaws in the other elements of the government's theory. *Id.* at *17-18. Specifically, the Court noted that the government's "evidence" was derived entirely from four intelligence reports describing ETIM's "activities and relationships as having 'reportedly' occurred, as being 'said to' or 'reported to' have happened, and as things that are 'suspected of' having taken place." *Id.* at *23.[7] But because the reports failed to identify any underlying source for who may have "reported," "said," or "suspected" such things, the Court found the reports inherently unreliable. *Id.* at *24. The Court held that, as a matter of law, the government's "bare assertions cannot sustain the determination that Parhat is an enemy combatant." *Id.* at *24.

## II. RESPONDENTS MUST BE RESTRAINED AND ENJOINED FROM DETAINING PETITIONERS IN SOLITARY CONFINEMENT CAMPS AND MUST TRANSFER THEM IMMEDIATELY TO MORE HUMANE CONDITIONS.

Since late 2006, Petitioners have endured conditions of almost-complete isolation at Guantanamo's Camp 6. Petitioners have suffered (and on information and belief continue to suffer) astonishingly harsh, and potentially-deadly isolation. The D.C. Circuit has now ruled that the government has failed to make a case for enemy combatant status for an individual – Parhat – who was so-classified on the *same* grounds as Petitioners here. Thus, under the existing state of the law the government has no lawful basis to detain Parhat. For the same reason, the government has no lawful basis to detain Petitioners in this action, each of whom was determined to be an enemy combatant under the same discredited rationale as was applied to Parhat.

### A. This Court's *habeas* jurisdiction gives it ample basis to grant the relief requested.

Petitioners expect shortly to move for an order directing their release, if necessary, into the United States. Petitioners expect the government to resist this request for relief. In the interim, however, the Court has broad power to fashion equitable relief as may be necessary in aid of its equity jurisdiction in habeas cases. *See SEC v. Vision Commc'ns, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996) (noting that the All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction"); *see also Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) (noting that centuries of tradition confirm that federal judges have "broad discretion in conditioning a judgment granting habeas relief"); *see* 28 U.S.C. § 2243 (directing courts to "dispose of [a habeas case] as law and justice require"); *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968) ("mandate [of § 2243] is broad with respect to the relief that may be granted"); *Jones v.*

*Cunningham*, 371 U.S. 236, 243 (1963) (habeas "never has been a static, narrow, formalistic remedy").

The Court also has broad and specific authority to order appropriate relief under *habeas corpus*, including relief in the nature of bail or parole, addressed to the condition or maintenance of the prisoner prior to final resolution of the *habeas* petition. *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969) (noting that a district court has "an inherent power to grant relief *pendente lite*, to grant bail or release, pending determination of the merits" and that "[r]elease is available in a habeas corpus action, which is a civil collateral attack"); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (citing to *Baker*, 420 F.2d at 1343); *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978); *Boyer v. City of Orlando*, 402 F.2d 966, 968 (5th Cir. 1968) (ordering the release of a habeas petitioner on bail pending exhaustion of state and federal remedies). In addition, the writ of habeas corpus has long dealt with movement of prisoners. *See, e.g.*, *United States v. Mauro*, 436 U.S. 340, 357 (1978) (power to issue writs of habeas corpus includes authority to issue such a writ when it is necessary to bring a prisoner into court to testify or for trial or to remove a prisoner in order to prosecute him in the proper jurisdiction where offense was committed).

In light of the D.C. Circuit's June 20 ruling in *Parhat*, the near-certainty of terrible harm to their psychological well-being, and astonishing length of these imprisonments, Petitioners have an urgent need, which cannot be remedied at law, to be protected from further exposure to the harsh regime of Camp 6. On information and belief, accommodations for Petitioners are immediately available in Camp 4. Camp 4, on information and belief, (i) already houses eleven

of the Uighurs[8] (ii) permits prisoners to live communally in a bunk-house arrangement, and (iii) represents the least restrictive imprisonment regimen currently available at JTF-GTMO.

Movement to Camp 4 would also assist with the overall goal of helping Petitioners recover from their psychological cruelty of their isolation, and readying them for transfer to the United States or an appropriate country.

### B. There is an Equitable Basis for Injunctive Relief Here.

This case does not fall within the Federal Rules of Civil Procedure, but the Court's All Writs authority gives it power to enter injunctions as appropriate. Reference to the standard for the issuance of injunctions shows that each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) the Petitioners will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) in light of the decision in *Parhat,* Petitioners are likely to succeed on the merits of their claims, and (4) there is a clear public interest in preventing the government from detaining individuals in astonishingly harsh, and potentially deadly isolation, particularly where the government has no lawful basis to detain them. *See Al-Fayed v. CIA*, 254 F.3d 300, 304 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

### C. Other Matters

Pursuant to Local Rule 7(m), counsel on July 25, 2008 sought the government's consent to a grant of this relief. No consent has been given.

As the prisoners are destitute, the Court should waive any requirement for a bond.

A grant of the relief requested herein lies within the sound discretion of the Court.

---

[8] See footnote 4, *supra.*

Petitioners have sought this emergency relief to address only the gravest, most immediate and emergent harms they are unlawfully suffering. Petitioners reserve all rights to seek other and further relief, and expect to seek such relief by means of further motion.

**WHEREFORE**, Petitioners request that their Motion be allowed, and that they be granted such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: July 29, 2008 | COUNSEL FOR PETITIONERS: |
| | /s/ Elizabeth P. Gilson |
| J. Wells Dixon(Pursuant to LCvR 83.2(g)) | Elizabeth P. Gilson(Pursuant to LCvR 83.2(g)) |
| Wdixon@ccr-ny.org | egilson@snet.net |
| CENTER FOR CONSTITUTIONAL RIGHTS | 383 Orange Street |
| 666 Broadway, 7th Floor | New Haven, CT 06511 |
| New York, NY 10012 | Telephone:(203) 777-4050 |
| Telephone: (212) 614-6423 | Facsimile: (203) 787-3259 |
| Facsimile:  (212) 614-6499 | *Counsel to Petitioners Bahtiyar Mahnut and Arkin Mahmud* |
| *Of Counsel for all Petitioners* | |
| | Susan Baker Manning |
| Eric A. Tirschwell (Pursuant to LCvR 83.2(g)) | BINGHAM McCUTCHEN LLP |
| Michael J. Sternhell (Pursuant to LCvR 83.2(g)) | 1120 20th Street NW, Suite 800 |
| Darren LaVerne (Pursuant to LCvR 83.2(g)) | Washington, DC 20036-3406 |
| Seema Saifee (Pursuant to LCvR 83.2(g)) | Telephone:  (202) 778-6150 |
| 1177 Avenue of the Americas | Facsimile:  (202) 778-6155 |
| New York, New York  10036 | |
| Telephone:  (212) 715-9100 | Sabin Willett (Pursuant to LCvR 83.2(g)) |
| Facsimile:  (212) 715-8000 | Neil McGaraghan (Pursuant to LCvR 83.2(g)) |
| *Counsel to PetitionerAdel Noori* | Rheba Rutkowski (Pursuant to LCvR 83.2(g)) |
| | Jason S. Pinney (Pursuant to LCvR 83.2(g)) |
| | BINGHAM McCUTCHEN LLP |
| | One Federal Street |
| | Boston, Massachusetts  02110 |
| | Telephone:  (617) 951-8000 |
| | Facsimile:  (617) 951-8736 |
| | *Counsel to Petitioners Hammad Memet, Khalid Ali, and Edham Mamet* |