IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
IN RE:                                    )
                                          )        Misc. No. 08-442 (TFH)
GUANTANAMO BAY                            )
DETAINEE LITIGATION                       )        Civil Action No. 05-CV-1704 (JR)
_____)

## RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Respondents hereby oppose the motion of Bahtiyar Mahnut and Arkin Mahmud ("petitioners") for a temporary restraining order and preliminary injunction seeking extraordinary court intervention and governance over the conditions of the petitioners' confinement at the United States Naval Base at Guantanamo Bay, Cuba ("Guantanamo Bay"), including their transfer between detention facilities. For the reasons discussed below, this Court lacks jurisdiction to consider the petitioners' motion, which challenges aspects of their detention and conditions of confinement that the Military Commissions Act of 2006 specifically withdrew from the Court's purview. This is so even in light of the Supreme Court's decision in *Boumediene v. Bush*, ___ U.S. ___, 128 S. Ct. 2229 (June 12, 2008). Moreover, even if the Court had jurisdiction, the petitioners have failed to meet the standard for obtaining the extraordinary and drastic remedy of a preliminary injunction. Their conditions-of-confinement claims are not cognizable in habeas and, in any event, their conclusory allegations fail to establish any likelihood of success on the merits, let alone demonstrate the substantial likelihood of success required for a preliminary injunction. The petitioners have likewise failed to demonstrate an imminent, irreparable harm that would justify injunctive relief, particularly because the conditions that they challenge are the product of their own actions. Further, the Court's micro-management of detention operations at Guantanamo—which is what the

petitioners seek—would impose significant burdens upon the government and other detainees, and would harm the public interest. This Court should thus deny the petitioners' motion.

**STATEMENT OF FACTS**

The petitioners, ethnic Uighurs from the People's Republic of China, have been detained as enemy combatants at Guantanamo Bay since 2002. Despite their status, the Department of Defense's administrative process has determined that the petitioners are eligible for release from the facility once a destination country that can provide assurances that satisfy U.S. obligations under the Convention Against Torture is identified.

The petitioners' motion focuses on second-guessing decisions that have been made by the United States military concerning the placement of detainees among the several facilities at Guantanamo Bay. As the attached Declaration of Colonel Bruce E. Vargo[1] ("Vargo Decl.") makes clear, a detainee's behavior and the risk that behavior presents to others are the primary considerations when determining the camp in which the detainee is housed. Vargo Dec. ¶ 8. Detainees who are highly compliant are housed in Camp 4. Detainees who are not compliant with facility rules are housed in the other facilities. *Id.* ¶ 4.

But even assignment to Camp 6 does not entail the "isolation" that the petitioners allege. Detainees at Camp 6 generally have communication with and recreation privileges with other detainees, as well as library access and the ability to participate in uninterrupted group prayer. *Id.* ¶ 7. Of course, as the detainees' behavior allows, they have been reassigned to a camp involving even less restrictive conditions. *Id.* ¶ 8.

---

[1] Colonel Vargo is a 23-year veteran officer of the United States Army. He serves as the commander of the Joint Detention Group for the military's Joint Task Force–Guantanamo Bay ("JTF-GTMO"). Vargo Decl. ¶ 1.

Under the Detainee Treatment Act of 2005 (DTA), Pub. L. No. 108-148, div. A, tit. X, 119 Stat. 2739, detainees at Guantanamo Bay may challenge the administrative process by which the military reviews a detainee's status, through decisions rendered by Combatant Status Review Tribunals ("CSRT"), before the U.S. Court of Appeals for the District of Columbia Circuit. Recently, that Court held that the record before another detainee's CSRT was insufficient for that Tribunal adequately to determine his status as an enemy combatant. *Parhat v. Gates*, ___F.3d___, 2008WL2576977, at *2 (D.C. Cir. June 20, 2008). The Court therefore remanded his case, ordering the government to either conduct a new CSRT or transfer or release him. *Id.*[2]

The petitioners, in the wake of *Parhat*, now seek to use their newly-recognized right to petition this Court for a writ of habeas corpus, *see Boumediene*, 128 S. Ct. 2229, to challenge the conditions of confinement at Camp 6. In particular, they seek a preliminary injunction requiring movement from Camp 6 to Camp 4. In the alternative, they urge this Court to order their parole or release. In short, they invite this Court to micro-manage the decisions made by military authorities concerning the safety, welfare and security of detainees and personnel at a military facility in time of war. This Court should reject that invitation.

---

[2] Contrary to the petitioners' claim here, the D.C. Circuit's decision does not mean that the "status quo is that the government has no lawful basis to detain Parhat," Pet. Mot. at 2, or, for that matter, any of these petitioners. Rather, in remanding the case for a new CSRT, the status of the detainee at issue in *Parhat* reverts to that of a detainee assessed to be an enemy combatant but awaiting review by a CSRT. *See Boumediene v. Bush*, ___U.S.___, 128 S. Ct. 2229, 2276 (June 12, 2008). The petitioners' claim that the government "has no lawful basis to detain" them because of the *Parhat* decision is wholly unsupported. Detainee Parhat's CSRT is thus far the only one that has been reviewed on its merits by the D.C. Circuit.

## ARGUMENT

For the reasons discussed below, this Court lacks jurisdiction to consider the petitioners' conditions-of-confinement claim because, even after the Supreme Court's *Boumediene* decision, 28 U.S.C. § 2241(e)(2) prevents this Court from considering challenges to any aspect of a detainee's detention apart from the core habeas function of inquiring into the lawfulness of that detention.  Moreover, even if this Court had jurisdiction, the petitioners' challenge would fail because they have not met their burden of demonstrating the need for the extraordinary preliminary injunction they seek.

