UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY<br>DETAINEE LITIGATION | : Misc. No. 08-442 (TFH)<br>:<br>: Civil Action No. 05-1509 (RMU)<br>: Civil Action No. 05-1602 (RMU)<br>: Civil Action No. 05-1704 (RMU)<br>: Civil Action No. 08-1310 (RMU) |

**PETITIONERS' REPLY BRIEF IN SUPPORT OF THEIR MOTION
FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

The government devotes 11 pages of its opposition memorandum to arguing that Section 7 of the Military Commissions Act of 2006 strips this Court of jurisdiction to consider Petitioners' motion for release from solitary confinement into a more humane setting pending resolution of their *habeas* petitions. The government also argues that even if the Court does have jurisdiction, Petitioners have failed to demonstrate the need for injunctive relief. The government's argument is unavailing on both grounds, and Petitioners should be granted the temporary remedy that they seek.

I.  **THIS COURT HAS JURISDICTION TO ORDER THE RELIEF THAT PETITIONERS SEEK.**

   A.  **The jurisdiction-stripping provisions of section 7 are not relevant to these cases, to these prisoners, or to this Court.**

   1.  *Petitioners are entitled to a remedy under habeas and parole to Camp 4 is appropriate here*

In the first place, Petitioners do not seek to improve the conditions of their confinement in Camp 6, *per se*. Petitioners instead are asking the Court to order the conditional release of these men out of a situation of near-isolation into the relatively-

more-humane conditions of Camp 4. As such, it is more akin to a motion for parole, invoking the Court's inherent power to fashion relief as may be necessary in aid of its equity jurisdiction in *habeas* cases. "[W]hen the judicial power to issue *habeas corpus* properly is invoked the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release."). *Boumediene v. Bush*, ___ U.S. ___, 128 S.Ct. 2229, 2271 (June 12, 2008).

The Court has broad and specific authority to order appropriate relief under *habeas corpus*, including relief in the nature of bail or parole, addressed to the condition or maintenance of the prisoner prior to final resolution of the *habeas* petition. *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969) (noting that a district court has "an inherent power to grant relief *pendente lite*, to grant bail or release, pending determination of the merits.").

Here, Petitioners are not seeking parole into the United States by this motion. *Cf. Clark v. Martinez*, 543 U.S. 371 (2005)( refugee petitioners were not lawful aliens, and they were not "admitted," but rather "paroled" into the United States). They are only asking the Court to exercise its inherent power – unrelated to its statutory authority – to release them from Camp 6 by paroling them to Camp 4, still within the custody of the military at Guantanamo.

### 2. *Petitioners will demonstrate that they were not properly classified as enemy combatants under the Parhat standard.*

Section 7 of the MCA does not affect these petitioners, who can demonstrate that their detention is unlawful and that they have not been "properly detained as [] enemy combatant[s]." 28 U.S.C. §2241(e)(2)(precluding courts from considering aspects of

2

detention, transfer, treatment, trial or conditions of confinement of an alien who is or was detained by the United States *and has been determined by the United States to have be properly detained as an enemy combatant. . . .")(emphasis added).

Indeed, as was described more fully in Petitioners' Memorandum of Points and Authorities, the D.C. Circuit has determined as a matter of law, that the military's Combatant Status Review Tribunal ("CSRT") had invalidly declared one of Petitioners' Uighur brothers, Huzaifa Parhat, as an enemy combatant. *Parhat v. Gates*, No. 06-139, 2008 WL 2576977 (D.C. Cir. June 20, 2008). The court directed the government to release or to transfer Parhat, or expeditiously to hold a new CSRT consistent with the court's opinion. *Id.* at *3; *id.* at *24 (the government's "bare assertions cannot sustain the determination that Parhat is an enemy combatant.").

In light of the decision in *Parhat,* Petitioners – whose detention is premised on the same discredited allegations as Parhat[1] – will be able to establish that their enemy combatant status also is invalid and that they should be released from military custody. In the meanwhile, release to Camp 4 is a proper temporary remedy. Nowhere is the imperative for fashioning a remedy more urgent than in a case of "actual innocence." *Schlup v. Delo,* 513 U.S. 298 (1995). *Accord, SEC v. Vision Commc'ns, Inc.,* 74 F.3d 287, 291 (D.C. Cir. 1996) (noting that the All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction"); *see also Hilton v. Braunskill,* 481 U.S. 770, 775 (1987) (noting that centuries of tradition confirm that federal judges have "broad discretion in conditioning a judgment granting habeas relief"); *see* 28 U.S.C. § 2243

---

[1] All 17 Uighur prisoners at Guantánamo are being held on a theory that they *allegedly* were affiliated with a group (the "East Turkistan Islamic Movement" or "ETIM") that *allegedly* was associated with al Qaida or the Taliban and *allegedly* engaged in hostilities against the U.S. or its allies.