## I.   THIS COURT LACKS JURISDICTION TO CONSIDER THE PETITIONERS' CHALLENGES TO ASPECTS OF THEIR DETENTION, AND THEIR MOTION SHOULD ACCORDINGLY BE DENIED OUTRIGHT.

Through section 7 of the MCA, Congress expressly withdrew from this Court's jurisdiction two independent types of actions that individuals detained by the United States as enemy combatants could bring.  Specifically, Congress carved out of this Court's jurisdiction claims concerning statutory habeas corpus generally:

> No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(1).  Congress separately withdrew federal court jurisdiction concerning any other aspects of the detention outside of the core habeas function, such that:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to *any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien* who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant . . . .

28 U.S.C. § 2241(e)(2) (emphasis added).  Under the recent decision in *Boumediene*, it is clear

that the Supreme Court did not invalidate the MCA except to the extent that it precluded courts

from exercising core habeas functions, *i.e.*, challenging the legality of the detention itself.

Petitioners' claims here indisputably fall outside the *Boumediene* holding because they do not

concern the core habeas function.  They do not challenge the legality of the petitioners'

detention, but rather the ancillary issue of the conditions of their confinement.  Jurisdiction is

therefore lacking and the motion must be denied.

> **A.**     ***Boumediene* Did Not Invalidate The MCA Except To The Extent That It Precluded Courts From Exercising Core Habeas Functions.**

In *Boumediene*, the Supreme Court held that Guantanamo Bay detainees have a

constitutional right to seek habeas corpus protected by the Suspension Clause, and that, as

applied to detainees who are being held on the basis of an enemy combatant determinations by a

CSRT and whose habeas challenge goes to the legality of their detention, section 7 of the MCA

operates as an unconstitutional suspension of the writ.  This holding is limited in two important

respects.

First, *Boumediene* holds that the first part of section 7 of the MCA, 28 U.S.C.

§ 2241(e)(1), is unconstitutional in some circumstances, but only insofar as it denies habeas

review to detainees who have available to them only the CSRT process and who raise a core

habeas challenge, that is, one that challenges the legality of their *detention*.  *See Boumediene*,

128 S.Ct. at 2269 ("The habeas court must have sufficient authority to conduct a meaningful

review of both the cause for detention and the Executive's power *to detain*.") (emphasis added).

Put another way, to the extent a petitioner seeks habeas relief concerning collateral or ancillary

issues not directly connected to the legality of detention, *Boumediene*'s holding does not

invalidate the jurisdiction limiting provision of § 2241(e)(1).  The result in *Boumediene* thus can

be read not as a facial invalidation of § 2241(e)(1), but an invalidation of § 2241(e)(1) only as applied to the particular factual situation presented, as it was never established that "no set of circumstances exists under which [section 7] would be valid."  *See United States v. Salerno*, 481 U.S. 739, 745 (1987).  Indeed, it is indisputable that the challenge presented by the *Boumediene* petitioners was not the right to raise a habeas challenge to some ancillary issue, such as the petitioners here seek to do, but rather a challenge to the legality of the fact of their detention at all.  *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 328–29 (2006) ("[T]he 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'") (citation omitted).

With regard to how much of § 2241(e)(1) remains operative following *Boumediene*, a reviewing court has an obligation to preserve as much of a statute as is legally permissible. Thus, "a court should refrain from invalidating more of the statute than is necessary," and "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of [the] court to so declare, and to maintain the act in so far as it is valid."  *Wyoming v. Oklahoma*, 502 U.S. 437, 460 (1992) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion)).  Thus, because Acts of Congress are valid to the extent they operate constitutionally, the Court's holding must be applied with an eye to "limit[ing] the solution to the problem."  *Ayotte*, 546 U.S. at 328.  Because the problem alleged in *Boumediene* as to § 2241(e)(1) concerned only a core habeas challenge to the legality of detention made by a petitioner with access only to the CSRT process, and not to an ancillary issue related only to conditions of confinement, § 2241(e)(1) remains operative here and removes jurisdiction with

regard to the instant challenge.

Second, *Boumediene*'s holding does not invalidate the second part of section 7. Indeed, the Court expressly noted that it was not deciding whether Guantanamo detainees have a constitutional right to bring non-core habeas claims, such as conditions of confinement claims—one type of claim barred by § 2241(e)(2). *See Boumediene*, 128 S.Ct. at 2274 ("[W]e need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement."). But even after *Boumediene*, Congress' withdrawal of federal court jurisdiction over "any other action . . . relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement" remains operative to deprive this Court of jurisdiction over petitioners' claims, which are ancillary to the core habeas issue.

The Supreme Court's rationale for invalidating § 2241(e)(1), as applied, has no application to § 2241(e)(2). The *Boumediene* majority discusses the detainees' constitutional right to bring only core *habeas* actions—challenging the lawfulness of detention—as opposed to the broader class of "any other action . . . relating to any aspect of the detention." *See, e.g.*, *id.* at 2262 ("Petitioners, therefore, are entitled to the privilege of habeas corpus *to challenge the legality of their detention*.") (emphasis added). Unlike § 2241(e)(1) however, § 2241(e)(2) does not impair the Guantanamo detainees' ability to pursue a writ of habeas corpus. Rather, it expressly limits *other* types of actions that Guantanamo detainees might bring. Indeed, the Court explicitly distinguished between habeas actions governed by § 2241(e)(1), and *other*, *non-habeas* actions governed by § 2241(e)(2), by recognizing that "[t]he structure of the two paragraphs [i.e. (e)(1) and (e)(2)] implies that habeas actions are a type of action 'relating to an aspect of the detention, transfer, treatment, trial, or conditions of confinement.'" *See id.* at 2243.