3

(directing courts to "dispose of [a habeas case] as law and justice require"); *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968) ("mandate [of § 2243] is broad with respect to the relief that may be granted"); *Jones v. Cunningham*, 371 U.S. 236, 243 (1963) (habeas "never has been a static, narrow, formalistic remedy").

### 3. *Continued detention in Camp 6 is motivated by a desire to punish.*

In defending its punitive isolation regime, the government invokes principles of judicial deference to administrative judgment that have no place in the present litigation. The Court is asked to look the other way and accept the military's judgment that its isolation regime advances prison security. It would have the court substitute the rhetoric of judicial deference for meaningful scrutiny of constitutional claims in a prison setting.

In fact, Petitioners are in Camp 6 for punitive reasons. All 17 Uighurs were condemned to isolation in Camp 6 in June 2007 as collective punishment for the acts of two unidentified individuals. Gilson Decl. ¶ 5. Indeed, the government makes the case for two of the Petitioners – admitting that they were put back into Camp 6 (from Camp 1 where they were housed from March 2007 until June 2007) as punishment for infractions that may or may not accurately describe their behavior. Declaration of Bruce E. Vargo ("Vargo Decl.") ¶ 12. Because the government's only evidence – a Declaration from the Commander of the Joint Detention Group (JDG) for the Joint Task force at Guantanamo ("JTF-GTMO") – does not address any alleged infractions by the other four Uighur prisoners still in Camp 6, it supports Petitioners' contention that the Uighurs were arbitrarily and capriciously punished as a group when they were transferred together to Camp 6 from Camp 1 in June 2007. *Id.*

In classic double-speak, the government claims that Petitioners are not in solitary, but are housed in "single cell detention maximum security facilities" that are "comparable to and modeled after" similar facilities in the United States. Vargo Decl. ¶7. The United States employs such "supermax" prisons to isolate and punish its most violent and dangerous offenders. Declarations from Petitioners' counsel detail the significant negative effects these men manifest as a result of being confined to their cells for up to 22 hours a day. The government conspicuously fails to address the deteriorating mental health of the Uighurs in Camp 6 (including attempted suicide by hunger strikes and other methods) and instead paints a duplicitously-bland picture of life in this "tomb above the ground" as the notorious Camp 6 prison is referred to by the prisoners.

The government euphemistically describes Camp 6 as filled with bonhomie: prisoners have "communication with recreation privileges with other detainees, as well as library access and the ability to participate in uninterrupted group prayer." Vargo Decl. ¶ 7. The government's description deliberately and invidiously neuters the cruel realities of Camp 6. "Recreation" is kicking a ball around a 3x4 meter caged area; the "library" consists of a cart of tattered and dog-eared Uighur books. Willett Decl. ¶ 8-10.

"Free communication is not discouraged," opines Col. Vargo. *Id.* ¶7. In reality, this "free communication" requires prisoners to shout through the food slot (when it is unsecured from the outside) in the hope of being heard over the clanking of the ventilation system and the reverberations from the uninsulated cell block, the chatter of guards who pass by every three minutes, and the cries of other prisoners also trying to communicate. Willett Decl. ¶8-10. And there is the sound of Petitioner Mahmud, who is

plagued by voices that tell him to shout out loud and engage in disruptive behavior. Gilson Decl. ¶ 6.

Clearly, such conditions are punitive. This conclusion is bolstered by the provisions of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3317 ("GPW").[2] Article 21 of the GPW bars close confinement except where necessary to safeguard a prisoner's health. However, in Camp 6, Petitioners are subject to conditions of close confinement 24 hours a day, counting the "rec" time spent in a holding pen. Article 87 of the GPW prohibits the imprisonment of a prisoner in premises without daylight. However, "[c]ontrary to international standards, the cells [in Camp 6] have no access to natural light or air, and are lit by fluorescent lightning which is on 24 hours a day and controlled by guards. Amnesty International, *Cruel and Inhuman: Conditions of isolation for detainees at Guantanamo Bay* (April 2007)("Amnesty Report") at 4. Article 26 of the GPW requires that adequate premises be provided for messing. However, each Petitioner eats each of his meals alone in his cell. Vargo Decl. ¶ 5 (Camp 4, as opposed to Camp 6, has communal dining facilities). Articles 25 and 27 of the GPW require that a prisoner's premises be adequately heated and that he or she be afforded adequate clothing for the conditions. Petitioners consistently complain "of being too cold in the steel cells, with the air-conditioning turned up too high." Amnesty Report at 4; Gilson Decl. ¶ 5.