-7-

The Suspension Clause thus provides no basis for invalidating § 2241(e)(2), because that section addresses "other action[s]" and not any constitutional core habeas right the detainees may hold.

Additional evidence that *Boumediene* did not reach § 2241(e)(2) comes from the Court's discussion of what is constitutionally required in habeas proceedings.  That discussion does not suggest that Guantanamo detainees have a right to challenge "other action[s]" related to "aspects" of their detention.  Instead, the Court's discussion is phrased in terms limiting a detainee's habeas action narrowly to a challenge of his status or custody.  *See*, *e.g.*, *id.* at 2266 ("We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law."); *id.* at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain."); *id.* at 2273 (detainee must have opportunity to present "reasonably available evidence demonstrating there is no basis for his continued detention").  None of the language suggests that a petitioner's *constitutional* habeas rights include a right to challenge any other aspect related to their detention beyond its legality.  Thus, the Court's holding that the Suspension Clause requires invalidation of section 7 of the MCA as applied to aliens detained at Guantanamo should be read to apply only to the first part of section 7, that is, § 2241(e)(1), and only as discussed above.[3]

---

[3]  Although the Court's opinion refers generally to section 7, without identifying a particular subsection of 28 U.S.C. § 2241(e), *see*, *e.g.*, *Boumediene*, 128 S.Ct. at 2274 ("MCA § 7 thus effects an unconstitutional suspension of the writ."); *id.* ("The only law we identify as unconstitutional is MCA §7, 28 U.S.C.A. § 2241(e) (Supp. 2007)."), that is an insufficient basis for construing the Court's opinion to invalidate *all* of section 7.  This is particularly so because the Court's rationale for invalidating § 2241(e)(1) has no application to § 2241(e)(2).  In fact, at one point in its opinion, the Court seems to acknowledge that its reference generally to section 7

A contrary conclusion would require this Court to conclude that while the Supreme Court *expressly* held that § 2241(e)(1) is unconstitutional as applied to Guantanamo detainees, who have only had the benefit of CSRT procedures, it determined *sub silentio* the constitutionality of 28 U.S.C. § 2241(e)(2).  But if the Court had intended to pass on § 2241(e)(2)'s constitutionality, the only rationale that might have supported that conclusion would have been if the Court had determined that conditions of confinement claims are encompassed in the detainees' constitutional right to habeas, so that elimination of jurisdiction over those claims jeopardized their constitutional habeas right.  But, as noted above, the Court expressly stated that it was *not* deciding that issue.[4]  *See Boumediene*, 128 S.Ct. at 2274.

While the continuing vitality of § 2242(e)(2) is therefore clear, if any doubt remains this Court must consider its duty to preserve as much of a statute as is constitutional.  *See Tilton* v. *Richardson*, 403 U.S. 672, 684 (1971) ("'The unconstitutionality of a part of an act does not necessarily defeat . . . the validity of its remaining provisions.  Unless it is evident that the Legislature would not have enacted those provisions which are within its power . . . the invalid part may be dropped if what is left is fully operative as a law.'") (citation omitted).  Indeed,

---

is simply short-hand for referring to § 2241(e)(1).  *See id.* at 2265 (stating that MCA section 7 is the source of the relevant "jurisdiction-stripping language," but citing specifically to subsection § 2241(e)(1)).

[4]  Moreover, the fact that the constitutionality of § 2241(e)(2) was never challenged in *Boumediene* further supports the argument that the Court's holding does not invalidate that provision.  *See Belbacha* v. *Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008) ("In [the court of appeals' decision in] *Boumediene* we held that § 7(a)(1) [28 U.S.C. § 2241(e)(1)] of the MCA does not violate the Suspension Clause of the Constitution").  It would be odd to interpret the Court's decision in *Boumediene* as not only having reached the constitutionality of § 2241(e)(2), *sua sponte* and for the first time on appeal, but also to have determined that the provision is unconstitutional, without any explanation as to why.

-9-

because § 2241(e)(2) is severable, there is no obstacle to continuing to apply that provision,

despite *Boumediene*'s holding that § 2241(e)(1) cannot validly withdraw the privilege of the

writ of habeas corpus as applied to detainees at Guantanamo who have only the benefit of CSRT

procedures. *See Ayotte*, 546 U.S. at 330 ("After finding an application or portion of a statute

unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute

to no statute at all?").[5] Section 2241(e)(2) is thus severable and should remain in force. *Alaska*

*Airlines, Inc.* v. *Brock*, 480 U.S. 678, 685 (1987) ("[T]he unconstitutional provision must be

severed unless the statute created in its absence is legislation that Congress would not have

enacted"); *News America Pub., Inc.* v. *F.C.C.*, 844 F.2d 800, 802 (D.C. Cir. 1988) (noting that

the presumption is in favor of severability).

**B.      The Right to Seek a Writ of Habeas Corpus Recognized in *Boumediene* Does
          Not Encompass a Right to Challenge Ancillary Issues, Such as Conditions of
          Confinement.**

Section 2241(e)(1) still validly removes jurisdiction of issues ancillary to and beyond the

core habeas function of challenging the legality of detention and § 2241(e)(2) remains fully