---

[2] As the *Parhat* case demonstrates, Petitioners are all civilians who were wrongfully determined to be enemy combatants. Although Petitioners have not been subjected to a trial, they are presumptive prisoners of war. Petitioners' treatment, which does not meet the requirements to which they are entitled as presumptive prisoners of war under the GPW, amounts to punishment.

6

Clearly, conditions in Camp 6 – which on their face violate the provisions of the international treaty relative to conditions of prisoners of war, exceed conditions in any penal facility in the federal system, including the supermax prisons where *convicted* felons are housed with access to television and visits from family.

The government avers that Petitioners' incarceration in Camp 6 is for reasons of security, and that the Court should trust its judgment on this. However, the fact that the isolation regime – without a doubt – advances prison security does not make it ipso facto constitutional. And in this case, the government has *admitted* that incarceration in Camp 6 is to punish alleged misconduct, and that if Petitioners would only behave, they could extricate themselves from the punitive regime. Resps. Memo at 16 ("petitioners are housed in Camp 6 because they have been noncompliant and have committed infractions of the facility rules. . . .")

As the Supreme Court recognized in *Bell v. Wolfish,* 441 U.S. 520 (1979) a pretrial detainee bringing a *habeas* challenge to his conditions of confinement must show that the conditions are the product of punitive intent. *Id.* at 538-39 and nn. 19 and 20. Justice Blackmun discussed this burden in *Block v. Rutherford,* 468 U.S. 576 (1984) stating:

> When a constitutional challenge to prison conditions necessarily places the good faith of prison administrators at issue, I regard it as improper to make the plaintiff prove his case twice by requiring a court to defer to administrators' putative professional judgment. Instead, I think it sufficient to rest on the substantive due process standard announced in *Bell v. Wolfish* itself: absent direct proof of punitive intent, a "court permissibly may infer that the purpose of [a challenged] governmental action is punishment" if, but only if, the action "is not reasonably related to a legitimate goal." *Id.* at 539.
>
> . . .

7

> I recognize that constitutional challenges to prison conditions . . . pose a danger of excessive judicial intervention. At the same time, however, careless invocations of "deference" run the risk of returning us to the passivity of several decades ago, when the then-prevailing barbarism and squalor of many prisons were met with a judicial blind eye and a "hands off" approach.

*Block v. Rutherford,* 468 U.S. 593 -94 (concurring with the judgment).

In this case, Petitioners have provided direct evidence of punitive intent contained in the Vargo Declaration, and this Court can reasonably infer the same. These Petitioners – whom the military admits have been cleared for release, who are not enemy combatants, and who are innocent prisoners of war – are being punished by incarceration in a maximum security facility of the type that is reserved for the one-percent of America's most dangerous convicted felons. There is no legitimate goal in housing these men in maximum security isolation, and the motion for parole to Camp 4 should be granted. Alternatively, to allay the government's fears of court interference, the Court can consider paroling the men to a facility in the United States, where the Court can impose some basic rules of human decency without having to endure the insulting accusation that it is "micro-managing" the military.

## II.  PETITIONERS HAVE DEMONSTRATED THE NEED FOR INJUNCTIVE RELIEF

In opposing the TRO the government relies on an unrevised brief prepared in connection with an earlier motion in *Kabir v. Bush,* which Judge Robertson denied as moot at the time the case was transferred to Judge Urbina. Many of the statements – particularly those regarding the health of the prisoners – are not applicable to the motion before the Court. Contrary to the government's assertions, Petitioners have in the motion

now pending raised more than "conclusory allegations [that] fail to state any reason for this Court to believe that their lives or health is at risk." The detailed declarations establish that these Petitioners are suffering, and will suffer, increased and accelerated mental harm from the close conditions of confinement, which could gravely interfere with their prospects for settlement. Indeed, it is *predictable* that Petitioners – who have been told for years that they are eligible for release, but who have seen no relief – will deteriorate in these deplorable conditions. *See* Jeffery Klugar, *Are Prisons Driving Prisoners Mad?* Time, Jan. 26, 2007 (citing reports that these prisons drive their prisoners insane and noting that the isolation in these prisons is a type of "touchless torture").[3] *See also, Locked Up Alone – Detention Conditions and Mental Health at Guantánamo*, Human Rights Watch, June 2008, at 20 ("HRW Report"), *available at* http://www.hrw.org/reports/2008/us0608/us0608web.pdf.