---

[5]  The text and history of section 7 of the MCA demonstrate that Congress surely
intended § 2241(e)(2) to survive, even if the elimination of habeas jurisdiction in § 2241(e)(1)
could not.  In enacting the MCA, Congress sought to eliminate jurisdiction over ancillary issues,
precisely to prevent the Executive Branch from having to divert significant resources during the
duration of an armed conflict to respond to those claims. *See, e.g.*, 152 Cong Rec. S10403 (daily
ed. Sept. 28, 2006) (Sen. Cornyn) ("[O]nce . . . section 7 is effective, Congress will finally
accomplish what it sought to do through the [DTA] last year.  It will finally get the lawyers out
of Guantanamo Bay.  It will substitute the blizzard of litigation instigated by *Rasul v. Bush* with
a narrow DC Circuit-only review of the [CSRT] hearings."); 152 *id.* at S10367 (Sen. Graham)
(citing one petitioner's motion for preliminary injunction regarding conditions of confinement as
an examples of a claim that should be barred); *see also* 151 *id.* at S12656–57 (daily ed. Nov. 10,
2005) (Sen. Graham) (noting that DTA was intended to limit detainees' right to "challenge their
status"); 151 *id.* at S12659-60 (Sen. Kyl) (stating that DTA would grant detainees "substantial
rights to contest their status but not the right to clog up Federal courts" with medical malpractice
claims and complaints about food).

-10-

operative.  Consequently, there is no federal court jurisdiction over "any other action" concerning "any aspect" of the petitioners' detention, treatment or confinement, including the camp in which  a Guantanamo detainee is placed, except insofar as such actions may be constitutionally protected under *Boumediene*'s interpretation of the Suspension Clause. Therefore, under § 2241(e)(1) as applied to this claim and under § 2241(e)(2), the petitioners cannot state cognizable habeas claims, such as a challenge to the conditions of their confinement, unless their constitutional right to habeas corpus encompasses those claims.

The elimination of jurisdiction over such ancillary claims, however, could not constitute a Suspension Clause violation because they do not go to the core of habeas—challenges to the legality of detention—addressed by the Supreme Court in *Boumediene*.  A habeas action has historically been understood as a vehicle for challenging one thing only: the fact of detention or its duration.  Nothing else.  That is, the Great Writ concerns only relief that, if granted, will result in the petitioner's *release* from confinement, not with other ancillary issues.  The petitioners' claims here, which concern their conditions of confinement, are far from the heart of habeas as a remedy for unlawful detention.  Jurisdiction is therefore lacking to consider these claims.

The Supreme Court thus far has been unwilling to water down the writ from its core purpose in the way the petitioners seek.  *See Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself."); *see also Wilkinson v. Dotson*, 544 U.S. 74, 86 (2005) (Scalia, J., concurring) (noting that conditions-of-confinement claims in habeas would "utterly sever the

writ from its common-law roots"); *Brown v. Plaut*, 131 F.3d 163, 168–69 (D.C. Cir. 1997)

(indicating that requiring the use of habeas corpus for conditions claims would extend the writ

beyond its core). Indeed, the courts of appeals have held that conditions-of-confinement claims

that do not seek accelerated release from custody are not within the scope of the writ. *See Doe v.*

*Pennsylvania Bd. of Probation & Parole*, 513 F.3d 95, 100 n.3 (3d Cir. 2008) (noting that habeas

is limited to "[a]ttacks on the fact or duration of the confinement" and does not include

"[c]hallenges to conditions of confinement"); *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir.

2006) (noting that habeas corpus actions are not the proper vehicle for challenging conditions of

confinement); *Glaus v. Anderson*, 408 F.3d 382, 387–88 (7th Cir. 2005) (noting the Supreme

Court has "never found" a challenge to prison conditions that "qualified" as a habeas corpus

claim); *Rael v. Williams*, 223 F.3d 1153, 1154 (10th Cir. 2000) ("[F]ederal claims challenging

the conditions of . . . confinement generally do not arise under § 2241."); *Pischke v. Litscher*,

178 F.3d 497, 499 (7th Cir. 1999) (stating that habeas action is proper "only if the prisoner is

seeking to 'get out' of custody in a meaningful sense"); *Badea v. Cox*, 931 F.2d 573, 574 (9th

Cir. 1991) ("Habeas corpus proceedings are the proper mechanism for a prisoner to challenge the

'legality or duration' of confinement," but not to "challeng[e] 'conditions of . . . confinement.'")

(citation omitted). Indeed, in *Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953), the D.C.

Circuit recognized that a habeas action "is not the correct remedy" for challenging "discipline or

treatment," *id.* at 419–20.[6]

---

[6] In *Miller*, the D.C. Circuit allowed the petitioner to challenge the legality of his
confinement to a mental institution, because the challenge was essentially a core habeas
claim—disputing that he was not insane and thus could not be held in a facility for the criminally
insane—rather than an attack on the conditions of lawful confinement. *See* 206 F.2d at 418
("[T]his habeas corpus proceeding . . . tests only the legality of his present confinement . . . .");

Thus, even prior to the MCA, a detainee could not have challenged his conditions of

confinement under statutory habeas jurisdiction. And if statutory habeas jurisdiction prior to the

MCA did not encompass challenges to conditions of confinement, *a fortiori* the writ as it existed

at common law in 1789 would not have permitted such claims. *See Rasul v. Bush*, 542 U.S. 466,

474 (2004) (stating that the "habeas statute clearly has expanded habeas corpus 'beyond the

limits that obtained during the 17th and 18th centuries'"). Although the Supreme Court in

*Boumediene* noted that the Court has not "foreclose[d] the possibility that the protections of the

Suspension Clause have expanded along with post-1789 developments," *Boumediene*, 128 S. Ct.

at 2248, there is nothing in the Court's opinion to suggest that the detainees' constitutional

habeas rights extend beyond the common-law writ as it existed in 1789, or require them to be

able to challenge their conditions of confinement. In fact, the *Boumediene* Court expressly

declined to address whether the constitutional writ of habeas corpus encompasses claims

regarding unlawful conditions of confinement. *See id.* at 2274. Thus, the Suspension Clause

should be read, at most, to protect the common-law writ as it existed in 1789. In any event,

however, even if the writ protected by the Suspension Clause has expanded along with the

habeas statute, the habeas statute has not been interpreted to allow challenges to conditions of