Similarly, Respondents will not suffer comparable harm if the injunction is granted. Petitioners have demonstrated (and the government has admitted) that the isolation regime of Camp 6 is punitive. Clearly the near-complete lockdown of innocent men must be viewed as excessive in relation to any claim that doing so helps to maintain order and security in the prison. Confining the men in their cells 22 hours a day is hardly an incident of some other legitimate government purpose. It is arbitrary and punitive. Moving Petitioners to Camp 4 while they await their *habeas* hearing imposes no greater burden on the government than already exists.

---

[3] The supermax facilities also raise serious constitutional questions. Currently, at least seven states are facing charges that their supermax facilities are a form of cruel and unusual punishment.

9

The Vargo Declaration, ¶ 4, describes an incident that allegedly occurred in Camp 4 in 2006. There is no evidence or allegation that the incident involved the Uighur Petitioners; indeed, there is no evidence in the record concerning any disciplinary problems caused by four of the six Petitioners.[4] Moreover the Declaration claims that "[o]nce in Camp 4, a detainee is subject to immediate removal for acts of indiscipline [sic] and can be removed for a failure to assimilate into the current population." *Id.* Surely, if all detainees in Camp 4 are being monitored so closely, the addition of Petitioners will not require any additional measures.

As for the likelihood of success on the merits, the *Parhat* finding of innocence is dispositive in these cases, which involve identical government information and allegations. Specifically, the Court noted that the government's "evidence" was derived entirely from four intelligence reports describing ETIM's "activities and relationships as having 'reportedly' occurred, as being 'said to' or 'reported to' have happened, and as things that are 'suspected of' having taken place." *Parhat* at *23.[1] Because the reports failed to identify any underlying source for who may have "reported," "said," or "suspected" such things, the Court found the reports inherently unreliable. *Id.* at *24. The Court held that, as a matter of law, the government's "bare assertions cannot sustain the determination that Parhat is an enemy combatant." *Id.* at *24. The government's

---

[4] The Vargo Declaration details a history of infractions purportedly committed since 2003 by two other Petitioners. It is not clear what the procedures are for placing an infraction report in the prisoner's record, but it should be noted that the disciplinary incidents were not deemed to be serious enough to bar transfer to the less-restrictive Camp 4 between 2003 and 2006, Willett Decl. ¶¶ 27-29, or to Camp 1 in March of 2007. These Petitioners – and other Uighurs – were housed in Camp 1 until the time they were all transferred to Camp 6 for the indiscretions of an unknown few. Gilson Decl. ¶ 5.

evidence is no better in Petitioners' cases, and, accordingly, they are likely to succeed once the Court reaches the merits of their *habeas* cases.

In addition to the other elements necessary for the entry of a Temporary Restraining Order and Preliminary Injunction, there exists in these cases a clear public interest in preventing the government from detaining innocent individuals in astonishingly harsh, and potentially deadly isolation, particularly where the government has no lawful basis to detain them. *See Al-Fayed v. CIA*, 254 F.3d 300, 304 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

The Court simply must not "turn a blind eye" to the plight of these Petitioners.

**CONCLUSION**

Petitioners request that their Motion be allowed, and that they be granted such other and further relief as may be just and proper.

Dated: August 2, 2008

COUNSEL FOR PETITIONERS:

J. Wells Dixon(Pursuant to LCvR 83.2(g))
Wdixon@ccr-ny.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6423
Facsimile: (212) 614-6499
*Of Counsel for all Petitioners*

Eric A. Tirschwell (Pursuant to LCvR 83.2(g))
Michael J. Sternhell (Pursuant to LCvR 83.2(g))
Darren LaVerne (Pursuant to LCvR 83.2(g))
Seema Saifee (Pursuant to LCvR 83.2(g))
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel to Petitioner Adel Noori*

/s/ Elizabeth P. Gilson
Elizabeth P. Gilson(Pursuant to LCvR 83.2(g))
egilson@snet.net
383 Orange Street
New Haven, CT 06511
Telephone:(203) 777-4050
Facsimile: (203) 787-3259
*Counsel to Petitioners Bahtiyar Mahnut and Arkin Mahmud*

Susan Baker Manning
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC 20036-3406
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

Sabin Willett (Pursuant to LCvR 83.2(g))
Neil McGaraghan (Pursuant to LCvR 83.2(g))
Rheba Rutkowski (Pursuant to LCvR 83.2(g))
Jason S. Pinney (Pursuant to LCvR 83.2(g))
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 951-8000
Facsimile: (617) 951-8736
*Counsel to Petitioners Hammad Memet, Khalid Ali, and Edham Mamet*