---

*id.* at 419 (noting that the "legal validity of confinement in a certain place is a different problem" than "discipline or treatment in a place of legal confinement"); *see also Blair-Bey v. Quick*, 151 F.3d 1036, 1041–42 (D.C. Cir. 1998) (acknowledging possibility that habeas "might be available to challenge prison conditions in at least some situations," but that "pure prison-conditions cases" are "easy to identify" as outside the scope of habeas corpus); *Brown v. Plaut*, 131 F.3d 163, 1689–69 (D.C. Cir. 1997) (use of habeas corpus to challenge conditions of confinement would extend "beyond the 'core' of the writ"). The same consideration is not present here, where the petitioners as enemy combatants are lawfully detained—or have recourse in core habeas proceedings to challenge that detention—and here attack only the conditions of their detention.

confinement, as explained above.[7]  Accordingly, the MCA's elimination of jurisdiction over

conditions-of-confinement claims brought by Guantanamo detainees does not implicate the

Suspension Clause.

Indeed, the Court's decision in *Munaf v. Geren*, ___ U.S. ___, 128 S. Ct. 2207 (June 12,

2008)—decided the same day as *Boumediene*—further supports this understanding of the writ's

scope.  In *Munaf*, the Court emphasized that "[h]abeas is at its core a remedy for unlawful

detention. . . . The typical remedy is, of course, release."  *Munaf*, 128 S. Ct. at 2221 (citing

*Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion)); *see also Preiser v. Rodriguez*,

411 U.S. 475, 484 (1973), *quoted in Munaf*, 128 S. Ct. at 2221 ("[T]he traditional function of the

writ is to secure release from illegal custody.").  Accordingly, the Court refused to extend the

relief that a habeas court could grant to the *Munaf* petitioners' collateral challenge to their

transfer to Iraqi custody.  *Munaf*, 128 S. Ct. at 2228 ("Habeas corpus does not require the United

States to shelter such fugitives from the criminal justice system of the sovereign with authority to

prosecute them.").  As with the collateral claims at issue in *Munaf*, the petitioners' pleas for

relief here fall well outside the core of a habeas corpus proceeding, and request a form of relief

that may not be granted in habeas.[8]

---

[7]  Even if the habeas statute were to permit conditions-of-confinement claims, the
Guantanamo detainees have no rights under the habeas statute.  *See* MCA § 7, 28 U.S.C.
§ 2241(e)(1); *Boumediene*, 128 S. Ct. at 2278 (Souter, J., concurring) ("Subsequent legislation
eliminated the statutory habeas jurisdiction over these claims, so that now there must be
constitutionally based jurisdiction or none at all.").  There is no authority for the proposition that
*constitutional* habeas corpus encompasses challenges to the conditions of confinement.

[8]  The petitioners alternative request for relief—release or parole into the United States
—does arguably implicate the core of habeas corpus concerns.  However, any such relief in this
context raises issues pertaining to national security that are beyond the Court's expertise, not to
mention grave separation of powers concerns.  For this reason, this very Court has already held

-14-

II.     **EVEN IF THIS COURT HAD JURISDICTION TO ENTERTAIN THE PETITIONERS' MOTION, IT SHOULD BE DENIED BECAUSE THE PETITIONERS FAIL TO MEET THEIR BURDEN OF SHOWING A NEED FOR THE EXTRAORDINARY AND DRASTIC INJUNCTIVE RELIEF THEY SEEK.**

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in his request for a preliminary injunction, the petitioner "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" *See Katz v. Georgetown Univ.*, 246 F.3d 685, 687–88 (D.C. Cir. 2001) (quoting *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

A.     **The Petitioners Have Not Established that They Face Any Imminent, Irreparable Injury.**

Even if this Court had jurisdiction to consider the petitioners' motion, their request for a preliminary injunction should be denied because their submission on its face fails to demonstrate an irreparable harm that may be remedied by the relief they seek.

The irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758

---

that it cannot offer the requested relief even to Guantanamo detainees who are deemed to be no longer enemy combatants. *See Qassim v. Bush*, 407 F. Supp. 2d 198, 201–02 (D.D.C. 2005). For reasons stated in *Qassim*, the release or parole of these petitioners would be inappropriate. However, this Court need not even consider the propriety of release or parole because, as discussed below, the petitioners have not demonstrated a likelihood of success on the merits or any irreparable harm, so preliminary injunctive relief of any form is unwarranted.

-15-

F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citations and internal quotation marks omitted; emphasis in original). Injunctions are not intended "to prevent injuries neither extant nor presently threatened, but only merely feared." *Comm. in Solidarity v. Sessions*, 929 F.2d 742, 745–46 (D.C. Cir. 1991).

The petitioners' conclusory allegations of harm do not rise to this level and, indeed, they are without merit. There is no evidence that the petitioners risk irreparable harm from their conditions of confinement, nor that such harm is imminent. In fact, to the extent that the petitioners plead potential mental harm from being held in "isolation," the attached declaration makes clear that the petitioners are confined in conditions that do not even approach "isolation." They have regular and meaningful opportunities for human interaction and exercise, Vargo Decl. ¶ 3, and steps have been taken to provide them with additional privileges where consistent with security requirements based on their behavior, *id.* ¶¶ 7, 13.

Indeed, even if the petitioners have adequately alleged a harm, they have failed to demonstrate that it is irreparable without action from this Court. The petitioners are housed in Camp 6 because they have been noncompliant and have committed infractions of the facility rules, including assaulting United States military personnel. *Id.* ¶¶ 10, 12. Any alleged harm that results from their detention in Camp 6 is thus easily reparable: the petitioners could simply comply with facility rules, cease posing a security threat, and earn assignment to Camp 4. *Id.* ¶ 9. The alleged injury is far from being irreparable—the correction of any alleged harm rests

entirely within the petitioners' own hands.  *Id.*[9]

### B. The Relief Petitioners Request Would Impose Substantial and Undue Burdens on the Government and Injure its Interests, as Well as Those of Other Detainees.

Courts are understandably reluctant to intervene in the management of detention facilities and to second-guess the security judgments made by trained personnel.  *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *Bell v. Wolfish*, 441 U.S. 520, 548, 562 (1979).  Deference to the considered judgment of Guantanamo staff is particularly appropriate under the unique circumstances here, involving enemy combatants detained by the military in a time of war.

It is clear from the attached declaration that the assignment of detainees to camps within the Guantanamo Bay facility is dependent upon security concerns.  When a detainee fails to comply with facility regulations or engages in assaultive behavior, Guantanamo staff must maintain security and protect the welfare of individuals in the facility by assigning him to a more-restrictive camp.  Vargo Decl. ¶ 8; *see also id.* ¶ 2 (noting the goal of facility staff is to protect the welfare and safety of security personnel and detainees).

A judicial decree to move assaultive detainees into a less restrictive facility would place a significant burden on military staff, who will be forced to dedicate additional personnel and

---

[9] Further, the timing of the petitioners' motion is curious in this regard.  The motion followed closely on the heels of the D.C. Circuit's *Parhat* decision, but months after the petitioners were housed in Camp 6.  Vargo Decl. ¶ 12.  Nothing in the *Parhat* decision served to create an irreparable harm to the petitioners, and the lapse in time between their assignment to Camp 6 and the filing of this petition demonstrates that the harm the allege is not imminent or irreparable.  *See, e.g.*, *Tenacre Found. v. INS*, 892 F. Supp. 289, 294 n.5 (D.D.C.), *aff'd* 78 F.3d 693 (D.C. Cir. 1996) ("[P]laintiff waited seven months after receiving the denial notice from the AAU before filing suit, and plaintiff waited another month after filing suit to file a motion for preliminary injunction. . . . the time lapse undermines any assertions that plaintiff will suffer irreparable harm if the Court does not grant preliminary injunctive relief.").

resources to monitor a detainee in conditions that make it far more difficult to maintain control. The danger of such intervention, however, goes beyond injecting the Court into micro-managing decisions that are best made by trained personnel, because the burden would be borne by individuals that the security arrangements are meant to protect: military staff and detainees at Guantanamo.  That is, if this Court orders an assaultive and noncompliant detainee to be placed in a facility where adequate controls over his behavior are difficult to maintain, the likelihood that the detainee will injure military personnel or other detainees significantly increases.  *Cf. Wilkinson v. Austin*, 545 U.S. 209, 227–28 (2005) (noting that, in due process inquiry, state's interest in maintaining security against prison gangs and resource considerations were the "dominant consideration").  That possibility is not mere speculation.  As Colonel Vargo notes, Camp 4 is the most dangerous environment at Guantanamo because it allows detainees to plan and act in concert, sometimes with violent results.  Vargo Decl. ¶ 6.  Granting the petitioners' motion would, in essence, require military personnel to place detainees who are noncompliant and dangerous, *id.* ¶ 10,  in the camp where they would most seriously threaten the security of the facility, and the health, safety and welfare of guards and other detainees, *id.* ¶ 14.

Regardless whether petitioners have any right to seek the relief they request, its costs should not be borne by other interested parties—Guantanamo staff and, not incidentally, other detainees.  This Court should thus deny a preliminary injunction.

### C. The Petitioners Have Little Chance of Success on the Merits of Their Conditions of Confinement Claims Even if They Were Cognizable in Habeas.

Even if the petitioners' conditions-of-confinement claims were cognizable in habeas, they have little or no chance of success on the merits.  Because no court has ever determined that wartime military detainees can even bring constitutional conditions-of-confinement claims,

particularly in the habeas context, no court has definitively determined what legal standard should be applied to evaluate such claims brought by detainees in the custody of the military. *See O.K. v. Bush*, 377 F. Supp. 2d 102, 112 n.10 (D.D.C. 2005) ("No federal court has ever examined the nature of the substantive due process rights of a prisoner in a military interrogation or prisoner of war context."). This remains true even after *Boumediene*. *See Boumediene*, 128 S. Ct. at 2274.

However, of the settings in which courts have analyzed conditions-of-confinement claims, the most analogous is that of detained unadmitted or excludable aliens, in which courts have considered only whether the challenged conditions constituted "gross physical abuse." *See Adras v. Nelson*, 917 F.2d 1552, 1559 (11th Cir. 1990); *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987). In the other two settings—those of imprisoned criminals and pretrial detainees—courts have applied the Eighth Amendment's "deliberate indifference" standard, *see Farmer v. Brennan*, 511 U.S. 825, 846 (1994) (requiring prisoner to establish that prison officials "were knowingly and unreasonably disregarding an objectively intolerable risk of harm" to the prisoners' health or safety), or inquired whether the conditions constitute "punishment," *Block v. Rutherford*, 468 U.S. 576, 583 (1984) ("[W]here it is alleged that a pretrial detainee has been deprived of liberty without due process, the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment . . . ."); *see Wolfish*, 441 U.S. at 523; *Brogsdale v. Barry*, 926 F.2d 1184, 1188 n.4 (D.C. Cir. 1991); *see also Arar v. Ashcroft*, ___F.3d___, 2008 WL 2574470, at *24–25 (2d Cir. June 30, 2008) (noting the difference between the "gross physical abuse" and *Wolfish* standards, but not resolving which standard applies because the complainant failed to plead a cause of action under either standard).

-19-

Regardless which standard, if any, actually applies to these petitioners, one principle animates all three approaches: courts accord substantial deference to the judgment of prison administrators and generally refrain from interfering in the day-to-day operations of detention facilities. *See, e.g.*, *Wolfish*, 441 U.S. at 548, 562 (explaining that the operation of even domestic "correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial," and cautioning lower courts to avoid becoming "enmeshed in the minutiae of prison operations"). This deference is, naturally, at its height when the court is asked to second-guess decisions made by facility personnel that concern institutional security. *See Thornburgh v. Abbott*, 490 U.S. 401, 407–08 (1989) ("Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 841 (D.C. Cir. 1988) (noting that "courts are not to be in the business of running prisons" and that "questions of prison administration are to be left to the discretion of prison administrators").

Those same principles which counsel against judicial interference in the penal context should apply with even greater force in this unique context, where detainees are challenging how military forces balance the need for adequate security at a military detention center during a time of war. *See Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.") (citing cases); *see also Almurbati v. Bush*, 366 F. Supp. 2d 72, 81 (D.D.C. 2005) ("[I]t is a fundamental principle under our Constitution that deference to the Executive Branch must be

afforded in matters concerning the military and national security matters."). Keeping these principles in mind, it is clear that the appropriate standard for this Court to apply—if reaching this point is even necessary—is the "gross physical abuse" standard.

This result follows, in part, as a matter of status. Guantanamo detainees are aliens who have not been admitted to the United States. Moreover, they have not been convicted of any crime, and thus cannot rely on the Eighth Amendment-based "deliberate indifference" standard in challenging their conditions of confinement. *See, e.g.*, *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 465–78 (D.D.C. 2005) (dismissing Eighth Amendment claims). But the petitioners also are not "pretrial detainees," at least not as defined by the Supreme Court, because they have not been charged with a crime, nor are they being detained as part of the civilian criminal justice system. *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality opinion) (noting that purpose of detention of enemy combatants and unlawful enemy combatants is not punishment or penal in nature). Moreover, the criminal justice interests served by confining "pretrial detainees" are completely distinct from the military and national security interests served by detaining individuals, such as the petitioners, in conjunction with ongoing hostilities. *Compare Wolfish*, 441 U.S. at 536-37 (describing the criminal justice interest served by pretrial detention as ensuring the defendant's presence at trial), *with Hamdi*, 542 U.S. at 518 (plurality opinion) ("The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants . . . are 'important incident[s] of war.' The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once

again.") (citation omitted).[10]

Rather, these alien detainees are held outside the continental United States in military, administrative, detention, at a time of war and under circumstances in which this Court owes the highest degree of deference to executive decisions affecting the mechanics of detention.  In this way, the petitioners are most akin to the unadmitted aliens at issue in *Adras v. Nelson*, 917 F.2d 1552 (11th Cir. 1990) and *Lynch v. Cannatella*, 810 F.2d 1363 (5th Cir. 1987).  The inquiry this Court should thus make, if it reaches the likelihood of success on the merits, is whether the petitioners have presented evidence of "gross physical abuse," such that the Court's direct intervention in the management of the Guantanamo facility is likely warranted.[11]

---

[10]    Although the principle does not apply to these petitioners, some detainees who are charged with crimes under the MCA and are subject to trial by military commission may argue that they are "pretrial detainees."  This argument is unavailing.  First, *Boumediene* recognized only the right of a detainee to challenge the lawfulness of his detention, not other procedural rights.  Second, the question whether an enemy combatant has committed a crime—the province of the military commission—is separate from the issue that *Boumediene* allows this Court to consider: whether the detainee is an enemy combatant in the first place.  It is to this latter question that the substantive review standard attaches.  Third, relatedly, even apart from the unresolved question whether these detainees have due process or other constitutional rights, the purpose for detaining an unlawful enemy combatant for trial is not to ensure his appearance at trial or punish him for a crime.  Rather, the purpose remains to incapacitate the combatant and prevent him from again taking up arms.  *See Hamdi*, 542 U.S. at 518 (plurality opinion) (noting that the purpose of "the capture and detention of . . . unlawful combatants . . . . is to prevent captured individuals from returning to the field of battle and taking up arms once again").

[11]    The petitioners may assert that they need not satisfy the demanding "gross physical abuse" or "deliberate indifference" standards by alternatively arguing that courts have inherent authority under the habeas statute, the All Writs Act or otherwise to take whatever action necessary to protect the lives and health of all habeas petitioners.  This argument falters on the facts of these cases; as noted below, the petitioners' conclusory allegations fail to state any reason for this Court to believe that their lives or health are at risk.  Moreover, such a theory would involve standardless and unbounded court oversight of detention conditions, all in the name of preserving habeas petitioners' access to the courts, which is not and cannot be the appropriate legal standard.  Any court oversight of conditions of confinement (even if cognizable in habeas, which respondents dispute) must be tethered to an appropriate legal standard, and the

The petitioners' submission falls far short of this benchmark.  In substance, the petitioners apparently allege, in conclusory fashion and without any basis, that they are suffering an "alarming deterioration in their psychological well-being," and they also note as a substantive matter the "astonishing length of these imprisonments."  Pet. Mot. at 4.  They also apparently allege—again, in conclusory fashion—that the conditions under which they are held at Camp 6 constitute "almost complete isolation," causing them to suffer "astonishingly harsh, and potentially deadly isolation."  *Id.* at 3.

These vague allegations are unsupported by the record.  Indeed, what the record demonstrates is that the petitioners are *not* being held in "virtual isolation."  Although Camp 6 is modeled after maximum-security prisons in the United States, there are no solitary confinement facilities at JTF-GTMO.  Vargo Decl. ¶ 3.  Indeed, conditions in Camp 6 normally allow detainees regularly to interact with security personnel and each other.  *Id.* ¶ 7.  In addition, these particular petitioners' ability to interact is fostered by physical modifications to their facilities that allow them better to communicate with each other.  *Id.* ¶ 13.  They are allowed extended recreation and dining time, and further allowed to share these times with more detainees than is otherwise authorized.  *Id.*[12]  In short, the petitioners have failed to establish any physical abuse

---

case law, even in the context of domestic incarceration of those possessed of full constitutional rights, requires that prison conditions or care sink to the level of "deliberate indifference" to an inmate's health or well-being before a court may intervene in the management of a detention facility.  *See Neitzke v. Williams*, 490 U.S. 319, 321 (1989).  The standard for unadmitted aliens detained in administrative custody—here, detained as enemy combatants by the armed forces in time of war—must be even more demanding.

[12]  The respondents do not, of course, concede that the conditions of the petitioners' detention would warrant relief if their activities were as restricted as those of a "typical" resident of Camp 6.  The careful attention that military authorities have given to tailoring restrictions to balance the circumstances of individual detainees and the needs of institutional security, *see,*

that would be remedied by their transfer to Camp 4.

Indeed, this same result would obtain even if the Court were to find that a different standard, such as that of "deliberate indifference," applies to these detainees. *See, e.g.*, *O.K. v. Bush*, 344 F. Supp. 2d 44, 60–63 & n.23 (D.D.C. 2004) ("Without concluding that the 'deliberate indifference' doctrine is the correct standard for any constitutional claims the petitioners may raise . . . the Court will draw on this well-developed body of law to guide its analysis . . . ."). Under that standard, only upon a showing that prison conditions or care sink to the level of "deliberate indifference" to an inmate's health or well-being is a court justified in intervening in the treatment of inmates in the traditional penal prison setting. *See Neitzke v. Williams*, 490 U.S. 319, 321 (1989); *Chandler v. District of Columbia Dept. of Corrections*, 145 F.3d 1355, 1360 (D.C. Cir. 1998) ("To prevail in a case alleging unconstitutional conditions of confinement, a prisoner must show that the government official 'knew of and disregarded an excessive risk to inmate health or safety.'") (citation omitted).

The petitioners' conclusory allegations do not demonstrate any such indifference and, indeed, the record shows that military officials at Guantanamo Bay are well aware and comply with their obligations to maintain safe and humane detainee conditions while ensuring institutional security. *See, e.g.*, Vargo Decl. ¶¶ 2, 7. Accordingly, even if habeas courts have the authority to consider challenges to a detainee's confinement conditions, the petitioners are not likely to succeed on the merits of their challenge because they cannot demonstrate that the

---

*e.g.*, Vargo Decl. ¶¶ 6, 13, however, demonstrates why decisions about facility management are particularly unsuited for judicial determination.

Guantanamo staff has been deliberately indifferent to their health or well-being.[13]

The petitioners' request for relief invites this Court to micro-manage the manner in which they are detained. Their motion asks for the type of judicial intervention and oversight of the operations at Guantanamo that is highly discouraged under the law and particularly unwarranted in the unique context presented in this case. Indeed, as discussed above, their motion is an invitation to inject security *risks* into the facility against the considered judgment of those charged with maintaining the health, welfare and safety of these and other detainees. *See, e.g.*, *id.* ¶¶ 6, 10. But this Court is "not equipped or authorized to assume the broader roles of a congressional oversight committee or a superintendent of the operations of a military base." *O.K.*, 377 F. Supp. at 114. It should therefore reject the petitioners' invitation.

### D. The Public Interest Would Not be Served by a Preliminary Injunction.

Finally, the public has a strong interest in assuring that the military and security operations provided at Guantanamo are not interrupted, overly burdened, and second-guessed by the unnecessary demands of these petitioners pertaining to the particulars of their confinement conditions. As demonstrated above, the Guantanamo staff has taken and will continue to take appropriate and careful measures to preserve the life and health of the petitioners, as well as that of military personnel and other detainees. Accordingly, to avoid the unnecessary burdens imposed by petitioner's motion, the public interest would best be served if the Court denied the motion.

---

[13] Other Judges of this Court have rejected similar challenges by other Guantanamo detainees to their conditions of confinement, suggesting petitioner's claim is also not likely to succeed. *See, e.g.*, *El-Banna v. Bush*, 394 F. Supp. 2d 76, 78–79 (D.D.C. 2005); *O.K. v. Bush*, 344 F. Supp. 2d 44, 60–63 (D.D.C. 2004).

## CONCLUSION

For the reasons stated above, respondents respectfully request that the petitioners' motion for preliminary injunction be denied in all respects.

Dated: July 11, 2008                    Respectfully submitted,


                                        GREGORY G. KATSAS
                                        Assistant Attorney General

                                        JOHN C. O'QUINN
                                        Deputy Assistant Attorney General


                                        ___/s/ *Paul E. Ahern*_____
                                        JOSEPH H. HUNT (D.C. Bar No. 431134)
                                        VINCENT M. GARVEY (D.C. Bar No. 127191)
                                        JUDRY L. SUBAR
                                        TERRY M. HENRY
                                        ANDREW I. WARDEN
                                        PAUL E. AHERN
                                        Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Avenue N.W.
                                        Washington, DC  20530
                                        Tel:  (202) 514-3755
                                        Fax:  (202) 616-8470

                                        Attorneys for Respondents